Approved: _____
ARLO DEVLIN-BROWN
Assistant United States Attorney

Before:   THE HONORABLE DEBRA FREEMAN
          United States Magistrate Judge   12 MAG 2985
          Southern District of New York

- - - - - - - - - - - - - - - X     SEALED COMPLAINT

UNITED STATES OF AMERICA          :   Violations of
                                      18 U.S.C. § 371; 15 U.S.C
            - v. -                :   §§ 78j(b), 78ff; 17 C.F.R
                                      § 240.10b-5
MATHEW MARTOMA,                   :
                                      COUNTY OF OFFENSE:
            Defendant.            :   NEW YORK

- - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        Matthew T. Callahan, being duly sworn, deposes and
says that he is a Special Agent with the Federal Bureau of
Investigation ("FBI"), and charges as follows:

COUNT ONE
(Conspiracy to Commit Securities Fraud)

        1.    From in or about 2006 through in or about July
29, 2008, in the Southern District of New York and elsewhere,
MATHEW MARTOMA, the defendant, and others known and unknown,
willfully and knowingly did combine, conspire, confederate and
agree together and with each other to commit offenses against
the United States, to wit, securities fraud, in violation of
Title 15, United States Code, Sections 78j(b) and 78ff, and
Title 17, Code of Federal Regulations, Section 240.10b-5.

        2.    It was a part and object of the conspiracy that
MATHEW MARTOMA, the defendant, and others known and unknown,
willfully and knowingly, directly and indirectly, by the use of
means and instrumentalities of interstate commerce, and of the
mails, and of facilities of national securities exchanges, would
and did use and employ, in connection with the purchase and sale
of securities, manipulative and deceptive devices and
contrivances in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5 by: (a) employing devices,

schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon the purchaser and seller, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

Overt Acts

3.    In furtherance of the conspiracy and to effect its illegal object, the following overt acts, among others, were committed by MATHEW MARTOMA, the defendant, among others, in the Southern District of New York and elsewhere:

a.    On or about October 16, 2006, MARTOMA met in Manhattan, New York with a doctor involved in an Alzheimer's disease drug trial (the "Drug Trial") being conducted by Elan Corporation, PLC ("Elan") and Wyeth.

b.    On or about October 9, 2007, MARTOMA obtained confidential data relating to the Drug Trial during a meeting arranged through a consulting business located in Manhattan, New York.

c.    On or about July 17, 2008, MARTOMA obtained confidential final results of the Drug Trial.

d.    On or about July 20, 2008, MARTOMA spoke to the owner (the "Hedge Fund Owner") of the affiliated hedge funds (collectively, the "Hedge Fund") where he was employed and recommended selling Elan and Wyeth securities before the drug trial results were publicly announced.

e.    On or about July 21, 2008, MARTOMA and the Hedge Fund Owner instructed a Hedge Fund trader to begin selling the Hedge Fund's entire position in Elan securities, which are traded on the New York Stock Exchange ("NYSE") in Manhattan, New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud - Elan)

4.   In or about July 2008, in the Southern District
of New York and elsewhere, MATHEW MARTOMA, the defendant,
willfully and knowingly, directly and indirectly, by the use of
means and instrumentalities of interstate commerce, the mails
and the facilities of national securities exchanges, in
connection with the purchase and sale of securities, did use and
employ manipulative and deceptive devices and contrivances, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by (a) employing devices, schemes and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading; and (c) engaging in acts,
practices and courses of business which operated and would
operate as a fraud and deceit upon persons, to wit, before Elan
and Wyeth publicly disclosed the final results of an Alzheimer's
disease drug trial on July 29, 2008, MARTOMA obtained material,
nonpublic information about the results and, based in whole or
in part on that information, caused the Hedge Fund to sell
common stock of Elan and enter into options transactions
relating to Elan in advance of the public announcement and in
anticipation of a negative market reaction to the announcement.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE
### (Securities Fraud - Wyeth)

5.   In or about July 2008, in the Southern District
of New York and elsewhere, MATHEW MARTOMA, the defendant,
willfully and knowingly, directly and indirectly, by the use of
means and instrumentalities of interstate commerce, the mails
and the facilities of national securities exchanges, in
connection with the purchase and sale of securities, did use and
employ manipulative and deceptive devices and contrivances, in
violation of Title 17, Code of Federal Regulations, Section
240.10b-5, by (a) employing devices, schemes and artifices to
defraud; (b) making untrue statements of material facts and
omitting to state material facts necessary in order to make the
statements made, in the light of the circumstances under which
they were made, not misleading; and (c) engaging in acts,

practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, before Elan and Wyeth publicly disclosed the final results of an Alzheimer's disease drug trial on July 29, 2008, MARTOMA obtained material, nonpublic information about the results and based in whole or in part on that information, caused the Hedge Fund to sell common stock of Wyeth in advance of the public announcement and in anticipation of a negative market reaction to the announcement.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

6.     I have been a Special Agent with the Federal Bureau of Investigation for approximately three-and-a-half years.  I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses.  I have been involved in investigations of these offenses and in arresting individuals for participating in such offenses.

