# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MATHEW MARTOMA,

Defendant.

Criminal Case No.:  12 Cr. 973 (PGG)

**DEFENDANT MATHEW MARTOMA'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION TO DISMISS COUNT TWO AND THE CORRESPONDING ALLEGATIONS IN COUNT ONE OF THE INDICTMENT**

GOODWIN PROCTER LLP

Richard M. Strassberg
John O. Farley
Daniel P. Roeser
620 Eighth Avenue
The New York Times Building
New York, NY 10018
(212) 813-8800

Roberto M. Braceras
53 State Street
Boston, MA 02109
(617) 570-1000

*Attorneys for Defendant Mathew Martoma*

July 26, 2013

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................1

ARGUMENT ..........................................................................................................................4

I.   *MORRISON* PRECLUDES THE APPLICATION OF SECTION 10(B) OF THE EXCHANGE ACT TO FOREIGN TRANSACTIONS IN CRIMINAL CASES. ........................................................................................4

    A.   The Presumption Against Extraterritoriality Applies To Criminal Cases. ......................................................................................5

    B.   *Morrison* Makes Clear That Section 10(b) Of The Exchange Act Does Not Apply Extraterritorially In Criminal Cases..................................8

    C.   Commonsense Principles Of Statutory Interpretation Mandate That Section 10(b) Of The Exchange Act Can Have Only One Meaning. ........10

II.   TRANSACTIONS IN ELAN ADRS ARE FOREIGN TRANSACTIONS UNDER *MORRISON*............................................................................11

    A.   Transactions In ADRs Are Foreign Transactions By Their Very Nature..................................................................................13

    B.   Transactions In The Elan ADRs At Issue Are Foreign Transactions. ......................................................................................14

CONCLUSION......................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*7547 Corp. v. Paker & Parsley Development Partners, L.P.*,
  38 F.3d 211 (5th Cir. 1994) ..........................................................................12

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012).............................................................................17

*In re Alstom SA Sec. Litig.*,
  741 F. Supp. 2d 469 (S.D.N.Y. 2010)...............................................13, 14, 15

*Blackmer v. United States*,
  284 U.S. 421 (1932).........................................................................................5

*Caiola v. Citibank, N.A., New York*,
  295 F.3d 312 (2d Cir. 2002)...........................................................................11

*Copeland v. Fortis*,
  685 F. Supp. 2d 498 (S.D.N.Y. 2010).............................................................13

*Cornwell v. Credit Suisse Grp.*,
  729 F. Supp. 2d 620 (S.D.N.Y. 2010).............................................................14

*Dunne v. Libbra*,
  448 F.3d 1024 (8th Cir. 2006) .......................................................................12

*Elliott Assocs. v. Porsche Automobil Holding SE*,
  759 F. Supp. 2d 469 (S.D.N.Y. 2010).................................................13, 14, 18

*Futura Dev. Corp. v. Centex Corp.*,
  761 F.2d 33 (1st Cir. 1985)............................................................................12

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003).............................................................10

*King v. Winkler*,
  673 F.2d 342 (11th Cir. 1982) .......................................................................12

*Kollias v. D & G Marine Maint.*,
  29 F.3d 67 (2d Cir. 1994) .............................................................................7, 8

*Landreth Timber Co. v. Landreth*,
  471 U.S. 681 (1985).......................................................................................11

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004) ................................................................................................2, 10

*Long v. Shultz Cattle Co., Inc.*,
   881 F.2d 129 (5th Cir. 1999) .............................................................................12

*Morrison v. National Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010) ................................................................................ passim

*Robinson v. Glynn*,
   349 F.3d 166 (4th Cir. 2003) .............................................................................12

*In re Sanofi-Aventis Sec. Litig.*,
   No. 07 Civ. 10279 (GBD) (FM), 2013 WL 1149672 (S.D.N.Y. Mar. 20, 2013) ...................14

*Sears, Roebuck and Co. v. Sears PLC*,
   752 F. Supp. 1223 (D. Del. 1990) .....................................................................14

*SEC v. Aqua-Sonic Prods. Corp.*,
   687 F.2d 577 (2d Cir. 1982) .............................................................................11

*SEC v. M & A West, Inc.*,
   538 F.3d 1043 (9th Cir. 2008) ..........................................................................12

*SEC v. Platforms Wireless Intern. Corp.*,
   617 F.3d 1072 (9th Cir. 2010) ..........................................................................12

*Small v. United States*,
   544 U.S. 385 (2005) ..........................................................................................5

*In re Société Générale Sec. Litig.*,
   No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ...................3, 13, 14

*Stackhouse v. Toyota Motor Co.*,
   No. 10 Civ. 0922, 2010 WL 3377409 (C.D. Cal. July 16, 2010) ...........................14

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) ........................................................................................11

*United States v. Ahmed*,
   788 F. Supp. 196 (S.D.N.Y. 1992) ...................................................................2

*United States v. Al Kassar*,
   660 F.3d 108 (2d Cir. 2011) ..............................................................................8

*United States v. Bowman*,
   260 U.S. 94 (1922) ................................................................................5, 6, 7, 8

*United States v. Chiarella*,
  588 F.2d 1358 (2d Cir. 1978), *rev'd on other grounds*, 445 U.S. 222 (1980)........................10

*United States v. Cohen*,
  427 F.3d 164 (2d Cir. 2005)...........................................................................................7

*United States v. El-Gabrowny*,
  844 F. Supp. 955 (S.D.N.Y. 1994)................................................................................1

*United States v. Gansman*,
  657 F.3d 85 (2d Cir. 2011)...........................................................................................10

*United States v. Gatlin*,
  216 F.3d 207 (2d Cir. 2000).......................................................................................7, 8

*United States v. Gleason*,
  616 F.2d 2 (2d Cir. 1979) ............................................................................................10

