GOODWIN | PROCTER

Richard M. Strassberg
212.813.8859
rstrassberg@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
The New York Times Building
620 Eighth Avenue
New York, NY 10018
T: 212.813.8800
F: 212.355.3333

August 27, 2013

**BY HAND**

Honorable Paul G. Gardephe
United States District Court for the
    Southern District of New York
United States Courthouse
40 Foley Square Street
New York, NY 10007

Re:     **United States v. Martoma, No. 12 Cr. 973 (PGG)**

Dear Judge Gardephe:

We write on behalf of Mathew Martoma to respond to the question the Court posed at the August 23, 2013 hearing concerning the University of Michigan's policies that may be relevant in determining whether Dr. Gilman had a reasonable expectation of privacy in communications stored on the University's server and on University-issued devices.[1]  Dr. Gilman argues that all policies from May 15, 2002 to November 2012 should be produced, including "[m]aterials relating to the University's issuance of the [electronic] devices."  We believe this request is too broad and needlessly complicates the matter.

As we argued at the hearing, the relevant University policies should be those in effect at the date of Dr. Gilman's production of the Electronic Media to the U.S. Attorney and to the University of Michigan. Both of those productions occurred in 2012[2] and thus would be covered by the current, attached University policies.

---

[1]  For the Court's convenience, we have attached the policies that we believe control, all of which had been attached to our moving papers.  All of these policies are available on the University's website and were issued *before* Dr. Gilman surrendered the Electronic Media; the most relevant policies were issued before any of the emails at issue in this case were even prepared.  *See U-M SPG, Privacy and the Need to Monitor and Access Records* § 601.11, at Part VI.A (issued Sept. 7, 2004), attached as Ex. A; *U-M SPG, Acquisition, Use and Disposition of Property (Exclusive of Real Property)* § 520.01 (issued June 7, 2005), attached as Ex. B; *U-M SPG, Tech Tools: Cell Phones and Portable Electronic Resources* § 514.04 (issued May 31, 2012), attached as Ex. C; *U-M SPG, Policy Statement on the Integrity of Scholarship and Procedures for Investigating Allegations of Misconduct in the Pursuit of Scholaship [sic] and Research* § 303.03 (issued July 1, 1994), attached as Ex. D; *see also* Michigan Faculty Handbook 12.A, *General Principles* (issued Jan. 2008), attached as Ex. E; Michigan Faculty Handbook 12.G, *Electronic Privacy* (issued Jan. 2008), attached as Ex. F.

[2]  Dr. Gilman disclosed the Laptop Image to the Government on August 16, 2012.  *See* "Consent to Search Computer(s)" form signed by Dr. Sidney Gilman on August 16, 2012, attached as Ex. G.  Dr. Gilman surrendered the rest of the Electronic Media to the University of Michigan on or about November 27, 2012.  *See* Memorandum of Law in Support

GOODWIN | PROCTER

Hon. Paul G. Gardephe
August 27, 2013
Page 2

Alternatively, the Court could consider the policies in effect at the time that the relevant emails were created. According to Dr. Gilman's August 26, 2013 letter to the Court, "the earliest date of a [Dr. Gilman] document that reflects attorney-client communications, attorney work product or marital communications is May 30, 2012." (*See* 8/26/2013 letter from Mukasey to Gardephe at 1.) Accordingly, if the Court determines that the relevant policies are those in effect at the time the emails were created or exchanged, we again would be relying on the same policies in effect in 2012, which are attached.[3]

Moreover, we understand that all University of Michigan employees – including Dr. Gilman – signed a Code of Conduct Attestation annually, which requires "*[k]nowledge, understanding and compliance with the policies and procedures that apply to [their] work.*"[4]  In so doing, employees expressly "agree to comply with *all* policies and procedures that relate to [their] work" at the University, including specifically "*the U-M Standard Practice Guide*" that contains all of the relevant policies here.[5] Therefore, Dr. Gilman was required by the University of Michigan to reaffirm his agreement to comply with all of the policies at issue each and every year.

Whether the Court prefers this suggested focus on policies in effect in 2012 or a somewhat broader approach, the Court should not allow Dr. Gilman's proposal, which seeks to extend the Court's review up to a decade before any potentially privileged emails were created, much less shared with the Government and the University.[6]

---

of Third-Party Movant Sidney Gilman, M.D.'s Motion to Intervene and for a Protective Order and in Opposition to Defendant Martoma's Motion to Compel, at 5, July 17, 2013, Docket No. 47.

[3]     This Court has already suggested that the relevant policies should be those in effect at the time that the challenged emails were exchanged. *See Reserve Fund*, 275 F.R.D. at 158 ("The emails in question were exchanged by Bent II and his wife on September 15 and 16, 2008 . . . .  It is undisputed that in September 2008, RMCI had in place a written 'Email Policy' and that Bent II was aware of the policy."); *see also Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1108 (W.D. Wash. 2011) ("Based on the company policy described above, Mr. Benítez could not have had a reasonable expectation of confidentiality with regard to communications or other materials that he created or received on his KCDL laptop following the acquisition of Aventa and that were saved or stored on his KCDL laptop or on the Defendants' servers.").

[4]     SEC Prod. #7 001-002, an unsigned version of such an Attestation, attached as Ex. H to this letter (emphasis in original).

[5]     *Id.* (emphasis added).

[6]     Indeed, there is an inconsistency in Dr. Gilman's position:  he argued at the hearing that his subjective expectation of his privacy is relevant as long as 30 years ago, and yet his sworn testimony says that he "do[es] not recall being informed of any University policy regarding personal use of the Electronic Devices or the University's accessing or monitoring of these devices." *See* July 17, 2013 Gilman Decl. ¶ 3, Docket No. 48.   He cannot have it both ways.  If he had no familiarity with past policies, the earlier policies would have no impact on his subjective expectation of privacy.

GOODWIN | PROCTER

Hon. Paul G. Gardephe
August 27, 2013
Page 3

Finally, consistent with the attached policies (and Code of Conduct Attestation), we submit that Dr. Gilman could not have had a reasonable expectation of privacy. *See United States v. Angevine*, 281 F.3d 1130, 1132, 1134 (10th Cir. 2002) (university professor had no reasonable expectation of privacy in documents stored on university-issued computer where the university "'reserve[d] the right to view or scan any file or software stored on the computer or passing through the network'"); *Muick v. Glenayre Elecs.*, 280 F.3d 741, 743 (7th Cir. 2002) (employee had no reasonable expectation of privacy in files stored on employer-issued laptop where employer "announced that it could inspect laptops that it furnished for the use of its employees"). And, in any event, Dr. Gilman waived any claim of privilege over those communications when he disclosed the Laptop Image to the Government and surrendered the other Electronic Media to the University of Michigan. *See United States v. Finazzo*, No. 10-CR-457 (RRM)(RML), 2013 WL 619572, at *13 (S.D.N.Y. Feb. 19, 2013) ("Even assuming Finazzo's use of Aéropostale's e-mail system to communicate with his lawyer did not defeat his privilege claim over the Siegel e-mail, his hour-long discussion with Geiger and Slezak about the same e-mail certainly waived it.").

Respectfully submitted,

Richard M. Strassberg

cc:     All Counsel of Record (via email)

LIBA/2430014.1

# Exhibit A

Privacy and the Need to Monitor and Access Records | SPG
Page 1 of 5

Case 1:12-cr-00973-PGG   Document 71   Filed 09/24/13   Page 5 of 38
Case 1:12-cr-00973-PGG   Document 37-2   Filed 06/21/13   Page 2 of 6



UNIVERSITY OF MICHIGAN

# SPG  U-M Standard Practice Guide

## Privacy and the Need to Monitor and Access Records

601.11

### I. Background

The University of Michigan respects the privacy of its employees and seeks to foster a climate free from arbitrary or capricious monitoring of employees and the *records* they create, use, or control.

Nonetheless, the University must, at times, access *records* or monitor *record systems* that are under the control of its employees. Furthermore, because the University permits some latitude for employees to use University resources to conduct University business off-campus and to conduct personal matters at their work sites, *work-related records* and employees' *personal records* may be located in the same place.

This policy defines the rights, responsibilities, and expectations of the University and its employees regarding the conditions under which they may access *records* and monitor *record systems*.

### II. Policy

There are many laws that govern the maintenance and disclosure of *records*. Federal and state laws, for example, require the University to:

- protect from unwarranted disclosure certain *records* of patients (HIPAA), students (FERPA), or library patrons (Michigan Library Privacy Act);

- disclose *records* (Freedom of Information Act, see http://www.umich.edu/~urel/foia.html, subpoenas, etc.); and/or

- monitor *record systems*.

Accordingly, the University of Michigan cannot guarantee the privacy of any *records*, including the *personal records*, of any University employee.

This policy governs those circumstances in which the University, when not governed by external law, will monitor or access *records* and *record systems*.

Other than as authorized under the regulations of this policy, neither the University nor any employee acting on behalf of the University will access *records* or monitor the content of *record systems* located on University-controlled premises or University property, which includes but is not limited to University computers, networks, offices, and telephones.

