UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

MATHEW MARTOMA,

                Defendant.

No. 12-cr-00973 (PGG)
ECF Case

**DEFENDANT MATHEW MARTOMA'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR A WRITTEN JUROR
QUESTIONNAIRE IN ADVANCE OF *VOIR DIRE***

**(MR. MARTOMA'S MOTION *IN LIMINE* NO. 1)**

GOODWIN PROCTER LLP

Richard M. Strassberg (RS5141)
John O. Farley (JF4402)
Daniel Roeser (DR2380)

The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

Roberto M. Braceras (RB2470)
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Defendant Mathew Martoma*

December 6, 2013

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................1

FACTUAL BACKGROUND ......................................................................................................4

      A.      The U.S. Attorney's Office ...............................................................................5

      B.      The Press .............................................................................................................7

      C.      The Courts ........................................................................................................12

      D.      Animus Toward Wall Street ...........................................................................13

ARGUMENT ..............................................................................................................................14

I.      A WRITTEN JUROR QUESTIONNAIRE IS THE MOST EFFICIENT
      METHOD FOR THIS COURT TO IDENTIFY POTENTIAL JUROR
      PREJUDICE. ....................................................................................................14

      A.      Courts Routinely Use Written Juror Questionnaires. .............................14

      B.      A Written Juror Questionnaire Is the Most Efficient Method to Identify
              Potential Juror Prejudice in This Case. ...................................................17

CONCLUSION ...........................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bowers v. Walsh*,
    277 F. Supp. 2d 208 (W.D.N.Y. 2003) ...............................................................4, 18

*Coleman v. Kemp*,
    778 F.2d 1487 (11th Cir. 1985) ......................................................................20

*In re Application of Dow Jones & Co.*,
    842 F.2d 603 (2d Cir. 1998)...........................................................................19

*In re NBC Universal, Inc.*,
    426 F. Supp. 2d 49 (E.D.N.Y. 2006) ..............................................................19

*Jovanovic v. City of New York*,
    No. 04-cv-8437, 2010 WL 8500283 (S.D.N.Y. Sept. 29, 2010) ............................15

*Marshall v. United States*,
    360 U.S. 310 (1959).....................................................................................19

*Skilling v. United States*,
    130 S. Ct. 2896 (2010)............................................................................15, 22

*Steinberg v. Comm'r of Corr. Servs.*,
    No. 92-cv-7907, 1998 WL 259948 (S.D.N.Y. May 18, 1998) ..............................15

*United States ex rel. Bloeth v. Denno*,
    313 F.2d 364 (2d Cir. 1963)....................................................................4, 15, 18

*United States v. Awadallah*,
    457 F. Supp. 2d 246 (S.D.N.Y. 2006).............................................................17

*United States v. Blom*,
    242 F.3d 799 (8th Cir. 2001) ........................................................................16

*United States v. Bonanno*,
    177 F. Supp. 106 (S.D.N.Y. 1959)..................................................................18

*United States v. Brown*,
    303 F.3d 582 (5th Cir. 2002) ........................................................................16

*United States v. Bruno*,
    700 F. Supp. 2d 175 (N.D.N.Y 2010) .........................................................16, 17

*United States v. King*,
    No. 94-cr-455, 1998 WL 50221 (S.D.N.Y. Feb. 5, 1998) ...................................19

*United States v. Leonardo*,
    129 F. Supp. 2d 240 (W.D.N.Y. 2001) ...................................................................19

*United States v. Lord*,
    565 F.2d 831 (2d Cir. 1977).............................................................................19

*United States v. Muyet*,
    945 F. Supp. 586 (S.D.N.Y. 1996)..................................................................15

*United States v. Poulsen*,
    655 F.3d 492 (6th Cir. 2011) ..........................................................................15

*United States v. Quinones*,
    511 F.3d 289 (2d Cir. 2007)............................................................................15

*United States v. Rahman*,
    189 F.3d 88 (2d Cir. 1999).................................................................15, 16, 17

*United States v. Sattar*,
    395 F. Supp. 2d 66 (S.D.N.Y. 2005)..............................................................15

*United States v. Simon*,
    664 F. Supp. 780 (S.D.N.Y. 1987)....................................................4, 19, 20

*United States v. Stewart*,
    317 F. Supp. 2d 432 (S.D.N.Y. 2004)........................................................15, 16

*United States v. Wecht*,
    537 F.3d 222 (3d Cir. 2008)...........................................................................15

*United States v. Wilson*,
    925 F. Supp. 2d 410 (E.D.N.Y. 2013) ...........................................................17

Defendant Mathew Martoma respectfully submits this memorandum of law in support of his motion for a written juror questionnaire in advance of *voir dire*.[1]  A written juror questionnaire in advance of *voir dire* is the most efficient method to identify potential juror prejudice caused by the extensive media coverage in this case that has only exacerbated the public's pre-existing animus toward Wall Street.

## PRELIMINARY STATEMENT

The risk of potential juror prejudice is especially high in this case after the U.S. Attorney effectively told the public that Mr. Martoma – like SAC[2] and other SAC employees – is already guilty, declaring that his Office only "bring[s] cases when we have proof beyond a reasonable doubt that we can convince a jury unanimously of someone's criminal guilt, and when we get to that point with respect to anyone . . . we bring the case at that time."[3]  In covering the ongoing trial of SAC portfolio manager Michael Steinberg, *The New York Times* observed that "the widespread attention to SAC's guilty plea is likely to make the process of selecting jurors to hear the case more difficult if the trial remains in Manhattan."[4]  In this, the media was right.  In Mr. Steinberg's trial, Judge Sullivan recently ruled that "the amount of publicity surrounding this case risks prejudicing the jury."[5]  Against this backdrop, the Court should use a written juror questionnaire in advance of *voir dire*, just as it did in *United States v. Valle*, No. 12-cr-847

---

[1]   Mr. Martoma's proposed written juror questionnaire is attached as Appendix A.

[2]   For the purpose of this motion, "SAC" refers to SAC Capital Advisors LLC and its affiliates.

[3]   United States Attorney's Office for the Southern District of New York, *Guilty Plea Agreement with SAC Capital Management Companies Announced*, Nov. 5, 2013, *available at* http://www.justice.gov/usao/nys/pressconference.

[4]   Peter J. Henning, *The Impact of the Settlement on SAC Capital and Cohen*, N.Y. Times, Nov. 4, 2013, Declaration of Richard M. Strassberg in Support of Defendant Mathew Martoma's Motion For A Written Juror Questionnaire In Advance Of *Voir Dire* ("Strassberg Decl. No. 1"), Ex. 1.

[5]   Order Granting Individualized Voir Dire at 2, *United States v. Steinberg*, No. 12-cr-121 (S.D.N.Y. Nov. 12, 2013), ECF No. 319.  Although Judge Sullivan previously denied Mr. Steinberg's motion for a juror questionnaire, he did so on July 12, 2013, **before** SAC's indictment was announced (July 25, 2013) or SAC's settlement and plea agreement was announced (November 4, 2013) and the ensuing avalanche of negative publicity surrounding both of those events.

(S.D.N.Y.), to identify potential juror prejudice and preserve Mr. Martoma's right to a fair trial.

