# EXHIBIT A

### Page 1

BEFORE THE SECURITIES AND EXCHANGE COMMISSION

In the Matter of:     )
                      )
Elan Corporation, plc )  File No. NY-8152
                      )
                      )

WITNESS:  STEVEN COHEN

PAGES:    1-253

PLACE:    Room 425
          Securities and Exchange Commission
          3 World Financial Center
          New York, New York

Date:     May 3, 2012

The above-entitled matter come on for investigation at 10:10 a.m.

### Page 2

On behalf of the Securities and Exchange Commission:

CHARLES D. RIELY, ESQ.
AMELIA A. COTTRELL, Assistant Director
SANJAY WADHWA, Associate Regional Director
NEIL HENDELMAN, Staff Accountant
  Securities and Exchange Commission
  Division of Enforcement
  Northeast Regional Office
  4th Floor, Suite 400
  3 World Financial Center
  New York, New York 10281

On behalf of the Witness and S.A.C. Capital Advisors, L.P.:

MARTIN B. KLOTZ, ESQ.
JEANNA COMPOSTI, ESQ.
  Willkie Farr & Gallagher, Llp
  787 Seventh Avenue
  New York, New York 10019
-and-
DANIEL J. KRAMER, ESQ.
  Paul, Weiss, Rifkind, Wharton & Garrison, Llp
  1285 Avenue of the Americas
  New York, New York 10019

### Page 3

1   PROCEEDINGS
2       MR. RIELY: We are on the record May 3, 2012,
3   at 10:10 a.m., New York regional office of the SEC.
4   Whereupon,
5       STEVEN COHEN,
6   having been first duly sworn/affirmed, was examined and
7   testified as follows:
8   EXAMINATION BY
9   MR. RIELY:
10      Q    Will you please state and spell your full
11  name for the record?
12      A    Steven A. Cohen.
13      Q    My name is Charles Riely. With me are my
14  colleagues, Sanjay Wadhwa, Amelia Cottrell, Neil
15  Hendelman. We are members of the Division of Enforcement
16  of the United States Securities and Exchange Commission
17  and are officers of the Commission for purposes of this
18  proceeding.
19          This is an investigation by the Securities
20  and Exchange Commission entitled Elan Corporation, plc,
21  File Number NY-8152, to determine whether there have been
22  violations of certain provisions of the federal securities
23  laws. However, the facts developed in this investigation
24  might constitute violations of other federal or state
25  civil or criminal laws.

### Page 4

1        Prior to the opening of the record you were
2   provided with a copy of the formal order of investigation
3   in this matter. It will be available for your examination
4   during the course of this proceeding. Okay?
5       A    Okay.
6       Q    Have you had an opportunity to review the
7   formal order?
8       A    Yes, I have.
9       Q    Prior to the opening of the record you were
10  also provided with a copy of the Commission's Supplemental
11  Information Form 1662. A copy of that notice has been
12  previously marked as Exhibit Number 1.
13           Have you had the opportunity to read Exhibit
14  number 1?
15      A    Yes, I have.
16      Q    Do you have any questions concerning
17  Exhibit 1?
18      A    No, I don't.
19      Q    Mr. Cohen, do you understand that you are
20  under oath?
21      A    Yes, I do.
22      Q    Do you understand that you are swearing that
23  your answers to my questions are true and correct?
24      A    Yes, I do.
25      Q    If at any time you do not understand a

Steven Cohen                                                                      May 3, 2012

Page 21

1   David Munno and Benjamin Slate.
2       Are you familiar with any account you have
3   co-managed with those individuals?
4   A   I don't remember.
5   Q   Is there anything we can do to refresh your
6   recollection?
7   A   I don't know.
8   Q   The last account is FSAE. Do you know what
9   that account refers to?
10  A   No, I don't.
11  Q   Further up on the page is an account
12  referenced as COHE. What is that account?
13  A   That is the account that I run.
14  Q   When you say you run it, what do you mean by
15  that?
16  A   It means that I make the investment decisions
17  in the account.
18  Q   How long have you made the investment
19  decisions in that account?
20  A   For -- I don't know exactly when the account
21  was assigned the acronym COHE, but I believe that is what
22  I described as my account, as the Cohen account. I have
23  run it for a long time. I can't give you an exact time
24  when it was called the Cohen account.
25  Q   Do you believe it has been at least since

