# EXHIBIT A

## Page 1

```
          BEFORE THE SECURITIES AND EXCHANGE COMMISSION
                                  )
In the Matter of:                 )
                                  )
Elan Corporation, plc             )   File No. NY-8152
                                  )
                                  )

WITNESS:      STEVEN COHEN

PAGES:        1-253

PLACE:        Room 425
              Securities and Exchange Commission
              3 World Financial Center
              New York, New York
Date:         May 3, 2012

          The above-entitled matter come on for
investigation at 10:10 a.m.
```

## Page 2

On behalf of the Securities and Exchange Commission:

CHARLES D. RIELY, ESQ.
AMELIA A. COTTRELL, Assistant Director
SANJAY WADHWA, Associate Regional Director
NEIL HENDELMAN, Staff Accountant
  Securities and Exchange Commission
  Division of Enforcement
  Northeast Regional Office
  4th Floor, Suite 400
  3 World Financial Center
  New York, New York 10281

On behalf of the Witness and S.A.C. Capital Advisors, L.P.:

MARTIN B. KLOTZ, ESQ.
JEANNA COMPOSTI, ESQ.
  Willkie Farr & Gallagher, Llp
  787 Seventh Avenue
  New York, New York 10019
-and-
DANIEL J. KRAMER, ESQ.
  Paul, Weiss, Rifkind, Wharton & Garrison, Llp
  1285 Avenue of the Americas
  New York, New York 10019

## Page 3

1  PROCEEDINGS
2      MR. RIELY: We are on the record May 3, 2012,
3  at 10:10 a.m., New York regional office of the SEC.
4  Whereupon,
5      STEVEN COHEN,
6  having been first duly sworn/affirmed, was examined and
7  testified as follows:
8  EXAMINATION BY
9  MR. RIELY:
10     Q    Will you please state and spell your full
11  name for the record?
12     A    Steven A. Cohen.
13     Q    My name is Charles Riely. With me are my
14  colleagues, Sanjay Wadhwa, Amelia Cottrell, Neil
15  Hendelman. We are members of the Division of Enforcement
16  of the United States Securities and Exchange Commission
17  and are officers of the Commission for purposes of this
18  proceeding.
19          This is an investigation by the Securities
20  and Exchange Commission entitled Elan Corporation, plc,
21  File Number NY-8152, to determine whether there have been
22  violations of certain provisions of the federal securities
23  laws. However, the facts developed in this investigation
24  might constitute violations of other federal or state
25  civil or criminal laws.

## Page 4

1       Prior to the opening of the record you were
2  provided with a copy of the formal order of investigation
3  in this matter. It will be available for your examination
4  during the course of this proceeding. Okay?
5      A    Okay.
6      Q    Have you had an opportunity to review the
7  formal order?
8      A    Yes, I have.
9      Q    Prior to the opening of the record you were
10  also provided with a copy of the Commission's Supplemental
11  Information Form 1662. A copy of that notice has been
12  previously marked as Exhibit Number 1.
13          Have you had the opportunity to read Exhibit
14  number 1?
15     A    Yes, I have.
16     Q    Do you have any questions concerning
17  Exhibit 1?
18     A    No, I don't.
19     Q    Mr. Cohen, do you understand that you are
20  under oath?
21     A    Yes, I do.
22     Q    Do you understand that you are swearing that
23  your answers to my questions are true and correct?
24     A    Yes, I do.
25     Q    If at any time you do not understand a

Page 193

1  you have an understanding as to what he meant by that?
2    A    No, I didn't.
3    Q    Did you ask him what he meant by that?
4    A    I definitely asked him because he repeated
5  back to me.
6    Q    And you said part of the reason you
7  established a position in your accounts in the first place
8  was because of advice from Mr. Martoma. Correct?
9    A    That's correct.
10   Q    When he switched his advise and told you
11 nothing more than he was uncomfortable, did you seek
12 additional information from him?
13   A    I might have.
14   Q    Do you remember doing that?
15   A    I don't remember but I might have.
16   Q    Do you remember getting any additional
17 information?
18   A    It's certainly possible but I just don't
19 remember.
20        (Plaintiff's Exhibit 36, E-mail chain, SAC
21         ELAN 733567 through 569, was marked for
22         identification as of this date.)
23   Q    Mr. Cohen, I am handing you what has been
24 marked Exhibit 36, a document Bates stamped SAC ELAN
25 733567 through 569, an e-mail chain starting with an

