# EXHIBIT A

# VANITY FAIR

POLITICS  BUSINESS  CULTURE  HOLLYWOOD  STYLE  SOCIETY  BLOGS  PHOTOS  VIDEO  INSIDE THE ISSUE                              VF AGENDA

business  ▶  *June 2013*

## The Hunt for Steve Cohen

With arrest after arrest in a massive, seven-year insider-trading investigation, U.S. Attorney Preet Bharara is getting closer to the biggest fish of them all: Steve Cohen, founder of SAC Capital, the $14 billion hedge fund, who some regard as the most successful stock picker of his time. C.E.O.'s have fallen, lives and companies have been upturned, but Cohen has thus far escaped. Bryan Burrough and Bethany McLean go deep inside Bharara's probe—and SAC's org chart—to reveal just how much blood is in Wall Street's waters.

By Bryan Burrough   AND Bethany McLean        Illustration by André Carrilho

READ  WHAT FINANCIAL TITANS PURCHASED ON THE BRINK OF RUIN



**THAR SHE BLOWS** Steve Cohen has become a focal point of a seven-year probe into insider trading, led by U.S. Attorney Preet Bharara. So far, 71 people have been convicted or admitted guilt. Download this image as a desktop wallpaper.

Twenty-five years ago Wall Street, and much of America, was transfixed by a sweeping set of insider-trading investigations centered on the greatest financier of the age, junk-bond king Michael Milken, of Drexel Burnham Lambert. Day after day, week after week, month after month, stories of U.S. Attorney Rudolph Giuliani's relentless investigation dribbled out to the press. One by one, Giuliani picked off Milken's minions, confronting them at their homes, handcuffing them at their offices, pulling them before secret grand juries, indicting a few, pressing for evidence that Milken had broken the law. It all took on an inexorable quality. In their hearts, most everyone knew that Milken was going down sooner or later—and he did, paying more than $1 billion in fines and spending 22 months in prison. He was banned for life from the securities industry, and his firm was dismantled.

Twenty-five years later it's all happening again. Once more a relentless U.S. attorney, this time 44-year-old Preet Bharara, has seemingly targeted the billionaire investor Steve Cohen, founder of SAC Capital Advisors, the $14 billion hedge fund based in Stamford, Connecticut. One by one, Bharara has picked off onetime SAC traders and analysts, confronting them at their homes, pulling them before grand juries, bringing criminal cases, and pressing them for evidence that Cohen has broken insider-trading laws. So far Cohen

has not been charged with anything, but there is the same sense that Bharara, like Giuliani before him, has too much invested in all this to lose. "If Steve Cohen gets off," one hedge-fund manager observes, "he will be the O. J. Simpson of insider trading."

In almost every way, though, today's scandal surpasses the one that brought the Roaring 80s to an end. There have been more arrests, many more convictions; C.E.O.'s have fallen, lives and companies have been ruined, all in a campaign that has increasingly put one man in the government's crosshairs: Steve Cohen, thought to be the most brilliant trader of his generation.

Simply reading the headlines this spring, one could be forgiven for being a bit confused. In mid-March, after years of scoffing at every suggestion any of its traders might have done something untoward, SAC agreed to pay, without admitting guilt, the largest fine in the history of the Securities and Exchange Commission, a stunning $616 million, to settle charges of insider trading in only two trades. Some on Wall Street called it a victory for Cohen, who paid a pittance—for him—to make a messy situation go away. Others were not so sanguine, observing—correctly—that blood was finally in the water, that an S.E.C. fine did nothing to curtail the ongoing criminal investigation, which has already led to guilty pleas from and convictions of at least five onetime SAC employees.

Cohen seems determined to ride it all out with sheer bravado. A week after the settlement, news broke that he had paid the casino owner Steve Wynn an astounding $155 million—a record sum for a U.S. collector—to buy Picasso's *Le Rêve* (which Wynn had accidentally put his elbow through in 2006). Days after that revelation Cohen paid $60 million for a 10,000-square-foot, seven-bedroom mansion with ocean views, on Further Lane in East Hampton. Taken together, it all had a "Let them eat cake" quality, as if Cohen were waving his billions in the government's face, daring it take him on.

Their looming showdown draws on themes of money, privilege, and class that define the era. Steve Cohen isn't just another hedge-fund billionaire; he is *the* hedge-fund billionaire. He doesn't live in just another Greenwich, Connecticut, mansion; he lives in the largest of them all, complete with its own two-hole golf course and Jeff Koons's *Balloon Dog* sculpture adorning the driveway. Inside, the walls are festooned with paintings from his fabled collection of Impressionist and contemporary art, which includes Francis Bacon's *Screaming Pope,* hanging just outside his bedroom. Doughy and clerk-like, Cohen is nevertheless the Gatsby of our age, a middle-class kid from Long Island who caught the gambling bug fleecing his high-school pals in all-night poker games. Today he tosses around his winnings in transparent attempts to join the social elite that's never quite accepted him and his 48-year-old Puerto Rican second wife, Alex, whom he met through a dating service.

O n Wall Street everyone knows the Cohen legend. The awkward kid who stood outside Merrill Lynch offices in college studying the green digital stock prices as they slid silently across screens in the window, finally deducing patterns no one else could see. The years as a wunderkind at little Gruntal & Co. during the 1980s, screaming at assistants who couldn't keep up with his flood of trading orders.

Then came the formation of SAC at the dawn of the hedge-fund age, in 1992, its returns so enormous Cohen could demand as much as double the industry average 1.5 percent management fee and take 50 percent of investment gains, as opposed to the usual 20 percent. The jaw-dropping 70 percent returns he piled up riding the high-tech wave of 1998–99, then the even more mind-boggling 70 percent he earned betting against the very same stocks in 2000, inspired *BusinessWeek* to crown him "The Most Powerful Trader on Wall Street You've Never Heard Of."

Cohen never wanted the attention, even after buying his Greenwich mansion and moving SAC into its new brick-and-glass headquarters on Long Island Sound. Taking a page from Milken's book, he bought the copyright to photographs of himself—so the press couldn't run them. He dodged reporters for years, until SAC's name began popping up in stories about this new insider-trading investigation, at which point, in 2010, he sat for a series of

exclusive interviews with *Vanity Fair*. "I feel like Don Quixote fighting windmills," he groused. "There's a perception, and I'm trying to fight that perception. I find it offensive that they lump SAC into these articles. I really do. The press, I mean, they don't understand what the hell—they don't understand what they're writing about."

