UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA       :

        - v. -       :       S1 12 Cr. 973 (PGG)

MATHEW MARTOMA,       :

        Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANT'S SECOND AND THIRD MOTIONS *IN LIMINE* TO EXCLUDE CERTAIN EVIDENCE RELATING TO SECURITIES SALES OR TO ADMIT SELECTED PORTIONS OF STEVE COHEN'S SEC TESTIMONY

                                                      PREET BHARARA
                                                      United States Attorney for the
                                                      Southern District of New York
                                                      Attorney for the United States
                                                         of America.

Arlo Devlin-Brown
Eugene Ingoglia
Assistant United States Attorneys

## PRELIMINARY STATEMENT

The defendant's second and third *in limine* motions seek to preclude the Government from offering evidence with respect to core allegations explicitly charged in the Superseding Indictment, including Count Three in its entirety. Specifically, the defendant's second motion *in limine* seeks an order "precluding the Government from introducing any evidence about, or mentioning at any time during trial (including in its opening and closing argument), SAC's sales of Wyeth securities" (Def. MIL 2, at 1) and the defendant's third motion *in limine* seeks an order precluding all argument and evidence with respect to "SAC's decisions to (1) short Elan and Wyeth securities" and (2) the manner in which SAC Capital executed the sales. (Def. MIL 3, at 1). The Government, however, has specifically charged Martoma with engaging in this conduct: Count Three, for example, charges nothing *other* than "SAC's sales of Wyeth securities." The defendant's request for an order preventing the Government from proving what it has charged is baseless.

The alternative relief the defendant seeks – to introduce isolated (and, without context, deeply misleading) portions of testimony Steve Cohen provided to the U.S. Securities & Exchange Commission ("SEC") – should likewise be denied. Mr. Cohen's testimony to the SEC is inadmissible hearsay obtained in a proceeding in which the criminal authorities did not participate and it would be profoundly unfair to allow the defendant to cherry-pick self-serving portions of testimony (while ignoring other, far less favorable excerpts) from a person unwilling to subject himself to cross-examination on those same subjects. Accordingly, the defendant's second and third *in limine* motions should be denied in their entirety.

1

## FACTUAL BACKGROUND

### A. Trial Evidence On The Subjects The Defendant Seeks To Preclude

At trial, the Government expects to offer evidence that – contrary to the claim in defendant's motions *in limine* – the defendant caused SAC Capital to sell Wyeth securities (as well as Elan securities) and to short both Elan and Wyeth securities, and that Martoma played a personal role in the manner in which these securities were sold. In particular, the Government will offer evidence at trial establishing that on or about July 16, 2008 – immediately before Dr. Gilman provided the defendant with the final results of the phase 2 bapineuzumab trial (the "Drug Trial") – SAC Capital had amassed a position in Elan and Wyeth equity securities worth approximately $700 million. Approximately $100 million of that position was held in the SAC capital portfolio that the defendant personally managed with extraordinarily wide latitude over investment decisions (the "GEHC" portfolio). Over $200 million of the position was in a separate portfolio (the "GGEN" portfolio) that the defendant had traded in with Steve Cohen's approval. The balance of the position was held in firm accounts over which Steve Cohen had control. But, with respect to these positions too, Mr. Cohen had "tagged" the defendant as a portfolio manager responsible for the Elan and Wyeth positions who would be entitled to a share of the profits.

As alleged in the Superseding Indictment, and as the evidence at trial will establish, the defendant obtained the Drug Trial results in advance of the Public Announcement from Dr. Sidney Gilman, who had himself been "unblinded" to the highly confidential Drug Trial results on July 15 and July 16, 2008 so that Dr. Gilman could present the results at the Public Announcement scheduled for July 29, 2008. The Government will offer evidence that Dr. Gilman shared the results with the defendant on July 17, 2008 and during an in-person meeting

2

with the defendant in Ann Arbor, Michigan on Saturday, July 19, 2008. The Government will offer evidence that the next day, Sunday, July 20, 2008, the defendant spoke to Mr. Cohen by phone for 20 minutes and recommended that SAC Capital sell Elan and Wyeth securities prior to the Public Announcement. Between July 21, 2008 and the Drug Trial announcement on July 29, 2008 (the "Public Announcement"), SAC Capital liquidated all Elan and Wyeth equity securities,[1] shorted both stocks, and purchased Elan options that would profit if Elan shares fell after the Public Announcement by a particular amount. The Elan and Wyeth shares were sold not only from Steve Cohen's portfolio, but also from the defendant's personal portfolio, GEHC. The defendant's compensation for the year – consisting principally of a $9.3 million bonus – was based on the Elan and Wyeth positions not just in the defendant's own portfolio, but the GGEN portfolio and in Steve Cohen-controlled portfolios as well.