7.     The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources of information and agents, including, but not limited to: (a) witness interviews and sworn testimony; (b) information received from the Securities & Exchange Commission ("SEC"); (c) telephone and financial records; (d) business records of the Hedge Fund, Elan and other entities; (e) trading records from banks and broker-dealers; (f) e-mails and other documents prepared and received by MATHEW MARTOMA, the defendant, and others; and (g) publicly available records. Because this affidavit is prepared for a limited purpose, I have not included each and every fact I have learned in connection with this investigation.  Moreover, the investigation is ongoing.  Where conversations and events are referred to herein, they are related in substance and in part.  Where dates, figures, and calculations are provided, they are approximate, and subject to further revision.

Relevant Entities and Individuals

8.   At all relevant times, the Hedge Fund was a privately held group of affiliated funds and associated fund advisers which was founded, owned and principally managed by the Hedge Fund Owner, and which maintained offices in Connecticut and Manhattan, New York among other places.

9.   At all relevant times, MATHEW MARTOMA, the defendant, served as a portfolio manager for a division of the Hedge Fund, where he specialized in the health care sector.  In addition to making investment decisions in a portfolio MARTOMA personally controlled, MARTOMA, like other portfolio managers at the Hedge Fund, recommended investment ideas to the Hedge Fund Owner for inclusion in other portfolios, including a portfolio managed by the Hedge Fund Owner.  MARTOMA, like other Hedge Fund portfolio managers, was compensated based on a percentage of the annual profits in his own portfolio and the profitability of investments recommended by MARTOMA to the Hedge Fund Owner.

10.   At all relevant times, an individual referred to as the Cooperating Witness, or CW, a co-conspirator not named as a defendant herein, was a Professor of Neurology at a leading medical school and a neurologist at the hospitals affiliated with the medical school, and the director of an Alzheimer's disease research center.[1]  The CW was widely regarded as a leading expert in various neurological diseases, including Alzheimer's disease.  In addition to his academic work, the CW served as a paid consultant to various other entities, including, as is relevant here, the following:

a.   At all relevant times, the CW worked as a consultant to Elan and served as the chair of the Safety Monitoring Committee ("SMC") in connection with the phase II clinical trial (the "Drug Trial") of an Alzheimer's disease drug in development by Elan and Wyeth known as AAB-001 or

---

[1]   The CW has entered into a non-prosecution agreement with the United States Attorney's Office for the Southern District of New York.  It is my judgment that the information provided by the CW referred to in this Compliant is credible because, among other things, it is corroborated in part by other investigative sources.

bapineuzumab, and referred to by some as "bapi."[2]

      b.   In addition, at all relevant times, the CW was a consultant with a Manhattan-based expert networking firm (the "Expert Networking Firm") and engaged in paid consultation with financial industry clients on matters within the CW's expertise.

      11.   At all relevant times, Elan was a corporation headquartered in Dublin, Ireland that operated as a biopharmaceutical company.  Elan's stock traded on the Irish Stock Exchange, the London Stock Exchange and, through the issuance of American Depository Receipts (or "ADRs"), on the New York Stock Exchange ("NYSE") under the ticker symbol "ELN."[3]

      12.   At all relevant times, Wyeth was a Delaware corporation headquartered in New Jersey that operated a biopharmaceutical company.  Wyeth's common stock was registered with the SEC and listed on the New York Stock Exchange under the ticker symbol "WYE."

---

[2]   Clinical trials of experimental drug treatments are conducted in a series of steps, called phases.  Phase I trials test a new drug or treatment in a small group of people to evaluate whether it is safe.  Phase II trials test the drug or treatment in a somewhat larger group of people to see if it is effective and to further evaluate safety.  Phase III trials test the drug or treatment on large groups of people to confirm effectiveness, monitor side effects, compare results to existing treatment, and gather information regarding safe and effective use.

[3]   An ADR is a security issued by a United States bank that gives its holder the right to obtain one or more shares of a publicly traded foreign company.  The stocks of most foreign companies that trade on United States stock exchanges are traded as ADRs.  For convenience, this Complaint refers to transactions by the Hedge Fund in Elan ADRs simply as transactions in Elan shares or Elan stock.

## Overview Of The Insider Trading Scheme[4]

13.   Between the summer of 2006 and mid-July 2008, MATHEW MARTOMA, the defendant, arranged for approximately 42 paid consultations with the CW through the Expert Networking Firm.   In these consultations, through an exploitation of MARTOMA's personal and financial relationship with the CW, MARTOMA sought and obtained from the CW material, nonpublic information ("Inside Information") about the Drug Trial, including generally positive safety data which the CW was privy to through his participation in the Safety Monitoring Committee and which the CW was explicitly required to keep confidential by Elan.   Based in part on this positive Inside Information, MARTOMA bought shares in Elan and Wyeth for his own portfolio. In addition, at MARTOMA'S recommendation, the Hedge Fund Owner also bought shares of Elan and Wyeth for the Hedge Fund.