*United States v. Gotti*,
  755 F. Supp. 1157 (E.D.N.Y. 1991) .............................................................................2

*United States v. Palmer*,
  16 U.S. (3 Wheat.) 610 (1818).....................................................................................6

*United States v. Siddiqui*,
  699 F.3d 690 (2d Cir. 2012).........................................................................................8

*United States v. Weingarten*,
  632 F.3d 60 (2d Cir. 2011).......................................................................................7, 8

*United States v. Yousef*,
  327 F.3d 56 (2d Cir. 2003)...........................................................................................7

*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011).........................................................................14

STATUTES

Section 10(b) of the Securities Exchange Act of 1934 .......................................... passim

Defendant Mathew Martoma respectfully submits this reply memorandum of law in further support of his motion to dismiss Count Two and the corresponding allegations in Count One of the Indictment.[1]  More specifically, Mr. Martoma respectfully requests that this Court dismiss all charges related to transactions in the securities of Elan Corporation, plc ("Elan"), an Irish corporation with stock publicly traded on the Irish and London stock exchanges, because Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") does not reach foreign securities transactions.

## PRELIMINARY STATEMENT

In their briefs,[2] the Government and the Lead Plaintiffs in *Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 12 Civ. 9350 (VM) (KNF) (S.D.N.Y.) (the "*Kaplan* Plaintiffs") argue that Section 10(b) of the Exchange Act applies to Elan ADRs under *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), because, in short, Elan ADRs were listed on the New York Stock Exchange and traded just like "IBM or Coca-Cola."  (Opp. at 6; *see also* Kaplan Plaintiffs' Br. at 4-5.)  This argument is attractive in its simplicity, but it ignores both the relevant case law and the economic reality of transactions in Elan ADRs.[3]

---

[1]   Unless otherwise noted, defined terms have the meanings set forth in Mr. Martoma's Memorandum of Law in Support of His Motion to Dismiss Count Two and the Corresponding Allegations in Count One of the Indictment, June 28, 2013, Docket No. 39 ("Opening Memorandum" or "Opening Mem.").

[2]   Those briefs are the Government's Opposition to Defendant Mathew Martoma's Motion to Dismiss Count Two and the Corresponding Allegations in Count One of the Indictment, July 19, 2013, Docket No. 51 ("Opposition" or "Opp.") and the Brief of *Amici Curiae* David E. Kaplan, Roxy D. Sullivan, Lindsey Rankin, Michael S. Allen, and Chi-Pin Hsu in Opposition to Defendant's Motion To Dismiss, July 22, 2013, Docket No. 52-1 ("*Kaplan* Plaintiffs' Brief" or "*Kaplan* Plaintiffs' Br.").

[3]   Mr. Martoma opposes, and this Court should deny, the *Kaplan* Plaintiffs' motion for leave to file a brief as *amici curiae*.  In deciding whether to grant a motion for leave to file an *amicus* brief, district courts follow the "usual rationale" of whether the brief will be of "aid to the court" and whether it will "offer insights not available from the parties."  *United States v. El-Gabrowny*, 844 F. Supp. 955, 957 n.1 (S.D.N.Y. 1994).  The *Kaplan* Plaintiffs assert that they meet such criteria because their proposed brief "is limited to matters not raised or fully addressed by the Government."  (*Kaplan* Plaintiffs' Mot. for Leave at 3.)  That is not true.  The arguments made by the *Kaplan* Plaintiffs are duplicative of the arguments made by the Government, which has shown itself to be quite capable in prosecuting this case and has ample experience and resources to address the issues presently before the Court.  The Kaplan Plaintiffs were aware of the quality and breadth of the

***Morrison* precludes the application of Section 10(b) of the Exchange Act to foreign transactions in criminal cases.**  As an initial matter, the Government buries at the back of its brief any discussion of the threshold question whether *Morrison* precludes the application of Section 10(b) to foreign transactions in criminal cases.  That is not surprising.  The Government's position – *i.e.*, that the Supreme Court did not intend its decision in *Morrison* to apply to criminal cases – is wrong as a matter of logic and law.  *First*, there is a presumption against the extraterritorial application of federal statutes – including Section 10(b) – that applies to criminal (and civil) cases.  As the Supreme Court held, "we apply the presumption ***in all cases***, preserving a stable background against which Congress can legislate with predictable effects."  *Morrison*, 130 S. Ct. at 2881 (emphasis added).  *Second*, *Morrison* makes clear that Section 10(b) does not apply extraterritorially in either criminal (or civil) cases.  The Supreme Court did not distinguish between the criminal and civil application of Section 10(b) in *Morrison* but instead announced a definitive construction of the statutory text for all purposes.  *Id.* at 2881-83.  *Third*, commonsense principles of statutory interpretation mandate that Section 10(b) can have only one meaning in both criminal and civil cases.  As the Supreme Court has recognized, "we must interpret [a] statute consistently, whether we encounter its application in a criminal or noncriminal context."  *Leocal v. Ashcroft*, 543 U.S. 1, 11-12 n.8 (2004).

---

Government's brief, as they chose to file their brief three days *after* the Government filed its brief and *only four days* before Mr. Martoma's reply was due.  In short, it is unnecessary for this Court to consider the *Kaplan* Plaintiffs' duplicative brief.  *See, e.g., United States v. Ahmed*, 788 F. Supp. 196, 198 n.1 (S.D.N.Y. 1992) (denying a motion for leave to appear as *amicus curiae* on behalf of the defendant because the defendant's interests were found to be adequately represented by his counsel); *United States v. Gotti*, 755 F. Supp. 1157, 1159 (E.D.N.Y. 1991) ("[I]t may be thought particularly questionable for the court to accept an *amicus* when it appears that the parties are well represented and that their counsel do not need supplemental assistance and where the joint consent of the parties to the submission by the *amicus* is lacking.") (citation and internal quotation marks omitted).  Moreover, contrary to their claims (*Kaplan* Plaintiffs' Mot. for Leave at 2), the *Kaplan* Plaintiffs have *no* interest in this case.  A ruling in favor of Mr. Martoma by this Court would not "likely be dispositive" of the claims in the *Kaplan* Plaintiffs' private securities class action (*id.* at 2, 3), because it would not bind the court presiding over that case.  The securities class action Plaintiffs have no business seeking to intervene in this criminal case.