### III. Regulations

#### A. University Obligations

##### 1. Standards for Accessing or Monitoring Records

As described below, the University has established general standards for accessing or monitoring all types of *records* (*business*, *faculty-owned scholarly*, and *personal*) or *record systems*, and additional standards for accessing or monitoring each type of *record*.

###### a. Standards that apply to all *business*, *faculty-owned scholarly*, and *personal records* or *record systems*

The University may access or monitor all records (*business*, *faculty-owned scholarly*, and *personal*) or *record system*s in the following circumstances:

1. When the University must monitor *record systems* to avert reasonably anticipated threats or hazards to those *record systems*. An example includes scanning to detect computer viruses. (This does not include an examination of the contents of *records* or *record systems*.); or

2. When the University is required by law to access, monitor, or disclose *records* or *record systems*.

Privacy and the Need to Monitor and Access Records | SPG                    Page 2 of 5
Case 1:12-cr-00973-PGG   Document 71   Filed 09/24/13   Page 6 of 38

Case 1:12-cr-00973-PGG   Document 37-2   Filed 06/21/13   Page 3 of 6

b. Standards that apply to each type of record (*business*, *faculty-owned scholarly*, and *personal*)

1. *Business Records*

   The University may access *business records* or monitor the *business record* content of *record systems* in the following circumstances:

   - When the University has a *legitimate business* need to know or access the information contained in *business records*, and the employee who controls the business records or access to the *business records* (e.g. password, assigned office holder, etc.) is unavailable or unwilling to give consent to access.

2. *Faculty-Owned Scholarly Records*

   According to the 1940 Statement of Principles on Academic Freedom and Tenure, American Association of University Professors' Policy Documents & Reports (1995 ed.), "Institutions of higher education are conducted for the common good and not to further the interest of either the individual teacher or the institution as a whole. The common good depends upon the free search for truth and its free expression."

   Consistent with academic freedom and tradition, all University of Michigan faculty (including full-time, part-time, adjunct, and emeritus faculty) own and control instructional materials and scholarly works created at their own initiative with usual University resources. (For more information regarding ownership of works, see SPG section 601.28 "Who Holds Copyright at or in Affiliation with the University of Michigan")

   For the purposes of this policy the monitoring and access standards that apply to *faculty-owned scholarly* records (or records that are labeled as such) will also apply to *personal records*.

3. *Personal Records*

   The University and its employees will not access or monitor the content of *personal records* (including *faculty-owned scholarly records*), or monitor the *personal records* (including *faculty-owned scholarly records*) content of *record systems*, except under the following circumstances:

   a. When an employee who controls *faculty-owned scholarly* or *personal records* (e.g. password, assigned office holder, etc.) is unavailable or unwilling to give consent to access and when it is necessary for the University to determine whether there are *business records* contained therein, the University will access such *records* only to the extent necessary; or

   b. When there is reasonable cause to believe that the employee has engaged in misconduct and may have used University resources improperly.

2. Preserving and Protecting *Records*

In circumstances where the University determines that there may be a specific risk to the integrity or security of *records*, the University may take measures to protect or preserve those *records*. For instance, the University may take a "snapshot" of a computing account to preserve its status on a given date, copy the contents of a file folder, or restrict access to a *record system*. The University may access or monitor preserved or protected *records* pursuant to Part III of this policy.

B. Employee Obligations

1. File Maintenance

   a. *Work-Related Records*. Employees are responsible for organizing their *work-related records* so that they are accessible to those with a *legitimate business* need to know or access the information contained in them.

   b. *Faculty-owned Scholarly* or *Personal Records*. While the University cannot provide an absolute guarantee as to the privacy of *faculty-owned scholarly* or *personal records*, employees should take reasonable measures to safeguard against inappropriate or inadvertent access to their *records*. Employees should mark as "private" or "personal" all *personal records*, or as "scholarship" or "research" all *faculty-owned scholarly records* maintained on University-controlled premises or property. Employees should maintain this information in an identifiable separate location (e.g. folder or file) from their *business records*.

2. Standards of Employee Conduct for Accessing or Monitoring *Records*

It is a violation of this policy for an employee to monitor *record systems* or access *records* beyond the standards established by Section III. A. of this policy. It is also a violation of the policy if the University has granted access to the employee (to monitor or access *records*) and if the employee has accessed or monitored *records* or *record systems* for purposes other than the purposes for which the University has granted access.

## IV. Sanctions

Violations of this policy will be considered misconduct on the part of the employee and will be subject to institutional sanctions up to and including termination of appointment.

Violations of this policy include:

1. An employee monitors *record systems* or accesses *records* beyond the standards established by Section III. A. of this policy.

2. The University has granted access to the employee (to monitor or access records) and the employee accesses or monitors *records* or *record systems* for purposes other than the purposes for which the University has granted access.

## V. Employee Grievances

Employees who allege that the University has violated their rights as described in this policy may file a grievance under the appropriate University grievance procedure. Staff members should see Standard Practice Guide 201.08 "Grievance Procedures and Dispute Resolution" http://spg.umich.edu/pdf/201.08.pdf and faculty members should see the Faculty Handbook, Section 10.H "Formal Grievance Procedures" (http://www.provost.umich.edu/faculty/handbook/10/10.H.html); union members (faculty or staff) should refer to the grievance procedure in the applicable collective bargaining agreement.

## VI. Definitions

### A. Records

For purposes of this policy, a record is any document, file, computer program, database, image, recording, or other means of expressing fixed information that is created, received, used, or maintained within the scope of University business or employment at the University or that resides on University-controlled premises or property. Records are either *work-related* or *personal*.

### B. Record Systems

Record systems are ways of storing, disseminating, or organizing *records*. They include, but are not limited to, computers, computing networks, telephones lines, voice mail, fax machines, filing cabinets, etc. which are University property or which are controlled by the University.

### C. Work-Related Records

Work-related records are either *business records* or *scholarly records*.

### D. Business Records

A business record is any *record* created, received, used, or maintained by an employee in the normal course of his or her professional responsibility or work for the University. This includes *records* relating to an employee's professional development, but does not include *faculty-owned scholarly records*. Examples of business records are drafts or final documents, including underlying or supporting documentation, of the following:

- budget reports;
- documents shared with or generated by third parties, such as purchase orders, bills for services or contracts with vendors;
- data sets that do not meet the definition of *faculty-owned scholarly records*, such as financial or enrollment data;
- feasibility studies or utilization analysis;
- attendance records, work schedules, or work orders;
- architectural drawings;
- correspondence or memoranda related to University business;
- course syllabi;

Case 1:12-cr-00973-PGG   Document 37-2   Filed 09/24/13   Page 8 of 38
Case 1:12-cr-00973-PGG   Document 37-2   Filed 06/21/13   Page 5 of 6

- student grades;
- meeting minutes;
- departmental web sites or e-mail groups; and
- committee reports.

E. Faculty-Owned Scholarly Records

Faculty-owned scholarly records are defined in SPG section 601.03 "Ownership of Copyrighted Works Created at or in Affiliation with the University of Michigan" as works that are created at the faculty member's own initiative with usual University resources. They include, but are not limited to *records* related to information gathering, knowledge production, methodology, distribution, handouts, reading lists, research, research plans, notes, charts, articles, presentations, books, scholarly commentary, consulting works, films, music, choreography, works of art, and all other *records* produced in the role of scholar, researcher, teacher, or faculty member. They do not include grades or course syllabi, nor do they include *records* produced using unusual University resources, commissioned works, or *records* created as a result of a faculty member's administrative appointment, or service to the University, such as committee work or serving as a hearing officer.

F. Personal Records

A personal record is a *record* that is created, received, used, or maintained by an employee for a purpose not related in any way to his or her work for the University.

G. Legitimate Business Need

A legitimate business need is any reason necessary to conduct the normal business of the University. A legitimate business need can be held only by a person who, based strictly on his or her job responsibilities, has a specific need to know the information accessed or monitored. The normal business of the University includes, but is not limited to:

- preparation of departmental budgets;
- ordering of materials, supplies, and equipment for the unit;
- activity related to providing service, such as food service, human resources, legal services, computer support services, etc.;
- strategic planning activity;
- planning, financing and construction of capital projects;
- preparation of work schedules;
- duties related to University committees; or
- audits of University finances, processes, and related activity.

Legitimate business need does **not** include access or monitoring the content of *records* or *record systems* in order to determine:

- whether a faculty or staff member is spending an excessive amount of work time on personal activities; or
- whether a faculty or staff member has committed misconduct, unless there is reasonable cause to believe that misconduct has been committed, *and* that University resources may have been used improperly.