Given the extensive media coverage in this particular case and the animus toward Wall Street in general, it is hard to imagine a case more worthy of a juror questionnaire. The numbers are striking. Over the past year, Mr. Martoma and/or SAC has been mentioned in ***more than 2,000 articles***, including ***more than 330 stories*** about insider trading allegations (and ***at least 60 front-page stories***) in *The Wall Street Journal*, *The New York Times*, and *The New York Post* alone.[6] And the numbers do not tell the whole story. Public statements and media coverage have not only been ubiquitous but almost universally negative. The U.S. Attorney's Office has made frequent public statements that paint SAC as the picture of greedy, wealthy, privileged Wall Street investors who will stop at nothing to line their pockets. The press has widely reported those statements, saturating the public with the prosecution's views. Indeed, the media has directly and repeatedly linked Mr. Martoma to SAC, SAC founder Steven Cohen, and other SAC employees who have been charged with, and/or have pleaded guilty to, insider trading. The press has rushed to judgment and presented a story where Mr. Martoma is assumed guilty by association. The media also has reported at length that SAC hired people who would break the rules and then encouraged them to do so, routinely describing Mr. Cohen, despite his not having been charged with any crime, as a criminal. Not surprisingly, the intensity and negativity of the media coverage has only increased with SAC's plea agreement on November 4, 2013, and the ongoing trial of Mr. Steinberg.

The impact of the U.S. Attorney's Office's public statements and the press coverage is indisputable. For example, during Mr. Steinberg's trial, Judge Sullivan conducted two days of

---

[6]     Strassberg Decl. ¶¶ 2, 3.

*voir dire*.[7]  He questioned jurors individually in the jury room and at length about their exposure to the intense media coverage surrounding the case, asking specific questions about SAC, Mr. Cohen, and Mr. Steinberg.[8]  More than one half of the initial panel of 34 jurors had heard of SAC, several of whom already had an opinion about the allegations in the indictment.[9] Following specific questioning (including individualized follow-up questions) about pre-trial publicity concerning SAC and Mr. Cohen, 15 of the first 34 panelists were dismissed for cause.[10] There is no reason to think that the jurors in this case will be any different.

A written juror questionnaire in advance of *voir dire* is the most efficient method for the Court to identify potential juror prejudice caused by the extensive media coverage and the animus toward Wall Street.  In cases where there has been substantial pre-trial publicity, trial courts in this Circuit (and elsewhere) routinely use such questionnaires.  Juror questionnaires address many concerns associated with pre-trial publicity – *e.g.*, the difficulty of finding an objective jury pool, the risk that jurors will not be candid because they are embarrassed or unwilling to acknowledge potential biases in open court or afraid that their answers will be reported to the press, the likelihood that potential jurors will taint the venire with statements about the press reports that they have seen, and the practical consideration that selecting an impartial jury will require a more extensive examination of a larger pool of potential jurors. Juror questionnaires also conserve the Court's and the jurors' time and resources by allowing the parties to analyze potential jurors' answers in advance, such that challenges for cause are

---

[7]    Tr. of Voir Dire at 284:12-14, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 2.

[8]    Juror Questionnaire at 1, 5, 12, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 3; *see, e.g.*, Tr. of Voir Dire at 24:5-25:23, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 2.

[9]    Tr. of Voir Dire at 240:15-241:4, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 2.

[10]    *Id.*

resolved more quickly, peremptory challenges are faster, and side-bar questioning requires less time.

A juror questionnaire is particularly warranted in this case for at least four separate and independent reasons.

- **First**, a defendant's rights are especially at risk when "[t]he publicity, partly sponsored by the prosecution, create[s] opinions of guilt long before trial, far removed from any safeguards against inadmissible matter . . . ." *United States ex rel. Bloeth v. Denno*, 313 F.2d 364, 372-73 (2d Cir. 1963).

- **Second**, as "the [Supreme] Court's jurisprudence in this area makes clear, the most damning type of publicity is that which shows or states that the defendant has committed the crime charged." *Bowers v. Walsh*, 277 F. Supp. 2d 208, 220-21 (W.D.N.Y. 2003).

- **Third**, "in widely published or sensational cases, where the statements of trial participants are likely to appear in a widely disseminated manner there is a substantial likelihood that prospective jurors are unwittingly exposed to statements constituting prejudicial inadmissible evidence that would jeopardize the defendants' right to a fair trial." *United States v. Simon*, 664 F. Supp. 780, 792-93 & n.15 (S.D.N.Y. 1987), *aff'd sub nom. In re Application of Dow Jones & Co., Inc.*, 842 F.2d 603 (2d Cir. 1988).

- **Fourth**, press coverage that comments directly on evidence that may be admitted and/or the merits of a case further heightens the risk that jurors will prejudge the defendant rather than reach their own independent conclusions about the significance of what is presented at trial. *See Simon*, 664 F. Supp. at 789-90, 796.

All of these reasons apply here.

In sum, this Court should use a written juror questionnaire in advance of *voir dire* to identify potential juror prejudice.

## FACTUAL BACKGROUND

On November 20, 2012, the U.S. Attorney's Office filed a criminal complaint against Mr. Martoma, sweeping him into one of the most extensively publicized insider trading investigations in the Office's history. In so doing, the U.S. Attorney's Office announced to the public that Mr. Martoma had perpetrated the "most lucrative insider trading scheme ever

charged."[11]  The case against Mr. Martoma was just the latest in a series of insider trading cases spawned by a probe into SAC and Mr. Cohen that began in 2006.[12]  Before the complaint against Mr. Martoma was filed, there had already been intense media coverage of the insider trading allegations involving SAC; that coverage has only increased in the year since Mr. Martoma was charged.

The numbers are impressive.  Since the U.S. Attorney's Office filed its criminal complaint against Mr. Martoma:

- Mr. Martoma and/or SAC has been mentioned in *more than 2,000 articles*.[13]

- Mr. Martoma and/or SAC has been mentioned in connection with insider trading *at least 1,800 times*.[14]

- Mr. Martoma and/or SAC has been mentioned in *more than 330 stories* about insider trading allegations – including *at least 60 front-page stories* – in *The Wall Street Journal*, *The New York Times*, and *The New York Post*.[15]

- In fact, a single tweet by Forbes about Mr. Martoma's arrest was viewed *more than 1 million times*, and a single tweet by the Associated Press about SAC's guilty plea was viewed *more than 2 million times*.[16]

The numbers, however, do not even tell the whole story.  Public statements from the U.S. Attorney's Office and ongoing media coverage have not only been ubiquitous but almost universally negative, cast in inflammatory terms that presume Mr. Martoma's and SAC's guilt.

### A. The U.S. Attorney's Office

---

[11]  Press Release, United States Attorney's Office for the Southern District of New York, *Manhattan U.S. Attorney and FBI Special Agent-In-Charge Announce Charges against Former Hedge Fund Portfolio Manager for $276 Million Insider Trading Scheme Involving Alzheimer's Disease Drug Trial*, Nov. 20, 2012, Strassberg Decl. No. 1, Ex. 4.

[12]  Bryan Burrough & Bethany McLean, *The Hunt for Steve Cohen*, VANITY FAIR, June 2013, Strassberg Decl. No. 1, Ex. 5.