Page 22

1   2008?
2   A   Yes, I do.
3   Q   Further down on the page there is reference
4   to GEHC and it references Mathew Martoma?
5   A   Yes.
6   Q   Do you know Mr. Martoma?
7   A   Yes, I do.
8   Q   When did you first hear of Mr. Martoma?
9   A   I believe -- I heard of him when we hired
10  him, or maybe before, when we were thinking about hiring
11  him. I believe it would have been somewhere between 2004
12  or '5 or 2006. Somewhere in there.
13  Q   Were you involved in the decision to hire
14  Mr. Martoma?
15  A   I might have been.
16  Q   What was your involvement?
17  A   I don't remember.
18  Q   Do you recall interviewing Mr. Martoma before
19  he started at SAC?
20  A   I don't remember.
21  Q   You also mentioned Mr. Holman. How long have
22  you known Mr. Holman?
23  A   I have known Wayne Holman probably ten to
24  twelve years.
25  Q   How did you first meet Mr. Holman?

Page 23

1   A   I don't remember.
2   Q   Did Mr. Holman ever work for you?
3   A   Yes, he did.
4   Q   When was that?
5   A   It was, I believe, in the early 2000's. The
6   exact years I just don't recall.
7   Q   Were you involved in the decision to hire
8   Mr. Holman?
9   A   Probably.
10  Q   Did you interview Mr. Holman before he
11  started at SAC?
12  A   I believe so.
13  Q   How long did he work at SAC?
14  A   I am going to take a guess and say three to
15  five years.
16  Q   When did Mr. Holman leave SAC?
17  A   I believe he left between 2005 and 2007.
18  Q   When Mr. Holman was at SAC, how was his
19  performance?
20  A   His performance in general was pretty good.
21  Q   What do you mean by that?
22  A   It means he was profitable.
23  Q   Since Mr. Holman left SAC have you had any
24  interactions with him?
25  A   Yes, I have.

Page 24

1   Q   Can you describe that?
2   A   We're good friends. We go to dinner. The
3   wives are friendly. You know, we see each other off and
4   on.
5   Q   Have you heard of a fund called Ridgeback?
6   A   Yes, I have.
7   Q   What is Ridgeback?
8   A   Ridgeback is the hedge fund that Wayne Holman
9   set up. It was his hedge fund.
10  Q   Has SAC ever had an investment in Ridgeback?
11  A   Yes, it has.
12  Q   When was the first time?
13  A   It was after he left. The exact date, I
14  don't remember, but we invested in his new fund.
15  Q   Is SAC still invested in Ridgeback?
16  A   I am not really sure. I know he's liquidated
17  the portfolio. And whether all the positions have been
18  liquidated, I am not really sure. Therefore, it's
19  possible we still have a position, but I believe the vast
20  majority of the positions have been liquidated.
21  Q   Why have the vast majority of the positions
22  been liquidated?
23  A   Because Wayne decided to close down his fund.
24  Q   How much money did SAC invest in Ridgeback?
25  A   It varied.

6 (Pages 21 to 24)

**Page 29**

1  his work. I know he spent a lot of time working on it.
2  Q    At the beginning of 2008 did SAC have an
3  investment in Wyeth?
4  A    I believe so.
5  Q    In the beginning of 2008 were you bullish or
6  bearish on Wyeth?
7  A    I was bullish based on the recommendation of
8  Mat Martoma and Wayne Holman. And there may have been
9  others that were bullish; I just don't remember.
10 Q    Other than Mr. Martoma and Mr. Holman can you
11 remember anybody else being bullish on Wyeth at the
12 beginning of 2008?
13 A    I can't remember. There could have been.
14 Q    What was Mr. Martoma's recommendation
15 concerning Wyeth?
16 A    I believe he was positive on Bapineuzumab and
17 therefore he might have been positive on Wyeth.
18 Q    What was Mr. Holman's recommendation
19 concerning Wyeth?
20 A    He generally thought Wyeth was a good
21 risk/reward.
22 Q    Did you have an understanding as to why that
23 was?
24 A    No. Wayne -- I don't remember other than,
25 you know, I think Wayne's a great investor. I assume he