Page 194

1  e-mail from Phillip Villhauer to you and others on Sunday,
2  July 27, 2008 at 8:44 a.m.
3        Do you see that?
4    A    Yes, I do.
5    Q    Mr. Villhauer was the head trader that you
6  gave your instructions to about getting out of the Elan
7  position; correct?
8    A    That's correct.
9    Q    If you look at the bottom of the page there
10 is a reference to ELN?
11   A    I see that.
12   Q    Take a moment to review it.
13       (Pause.)
14   A    I see it.
15   Q    The first sentence reads, "We executed a sale
16 of over 10.5 million ELN for COHE, GGEN, GEHC, SELC at an
17 avg price of 34.21."
18       Do you see that first sentence?
19   A    "We executed a sale --" is that the first
20 sentence?
21   Q    Yes.
22   A    Okay.
23   Q    Were these sales done in compliance with an
24 instruction that you gave Mr. Villhauer?
25   A    I believe so.

Page 195

1    Q    Were you aware that SAC, through these
2  accounts, had sold 10.5 million Elan the week of
3  July 21st?
4    A    I don't remember the exact amount but that's
5  what it says.
6    Q    And you believe it's accurate?
7    A    It probably is accurate.
8    Q    Then the next clause says, "This was executed
9  quietly and efficiently over a four day period."
10       Do you know what he is referring to when he
11 says "quietly and efficiently"?
12   A    Yes. We executed quietly so that as few
13 people as possible knew that we were selling the stock.
14   Q    Why was that important?
15   A    Well, it was a big position. Ten and a half
16 million shares is a lot of stock to sell. The more people
17 you tell, the more they talk; the more they talk, the more
18 it gets out that you are selling Elan.
19       We were probably a first page holder. Market
20 loves information like that. So, we wanted to do it
21 quietly so we would, you know, execute as efficiently as
22 we could so it didn't get out and people run in front of
23 us or -- so we'd get out at a decent price.
24   Q    When you say "first page holder" what do you
25 mean by that?

Page 196

1    A    On Bloomberg it shows up that you might be a
2  holder of Elan. And so if the marketplace finds out, you
3  try to sell it through a broker or sell it through
4  somebody, they might tell somebody, "Hey, Connecticut
5  seller of Elan" and people might surmise who it might be
6  and that cause people to run in front -- they might see
7  our position and say "Oh, they are selling" and create
8  what I call slippage in the execution of the transaction.
9    Q    It refers to the executions being done
10 quietly. What steps did you take to keep the execution of
11 the Elan sales the week of July 21st quiet?
12   A    I didn't do anything.
13   Q    In your instructions to Mr. Villhauer did you
14 communicate to him that you wanted the sales of Elan to be
15 done in a quiet way?
16   A    I gave the order to him and told him I didn't
17 want anybody to know.
18   Q    Why did you tell him you did not want anybody
19 to know?
20   A    Just for the reason I gave you; that I was
21 afraid that it would leak out either in the firm or
22 outside the firm or on Wall Street brokerage desks,
23 trading desks, and that people might run in front of our
24 order, they might tell other people we're selling and, you
25 know, that might create a dislocation in the stock.