Yet even Cohen would admit that this "perception"—that SAC had to be doing something illegal to make such astounding returns—had been around for a while. In the 1990s, SAC earned a reputation for pumping brokerages for advance notice of analyst recommendations, a rumor that was never proved. In the early 2000s it was known as a fund that hoovered up all available information on every conceivable stock, to the point where some of it crossed the line into illegal insider information, another suspicion that was never proved. In response Cohen beefed up SAC's compliance department (its internal police) and began hiring a new breed of trader. The stereotypical Wall Street trader, the hard-charging, foulmouthed kid from Staten Island, began to disappear from SAC's halls; in his place came Ph.D.'s from Harvard and Stanford, traders always referred to as "super-smart," who took jobs at SAC over offers from Google or Microsoft. In his interviews with *Vanity Fair,* Cohen all but admitted SAC had once steered too close to legal boundaries, necessitating a change in its culture. "Things were different then," he acknowledged. "This was a learning process."

But the whispers about Cohen continued to spread as SAC grew to become one of the world's largest hedge funds, with $14 billion under management.

What you'll hear from SAC's supporters or Cohen's friends is that of course the government is trying to get Steve Cohen. Why? Well, anyone who has earned those kind of returns, who charges the highest fees in the industry, who is personally worth over $10 billion, and who has done all that by trading, well, he must be using inside information to be that good, that rich.

No doubt some of the whispering is fueled by envy, as well as personal distaste—Cohen, people who know him say, can turn nasty on a dime—but SAC courted it by assembling what is by any measure one of Wall Street's greatest information-gathering machines. It's fueled, many believe, by the exorbitant fees SAC pays scores of Wall Street firms for processing its trades and other services; whereas other hedge funds trade via computer at fractions of a penny per share, SAC still does it the old-fashioned way, paying three to five cents, making it, by wide agreement, the largest payer of fees on Wall Street, $400 million a year by some estimates. That kind of largesse, some charge, spurs a blizzard of tips from Wall Streeters eager to ingratiate themselves with Cohen. In addition, former SAC employees have started at least 31 other funds, in which Cohen often invests, and the expectation is that the former traders will continue to feed SAC information, which is why one SAC alumnus calls Cohen "the Godfather."

At one point, in 2008, Cohen was so proud of his information-gathering techniques that an SAC marketing document summarized his trading strategy with one word: "Edge." But when asked about this in a 2011 civil-suit deposition, Cohen said, "I hate that word."

What makes the rumors linger is SAC's business structure. Splayed before five screens at his workstation on SAC's library-quiet trading floor, Cohen himself manages only about $2 billion of the firm's capital; the rest is handled by a hundred or so portfolio managers, known as P.M.'s, each of whom leads a small team, usually of two or three analysts, known as a "pod." They can always see Cohen, thanks to the "Steve Cam," a tiny camera trained on the boss sitting at his 50-foot black desk, divided into eight trading stations.

SAC is a notoriously cutthroat environment; those who don't perform don't last. Each pod typically manages hundreds of millions—although some manage more—and is required to pass its best ideas to Cohen, usually at a Sunday-night teleconference; if Cohen makes money off the idea—a process known inside SAC as "centerbooking" or getting "tagged"—the pod members receive a 4 percent cut.

There's a high hurdle, though: when asked in the deposition what the threshold for a good idea was, Cohen responded, "You don't want to hear an idea that you're going to make 5

percent in a year on. I don't think anyone would embarrass himself by bringing me an idea like that."

Those who believe SAC has, at least in the past, trafficked in dirty information, including onetime SAC traders who spoke to *Vanity Fair* on background, say this high-pressure structure spurs desperate P.M.'s to resort to the use of inside information—and combined with the potential to make a fortune, this can lead to temptation. And where there's temptation, of course, people will cross the line. As a former SAC analyst puts it, "What happens if the puppet master doesn't want you to have a moral compass?"

T he very same structure, however, tends to insulate Cohen, who can say he doesn't know the sources of information behind his traders' tips. "Steve knows his business model protects him," says the former SAC analyst. "There's not a single hedge fund that hasn't somewhere, sometime, gotten sketchy info. But this is different. You think Steve wants you to have inside information but doesn't want to know you do. Why do it? Why did A-Rod take steroids? Because it's worth it.… The payout is huge and you can get swayed. What would you do for, say, 20 percent of $276 million? You do stuff. You fucking do stuff. You can't be in this job without navigating a gray line constantly."

Tom Conheeney, SAC's president, counters that it is "absolutely false" to say that the business model is designed to protect Cohen. "The structure has nothing to do with 'insulating' Steve," he says. "We believe the multi-manager model is the best model to produce attractive, risk-adjusted returns over time."

"Activity that was acceptable no longer is. Steve made the appropriate adjustment," says Anthony Scaramucci, an SAC investor, who runs SkyBridge Capital. "The government has had years to prove its case. If they could, they would have done it by now."

Many of the safeguards came after the S.E.C. initiated the current insider-trading investigation, in 2006. That year, for instance, SAC instituted a rule forbidding any P.M. from using a so-called expert network—a company that provides industry "experts" to help traders analyze stocks—that talked directly to company insiders. SAC says it was also one of the first hedge funds to establish a separate compliance department led by a well-respected professional, and it has steadily strengthened its compliance program over time, increasing its total compliance personnel from 3 in 2005 to 36 today.

shot across the bow

T he legal waves lapping at Steve Cohen's feet today spread from the dropping of a single pebble into regulatory waters almost seven years ago, on August 22, 2006, a hot, hazy summer afternoon in Lower Manhattan. It was then, according to *The Billionaire's Apprentice,* the excellent new book by Anita Raghavan, of the *New York Times* Dealbook site, that a lawyer named John Moon walked into the S.E.C.'s New York regional office at the World Financial Center with suspicions about a client's trades. Moon worked for the giant Swiss bank UBS, which processed trading for any number of hedge funds, large and small. A month earlier one of its newest and smallest clients—a fund called Sedna Capital Management—had embarked on an incredible run of success, nearly doubling its $2 million in capital with barely a handful of trades. Moon suspected Sedna was benefiting from "cherry-picking," an age-old Wall Street scheme in which a fund manager allocates his most profitable trades to a friend or relative, in this case Sedna, in order to avoid scrutiny. When S.E.C. attorneys Googled Sedna, they realized they might be onto something big. It was run by Rengan Rajaratnam, whose older brother, a rotund Sri Lankan named Raj Rajaratnam, headed one of the world's largest and most successful hedge funds, the $7 billion Galleon Group.