The evidence will also show that the defendant was aware of and involved in the manner in which the securities were sold. The defendant, Mr. Cohen, and Mr. Cohen's head trader, Phil Villhauer, worked together to execute the sales in the manner least likely to draw attention, either internally or outside the firm. The plan, of which the evidence will show the defendant was fully aware, was to sell the Elan securities (which consisted of over 10 million shares) slowly, over the course of the week leading up to the Public Announcement, and to use computer algorithms and "dark pools" (rather than public exchanges) in order to mask that there was a single seller of substantial positions of Elan. The defendant also spoke to Mr. Cohen and Mr. Villhauer about the unusual manner in which the sales would be handled internally. In particular, Mr. Villhauer and an associate booked Elan sales through dummy accounts so that the positions in the portfolios controlled by the defendant and Mr. Cohen would appear unchanged to those inside

---

[1] SAC Capital had a 12 million share equity swap relating to Wyeth in an account which Martoma did not control. Selling this position would have required SAC Capital to contact Wall Street investment banks that were counterparties on these swaps to break the transactions early.

3

the firm (including Martoma's own trader and research analyst). After the Public Announcement, SAC Capital made internal bookkeeping entries to move the proceeds from the sales into the portfolios that had held the positions before the sell-off.

### B. The Role Of Wayne Holman

In his *in limine* motions, the defendant purports to describe evidence about the role another individual, Wayne Holman, allegedly played in the decision to sell Wyeth securities. The Government does not anticipate offering evidence regarding Wayne Holman except to the extent necessary to explain documents that refer to both Mr. Holman and the defendant or to otherwise complete the story of the crime on trial and avoid juror confusion. With this caveat aside, and for the purpose of understanding the argument advanced in the defendant's *in limine* motions, the Government provides the following background:

Wayne Holman was a former SAC Capital Portfolio Manager who established his own firm, Ridgeback Capital, which managed a portion of SAC Capital's investments. The evidence (inasmuch as it is relevant) will show that in early 2008, Mr. Holman and the defendant both shared a positive outlook about the Drug Trial results and from time-to-time communicated with each other and with Mr. Cohen about their positive views. However, whereas the defendant recommended shares of *both* Elan and Wyeth to Mr. Cohen (and purchased both in his own portfolio), Mr. Holman believed Wyeth was a better and less-risky vehicle through which to express a positive view about the Drug Trial results because (among other reasons), as a larger and more diversified company than Elan, Wyeth was less exposed if the Drug Trial was unsuccessful.

On the morning of Sunday, July 20, 2008, the day after the defendant returned from an Ann Arbor meeting with Dr. Gilman, the defendant called Mr. Cohen to recommend the sale of

4

Elan and Wyeth. Mr. Martoma also spoke to Mr. Holman later that day. *Following* this sequence (according the timeline conveyed in Mr. Cohen's SEC testimony), Mr. Holman spoke to Mr. Cohen and said something that Mr. Cohen has testified influenced his decision to sell Wyeth, as discussed below.

### C. Steve Cohen's Deposition Testimony

Steve Cohen provided investigative testimony to the SEC on May 3, 2012 – well prior to the defendant's indictment, and prior to Dr. Gilman's admission that he had provided the Drug Trial results to Martoma. No representative from the Department of Justice attended the proceedings or participated in any other fashion. While the defendant's motions incorrectly describe Mr. Cohen as testifying to the involvement of Mr. Holman and Mr. Villhauer in aspects of the conduct to the *exclusion* of involvement by Mathew Martoma, a review of other portions of the transcripts makes clear that Mr. Cohen's testimony does not demonstrate Martoma's lack of involvement. In particular, in addition to the excerpts quoted in the defense motions, the following excerpts are relevant:[2]

- Mr. Cohen stated that he was bullish on Elan at the beginning of 2008 "on the recommendation of Mat Martoma" because Martoma "thought Bap would be a good drug for Elan" (Tr. 27-28). Mr. Cohen stated that he was "bullish" on Wyeth "based on the recommendation of Mat Martoma and Wayne Holman." (Tr. 29). *See also* Tr. at 66 ("Well, certainly, you know, Mat Martoma's view on Bap contributed to having a position in Wyeth."); Tr. at 71 ("Well, Martoma liked both names [Elan and Wyeth] and Wayne like Wyeth.")

- Mr. Cohen also made clear that Martoma's enthusiasm for these positions was based on the Drug Trial *both* companies were conducting together. *See* Tr. at 77-78 (Martoma "thought. . . that the data would come out and the trials that would come out he would hope to be positive.")