14.   On or about June 17, 2008, Elan and Wyeth issued a press release announcing what they characterized as "encouraging top-line results" for the Drug Trial, while noting that the "detailed data presentation" would not occur until the International Conference on Alzheimer's Disease ("ICAD") on July 29, 2008 (the "ICAD Presentation").   The market reacted positively to the press release, and, following the announcement, the Hedge Fund continued to purchase shares of Elan and Wyeth stock, ending the month of June 2008 with approximately $700 million worth of Elan and Wyeth stock.

15.   In or around late June 2008, Elan selected the CW to present the detailed Drug Trial data to the public at the ICAD conference.   In order to enable the CW to make the presentation, Elan provided the CW for the first time with still-secret data regarding bapineuzumab's efficacy – i.e. the drug's ability to treat Alzheimer's disease – on or about July 15 and July 16, 2008.   On or about July 17, 2008 the CW provided MATHEW MARTOMA, the defendant, with the confidential data he had just received from Elan.   The confidential data showed that Alzheimer's disease symptoms in patients taking the drug consistently got worse over time, as opposed to stabilizing or even improving.   While a particular subset of trial participants taking the drug got worse at a somewhat slower rate than

---

[4]      This overview is based on my conversations with the CW and other witnesses, my review of the business records of Elan, the Expert Networking Firm, the Hedge Fund, and other sources, as described in more detail herein.

7

patients taking a placebo, the data raised significant questions about whether the difference was simply a matter of chance rather than proof that the drug worked.  In short, the data was negative as to bapineuzumab.

16.    After receiving the negative confidential data from the CW, MARTOMA, through a recommendation to the Hedge Fund Owner, caused the Hedge Fund to sell its entire approximately 10.5 million share position in Elan and approximately seven million shares of Wyeth prior to the ICAD Presentation.  The Hedge Fund also "shorted" the stocks of Elan and Wyeth, effectively betting that the price of the stocks would decrease after the data was made public at the ICAD Conference.  The day after the negative data was announced at the ICAD Conference, shares of Elan stock lost approximately 42% of their value and shares of Wyeth stock fell approximately 12%.  The Hedge Fund's combined profits and avoided losses through the sale of Elan and Wyeth stock and related options activity between July 21, 2008 and the public announcement at the ICAD conference is estimated to be approximately $276 million.

### Obligations To Maintain The Confidentiality Of The Drug Trial Data

17.    I have reviewed the consulting agreement between Elan and the CW that covered the CW's participation in the Drug Trial.  The agreement provided that "any and all information which Elan may disclose to the Consultant under this Agreement will be considered confidential . . . ."  In addition, the Operating Guidelines for the Safety Monitoring Committee for the Drug Trial provided that Elan alone had responsibility to make:

> any and all regulatory, private and or public disclosures as it relates to any and all data, safety, efficacy, or otherwise, as it pertains to these clinical trials [and] specifically to the AAB-001 program, in part or in general.  As such, strict confidentiality will be maintained by all SMC members in accordance with written agreements with [Elan] and at least until the multi-center publication has been made public or an SMC member obtains prior, written permission from [Elan] to disclose any confidential information.

8

18.    Based on my review of the Hedge Fund's business records and my discussions with individuals with knowledge of the Hedge Fund's policies, I know that MATHEW MARTOMA, the defendant, was forbidden by written Hedge Fund policy from trading on the basis of Inside Information.  For example, a Hedge Fund document entitled "Code of Ethics" in effect during MARTOMA's employment expressly prohibited employees from trading on "material nonpublic information," which the document described as "any information that has not been made available to the public if the information could affect the market price of specific Securities and a reasonable investor would attach importance to it in deciding whether to buy, sell or retain such Securities."  The Code of Ethics contained a bold-faced paragraph cautioning employees to be conscious of insider trading rules "when communicating with potential sources of market information such as . . . doctors conducting clinical trials. . . . ."  The Code of Ethics further warned that insider trading could lead to "criminal prosecution by the United States Attorney."

19.    Based on my review of Hedge Fund and Expert Networking Firm business records, I have learned that MATHEW MARTOMA, the defendant, was also expressly advised by the Expert Networking Firm that its experts were forbidden from disclosing Inside Information during the consultations.  Indeed, in multiple instances the Expert Networking Firm advised MARTOMA expressly that the CW was involved in bapineuzumab trials and was not permitted to discuss bapineuzumab with MARTOMA.  For example, in an e-mail dated June 25, 2008 from the Expert Networking Firm to MARTOMA confirming a consultation that MARTOMA had requested of the CW, the Expert Networking Firm included a form notice stating that the consulting expert "will not reveal any information that the [expert] has a duty to keep confidential, including material non-public information."  The e-mail further provided that experts "participating in clinical trials may not discuss the patient experience or trial results not yet in the public domain."  The confirmatory e-mail also expressly stated that the CW was "unable to discuss" bapineuzumab due to his involvement in clinical trials.