***Transactions in Elan ADRs are Foreign Transactions under Morrison.*** Try as they might, the Government and the *Kaplan* Plaintiffs cannot escape the fact that transactions in Elan ADRs are foreign transactions under *Morrison*. Neither the Government nor the *Kaplan* Plaintiffs can explain away the **only** two cases that have actually examined whether Section 10(b) applies to ADRs under *Morrison*: *In re Société Générale Sec. Litig.*, No. 08 Civ. 2495 (RMB), 2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) and *In re Elan Corp. Sec. Litig.*, Nos. 08 Civ. 8761 (AKH), 10 Civ. 5630 (AKH) (S.D.N.Y.). In *Société Générale*, Judge Berman dismissed Section 10(b) securities fraud claims on ADRs *sua sponte* under *Morrison* because "trade in ADRs is considered to be a predominantly foreign securities transaction" even where the ADRs are purchased on a U.S. exchange. *Id*. at *6 & n.5 (brackets and internal quotation marks omitted). And in *In re Elan*, Judge Hellerstein considered the very Elan ADRs at issue here and found that, if it could be shown "that the ADRs are entirely derivative in value on the shares traded on the Irish exchange," that fact could warrant dismissal under *Morrison*. Transcript of Proceedings Before Hon. Alvin K. Hellerstein at 9:3-6, *In re Elan Corp. Sec. Litig.*, Nos. 08 Civ. 8761 (AKH), 10 Civ. 5630 (AKH), (S.D.N.Y. Mar. 17, 2011) ("Transcript") (Strassberg Decl., Ex. A). Mr. Martoma has shown just that – *i.e.*, that the Elan ADRs **were** entirely derivative of the Elan stock. Therefore, under both *Société Générale* and *In re Elan*, Section 10(b) does not reach Mr. Martoma's purchases and sales of Elan ADRs.

The Government and the *Kaplan* Plaintiffs also cannot avoid the economic reality of transactions in Elan ADRs. Both the Supreme Court and the Courts of Appeals have held in a variety of contexts that federal securities laws place emphasis on economic reality and disregard form for substance. Here, that economic reality is undisputed. Elan ADRs are not like equity shares of IBM or Coca-Cola. The ADRs are, by definition, "receipts" for the right to the stock of

a foreign issuer, which was traded on foreign exchanges and held by a foreign custodian – receipts that may be redeemed for the foreign stock at any time.  As such, they are economically equivalent to (and, in fact, regarded by investors as a substitute for) trading Elan stock on a foreign exchange.  That investors purchased Elan stock through ADRs issued in the United States rather than directly on the Irish or London stock exchange is of no consequence under *Morrison*.  Transactions in Elan ADRs are foreign transactions to which Section 10(b) does not apply.

For all of these reasons, the charges against Mr. Martoma based on transactions in Elan ADRs should be dismissed.

## ARGUMENT

### I.    *MORRISON* PRECLUDES THE APPLICATION OF SECTION 10(B) OF THE EXCHANGE ACT TO FOREIGN TRANSACTIONS IN CRIMINAL CASES.

Under *Morrison*, Section 10(b) of the Exchange Act does not apply to foreign transactions in either criminal or civil cases.  The Government does not (and cannot) dispute the reasoning and holding of the Supreme Court in *Morrison*:

- "It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States."  *Morrison*, 130 S. Ct. at 2877 (internal quotation marks omitted).

- "Thus, unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions."  *Id*. (internal quotation marks omitted).

- "[T]here is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we therefore conclude that it does not." *Id*. at 2883.

Nevertheless, the Government persists in arguing that *Morrison* precludes the application of Section 10(b) to foreign transactions **only** in civil cases.  The Government is wrong, and this Court should reject any extraterritorial application of Section 10(b) in criminal (as well as civil) cases, for at least the following three reasons:  (1) the presumption against extraterritoriality

applies to criminal cases; (2) *Morrison* makes clear that Section 10(b) does not apply extraterritorially in criminal cases; and (3) commonsense principles of statutory interpretation mandate that Section 10(b) can have only one meaning in both criminal and civil cases.

### A.      The Presumption Against Extraterritoriality Applies To Criminal Cases.

In *Morrison*, the Supreme Court did not differentiate between criminal and civil cases when it applied the presumption against extraterritoriality and concluded that Section 10(b) does not apply to foreign transactions.  "[W]e apply the presumption ***in all cases***, preserving a stable background against which Congress can legislate with predictable effects."  *Morrison*, 130 S. Ct. at 2881 (emphasis added).  Relying on the Supreme Court's decision in *United States v. Bowman*, 260 U.S. 94 (1922) – which was decided ***almost 90 years before Morrison*** – the Government argues that "[t]he Supreme Court in *Morrison* did not purport to interpret Section 10(b) as it applies in criminal cases" because "the presumption against extraterritoriality – which provided the basis of the *Morrison* Court's analysis – does not apply in criminal cases." (Opp. at 12.)  In so doing, the Government rehashes the meritless arguments that it has already made to the Second Circuit.  (*See id*. at 11 n.5.)