---

1  Words that appear in italics are defined in section VI, Definitions.

| SPG number:<br>601.11 | Applies to:<br>All Employees | Related policies:<br>Grievance Procedure and Dispute |
| --- | --- | --- |
| Date issued:<br>September 7, 2004 | Owner:<br>Office of the Provost and Executive<br>Vice President for Academic Affairs | Resolution<br><br>Related links:<br>Communications |
| Next review date:<br>September 7, 2008 | Primary Contact:<br>Office of the Provost and Executive<br>Vice President for Academic Affairs | |

**Hard copies of this document are considered uncontrolled. If you have a printed version, please refer to the University SPG website (spg.umich.edu) for the official, most recent version.**

# Exhibit B

Acquisition, Use and Disposition of Property (Exclusive of Real Property) | SPG Page 1 of 4
Case 1:12-cr-00973-PGG   Document 71   Filed 09/24/13   Page 11 of 38
Case 1:12-cr-00973-PGG   Document 37-6   Filed 06/21/13   Page 2 of 5





UNIVERSITY OF MICHIGAN

# SPG U-M Standard Practice Guide

Acquisition, Use and Disposition of Property (Exclusive of Real Property)                    520.01

## I. Overview

Personal property is acquired and used in the University by faculty, staff, students and visitors for the support of activities of the University and may not be used for personal, for-profit activities or illegal purposes. All personal property owned by the University of Michigan (either through direct purchase or transfer) must be controlled within the following policies of acquisition, use and disposal. This property is ultimately under the control of the Property Control Office of the University and subject to the procedures issued by that office. For more information about Property Control see their website at http://www.umich.edu/~ofa/propertycontrol/. For information on the acquisition, use and disposition of real property (real estate), see SPG 601.23 entitled Real Estate Transactions.

The University has sole responsibility for the disposition of property and any resulting proceeds via the Property Disposition Office. For more information about Property Disposition see their website at http://propertydisposition.umich.edu/.

Property is defined as all items of a capital nature such as fixtures, furniture, and moveable equipment over $5,000 as well as non-capital purchases of equipment that is not generally considered disposable or consumable in nature (i.e. consumed as part of use).

## II. Acquisition of Property

### A. Purchased Property

Property acquired by the University must comply with all of the purchasing policies (re: SPG 507.01) and procedures of the University http://spg.umich.edu/policy/507.01.

### B. Transferred Property

Property may be acquired as gifts or transfers of research property purchased by grants or contracts held by other institutions. Property Control signs for all incoming equipment, determines the depreciated value, and tags and books the equipment where required. Transfer of research equipment usually occurs when a researcher moves to Michigan and brings contracts or grants. For information on this process see http://www.umich.edu/~ofa/propertycontrol/TrsfResProp.htm

### C. Inventory Record and Tagging of Capital Equipment

Property Control and Financial Operations will ensure that all acquisitions of capital equipment are recorded into the University's inventory. The following data is collected: Purchase Order Number, Voucher Number, Project/Grant, and the description of the equipment. All movable equipment costing $5,000 or more, whose useful life is 2 or more years is considered capital equipment and must be tagged by Property Control.

## III. Use of Property

Property is provided by the University for the use of faculty, staff, students and visitors in pursuit of University activities and includes teaching, research, public service, patient care and administrative activities. For more information see the Web Site at http://www.umich.edu/~ofa/propertycontrol/EquipLoan.htm.

### A. Off campus Use of University Equipment

Faculty and staff members who hold regular appointments and students who have class requirements are permitted to use University equipment at off-campus locations whenever it will benefit the teaching, research or public service or administrative activities of the University.

Acquisition, Use and Disposition of Property (Exclusive of Real Property) | SPG ... Page 2 of 4
Case 1:12-cr-00973-PGG   Document 71   Filed 09/24/13   Page 12 of 38
Case 1:12-cr-00973-PGG   Document 37-6   Filed 06/21/13   Page 3 of 5

Requests for off-campus use and return of equipment require approval of the department head who is responsible for the equipment and is of higher administrative authority than the requestor. The department head is also responsible for notifying:

1. Property Control when equipment is removed, returned or damaged.

2. The Department of Public Safety and Risk Management when there is a loss of equipment. You can find more information at http://police.umich.edu/ for Public Safety and http://www.umich.edu/~riskmgmt/property.html for Risk Management.

## B. Personal Use of Property

Property is purchased to support the mission of the University and is not intended to support the personal use by faculty, staff, students or visitors. Limited personal use of property may be deemed acceptable (such as essential personal calls, internet used during off-hours) within the following principles:

1. Personal use of equipment does not reduce the effort or hours worked by the employee.

2. Personal use does not interfere with business usage.

3. Personal use does not result in material incremental cost to the University; permission may be given for personal use if individual reimburses the University for the cost (such as phone calls, copies).

4. Activities in support of the University's objectives of creating knowledge and disseminating same, such as scholarly publishing and discipline-related consulting are recognized as normal professional responsibilities and therefore understood as appropriate uses.

5. University-owned property is not to be used in any personal, for-profit activity by faculty or staff.

6. University-owned property is not to be used for illegal purposes such as copying licensed or copyrighted software or other materials.

## C. Management of Copyrighted Materials

University administrators must be proactive in managing and monitoring the use of copyrighted materials such as computing software. Mismanagement of this resource may subject the University to a considerable liability. Copying copyrighted materials without the proper licensing or approvals also conflicts with the fundamental values of the University community regarding intellectual property.

**References**: SPG 500.01 Fiscal Responsibilities at http://spg.umich.edu/policy/500.01 ; SPG 507.01 Purchasing Policies and Procedure at http://spg.umich.edu/policy/507.01 ; SPG 601.03 Ownership and Use of Computer Software at http://spg.umich.edu/policy/601.03.; SPG 601.07 Proper Use of Information Resources, Information Technology Resources, and Networks at the University of Michigan at http://spg.umich.edu/policy/601.07

# IV. Disposition of Property

All University of Michigan property and scrap material must be sold or disposed of by Property Disposition. No property may be sold or disposed of to buyers outside the University (employees purchasing property personally are considered "buyers outside the University") without the concurrence of Property Disposition.

## A. Surplus Property

Determination of final disposition and/or sale price of an item, once it has been declared surplus, is the sole prerogative of Property Disposition. Individual items that are part of a group sale may not be removed from sale if their removal will jeopardize the total sale and result in a net loss to the University. This determination will be made by Property Disposition.

## B. Scrap

All scrap that has a value is the property of the University and must be disposed or utilized to the University's best advantage. Scrap includes but is not limited to: silver, gold, other metals, paper, wood or other byproducts of operations. No scrap may be given away without the approval of Property Disposition.

## C. Sale of Property to University Employees and Students

University employees and students are eligible to purchase property from Property Disposition at the resale price plus Michigan Sales Tax. The purchaser may not be the employee who initially designated the property as surplus.

It is Property Disposition's practice to give priority as follows whenever possible:

1. University departments will be given preferential treatment in the purchase of surplus items.
2. The major user of the equipment before disposal.
3. Faculty, staff, or students of the University of Michigan.

### D. Preparation of Equipment Prior to Disposal

Any equipment which records or stores materials of a proprietary nature, material which is protected by federal or state statute (such as the Health Insurance Portability and Accountability Act which protects privacy of patient information or Human Subjects regulations), or which has material with separate copyright issues must have this material/data removed before disposition. Most notable are computer drives, which must be cleared of all software and files prior to disposition. It is the responsibility of the department to do this. Please reference the Property Disposition web site at http://propertydisposition.umich.edu/ for the detailed policy and recommended procedures.

### E. Transfer of Equipment between UM departments

When a department needs to transfer (or sell) capital equipment to a different department, Financial Operations must be contacted to ensure that the University records are maintained. Please email amtransfers@umich.edu and include the following information: Description of the capital equipment (i.e. computer), Department ID to which the asset currently belongs, Department ID to which the asset is being transferred and the Tag Number or Asset ID.

### F. Transfer and Sale of Research Property Purchased by Grants and Contracts

In setting forth the procedure for requesting the transfer or sale to another institution of property purchased with funds from University of Michigan grants or contracts, several principles must be kept in mind. Specifically, the concerns of three separate institutions can influence the decision to transfer:

1. Sponsor – The sponsor may retain full title, in which case the sponsor decides whether the property may be transferred. The sponsor may give title to the University only after a certain time has elapsed following termination of the grant or contract. In this interim period, both the sponsor and the University may be involved in making the transfer decision.
2. University of Michigan – In the event that the sponsor has given title of the property to the University, either at the time of purchase or at a later date, the decision to transfer is a University decision.
3. Recipient Institution – If the sponsor and the University agree to the transfer of property to another institution, the proposed recipient institution must then also agree. The recipient institution must supply the University with a contact name, mailing address, telephone, email address and facsimile numbers. The recipient contact must check the equipment and sign and return the paperwork within two weeks.

Exceptional cases arise where specialized items of property may be essential to the continuation of a Project Director's research at his new institution. Should this be the case, consideration will be given to a request by the Project Director for the transfer of property. The Project Director should note that, in addition to the need for the property, the following conditions must prevail if the University holds title to the property.