[13]  Strassberg Decl. ¶ 2.

[14]  Strassberg Decl. ¶ 4.

[15]  Strassberg Decl. ¶ 3.

[16]  Strassberg Decl. ¶ 5.

The U.S. Attorney's Office has issued press releases and/or held press conferences announcing charges, convictions, pleas, and/or sentencings for nearly every one of the cases related to its investigation of SAC and Mr. Cohen.  Those public statements use emotionally and politically charged language to paint SAC as the picture of greedy, wealthy, privileged Wall Street investors who will stop at nothing to line their pockets.  As one commentator put it, the U.S. Attorney's Office's press releases "[s]ound[ ] like a southern Sunday church sermon" and allow reporters to make statements that would otherwise be "slander or defamation of character" by simply "parroting what a federal prosecutor said."[17]  For example:

- In a November 20, 2012, press release announcing the charges against Mr. Martoma, the U.S. Attorney's Office described him as "yet another privileged hedge fund professional [who] stands accused of insider trading," was "***cheating coming and going***," and "cultivat[ed] and corrupt[ed] a doctor with access to secret drug data."[18]  Not to be outdone, the FBI added: "What we see again is an ***unholy alliance*** between an insider willing to divulge valuable non-public information, and a money manager to whom that information is as good as gold."[19]

- In a March 29, 2013, press release announcing the charges against Mr. Steinberg,[20] the U.S. Attorney's Office described him as "another Wall Street insider who fed off a ***corrupt grapevine*** of proprietary and confidential information cultivated by other professionals who made their own rules to make money."[21]  It continued: "[W]here once [he] ***answered only to his own rules***, now he will have to answer to the rule of law, like so many others before him."[22]

---

[17]   Walter Pavlo, *Prosecutors Spoon Feed Journalists Stories*, Forbes, Oct. 7, 2013, Strassberg Decl. No. 1, Ex. 6.

[18]   Press Release, United States Attorney's Office for the Southern District of New York, *Manhattan U.S. Attorney and FBI Special Agent-In-Charge Announce Charges against Former Hedge Fund Portfolio Manager for $276 Million Insider Trading Scheme Involving Alzheimer's Disease Drug Trial*, Nov. 20, 2012, Strassberg Decl. No. 1, Ex. 4 (emphasis added).

[19]   *Id.* (emphasis added).

[20]   Mr. Steinberg is a portfolio manager at Sigma Capital Management, a SAC affiliate, who has been charged with securities fraud and conspiracy to commit securities fraud.  *See United States v. Steinberg*, No. 12-cr-121 (S.D.N.Y.).

[21]   Press Release, United States Attorney's Office for the Southern District of New York, *Manhattan U.S. Attorney and FBI Assistant Director-In-Charge Announce Insider Trading Charges against Hedge Fund Portfolio Manager*, Mar. 29, 2013, Strassberg Decl. No. 1, Ex. 7 (emphasis added).

[22]   *Id.* (emphasis added).

- In a July 25, 2013, press release announcing the charges against SAC, the U.S. Attorney's Office declared: "A company reaps what it sows, and as alleged, ***S.A.C. seeded itself with corrupt traders***, empowered to engage in criminal acts by a culture that looked the other way despite ***red flags all around***. S.A.C. deliberately encouraged the no-holds-barred pursuit of an 'edge' that literally carried it over the edge into corporate criminality. Companies, like individuals, need to be held to account and need to be deterred from becoming ***dens of corruption***."[23]

- In a November 4, 2013, press release announcing SAC's plea agreement, the U.S. Attorney's Office proclaimed: "[I]ndividual guilt is not the whole of our mission. Sometimes, blameworthy institutions need to be held accountable too. ***No institution should rest easy in the belief that it is too big to jail.*** That is a moral hazard that a just society can ill afford."[24]

Moreover, according to the U.S. Attorney, his Office only "bring[s] cases when we have proof beyond a reasonable doubt that we can convince a jury unanimously of someone's criminal guilt, and when we get to that point with respect to anyone . . . we bring the case at that time."[25] Such statements directly undermine the fundamental tenet of our criminal justice system that individuals are innocent until proven guilty, and predictably leave the public predisposed to view Mr. Martoma in a negative light.

### B.     The Press

Not surprisingly, the press has widely reported the statements of the U.S. Attorney's Office, saturating the public with the prosecution's views. In fact, commentators have taken notice that "prosecutors are doing a good job of feeding the information to the press and also providing a little color commentary to boot" so that "it does not take much to cut and paste much

---

[23]   Press Release, United States Attorney's Office for the Southern District of New York, *Manhattan U.S. Attorney and FBI Assistant Director-In-Charge Announce Insider Trading Charges against Four SAC Capital Management Companies and SAC Portfolio Manager*, July 25, 2013, Strassberg Decl. No. 1, Ex. 8 (emphasis added).

[24]   Press Release, United States Attorney's Office for the Southern District of New York, *Manhattan U.S. Attorney Announces Guilty Plea Agreement with SAC Capital Management Companies*, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 9 (emphasis added).

[25]   United States Attorney's Office for the Southern District of New York, *Guilty Plea Agreement with SAC Capital Management Companies Announced*, Nov. 5, 2013, *available at* http://www.justice.gov/usao/nys/pressconference.

of what prosecutors write and put it out to our readers as fact."[26]

As soon as the U.S. Attorney's Office announced the charges against Mr. Martoma, the media inundated the public with reports of "the most lucrative insider-trading scheme ever charged":[27]

- "Feast your eyes on the recently released civil and criminal complaints stemming from what U.S. authorities are describing as 'the most lucrative insider-trading scheme ever charged.'"[28]

- "[The U.S. Attorney] called the Martoma case the 'most lucrative' insider trading scheme ever."[29]

Since then, Mr. Martoma has been directly and repeatedly linked to SAC, Mr. Cohen, and other SAC employees who have been charged with, and/or have pleaded guilty to, insider trading:

- "At least seven present and former employees of Mr. Cohen's have been charged with insider trading, including Mathew Martoma, who was arrested last week for what has been described as the most lucrative insider trading scam of all time."[30]

- "Three criminal defendants – Mr. Lee, Mr. Freeman and Mr. Martoma – have a common denominator: Each had worked for SAC Capital Advisors, the hedge fund run by Steven A. Cohen."[31]

- "Although several former employees have entered guilty pleas, the largest trades

---

[26]  Walter Pavlo, *Prosecutors Spoon Feed Journalists Stories*, Fobes, Oct. 7, 2013, Strassberg Decl. No. 1, Ex. 6.

[27]  In the addition to the articles below, see Peter Lattman, *Insider Inquiry Inching Closer to a Billionaire*, N.Y. Times, Nov. 20, 2012, Strassberg Decl. No. 1, Ex. 10; Adam Shell, N.Y. Feds Claim Most Lucrative *Insider-trading Case Yet*, USA TODAY, Nov. 21, 2012 Strassberg Decl. No. 1, Ex. 11; David Glovin, et al., *SAC Insider Probe Rides a FINRA Referral to Cohen's Backyard*, Bloomberg, Nov. 22, 2012, Strassberg Decl. No. 1, Ex. 12.