**Page 30**

1  did good work on the drug Bapineuzumab and thought Wyeth
2  was a reasonable investment.
3  Q    Did he tell you why he believed that Wyeth --
4  did Mr. Holman tell you why he believed that Wyeth was a
5  good investment at the beginning of 2008?
6       MR. KLOTZ: Object to the form.
7  A    Can you repeat the question?
8  Q    Did Mr. Holman tell you why he thought Wyeth
9  was a good investment at the beginning of 2008?
10      MR. KLOTZ: My objection, by the way, is
11 simply to the time frame. I think he can answer it at
12 some point in 2008. If you want to focus on the time
13 frame, I am happy to have you do that.
14 A    I mean, at some point in 2008 -- and I don't
15 remember. I know he recommended that we buy Wyeth for the
16 firm account or that we buy Wyeth.
17 Q    Mr. Cohen, I am handing you a document that
18 has been previously marked as Exhibit 4. I am also
19 providing a copy for counsel. For the record, Exhibit 4
20 is Bates stamped SAC ELAN 726049 through 52.
21      Mr. Cohen, have you seen Exhibit 4 before?
22 A    I might have.
23 Q    Can you identify it?
24 A    Excuse me?
25 Q    Can you identify Exhibit 4?

**Page 31**

1  A    What does that mean?
2  Q    Describe it for the record.
3  A    You want me to describe this document now?
4  Q    Yes.
5  A    Okay. You want me to read it, or just
6  describe it?
7  Q    Is the letter dated November 9, 2007?
8  A    I see that.
9  Q    Let's do it this way: Is it correct that
10 Exhibit 4 is a letter agreement between S.A.C. Capital
11 Advisors and Ridgeback Capital Management?
12 A    Looking at the first page, it appears to be
13 an agreement between S.A.C. Capital and Ridgeback Capital.
14 Q    Did you negotiate this agreement?
15 A    I don't remember.
16 Q    Do you recall, were you involved in the
17 negotiation of this agreement?
18 A    I could have been.
19      MS. COTTRELL: Do you recall there being an
20 agreement with Ridgeback Capital around November 2007?
21      THE WITNESS: I remember that we had an
22 agreement, but I wasn't the person who negotiated. While
23 I was kept up on the agreement, my general counsel was
24 probably the person who worked on this agreement.
25      MS. COTTRELL: Was it your idea to enter into

**Page 32**

1  an agreement with Ridgeback Capital in November of 2007?
2       THE WITNESS: I don't remember.
3       MS. COTTRELL: Did you agree with S.A.C.
4  Capital entering into an agreement with Ridgeback in
5  November of 2007?
6       THE WITNESS: I believe so.
7  Q    Why did you enter into an agreement with
8  Ridgeback in November of 2007?
9  A    Wayne Holman suggested that SAC buy Wyeth
10 based on his recommendation, and so we set up an agreement
11 for this purchase.
12      Now what was the question again?
13 Q    Why did you enter into an agreement with
14 Ridgeback concerning Wyeth in November of 2007?
15 A    It was just a documentation of an agreement
16 that the firm came to with Wayne Holman.
17 Q    What were the terms, what was your
18 understanding of the terms of the agreement with
19 Mr. Holman?
20 A    I don't remember.
21      MS. COTTRELL: In general was your
22 understanding that Mr. Holman would be compensated for any
23 P and L that SAC generated as a result of his
24 recommendations concerning Wyeth?
25      THE WITNESS: I believe so.