Steven Cohen                                                      May 3, 2012

**Page 197**

1   Q    So you communicated to Mr. Villhauer that you
2   didn't want anybody else within the firm to know about the
3   sales of the Elan securities?
4   A    That's correct.
5        MS. COTTRELL: How often do you give such a
6   communication to a trader executing an order?
7        THE WITNESS: Sometimes. Not very often.
8        MS. COTTRELL: Under what circumstances do
9   you do it?
10       THE WITNESS: Could be any time there is a
11  large position or it could be if I don't want other people
12  to know what I am doing.
13       MS. COTTRELL: As a general course, do other
14  employees at S.A.C. Capital know when the firm account is
15  trading in or out of a position?
16       THE WITNESS: They could.
17       MS. COTTRELL: How could they?
18       THE WITNESS: Through other traders on the
19  trading desk. We have systems. Sometimes they watch what
20  I do. I have a board that people can see. There is many
21  ways that people can see what I am doing.
22       MS. COTTRELL: As to the general course,
23  people aren't prohibited from looking at what you are
24  doing in your accounts?
25       THE WITNESS: Generally, but not always.

**Page 198**

1   Q    In the e-mail it refers to sales being done
2   in a four-day period through algos and dark pools.
3        Did you have an understanding what he was
4   referring to when he referred to dark pools?
5   A    I believe, yes; those are electronic places
6   where people transact.
7   Q    Transact securities?
8   A    Transact securities, yes.
9   Q    In executing the securities in a dark pool,
10  in your understanding did that help SAC reduce the
11  visibility of the trade?
12  A    The point of a dark pool is anonymity.
13  Q    It also refers to trades being done through
14  algos. Do you know what that refers to?
15  A    That is an electronic trade.
16  Q    What were the algos that made executions in
17  Elan the week of July 21st?
18  A    What was the question?
19  Q    What were the algos that did executions of
20  Elan securities sales for SAC the week of July 21st?
21  A    Well, the way I understand algos, that is a
22  term for algorithms. Those are electronic trading
23  software that allows you to break up your order and
24  transact it any which way you want.
25  Q    During the week of July 21st, did you have

**Page 199**

1   communications with Mr. Villhauer about the sales of Elan?
2   A    I don't remember but I am sure he kept me up
3   on the sales.
4   Q    How did he keep you up on the sales?
5   A    He could have told me, he could have done it
6   by IM. Either one.
7   Q    By the end of the week of the 21st, did SAC
8   or CR Intrinsic still hold any position in Elan?
9   A    I don't remember.
10  Q    Who is Edmund Debler?
11  A    He was my healthcare conduit, helped me trade
12  my healthcare portfolio in my account.
13  Q    In 2008 what was Mr. Debler's title?
14  A    I don't know what the title was.
15  Q    During the week of July 21st did you talk to
16  Mr. Debler about Elan?
17  A    I might have. I don't remember.
18  Q    You discussed earlier that you didn't want
19  people within SAC to know about the sales of Elan.
20  Correct?
21  A    That's correct.
22  Q    Was Mr. Debler one of the people that knew
23  about the sales of Elan?
24  A    He might have been. He might have. I don't
25  remember.

**Page 200**

1        MS. COTTRELL: Other than Martoma and
2   Villhauer and maybe another trader, who else within SAC
3   knew that you were selling your Elan position that week of
4   July 21st?
5        THE WITNESS: Could have been risk, could
6   have been management.
7        MS. COTTRELL: When you say "could have
8   been," do you have a recollection of informing risk or
9   informing management?
10       THE WITNESS: We have -- they see -- we have
11  minute to minute realtime -- they have access to
12  positions, and certainly if they look at it minute by
13  minute they'd see that perhaps at the end of the day. So
14  it is very conceivable they would have known.
15       MS. COTTRELL: Did you have any conversations
16  with anyone from risk or management the week of the 21st
17  about selling your Elan position?
18       THE WITNESS: I might have.
19       MS. COTTRELL: Do you recall any?
20       THE WITNESS: I don't recall.
21       (Plaintiff's Exhibit 37, E-mail, SAC 3349531
22       through 32, was marked for identification as
23       of this date.)
24  Q    I am handing the witness Exhibit 37. A copy
25  has also been provided to his counsel. For the record