The S.E.C. began examining Raj's trades. Soon federal prosecutors and two teams of F.B.I. agents in New York were on the case. In time the overall investigation came under the supervision of Preet Bharara, the politically ambitious U.S. attorney for the Southern

District of New York. Born in India, Bharara came to the United States when he was two years old. After graduating magna cum laude from Harvard, he attended Columbia Law School and eventually joined the organized-crime unit of the Southern District, where he helped bust up New York's Colombo and Gambino crime families. Next he worked for New York senator Chuck Schumer, who got him the job as U.S. attorney.

Federal investigators discovered that Raj Rajaratnam sat at the center of a vast insider-trading network stretching from New York to Taiwan. It took three long years of subpoenas, wiretaps, and grand juries, but once Rajaratnam himself was hauled away in handcuffs, in October 2009, many of his partners in crime became familiar names on Wall Street, their taut faces appearing regularly on CNBC. There was Roomy Khan, a chatty Silicon Valley trader infamous for allegedly "enslaving" one of her maids. And Danielle Chiesi, a fading beauty queen who gleefully fed tips to Rajaratnam. Most infamous of all was Rajat K. Gupta, a Goldman Sachs board member and former C.E.O. of the global consulting giant McKinsey & Company, who was convicted of funneling tips to Rajaratnam about deliberations inside the vaunted Goldman boardroom itself. In the three and a half years since Rajaratnam's arrest, federal prosecutors have charged 77 people with securities-law violations, most of them insider trading; 71 have pleaded guilty or been convicted.

SAC's name popped up in the early months of the Galleon investigation, all the way back in 2007, according to Bloomberg.com, when F.B.I. agents successfully "flipped" a now infamous Wall Street trader named David Slaine, who provided prosecutors with several examples of what he believed to be insider trading at SAC. During 2008 the names of former SAC traders began appearing on government wiretaps.

The investigation worked like this: if someone was overheard swapping inside information with, say, Roomy Khan or Danielle Chiesi, there was a good chance his phone would be tapped. Traders who were overheard actively swapping inside information—call them "big fish"—might be marked for prosecution. But "little fish," it appears, were often seen to be most valuable as potential informants. Between January and April 2009, F.B.I. teams led by agents David Makol and B. J. Kang approached three of these little fish, confronted them with evidence of their own wrongdoing, and easily gained their cooperation. In doing so they moved the investigation away from Galleon and toward a group of new targets, including SAC. The first of the little fish was an unemployed 35-year-old named Wesley Wang, the son of Chinese immigrants.

In November 2008 investigators received the go-ahead to place taps on Wang's phones. A more unlikely "Patient Zero" for the SAC case would be hard to imagine. When the F.B.I. came calling, he hadn't worked at a hedge fund for months. "Wes," sighs someone who knows him well, "was a schlub." After dropping out of the University of California, Berkeley, he worked at three hedge funds: Whitman Capital; Sigma Capital, an affiliate of SAC; and Trellus Management, where he was employed until September 2008. Court filings say Wang knew little about finance and got through the hedge-fund doors only because he was fluent in Mandarin, which made him useful in translating data on Chinese companies. To stay inside, he admitted to the F.B.I., he had resorted to passing inside information.

An F.B.I. agent approached Wang on January 7, 2009, and he agreed to cooperate within a week. If Wes Wang was a mediocre analyst, he proved to be a superstar informant, naming at least 20 people he believed were involved in insider trading. Prosecutors would eventually gush that Wang "was the key witness that was able to open the door to literally dozens of other witnesses." He provided "the government with answers to questions it did not even know to ask," a prosecutor told a court in early 2013. "He has provided so much information that the government has not yet been able to investigate all of it for want of manpower."

What little detail is available on Wang's illegal exploits suggests he was alternately resourceful and a bit pathetic. In one job he boasted that he had an excellent source inside the Target department-store chain; it turned out to be an assistant store manager in Oakland whose tips were, as might be expected, useless. Apparently Wang had better success chatting up a neighbor, a Cisco Systems executive, whose information he was able to trade to others. Among those Wang named was his onetime boss, Doug Whitman, of

Whitman Capital, about whom he testified at a three-week trial last summer; Whitman was eventually sentenced to two years in prison.

But perhaps the most useful source Wang led the F.B.I. to was a man he had once worked for as a college intern, Karl Motey. Motey, who was then 44, had been a respected Silicon Valley semiconductor analyst for years before opening his own small firm, the Coda Group, in Los Altos, California. Some of the insights he fed his hedge-fund clients, however, crossed the line into inside information, as Motey revealed to Wes Wang one day in February 2009. What Motey didn't know was that Wang was wearing a wire. Two months later F.B.I. agent Makol walked up to Motey in the parking lot of his gym, where Motey had just finished a workout. The two repaired to a coffee shop where, when confronted, Motey quickly admitted his guilt and agreed to cooperate. Inside a week he was on a plane to New York, where prosecutors briefed him on their unusual plan: Motey was to be the first government informant inserted into the strange world of "expert networks."

These companies—about 40 existed in 2009—had begun springing up after the S.E.C. in 2000 issued the Regulation Fair Disclosure rule, known as "Reg F.D.," which mandated that public companies issue "market-moving" information to all investors at the same time. Until Reg F.D., many companies had given select analysts advance notice of upcoming earnings in private conference calls.

Once companies clammed up, hedge funds and other big investors were obliged to do more of their own detective work. Expert-network firms rose to fill the vacuum. On paper, they connected traders with outside "experts" who could offer insights about a given company; in practice, investigators suspected, these insights often amounted to inside information. Early on, they decided to focus on a single expert-network company in Silicon Valley: Primary Global Research, known as P.G.R., which had a reputation for passing information of borderline legality.

The F.B.I. instructed Karl Motey to telephone P.G.R. consultants, tell them he was setting up a new hedge fund, and secure their services. It worked like a charm. Thanks in large part to Motey, in the fall of 2009 the government was able to ask a judge for a wiretap on the phone lines used by P.G.R. and almost 100 of its clients. That allowed the government to compile cases on at least 10 people, including P.G.R. consultants and their sources of illegal information at several companies, such as Dell. Roughly one of every eight convictions in the Galleon-SAC probe, in other words, was the result of Motey's work.

"Look at the minnows who ended up swallowing the sharks," someone close to the case observes. "Motey is Moby Dick. Anything that gets close to him, he traps and eviscerates."

*a hindu, a jew, and a catholic walk into a hedge fund ...*

But Karl Motey did more than simply bring down P.G.R. More than any other single informant to that point, he brought the government within striking distance of SAC. In this he was joined by another of the government's Bay Area informants, a savvy 53-year-old Malaysian named Richard Choo-Beng Lee, known as "C.B.," who had been a high-tech analyst for several funds, including SAC, before starting his own Silicon Valley-based fund. His new partner, Ali Far, however, had previously worked closely with Raj Rajaratnam at Galleon, and when investigators overheard the two swapping tips they confronted both Lee and Far. Both agreed to cooperate.