- Mr. Cohen testified that on the morning of Sunday, July 20, 2008, Martoma "called me and he said – I remember him saying that he was getting uncomfortable with the Elan position . . . . I must have asked him how come or – because he repeated back to

---

[2]   Attached as Exhibit A. In addition, the entirety of Mr. Cohen's testimony can be made available to the Court upon request.

5

me, 'I am just getting uncomfortable with the Elan position.'" (Tr. 161-162). *See also* Tr. 174 (After Martoma's initial statement of discomfort, Mr. Cohen asked why, and Martoma "told me again that he was uncomfortable."); Tr. 192-193 (Mr. Cohen "definitely asked" Martoma what he meant by being uncomfortable with the Elan position "because he repeated it back to me.")

- *Following* this call with Martoma, Mr. Cohen sought to convene a conference call between the defendant and Mr. Holman to "hear them discuss it" because "they were the experts in Elan and Wyeth." (Tr. 163-164). Mr. Holman had not, to Mr. Cohen's knowledge, changed his views on Wyeth at any point prior to Martoma's Sunday morning call with Mr. Cohen. (Tr. 163). After an inability to arrange a conference call, Mr. Cohen "ask[ed] Wayne to speak to Mat." (Tr. 176). Mr. Holman then "reported back" that he had "spoke[n] to Martoma" and that "Martoma had reasons why he didn't want to be in Elan anymore" which were "normal, typical reasons" although Mr. Cohen did not remember what Mr. Holman said they were. (Tr. 177, 179-180). According to Mr. Cohen, Mr. Holman then added "'Listen, in the end, this data is 50/50. You know, this data is unknowable, it's a 50/50 bet.'" (Tr. 177). Mr. Cohen was "surprised" by Mr. Holman's changed view following Mr. Holman's call with Mr. Martoma. (Tr. 178).

- After this call, Mr. Cohen started selling Elan based on the views of his "two experts" who now sounded "very different than the way . . . they sounded previous." (Tr. 178). Mr. Cohen added that "I believed Mat Martoma wanted to sell his Elan," and that Martoma "wanted to be out of the position before the data came out." (Tr. 182-183). Mr. Cohen testified that "what we did was instruct Phil Villhauer to liquidate all the stock that was owned by – in the firm account, in my account, and in Mat Martoma's account and let him handle it." (Tr. 184).

- With respect to selling Wyeth, Mr. Cohen stated that he spoke to Mr. Holman "at some point" and that Mr. Holman said something about Wyeth (Tr. 186), which prompted Mr. Cohen to sell Wyeth in accounts he controlled. Mr. Cohen testified that he had "no idea" if Mr. Martoma sold his entire Wyeth position in the portfolio he controlled. (Tr. 210). At no point did Mr. Cohen testify that his determination to sell Wyeth was entirely independent from the earlier decision to sell Elan, and there was limited testimony on this topic.

## ARGUMENT

I.  **The Defendant's Motions Improperly Seek To Prevent The Government From Proving Certain Allegations Expressly Charged In The Indictment**

The defendant's second motion *in limine* seeks "an order precluding the Government from introducing any evidence about, or mentioning at any time during trial (including in its opening statement and closing argument), SAC's sales of Wyeth securities," (Def. MIL 2 at 1),

6

asserting that "[e]vidence of SAC's sales of Wyeth securities is not relevant to the charged offenses" (Def. MIL 2, at 6). The defendant's third motion *in limine* seeks an order precluding the Government from offering evidence of "either SAC's decision to short Elan and Wyeth securities or its decisions about the manner in which Elan and Wyeth securities were sold" (Def. MIL 3, at 1) on the grounds that "[t]he Government does not and cannot allege that *Mr. Martoma* was involved in SAC's decision to short Elan and Wyeth securities or its decisions about the process for selling these securities." (Def MIL 3, at 10) (emphasis in original in this and other citations to Def MIL 2 and 3).

These assertions are remarkable given that a cursory review of the Superseding Indictment makes quite clear that the Government is, in fact, quite explicitly alleging the very things that the defendant says it is not. Most obviously, the claim that "evidence of SAC's sales of Wyeth securities is not relevant to the charged offenses" appears to overlook that Count Three of the Superseding Indictment charges Martoma with causing these sales, and only these sales.[3] The assertion that the "Government has *never* alleged that Mr. Martoma was part of SAC's decision to short Elan and Wyeth securities" is similarly bewildering as Counts Two and Three both charge that "Martoma obtained material, nonpublic information about the [drug trial] results, and, based in whole or in part on that information, caused the SAC Hedge Fund" with respect to Court Two "to sell common stock of Elan, short Elan stock, and enter into options transactions relating to Elan" and, with respect to Court Three, "to sell common stock of Wyeth and short Wyeth stock." The defendant may disagree that the Government's evidence *proves* these allegations but the claim that the Government did not make the allegations in the first place does not withstand scrutiny.