9

## The CW's Access To Inside Information Regarding The Safety Of Bapineuzumab Through The Safety Monitoring Committee

20.   I have learned from conversations with the CW and other witnesses, as well as from review of business records from Elan and other entities, that Alzheimer's disease patients typically have abnormally high levels of beta-amyloid plaque deposits within their brains.   Bapineuzumab was developed as an experimental Alzheimer's disease treatment intended to remove these plaque deposits which, it was hoped, would in turn meaningfully slow or even potentially halt the progress of the disease.   The phase II clinical trial of bapineuzumab was designed to measure the results on tests of cognition and function of patients receiving varying doses of bapineuzumab on the one hand and patients receiving only a placebo on the other hand.   Approximately 234 patients participated in the trial. The results of the phase II trial were eagerly anticipated by the scientific community – as well as investors – as an important indicator of whether novel drugs of this type could work.

21.   I have learned from conversations with the CW and other witnesses, as well as from my review of business records from Elan and other entities, that the phase II clinical trial of bapineuzumab was "double blinded," meaning that neither the patients nor doctors who administered the test knew which patients were receiving a placebo and which were receiving the actual drug.   In order to provide for patient safety over the course of the trial, however, Elan provided partially "unblinded" safety data to members of the Safety Monitoring Committee.   Specifically, the SMC members received from Elan confidential periodic reports relating to patients who experienced "serious adverse events" (or "SAEs") during the trial.   The data in these confidential reports identified whether the patients who experienced the SAEs were taking the placebo or the drug and, for those taking the drug, the amount of the dose.   The CW and other members of the SMC were not provided with data regarding the efficacy of the drug, such as how patients taking the drug were performing on the various cognitive and life abilities tests.

<u>MARTOMA Obtains Positive Inside Information About The Safety Of</u>
<u>Bapineuzumab Acquired By The CW Through SMC Meetings</u>

     22. Between the summer of 2006 and mid-July 2008, MATHEW MARTOMA, the defendant, arranged approximately 42 paid consultations with the CW through the Expert Networking Firm, according to the Expert Networking Firm's business records. For example, on or about August 21, 2006, August 23, 2006, August 30, 2006 and October 3, 2006, MARTOMA requested through the Expert Networking Firm a consultation with the CW on "AAB-001 [another name for bapineuzumab] for the treatment of patients with Alzheimer's Disease." On or about October 16, 2006, MARTOMA arranged through the Expert Networking Firm for an in-person visit with the CW at the Hedge Fund's Manhattan office regarding "Alzheimer's Disease."

     23. Based on my review of business records of Elan and the Expert Networking Firm, together with phone records and electronic calendar entries, I have learned that MATHEW MARTOMA, the defendant, arranged through the Expert Networking Firm to consult with the CW after the SMC meetings took place, and that in fact, such consultations occurred on a regular basis very shortly after SMC meetings. The chart below shows the date and, in some cases, the approximate time of CW Expert Networking Firm consultations with MARTOMA in relation to SMC meetings at which the CW obtained from Elan confidential information about the safety of bapineuzumab:

| CW Attends Elan SMC Meeting | MARTOMA-CW Consultation |
| --- | --- |
| November 21, 2006 | November 22, 2006 |
| February 8, 2007 | February 9, 2007 |
| October 9, 2007, 10:00 a.m. | October 9, 2007, 4:00 p.m. |
| March 18, 2008, 11:00 a.m. | March 18, 2008, 4:00 p.m. |
| July 11, 2008 | July 13, 2008 |

     24. Additionally, e-mails reflect that MATHEW MARTOMA, the defendant, arranged with the CW to move a planned Expert Networking Firm consultation so that it would occur after a delayed SMC meeting had been rescheduled. Specifically, on or about August 22, 2007, MARTOMA requested that the Expert Networking Firm arrange a consultation with the CW regarding "therapies for Alzheimer's Disease." The next day, August 23, 2007, the CW sent an e-mail to MARTOMA reading "Mathew, The SMC teleconference will be postponed until the following week. Should we postpone our planned teleconference until a more

11

definite date has been established?"  On or about August 28, 2007, the CW forwarded to MARTOMA an e-mail from Elan containing potential dates for an SMC meeting with the comment "Mat / For your information.  I will inform you about the time that [the Elan employee] sets for the conference call."  On or about September 5, 2007, the CW forwarded another Elan e-mail to MARTOMA regarding SMC scheduling that proposed an in-person meeting of the SMC on October 9, 2007.  The CW and MARTOMA then arranged to speak and did in fact speak on October 9, 2007, a few hours after the SMC meeting had finished.