*First*, the Government contends that "[t]he Supreme Court in *Morrison* did not even mention, let alone explicitly overrule, its prior decision in *Bowman* or the cases that follow it." (*Id.* at 12.)  The Government, however, misses the point that there is nothing for the Supreme Court to overrule.  The presumption against extraterritoriality has been upheld by the Supreme Court in criminal (and civil) cases stretching back almost 200 years – including *Bowman*.  *See, e.g., Small v. United States*, 544 U.S. 385, 388-89 (2005) ("Congress generally legislates with domestic concerns in mind.  This notion has led the Court to adopt the legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application.") (citation and internal quotation marks omitted); *Blackmer v. United States*, 284 U.S. 421, 437

(1932) ("[L]egislation of the Congress, unless the contrary intent appears, is construed to apply only within the territorial jurisdiction of the United States."); *Bowman*, 260 U.S. at 98 ("Crimes…must, of course, be committed within the territorial jurisdiction of the government[.]"); *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 631 (1818) (Antipiracy provisions "must…be limited to cases within the jurisdiction of the state.").  Indeed, *Bowman* is entirely consistent with *Morrison* and actually applied the presumption against extraterritoriality in a criminal case:

> Crimes against private individuals or their property, like…frauds of all kinds,…must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it.  If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

*Bowman*, 260 U.S. at 98.  The Supreme Court in *Bowman* recognized a narrow set of statutes with respect to which the presumption may be overcome absent a clear statement by Congress – *i.e.*, statutes that protect government contracts from fraud and can only (or mostly) be implicated abroad.  Such statutes clearly do not include Section 10(b).  *Id*. at 98-99 (absent a clear statement by Congress, the presumption against extraterritoriality may be overcome only with respect to the narrow set of statutes "enacted because of the right of the government to defend ***itself*** against obstruction, or fraud whenever perpetrated, especially if committed by its own citizens, officers or agents" where the "natural inference from the character of the offense" is that an extraterritorial location "would be a probable place for its commission") (emphasis added); (Opening Mem. at 8-9).[4]

---

[4]    The Government argues that "the Second Circuit has not artificially limited its application of *Bowman* to crimes against the government."  (Opp. at 14.)  But, even with respect to the narrow set of statutes identified in *Bowman*, the Second Circuit has recognized that *Bowman* must be "read narrowly" and "limited to its facts."

*Second*, the Government asserts that, "the Second Circuit has repeatedly invoked *Bowman* in post-*Morrison* decisions to analyze a criminal statute's extraterritorial application." (Opp. at 13.)  To the contrary, the Second Circuit applies the presumption against extraterritoriality expressed in *Morrison* (and *Bowman*) – not the narrow carve-out in *Bowman* – to analyze a criminal statute's extraterritorial application.  As the Second Circuit held in its post-*Morrison* decision, *United States v. Weingarten*:  "Congress does not intend a statute to apply to conduct outside the territorial jurisdiction of the United States unless it clearly expresses its intent to do so" and, therefore, a court must "look for a clear and affirmative indication that a statute applies to conduct occurring outside the territorial jurisdiction of the United States."  632 F.3d 60, 64-65 (2d Cir. 2011) (citation and internal quotation marks omitted).  *Weingarten* is consistent with the Second Circuit's pre-*Morrison* decisions analyzing a criminal statute's extraterritorial application.  *See United States v. Gatlin*, 216 F.3d 207, 211-12 (2d Cir. 2000) (a statute can have extraterritorial application only if "there appears the affirmative intention of the Congress clearly expressed" and "absent clear evidence of congressional intent to apply a statute beyond our borders, the statute will apply only to the territorial United States") (citation and internal quotation marks omitted); *Kollias v. D & G Marine Maint.*, 29 F.3d 67, 71 (2d Cir. 1994) ("The Supreme Court's recent discussions of the presumption against extraterritoriality,

---

*Kollias v. D & G Marine Maint.*, 29 F.3d 67, 71 (2d Cir. 1994); *United States v. Gatlin*, 216 F.3d 207, 211 n.5 (2d Cir. 2000).  The cases cited by the Government are not to the contrary.  In *United States v. Weingarten*, the Second Circuit stated that "*Bowman* does not hold that criminal statutes ***always*** apply extraterritorially."  632 F.3d at 66 (2d Cir. 2011) (emphasis in original; internal quotation marks omitted).  The Second Circuit applied the presumption against extraterritoriality and found that the presumption was overcome with respect to the particular statute in question.  *See id.* at 66-67.  In *United States v. Cohen*, the presumption against extraterritoriality was overcome because the statutes in question were part of a statutory scheme specifically meant to eradicate all – including foreign – illegal drug trafficking.  427 F.3d 164, 168-69 (2d Cir. 2005).  In *United States v. Yousef*, the presumption against extraterritoriality was overcome because the statutes in question evidenced a clear intent by Congress to "vest in United States courts the requisite jurisdiction over an extraterritorial conspiracy to commit [the] crime" of placing bombs aboard aircraft in order to destroy them, including the attempted destruction of aircraft in U.S. airspace.  327 F.3d 56, 88 (2d Cir. 2003); *see also id.* at 87-88.

none of which mentions *Bowman*, seem to require that **all** statutes, without exception, be construed to apply within the United States only, unless a contrary intent appears.") (emphasis in original).[5]

In short, under both Supreme Court and Second Circuit precedent, the presumption against extraterritoriality reflected in *Morrison* applies to criminal cases.