1. The equipment was purchased by the researcher's grant or contract in whole or part. In cases where the University of Michigan provided a portion of the funding, the new institution will be asked to reimburse in the same proportion of the existing appraised value determined by Property Disposition.
2. The property is not required in research continuing in the University under direction of others.
3. Outgoing equipment must be formally accepted by the new institution.

The approval for divesting of such equipment must be recommended in writing by the Department Chair/Unit Head/Dean or Director. The final decision to sell the property will remain that of the Executive Vice President and Chief Financial Officer or his or her designee.

The approval for the sale of research equipment must be recommended in writing by the Department Chair/Unit Head/Dean or Director. The final decision to sell the property will remain that of the Executive Vice President and Chief Financial Officer or his or her designee. See http://www.umich.edu/~ofa/propertycontrol/TrsfResProp.htm for the specific procedure.

SPG number:
520.01

Date issued:
June 7, 2005

Next review date:
June 7, 2009

Owner:
**Office of the Executive Vice President and Chief Financial Officer**

Primary Contact:
**Office of the Executive Vice President and Chief Financial Officer**

Related policies:
Fiscal Responsibilities
General Policies and Procedures
Ownership and Use of Computer Software
Proper Use of Information Resources, Information Technology, and Networks at the University of Michigan
Real Estate Transactions

Related links:
Property Control
Property Disposition
Risk Management
UM Police

**Hard copies of this document are considered uncontrolled. If you have a printed version, please refer to the University SPG website (spg.umich.edu) for the official, most recent version.**

Exhibit C

 

# SPG U-M Standard Practice Guide

**UNIVERSITY OF MICHIGAN**

Tech Tools: Cell Phones and Portable Electronic Resources                    514.04

## I. Overview

This SPG provides guidance regarding University-funded technology tools such as cell phones and portable electronic resources for faculty and staff as defined below. When the University is paying for cell phones and portable electronic resources, employees should ensure that these devices are used prudently to support the teaching, research, public service, and patient care missions of the University. University resources must not be misused to subsidize employees' personal expenses.

This policy promotes prudent fiscal practices across the University, but also allows each unit the reasonable flexibility to provide cell phones and other portable electronic resources to employees when there is a legitimate business need. Units may establish more restrictive procedures than those outlined in this SPG but should balance any efforts to economize against additional administrative burden on faculty and staff. This policy is also intended to protect the University and its employees from tax liability by ensuring compliance with the Internal Revenue Code (IRC) and its corresponding regulations.

### A. Types of Portable Electronic Resources

This policy covers portable electronic resources that feature wired and wireless telecommunication and data services, including cell phones, smart phones, portable computers (e.g., laptops, iPads and tablets), and similar devices. This list is illustrative and not intended to be a comprehensive list of all tools covered by this policy.

This SPG does not cover certain resources such as two-way radios, prepaid cell phones, one-time purchases of international phones, pooled equipment, home desktop computers, and pagers. These resources will continue to be deployed only when there is a legitimate business need and will be managed at the unit level.

### B. Policy

Cell Phones, Smart Phones, etc.

The University may offer a stipend to employees who have a demonstrable business need for cell phones, smart phones and other similar telecommunication resources. This stipend is intended to cover a portion of the monthly service cost and associated hardware to a specified maximum cap per month, provided the resource is used "*Primarily*" for business use. "*Primarily*" is defined as more than 50 percent business usage.

As an alternative, the University can provide the cell phone directly to employees when regulatory data protection requirements are present (e.g., NCAA regulations) and/or usage is "*Almost Exclusively*" for business purposes (greater than 85 percent). See Section II, B for more information.

The University's recommended reimbursement approach for cell phones is the stipend approach. Most units should use this approach since it minimizes the overall administrative burden. (See Section II, A for more information).

Laptops, iPads, Tablets, and Similar Devices

The University may offer these resources directly to employees who have a demonstrable business need for them and the resources are used "*Primarily*" (greater than 50 percent) for these business needs. The stipend model may **not** be used to pay for these resources.

As the number of computing and mobile devices proliferate, it will impose a greater financial and data security burden on University units. For this reason, it is generally recommended that units limit the number of devices directly funded by the University to what is reasonable from a business standpoint.

### C. Home Internet Connectivity

Costs associated with home internet connectivity will not be paid for—or reimbursed—by the University. Exceptions include employees who perform 90 percent of their jobs in non-university space, (e.g., work from home 90 percent of time).

D. Effective Date

While this policy is effective July 1, 2012, units have a six-month grace period (through January 1, 2013) to formally implement the policy.

## II. Options for Providing Cell Phones

Units have two options to pay for the use of cell phones—a monthly payroll stipend or providing the resources directly to employees.

A. Stipends

Stipends maximize efficiencies, minimize administrative costs, as well as eliminate the burden of managing bills and the cost of insuring or replacing lost tools. The stipend is the recommended method of payment. For the vast majority of the units, this is the option that should be put into place. Under this option, employees are responsible for purchasing the cell phone and related service contract with their personal funds.

In those instances where the tool is used "*Almost Exclusively*" for business purposes (greater than 85 percent) and/or regulatory data protection requirements are present the University may provide the cell phone/smart phone directly to the employee. (See Section II, B for more information.)

1. Unit Responsibilities
   a. A Verification Statement (http://finance.umich.edu/techtoolpolicy) should be completed annually by employees who receive a stipend.
   b. One monthly billing statement should be collected by units from the employee when the stipend begins and then each January to verify that the stipend is spent on this resource.
   c. Stipends should be processed as *Additional Pay Workflow Transactions* into the HRMS M-Pathways system. The TTN earnings code should be used for this nontaxable reimbursement.
   d. Stipends should be limited to the cost of the normal business use of the resource up to the maximum amount allowed. See website for capped amount (http://finance.umich.edu/techtoolpolicy). See Section 3a.

2. Faculty and Staff Responsibilities
   a. Employees are responsible for maintaining their own service contracts as well as purchasing, insuring, and replacing the tools. Note that all employees are eligible for M-Card discounts on communication devices. (http://www.finance.umich.edu/treasury/mcard/discounts)
   b. Employees should complete a Verification Statement (http://finance.umich.edu/techtoolpolicy) each year attesting to their business use as "*Primarily*."
   c. Employees are responsible for reporting any reduction below the greater-than-50 percent threshold to appropriate personnel in their units. If, at any time, the usage changes so that the device is not used "*Primarily*" (more than 50 percent) for business, the stipend should be stopped.
   d. Employees should keep (or have access to) monthly invoices for a one-year period so they can be produced upon request by either a University compliance department or the Internal Revenue Service. Most cell phone providers offer online access to billing information, so you may wish to check with your provider about this service.

3. Stipend Amounts
   a. Monthly stipends will be capped at a specific dollar amount. Information about the capped amount can be found at http://finance.umich.edu/techtoolpolicy. Monthly stipends are intended to pay only for business-related service fees and/or the cost of the cell phone.

B. University-Provided Cell Phones

The University may provide cell phones directly to the employee when the tool is used "*Almost Exclusively*" for business purposes (greater than 85 percent) and/or when regulatory data protection requirements exist. As a general practice, however, it is recommended that the stipend approach be used.

If the unit provides a cell phone directly to employees, the unit must use a service provider that has a strategic contract with Procurement Services and offers discounted pricing to the University. A list of these vendors and instructions on how to obtain University pricing is available at http://finance.umich.edu/techtoolpolicy. Cell phones provided under this option can only be replaced every 24 months. Units may opt to use their equipment for longer periods of time. Lost or damaged cell phones can be replaced at the discretion of the unit.

**NOTE:** Since some units may already have established agreements with carriers for existing devices, the policies in this document should go into effect immediately after those agreements expire. New agreements after July 1, 2012, must be structured to be compliant with this policy.

1. Unit Responsibilities

   a. Purchases made by the University must be made based on procedures defined by Procurement Services. Detailed information about these procedures is available at http://finance.umich.edu/techtoolpolicy.

   b. A Verification Statement (http://finance.umich.edu/techtoolpolicy) should be completed annually by each employee who uses a cell phone covered by this policy. This statement should be completed when the cell phone is initially provided to the employee and every January thereafter.

   c. Units should also keep (or have access to) monthly invoices for a one-year period so they can be produced upon request by either a University compliance department or the Internal Revenue Service. Service providers that have a strategic contract with the university maintain this information. Units should contact Procurement Services to obtain this information as the need arises.

   d. Use of this option must be approved by:

      **Campuses**

      **Ann Arbor:** Executive Officers, Deans, Associate Deans, Associate Vice Presidents, or Executive Director of University Audits

      **Dearborn:** Chancellor, Vice Chancellors, Deans, or Associate Deans

      **Flint:** Chancellor, Vice Chancellors, Deans, or Associate Deans

      **Hospitals and Health Centers:** UMHS CFO or Executive Directors

2. Faculty and Staff Responsibilities

   a. All devices remain the property of the University and should be returned to the unit when no longer needed by employees or when employees leave the unit. Units can also turn the devices over to Property Disposition to sell if they do not reissue them to current employees.

   b. Employees should complete a Verification Statement (http://finance.umich.edu/techtoolpolicy) each year attesting that regulatory data requirements are present and/or that their business use is "*Almost Exclusively*" (greater than 85 percent).

   c. Employees are required to reimburse the University for any personal usage that results in additional charges. Costs of optional features which have no business purpose (e.g., ring tones, games, excessive charges due to pictures in texts, international coverage for staff not traveling internationally) must be reimbursed by employees.

   d. Employees are responsible for reporting any reduction below the "*Almost Exclusively*" (greater than 85 percent) threshold. In this situation, the device should be returned to the unit and use of the Stipend Model should be considered.