[28]  Joe Palazzolo, *Doc Dump: 'Most Lucrative Insider-Trading Scheme Ever Charged'*, Wall St. J., Nov. 20, 2012, Strassberg Decl. No. 1, Ex. 13.

[29]  Aaron Smith, *Federal Investigators Keep Circling Steven Cohen and SAC Capital*, CNN, Nov. 21, 2012, Strassberg Decl. No. 1, Ex. 14.

[30]  David Robertson, *FBI Takes Next Step Towards Landing the 'White Whale'*, The Times, Nov. 26, 2012, at 42, Strassberg Decl. No. 1, Ex. 15.

[31]  Peter Lattman & Ben Protess, *Trail to a Hedge Fund, from a Cluster of Cases*, N.Y. Times, Dec. 5, 2012, Strassberg Decl. No. 1, Ex. 16.

in the indictment involve Mathew Martoma, who is not cooperating."[32]

- "Investigators have been circling Cohen and SAC for years. The firm agreed in March to pay the SEC roughly $615 million in connection with alleged insider trading by employees including two portfolio managers, Mathew Martoma and Michael Steinberg."[33]

Notably, if not surprisingly, the media has rushed to judgment by adopting the U.S. Attorney's Office's view that Mr. Martoma – like other SAC employees – was a privileged investor motivated by greed and then assuming his guilt:

- "[Mr. Martoma's] fund didn't merely avoid losses, it **greedily schemed to profit** further by shorting Elan and Wyeth stock."[34]

- "Why [are] so many people . . . willing to put themselves in the position of potential fall guy for crimes conceived by their Wall Street overlords[?] . . . Only greed. And as the bard once wrote, '**Shame on your greed, shame on your wicked schemes.**'"[35]

The press coverage surrounding Mr. Martoma is consistent with the widespread, negative coverage of SAC and Mr. Cohen. The media has reported at length that SAC hired people who would break the rules and then encouraged them to do so:

- "While Mr. Cohen has not been accused of any wrongdoing, you have to wonder whether his returns have been generated not only through his trading brilliance but also through a culture of cutting corners and pushing employees to the point where they break the law."[36]

- "SAC Capital and its management fostered a culture of permissiveness. SAC not only tolerated cheating, it encouraged it. . . . S.A.C. became, over time, a veritable magnet for market cheaters. The S.A.C. Companies operated a compliance

---

[32]   Peter Henning, *What's Next in the Case against SAC*, N.Y. Times, July 25, 2013, Strassberg Decl. No. 1, Ex. 17.

[33]   James O'Toole, *SAC Capital Hit with Criminal Charges*, CNN, July 25, 2013, Strassberg Decl. No. 1, Ex. 18.

[34]   Andrew Ross Sorkin & Peter Lattman, *New Details Suggest a Defense in SAC Case*, N.Y. Times, Feb. 3, 2013, Strassberg Decl. No. 1, Ex. 19 (quoting a senior FBI official) (emphasis added).

[35]   Duff McDonald, *SAC Faces the Music: Preet Bharara Goes Nuclear on Hedge Fund – Is Cohen Next?*, New York Observer, July 30, 2013, Strassberg Decl. No. 1, Ex. 20 (emphasis added).

[36]   Jesse Eisinger, *When Wall Street Investors Favor Performance over Ethics*, N.Y. Times, Dec. 12, 2012, Strassberg Decl. No. 1, Ex. 21.

system that appeared to talk the talk, but almost never walked the walk."[37]

- "Prosecutors placed the 'SAC owner' directly at the center of what the government described as a 'pervasive' culture of corruption all but designed to elicit and profit from inside information, and to conceal the improper trading."[38]

- "Cohen led the pack in fostering a culture of insider trading, including actively seeking to hire traders who had links to inside information, prosecutors contend."[39]

Mr. Cohen himself is routinely described as a criminal, who "has been known to do anything to gain an edge."[40]  He has been called "fearless, connected and ruthless"[41] and analogized to "drug-cheating cyclist Lance Armstrong."[42]  Among the monikers that the press has given him:

- "public enemy number one"[43]

- the "Godfather"[44]

- the "Teflon Don of Wall Street"[45]

- the "O.J. Simpson of insider trading"[46]

---

[37]   Rebecca Jarvis, et al. *Indicted Hedge Fund SAC Capital 'Magnet for Market Cheaters'*, ABC NEWS, July 25, 2013, Strassberg Decl. No. 1, Ex. 22 (quoting the FBI Assistant Director and the U.S. Attorney).

[38]   James Sterngold, *In SAC Case, the Name Steve A. Cohen Is Conspicuous by Its Absence*, WALL ST. J., July 25, 2013, Strassberg Decl. No. 1, Ex. 23.

[39]   Kaja Whitehouse, *SAC Indicted by US, Charge Decade-Long Insider Scam*, NEW YORK POST, July 26, 2013, Strassberg Decl. No. 1, Ex. 24.

[40]   Jia Lynn Yang & Sari Horwitz, *Criminal Charges Against SAC Said to Be Coming Soon*, THE WASHINGTON POST, July 25, 2013, Strassberg Decl. No. 1, Ex. 25.

[41]   Dan McCrum, *Steven Cohen: Trader in the Spotlight*, FINANCIAL TIMES, Nov. 23, 2012, Strassberg Decl. No. 1, Ex. 26.

[42]   Sam Pizzigati, *America's Top 10 Greediest People of 2012*, HUFFINGTON POST, Jan. 8, 2013, Strassberg Decl. No. 1, Ex. 27.

[43]   Jake Zamansky, *The Feds Must Chase Down King Cohen*, FORBES, Apr. 4, 2013, Strassberg Decl. No. 1, Ex. 28.

[44]   *SEC Charges Hedge Fund Godfather Cohen with Insider Trading*, THE WASHINGTON POST, July 20, 2013, Strassberg Decl. No. 1, Ex. 29; Bryan Burrough & Bethany McLean, *The Hunt for Steve Cohen*, VANITY FAIR, June 2013, Strassberg Decl. No. 1, Ex. 5.

[45]   Sam Gustin, *Stevie Walks: Wall Street Billionaire Steve Cohen Dodges Insider Trading Charges*, TIME, July 5, 2013, Strassberg Decl. No. 1, Ex. 30.

- the "Alex Rodriguez of Wall Street"[47]

The intensity and negativity of the media coverage of SAC and Mr. Cohen only increased with SAC's plea agreement on November 4, 2013. Almost immediately, news stories reporting the agreement flooded the public domain;[48] and many specifically tied Mr. Martoma to SAC's plea.[49] This extraordinary publicity – involving an unprecedented guilty plea by one of the world's largest hedge funds – has led *The New York Times* to observe in covering Mr. Steinberg's case that "the widespread attention to SAC's guilty plea is likely to make the process of selecting jurors to hear the case more difficult if the trial remains in Manhattan."[50] And, of course, the media scrutiny has only intensified now that the Steinberg trial has commenced, with

---

[46] Bryan Burrough & Bethany McLean, *The Hunt for Steve Cohen*, VANITY FAIR, June 2013, Strassberg Decl. No. 1, Ex. 5.

[47] Reynolds Holding, *SAC's Steve Cohen may be the A-Rod of Wall Street*, REUTERS BREAKINGVIEWS, Aug. 7, 2013, Strassberg Decl. No. 1, Ex. 31.