Steven Cohen                                                                                             May 3, 2012

Page 57

1  A    It could be multiple people on.
2  Q    Is it a group call with all the portfolio
3  managers, or is it just a conversation with one portfolio
4  at a time?
5  A    One -- usually one portfolio manager at a
6  time. It could be a portfolio group. It could also be
7  other possibilities.
8  Q    What is the purpose of the Sunday night
9  calls?
10 A    Just generally to get updated on whatever PM
11 or I want to talk to them about.
12 Q    How does it compare to the idea e-mail?
13 A    It's probably -- discussions could be on the
14 ideas on the e-mail. It could be on other thoughts or
15 ideas.
16      MS. COTTRELL: Is each PM required to call
17 you every Sunday?
18      THE WITNESS: No, they are not.
19      MS. COTTRELL: Do you determine which
20 portfolio manager has a call with you on Sunday?
21      THE WITNESS: Sometimes.
22      MS. COTTRELL: When you don't, how does it
23 come about that the portfolio managers and you have a
24 call?
25      THE WITNESS: They might call me, I might

Page 58

1  call them. It' usually how it works.
2  Q    Of your portfolio managers, what percentage
3  do you talk to on a typical Sunday?
4  A    It varies.
5  Q    What is the range in which it varies?
6  A    Could be very few and it could be many.
7  Q    Could it be as high as 90 percent of your
8  portfolio managers?
9  A    No way.
10 Q    Could it be as high as 50 percent of your
11 portfolio managers?
12 A    No way.
13      MR. KLOTZ: Object to form.
14 Q    What is the highest percentage of your
15 portfolio managers you can recall talking to on a Sunday?
16      MR. KLOTZ: Objection. You have no way of
17 knowing this, but a lot of portfolio managers manage
18 quantitative portfolio so it would be highly unlikely that
19 they would speak. We need to be a little more focused on
20 what the universe is that we are talking about for him to
21 answer meaningfully, I think.
22 Q    Of the portfolio managers that work at SAC,
23 what percentage are managers that work in quantitative
24 funds?
25 A    I'd be guessing. Say 20 percent.

Page 59

1  Q    So the other approximately 80 percent work on
2  portfolios that they manage with their discretion. Is
3  that correct?
4  A    That's correct.
5  Q    Of that subset, what is the highest percent
6  of that subset of portfolio managers that you have talked
7  to on a Sunday?
8       MR. KLOTZ: Object to the form but go ahead
9  and answer.
10 A    Well, today we have approximately 125
11 portfolio managers, 20 percent quant, let's say. So, say
12 100 portfolio managers around the world.
13      So to answer your question, I would say --
14 and the question is again?
15 Q    The question is -- we started the line of
16 questions with what is the typical range of the number of
17 portfolio managers you talk to on a Sunday.
18 A    That's right.
19 Q    You said sometimes very few. The follow-up
20 question is, what is the top of the range?
21 A    I would say 20 percent.
22 Q    Is the maximum you talk to on a typical
23 Sunday?
24 A    You know, I am guessing.
25 Q    That is your approximation sitting here

Page 60

1  today?
2  A    That's my best guess.
3       MS. COTTRELL: Did you have the Sunday night
4  calls with portfolio managers in 2008?
5       THE WITNESS: Yes, I did.
6       MS. COTTRELL: Have you had them since 2008
7  to the present?
8       THE WITNESS: Yes, I have.
9  Q    Where are you typically for the Sunday night
10 calls?
11 A    I am typically in front of my screens in one
12 of my homes.
13 Q    We talked before about the Holman account and
14 you referred to the Holman account as a separate account
15 in which you make security trades based on the advice
16 Mr. Holman gave to you. Is that correct?
17 A    That's correct.
18 Q    Does Mr. Holman receive any compensation for
19 the trades placed in the Holman account?
20 A    I believe so.
21 Q    How is that calculated?
22 A    It's a percentage of profits.
23 Q    How long has he received that compensation?
24 Let me rephrase the question.
25      How long has Mr. Holman received a percentage

15 (Pages 57 to 60)

Steven Cohen                                                                    May 3, 2012

Page 69

1  exposures I have and whether -- you know, do I want to
2  increase my exposure or decrease my exposure?
3          And there is probably a lot of other things I
4  do.
5          MR. WADHA: And has this evolved in any
6  fashion since 2007 or have you generally continued to do
7  the same things as you would have done back in '07?
8          THE WITNESS: Pretty much similar, yes.
9  Q       We are focused on your position in Wyeth in
10 the beginning of 2008. We have shown you the 13F's which
11 reflect the size of your position. So far you have
12 mentioned Mr. Martoma and Mr. Holman recommended that you
13 buy -- that you be bullish on the security because of
14 Bapineuzumab. Correct?
15 A       Repeat the question?
16 Q       I am just trying to make sure that I
17 understand your testimony so far.
18 A       I just blanked out for a second. Sorry.
19 Q       We have been discussing SAC's position in
20 Wyeth and Elan at the beginning of 2008.
21 A       That's right.
22 Q       We have talked about at least the position in
23 Wyeth was one of the top ten percent biggest positions
24 that SAC had at the beginning of 2008. Is that correct?
25 A       In equities, yes.