Page 201

1  Exhibit 37 is a document Bates stamped SAC 3349531 through
2  32.
3       Mr. Cohen, do you recognize Exhibit 37?
4   A  I don't recognize it but I see it.
5   Q  Exhibit 37 is an e-mail from you to
6  Mr. Debler on July 27, 2008. Do you see that?
7   A  Yes, I do.
8   Q  It says, "Between you and me, you can't
9  mention to anyone, I am completely out of ELN."
10      Do you see that?
11  A  Yes, I do.
12  Q  What did you mean by "I am completely out of
13 ELN"?
14  A  It appears to mean that I have completely
15 sold out my long position in ELN.
16  Q  What did you mean by "between you and me, you
17 can't mention to anyone"?
18  A  Well, I am not sure. I could surmise. He
19 was on my team, so he is instructed to follow my
20 healthcare names, and I didn't want him worrying about
21 Elan, you know, given the fact that I was out of the name.
22  Q  Why on July 27th, '08 were you telling him
23 not to mention the fact that you were completely out of
24 Elan to anybody else?
25  A  It's hard -- it's possible that, you know, I

Page 202

1  still owned the Wyeth position or some of it, so I still
2  had potential to transact. And obviously, you know, it
3  was a big position. Once again, I didn't want anybody to
4  know that I was transacting -- potentially transacting a
5  large position.
6   Q  On the week -- we referenced before that the
7  ICAD phase 2 announcement was on July 29, 2008. On the
8  weekend prior to the ICAD announcement did you talk to
9  Mr. Holman?
10  A  I don't remember.
11  Q  On that weekend did you talk to Mr. Martoma?
12  A  I don't remember.
13      MS. COTTRELL: Do you recall speaking to
14 anyone that weekend about Elan or Wyeth?
15      THE WITNESS: I don't remember.
16  Q  Do you know whether or not Mr. Martoma or
17 Mr. Holman attended the ICAD conference in Chicago?
18  A  I don't -- I don't know.
19      MS. COTTRELL: Did you attend the ICAD
20 conference?
21      THE WITNESS: I didn't.
22  Q  On July 28th and July 29th did you make any
23 transactions in Elan securities?
24  A  I might have.
25  Q  Do you recall?

Page 203

1   A  I know I transacted at some point but -- I
2  definitely transacted. I just don't remember exactly what
3  I did.
4       MS. COTTRELL: Do you recall generally what
5  you did?
6       THE WITNESS: Generally, what I remember was
7  selling Wyeth and then deciding to hedge out my exposure
8  in Wyeth by shorting Elan.
9       MS. COTTRELL: Can you explain that, your
10 thought process in a little more detail?
11      THE WITNESS: Sure. I still had a position
12 in Wyeth. It's conceivable Wayne might have been selling
13 Wyeth because he told me he was and so I didn't want to
14 compete in Wyeth. I knew that I had executed a lot of
15 stock in Elan the previous week.
16      Rather than just selling Wyeth and carrying
17 what I call slippage -- which would have meant could I get
18 out of the amount of stock that I had in Wyeth -- what I
19 decided to do was to sell Wyeth and reduce the amount of
20 overall slippage in the transaction by shorting Elan
21 against it.
22      It was sort of imperfect. I was estimating
23 the ratio that I would need to sell one against the other,
24 but that's what I did.
25      MS. COTTRELL: Did you discuss your strategy,

Page 204

1  as you just described it, with anyone?
2       THE WITNESS: I might have.
3       MS. COTTRELL: Do you recall discussing it
4  with anyone?
5       THE WITNESS: I don't remember.
6       MS. COTTRELL: Did you discuss it with
7  Martoma?
8       THE WITNESS: I could have.
9       MS. COTTRELL: Do you remember discussing it
10 with Martoma?
11      THE WITNESS: I don't remember.
12      MS. COTTRELL: Did you discuss your strategy
13 with Wayne Holman?
14      THE WITNESS: I might have.
15      MS. COTTRELL: Do you recall discussing it
16 with Wayne Holman?
17      THE WITNESS: I don't.
18      MS. COTTRELL: You said you were estimating
19 the ratio. Did you perform that work yourself?
20      THE WITNESS: I didn't do a lot of work on
21 this.
22      MS. COTTRELL: How did you go about
23 estimating the ratio?
24      THE WITNESS: Basically estimating how
25 much -- if -- where would Elan might go if the news was