Lee pointed the government toward another very senior ex-SAC trader. After he left SAC, Lee worked briefly for a hedge fund called Stratix, which was co-founded by Rich Grodin, who had joined SAC in the very early years—so if anyone could help the government understand the firm's culture, it would be he. (Cohen invested in Stratix, which closed in late 2007.) Grodin's calls with Lee were among those being wiretapped, according to a government filing. In the fall of 2009, Grodin abruptly closed down his second hedge fund, Quadrum, although he was never charged. Wall Street insiders wonder if this means he may be cooperating with the government. Lee was less successful when F.B.I. agents, in hopes of planting a mole inside SAC, had him contact the company in a vain attempt to get a job there. In his deposition, Cohen admitted that SAC had rejected Lee "because we were suspicious of his intentions [We] had heard rumors he was wearing a wire."

The wiretaps on P.G.R., which the government secured mainly with the help of the reliable Karl Motey, helped raise the blinds on two other insider-trading rings, which led to both SAC alumni and even a current, high-level SAC trader. The first centered on a pair of former SAC traders who were best friends, Noah Freeman and Donald Longueuil, along with a third man, Samir Barai, who ran his own fund, Barai Capital Management, in New York. Freeman and Longueuil, along with their fiancées, were active athletes, participating in triathlons and cycling events together. The three were so close that Longueuil served as best man at Freeman's 2009 wedding, and Freeman promised to serve as Longueuil's best man at a wedding that was scheduled to take place in February 2011 but never would.

Barai, Freeman, and Longueuil—who jokingly called themselves the Hindu, the Jew, and the Catholic—had been gathering, swapping, and trading on inside information since at least 2006, when they were all at other firms. They called their exchanges "data dumps" or "data smackdowns," and Barai later told the F.B.I. that they'd mark them on their calendars as a "threesome" or as "don, sam, noah—sex." They continued once Freeman and Longueuil joined SAC, in 2008, Freeman in the Boston office, Longueuil in New York. The trio developed a series of valuable sources who had contacts inside several tech companies. One, Freeman later told the F.B.I., was a consultant named Doug Munro, who ran a research firm called Worldwide Market Research and, according to both Freeman and Barai, had inside information on Cisco. Munro, they said, had an e-mail account called juicylucy_xxx@yahoo.com, and he'd send Barai an e-mail saying "lucy is wet" when he was supposed to check the account for new information. (Munro has not been charged.)

But the trio's best source was a consultant at P.G.R. named Winnie Jiau, whom they nicknamed Winnie the Pooh. She had valuable—and illegal—sources of her own, and they paid Jiau as much as $10,000 a month as well as pelting her with little gifts, from lobsters to gift certificates for the Cheesecake Factory restaurant chain. (At one point Freeman e-mailed his secretary, "Can you please send (12) lobsters to Winnie? I know you hate her but we have to do this." His secretary replied, "Sure thing. I hope she gets sick from the lobsters." The secretary didn't get her wish, because the lobsters didn't get picked up when they arrived. "Typical Winnie to leave 12 lobsters to die at FedEx," the secretary wrote in a follow-up e-mail. "She has no heart.")

The Freeman circle began to fall apart in 2010, when first Freeman and then Longueuil were fired by SAC for poor performance. Longueuil kept trading on his own while Freeman fled Wall Street altogether, taking a job teaching economics at the Winsor School, a prestigious all-girls academy outside Boston. The real blow, however, came on the evening of November 19, 2010, when *The Wall Street Journal* published online a lengthy story describing how the government investigation was beginning to focus on P.G.R. At his New York apartment, Longueuil panicked. That night, he used two pairs of pliers to tear apart a flash drive and two computer hard drives where he had stored his illegal information. He then slid the components into four ziplock bags, and a little before two A.M. he left his building and spent the next 40 minutes walking behind garbage trucks, throwing each of the little bags in the back of a different truck.

It was too late. The weak link in the Freeman circle turned out to be one of Samir Barai's assistants, a young man named Jason Pflaum. Because Barai was hearing-impaired, Pflaum handled many of his calls, and, as luck would have it, some were with P.G.R. experts who were being listened to by investigators on the Motey-enabled wiretaps. Confronted by investigators a month before the *Journal* story ran, Pflaum had given up everyone, even leading the F.B.I. to audiotapes of incriminating calls with Winnie Jiau. After reading the *Journal*'s article, Barai texted Pflaum. "Problem is this scope is said to focus on the use of so-called expert network firms Fuuuuuuck." He then told Pflaum: "Shred as much as u can." Barai himself not only went into his office and began shredding, but also asked Pflaum to leave his laptop with his doorman so Barai could pick it up and delete its contents.

Three weeks later, Noah Freeman walked into the Winsor School's parking lot and found B. J. Kang, of the F.B.I., waiting for him. Within days Freeman too admitted everything and agreed to cooperate, becoming one of the government's most valuable sources of information to that date. Not only did Freeman agree to secretly tape Longueuil incriminating himself—it was on a Freeman tape that investigators learned of Longueuil's garbage-truck expedition—he also gave detailed debriefings on SAC and Cohen. He told Kang that insider trading in the hedge-fund business was "ubiquitous," and said trafficking

in corporate secrets was expected of him while at SAC. According to a memo Kang wrote his superiors, "Freeman and others at SAC Capital understood that providing Cohen with your best trading information involved providing Cohen with inside information Freeman pitched to Cohen many trading ideas over the 18 months he was at SAC Capital and some of the trading ideas involved dirty information."

("Freeman's assertion that portfolio managers were expected to pass on improper information is categorically wrong," says the SAC president Conheeney. "I am confident that he didn't believe this while he worked at SAC, and that he knew he wasn't supposed to get, trade on, or share inside information. In fact, he testified under oath that he went to great lengths to hide his illegal behavior from us.")

Most everyone Freeman fingered is going to prison. Longueuil pleaded guilty and got two and a half years. After Freeman testified against Winnie Jiau, a jury gave her four years. Freeman himself is still awaiting sentencing but is hoping for no jail time because of his cooperation.