---

[3] In addition, the allegations that the defendant asserts have never been made are charged in Count One, which charges an insider trading conspiracy with respect to both stocks.

7

More surprising still is the defendant's transparently circular argument as to why the Government should not be permitted to offer evidence with respect to the allegations expressly made in the Superseding Indictment: there is no evidence supporting these allegations! With respect to Wyeth, the defendant asserts that "Mr. Martoma indisputably was *not* involved in SAC's decision to sell Wyeth securities" (Def. MIL 2 at 1) and that "Mr. Martoma did *not* cause SAC to sell its holdings in Wyeth securities" (Def. MIL 2 at 6). With respect to the shorting of the stocks and the manner of the sales, the defendant flatly asserts that "Mr. Martoma indisputably was not involved in making such decisions" (Def. MIL 3, at 7). In short, the defendant is seeking to preclude the Government from offering evidence to prove the conduct charged in the Indictment based on the defendant's unsupported assertion that he did not engage in this conduct. There is no authority, of course, to prevent the Government from offering evidence to prove its charges based on self-serving assertions by a defendant that there is no such evidence.

Unsurprisingly, the Government does intend to present evidence establishing that the defendant was involved in selling Wyeth securities, shorting Elan and Wyeth, and in the manner in which the securities were sold. This evidence includes (but is by no means limited to) the following:

- Leaving aside SAC Capital portfolios controlled by Steve Cohen, the defendant sold all of the Elan and Wyeth positions (approximately $100 million worth) in the portfolio he personally controlled. Martoma also shorted Elan in this portfolio.

- The defendant exchanged e-mails and instant messages with Mr. Villhauer relating to how the Elan positions should be sold.

- Witnesses will testify that Martoma told them that he had decided to sell Wyeth and Elan securities and short the stocks in advance of the Drug Trial announcement, which was sponsored by both companies, and that he had discussed his views with Mr. Cohen.

- SAC Capital records will show that the positions Mr. Cohen arranged to be sold had been "tagged" to Mr. Martoma (meaning he was identified as the SAC PM responsible for the idea, and entitled to profits from). Martoma was in fact compensated for profits in these positions.

There is additional evidence, but to go on would be to obfuscate the main point. Stripped of hyperbole, the defendant's real argument is not that there is *no* evidence of Martoma's involvement in selling Wyeth, shorting the stocks, or the manner in which the stocks were sold. It is that the defendant disputes the Government's evidence, and apparently believes that other evidence would support its position.[4] The resolution of this factual dispute is for the jury, at trial, and not for the Court, before the Government presents any evidence at all.

Finally, it is not at all clear what evidence the defendant is seeking to preclude the Government from offering. Perhaps owing to the defendant's rhetorical position that that there is "no" evidence of Martoma's involvement in the sale of Wyeth, the shorting of Elan and Wyeth, or the manner of the sales, the only evidence that the defendant identifies at all is evidence that *other* people (Mr. Cohen, Mr. Villhauer and Mr. Holman) played a role in this conduct.

As to the significance of the evidence involving the conduct of others, the defendant makes two entirely inconsistent arguments. On the one hand, the defendant argues that evidence of the conduct of other people, not named as co-conspirators, is so prejudicial to Martoma that evidence of their involvement on any particular point (sales of Wyeth, shorting of Elan and Wyeth, or manner of sales) must be excluded due to the prejudicial impact on Martoma. *See, e.g.,* Def. MIL 3, at 8 ("introducing evidence of decisions by SAC that did not involve Mr.

---

[4] Much of the evidence proffered by the defendant as proving Martoma's lack of involvement in the various issues is inaccurately described or of dubious validity, and in any event in most cases supports only that other individuals were involved in certain conduct rather than establishing the defendant's own lack of involvement. In particular, the defendant presents Mr. Holman's call to Mr. Cohen that allegedly caused Mr. Cohen to consider selling Wyeth as being entirely unconnected from the conduct of Mr. Martoma, when this is demonstrably not the case, as discussed subsequently herein.