    25.  Based on my conversations with the CW and other witnesses, my review of the business records of Elan and the Hedge Fund, and other sources, I have learned the following about communications between the CW and MATHEW MARTOMA, the defendant, in relation to the SMC meetings:

    a.    During consultations following the SMC meetings, the CW provided the confidential drug safety data he had learned from Elan to MARTOMA.  Among other things, the CW discussed with MARTOMA charts provided by Elan to SMC members detailing the instances of serious adverse effects, or "SAEs," in patients receiving various doses of bapineuzumab versus a dose of the placebo.

    b.    During consultations after the March 18, 2008 SMC meeting, the CW read to MARTOMA data Elan had provided to SMC members reflecting the number of patients in each of the four dosage groups who were still participating in the study at the time of the sixth and final administration of the drug.  Upon later learning that a math error in the Elan data made it appear that a large number of patients had dropped out of the trial before receiving this final dose, the CW wrote the following in an April 30, 2008 e-mail to MARTOMA that the CW started with the note "** For Your Eyes Only **:"

    Interestingly enough, I was just thinking about you this morning.  The high dropout rate in the Bap study has continually puzzled me, as in tracking back through the safety data, I don't find much in the way of reason for such a high rate.  Oddly enough, you and I have gone through this previously, but recall that the numbers [of patients still remaining in the trial] in the 6th

12

dose were: 37, 42, 45, and 40, and yet the
bottom line reads 126 in the material from
Elan.  Simple addition, which I thought we
had done, yields 164, not 126!

These and other figures included in this April 30, 2008 e-mail
correspond exactly – math errors and all - to a slide in a
confidential PowerPoint presentation made to the SMC meeting on
or about March 18, 2008.

      c.  During consultations with MARTOMA, the CW
also discussed his view that the SMC data showed that
bapineuzumab was reasonably safe for a drug of its kind, with
side effects broadly consistent with expectation.  The CW
further told MARTOMA that the fact that a particular side effect
was observed only in patients taking the drug (and not the
placebo), and that the side effect occurred more frequently in
patients taking higher doses of the drug, indicated that the
drug was likely attacking the beta-amyloid plaque just as the CW
had hoped.  While by no means definitive, this apparent "dose-
response" relationship was a positive sign that the drug could
be effective in treating Alzheimer's disease.

<u>The Hedge Fund Accumulates A Substantial Long Position In Elan
    And Wyeth Stock Following MARTOMA's Recommendation</u>

      26.  From my review of trading and position records
provided by the SEC and the Hedge Fund, I am familiar with the
Hedge Fund's investments in the securities of Elan and Wyeth,
the joint partners in bapineuzumab's development.  Beginning in
approximately late 2007, and continuing through approximately on
or about July 18, 2008, the Hedge Fund amassed a large position
in Elan and Wyeth securities.  According to reports filed with
the SEC, the Hedge Fund held approximately $328 million of Elan
equity securities and approximately $373 million of Wyeth equity
securities as of June 30, 2008.

      27.  From my review of Hedge Fund business records and
interviews and sworn statements of individuals associated with
the Hedge Fund, I have learned that the Hedge Fund's long
position on Elan and Wyeth increased following the
recommendation of MATHEW MARTOMA, the defendant.  In or about
late 2007 or early 2008, MARTOMA, who was buying Elan and Wyeth
securities for the portfolio he controlled, recommended that the
Hedge Fund Owner acquire additional Elan and Wyeth shares for

the Hedge Fund.  MARTOMA told the Hedge Fund Owner, in substance
and among other things, that he believed that the Drug Trial
would go well. Following this, the Hedge Fund Owner acquired
significant Elan and Wyeth holdings in portfolios controlled by
the Hedge Fund Owner.

        28.  From my review of Hedge Fund business records and
interviews and sworn testimony of individuals associated with
the Hedge Fund, I have learned that the recommendation of MATHEW
MARTOMA, the defendant, to the Hedge Fund Owner to acquire a
substantial Elan and Wyeth position was vocally opposed by
several others at the Hedge Fund who argued to MARTOMA and the
Hedge Fund Owner that uncertainty surrounding the Drug Trial
results made such an investment far too risky.  The Hedge Fund
Owner consistently backed MARTOMA against the naysayers, citing
among other things MARTOMA's conviction in his recommendation.
For example, in an instant message on or about March 28, 2008
with one of Hedge Fund health care experts who opposed the long
position, the Hedge Fund Owner wrote that MARTOMA anticipated
positive news from the Drug Trial and that MARTOMA was the one
"closest" to it.