**B.** *Morrison* **Makes Clear That Section 10(b) Of The Exchange Act Does Not Apply Extraterritorially In Criminal Cases.**

In *Morrison*, the Supreme Court did not distinguish between the criminal and civil application of Section 10(b) but instead grounded its holding in the plain language of the statute, which governs both criminal and civil cases.  "[W]hen it comes to the scope of the conduct prohibited by Rule 10b-5 and § 10(b), the text of the statute controls our decision." *Morrison*, 130 S. Ct. at 2881 n.5 (brackets and internal quotation marks omitted).  The Government argues that "the most natural reading of *Morrison* limits its teaching to civil actions." (Opp. at 13.)  Not so.  The Supreme Court undertook a definitive construction of Section 10(b)'s text for all purposes, deciding (1) "what conduct § 10(b) reaches," (2) "what conduct § 10(b) prohibits," (3) what conduct "Section 10(b)…punishes," and (4) what were the "transactions…to which § 10(b) applies." *Morrison*, 130 S. Ct. at 2877, 2884, 2887.  After a detailed analysis of Section 10(b)'s statutory language, the Supreme Court concluded that Section 10(b) does not apply extraterritorially because, "[o]n its face, § 10(b) contains nothing to suggest it applies

---

[5]   The Second Circuit cases cited by the Government (*see* Opp. at 13) are consistent with these decisions.  Both *United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 2374 (2012), and *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011), concerned crimes committed against U.S. officers and employees – crimes that, by their very nature, reflected a congressional intent to apply extraterritorially.  *Siddiqui*, 699 F.3d at 701; *Al Kassar*, 660 F.3d at 118.  In contrast, "there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially," as the Supreme Court recognized in *Morrison*.  130 S. Ct. at 2883.  To the extent that courts outside of this Circuit have reached conclusions contrary to the binding precedent of the Second Circuit's decisions in *Weingarten*, *Gatlin*, and *Kollias* (*see* Opp. at 13-14), this Court should not follow them.

abroad." *Id*. at 2881; *see also id.* at 2881-83.  That construction was not limited to civil cases

because, as the Supreme Court made clear, it did not turn on – and, in fact, was independent of –

"the additional elements of the 10b-5 private liability scheme." *Id*. at 2881 n.5 (internal

quotation marks omitted).

 Finding no support in the text of Section 10(b) or the language of *Morrison*, the

Government turns to policy arguments.  The Government asserts that, were "insider trading held

to fall outside the purview of Section 10(b) simply because the securities in question concerned a

foreign company, it would severely diminish the statute's effectiveness" by "render[ing] the

criminal securities fraud laws ineffectual against U.S. citizens who commit certain securities

fraud crimes from entirely within this country."  (Opp. at 15 (internal quotation marks omitted).)

The Supreme Court has already rejected this argument.  In *Morrison*, the Solicitor General

contended that Section 10(b) should apply extraterritorially in cases brought by the Government

"when the fraud involves significant conduct in the United States that is material to the fraud's

success."  130 S. Ct. at 2886.  In so doing, the Solicitor General made a number of policy

arguments in support of its position:  "achieving a high standard of business ethics in the

securities industry, ensuring honest securities markets and thereby promoting investor

confidence, and preventing the United States from becoming a 'Barbary Coast' for malefactors

perpetrating frauds in foreign markets." *Id*.  The Supreme Court flatly rejected the Solicitor

General's position because (1) the argument had no "textual support" and the Supreme Court's

"function [is] to give the statute the effect its language suggests, however modest that may be;

not to extend it to admirable purposes it might be used to achieve"; and (2) the argument "relied

on cases we disapprove, which ignored or discarded the presumption against extraterritoriality."

*Id*. at 2886-88.  This Court should reach the same conclusion.

### C.   Commonsense Principles Of Statutory Interpretation Mandate That Section 10(b) Of The Exchange Act Can Have Only One Meaning.

Not only does the Government's argument that Section 10(b) applies extraterritorially in criminal cases disregard a long line of Supreme Court and Second Circuit precedent, it violates the commonsense principle of statutory interpretation that the text of a statute can have only one meaning.  As the Supreme Court has recognized, "we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context."  *Leocal*, 543 U.S. at 11-12 n.8.  The Government argues that "courts have consistently read the language of Section 10(b) to mean different things for civil litigants and criminal prosecutors."  (Opp. at 15.)  Not so.  The Second Circuit has expressly held that the text of Section 10(b) can have only one meaning:  "The basic elements of proof for insider trading are the same for civil and criminal enforcement actions, but criminal enforcement differs principally with respect to the required intent and burden of proof."  *United States v. Gansman*, 657 F.3d 85, 91 n.7 (2d Cir. 2011); *accord United States v. Gleason*, 616 F.2d 2, 28 (2d Cir. 1979); *United States v. Chiarella*, 588 F.2d 1358, 1368 n.16 (2d Cir. 1978), *rev'd on other grounds*, 445 U.S. 222 (1980); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 387-88 n.164 (S.D.N.Y. 2003).  To manufacture a difference where none exists, the Government points to the elements of criminal and civil violations of Section 10(b).  (Opp. at 15.)  *Morrison* itself, however, forecloses any such argument.  The Supreme Court made clear that the scope of the conduct prohibited by Section 10(b) is controlled by the text of the statute – not "the additional elements of the 10b-5 private liability scheme."  *Morrison*, 130 S. Ct. at 2881 n.5 (internal quotation marks omitted).[6]

---

[6]   As both Mr. Martoma and the Government have noted (*see* Opening Mem. at 5 & n.5; Opp. at 11. n.5), the question of whether *Morrison* applies to criminal cases brought under Section 10(b) has been pending before the Second Circuit for almost a year, *see United States v. Vilar*, Docket No. 10-521 (2d Cir).  The issue was fully briefed on April 30, 2012,  and the Second Circuit heard oral argument on August 21, 2012.  To the extent

## II.     TRANSACTIONS IN ELAN ADRS ARE FOREIGN TRANSACTIONS UNDER *MORRISON*.

In *Morrison*, the Supreme Court held that "the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States" because the Exchange Act does not reach "conduct in this country affecting exchanges or transactions abroad." *Morrison*, 130 S. Ct. at 2884. The Government and the *Kaplan* Plaintiffs miss this fundamental point, instead relying on a cramped reading of *Morrison* to analyze whether the Elan ADRs were listed on an American stock exchange and/or the purchase or sale of Elan ADRs occurred in the United States. (Opp. at 7; *Kaplan* Plaintiffs' Br. at 3 & n.2.) Indeed, the Government's assertion that "Elan ADRs trade on NYSE in a manner indistinguishable from the equity of U.S. firms such as IBM or Coca-Cola" (Opp. at 6) is attractive in its simplicity, but wrong as a matter of law.