C. Use of P-Cards

   Fees for cell phones and their related services should not be charged to University-issued P-Cards. Reimbursement for non-recurring expenses incurred by employees, such as costs for occasional international service, should be considered on an exception basis. As of January 1, 2013, the University will no longer allow the use of P-Cards to pay for cell phones or other technology devices, including purchases made at Computer Showcase (for which a short code should be used). Failure to adhere to this policy may result in a loss of P-Card privileges.

III. Option for Providing Laptops

   *(**Note:** The term 'laptop' as used below includes iPads, tablets, and other similar devices.)*

   A. University-Provided Laptops

Tech Tools: Cell Phones and Portable Electronic Resources | SPG ... Page 4 of 5
Case 1:12-cr-00973-PGG   Document 71   Filed 09/24/13   Page 19 of 38
Case 1:12-cr-00973-PGG   Document 37-7   Filed 06/21/13   Page 5 of 6

Units may choose to provide these resources directly to employees when a specific job responsibility requires a University-provided resource. The stipend method should not be used to provide laptops, tablets, and other devices to employees.

When exercising this option, units must select a vendor that has a strategic contract with Procurement Services and offers discounted pricing to the University. A list of these vendors and instructions on how to obtain University pricing is available at http://finance.umich.edu/techtoolpolicy. Laptops provided under this option can be replaced no earlier than every 36 months. Lost or damaged tools can be replaced at the discretion of the unit. Units may opt to use their equipment for longer periods of time.

1. Unit Responsibilities

   Purchases made by the University must be made based on procedures defined by Procurement Services. Detailed information about these procedures is available at (http://finance.umich.edu/techtoolpolicy).

   a. A Verification Statement (http://finance.umich.edu/techtoolpolicy) should be completed annually by each employee who uses a portable resource covered by this policy. This statement should be completed when the resource is initially provided to the employee and every January thereafter.

2. Faculty and Staff Responsibilities

   a. All laptops and related devices remain the property of the University and should be returned to the unit when no longer needed by employees or when employees leave the unit. Units can also turn the devices over to Property Disposition to sell if they do not reissue them to current employees.

   b. Employees should complete a Verification Statement (http://finance.umich.edu/techtoolpolicy) each year attesting to their business use as "*Primarily*."

   c. Employees are required to reimburse the University for any personal usage that results in additional charges. Costs of optional features which have no business purpose (e.g., licensing software applications for entertainment) must be reimbursed by employees through payroll deduction.

   d. Employees are responsible for reporting any reduction below the greater-than-50 percent threshold to appropriate personnel in their units. If, at any time, the usage changes so the device is not used "*Primarily*," (greater than 50 percent) for business, the device should be returned to the unit.

B. Use of P-Cards

   Fees for laptops, iPads, and tablets should not be purchased with University-issued P-Cards. As of January 1, 2013, the University will no longer allow the use of P-Cards to pay for laptops and related devices, including purchases made at the Computer Showcase (for which a short code should be used.). Failure to adhere to this policy may result in the loss of P-Card privileges.

IV. Policy Exceptions

The Department of Procurement Services has the authority to approve, modify, or decline all exceptions made to this policy. In an effort to provide flexibility to the units, Procurement Services delegates the authority to make exceptions to this policy to the following roles:

Policy exceptions must be approved by:

**Campuses**

**Ann Arbor:** Executive Officers, Deans, Associate Deans, Associate Vice Presidents, or Executive Director of University Audits

**Dearborn:** Chancellor, Vice Chancellors, Deans, or Associate Deans

**Flint:** Chancellor, Vice Chancellors, Deans, or Associate Deans

**Hospitals and Health Centers:** UMHS CFO or Executive Directors

Exceptions must only be made in those instances where a legitimate business rationale exists. Units must retain documentation for each exception that is granted. Exceptions will be monitored periodically by Procurement Services and subject to audit. Exceptions that are deemed to be excessive in dollar amount, volume, or otherwise inconsistent with the goals of this policy will be declined.

Tech Tools: Cell Phones and Portable Electronic Resources | SPG    Page 5 of 5

Case 1:12-cr-00973-PGG    Document 71    Filed 09/24/13    Page 20 of 38
Case 1:12-cr-00973-PGG    Document 37-7    Filed 06/21/13    Page 6 of 6

## V. For More Information

Finance has a webpage that includes a variety of resources about this SPG, including FAQs, Verification Statements, information about vendors with strategic contracts for these resources, and information about the capped stipend amount. The web page is available at http://finance.umich.edu/techtoolpolicy.

## VI. Implementation Guidance and University Contact

This SPG outlines the University policy for the purchase and payment/reimbursement of cell phones and portable electronic resources. The policy was developed after extensive discussion with different stakeholders across the University. Given the complexity of the University's business, there may be extenuating circumstances that this policy has not anticipated. Procurement Services will work with its customers to address such circumstances.

Prior to January 1, 2013, compliance documentation for this policy must be retained by appropriate personnel in the units. After January 1, 2013, Procurement Services expects to deploy a web-based tool that will collect documentation (Verification Statements, exceptions, etc.) electronically in an effort to reduce the paperwork burden.

For questions about this SPG, please contact the Procurement Solutions Team at (734) 764-8212, option 1, or by e-mail at procurement.services@umich.edu.

| Attachment | Size |
|---|---|
| 514x04.pdf | 80.32 KB |

SPG number:          Applies to:                          Related links:
514.04               Faculty and Staff                    Finance - Tech Tools
                                                          M-Card Discounts
Date issued:         Owner:
May 31, 2012         Associate Vice President for Finance

                     Primary Contact:
                     Office of the Executive Vice President
                     and Chief Financial Officer

**Hard copies of this document are considered uncontrolled. If you have a printed version, please refer to the University SPG website (spg.umich.edu) for the official, most recent version.**

# Exhibit D

Case 1:12-cr-00973-PGG   Document 71   Filed 09/24/13   Page 22 of 38
Policy Statement on the Integrity of Scholarship and Procedures for Investigating Allegati...   Page 1 of 6
Case 1:12-cr-00973-PGG   Document 37-8   Filed 06/21/13   Page 2 of 7





Policy Statement on the Integrity of Scholarship and Procedures for Investigating
Allegations of Misconduct in the Pursuit of Scholaship and Research

303.03

## 1. Policy Statement on the Integrity of Scholarship

A. Integrity in scholarship and teaching is a fundamental value upon which the University is founded. Without integrity, we could not justify the privilege of academic freedom intrinsic to scholarship and education, nor could we provide to society the advancements of knowledge that derive from free and open inquiry.

B. It is, therefore, a fundamental responsibility of the faculty, staff, students, and administration of the University of Michigan to maintain the trust of the public in all research and scholarly activity. It is the shared responsibility of all members of our academic community to assure that misconduct in academic endeavors is dealt with in a timely and effective manner, and that the reputation of the University for high standards of scholarly integrity is preserved.

C. Some lapses in integrity are more serious than others. Lesser offenses, such as carelessness or questionable research practices, should be handled through the normal administrative channels. Other situations are sufficiently grave that they require University review through an inquiry or formal investigation. The procedures outlined in this document govern the steps to be taken in handling major offenses. It is critical to distinguish serious academic misconduct from the honest error and the differences of interpretation that are inherent in the scientific and creative process and are normally corrected through further research and scholarship.

D. The University community views serious academic misconduct as potential grounds for termination of employment under appropriate University procedures.

E. Misconduct in the pursuit of scholarship and research includes at least the following major offenses:

1. Fabrication of data: dishonesty in reporting results, ranging from fabrication of data, improper adjustment of results, and gross negligence in collecting or analyzing data to selective reporting or omission of conflicting data for deceptive purposes;

2. Plagiarism: taking credit for someone else's work and ideas, stealing others' results or methods, copying the writing of others without proper acknowledgment, or otherwise falsely taking credit for the work or ideas of another;

3. Abuse of confidentiality: taking or releasing the ideas or data of others which were shared with the legitimate expectation of confidentiality, e.g., stealing ideas from others' grant proposals, award applications, or manuscripts for publication when one is a reviewer for granting agencies or journals;

4. Falsification in research: deliberately misrepresenting research, including the progress of research, to a research sponsor;

5. Dishonesty in publication: knowingly publishing material that will mislead readers, e.g., misrepresenting data, particularly its originality, misrepresenting research progress, or adding the names of other authors without permission;

6. Deliberate violation of regulations: flagrant and repeated failure to adhere to or to receive the approval required for work under research regulations of Federal, State, local or University agencies, including, but not limited to, guidelines for the:

   - protection of human subjects

   - protection of animal subjects

   - use of recombinant DNA

   - use of radioactive material

   - use of hazardous chemicals or biologicals

- conduct of classified research

7. Property violations: stealing or destroying property of others, such as research papers, supplies, equipment, or products of research or scholarship;

8. Failure to report observed major offenses: covering up or otherwise failing to report major offenses or breaches of research ethics by others that one has observed.