[48] Linette Lopez, *The Government Just Finished up Its Press Conference on SAC Capital – Here's What We Learned*, BUSINESS INSIDER, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 32; Peter J. Henning, *The Impact of the Settlement on SAC Capital and Cohen*, N.Y. TIMES, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 1; John Carreyrou, *For U.S. and SAC Alike, Battles Won and Lost*, WALL ST. J., Nov. 5, 2013, Strassberg Decl. No. 1, Ex. 33; Sheelah Kolhatkar, *SAC Capital to Pay $1.8 Billion, the Largest Insider Trading Fine Ever*, BLOOMBERG BUSINESSWEEK, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 34; Joe Schneider & Joshua Gallu, *Cohen's SAC Capital Seen Pleading Guilty to Securities Fraud*, BLOOMBERG, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 35; Daniel Beekman, *SAC Capital Advisors Reaches $1.8 Billion Deal with Feds Over Insider Trading Charges*, New York Daily News, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 36; James O'Toole & Chris Isidore, *SAC Capital to Plead Guilty toInsider Trading Charges*, CNN, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 37; Nathan Vardi, *Steve Cohen Will Probably Earn Enough This Year to Cover His Hedge Fund's New $1.2 Billion Settlement*, Forbes, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 38; Kevin Roose, *Steve Cohen Rolls Over*, Daily Intelligencer, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 39.

[49] Joe Schneider & Joshua Gallu, *Cohen's SAC Capital Seen Pleading Guilty to Securities Fraud*, BLOOMBERG, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 35 ("Two of Cohen's most senior lieutenants to face charges will go on trial in the next three months . . . [including] Mathew Martoma, a former SAC money manager [charged] with using illegal tips about an Alzheimer's drug trial to help the firm make profits or avoid losses totaling $276 million by trading Elan Corp. and Wyeth LLC shares."); John Carreyrou, *For U.S. and SAC Alike, Battles Won and Lost*, WALL ST. J., Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 33 ("Mr. Martoma and other key SAC employees don't appear to have been willing or able to implicate Mr. Cohen in wrongdoing."); *see also* Ben Protess & Peter Lattman, *SAC Nears an Insider Trading Guilty Plea, but Legal Cases Aren't Shut*, N.Y. TIMES, Nov. 3, 2013, Strassberg Decl. No. 1, Ex. 40 ("Prosecutors said that Mr. Cohen was intimately involved with the Elan and Wyeth trades. The day before SAC began aggressively selling its shares, Mr. Martoma spent 20 minutes on the telephone with Mr. Cohen. But the government stopped short of saying that Mr. Martoma told Mr. Cohen about the secret clinical trials.").

[50] Peter J. Henning, *The Impact of the Settlement on SAC Capital and Cohen*, N.Y. TIMES, Nov. 4, 2013, Strassberg Decl. No. 1, Ex. 1.

scores of articles each day referencing the alleged insider trading involving SAC in that case.

### C.     The Courts

The publicity surrounding the cases against SAC and its employees has reached such a level that judges presiding over those cases have become increasingly sensitive to its significance.  As Judge Sullivan observed in connection with SAC's plea agreement, the proceeding "is obviously a high-profile case, and it's obviously one that I think will engender opinions on the part of the public and others, sophisticated and unsophisticated."[51]  As Judge Sullivan also observed in the context of Mr. Steinberg's trial, media saturation will only continue in the coming months: "[W]hether we do this in January, February, or March, there is still going to be a lot of press and *whenever we do this it will spawn more press*.  So I don't think we can put the press genie back in the bottle.  I think that can't be done."[52]

The indisputable impact on public opinion of the U.S. Attorney's Office's public statements and the press coverage has been manifest in court proceedings against SAC and its employees.  As a letter sent to (and filed by) Judges Sullivan and Swain following the announcement of SAC's plea agreement stated:

> The American people are outraged that DoJ have offered SAC Capital a sweetheart deal with no jail time and paying a penalty of only $1.8 billion.  Hedge fund crook Steve Cohen is laughing all the way to the bank because this is just one year's pay for him, he is guilty as sin and we urge the Court to reject the plea deal . . . .  This plea deal is a slap in [sic] the wrist for Cohen and a slap in the face to the American people.[53]

That letter – like the U.S. Attorney's Office's statements and the media coverage – ties the

---

[51]   Hearing Tr. at 11:14-17, *United States of America v. S.A.C. Capital Advisors, L.P., et al.*, No. 13-cv-05182 (Nov. 6, 2013), Strassberg Decl. No. 1, Ex. 41.

[52]   Pre-trial Conference Tr. at 45:15-21, *United States v. Steinberg*, No. 12-cr-121 (Nov. 14, 2013), Strassberg Decl. No. 1, Ex. 42 (emphasis added).

[53]   Letter to Judge Sullivan, *United States of America v. S.A.C. Capital Advisors, L.P., et al.*, No. 13-cv-05182 (Nov. 5, 2013), ECF No. 51; Letter to Judge Swain, *United States of America v. S.A.C. Capital Advisors, L.P., et al.*, No. 13-cr-00541 (Nov. 6, 2013), ECF No. 14.

charges against SAC directly to Mr. Martoma and contends that Mr. Martoma is "guilty too."[54]

In fact, the results of the *voir dire* in Mr. Steinberg's trial confirm the effects of the U.S. Attorney's Office's public statements and the press coverage.  There, Judge Sullivan used a written juror questionnaire containing the *voir dire* questions as an aid in screening the jury and expediting the *voir dire* process.[55]  Judge Sullivan asked multiple questions to identify jurors' exposure to the intense media coverage surrounding the case, including questions about SAC, Mr. Cohen, and Mr. Steinberg specifically and questions about media coverage of insider trading investigations generally.[56]  The results showed a panel with extensive exposure to the pre-trial publicity.  More than one half of the initial panel of 34 jurors had heard of SAC, several of whom already had an opinion about the allegations in the indictment.[57]  Following specific questioning (including individualized follow-up questions) about pre-trial publicity concerning SAC and Mr. Cohen, 15 of the first 34 panelists were dismissed for cause.[58]  There is no reason to think that the jurors in this case will be any different.

### D.   Animus Toward Wall Street

The consequences of the U.S. Attorney's Office's public statements and the press coverage have been magnified by the public's pre-existing animus toward Wall Street. Following the global economic crisis of 2008 and ensuing Great Recession, the public in general

---

[54]   Letter to Judge Sullivan, *United States of America v. S.A.C. Capital Advisors, L.P. et al.*, No. 13-cv-05182 (Nov. 5, 2013), ECF No. 51; Letter to Judge Swain, *United States of America v. S.A.C. Capital Advisors, L.P. et al.*, No. 13-cr-00541 (Nov. 6, 2013), ECF No. 14.

[55]   Tr. of Voir Dire at 13:12-24, 242:1-5, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 2 ("[Voir dire] should go more quickly because we're just going to hit the affirmative[] [responses in the questionnaire].").

[56]   Juror Questionnaire at 1, 5, 12, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 3; *see, e.g.*, Tr. of Voir Dire at 24:5-25:23, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 2.