Page 70

1  Q       So far your reasons for investing in SAC --
2  investing in Wyeth is Mr. Martoma and Mr. Holman?
3  A       Like I said, yes, and there may have been
4  others.
5  Q       And you said you can't remember others?
6  A       Certainly can't remember. I have other -- I
7  have many healthcare portfolio managers and so they could
8  have contributed to the knowledge pool. But I can't
9  recall who at that time.
10 Q       We're trying to understand all of your
11 reasons for having a bullish position in Elan and Wyeth.
12 A       Okay.
13 Q       For example, the position in Wyeth alone was
14 over $627 million.
15 A       Okay.
16 Q       So what did Mr. Holman and Mr. Martoma tell
17 you that led you to take a bullish position in Elan and
18 Wyeth?
19 A       Well, you know, I think Wayne Holman was
20 recommending Wyeth. And, you know, I consider Wayne one
21 of the great healthcare investors I have ever met and so I
22 have a ton of respect for his work. If he's positive on
23 something and recommends a position -- and he did -- you
24 know, I would be very willing to -- to invest in that.
25         And Mat Martoma had done a lot of work on

Page 71

1  Elan and Bapineuzumab for a long time. So I really
2  considered them experts, you know, what I would consider
3  to be experts in this particular area. And they are both
4  coming at it from different stocks. Well, Martoma liked
5  both names and Wayne liked Wyeth.
6          And so the answer is, they did the work, they
7  were the experts, and I relied on their recommendations.
8  Q       When a portfolio manager gives you a
9  recommendation how do you evaluate whether or not it is a
10 good idea or bad idea?
11 A       It really depends. Sometimes it's based on
12 reading e-mails, sometimes it's based on discussions with
13 the portfolio manager, sometimes it involves discussions
14 with other people in the firm, outside the firm, their
15 views. So it really depends on the particular situation.
16 Q       In late 2007 you entered into a letter
17 agreement with Mr. Holman that contemplated a large
18 investment in Wyeth. Correct?
19 A       That's correct.
20 Q       That agreement was entered into because
21 Mr. Holman recommended to you that you make an investment
22 in Wyeth through S.A.C. Capital. Correct?
23 A       That's correct.
24 Q       When evaluating Mr. Holman's recommendation,
25 what did you do?

Page 72

1  A       Well, I don't remember exactly what I did in
2  this particular case. Certainly I am talking to other
3  portfolio managers at the firm. I certainly could be
4  reading research reports. But like I said before, Wayne
5  Holman is a great healthcare investor and so his
6  recommendations are very important to me.
7  Q       Do you accept every recommendation made by
8  Mr. Holman?
9  A       We don't talk about everything he does.
10 Q       The question is, do you accept every
11 recommendation made by Mr. Holman?
12 A       Sometimes -- the answer is no.
13 Q       In this instance, why did you accept his
14 recommendation to invest in Wyeth?
15 A       Because he felt strongly this was a position
16 that the firm ought to take.
17 Q       It sounded like, when you described your
18 method for evaluating investments, that you independently
19 evaluated ideas and not just relied on a person to tell
20 you whether it was a good idea, a really good idea, or a
21 bad idea.
22         The question is, in this instance why did you
23 follow Mr. Holman's advice concerning Wyeth?
24         MR. KLOTZ: Object to form but go ahead and
25 answer.