### rule number one: there is no e-mail list

The second insider-trading ring Karl Motey helped uncover involved a huge, byzantine group of analysts and traders at a trio of hedge funds. This theater of the scandal sprang dramatically into view on Monday, November 22, 2010, three days after Donald Longueuil's garbage-truck episode. That morning, just after the market opened, black unmarked cars assembled at a parking lot across the street from One Landmark Square, in Stamford, Connecticut, which was the home of a hedge fund named Diamondback Capital. About a dozen armed F.B.I. agents stormed in and began sweeping through both floors of the office. They did the same at two other hedge funds, Loch Capital, in Boston, and Level Global, in Manhattan. Both Diamondback and Level were multi-billion-dollar funds run by prominent ex-SAC people. Loch, run by twins Tim and Todd McSweeney, was a smaller, technology-stock-focused fund, but it was a big name in the tech world and had investments from firms such as Citigroup and AIG.

The next day, SAC sent a letter to its investors, telling them that the government had issued "extraordinarily broad" subpoenas to a number of investment managers, including SAC, which said that the subpoenas "don't shed much light on whom or what the government may be investigating." The firm added, "Neither the subpoena nor any other information of which we are aware suggests that anyone at SAC has engaged in any wrongdoing."

SAC's all-clear signal would turn out to be extremely premature.

The raids were a shock to everyone on Wall Street, but the targets all seemed to make sense. At Loch, nervous investors had been yanking money from the fund, which once had more than $2 billion in assets, ever since the news broke that Steve Fortuna, co-founder of S2 Capital and a close friend of the McSweeneys', had pleaded guilty to insider trading. At Diamondback, Richard Schimel, one of the founders, was married to Steve Cohen's sister, Wendy. Diamondback was started by Schimel, along with two other people, Larry Sapanski and Chad Loweth, who had left SAC in 2005. The word on the street was that the parting had not been amicable, and Cohen had put no money into Diamondback—so, people speculated, who better to inform on Cohen than Schimel? Level Global also had close ties to SAC. The fund was founded in 2003 by David Ganek and his former analyst Anthony Chiasson, who had made their reputations at SAC. By the end of 2010 the fund had gained almost 90 percent since its launch, versus the S&P's 27 percent, and also had more than $4 billion under management.

But the speculation and gossip was mostly wrong. Indeed, although the trail through Diamondback and Level would end up reaching into the very high ranks of SAC, the route was not what anyone had expected. In fact, at Diamondback, the fund's founders were not named on the search warrant, and the government would show no interest in them.

Unbeknownst to the outside world at the time of the raids, two former analysts, one at Diamondback and one at Level Global, were the ones cooperating with the government. Spyridon "Sam" Adondakis, who worked at Level from 2006 to 2010, was approached in October 2010 by F.B.I. agents as he was leaving a lunch in Midtown Manhattan. They asked to speak to him in a nearby park, and they

played a recording of him that they'd gotten from the P.G.R. wiretaps. (The government would later credit Motey with pointing them to Adondakis.)

Adondakis, then in his early 30s, agreed to cooperate—and to record his friends. Among them was a guy named Jesse Tortora, who had started working for Diamondback in 2007 as an analyst for a technology-focused portfolio manager named Todd Newman. Tortora and Adondakis had become friends earlier in the decade when they both worked in San Francisco for a stock-research firm called the Prudential Equity Group, a division of the big insurance company. Adondakis later said about Tortora, "We shared all of the information that we got on pretty much everything."

The group gradually expanded to include several Prudential analysts and their friends: a former Dell employee named Sandeep "Sandy" Goyal and Fayad Abbasi, another analyst. Abbasi's roommate in San Francisco was a technology analyst named Jon Horvath. Tortora also started talking to a client named Ron Dennis, a research analyst at the mutual-fund company Waddell & Reed.

Eventually, both Dennis and Horvath got jobs as analysts for portfolio managers at SAC. Horvath worked for Mike Steinberg, who had joined SAC in the early years. In fact, Steinberg, who is reportedly close to Cohen, had worked for Rich Grodin. When Prudential closed down its equity-research unit, the rest of the group soon migrated to New York, too. Adondakis got a job at Level Global working as an analyst for Anthony Chiasson; he and Abbasi, who landed at the mutual-fund company Neuberger Berman, shared an apartment in Tribeca. Abbasi hired Goyal as an analyst. As for Tortora, he'd gotten to know the McSweeneys at Loch Capital, and they referred him to their friend Todd Newman, at Diamondback, which Tortora joined in the fall of 2007.

This was a world where business relationships seem to have been indistinguishable from friendships. A defense lawyer later said about the group, "They traveled together, they partied together, they ate together, they drank together, they rented homes in the Hamptons together. They were very, very close."

In 2009, Tortora e-mailed a group that included Abbasi and Adondakis: "Rule number one about email list, there is no email list, fight club reference. [He was referring to the 1999 movie *Fight Club,* in which Brad Pitt says, "First rule of Fight Club is: you do not talk about Fight Club."] Rule number two, only data points can be sent, no sarcastic comments. Enjoy. Your performance will now go up by 100 percent in 09 and your boss will love you. Game theory, look it up."

The group shared a lot of legitimate information, obtained by going to conferences and speaking with research analysts. But they also shared a lot of inside information. Tortora and Adondakis both got information from P.G.R. consultants. The group also had its tentacles into other big companies, including Dell and another technology company, Nvidia. Tortora later told a jury that Horvath had a contact at Sun Microsystems, and he passed that contact's information along to the group. He also said that since Dennis preferred speaking on the phone to e-mail, "as a matter of practice, I would talk to Ron very frequently, maybe every other day."

When asked by a prosecutor, "Did Mr. Dennis provide you with confidential information during your time at Diamondback?," Tortora responded simply, "He did." (Dennis has not been charged with any wrongdoing.)

T he information sharing, it seems, was a way of life in the high-stakes world of trading technology stocks, which were evaluated not on whether the company was a good long-term investment but on whether it was going to please investors in a given quarter. "We came to the conclusion that that was the way they [people who traded technology stocks] did business," says one person close to events. "They were doing it for so long that it became normal."

"The line had been blurred," says another hedge-fund executive. "It became extremely fast and furious, and all that mattered was who you were and what you knew." He adds, "It was: What data points do you have? That was your Edge."

The trade that would reach all the way into the highest ranks of Level Global and up to

powerful portfolio managers at SAC certainly involved Edge. Goyal, who had worked at Dell, developed a contact in Dell's investor-relations department who began to pass along what Tortora testified was "very specific" inside information on Dell's revenues and profits. Goyal would then send the information to Tortora, who would then pass it along to the rest of the group.

Both Tortora and Adondakis later told a jury that the reason they gathered inside information and passed it to their friends, such as Horvath, was so that the analysts could relay it to the portfolio managers for whom they worked. The trade that would cause so much trouble for so many happened in late August 2008. Dell's second quarter had finished at the end of July. It took time for the company to figure out what its revenues and profits were in a given quarter, but the Dell contact started telling Goyal that the company's G.M., or gross margin—a measure of profitability—would be less than investors were expecting. In the volatile world of trading technology stocks, even a small "miss"— profits that are less than investors are expecting to see—can send a stock plummeting. Goyal told Tortora, and Tortora later testified that he had told others, including Adondakis.