9

Martoma invites the jury to find Mr. Martoma guilty by association"); Def. MIL 2, at 8 (same). But the defendant then argues that this same supposedly prejudicial evidence of the conduct of others is so helpful to the defense that the Court should make an exception to the hearsay rules and allow sections of Mr. Cohen's SEC deposition testimony in which he discusses the role of others in the decisions to be admitted. *See, e.g.,* Def MIL 2 at 12-13 ("Mr. Martoma should be allowed to introduce selected portions of Mr. Cohen's SEC deposition testimony that Mr. Cohen, in consultation with Mr. Holman (not Mr. Martoma), made the decision to sell those securities."); Def. MIL 3 at 15 ("Mr. Martoma should be allowed to introduce selected portions of Mr. Cohen's SEC deposition testimony that Mr. Cohen and Mr. Villhauer (not Mr. Martoma) made SAC's decisions to short Elan and Wyeth securities and its decisions about the process for selling those securities."). In truth, neither of the defendant's inconsistent arguments is accurate: the evidence relating to the involvement of others is neither of the sort to establish Martoma as "guilty by association" nor to exculpate him.

Nor is the defendant's argument that it is impermissible to offer evidence of conduct by Mr. Cohen, Mr. Holman or Mr. Villhauer because the Government has not named them as co-conspirators (e.g., Def. MIL 2, at 7-8) at all compelling. The defendant is correct that it would be impermissible for the Government to argue that other individuals, not named as co-conspirators, engaged in criminal conduct and that their criminal acts should be attributed to the defendant. But the Government intends to make no such argument.[5] The significance in this trial of Mr. Cohen's sales of Elan and Wyeth securities after speaking to Martoma is that it is corroborative evidence that Dr. Gilman did in fact share the negative Drug Trial results with the defendant, and that the defendant was so confident in the new information that he made a

---

[5] Accordingly, the cases cited by the defendant at MIL 2 at 7-8 and again at MIL 3 at 8-9 – all of which deal with situations where the criminal conduct of others is being used as a proxy to establish the guilt of the defendant – are irrelevant.

10

sufficiently forceful case to his boss to reverse a large position. With respect to Mr. Villhauer, the relevance of his actions in selling the securities through (concededly lawful) mechanisms designed to mask that SAC Capital was selling over ten millions shares of Elan approximately one week before an important Drug Trial announcement is two-fold. First, it demonstrates the magnitude of SAC Capital's bullish position on Elan, developed at the defendant's recommendation, before the sell-off. Second, it supports the argument that Dr. Gilman provided the defendant with something so compelling – an advance preview of the results – that the defendant advised selling out of the position entirely, even though, as Mr. Villhauer's conduct demonstrated, selling a position this large without news leaking out was difficult.[6] Finally, with respect to Mr. Holman, the Government has no intention of arguing that Mr. Holman engaged in criminal conduct that should be attributed to the defendant. Indeed, the Government does not intend to introduce more than minimal evidence about Mr. Holman at all.

In sum, the Government has plainly charged the defendant with selling Wyeth securities and shorting Elan and Wyeth stock, and is clearly alleging that the defendant was involved in the manner in which the securities were sold. Evidence that the defendant did what he is specifically charged with doing is quintessentially relevant, and the defendant provides no valid grounds to preclude it.

---

[6] It should be noted, however, that simply because the means used to hide the sales of Elan internally were lawful and *could* serve valid ends (like preventing other entities from learning that well-known hedge fund SAC Capital was selling large volumes, thereby causing prices to drop) does not mean that such techniques could not simultaneously serve more nefarious ends, such as minimizing the risk that SAC Capital's trading would be flagged by a counterparty as suspicious. For example, if an investor knew that SAC Capital (rather than anonymous investors in a dark pool) had sold a large block of Elan to the investor a day before the Public Announcement caused the price of Elan shares to drop 40%, that investor might be more likely to promptly report suspicious activity to the regulators, leading to a contemporaneous investigation. Accordingly, even if, for the sake of argument, some individuals at SAC Capital had purely non-criminal intent in using these techniques (or were simply carrying them out at the direction of a supervisor, in Mr. Villhauer's case), it would not necessarily follow that Martoma's intentions were purely benign.

## II. Mr. Cohen's Deposition Testimony Is Inadmissible Hearsay

As an "alternative" to the orders requested by the defendant to preclude the Government from offering evidence of the conduct charged, the defendant moves to introduce isolated snippets from Mr. Cohen's testimony in a proceeding that took place over six months prior to the defendant's arrest and in a forum in which the criminal authorities did not participate. Mr. Cohen's testimony is inadmissible hearsay and does not and cannot substitute for testimony in the criminal trial that would be subject to cross-examination.