        <u>Elan And Wyeth Issue A Press Release Announcing High-Level
        Summary Of Drug Trial Findings, But Not Detailed Results</u>

        29.  On or about June 17, 2008, before the stock
market opened, Elan and Wyeth issued a press release (the "June
17 Press Release") announcing the "top line" results of the
bapineuzumab trial but not the actual trial data itself.  The
press release stated that while "the study did not attain
statistical significance" in terms of showing a general
difference between patients taking the drug compared to patients
taking the placebo, the study did show "statistically
significant and clinically meaningful benefits" in patients who
did not have a particular gene, ApoE4 (the "Non-Carriers").  The
June 17 Press Release did not say, however, whether the Non-
Carriers who were taking bapineuzumab actually improved, simply
stopped getting worse, or merely continued to get worse but just
at a slower rate than patients not taking the drug.  Nor did the
June 17 Press Release provide detailed data enabling investors
to assess whether the benefit to the Non-Carriers was likely due
to the drug working as opposed to other factors, including mere
chance.  Instead, the June 17 Press Release announced that the
companies would make a "Detailed Data Presentation At ICAD July
29, 2008" (as previously defined, the "ICAD Presentation").

30.   Trading records reflect that the market reacted positively to the June 17 Press Release.  Elan had been trading at approximately $27.11 per share immediately prior to the issuance of the June 17 Press Release, and rose to approximately $30 per share immediately after the announcement.  Between June 19, 2008 and the ICAD Presentation, shares of Elan traded between approximately $31.90 and $36.82 per share.  The Hedge Fund, at the recommendation of MATHEW MARTOMA, the defendant, also continued to maintain a large position in Elan and Wyeth following the June 17, 2008 Press Release.  On or about June 30, 2008, MARTOMA e-mailed the Hedge Fund Owner "I think the stock [Elan] breaks $40 on the ICAD data . . . ."

31.   Although the market reacted positively to the June 17 Press Release, certain market analyst reports, which I have reviewed, stated in substance that the "top line" results lacked detail and that, in the words of one analyst, the "[p]resentation of a more complete data set at ICAD at the end of July will be a much anticipated event as investors should gain much greater insight into the drug's safety and efficacy." As another analyst put it, "clearly many questions remain and the ICAD meeting on the 29th of July should allow investors to fully drill into the data in more detail."  A third analyst wrote that the June 17 Press Release added "little to what we already knew on bapineuzumab" and that "[a]s a consequence, we await full Phase 2 results at ICAD next month to see if a disease modifying trend can be demonstrated. . . ."

<u>MARTOMA Obtains Negative Insider Information Shortly Before The Detailed Drug Trial Results Are Publicly Announced</u>

32.   Based on interviews with the CW and the review of contemporaneous business records from Elan and other sources, I have learned that, at the time of the June 17 Press Release, the CW remained "blinded" to data relating to bapineuzumab's efficacy and was privy only to safety data that had been previously presented to the SMC.  However, as set forth below, in mid-July 2008 the CW was given access to the detailed trial data from Elan and provided it to MATHEW MARTOMA, the defendant.

33.   Unless otherwise specifically stated, I have learned the following based on my interviews with the CW and other witnesses, my review of business records of Elan, the Hedge Fund, the Expert Networking Firm and other entities, and

other sources:

     a.   In late June 2008, a representative of Elan asked the CW to present the detailed results of the phase II bapineuzumab trial at the ICAD Presentation.  Then, on or about June 25, 2008 at approximately 11:02 a.m., the CW sent an e-mail to MATHEW MARTOMA, the defendant, with the subject "Some news" and stating "Please set up a [Expert Networking Firm] conversation re MS."  The CW suggested the subject of MS (multiple sclerosis) even though the "news" he was referring to was that he had been asked to report on the results at ICAD. This was done in order to avoid references in the Expert Networking Firm records to anything relating to the Drug Trial. At approximately 11:06 a.m., MARTOMA e-mailed his secretary, "Can u set up another [Expert Networking Firm] consult on MS therapies with [the CW]" and then, approximately one minute later, MARTOMA replied to the CW's e-mail "Done, can you talk now?"  At approximately 2:08 p.m., MARTOMA and the CW spoke by phone for approximately 20 minutes, and the CW told MARTOMA that the CW had been selected to make the ICAD Presentation announcing the Drug Trial results.

     b.   On or about July 7, 2008, the CW created an entry in his electronic calendar for an appointment on July 13, 2008 from 5:00 p.m. to 6:00 p.m. reading "Mat Martoma will call me re: SAEs in bap" [serious adverse effects in bapineuzumab]. The call was scheduled so the CW could brief MATHEW MARTOMA, the defendant, on the full safety data for the trial, which was to be discussed at the final SMC meeting on or about Friday, July 11, 2008.  However, to avoid creating a record that they would be discussing Inside Information, the CW and MARTOMA arranged to disguise the purpose of the consultation with the Expert Networking Firm.  Specifically, on or about Sunday, July 13, 2008, the CW emailed MARTOMA "Hi Mat, For today's call at 5 pm EDT, please: 1. Obtain [Expert Networking Firm] consent for us to speak, perhaps on Parkinson's disease and Rasagiline [a drug to treat Parkinson's disease]. . . ."  Expert Networking firm records reflect that MARTOMA made a request that same day to speak to the CW "regarding Rasagiline for Parkinson's Disease." At approximately 5:33 p.m., MARTOMA called the CW from his home and spoke to the CW for over one-and-a-half hours.  During the conversation, the CW described in detail the final safety data presented to the SMC, which the CW continued to interpret as largely positive.  While the call was in progress, both the CW and MARTOMA made entries in their electronic calendars

scheduling a further call on July 17, 2008.