Both the Supreme Court and the Courts of Appeals have held in a variety of contexts that federal securities laws place emphasis on economic reality and disregard form for substance. *See, e.g., Landreth Timber Co. v. Landreth*, 471 U.S. 681, 691 (1985) (the "economic reality test was designed to determine whether a particular instrument is an 'investment contract'" subject to the securities laws); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 848 (1975) (holding that "form should be disregarded for substance and the emphasis should be on economic reality" in determining whether a particular instrument is a security subject to Section 10(b)); *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 325 (2d Cir. 2002) (looking to "economic reality" to determine whether a swap is a "security"); *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 584

---

that this Court has any questions about whether *Morrison* applies to criminal cases, it should await a ruling by the Second Circuit – which is likely imminent.

(2d Cir. 1982) (emphasizing that the Supreme Court has focused on "economic reality" in

determining if a transaction is a security), *cert denied*, 459 U.S. 1086 (1982).[7]

      In fact, "it is now generally understood that courts must examine the substance or

'economic realities' of all alleged securities transactions and not rely on the form of the

instrument to determine whether the transaction falls within the ambit of the federal securities

laws." *Futura Dev. Corp. v. Centex Corp.*, 761 F.2d 33, 39 (1st Cir. 1985); *accord Robinson v.

Glynn*, 349 F.3d 166, 172 (4th Cir. 2003) ("It is the 'economic reality' of a particular instrument,

rather than the label attached to it, that ultimately determines whether it falls within the reach of

the securities laws."); *Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 133 (5th Cir. 1999) ("It is

axiomatic in federal securities law that in order to give effect to the remedial purposes of the

Acts, substantive 'economic realities' must govern over form."); *King v. Winkler*, 673 F.2d 342,

346 (11th Cir. 1982) ("Once the literal words of the statute are abandoned for an 'economic

realities' test, each case must be evaluated on its own facts to determine if the transaction, though

within the letter of the statute, is not within its spirit nor the intent of the lawmakers.").

      By definition, Elan ADRs represent Elan stock; and transactions in Elan ADRs are

economically equivalent to transactions in Elan stock. Those transactions in Elan stock – which

necessarily occurred outside of the United States – are the proper focus of this Court's inquiry.

---

[7]   *Accord 7547 Corp. v. Paker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 227 (5th Cir. 1994) (focusing on the "economic reality of the transaction" in determining whether a securities plaintiff has standing under the "forced seller" doctrine); *Dunne v. Libbra*, 448 F.3d 1024, 1030 (8th Cir. 2006) ("[W]hen a closely-held business is acquired by purchasing corporate stock, whether federal and state securities laws apply requires analysis of the economic realities of the transaction."); *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1086 (9th Cir. 2010) ("In reviewing the Section 5 claim here, we note that the 'Supreme Court has long instructed that securities law places emphasis on economic reality and disregards form for substance.'") (quoting *SEC v. M & A West, Inc.*, 538 F.3d 1043, 1053 (9th Cir. 2008)).

**A.      Transactions In ADRs Are Foreign Transactions By Their Very Nature.**

The Government and the *Kaplan* Plaintiffs do not (and cannot) dispute that, both before and after the Supreme Court's decision in *Morrison*, courts in this District have held that Section 10(b) is inapplicable to ADR transactions because a "trade in ADRs is considered to be a predominantly foreign securities transaction." *Société Générale*, 2010 WL 3910286, at *6 (brackets and internal quotation marks omitted); *Copeland v. Fortis,* 685 F. Supp. 2d 498, 506 (S.D.N.Y. 2010).[8]  The Government and the *Kaplan* Plaintiffs attempt to distinguish *Société Générale* on the basis that it "concerned ADRs that were not traded on an official American securities exchange" (Opp. at 8; *see Kaplan* Plaintiffs' Br. at 8-9); but this was a distinction without a difference to Judge Berman, who stated that "courts have also held that Section 10(b) is inapplicable to transactions in which a plaintiff purchases ADRs on a U.S. exchange" (*id*. (quoting *Société Générale*, 2010 WL 3910286, at *6 n.5).  As Mr. Martoma explained in his Opening Memorandum – and as the Government and the *Kaplan* Plaintiffs do not dispute – the reasoning behind this conclusion is straightforward:

- In determining whether a given transaction is subject to Section 10(b), courts in this District have rejected "any selective and overly-technical reading of *Morrison* that ignores the larger point of the decision." *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 472 (S.D.N.Y. 2010).

- Both the Supreme Court and the Courts of Appeals have routinely emphasized the importance of economic reality and disregarded form for substance in a variety of contexts in determining whether the federal securities laws apply.  *See supra* at 11-12; *Elliott Assocs. v. Porsche Automobil Holding SE*, 759 F. Supp. 2d 469, 475-76 (S.D.N.Y. 2010).

---

[8]     The Government and the *Kaplan* Plaintiffs attempt to distinguish *Copeland* on the basis that it "was decided before *Morrison* and therefore has limited relevance to the present discussion."  (Opp. at 8 n.2; *see also Kaplan* Plaintiffs' Br. at 10-11.)  Yet whether *Copeland* was decided before or after *Morrison* does not affect the court's conclusion that transactions in ADRs are foreign securities transactions.  The *Kaplan* Plaintiffs also try to distinguish *Copeland* on the basis that the ADRs did not trade on "an official American securities exchange." (*Kaplan* Plaintiffs' Br. at 10.)  As discussed, that is a distinction without a difference.