9. Retaliation: taking punitive action against an individual for having reported alleged major offenses.

## II. Procedures for Investigating Allegations of Misconduct in the Pursuit of Scholarship and Research

### A. Applicability

1. These procedures apply only to allegations or other indications of serious misconduct in scholarship and research, which shall include, but not be limited to, the major offenses listed above.

2. These procedures apply to all instructional faculty, primary researchers, and other staff members, including without limitation graduate student research assistants, graduate student teaching assistants, graduate student staff assistants, undergraduate students employed in research or other scholarly activity, postdoctoral fellows and postdoctoral research associates, visiting faculty or staff, faculty or staff on sabbatical leave, adjunct faculty when performing University work, and faculty or staff on leave without pay.

   a. These procedures apply to students only when acting in their employment or service capacity, and not as students per se. In cases in which the student or employee status of the accused is unclear, the responsible administrator (herein called the director) shall elect whether to employ these procedures or other procedures available for the investigation and adjudication of alleged academic misconduct by students. Schools and colleges have procedures for handling allegations of academic misconduct by students, such as the "Academic Integrity: Policy and Procedures" of the Horace H. Rackham School of Graduate Studies. Questions about applicability may be directed to the Office of the General Counsel.

   b. Staff members subject to the terms and conditions of collective bargaining agreements should consult the specific provisions in their current agreements dealing with misconduct. Any provision in such agreements that differ from the provisions stated herein supersede the affected regulation of this policy. Information concerning staff members covered by collective bargaining agreements may be obtained from the personnel service center.

3. If the accused is no longer employed by the University, these procedures may nonetheless be used, at the discretion of the appropriate director and upon the advice of the Vice President for Research and the Office of the General Counsel, as a means of ascertaining the culpability of the accused.

### B. Reporting and Investigation

1. General Comments

   a. Reporting suspected academic misconduct is a shared and serious responsibility of all members of the academic community. Allegations should not be made capriciously, but indications or evidence of fraud or misconduct must not be ignored. Confidential advice about University policy and procedures is available at any time from the Office of the Vice President for Research or the Office of the General Counsel.

   b. The procedures that follow have five sequential stages: (1) an inquiry (Section 4) to determine whether an allegation or other indications of misconduct issues warrant further investigation; (2) reporting on the inquiry (Section 5); (3) when warranted, an investigation (Section 6) to collect and thoroughly examine evidence; (4) formal findings (Section 7); and (5) resolution and outcome (Section 8).

   c. In cases which present potential danger to third parties (e.g., hospital patients or research subjects) or which require interim measures pending final resolution, the appropriate university official, in consultation with the General Counsel, may meet with the accused for the purposes of imposing a temporary suspension of duties, pending conclusion of the formal investigation. At such a meeting, the accused shall be informed of the reasons for consideration of a temporary suspension and afforded the opportunity to oppose such action. The accused may be accompanied by counsel at such a meeting.

   d. Because of the potential jeopardy to the reputation and rights of an accused, great care must be taken to handle both inquiry and investigations in a way that preserves confidentiality, providing information only to those with a need to know. The procedures that follow are intended to safeguard the rights of the accused and the accuser, if an accuser exists, and to recognize the interest of the University community in academic integrity. The University will protect, to the best of its ability, the privacy of those who, in good faith, report apparent misconduct. The University will also provide to the accused individual(s) confidential treatment to the best of

its ability, an expeditious and thorough investigation, and an opportunity to comment on all allegations during the inquiry stage and, if initiated, during the investigation.

e. The integrity of the process will be maintained by disclosure and evaluation of any prejudicial conflict of interest. Individuals judged by the Vice President for Research or the Executive Vice president for Academic Affairs or the Chancellor, as appropriate, to have a conflict of interest that would jeopardize the credibility of the inquiry or investigation will not be assigned decision-making roles in the process.

f. It is a violation of University policy to retaliate against an individual for reporting in good faith an allegation of academic misconduct.

2. Federal Requirements

a. The National Science Foundation and the Public Health Service and other federal agencies have published formal regulations regarding the investigation of allegations of research misconduct involving activities supported by those agencies (See Exhibit A). Each of these regulations contains a definition of research misconduct, prescribes certain time limits for inquiries and investigations, and requires reporting to the agencies under certain conditions and at specified stages in the process.

b. The Vice President for Research, in consultation with the General Counsel, will determine the applicability of external regulations in each particular case. The University will comply with the requirements of the Federal regulations.

c. At any stage in the process of inquiry, investigation, formal finding, and disposition, the University may take interim administrative action to protect Federal funds.

3. Allegations

a. Allegations of academic misconduct and the basis for them shall be communicated confidentially and preferably, though not necessarily, in writing to the dean, director or department head (hereafter collectively, "director") in charge of the unit(s) in which the accused is employed, to the Office of the Chancellor, as appropriate, to the Office of the Vice President for Research, or to the Office of the General Counsel.

b. Upon receipt of such an allegation or other indication of misconduct, the director shall inform the General Counsel, who shall inform the Vice President for Research. The Vice President for Research, in consultation with the director, the Chancellor, as appropriate, and the General Counsel, shall designate an individual or individuals without conflicts of interest to conduct an inquiry into the allegation or other indication of misconduct.

4. Inquiry

a. An inquiry is information gathering and initial fact-finding to determine whether the allegation or apparent instance of misconduct warrants a formal investigation. An inquiry is not a formal hearing. It is intended to separate serious allegations deserving further investigation through this process from trivial, frivolous, unjustified, or clearly mistaken allegations, or from situations that clearly do not involve serious academic misconduct and which may be appropriately pursued through other administrative channels.

b. The Office of the Vice President for Research will oversee the inquiry process.

c. The Vice President for Research shall secure the necessary and appropriate assistance to insure a thorough and authoritative evaluation of the allegations(s). Such assistance will typically include an individual with training and/or experience in the conduct of inquiries. With the additional assistance, if needed, of an expert in the academic discipline involved, either from within the University or elsewhere, the Vice President for Research shall determine promptly whether the allegation or other indication of misconduct appears sufficiently well-founded to warrant a formal investigation.

d. Upon initiation of an inquiry, the accused shall be informed of the allegation(s) or other indication(s) of misconduct.

e. During the inquiry, every reasonable effort shall be made to keep confidential the identity of those accused and the accuser(s). Suspect data should be sequestered. Sufficiently detailed documentation shall be kept to permit later assessment of the adequacy of the inquiry. (This is particularly important in those instances in which the Vice President for Research determines that a formal investigation is not warranted). The documentation will be kept in a secure manner.

5. Reporting on the Inquiry

Policy Statement on the Integrity of Scholarship and Procedures for Investigating Allegations... Page 4 of 6
Case 1:12-cr-00973-PGG    Document 71    Filed 09/24/13    Page 25 of 38
Case 1:12-cr-00973-PGG    Document 37-8    Filed 06/21/13    Page 5 of 7

a. The individual(s) appointed to conduct the inquiry shall prepare a written report. It shall include a statement of the allegation, a description of the evidence reviewed, summaries of the relevant interviews, and the conclusions of the inquiry. It shall contain an assessment of whether there is sufficient evidence to warrant a formal investigation.

b. If the inquiry concludes that an investigation is warranted, the accused shall be provided the opportunity to comment on the report and any such comment will become part of the record. The individual who made the allegation may review and comment on that portion of the report directly related to the testimony or other evidence brought forth by that individual.

c. The report of the inquiry, along with any formal comments on the report, shall be forwarded to the Vice President for Research. The Vice President for Research shall notify the Executive Vice President for Academic Affairs, the Chancellor, as appropriate, the Office of the General Counsel, and any other appropriate university official.

d. If the inquiry produces sufficient evidence to warrant a formal investigation, the Vice President for Research, the Executive Vice President for Academic Affairs, or the Chancellor as appropriate, will initiate a formal investigation. It is generally appropriate for the Executive Vice President for Academic Affairs (or Chancellor) to initiate a formal investigation if the accused is a tenured or tenured-track faculty member. If there is substantial evidence of serious misconduct and if the accused is a faculty member to whom Regents' Bylaw 5.09 (R 5.09) applies, the Executive Vice President for Academic Affairs (or Chancellor) may, at his or her discretion, initiate the procedures required by the Bylaw as a substitute for the investigation outlined below.

e. The Vice President for Research, or a designee, in consultation with the General Counsel, shall decide if and when external funding agencies, if any, are to be notified, what any such notification shall include, and to whom it should be directed. Any such notice shall be provided by the Vice President for Research.

f. The director and the vice president concerned, in consultation with the General Counsel, will determine what additional notification is necessary. Every reasonable effort will continue to be made to protect the identity of the accused and the accuser(s) from all except those who have a legitimate need to know.

g. If the inquiry does not produce sufficient evidence to warrant a formal investigation, the Vice President for Research, after consultation with the General Counsel, shall so inform any persons involved in the informal inquiry to whom the identity of the accused was disclosed.

h. Unsupported allegations of academic misconduct not brought in good faith may lead to disciplinary action against the accuser.