[57]   Tr. of Voir Dire at 240:15-241:4, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 2.

[58]   *Id.*

13

and jurors in particular were inclined to find defendants in financial cases responsible for the

country's financial woes and even their own personal financial problems.  For example:

- "In September 2011, a groundswell of rage led to the creation of the Occupy movement and the concept of the 99 percent of people against the 1 percent of highest income earners, including bankers on Wall Street."[59]

- "[A] new Reuters/Ipsos poll [from September 2013] shows *Main Street animus against bankers and their role in the financial crisis persists*."[60]

- "The poll of more than 1,400 adults, representing a cross-section of the U.S. population, shows that half of the respondents believe there has not been enough reform to prevent a future crisis. . . . *Fifty-three percent think not enough was done to prosecute bankers*; [only]15 percent were satisfied with the effort."[61]

- "*More than half also want the government to do more to punish those responsible for the crisis.*  'I haven't seen anybody prosecuted and joining Bernie Madoff in jail as a cell mate,' said Francisco Ramos, 47, a Florida-based former land surveyor, in reference to the fraudster.  Ramos, who was among those polled, said he wants to see *bankers jailed 'just to scare them so they don't pull the same shenanigans again*.'"[62]

These deep-seated biases are precisely the reason to use a juror questionnaire.  Such biases

caused this Court to employ a written juror questionnaire in advance of *voir dire* in *United States*

*v. Valle*, No. 12-cr-847 (S.D.N.Y.), and they also should cause this Court to employ a written

juror questionnaire in advance of *voir dire* in this case.

## ARGUMENT

**I.     A WRITTEN JUROR QUESTIONNAIRE IS THE MOST EFFICIENT METHOD FOR THIS COURT TO IDENTIFY POTENTIAL JUROR PREJUDICE.**

### A.     Courts Routinely Use Written Juror Questionnaires.

As the Second Circuit recognized long ago, "[o]ne cannot assume that the average juror

---

[59]   Michael Erman, *Five Years After Lehman, Americans Still Angry at Wall Street: Reuters/Ipsos Poll*, REUTERS, Sept. 15, 2013, Strassberg Decl. No. 1, Ex. 43.

[60]   *Id.* (emphasis added).

[61]   *Id.* (emphasis added).

[62]   *Id.* (emphasis added).

is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity." *Bloeth*, 313 F.2d at 373.

Trial courts have substantial discretion in determining the measures necessary to protect a defendant's right to a fair and impartial trial. *United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007). In cases "where there has been extensive pre-trial publicity," trial courts in this Circuit "routinely employ questionnaires to facilitate *voir dire*" to ensure that the defendant's constitutional rights have been upheld. *Id.* (citing *United States v. Stewart*, 433 F.3d 273, 303 (2d Cir. 2006)); *accord United States v. Rahman*, 189 F.3d 88, 121-22 (2d Cir. 1999) (holding that a juror questionnaire "skillfully balanced the difficult task of questioning . . . a large jury pool with the defendants' right to inquire into . . . sensitive issues that might arise in the case").[63] The same is true of courts elsewhere. *See Skilling v. United States*, 130 S. Ct. 2896, 2900, 2910 (2010) (the district court "declined to move the trial, ruling that the questionnaires and *voir dire* provided safeguards adequate to ensure an impartial jury" and identify potential juror prejudice caused by exposure to Enron-related press coverage).[64]

---

[63] *See also, e.g.*, *Jovanovic v. City of New York*, No. 04-cv-8437, 2010 WL 8500283, at *12-13 (S.D.N.Y. Sept. 29, 2010) (holding that the use of a "juror questionnaire [that] asked questions relating to media coverage of [the] case" remedied potential prejudice caused by inflammatory statements made by the Assistant District Attorney to the press before trial), *aff'd* 486 Fed. Appx. 149 (2d Cir. 2012); *United States v. Sattar*, 395 F. Supp. 2d 66, 70 (S.D.N.Y. 2005) (using a juror questionnaire "[d]ue to the extensive publicity surrounding this case"); *United States v. Stewart*, 317 F. Supp. 2d 432, 435 (S.D.N.Y. 2004) (using a juror questionnaire "[b]ecause the extraordinary publicity surrounding the case presaged difficulty in finding an unopinioned jury pool"), *aff'd* 433 F.3d 273 (2d Cir. 2006); *Steinberg v. Comm'r of Corr. Servs.*, No. 92-cv-7907, 1998 WL 259948, at *5-6 & n.2 (S.D.N.Y. May 18, 1998) (finding that "a questionnaire . . . used during *voir dire* to screen out those with possible prejudice" was "adequate . . . to protect petitioner from publicity before and during the trial"); *United States v. Muyet*, 945 F. Supp. 586, 595 (S.D.N.Y. 1996) (endorsing the use of a juror questionnaire in a case involving extensive pre-trial publicity).

[64] *See also, e.g.*, *United States v. Poulsen*, 655 F.3d 492, 507-08 (6th Cir. 2011) (approving of a juror questionnaire with "questions addressing the existence and extent of prospective jurors' media exposure and any opinions prospective jurors may have formed about the case"); *United States v. Wecht*, 537 F.3d 222, 225-27 (3d Cir. 2008) (approving of a juror questionnaire in a case involving extensive media coverage); *United*

Trial courts use juror questionnaires because they address many concerns associated with pre-trial publicity and inherent, pre-existing biases.  Extensive pre-trial publicity increases the difficulty of finding an objective jury pool and creates the risk that jurors will not be candid because they are embarrassed or unwilling to acknowledge potential biases in open court or afraid that their answers will be reported to the press.  *See, e.g.*, *United States v. Bruno*, 700 F. Supp. 2d 175, 178-79 (N.D.N.Y. 2010); *Stewart*, 317 F. Supp. 2d at 435.  There is also the practical consideration that selecting an impartial jury in a highly publicized case will require a more extensive examination of a larger pool of potential jurors.  *See, e.g.*, *Rahman*, 189 F.3d at 121-22; *Bruno*, 700 F. Supp. 2d at 178-79.  For all of these reasons, a juror questionnaire is a helpful "pre-screening measure" that will "expedite selection."  *Bruno*, 700 F. Supp. 2d at 178.

In fact, this Court itself used a written juror questionnaire in advance of *voir dire* in *United States v. Valle*, No. 12-cr-847 (S.D.N.Y.), another case with significant pre-trial publicity, for many of the same reasons:

- "The purpose . . . of the questionnaire is to focus the jury's attention on the unusual aspects of this case, and to find out whether the [venire] includes people who have, for example, such strong views about some of the matters that they may be exposed to that they can't be fair or, for example, people that may have read things in the media, seen things on TV or heard things on the radio that would make it difficult for them to be fair and impartial."[65]

- "Another purpose of the questionnaire is to encourage juror candor."[66]

- "Another purpose is to avoid polluting the [venire] by statements made by certain members of the [venire] about what they've read, seen or heard, and the impact of all of that on them when many members of the [venire] may not have had the

---

States v. Brown, 303 F.3d 582, 602-03 (5th Cir. 2002) (affirming the use of a juror questionnaire in a case involving "enormous local and national publicity"); *United States v. Blom*, 242 F.3d 799, 804 (8th Cir. 2001) (endorsing the use of juror questionnaires to inquire about jurors' "exposure to pretrial publicity").