Steven Cohen                                                                 May 3, 2012

Page 185

1  given to Mr. Villhauer concerning Wyeth?
2     A    I don't believe so at that point.
3     Q    Is Mr. Villhauer Mr. Martoma's trader?
4     A    No. He is the firm trader. He is in charge
5  of the trading desk.
6     Q    Why was the trades for Mr. Martoma's account
7  placed through Mr. Villhauer?
8     A    Because we wanted it executed all -- so he
9  could allocate and -- so he could handle it so we weren't
10 competing with each other in trying to get out of the
11 name.
12        MR. KLOTZ: I don't want to interrupt you in
13 the middle of key events but at some point I think it
14 would be time for a break. We have been going for well
15 over an hour.
16    Q    On July 21, 2008 did you make any decisions
17 concerning your investment in Wyeth?
18    A    What was the date?
19    Q    July 21st.
20    A    I don't remember.
21    Q    At some point prior to July 29, 2008, did you
22 make a decision concerning your investment in Wyeth?
23    A    Yes.
24    Q    When was that?
25    A    At some point during that week.

Page 186

1     Q    What prompted you to make a decision
2  concerning your investment in Wyeth the week of July 21st?
3     A    I spoke to Wayne at some point and he was
4  telling me he was selling his Wyeth.
5     Q    You referenced before a conversation on the
6  21st. Was that the same conversation in which he said he
7  was selling Wyeth?
8     A    I don't believe so.
9     Q    In the conversation where Mr. Holman
10 referenced that he was selling Wyeth, what do you recall
11 about that conversation?
12    A    I don't recall much other than he was telling
13 me he is selling his -- he is selling some Wyeth.
14        MS. COTTRELL: Did he say why?
15        THE WITNESS: I don't remember. I know he
16 was nervous about the world, the macro picture, but he
17 didn't give me any specifics.
18        MS. COTTRELL: Did he say anything else to
19 you in that conversation?
20        THE WITNESS: I don't remember.
21        MS. COTTRELL: Did he recommend that you sell
22 Wyeth?
23        THE WITNESS: I don't believe so.
24        MS. COTTRELL: Did Mr. Holman ever recommend
25 that you sell your Wyeth position?

Page 187

1         THE WITNESS: I don't believe so, but he
2  might have.
3         MS. COTTRELL: Do you have a recollection of
4  him telling you?
5         THE WITNESS: I know he told me that he was
6  selling Wyeth, so I am not sure if he told me to sell it
7  or I took it on my own volition based on that he was
8  selling it.
9         MS. COTTRELL: Aside from kind of the macro
10 concerns, did Mr. Holman say anything else about why he
11 was selling Wyeth?
12        THE WITNESS: I don't believe so.
13        MS. COTTRELL: Since Mr. Holman had macro
14 concerns, his macro concerns might not have been your
15 macro concerns. Isn't that correct?
16        THE WITNESS: I can't speak for what his
17 macro concerns were.
18        MS. COTTRELL: So did he give you any reason
19 relating to the investment in Wyeth why he was selling
20 Wyeth as opposed to kind of macro concerns about the
21 economy in general?
22        THE WITNESS: He -- I don't remember him
23 telling me specifically why he was selling Wyeth.
24        MS. COTTRELL: When we were both talking
25 about macro concerns, can you say what you meant by macro

Page 188

1  concerns?
2         THE WITNESS: Yeah. It was 2008. The
3  markets were under pressure. The stocks had outperformed
4  a lot and the markets were under pressure.
5         MS. COTTRELL: So Mr. Holman didn't tell you
6  anything specific about his views on Wyeth as to why he
7  sold Wyeth?
8         THE WITNESS: I know we spoke. I just don't
9  remember the specifics.
10        MS. COTTRELL  you don't remember him saying
11 anything specifically concerning Wyeth?
12        THE WITNESS: I don't remember that, no.
13        MR. RIELY: Off the record at 4:08.
14        (Recess.)
15        MR. RIELY: Back on the record at 4:20.
16    Q    Mr. Cohen, while we were off the record we
17 had no conversations about the substance of this
18 investigation. Correct?
19    A    That's correct.
20    Q    You referenced before that Mr. Martoma wanted
21 to get out of his position in Elan. Is that correct?
22    A    That's correct.
23    Q    When did he first express that view to you?
24    A    I don't remember. It was definitely after
25 the first conversation we had that Sunday.