Indeed, the morning of August 5, after Goyal had had a late-night phone call with the contact, he called Tortora. While they were on the phone, Tortora e-mailed Newman bullet points from the conversation, including that it looked as if the gross margin was going to be lower than investors were expecting. "The Dell from Sandy [Goyal]?" asked Newman. "[Yes] on with him now," Tortora responded. That day, Newman began to build a short position in Dell, according to trial testimony.

Tortora also immediately forwarded that same e-mail to others, including Adondakis and Horvath. At Level Global, Chiasson eventually built a far bigger short position, at least in part due to Tortora's information, according to the government. Adondakis testified that Chiasson knew exactly where the information was coming from. A few days after getting Tortora's e-mail, Adondakis testified, he met with Chiasson and a senior analyst at Level Global named Greg Brenner in Chiasson's office. They talked about the information, and Brenner said that, if the numbers Adondakis was getting were right, the Dell trade was the best idea at the firm.

At another meeting in August, Chiasson, according to Adondakis, warned others that the large short position was based at least in part on information from a contact, so no one should discuss it outside the firm. As August 28, the date when Dell would announce its earnings, drew nearer, Chiasson wanted frequent updates, and it appears that he was updating his partner, David Ganek, too, but there is no proof Ganek knew where the information was coming from.

O ver at SAC, they were also talking Dell. On August 18, Horvath, three minutes after getting another update from Tortora, called his boss, Mike Steinberg, according to the government. A minute later, Horvath sent Steinberg an e-mail. The headline: "Pls keep the DELL stuff especially on the down low." Steinberg returned, "I will." The government later alleged that Steinberg began to short Dell's stock that day.

Even when you have inside information, trading technology stocks ahead of earnings isn't a sure thing in the way that buying a stock before a big merger announcement is. It still takes work—and some luck—to figure out how the market will react to the numbers. The information is just Edge. It's not certainty. And so, everyone was getting nervous. On August 22, a trader at Diamondback texted Adondakis. "Dell's getting bigger," he said, meaning that Chiasson was increasing the size of the bet. "I'm wearing depends now," Adondakis replied.

At SAC, Cohen himself was paying attention to the trade, because of a particular problem: another portfolio manager, Gabe Plotkin, was on the opposite side of Steinberg's trade. Although Plotkin didn't join SAC until 2006, he is a superstar there. He manages more than $1 billion of SAC's capital and is hugely profitable for the firm. "The guy who is killing it at SAC Capital," Reuters called him in 2011.

On August 26, Steinberg wrote to Horvath and Plotkin, in an e-mail with the subject line "DELL," "Guys, I was talking to Steve [Cohen] about DELL earlier today, and he asked me to get the two of you to compare notes before the print [meaning before Dell officially

announced its earnings], as we are on opposite sides of this one. Gabe—we think GMs [gross margins] are at risk this qtr … " "I do think that is the biggest risk," Plotkin wrote back. Horvath responded, "I have a 2nd hand read from someone at the company—this is 3rd quarter I have gotten this read from them and it has been very good in the last two quarters. They are saying GMs miss by 50–80 bps [basis points] … Please keep to yourself as obviously not well known." Steinberg responded, "Normally we would never divulge data like this, so please be discreet. Thanks."

The S.E.C. later alleged that 24 minutes after getting Horvath's e-mail Plotkin began selling his Dell position and, as a result, was able to avoid $2 million in losses.

A day later, Steinberg e-mailed Horvath again. With the subject line "Dell action," he asked, "Have u double checked JT [Tortora] this week?" Horvath responded, "Yes he checked in couple days ago, same read no change." Steinberg shorted more Dell, according to the government.

When Dell's number came out, the gross margin was even lower than what Goyal had told Tortora—so the stock began plummeting and eventually fell more than 13 percent.

Chiasson wrote to Adondakis, "Nice call." Indeed: according to the government, Level made more than $53 million in illegal profits on that one trade. At Diamondback, Newman, who had taken a much smaller position, made almost $3 million for the fund.

Ron Dennis wrote to Tortora, "You da man. I owe you."

Tortora checked in with Horvath. "You there on Dell," he asked. Horvath responded, "nice man, you nailed it."

The government later alleged that Steinberg's fund earned $1 million in illegal profits.

Ultimately, the government indicted Chiasson, Newman, and Horvath not just for the big Dell trade but also for conspiring to swap information on other stocks, including Nvidia. After a month-long trial, a jury found Chiasson and Newman guilty after deliberating for just two days. (Both men are appealing the verdict.) Six weeks before the trial, in late September 2012, Horvath pleaded guilty to insider trading in both Dell and Nvidia. In his plea, he said that he provided information to his portfolio manager—Mike Steinberg—who then traded on his tips.

Although the judge ruled that there was an "inference" that Ganek "was aware of the source and nature of this information," Adondakis testified that he had never told Ganek his source. Ganek was not charged. Immediately after the raid, he hired an outside law firm to do an investigation and told investors that he was "highly confident that my conduct in leading the firm and its investment process was lawful and ethical at all times," but he couldn't say the same for Chiasson. On February 11, 2011, he sent a letter to investors telling them he was shutting Level Global down, which he called a "very difficult and painful personal decision."

Diamondback ultimately paid a big price, too, even though the senior people were never implicated. The firm eventually struck a non-prosecution agreement with the government, meaning that it wouldn't be held criminally liable, and it paid the government $9 million, which is small for an insider-trading fine. But a combination of some rocky performance and the continued torrent of bad news about the industry-wide insider-trading investigation finally caused investors to say, Enough. At the end of 2012, Diamondback announced that it was closing its doors, too.

As for Loch Capital, soon after the raid the McSweeneys reportedly told investors that they were not the focus of the investigation, but by the end of the year Loch Capital had closed, too.

In late March, Mike Steinberg was indicted for insider trading on Dell and Nvidia. He is—by a long shot—the person closest to Cohen who has been caught up in the probe.

Once Steinberg's name started appearing in connection with Horvath, many had the sense he was next. Including Steinberg. Which is why, according to Reuters, he jumped from

hotel to hotel for weeks, hoping to avoid the embarrassment of being arrested in front of his wife and two children, while his lawyer tried to arrange a deal wherein prosecutors allowed him to turn himself in. This tactic had worked for Chiasson; when F.B.I. agents showed up at his Upper East Side Manhattan apartment, the doorman handed them a note, instructing them to call Chiasson's lawyer. (Chiasson turned himself in later that day.)