Under Federal Rule of Evidence 804(b)(1), an unavailable declarant's testimony at a prior proceeding is admissible if it is "offered against a party who had . . . an opportunity and similar motive to develop it" in the prior proceeding. Fed. R. Evid. 804(b)(1). In order to satisfy these requirements, the proponent of the prior testimony must establish that the party against whom the testimony is offered was a party to the prior proceeding, "is on the same side of the same issue at both proceedings, . . [and] had a substantially similar interest in asserting that side of the issue." *United States* v. *DiNapoli*, 8 F.3d 909, 912 (2d Cir. 1993) (en banc). "Where both proceedings are trials and the same matter is seriously disputed at both trials, it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial." *Id.* "The situation is not necessarily the same where the two proceedings are different in significant respects, such as their purposes or the applicable burden of proof." *Id.* at 913.

There are at least two reasons why the above precedent does not permit admission of Mr. Cohen's testimony before the SEC. First, the parties were different. Even when involved in parallel proceedings, the SEC and the USAO are different agencies with different interests and missions, and not proxies for one another. *See United States v. Rigas*, 583 F.3d 108, 126 (2d Cir.

12

2009) (affirming district court's determination that Government's discovery obligation did not extend to documents in the possession of the SEC). Although Judge Rakoff recently crafted a limited exception with respect to the production of *Brady* material in the SEC's possession relating to jointly-conducted interviews, *United States v. Gupta*, 848 F.Supp 2d 491 (S.D.N.Y. 2012), Judge Rakoff subsequently ruled that this limited exception did not warrant introducing SEC testimony in a criminal proceeding where, as here, the prosecution had not participated in the deposition. *See United States v. Whitman* trial transcript at 2305-2310, attached as Exhibit B. Judge Rakoff's ruling on this matter is one of several issues raised by the defendant in an appeal pending before the Second Circuit. *See United States v. Whitman*, 13-491-cr (2013).[7]

The principle articulated by the district court in *Whitman* makes sense. The rationale behind Rule 804(b)(1) is that "[i]f the party against whom the previous statement is now offered is the party against whom that testimony was given, it is usually compatible with fair practice to make that party bear the consequences of any deficiencies in the cross-examination or of the decision not to cross-examine." 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 804.04 (2013); *see also* Fed. R. Evid. 804 advisory committee's note (1972 Prop. Rules) (same). The defendant makes no argument, much less a factual showing, that the Government

---

[7] Martoma principally relies on *United States v. Sklena*, 692 F.3d 725 (7th Cir. 2012), to contend that the USAO and the SEC are the same "party." (Br. 36). Assuming *arguendo* that *Sklena* was correctly decided, it differs in an important respect from this case. There, the Seventh Circuit ruled that the district court had erred in excluding deposition testimony of Sklena's co-conspirator (who subsequently died) taken in connection with a parallel civil action against Sklena and the co-conspirator by the Commodities Futures Trading Commission ("CFTC"). *United States v. Sklena,* 692 F.3d at 729-34. In ruling that the CFTC and the Department of Justice ("DOJ") were the same party, the Court noted that the CFTC "is required by statute to report on its litigation activities directly to the Justice Department" and stated that this "statutory control mechanism" suggested that the DOJ "could have ensured that the CFTC lawyers included questions of interest to the United States when they deposed [the co-conspirator]." *Id.* at 731 (citing 7 U.S.C. § 13a-1(a), (f)-(g)). This case differs from *Sklena* because the USAO has no similar relationship with the SEC. Unlike the CFTC, the SEC has plenary litigation authority, and is not required to report to the DOJ regarding its litigation activities. *See SEC* v. *Robert Collier*, 76 F.2d 939, 940-41 (2d Cir. 1935) (Hand, *J.*) (concluding that the SEC has "complete autonomy in civil prosecutions"); 28 U.S.C. § 516 (establishing the primacy of the DOJ in litigation where the federal government is a party, in all circumstances "[e]xcept as otherwise authorized by law"); 15 U.S.C. §§ 77t(b) (authorizing the SEC to bring its own civil actions), 78u (conferring upon the SEC various investigative powers).

played any role in the SEC testimony of Mr. Cohen and indeed the Government did not. It would not therefore be fair to treat the SEC proceeding as the functional equivalent of a testimonial proceeding at which the Government could have asked such questions. ▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[8]

Second, the proceedings were different in nature and purpose. As Judge Rakoff observed in *Whitman*, an administrative agency taking testimony for investigative purposes "frequently has no motive other than to freeze the witness in whatever his or her story is." (Tr. 2307). The Court further remarked that a party to a deposition would "not necessarily . . . undertake to cross-examine" the witness at all, and that a deposition is a "very different situation from the kind of examination that one would undertake if either it were a trial or if one had reason to believe [the deposition testimony] might be used at a trial." (Tr. 2307). In this case, the SEC's investigative testimony was undertaken before much of the evidence to be introduced at this trial had been developed. Most notably, the testimony occurred before Dr. Gilman had acknowledged providing Mr. Martoma with the Drug Trial results. Given the setting, the SEC could not have cross-examined Mr. Cohen about the range of evidence later developed in order to further test the veracity of his statements. Nor would that necessarily have been the point. One rationale for taking testimony at an early stage is to simply develop investigative leads and/or lock a witness into his version of events *before* the investigative facts are fully developed. In such settings – unlike a trial – the purpose of investigative testimony may not be to impeach a witness or challenge the accuracy of described events as much as to ensure that the witness

---

[8]   The preceding sentencing has been redacted from the publicly filed version of this Opposition and is being provided to the Court initially on an *ex parte* basis.

provides as detailed account of events as possible. In addition, the SEC did not conduct the deposition with an eye toward Martoma's role.