        c.   On or about July 15, 2008, Elan flew the CW by private jet to San Francisco and, over the course of that day and the next, Elan and Wyeth "unblinded" the CW to the full results of the trial.  This was the first time that the CW had seen data on the efficacy of the drug rather than simply safety data.  The efficacy data was negative, particularly in comparison with market expectations following the June 17 Press Release.  First, the data reflected that the symptoms of Alzheimer's disease in patients taking the drug – including the Non-Carriers – continued to get markedly worse over the 18-month drug trial, rather than getting better or stabilizing.  Second, although Non-Carriers taking the drug completed the trial with somewhat better results than Non-Carriers taking the placebo, it was not clear from the data whether this change was caused by the drug as opposed to other factors, including chance, given the small size of the trial.  For example, the Non-Carriers taking the placebo suffered a sharp and apparently random decline in health towards the end of trial, which had the effect of making the Non-Carriers taking the drug look that much healthier. For another thing, and contrary to the CW's expectations, there was no sign in the data that the size of the dose of bapineuzumab a patient received had anything to do with how well or poorly a patient performed on the tests of cognition or function.

        d.   During the unblinding on July 15 and July 16, the CW worked with Elan personnel to create draft PowerPoint slides that the CW intended to present during the ICAD Presentation.  On or about July 17, 2008, after returning home from San Francisco, the CW received an e-mail from Elan with the subject "Confidential, Do Not Distribute," and which attached a 24-page document representing "the updated ICAD podium presentation slides, reflecting the combined edits of [the CW] and the Elan working group."  Later that day, at approximately 4:15 p.m., MARTOMA called the CW at his office, and spoke to him for approximately one hour and 45 minutes.  During the call, which was not set up through or reported to the Expert Networking Firm, the CW described and discussed in detail the Drug Trial results, including the data on the 24-page presentation that the CW had received earlier that day.  Additionally, the CW sent MARTOMA the 24-page draft presentation and provided MARTOMA with the password for the document so that he would be able to open it.

<u>MARTOMA Causes The Hedge Fund To Sell Elan And Wyeth Stock In
Advance Of The ICAD Announcement Based On The Negative Inside
Information Provided By The CW</u>

34.  Unless otherwise specifically stated, based on my
interviews with and/or review of transcripts of testimony of
current and former Hedge Fund employees, Hedge Fund business
records, SEC documents, phone records, and publicly available
information, among other sources, I have learned the following
about Hedge Fund trades caused by MATHEW MARTOMA, the defendant,
and others at the Hedge Fund, after MARTOMA obtained the
negative Drug Trial results from the CW prior to the ICAD
Presentation:

a.  On or about Sunday, July 20, 2008 at
approximately 8:52 a.m., MARTOMA e-mailed the Hedge Fund Owner
"Is there a good time to catch up with you this morning?  It's
important."  The Hedge Fund Owner replied approximately one hour
later with his cell phone number, and MARTOMA and the Hedge Fund
Owner subsequently spoke by phone at approximately 9:43 a.m. for
approximately 20 minutes.  As of July 20, 2008, the Hedge Fund
owned approximately 10.5 million shares of Elan stock.

b.  On or about Monday, July 21, 2008, the Hedge
Fund Owner and MARTOMA instructed the Hedge Fund Owner's senior
trader (the "Senior Trader") to begin selling the Elan position,
and to do so in a way so as to not alert anyone else, inside or
outside of the Hedge Fund.  At the end of that Monday, the
Senior Trader e-mailed MARTOMA that he had sold 1.5 million
shares of Elan that day, and that "obviously no one knows except
you me and [the Hedge Fund Owner]."

c.  On or about Tuesday, July 22, 2008, at
approximately 1:22 p.m., the Hedge Fund Owner sent an instant
message to MARTOMA, referring to sales of Elan stock, and
stating "we are done on 2.3 [million] today" for a "total 3.8
[million] in 2 days."  MARTOMA replied "my sense is today-thurs
are best days / so if possible to do more, would do so."
Following the instant message, the Hedge Fund sold additional
Elan stock, bringing the total shares sold to approximately 4.5
million by the end of the day.

d.  On or about Sunday, July 27, 2008, the
Senior Trader e-mailed the Hedge Fund Owner the results of the

week's activity:

> We executed a sale of over 10.5 million
> ELN for [four internal Hedge Fund
> account names] at an avg price of
> 34.21.  This was executed quietly and
> effectively over a 4 day period through
> algos and darkpools and booked into two
> firm accounts that have very limited
> viewing access.  This process clearly
> stopped leakage of info from either in
> [or] outside the firm and in my
> viewpoint clearly saved us some
> slippage.

     e.   On or about Monday, July 28, 2008 and Tuesday, July 29, 2008, the Hedge Fund, having sold the entire Elan position, shorted approximately 4.5 million additional shares of Elan stock.

     f.   In addition to the Elan transactions, between July 21, 2008 and the ICAD Presentation, the Hedge Fund sold the entire approximately seven million shares of Wyeth stock in portfolios over which MARTOMA and/or the Hedge Fund Owner had trading authority[5] and shorted Wyeth stock by an additional approximately 3.25 million shares.

     35.  Based on information provided by the SEC, I have learned that during the seven trading days preceding the July 29, 2008 ICAD announcement, the Hedge Fund's trading in Elan stock (ADRs) represented over 20% of the reported trading volume in the security and the Hedge Fund's trading in Wyeth stock represented over 11% of the reported trading volume in that security.

---

[5]   The Hedge Fund did not sell approximately 400,000 shares of Wyeth in a portfolio maintained by a separate portfolio manager. Additionally, the Hedge Fund did not seek to unwind a derivative swap contract between the Hedge Fund and various financial institutions relating to the performance of Wyeth shares. (This position, in any event, remained profitable even after the ICAD Presentation.)

19

<u>The Hedge Fund Profits From Trading In Advance Of The
Announcement Of The Negative Drug Trial Data</u>

36.   On or about July 29, 2008, shortly after the
stock market closed, and on a schedule previously announced by
Elan and Wyeth, the CW described the detailed results of the
Drug Trial during the ICAD Presentation to what one investment
analyst reported as "a very full room" including "the who's who
of the investor / analyst community."  During the ICAD
Presentation, the CW, used a more polished version of the very
PowerPoint presentation he had previously sent to MATHEW
MARTOMA, the defendant.

37.   The data announced at the ICAD Presentation was
viewed by the market as negative, and the shares of Elan and
Wyeth fell as a result.  On or about July 30, 2008, the day
after the ICAD Presentation, Elan closed at $19.63 per share,
approximately 42% lower than its close the day before.  Wyeth
closed on July 30, 2008 at approximately $39.74 per share,
approximately 12% lower than its closing price the prior day.
Multiple investment analysts cited the fact that, as one analyst
put it "patients didn't improve on the drug" (and simply got
worse somewhat more slowly) as a bad sign for the drug's
prospects.  Multiple analysts pointed to weaknesses in the
detailed data that suggested that even the limited benefits seen
in a subset of patients (the Non-Carriers) could instead have
been caused by chance.

38.   Based on Hedge Fund trading data and information
provided by the SEC, I have learned that the Hedge Fund earned
profits and avoided losses of what is currently estimated to be
$276 million, as detailed on the chart below, through sales of
Elan and Wyeth stock, short sales, and profitable options
activity between July 21, 2008 and the ICAD Presentation:[6]

───────────────────

[6]   These calculations are estimates only and are based on an
analysis of presently available information, and are therefore
subject to revision.  The calculation of losses avoided is based
on an average of the price of Elan and Wyeth stock between July
21, 2008 and the ICAD Presentation in comparison to the closing
price of Elan and Wyeth stock on July 30, 2008, the day after
the ICAD Presentation.

|  | Elan | Wyeth | Total |
|---|---|---|---|
| Losses Avoided Through Pre-ICAD Sales | $154.2 million | $40 million | $194.2 |
| Gains From Short Sales | $59.2 million | $16 million | $76.2million |
| Profitable Option Trades | $6.6 million | - | $6.6 million |
| Total | $220 million | $56 million | **$276 million** |

39.   In or around early January 2009, the Hedge Fund assessed the bonus to be paid to MARTOMA for the preceding year. MARTOMA was paid a total of approximately $9,380,435 by the Hedge Fund, which in large part was attributable to the results of the Hedge Fund's trading in Elan and Wyeth.  By contrast, MARTOMA received no bonus for his work in 2009 (a year in which his portfolio lost money).  On or about May 5, 2010, a Hedge Fund employee e-mailed a recommendation that MARTOMA be fired after continuing to lose money that year, stating in the e-mail that MARTOMA appeared to be a "one trick pony with Elan." MARTOMA's employment with the Hedge Fund was subsequently terminated.

WHEREFORE, deponent prays that an arrest warrant be issued for MATHEW MARTOMA, the defendant, and that he be imprisoned or bailed, as the case may be.

MATTHEW CALLAHAN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
19th day of November 2012

Hon. Debra Freeman
United States Magistrate Judge

21