- ADRs are economically equivalent to trading the underlying stock of the foreign issuer on a foreign exchange, *Sears, Roebuck and Co. v. Sears PLC*, 752 F. Supp. 1223, 1224 n.2 (D. Del. 1990) – foreign transactions to which Section 10(b) does not apply, *Elliott*, 759 F. Supp. 2d at 476.

Unable to distinguish the holding of *Société Générale*, the Government and the *Kaplan* Plaintiffs baldly assert that "[e]very court that has previously considered the applicability of Section 10(b) to ADRs listed on an American exchange has concluded that…*Morrison* is satisfied."  (Opp. at 7; *see also Kaplan* Plaintiffs' Br. at 5-8.)  That is simply false.  In each of the cases cited by the Government and the *Kaplan* Plaintiffs (*see* Opp. at 7-8; *Kaplan* Plaintiffs' Br. at 5-8), the court **never** considered whether Section 10(b) applied to ADRs listed on an American exchange because the issue was **never** raised.[9]  Indeed, the **only** two courts to consider the applicability of Section 10(b) to ADRs listed on an American exchange support the conclusion that Section 10(b) does not apply to the Elan ADRs based on the record here.  *Société Générale*, 2010 WL 3910286, at *6 & n.5; *In re Elan*, Nos. 08 Civ. 8761 (AKH), 10 Civ. 5630 (AKH) (S.D.N.Y.).

### B.   Transactions In The Elan ADRs At Issue Are Foreign Transactions.

Elan ADRs are by definition "receipts" for the right to the stock of a foreign issuer, which was traded on foreign exchanges and held by a foreign custodian – receipts that may be redeemed for the foreign stock at any time.  It is undisputed that (1) "Elan ADRs carry the same

---

[9]     Take, for example, the cases cited by the Government.  *See In re Sanofi-Aventis Sec. Litig.*, No. 07 Civ. 10279 (GBD) (FM), 2013 WL 1149672, at *7 (S.D.N.Y. Mar. 20, 2013) (the defendants raised a *Morrison* argument only with respect to plaintiffs who purchased common stock, not ADRs); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 527  (S.D.N.Y. 2011) ("the parties disagree over *Morrison*'s impact on the claims of foreign and American purchasers of ordinary shares," not ADRs); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 621-22 (S.D.N.Y. 2010) (the defendants moved to dismiss the claims of plaintiffs who purchased securities on the Swiss Stock Exchange, not ADRs); *Alstom*, 741 F. Supp. 2d at 471 (the court's opinion addressed the claims of plaintiffs who purchased securities on a European stock exchange, not ADRs); *Stackhouse v. Toyota Motor Co.*, No. CV 10-0922 (DSF) (AJWx), 2010 WL 3377409, at *2 (C.D. Cal. July 16, 2010) (the parties did not raise, and the court did not consider, the issue of whether *Morrison* precluded claims by purchasers of American Depository Shares ("ADS")).

dividends and voting rights as ordinary Elan shares" and (2) "[e]ach Elan ADR is redeemable for one ordinary share of Elan stock held at the Bank of Ireland." (Opp. at 6.) That investors purchased the foreign Elan stock through ADRs listed on the NYSE rather than through direct purchases on the Irish and London stock exchanges is of no consequence under *Morrison*. Transactions in Elan ADRs are foreign transactions to which Section 10(b) does not apply.

The Government and the *Kaplan* Plaintiffs argue that transactions in Elan ADRs occurred within the United States because (1) "ADRs are independent securities listed and traded within the United States" and (2) "the fact that the price of Elan ADRs moves in tandem with the price of Elan common stock on foreign exchanges is of no legal significance." (Opp. at 10; *see also Kaplan* Plaintiffs' Br. at 4-5, 11-13.) They are wrong in both instances.

*First*, that Elan ADRs are listed on the NYSE does not mean that transactions in Elan ADRs are subject to Section 10(b) under *Morrison*. As Judge Marrero has observed, the Supreme Court's reasoning "reveals a focus on where the securities transaction actually occurs, not the stock exchange where ministerial pre-purchase activities were directed." *Alstom*, 741 F. Supp. 2d at 472-73. The Government and the *Kaplan* Plaintiffs do not dispute that Elan ADRs were created when ordinary shares issued by Elan (an Irish company) in Ireland, which were traded principally on the Irish and London stock exchanges (not on any U.S. exchange), were deposited in The Bank of Ireland in Ireland. (*See* Opening Mem. at 15.) This operative transaction was carried out in Ireland; the only domestic entity involved in the issuance of Elan ADRs, The Bank of New York, acted merely as an intermediary bound in all respects by the transaction in Ireland. (*Id.*) Moreover, the Government and the *Kaplan* Plaintiffs do not dispute, and in fact concede, that Elan ADRs were readily exchangeable into Elan ordinary shares. (Opp. at 6; Opening Mem. at 16.) For the application of Section 10(b) to turn on whether an investor

had redeemed its Elan ADRs for Elan ordinary shares would disregard the economic reality of the transaction and foster "the unpredictable and inconsistent application of § 10(b) to transnational cases," contrary to *Morrison* and a long line of prior Supreme Court decisions. *Morrison*, 130 S. Ct. at 2880-81.