6. Investigation

a. An investigation is the formal examination and evaluation of all relevant facts to determine if a major offense has taken place.

b. Upon determining that a formal investigation is warranted, the appropriate Vice President or Chancellor shall appoint an ad hoc investigating committee, the composition and size of which shall be determined by the Vice President or Chancellor. The committee should include at least one faculty member who is an expert in the general academic field of the accused and may also include one or more such experts from outside the University.

c. The appropriate Vice President or Chancellor shall inform the accused of the initiation of the investigation, the composition of the ad hoc investigating committee, and the charge to that committee.

d. The General Counsel or designee shall advise the ad hoc investigating committee on procedural matters.

e. The ad hoc investigating committee shall gather evidence and reach a determination promptly (within 120 days of appointment, in the absence of extraordinary circumstances) of whether formal charges of misconduct should be brought. A committee determination to bring charges should also include recommended sanctions (e.g., reprimand, demotion, or discharge) or other actions appropriate for resolution of the matter.

f. The ad hoc investigating committee shall secure the necessary and appropriate expertise to carry out a thorough investigation and authoritative evaluation of the relevant evidence.

g. During the formal investigation, every reasonable effort shall be made to protect the identity of those accused and the accuser(s), if any, from third parties. However, at this stage the accused shall normally be entitled to know the identity of all witnesses called before the committee. Cases that depend specifically upon the observations or statements of the complainant cannot proceed without the involvement of that individual; other cases that can rely on documentary evidence may permit the complainant to remain anonymous.

h. At fact-finding meetings of the committee, but not during its deliberations, the accused shall be permitted to be present with counsel, whose role shall be limited to advising the accused.

i. The ad hoc committee shall keep the accused and the appropriate Vice President or Chancellor apprised of any additional allegations or other developments during the investigation.

7. Formal Findings of the Investigation

a. The ad hoc committee shall oversee the preparation of complete summaries of interviews conducted during the course of the investigation. These summaries shall be provided to the interviewed party for comment or revision and included as part of the investigation file.

b. The ad hoc committee shall prepare a written report on the results of the investigation and its recommendations regarding outcome. The accused shall be provided the opportunity to comment on the report, and such comment will become part of the record. The person(s) who raised the allegation shall be provided with those portions of the report that describe their role and opinions in the investigation.

c. The ad hoc committee shall submit its report, along with the complete investigatory file, to the Vice President or Chancellor who appointed it. The Vice President or Chancellor shall decide on what actions to take in light of the report. He or she shall so notify the accused, the Vice President for Research, the appropriate dean or director, and any other appropriate university official of the decision. In consultation with the General Counsel and other appropriate university official, the Vice President for Research shall then decide if and when external funding agencies, if any, are to be notified, what any such notification shall include, and to whom it should be directed. Any such notice shall be provided by the Vice President for Research.

d. Investigatory files will be maintained in a secure manner in the Office of the General Counsel.

8. Resolution and Outcome

a. The University will undertake efforts, as appropriate and feasible, to restore the reputations of persons alleged to have engaged in misconduct when allegations are not confirmed, and also undertake efforts to protect the positions and reputations of those persons who, in good faith, made allegations.

b. If a misconduct determination is made, the next step depends on the kind of appointment the accused holds and on the seriousness of the sanction recommend.

1. Faculty Cases Covered by Regents' Bylaw 5.09

If the ad hoc investigating committee recommends a sanction of dismissal, demotion, or terminal appointment against a faculty member to whom Regents' Bylaw 5.09 applies, the Executive Vice President for Academic Affairs or Chancellor, as appropriate, may initiate the procedures required by the Bylaw.

2. Faculty Cases In Which Bylaw 5.09 Does Not Apply

In cases to which R 5.09 does not apply, but which are covered by a school or college faculty grievance procedure, the dean shall decide on the appropriate outcome, which the faculty member may then challenge through the applicable faculty grievance procedures. The substantive determination of misconduct shall not, however, be subject to challenge.

3. Other Cases

In cases to which R 5.09 does not apply, and which are not covered by an applicable faculty grievance procedure, the appropriate University manager and Personnel Department shall then initiate procedures required by the University's Standard Practice Guide 201.12, "Discipline," or the appropriate collective bargaining agreement.

Questions regarding these procedures may be directed to the Office of the General Counsel or the Office of the Vice President for Research.

| Attachment | Size |
|---|---|
| SPG 303.3 ExhibitA - Federal Research Misconduct Policies | 84.59 KB |

Case 1:12-cr-00973-PGG   Document 71   Filed 09/24/13   Page 27 of 38
Policy Statement on the Integrity of Scholarship and Procedures for Investigating Allegati...   Page 6 of 6
Case 1:12-cr-00973-PGG   Document 37-8   Filed 06/21/13   Page 7 of 7

| SPG number: | Owner: |
|---|---|
| 303.03 | Office of the Vice President for Research |
| Date issued: | |
| July 1, 1994 | Primary Contact: |
| Next review date: | Office of the Vice President for Research |
| September 16, 2013 | |

**Hard copies of this document are considered uncontrolled. If you have a printed version, please refer to the University SPG website (spg.umich.edu) for the official, most recent version.**

# Exhibit E

Case 1:12-cr-00973-PGG   Document 71   Filed 09/24/13   Page 29 of 38   Page 1 of 1
University of Michigan Office of the Provost

Case 1:12-cr-00973-PGG   Document 57-3   Filed 07/31/13   Page 2 of 2

contact us | site map

HOME

SEARCH
Search this site    [ Go ]



# Office of the Provost

ABOUT THE OFFICE

REPORTING UNITS

PROGRAMS, PROCESSES, & AWARDS

FACULTY INFORMATION

FUNDING OPPORTUNITIES

BUDGET

COST REDUCTION & REVENUE ENHANCEMENT

SPACE PLANNING & UTILIZATION

ACCREDITATION

CALENDARS

NEWS

REPORTS

SPEAKER REQUEST

FOR OFFICE OF THE PROVOST STAFF

Faculty Handbook
Table of Contents
Appendices
Acronyms
Help
Index

## The University of Michigan Faculty Handbook

### 12.A General Principles

The University of Michigan respects the privacy of its employees. Bylaw 14.07 states that the University will not release sensitive information without the consent of the individual involved unless required to do so by law. Individuals who provide information to the University are expected to provide truthful and timely information and to inform the University of any known inaccuracies in the University's records.

In addition to University policy, several statutes address privacy of and access to University records. These include the Michigan Freedom of Information Act (FOIA), which governs access to all University records (see Section 12.B); the Michigan Bullard-Plawecki Employee Right to Know Act, which governs access by employees to their personnel records (see Section 12.C); the federal Family Educational Rights and Privacy Act (FERPA), which governs access to student records (see Section 12.D); and SPG 601.11, "Privacy and the Need to Monitor and Access Records."

Faculty Handbook: University Records, Privacy, and Access to Information

U-M Gateway | Nondiscrimination Policy | Smoke-Free University Initiative | Design by Michigan Marketing & Design
Copyright © 2012-2013 The Regents of the University of Michigan, Ann Arbor, MI 48109 USA 734-764-1817

Exhibit F

contact us  |  site map

HOME

SEARCH
Search this site   [ Go ]



# Office of the Provost

ABOUT THE OFFICE

REPORTING UNITS

PROGRAMS, PROCESSES, &
AWARDS

FACULTY INFORMATION

FUNDING OPPORTUNITIES

BUDGET

COST REDUCTION & REVENUE
ENHANCEMENT

SPACE PLANNING &
UTILIZATION

ACCREDITATION

CALENDARS

NEWS

REPORTS

SPEAKER REQUEST

FOR OFFICE OF THE PROVOST
STAFF

Faculty Handbook
Table of Contents
Appendices
Acronyms
Help
Index

## The University of Michigan Faculty Handbook

### 12.G Electronic Privacy

The University of Michigan respects the privacy of its employees and seeks to
foster a climate free from arbitrary or capricious monitoring of employees and
the records they create, use, or control.

Nonetheless, the University must, at times, access records or monitor record
systems that are under the control of its employees. Furthermore, because the
University permits some latitude for employees to use University resources to
conduct University business off-campus and to conduct personal matters at
their work sites, work-related records and employees' personal records may be
located in the same place. For further discussion, including policy interpretations
and interpretative guidelines, see SPG 601.11.