[65]   Tr. of Hearing Regarding Voir Dire at 3:15-22, *United States v. Valle*, No. 12-cr-847 (Jan. 28, 2013), ECF No. 111.

[66]   *Id.* at 4:1-2.

16

same experience."[67]

This Court's rationale also applies here.

### B.  A Written Juror Questionnaire Is the Most Efficient Method to Identify Potential Juror Prejudice in This Case.

A written juror questionnaire in advance of *voir dire* is the most efficient method to

identify potential juror prejudice.  In a high profile case such as this, a questionnaire will

conserve the Court's and the jurors' time and resources by allowing the parties to analyze

potential jurors' answers in advance.  *See Rahman*, 189 F.3d at 121-22 (using a juror

questionnaire in a high-profile case to screen a large jury pool); *Bruno*, 700 F. Supp. 2d at 178-

79 (same); *United States v. Awadallah*, 457 F. Supp. 2d 246, 254 (S.D.N.Y. 2006) (same); *see

also United States v. Wilson*, 925 F. Supp. 2d 410, 411-13 (E.D.N.Y. 2013) (using a juror

questionnaire "to root out any and all bias," including any "exposure to the news coverage on

this case").  Challenges for cause will be resolved more quickly, peremptory challenges will be

faster, and side-bar questioning will require less time.  *See* Tr. of Hearing Regarding Voir Dire at

3:22-25, *United States v. Valle*, No. 12-cr-847 (S.D.N.Y. Jan. 28, 2013), ECF No. 111 ("It may

be that if members of the [venire] express such views in responding to the questionnaire, both

sides will agree that that person should be excused."); *Bruno*, 700 F. Supp. 2d at 178-79 (finding

that a juror questionnaire will "expedite selection").

The need for a juror questionnaire is especially great in this case, where the U.S.

Attorney's Office has done everything that it can to propagandize its pursuit of SAC, Mr. Cohen,

and SAC employees such as Mr. Martoma.  Indeed, in determining whether pre-trial publicity

requires a juror questionnaire (and/or other measures), "an important consideration [is] whether

the government was responsible for the publication of the objectionable material, or if it

---

[67]  *Id.* at 4:2-6.

emanated from independent sources." *United States v. Bonanno*, 177 F. Supp. 106, 122 (S.D.N.Y. 1959). "In fact, governmental complicity was almost singularly dispositive in the leading case in which a trial judge's discretion was reversed." *Id.* As the Second Circuit has held, a defendant's rights are especially at risk when "[t]he publicity, partly sponsored by the prosecution, create[s] opinions of guilt long before trial, far removed from any safeguards against inadmissible matter." *Bloeth*, 313 F.2d at 372-73 (holding that a jury was not impartial under the Fourteenth Amendment where (among other things) pre-trial publicity "included inadmissible material emanating from the prosecution denigrating" one of the defense theories "and so predisposing the prospective jurors to reject it"). That is certainly true here. The media coverage has been particularly prejudicial because the press has widely reported the statements of the U.S. Attorney's Office, saturating the public with the prosecution's view of the case. (*See supra* at 7-8.)

Moreover, as "the [Supreme] Court's jurisprudence in this area makes clear, the most damning type of publicity is that which shows or states that the defendant has committed the crime charged." *Bowers*, 277 F. Supp. 2d at 220-21 (citing *Sheppard v. Maxwell*, 384 U.S. 333 (1966), *Irvin v. Dowd*, 366 U.S. 717 (1961), and *Rideau v. Louisiana*, 373 U.S. 723 (1963)); *accord Bloeth*, 313 F.2d at 372-73. That is exactly the sort of publicity that this case has received – often as a direct result of statements made by the U.S. Attorney. The press has directly and repeatedly linked Mr. Martoma to SAC and other SAC employees who have been charged with, and/or have pleaded guilty to, insider trading. (*See supra* at 8-10.) The media has rushed to judgment by adopting the U.S. Attorney's Office's view that Mr. Martoma – like SAC and other SAC employees – is guilty. (*See supra* at 9-11.) And the intensity and negativity of the press coverage has only increased with SAC's plea agreement on November 4, 2013. (*See*

*supra* at 10-11.)  All of this dramatically heightens the risk that potential jurors will enter the courtroom predisposed to find Mr. Martoma guilty.

Further, "in widely publicized or sensational cases, where the statements of trial participants are likely to appear in a widely disseminated manner there is a substantial likelihood that prospective jurors are unwittingly exposed to statements constituting prejudicial inadmissible evidence that would jeopardize the defendants' right to a fair trial.  To the extent that the Court has authority, it is the duty of the Court to prevent that kind of jury prejudice." *Simon*, 664 F. Supp. at 792-93 & n.15.[68]  Courts do so through (among other things) a juror questionnaire where "prospective jurors will have been exposed in newspapers of large circulation in the area from which jurors must be drawn" to an "anti-[defendant] editorial stance and the suggestions of conduct on the part of [the defendant], inadmissible under Fed. R. Evid. 402, 403 or 404."  *United States v. King*, No. 94-cr-455, 1998 WL 50221, at *1, 6-7 (S.D.N.Y. Feb. 5, 1998), *aff'd*, 140 F.3d 76 (2d Cir. 1998).  This Court should do the same.  The media coverage in this case routinely includes inadmissible and unfairly prejudicial information such as the guilty pleas of SAC and SAC employees to unrelated insider trading charges, SAC's

---

[68]  *Accord Marshall v. United States*, 360 U.S. 310, 311-13 (1959) (granting a new trial where jurors read news stories that referenced evidence that the trial judge excluded); *United States v. Lord*, 565 F.2d 831, 837-39 (2d Cir. 1977) (reversing convictions where the trial court did not poll jurors about their knowledge of inadmissible information because "widespread availability of the newspapers, as well as the prominent position occupied by the articles, created a strong possibility that some jurors might have been exposed to the irrelevant and prejudicial matter in the publicity"); *In re Application of Dow Jones & Co.*, 842 F.2d 603, 611 (2d Cir. 1998) (affirming the restraint of extrajudicial speech where (among other things) "lawyers air[ed] matters in the press that are inadmissible at trial"); *In re NBC Universal, Inc.*, 426 F. Supp. 2d 49, 58 (E.D.N.Y. 2006) (holding that certain video and audio recordings "should not be disseminated [by the press] until after the trial is over" because "the recordings would be inadmissible at trial" and "[i]nevitable repetition by multiple media outlets would almost ensure that jurors would be tainted by direct viewing or by reactions from family and friends"); *United States v. Leonardo*, 129 F. Supp. 2d 240, 246-47 (W.D.N.Y. 2001) (partially closing a pre-trial detention hearing after finding "a substantial probability that the defendants' constitutional right to a fair trial will be compromised by publication" of evidence that would be inadmissible at trial).

settlement with the SEC, Mr. Steinberg's trial, and Mr. Cohen's invocation of his Fifth

Amendment right against self-incrimination in response to a recent grand jury subpoena.[69]

In addition, press coverage that comments directly on evidence that may be admitted

and/or the merits of a case further heightens the risk that jurors will prejudge the defendant rather

than reach their own independent conclusions about the significance of what is presented at trial.