47 (Pages 185 to 188)

Page 225

1  Martoma an 8 percent bonus on the positions in Elan in the
2  firm Holman account?
3      A    I don't remember.
4      Q    Did Mr. Holman receive any compensation for
5  the positions in Elan held in the firm Holman account?
6      A    I don't remember.
7      Q    Did you review whether Mr. Martoma would
8  receive a bonus for 2009 or 2010?
9      A    Excuse me? Can you say that again?
10          (Record read.)
11     A    I don't remember.
12          MS. COTTRELL: Aside from Mr. Martoma did
13 anybody else receive a bonus based on the Elan trades?
14          THE WITNESS: I don't remember.
15          MR. WADHWA: Do you remember anything in
16 particular that would have caused Mr. Martoma to go from
17 receiving $9.38 million in bonus in 2008 to receiving
18 nothing in 2009?
19          THE WITNESS: I could speculate but I don't
20 remember.
21          MR. WADHWA: Well, let's hear you speculate.
22          THE WITNESS: I mean, it looks like there is
23 nothing there, which probably means he didn't make any
24 money in 2009.
25          MR. WADHWA: The same in 2010?

Page 226

1           THE WITNESS: 2010 appears that way, yes.
2           MR. WADHWA: Is there anything about his
3  performance, sitting here, that you can remember other
4  than fact that he may not have made money? Is there
5  anything that you remember as having been disappointed in
6  vis-a-vis Mr. Martoma?
7           THE WITNESS: I believe he had a bad position
8  in a biotech name where he lost a lot of money.
9           MR. WADHWA: Do you remember the name?
10          THE WITNESS: I believe it was InterMune,
11 ITMN.
12          MS. COTTRELL: Also looking at Exhibit 39, it
13 looks like Mr. Martoma did not receive any attribution
14 bonus or firm account bonus before 2008. Do you see that?
15          THE WITNESS: I see that.
16          MS. COTTRELL: Do you have a recollection
17 that Mr. Martoma didn't have any attributable positions or
18 any positions that you took the ideas for in the COHE
19 account or the firm account prior to 2008?
20          THE WITNESS: I just don't remember.
21          MS. COTTRELL: Do you have any reason to
22 doubt that this document isn't accurate?
23          THE WITNESS: It probably is true but I
24 didn't prepare the document.
25     Q    Aside from Mr. Martoma, did anybody else

Page 227

1  receive a portion of the profits in Elan in 2008?
2      A    I don't remember.
3      Q    Did Mr. Munno or Mr. Slate receive any
4  compensation for their investment advice concerning Elan?
5      A    I don't remember.
6      Q    Aside from Mr. Martoma did anybody else
7  receive a portion of any payout for Wyeth?
8      A    What was the question again?
9           (Record read.)
10     A    I don't remember.
11     Q    Did Mr. Munno or Mr. Slate receive any bonus
12 for their investment advice concerning Wyeth?
13     A    I don't remember.
14     Q    You mentioned that Mr. Holman is currently
15 working under a consulting agreement?
16     A    That's correct.
17     Q    What led you to enter into a consulting
18 agreement with Mr. Holman?
19     A    We discussed it and we decided to do it.
20     Q    Who negotiated the consulting agreement?
21     A    I believe, my general counsel.
22     Q    Did you participate in the negotiation?
23     A    Only in setting the amount.
24     Q    And what was the amount?
25     A    I believe it was $20 million.

Page 228

1      Q    $20 million over what period?
2      A    Over one year.
3      Q    How did you -- who determined that Mr. Holman
4  would be paid $20 million for one year?
5      A    Wayne and I discussed it. That's what he
6  wanted. I really didn't want to pay that amount. I
7  agreed to it.
8      Q    Why did you agree to it?
9      A    Because I think he's worth it.
10     Q    What services does Mr. Holman provide
11 pursuant to the consulting agreement?
12     A    He is, you know, recommending stocks for me
13 to buy and sell.
14     Q    When was the consulting agreement entered
15 into?
16     A    I believe it was over the last year.
17          (Plaintiff's Exhibit 40, Letter agreement,
18          RIDGE 8144 through 8151, was marked for
19          identification as of this date.)
20     Q    Mr. Cohen, I am handing you Exhibit 40. For
21 the record Exhibit 40 is a document Bates stamped RIDGE
22 8144 through 8151. Have you ever seen this document
23 before?
24     A    No.
25     Q    For the record Exhibit 40 is a letter