Steinberg was not so lucky. At six A.M. on March 29, agents arrested him at his $8 million Park Avenue apartment. He had just returned from a trip to Florida, while his family, thankfully, had stayed behind. Steinberg's lawyer, Barry Berke, says, "We are preparing for a full-fledged and full-throated defense, and we have every expectation that he will be vindicated."

Gabe Plotkin, who also allegedly traded Dell shares at SAC, has not been charged with any wrongdoing, but even the mention of his name is potentially a much bigger problem for the firm. Not only is he a big deal in terms of the profits he makes, but, as one person familiar with SAC says, Plotkin has also been in front of investors as one of the faces of the firm. And SAC is defending him vigorously. "Gabe Plotkin has not been accused of wrongdoing and has done nothing wrong," says an SAC spokesperson. "He has built a successful career on a commitment to sound fundamental research."

Maybe so. SAC insists that its compliance system is extraordinary and emblematic of the new SAC. But the first line of defense against insider trading is supposed to be the portfolio managers, who are required to go to the compliance lawyers immediately if they even suspect they've gotten inside information. Another hedge-fund executive, when asked what the compliance lawyers should have done after seeing Horvath's e-mails, laughs. "After the lawyer had a heart attack or lost his lunch, you mean?"

And so, what some others in the industry can't understand is why the Dell trade wasn't a red alert for SAC's lawyers long before the government got there.

### implausible deniability

In the fall of 2012, just after Chiasson and Newman's trial began, the government unveiled yet another shocker. On November 20, the S.E.C. filed a complaint against a former SAC portfolio manager named Mathew Martoma, alleging that he'd orchestrated the largest insider trade in history—$276 million in illegal profits and avoided losses, more than *five times* the size of the Dell trade—by getting advance information about the clinical trial of an experimental Alzheimer's drug. He allegedly used that information to persuade Cohen to take a big long position in the stocks of the two drugmakers—the Dublin-based Elan, and Wyeth, a New Jersey company (eventually acquired by Pfizer)—that were developing the drug. In July 2008, a week before the results of the clinical trial were due out, Martoma helped persuade Cohen to do a 180 and not only sell his huge stake in the two stocks but bet against them with big short positions.

In late 2011, F.B.I. agents confronted Martoma on the artificial front lawn of his $1.9 million, 8,000-square-foot home, in Boca Raton, Florida, while his wife, Rosemary, took their three children inside. Agent Matthew Callahan pressed him to become an informant against Cohen; when he refused, the agents leaned on him, reminding him of the damning evidence they had against him and of how much time he might spend away from his family if he were sent to prison (as much as 45 years). Martoma then fainted, but, soon on his feet, he remained defiant.

"The charges unsealed today describe cheating coming and going," Bharara told the press on November 20, 2012, the same day the S.E.C. also filed a complaint. "Specifically, insider trading first on the long side, and then on the short side." It is this trade that accounts for the lion's share—more than $600 million—of the $616 million fine that SAC agreed to pay the S.E.C.

In the narrative of how the government continued to pick away at SAC, this particular case came out of left field. The investigation into the Elan trade was not begotten by Karl Motey, or Wes Wang, or Richard Choo-Beng Lee. It did not involve Primary Global Research, or even a technology stock, for that matter.

But in the narrative of the evolution of SAC—and, perhaps, the evolution of insider trading —Martoma makes perfect sense to Wall Street insiders. He didn't drop off a big bag of cash

to get advance word of an impending merger or pay big commissions to get an early call on a stock from a Wall Street analyst. He was a smart, hardworking guy who did an enormous amount of legwork—and who also allegedly used his expertise to cultivate a source who then gave him that extra bit of Edge.

Born Ajai Mathew Mariamdani Thomas to Indian immigrants, Martoma was raised in Florida and graduated summa cum laude from Duke in 1995. According to *The New York Times,* he studied biomedicine, ethics, and public policy, worked briefly at the National Human Genome Research Institute, in Washington, and spent a year and a half at Harvard Law School before dropping out to go to business school at Stanford. He worked at a small Boston hedge fund called Sirios Capital, and then joined SAC in 2006. Well coiffed and always dressed in neatly pressed slacks, he was "articulate, well put together, smooth, and calm," according to someone who knows him, who adds, "You can see how he would be persuasive in a credible way."

Elan, the company that got Martoma in trouble, had a history of controversy, "decades of accounting fraud, overstated clinical trials, and blowups," says a hedge-fund manager, and indeed, in 2005, Elan had to pay the S.E.C. $15 million for violating the anti-fraud statutes of the federal securities laws. But by 2007 it was making a comeback thanks to excitement about an experimental Alzheimer's drug called bapineuzumab, or "bapi," that it was developing with Wyeth. Results from the drug's clinical trials, which would show whether it was safe and effective, were due in the summer of 2008. On the Street, Elan's stock generated strong feelings. Detractors said the company simply couldn't be trusted. On top of that, experienced health-care traders are always suspicious of companies that claim success with Alzheimer's drugs, because they think the area is rife with pipe dreams.

By 2007, Elan's stock was "a battleground," says another trader. "People were getting into fights at medical meetings. Guys were getting really violent, not in a physical way, but verbally." And it was a battleground within SAC, because the other health-care pods there wanted not to own the stock but to sell it short, according to one person familiar with the situation. The dissenters included a health-care pod run by David Munno and Benjamin Slate.

But Martoma remained an enthusiastic buyer of Elan and Wyeth—he included Elan on the list of his best ideas that he submitted to Cohen—and Cohen "centerbooked" them, meaning that he bought their stocks in the "Cohen account."

Perhaps not surprisingly, Martoma was not well liked within SAC. "A lot of guys hated him," recalls the person familiar with events. "They thought he was cocky, he had Steve's ear on this giant trade, and he didn't talk to anyone about it. People thought he was sneaky and selfish."

But none of that—the skepticism of his fellow portfolio managers, the sketchiness of the situation—seemed to matter to Cohen, who was with Martoma, and in a huge way. According to the government, SAC accumulated more than $700 million worth of Elan and Wyeth stock, almost $400 million of which was held in the Cohen account.

The government would later allege that it wasn't just Martoma's knowledge of this industry or his hard work that led to the giant long position. Rather, he had cultivated a relationship with Dr. Sidney Gilman, a neurology professor at the University of Michigan—and the chairman of the committee that was monitoring the bapi clinical trial. Martoma had met Gilman through an expert-network firm called the Gerson Lehrman Group, and SAC wound up paying him $108,000 in total for his insights. The government alleges that Gilman, who came to regard Martoma as a "friend and a pupil," began leaking positive information from the clinical trials to him as early as 2007, even once sending him non-public data labeled "For Your Eyes Only." ("Gilman made a tremendously bad judgment and he'll live with that," says his lawyer, Marc Mukasey.)