The defendant's contention that Mr. Cohen's testimony should alternatively be admitted under Federal Rule of Evidence 807 is also unfounded. Rule 807, the residual hearsay exception, provides that "even if the statement is not specifically covered by a hearsay exception in Rule 803 or Rule 804" it may be accepted as evidence if it "has equivalent circumstantial guarantees of trustworthiness, is "offered as evidence of a material fact," is "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts" and where admitting the statement "best serve the purposes of these rules and the interests of justice." "Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances." *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907-08 (2d Cir.1991).

The defendant cites no cases in which deposition testimony from a civil proceeding was offered against the Government in a criminal case, and the Government is aware of none.[9] Indeed, the same arguments as to why such investigative testimony should not be admitted pursuant to Rule 804(b)(1) apply to the Rule 807 argument. Moreover, the defendant has made no showing that he could not obtain equally probative evidence through "reasonable efforts," as Rule 807 requires. The defendant cites Mr. Cohen's transcript largely in connection with interactions Mr. Cohen testified he had with Mr. Holman and Mr. Villhauer. The Government understands that Mr. Holman would be available, and does not intend to assert his Fifth Amendment rights, if called as a witness. Similarly, as the defendant knows, Mr. Villhauer is not only available, he has already been identified by the Government as a potential witness. The

---

[9] The only Second Circuit case cited by the defendant in this section, *United States v. Detrick*, 865 F.2d 17, 21-22 (2d Cir. 1988), concerned evidence that the Second Circuit expressly found not to be hearsay, and has no relevance to the Rule 807 issue at all.

15

defendant makes no showing as to why these witnesses could not testify with regards to their interactions with Mr. Cohen in the Elan and Wyeth transactions. Finally, the defendant's arguments with respect to whether SAC Capital was betting against the Drug Trial versus simply moving a $700 million plus long position to neutral can be resolved through trading records and other documents rather than Mr. Cohen's testimony.

Finally, the defendant's characterization of the potential of Mr. Cohen's testimony is substantially overblown. The defendant makes several sweeping and unequivocal statements about what Mr. Cohen's testimony could establish, such as the following:

- "The uncontroverted testimony of Mr. Cohen establishes that Mr. Martoma had *nothing* to do with SAC's sales of Wyeth." (Def. MIL 2, at 6).

- "Mr. Cohen's testimony makes clear that no information from Mr. Martoma was used to sell Wyeth securities." (Def. MIL 2, at 7).

- "[T]he unrebutted testimony of Mr. Cohen clearly shows that Mr. Martoma was *not* involved in SAC's decision to sell Wyeth securities." (Def. MIL 2, at 9).

- "The unrebutted sworn testimony of Mr. Cohen (SAC's founder) and Mr. Villhauer (SAC's senior trader) unequivocally establishes that Mr. Martoma had *nothing* to do with deciding which trading strategies to use." (Def. MIL 3 at 1).

- "Moreover, Mr. Cohen and Mr. Villhauer testified in detail that they (*not Mr. Martoma*) made the decisions about the manner in which SAC sold Elan and Wyeth securities." (Def. MIL 3, at 5).

- "Mr. Cohen testified that he (not Mr. Martoma") made the decision to short Elan and Wyeth securities." (Def. MIL 3, at 6).

But a review of the testimony, particularly beyond the portions identified by the defendant, do not support these claims.

As an initial matter, despite the regular use of "uncontroverted" and "unrebutted" in the defense motion there is ample evidence – some but not all of which was described in the preceding section – that Martoma *did* play a role in the sale of Wyeth (he sold Wyeth himself in

16

his own portfolio), did play a role in shorting the securities (he shorted Elan in his own portfolio), and was involved in the manner in which the transactions were executed (as witnesses will testify and documents will show). But even if the defendant's claims are assessed only in terms of what Mr. Cohen said in his deposition, the broad characterizations offered by the defense are simply inaccurate.