*Second*, that Elan ADRs are entirely derivative of Elan stock traded on foreign exchanges is of paramount legal importance.  In *In re Elan*, Judge Hellerstein considered whether, under *Morrison*, Section 10(b) applies to the Elan ADRs at issue in this case.  (*See* Opening Mem. at 16-17.)  The Government states that "nothing about the civil case before Judge Hellerstein helps the defendant save his instant *Morrison* claim."  (Opp. at 11.)  To the contrary, Mr. Martoma is simply following the reasoning of Judge Hellerstein as that court applied *Morrison* to ***these very ADRs***.  Like others before him, Judge Hellerstein eschewed a "wooden application of *Morrison*" and asked "[w]hy, in a practical sense – not a wooden sense – does it make sense for this District Court to assume jurisdiction of this case?"  Transcript, *In re Elan*, at 5:25-6:3.  Judge Hellerstein then focused on the derivative nature of ADRs and found that, if it could be shown "that the ADRs are entirely derivative in value on the shares traded on the Irish exchange, not necessarily the company on the exchange, I might change my mind" and dismiss all claims on the ADRs under *Morrison* because trading in ADRs would be foreign securities transactions.  *See* Transcript, *In re Elan*, at 9:3-6.  Mr. Martoma has shown exactly that.  The Government and the *Kaplan* Plaintiffs do not dispute that the agreements governing the Elan ADRs demonstrate that, by definition, Elan ADRs are entirely derivative of Elan ordinary shares traded on foreign exchanges.  (*See* Opening Mem. at 17.)  Moreover, a simple comparison of the publicly available prices of Elan ADRs to the publicly available prices of Elan ordinary shares traded on the Irish

and London stock exchanges shows that Elan ADRs are wholly derivative of Elan ordinary shares.  (*See id.* at 17-18.)[10]

The *Kaplan* Plaintiffs assert that Judge Hellerstein's analysis is "flawed because it seeks to inquire into the nature of the security, rather than focusing – as *Morrison* directs – on the location of the purchase or sale at issue" and that the Second Circuit "expressly rejected" Judge Hellerstein's "derivative" analysis in *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67-68 (2d Cir. 2012).  (*Kaplan* Plaintiffs' Br. at 13.)  Neither statement is true.  Judge Hellerstein's "derivative" analysis does not "inquire into the nature of the security"  but rather focuses on the economic reality of the transaction – as the Supreme Court has emphasized – in analyzing the location of the transaction under *Morrison*.  Further, the Second Circuit did not "expressly reject" Judge Hellerstein's approach in *Absolute Activist* (or anywhere else).  The securities at issue in that case were not derivative of foreign securities and, therefore, the Second Circuit was not presented with and did not consider whether transactions in securities that are entirely derivative in value of foreign stock constitute foreign securities transactions under *Morrison*.  Since the value of Elan ADRs is derived from Elan ordinary shares (*see* Opp. at 10),[11]

---

[10]   The *Kaplan* Plaintiffs contend that "Defendant's stock chart, showing prices in New York, Dublin and London moving in lockstep, does nothing more than confirm that trading prices on the three exchanges were highly correlated – as both efficient market theory and market reality would dictate."  (*Kaplan* Plaintiffs' Br. at 18 (citation omitted).)  According to the *Kaplan* Plaintiffs, "prices are set by public information, not 'derivatively' by one market based on another," because, "[i]n an efficient, high-volume market such as Elan's, averaging over four million ADRs and shares daily during the period addressed in the Indictment, any systematic discrepancy between trading prices in New York and Dublin would create an arbitrage opportunity that would very rapidly be traded away."  (*Id.* at 12.)  In addition, the Government and the *Kaplan* Plaintiffs assert that, "[i]n fact, the overwhelming majority of trading in Elan securities took place on the NYSE" and, "if any exchange were deemed to be setting the price of Elan securities, it would be the NYSE."  (Opp. at 10; *see also Kaplan* Plaintiffs' Br. at 12.)  But those arguments do not change the undisputed fact that the agreements governing the Elan ADRs require that ADRs are entirely derivative of Elan ordinary shares traded on foreign exchanges.  Moreover, such arguments are the proper subject of expert analysis.  Therefore, to the extent that the Government and the *Kaplan* Plaintiffs oppose Mr. Martoma's motion on that basis, Mr. Martoma respectfully requests an evidentiary hearing on the issue.

[11]   Although the Government asserts that "Elan ADRs are not derivatives," it concedes in the same breath that in fact "ADRs are ***derived*** from common stock issued on a foreign exchange."  (Opp. at 10 (emphasis added).)

which is foreign stock traded only on foreign exchanges, Elan ADRs are not subject to

Section 10(b) under *Morrison*, *see* Transcript, *In re Elan*, at 9:3-6; *Elliott*, 759 F. Supp. 2d at

476.

## **CONCLUSION**

For the foregoing reasons and those in the Opening Memorandum, Mr. Martoma

respectfully requests that this Court dismiss all charges related to transactions in Elan securities

in Counts One and Two and provide such other and further relief as the Court deems just and

proper.

Dated:  July 26, 2013                                      Respectfully submitted,

                                                          GOODWIN PROCTER LLP

                                                          /s/ Richard M. Strassberg
                                                          Richard M. Strassberg (RS5141)
                                                          John O. Farley (JF4402)
                                                          Daniel P. Roeser (DR2380)
                                                          The New York Times Building
                                                          620 Eighth Avenue
                                                          New York, NY 10018
                                                          T:  212-813-8800
                                                          F:  212-355-3333
                                                          rstrassberg@goodwinprocter.com

                                                          Roberto M. Braceras (RB2470)
                                                          53 State Street
                                                          Boston, MA 02109
                                                          T:  617-570-1000
                                                          F:  617-523-1231
                                                          rbraceras@goodwinprocter.com

                                                          *Attorneys for Defendant Mathew Martoma*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing documents, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies shall be served by first class mail postage prepaid on all counsel who are not served through the CM/ECF system on July 26, 2013.

/s/ Richard M. Strassberg
Richard M. Strassberg (RS5141)