The University also has a policy and guidelines regarding electronic access to
potentially offensive material. It attempts to balance the right of members of
the University community to access whatever electronic material they need and
to express themselves freely with the responsibility not to expose others to
material they find offensive. (SPG 601.16) Questions about this policy can be
addressed to the Office of the Vice President and General Counsel (764-0304).
See also Section 20.B, "University Policies Concerning Use of Technology."

Faculty Handbook: University Records, Privacy, and Access to Information

U–M Gateway | Nondiscrimination Policy | Smoke-Free University Initiative | Design by Michigan Marketing & Design
Copyright © 2012-2013 The Regents of the University of Michigan, Ann Arbor, MI 48109 USA 734-764-1817

# Exhibit G



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 24, 2013

**By Electronic Mail**
Richard Strassberg, Esq.
Goodwin Procter
The New York Times Building
620 Eighth Avenue
New York, NY 10018

    Re: *United States v. Mathew Martoma*, 12 Cr. 973

Dear Mr. Strassberg:

    Enclosed please find a copy of the "consent to search" form executed by Dr. Gilman with respect to the FBI imaging of the computer hard drive.

    Very truly yours,

    PREET BHARARA
    United States Attorney

By: 

    Arlo Devlin-Brown
    Eugene Ingoglia
    Assistant United States Attorneys
    (212) 637-2506

FD-941 (2-26-01)

# CONSENT TO SEARCH COMPUTER(S)

I, _DR. SIDNEY GILMAN_____, have been asked by Special Agents of the

Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers,

any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals,

described below:

_DELL LATITUDE E6410 LAPTOP , POWER CORD_____
CPU Make, Model & Serial Number (if available)

Storage or Retrieval Media, Computer Peripherals

_N/A_____

and located at _1251 AVENUE OF THE AMERICAS, NEW YORK, NY 10020_____, which I own, possess,

control, and/or have access to, for any evidence of a crime or other violation of the law.  The required passwords, logins,

and/or specific directions for computer entry are as follows: _SEE ATTACHED SHEET_____

      I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely

and voluntarily, and not as the result of threats or promises of any kind.

      I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which

it is stored, and any associated data, hardware, software and computer peripherals.

_8-16-2012_____
Date

_Sidney Gilman_____
Signature

_7/16/2012_____
Date

_(witness signature)_____
Signature of Witness

_SA-MATTHEW CALLAHAN_____
Printed Full Name of Witness

_1251 AVENUE OF THE AMERICAS, NEW YORK, NY 10020_
Location

_Robert J. Frachman_____
Robert J. Frachman

BRACEWELL
&GIULIANI

Username: SGILMAN   Lower case

Password: DISNAM80  D is uppercase. The rest is
lowercase

DO NOT OPEN folders or documents labeled
Phase 3 Raymalyand or AAB-003

# Exhibit H

# University of Michigan Health System
# Code of Conduct Attestation

**The University of Michigan Health System (UMHS) is committed to excellence and leadership in patient care, education and research.** As an employee, faculty member, student, trainee, visitor, scholar, volunteer or vendor, I understand that I play a vital role in the success of the UMHS mission and that I will be held accountable for compliance with applicable law and University and UMHS policies and procedures. This statement summarizes the standards of conduct that UMHS requires me to uphold:

☉ **Knowledge, understanding and compliance with the policies and procedures that apply to my work.** I agree to comply with all of the policies and procedures that relate to my work at UMHS, including the Code of Conduct. I agree that if I do not know whether an action is permitted, I will ask my supervisor or review the relevant policies. Sources include the U-M Standard Practice Guide, UMHS policies, and unit (e.g., Medical School, Hospital), department, and division-level policies and procedures. The UMHS compliance website has additional information. If I do not know what is permitted or required, I may contact the UMHS Compliance Office at (734) 615-4400 or the Health System Legal Office at (734) 764-2178 for guidance.

☉ **Avoiding fraud, waste and abuse.** I will accurately and honestly perform my work for UMHS, and will not engage in any activity intended to defraud anyone of money, property or services. I will not request or accept payment, either directly or indirectly, that is intended to induce referrals, or to induce the purchasing, leasing, ordering or arranging for any item or service at or from any organization or facility. I will comply with UMHS and University policies on conflicts of interest and on interactions between vendors and faculty/staff. I have reviewed and understand the summary of federal and state false claims and whistleblower protection laws. I will report any potential fraudulent or false claims, inappropriate billing practices, or similar concerns to my supervisor or the Compliance Office.

☉ **Protecting the confidentiality and security of information.** I may have access to proprietary or confidential information (including protected health information) about UMHS operations, workforce members, subjects, and/or patients ("sensitive information"). All of this information, in whatever form transmitted or received (e.g., oral, fax, photographic, written, electronic), must be treated by me in a confidential and secure fashion. I have completed and understand any UMHS HIPAA training required for my position.

o I will not access, release, or share sensitive information – even demographic screens with addresses and phone numbers – unless doing so is necessary as a part of my assigned duties, or I am authorized to do so by a Release of Information form. **I understand that my access to UMHS systems containing sensitive information may be audited at any time,** with or without cause. I understand that I am responsible for any access that occurs using my password.

o I will protect sensitive information. **I will not share my passwords or access to any UMHS systems or applications with any other person.** I will be careful to avoid inadvertently revealing sensitive information, including avoiding discussions of sensitive information in public places. I will not remove sensitive information from UMHS without my supervisor's permission and I understand that I am responsible for maintaining the security of such information in accord with UMHS standards. **If I use a portable electronic device (e.g., laptop, PDA), I will ensure that it meets UMHS security standards.**

o I understand that when my employment, affiliation, visitation or assignment with UMHS ends, I may not take any sensitive information with me and I may not reveal any UMHS sensitive information to any third person except as permitted by a Release of Information form (in the case of individually

Revised 12/18/08,
Revisions Approved by: UMHS Compliance Committee
Revision Effective Date: 01/01/2009

SEC Prod. #7   001

# University of Michigan Health System
# Code of Conduct Attestation

identifiable private information) or by written release from an authorized UMHS representative (in the case of proprietary information).

☺ **Disclosing actual and potential conflicts of interest or commitment and complying with any plans imposed to manage those conflicts. I agree to report any potential or actual conflicts of interest or commitment, and I have reported any current potential or actual conflicts of which I am aware.** An actual or potential conflict occurs if I or a family or household member has an outside personal, professional, commercial, or financial interest. While outside relationships and activities that further the University's academic and clinical missions are encouraged, conflicts can arise. The existence of a conflict is not inappropriate in and of itself. However, in an academic or clinical setting, these relationships or activities can compromise or be perceived to compromise basic values of openness, scientific integrity, independence, and public trust. I understand that for these reasons, actual or potential conflicts must be disclosed and managed to assure that they do not compromise my judgment, bias my research, influence my decisions with respect to academic or clinical matters or University business, result in personal advancement at the expense of the University, or otherwise interfere or compete with the University's educational, research, or service missions, or with my ability or willingness to fulfill my responsibilities. I will disclose actual or potential conflicts of interest and conflicts of commitment as required by University and Health System policies. [If I am a vendor employee, I have reported and will continue to disclose any such conflicts to my employer.]

☺ **I agree to treat all UMHS personnel with respect, courtesy, and dignity** and will conduct myself in a professional and cooperative manner. I understand that collaboration, communication and collegiality in the workplace are essential for the provision of safe and competent patient care. Examples of appropriate and inappropriate behavior are provided in UMHS Policy 04-06-047, Disruptive or Inappropriate Behavior by UMHS Personnel. I also agree to report any disruptive or inappropriate behavior that I am subjected to or that I observe in the workplace.

☺ **I understand that if I do not comply with University or UMHS policies and procedures or applicable law, I may be subject to immediate disciplinary or corrective action, up to and including dismissal, termination of contract, and/or loss of access to UMHS property or resources.** I understand that noncompliance with federal or state law may result in criminal and civil penalties against the University, my employer (if I am employed by another entity) and/or me personally.

☺ **I agree to immediately report suspected noncompliance** to my supervisor, or to the UMHS Compliance Office at (734) 615-4400. I understand that I may also make such a report anonymously to (866-990-0111) or through the compliance website. I agree to cooperate with any investigation of possible noncompliance and not to withhold relevant information. UMHS does not tolerate retribution or retaliation against anyone reporting suspected noncompliance in good faith. I will immediately report to my supervisor and Medical Staff Services (if I am a member of the medical staff, physician's assistant, or advanced practice nurse) or Human Resources (if I am licensed, certified, or registered as a health professional) any suspension, restriction, termination, or change in status of any health professions license that I hold.

**BY SIGNING BELOW, I CERTIFY THAT I AM IN COMPLIANCE WITH ALL UNIVERSITY AND UMHS POLICIES AND PROCEDURES, INCLUDING THOSE THAT REQUIRE ME TO REPORT ANY SUSPECTED NON-COMPLIANCE.**

| Name | Date |
|---|---|
| Signature | Employee ID # or Vendor Employer ID # |

Revised 12/18/08,
Revisions Approved by: UMHS Compliance Committee
Revision Effective Date: 01/01/2009

SEC Prod. #7   002