*See, e.g.*, *Coleman v. Kemp*, 778 F.2d 1487, 1532, 1538 (11th Cir. 1985) (holding that the

petitioner was deprived of a fair trial where (among other things) pre-trial articles described the

cooperating witness's testimony such that "there was an overwhelming showing in the press of

petitioner['s] . . . guilt before his trial ever began"); *Simon*, 664 F. Supp. at 789-90, 796

(proscribing the parties from making "statements concerning the merits of the case, the character

of the defendants, the identity or credibility of potential witnesses, or the quality or content of

evidence" in order to "insure the fairness of a criminal proceeding in the face of excessive

publicity"). That is precisely the case here. The media frequently comments on e-mails and

conversations between Mr. Martoma, Mr. Cohen, and/or cooperating witnesses – as well as

potential prosecution and defense themes and strategies.[70]

Faced with the same considerations, Judge Sullivan used a written juror questionnaire

containing the *voir dire* questions as an aid in screening the jury and expediting the *voir dire*

---

[69]   *See, e.g.*, Jake Zamansky, *The Feds Must Chase Down King Cohen*, FORBES, Apr. 4, 2013, Strassberg Decl. No. 1, Ex. 28.; Sam Gustin, *Stevie Walks: Wall Street Billionaire Steve Cohen Dodges Insider Trading Charges*, TIME, July 5, 2013, Strassberg Decl. No. 1, Ex. 30; Jia Lynn Yang & Sari Horwitz, *Criminal Charges Against SAC Said to Be Coming Soon*, THE WASHINGTON POST, July 25, 2013, Strassberg Decl. No. 1, Ex. 25; *supra* at 10-11.

[70]   *See* Bryan Burrough & Bethany McLean, *The Hunt for Steve Cohen*, VANITY FAIR, June 2013, Strassberg Decl. No. 1, Ex. 5; Peter Henning, *What's Next in the Case Against SAC*, N.Y. TIMES, July 25, 2013, Strassberg Decl. No. 1, Ex. 17; Patricia Hurtado, *Martoma Judge Grants Defense Time to Review U.S. Evidence*, BLOOMBERG, Mar. 5, 2013; Lauren Tara LaCapra *et al.*, *SAC Gets Cut by 'Edge', a Word Cohen Hated*, REUTERS, July 25, 2013, Strassberg Decl. No. 1, Ex. 45; Dan McCrum, *Steven Cohen: Trader in the Spotlight*, FINANCIAL TIMES, Nov. 23, 2012, Strassberg Decl. No. 1, Ex. 26; Michael Rothfeld & Jenny Strasburg, *Witness Adds Thread to SAC Probe*, WALL ST. J., Jan. 23, 2013, Strassberg Decl. No. 1, Ex. 46; Bob Van Voris & Patricia Hurtado, *Martoma Faces Evidence from Trades to E-Mails, U.S. Says*, BLOOMBERG, May 14, 2013, Strassberg Decl. No. 1, Ex. 47.

process in Mr. Steinberg's trial.[71]  As Judge Sullivan recognized, "the amount of publicity surrounding this case risks prejudicing the jury."[72]  Accordingly, the questionnaire asked multiple questions about potential jurors' exposure to the media coverage surrounding the case, including questions about Mr. Cohen and Mr. Steinberg specifically and insider trading investigations generally.[73]  In fact, the U.S. Attorney's Office agreed that, "if a juror's answer reveals that the juror may have seen or become aware of the charges against SAC Capital," then additional questioning would be required during ***voir dire***.[74]  Specifically, "the Court [wa]s requested to pursue more detailed questioning regarding what the juror may have seen or heard outside the presence of the other jurors."[75]  This Court should likewise use a juror questionnaire with detailed, follow-up questioning.  In this case, however, the Court should provide the questionnaire ***in advance***, just as it did in *United States v. Valle*.  That would enable focused follow-up questions during the Court-led *voir dire* based on the jurors' answers to the questionnaire.  As this Court recognized in *Valle*, such a process is the most efficient approach to jury selection – and increases the likelihood of avoiding a multi-day *voir dire*.

Finally, a written juror questionnaire in advance of *voir dire* is particularly needed in a case such as this – *i.e.*, where potential jurors have widely held, pre-existing biases of the defendant and his business.  The purpose of a juror questionnaire is, in this Court's own words, "to find out whether the [venire] includes people who have, for example, such strong views

---

[71]   Tr. of Voir Dire at 13:12-24, 242:1-5, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 2.

[72]   Order Granting Individualized Voir Dire at 2, *United States v. Steinberg*, No. 12-cr-121 (Nov. 12, 2013), ECF No. 319.

[73]   Juror Questionnaire at 1, 5, 12, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 3; *see, e.g.*, Tr. of Voir Dire at 24:5-25:23, *United States v. Steinberg*, No. 12-cr-121 (Nov. 19, 2013), Strassberg Decl. No. 1, Ex. 2.

[74]   Joint Proposed Examination of Prospective Jurors at 1, *United States v. Steinberg*, No. 12-cr-121 (Nov. 6, 2013), ECF No. 311.

[75]   *Id.*

21

about some of the matters that they be may be exposed to that they can't be fair . . . ."[76]  The

public's and potential jurors' pre-existing, deep-seated animus toward Wall Street is undeniable.

(*See supra* at 13-14.)  That is yet another reason that a juror questionnaire is warranted in this

case.  *See, e.g.*, *Skilling v. United States*, 130 S. Ct. at 2920-21 (describing the use of a written

juror questionnaire to determine whether "community prejudice," "sympathy for victims of

Enron's bankruptcy," or "speculat[ion] that greed contributed to the corporation's collapse"

resulted in "animus toward [the defendant]").

## CONCLUSION

For the foregoing reasons, this Court should grant Mr. Martoma's motion for a written

juror questionnaire in advance of *voir dire*.[77]

Dated:  December 6, 2013
       New York, NY

Respectfully submitted,

GOODWIN PROCTER LLP

By: /s/ Richard M. Strassberg

Richard M. Strassberg (RS5141)
  (rstrassberg@goodwinprocter.com)
John O. Farley (JF4402)
  (jfarley@goodwinprocter.com)
Daniel Roeser (DR2380)
  (droeser@goodwinprocter.com)

The New York Times Building
620 Eighth Avenue
New York, New York 10018
Telephone:  (212) 813-8800

Roberto M. Braceras (RB2470)
  (rbraceras@goodwinprocter.com)
53 State Street

---

[76]  Tr. of Hearing Regarding Voir Dire at 3:15-22, *United States v. Valle*, No. 12-cr-847 (Jan. 28, 2013), ECF No. 111.

[77]  It is likely that media coverage will continue to intensify leading up to Mr. Martoma's trial.  Mr. Martoma hereby reserves the right to seek further relief as necessary in order to protect his right to a fair trial.

Boston, Massachusetts 02109
Telephone:  (617) 570-1000

*Attorneys for Defendant Mathew Martoma*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 6, 2013, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.   I also certify that I have caused copies of the aforementioned document to be served via first class mail, postage prepaid upon all non-CM/ECF participants.

/s/ Richard M. Strassberg____
Richard M. Strassberg (RS5141)