Throughout the summer of 2008, Elan's stock continued to soar. But the smart money didn't believe bapi was going to pan out, and they couldn't figure out why Cohen was long. "We were all saying, Why did SAC take a position this big? What the fuck does he know that we don't?" says another trader. The dissent within SAC reached a fever pitch, too. On March 26, 2008, Munno and Slate sent Cohen an e-mail that read, "ELN, (important, please read) negative reads from company and other buysiders." It listed reasons why they were concerned. Cohen forwarded the e-mail to Martoma, who responded, "I read the message. Nothing worrisome here. Let me know when you are free to discuss in detail." Cohen stayed long. In an instant message to another SAC trader, he wrote that Martoma was expecting positive news from the clinical trial, and he was the one "closest" to the situation. "Closer," says a former SAC trader, can be a euphemism for having inside information.

On June 17, Elan and Wyeth announced the preliminary results of the clinical trial. The headlines were positive, and although skeptics thought the data was sketchy, both stocks shot higher still. After that, Cohen "indicated he would no longer consider any investment ideas in Elan or Wyeth" from Munno and Slate, according to the S.E.C. Final results from the clinical trial were due on July 29.

At some point in late June, Gilman started getting even more information about the drug's progress because he was selected to present the final clinical-trial results. In the end, the news wasn't good, although the companies tried to spin it positively. It turned out that patients taking bapi over a long period of time didn't improve. On Sunday, July 13, Martoma and Gilman spoke for about an hour and 40 minutes. Four days later, Gilman received a PowerPoint from Elan in an e-mail labeled, "Confidential, do not distribute." It contained detailed information about the results of the clinical trial. Gilman sent the PowerPoint to Martoma, according to the government, who then called him to request the password needed to open the encrypted file. On the morning of Sunday, July 20, Martoma e-mailed Cohen. He asked, "Is there a good time to catch up with you this morning? It's important." Cohen sent his cell-phone number, and at 9:43 A.M. the two spoke for about 20 minutes.

"Every time there is a fraud, SAC says, We have amazing compliance!" observes another hedge-fund manager. "But the only question that matters is: Were the compliance people on the phone that Sunday morning? If they don't show up for that, who cares that there are a million people in compliance?"

The following Monday, July 21, Cohen's head trader began selling SAC's huge stakes in Elan and Wyeth, according to the S.E.C. He did his best to do so in a way that wouldn't be detected inside or outside SAC. Or as the head trader told Martoma in an e-mail, "Obviously no one knows except me you and [Cohen]." By July 29, the date of the announcement of the clinical-trial results, SAC had a big short position in Elan and Wyeth.

On July 30, the first trading day after the companies disclosed the negative trial results, Elan's stock fell about 42 percent and Wyeth's stock dropped about 12 percent. The government alleges that by selling, and then shorting, SAC was able to avoid $194 million in losses and make another $83 million in profits. That year, Martoma was paid a $9.4 million bonus.

In the fall of 2008, the regulator for the New York Stock Exchange noted the unusual trading leading up to the announcement of the results. According to Bloomberg, the S.E.C. figured out how much money SAC had made and began sending out subpoenas, requesting phone records and trading data, and looking through every phone call made by someone with an Elan connection to someone at SAC. They found Gilman and Martoma and compared the dates of the phone calls with those of SAC activity on the stocks.

In the hedge-fund grapevine, there's another theory floating around: Gilman was very active in speaking to hedge funds and had a reputation for being too chatty, according to

one source. The speculation is that a trader who was facing legal problems on another trade turned the government on to Gilman. In any event, after Gilman was contacted by the F.B.I. in the summer of 2012, he agreed to give testimony in exchange for not being prosecuted.

In 2010, Martoma was fired from SAC for poor performance. An SAC employee called him a "one trick pony with Elan," according to the government. As of this writing, he evidently continues to refuse to cooperate, saying he is innocent. Recently he changed lawyers, causing insiders to speculate that he intends to fight.

But it is hard to find a lawyer or hedge-fund trader familiar with the government's allegations who understands why SAC would agree to pay such a big fine if the firm believed in Martoma's innocence. (A source familiar with SAC's thinking says that the firm settled simply to remove the uncertainty.) The government's hope, of course, is that Martoma will flip and hand them Cohen's head on a silver platter, thereby reducing his own sentence. Cohen's supporters claim that, in light of the clear incentives for Martoma, he simply doesn't have the goods on Cohen. Cohen won't discuss it, and the firm has offered a number of defenses for its sudden change of heart on Elan and Wyeth.

There's also an argument that it simply doesn't make sense that a guy as smart as Steve Cohen, a guy who knows that the government has been watching him for years, a guy who already has more money than God, would ever take the risk of using inside information on such a huge trade.

No, it doesn't make sense—unless you believe that Cohen, when faced with the choice of winning or losing on a big bet, simply couldn't stop himself from choosing to win. Just as in the old fable of the scorpion and the frog, that's his nature.

The question remains whether the government can make a case against Cohen, much less prove to a jury, beyond a reasonable doubt, that Steve Cohen is guilty of insider trading. But maybe that doesn't matter, because, in what is arguably the most important way, the government has already won. In February, investors asked to withdraw $1.68 billion (nearly 30 percent of SAC's investor funds), and more is expected.

"You have to understand, all Steve Cohen cares about is that important people think that he is the world's greatest trader," says someone who once knew him well. "And he is already damaged goods. A lot of what he has worked for has been taken away already."

NOTE: An earlier version of this story contained incorrect information about the sentencing of Samir Barai. He has pled guilty, but as of May 13, 2013, he has not been sentenced.

REGISTRATION ON OR USE OF THIS SITE CONSTITUTES ACCEPTANCE OF OUR USER AGREEMENT (EFFECTVE MARCH 21, 2012) AND PRIVACY POLICY (EFFECTIVE MARCH 21, 2012).
VANITY FAIR © CONDÉ NAST DIGITAL. YOUR CALIFORNIA PRIVACY RIGHTS. THE MATERIAL ON THIS SITE MAY NOT BE REPRODUCED, DISTRIBUTED, TRANSMITTED, CACHED OR OTHERWISE USED,
EXCEPT WITH THE PRIOR WRITTEN PERMISSION OF CONDÉ NAST DIGITAL.
AD CHOICES