In particular, with respect to the sale of Wyeth securities, the defendant is correct that Mr. Cohen attributed in his testimony the impetus to sell Wyeth securities to a call from Mr. Holman. But the defendant implies Mr. Holman's advice was independent from any advice Mr. Martoma had been providing, when exactly the opposite is true. In particular, Mr. Cohen testified that he received a call from Martoma on Sunday, July 20, 2008, in which Mr. Cohen said he remembered only that Martoma had said he was "getting uncomfortable" with the position in Elan and that when Mr. Cohen asked "how come" Martoma "repeated back to me, 'I am just uncomfortable with the Elan position.'" (Tr. 161-162). After receiving this report from Martoma, Mr. Cohen asked Mr. Holman "to speak to Mat" and Mr. Holman "reported back" that he "spoke[n] to Martoma" and that "Martoma had reasons why he didn't want to be in Elan anymore," although Mr. Cohen could not recall what Mr. Holman said these reasons were. (Tr. 177, 179-180). To this, Mr. Holman added that the Drug Trial data was a "50/50 bet," which "surprised" Cohen. (Tr. 177-178). Accordingly, even if, as Mr. Cohen testified, it was something Mr. Holman said later that week that finally triggered Mr. Cohen's desire to sell Wyeth, that recommendation was hardly independent from Martoma's own negative prognosis about the Drug Trial. Indeed, given that the Drug Trial results were expected to affect the shares of both companies, and given that, as Mr. Cohen repeatedly testified, he had built the position in Wyeth "based on the recommendation of Mat Martoma and Wayne Holman" (Tr. 29), it is

17

misleading at best to claim that "Mr. Cohen's testimony makes clear that no information from Mr. Martoma was used to sell Wyeth securities." (Def MIL 2, at 7).

The defendant also incorrectly states that Mr. Cohen testified that Martoma had no role in particular events when, in fact, Mr. Cohen testified only that he had a lack of memory, to the extent questions were asked about Martoma's role at all. For example, Mr. Cohen never testified that Martoma "had *nothing* to do with SAC's sales of Wyeth" (Def MIL 2, at 6). Mr. Cohen simply answered "I don't remember" in response to limited questions about Martoma's views on Wyeth leading up to the public announcement. (Tr. 189). The claim that Mr. Cohen's testimony established that Martoma "had *nothing* to do with deciding which trading strategies to use," is also an overstatement (Def. MIL 3 at 1). Indeed, after testifying that he had shorted Elan and Wyeth as part of a strategy to offset a synthetic swap position in Wyeth, Mr. Cohen answered "I could have" when asked if he had discussed this strategy with Martoma, although he did not remember doing so. (Tr. 204).[10]

Finally – and perhaps most significantly with respect to materiality – the testimony that Martoma seeks to admit does not provide a defense to any of the insider trading charges in the Superseding Indictment. With respect to the conspiracy count, the Government need not show that the defendant even succeeded in obtaining material non-public information, much less that he made actual sales on the basis of such information. *See, e.g., United States* v. *Svboda*, 347 F.3d 471, 476 (2d Cir. 2003) ("'[T]he illegality of [a conspiracy] does not depend upon the achievement of its goal)." With respect to Counts Two and Three, there is irrefutable evidence, oddly ignored in the defense motion, that Elan and Wyeth positions were sold from Martoma's

---

[10] Likewise, when Mr. Cohen was asked "[h]ow did Mr. Martoma go about selling his position in Elan from the accounts that he controlled," Mr. Cohen answered "I don't know if he did. I think what *we* did was instruct Phil Villhauer to liquidate all the stock that was owned by – in the firm account, in my account, and in Mat Martoma's account and let him handle it." (Tr. 184) (emphasis added). While somewhat ambiguous, the "we" appears to refer to Mr. Cohen and Martoma.

18

*own* portfolio, over which he had authority, and ample other evidence showing that Mr. Cohen's sales in Mr. Cohen's portfolios too can be attributed to Martoma. Finally, even assuming, arguendo, that Mr. Holman's statement provided one basis for Mr. Cohen's Wyeth sales, the Government is only required to show – at the very most – that the defendant's communications with Mr. Cohen after the defendant obtained the results from Dr. Gilman were a factor in Mr. Cohen's Wyeth sales. *See States* v. *Royer*, 549 F.3d 886, 899 (2d Cir. 2008) (holding that "knowing possession" of material, nonpublic information is unlawful).

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the defendant's second and third motions *in limine* be denied.

Dated: December 20, 2013
        New York, New York

                                                  Respectfully submitted,

                                                  PREET BHARARA
                                                  United States Attorney

By: _____
      Arlo Devlin-Brown
      Eugene Ingoglia
      Assistant United States Attorneys
      Tel. No.: (212) 637-2506/2270