UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MATHEW MARTOMA,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/8/2014

**ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this insider trading case, Defendant Mathew Martoma is charged with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, and with two counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. (Superseding Indictment (Dkt. No. 61)) The Government alleges, inter alia, that between 2006 and July 2008, Martoma caused S.A.C. Capital Advisors, LLC ("SAC") to trade on the basis of material non-public information. The non-public information was allegedly supplied to Martoma by two doctors – Sidney Gilman and Joel Ross – who were participants in a clinical trial of bapineuzumab, a drug that was thought to be of possible use in treating Alzheimer's disease. Bapineuzumab was being developed by Wyeth and Elan Corporation, plc ("Elan"), and the alleged insider trading involves the shares of these companies. (Id.)

This order addresses the Defendant's motions in limine to (1) exclude certain evidence of SAC's trading activity in Wyeth and Elan stock; (2) introduce excerpts from an investigative deposition of Steven A. Cohen taken by Securities and Exchange Commission staff on May 3, 2012; and (3) exclude evidence of SAC's involvement in related civil and criminal litigation. (See Dkt. Nos. 106, 109, 112)

## DISCUSSION

### I. MOTION TO EXCLUDE EVIDENCE OF SAC'S TRADING ACTIVITY IN WYETH AND ELAN STOCK

The Defendant argues that evidence of SAC's sales of Wyeth securities should be excluded. In the alternative, the Defendant contends that he should be permitted to introduce portions of Steven A. Cohen's testimony before the SEC in which – according to Defendant – Cohen allegedly states that his decision to sell the Wyeth stock was made "in consultation with Wayne Holman" and not in consultation with the Defendant. (See Def. Br. (Dkt. No. 107) at 1)

The essence of Defendant's argument on this point is as follows:

> Mr. Martoma indisputably was not involved in SAC's decision to sell Wyeth securities. The unrebutted sworn testimony of Mr. Cohen, SAC's owner, makes clear that Mr. Martoma had nothing to do with that decision. Specifically, Mr. Cohen has testified that he made the decision to sell Wyeth securities in consultation with Mr. Holman (not Mr. Martoma), a former SAC healthcare portfolio manager whom Mr. Cohen described as a "great healthcare investor [whose] recommendations are very important to me."

(Id. (emphasis in original) (alteration in original)). Defendant goes on to argue that "the Government cannot ignore [Cohen's] sworn, unrebutted testimony that exculpates Mr. Martoma by establishing that he had nothing to do with SAC's decision to sell Wyeth securities." (Def. Br. (Dkt. No. 107) at 3).

The Defendant similarly argues that evidence of SAC's decisions to (1) short Elan and Wyeth securities, and (2) use algorithmic trading platforms, "dark pools," and accounts with "limited viewing access" to sell Elan and Wyeth securities should be excluded. (Def. Br. (Dkt. No. 110) at 1) In the alternative, the Defendant argues that he should be permitted to introduce portions of Cohen's SEC testimony in which he allegedly states that he "and Phillipp Villhauer (not Mr. Martoma) made those decisions." (Id.)

2

Defendant's argument on this point reads the same as his argument concerning the sale of Wyeth stock:

> Mr. Martoma indisputably was not involved in either SAC's decision to short Elan and Wyeth securities or its decisions about the manner in which Elan and Wyeth securities were sold. The unrebutted sworn testimony of Mr. Cohen (SAC's founder) and Mr. Villhauer (SAC's senior trader) unequivocally establishes that Mr. Martoma had nothing to do with deciding which trading strategies to use. Indeed, Mr. Cohen has testified that he (not Mr. Martoma) made the decision to short Elan and Wyeth securities; and Mr. Cohen and Mr. Villhauer have both testified that they (not Mr. Martoma) made the decisions about the process for selling SAC's holdings in Elan and Wyeth.

(Id. (emphasis in original)) Defendant goes on to assert that "the Government cannot ignore [Cohen's] sworn, unrebutted testimony that exculpates Mr. Martoma by establishing that he had nothing to do with SAC's decisions to (1) short Elan and Wyeth securities or (2) use 'algos' or algorithmic trading platforms, 'dark pools,' and accounts with 'limited viewing access' to sell Elan and Wyeth securities." (Def. Br. (Dkt. No. 110) at 4)

Even if Cohen had testified that Martoma played no role in SAC's decision to sell its Wyeth and Elan stock and to sell short these securities – an assertion that is not supported by a review of Cohen's deposition transcript[1] – this Court would, of course, not be required to accept Cohen's account.

---

[1] The Defendant's repeated assertions that Cohen's testimony is completely exculpatory of him are not accurate. Given that Cohen testified that Martoma played an important role in Cohen's decision to accumulate Elan and Wyeth stock, and in Cohen's decision to sell the Elan position in July 2008, much in Cohen's deposition is inculpatory of Martoma.

As to SAC's accumulation of Elan and Wyeth stock, Cohen testified that Martoma had told him that bapineuzumab – a drug being developed by Elan and Wyeth – was going to be a "good drug" and "could be potentially a major impact to Elan's bottom line" in 2008. (Govt. Br. (Dkt. No. 140), Ex. A (Cohen Dep. Tr.) at 28, 77) Cohen further testified that his decision to take a "bullish" position in Elan stock "was [based] on the recommendation of Mat Martoma," and his decision to take a "bullish" position in Wyeth stock was "based on the recommendation of Mat Martoma and Wayne Holman." (Id. at 27-29; see also id. at 66 ("Mat Martoma's view on Bap contributed to having a position in Wyeth."); id. at 67 (Martoma and Holman "recommended a position in Wyeth")).

3

As to SAC's sale of the Elan and Wyeth stock, Cohen testified that his decision to sell Elan and Wyeth stock was made after consultation with his "two experts" on Elan and Wyeth: Martoma and Holman. (Id. at 163, 178) Cohen testified that on Sunday morning, July 20, 2008, Martoma called him and said that "he was getting uncomfortable with the Elan position." (Id. at 161-62) Cohen testified that he asked Martoma why he was "getting uncomfortable," but cannot recall what Martoma said. (Id. at 162) Indeed, Cohen cannot recall anything else about the conversation, including whether the Wyeth position was discussed. (Id. at 162, 173-74) Cohen recalls that he wanted to arrange a conference call with Martoma and Holman to discuss Martoma's concerns, "[b]ecause they were the experts in Elan and Wyeth and [he] wanted to hear them discuss it." (Id. at 163) To Cohen's knowledge, Holman's views on Elan and Wyeth had not changed up to that point. (Id.)

Cohen was not able to arrange a conference call among himself, Martoma, and Holman, so he asked Holman to speak directly with Martoma. (Id. at 163-64, 175-76) Holman "reported back to [Cohen] on the conversation," and told Cohen that "Martoma had reasons why he didn't want to be in Elan anymore." (Id. at 176-77) Cohen cannot recall what Holman said Martoma's reasons were for wanting to sell the Elan position, but testified that "[t]hey were, you know, reasons that were normal, typical reasons. I am sort of summarizing because I don't remember exactly what Wayne [Holman] said to me." (Id. at 177, 179-80)

After his conversation with Holman, Cohen "decided to sell the Elan position" and "started selling Elan." (Id. at 177, 182) Cohen further testified that Martoma "wanted to be out of the [Elan] position before the [Phase II trial results] came out." (Id. at 183) When asked why he started selling the Elan position, Cohen testified that his "two experts sounded very different than the way I – the way they sounded previous. Mat sounded – said he was very – he was uncomfortable. Then when talking to Wayne [Holman], he described the Bap [Phase] 2 data as a coin flip, which I was a little surprised at. . . . I was surprised when he said it was 50/50. . . . That's not what I signed up for." (Id. at 178) Holman had not referred to the bapineuzumab data as a "coin flip" before July 21, 2008. (Id. at 180)

As is clear from this summary, much in Cohen's testimony is inculpatory of Martoma and consistent with the Government's theory in this case. According to Cohen, Martoma played a significant role in his decision to buy Elan and Wyeth stock, and it was Martoma's discomfort with the Elan position on July 20, 2008 that was the impetus for selling the position. While Cohen testified that he was also influenced by Holman's view that the outcome of the bapineuzumab trial was "50/50," it is a fair inference that Holman's views about Elan and Wyeth changed after speaking with Martoma on July 21. (Id. at 163) While the Defendant asserts that Cohen testified that Martoma had "nothing to do with" Cohen's decision to sell the Wyeth position (Def. Br. (Dkt. No. 107) at 1), Cohen actually said no such thing. Instead, he testified that he did not recall whether, in his July 20 call with Martoma, the two discussed both Elan and Wyeth. (Cohen Dep. Tr. at 173-74, 189) In any event, a reasonable jury could find that the outcome of the bapineuzumab trial was likely to affect the stock of both companies.

4

Although the Defendant asserts that he played no role in these decisions, the Government has alleged the opposite. As to the sale of Wyeth and Elan stock, Count One of the Indictment states:

> [o]n the morning of Sunday, July 20, 2008, after receiving the negative confidential information about the Drug Trial results from Doctor-1, MATHEW MARTOMA, the defendant, spoke to the SAC Owner and recommended the sale of Elan and Wyeth stock prior to the Public Announcement. Beginning on or about Monday, July 21, 2008, the SAC Hedge Fund sold virtually all of its approximately $700 million worth of Elan and Wyeth stock prior to the Public Announcement. In addition, the SAC Hedge Fund engaged in "short sales" and various options trades designed to profit if the price of Elan and Wyeth securities were to fall after the Public Announcement.

(Superseding Indictment (Dkt. No. 61) ¶ 14) Similarly, Counts Two and Three allege that – based on the material, non-public information Martoma had obtained – he caused SAC to (1) "sell common stock of Elan, short Elan stock, and enter into options transactions relating to Elan" and (2) "sell common stock of Wyeth and short Wyeth stock."[2] (Id. at ¶¶ 21, 23)

Martoma's role in SAC's sale of Wyeth and Elan stock, and short sales of these securities, presents questions of fact that the jury will resolve. The motion to exclude evidence of SAC's trading activity in Wyeth and Elan stock will be denied.[3]

---

With respect to Martoma's involvement in the decision to short Elan and Wyeth securities, and the manner in which Elan and Wyeth securities were sold, Cohen's testimony likewise does not demonstrate that Martoma played no role in these matters. When asked at his deposition how Martoma had gone about selling his position in Elan – in the SAC accounts Martoma controlled – Cohen testified: "I think what we did was instruct Phil Villhauer to liquidate all the stock that was owned by – in the firm account, in my account, and in Mat Martoma's account and let him handle it." (Id. at 184) (emphasis added) With respect to shorting Elan stock, Cohen was asked whether he discussed his shorting strategy with Martoma. Cohen testified: "I could have. . . . I don't remember." (Id. at 204)

[2] The Government also asserts that the evidence will show "that Elan and Wyeth positions were sold from Martoma's own portfolio [at SAC]" and that Martoma likewise "shorted Elan in his own portfolio [at SAC]." (Govt. Br. (Dkt. No. 140) at 16-19 (emphasis in original))

[3] The Defendant's motion to exclude reference to SAC's use of "algos," "dark pools," and "limited viewing access" accounts to execute the Elan and Wyeth trades (Def. Br. (Dkt. No. 110) at 11-12) will likewise be denied. These terms are not inherently prejudicial. According to

## II. MOTION TO INTRODUCE COHEN'S SEC TESTIMONY

In the event that evidence regarding SAC's trading in Wyeth and Elan stock is introduced at trial, the Defendant argues that excerpts from Steven A. Cohen's SEC testimony should be admitted to demonstrate that he was not involved in SAC's decisions concerning these matters.

Cohen's May 3, 2012 testimony was taken in connection with an SEC investigation of whether SAC's trading in Elan securities had violated federal securities laws. (See Strassberg Decl. (Dkt. No. 111), Ex. A (Cohen Dep. Tr.) at 3; Devlin-Brown Decl. (Dkt. No. 177) ¶ 2)

The Defendant argues that Cohen's testimony is admissible under Fed. R. Evid. 804(b)(1) and 807. Rule 804(b) states:

> The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> **(1) Former Testimony.** Testimony that:
>
> **(A)** was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
>
> **(B)** is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

Fed. R. Evid. 804(b)(1).[4]

Fed. R. Evid. 807 – the residual hearsay exception – provides that

---

Defendant, these terms refer to "processes . . . used by traders to avoid displaying the source, price, and size of trading orders until the trades actually take place. They are routinely used by many institutional investors (including SAC) to prevent other investors, both inside and outside of a firm, from trading ahead of large changes in position." (Id. at 12) All of this will undoubtedly be explained by one or more witnesses at trial.

[4] The parties here do not contest that Cohen is unavailable as a witness. (See Govt. Br. (Dkt. No. 140) at 12-14; Def. Br. (Dkt. No. 110) at 13)

> a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804 [where]
>
> (1) the statement has equivalent circumstantial guarantees of trustworthiness;
>
> (2) it is offered as evidence of a material fact;
>
> (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and
>
> (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807.

### A. Admissibility under Fed. R. Evid. 804(b)(1)

To determine admissibility under Rule 804(b)(1), the Court must determine whether (1) the U.S. Attorney's Office ("USAO") and the SEC should be regarded as the "same party" for purposes of this rule; and (2) the SEC had a similar motive to develop Cohen's testimony at the May 3, 2012 hearing as the USAO does here. In order for Cohen's testimony to be admissible under Rule 804(b)(1), both requirements must be met. See United States v. Peterson, 100 F.3d 7, 12-13 (2d Cir. 1996).

On May 3, 2012, when the SEC took investigative testimony from Cohen, the USAO was pursuing a criminal investigation concerning SAC's transactions in Elan and Wyeth securities. (Devlin-Brown Decl. (Dkt. No. 177) at ¶¶ 2-4) The USAO conferred periodically with SEC investigators about the SEC's parallel civil investigation, and learned that the SEC would be taking Cohen's testimony. (Id. ¶¶ 3-4) On April 30, 2012, Arlo Devlin-Brown – who was then the sole prosecutor assigned to the SAC investigation at the USAO – met with SEC investigators to discuss evidence obtained through the parallel investigations, including evidence relating to Cohen. (Id. ¶ 4) The USAO did not, however, "provide the SEC with direction on questions to ask Cohen . . . or topics to cover." (Id. ¶ 5) Nor did the SEC provide the USAO

7

with a "a preview of questions that the SEC planned to ask Mr. Cohen, an outline of the topics for testimony, or a request for instructions on topics to cover." (Id.) No representative of the USAO attended the Cohen deposition, nor did any representative of the USAO participate in any fashion in that deposition. (Id. ¶ 6) At a break during the deposition, Devlin-Brown received a five-minute call from the SEC staff taking the deposition, and was given a "short update as to the testimony thus far." (Id.) Devlin-Brown "did not provide guidance on questions that should be asked during the remainder of the deposition or provide any other feedback." (Id.) After the deposition concluded, Devlin-Brown received a further update on the deposition, and the USAO later received a transcript of Cohen's testimony. (Id.)

Under these circumstances, the USAO and the SEC cannot be regarded as the "same party" for purposes of Fed. R. Evid. 804(b)(1). See United States v. Whitman, 12 Cr. 125 (JSR) (S.D.N.Y. 2012) (Transcript of Proceedings on Aug. 14, 2012 ("Whitman Tr.") at 2305-07) (concluding that SEC and USAO could not be regarded as the "same party" under Rule 804(b)(1) for purposes of SEC deposition where USAO had played no role in conducting the deposition and no USAO representative had attended the deposition).

As to assessing similarity of motive under Fed. R. Evid. 804(b)(1), the Second Circuit has instructed that courts

> must consider whether the party resisting the offered testimony at a pending proceeding had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue. The nature of the two proceedings – both what is at stake and the applicable burden of proof – and, to a lesser extent, the cross-examination at the prior proceeding – both what was undertaken and what was available but forgone – will be relevant though not conclusive on the ultimate issue of similarity of motive.

United States v. DiNapoli, 8 F.3d 909, 914-15 (2d Cir. 1993).

Application of DiNapoli here indicates that the SEC's motive to cross-examine Cohen at the investigative deposition is not comparable to the motive that the USAO would have to cross-examine him at Martoma's trial. As Judge Rakoff pointed out in Whitman, the purpose of a deposition in a civil case or an administrative investigation is to develop investigative leads and to "freeze the witness['s] . . . story." (Whitman Tr. at 2307) The SEC lawyers taking Cohen's deposition were not attempting to persuade a jury to convict, or even attempting to persuade a grand jury to indict. Instead, the Cohen deposition was part of an effort to "develop the facts to determine if an [enforcement action] was warranted." DiNapoli, 8 F.3d at 913.

The SEC's questioning at Cohen's deposition – the relevant portions of which this Court has reviewed (see Govt. Br. (Dkt. No. 140), Ex. A (Cohen Dep. Tr.); Strassberg Decl. (Dkt. No. 111), Ex. A) – is exploratory and investigatory in nature, consisting primarily of non-leading questions. (See id.) It is "a very different . . . kind of examination tha[n] one would undertake if either it were a trial or if one had reason to believe that it might be used at a trial." (Whitman Tr. at 2307) Moreover, a lower standard of proof is applicable in a civil enforcement proceeding, and given that the vast majority of SEC enforcement actions end in settlements, the SEC's "motivation and intensity of the examination is wholly different from what would be the case in [a prosecution brought by] the U.S. Attorney's Office." (Id.) Finally, and most importantly, Cohen's deposition was taken before much of the evidence to be introduced at Martoma's trial was developed, including Dr. Gilman's admission that he had provided the final results of the bapineuzumab trial to Martoma before those results were publicly announced. (See 3501-16) For all these reasons, the necessary "similarity of motive" does not exist.[5]

---

[5] United States v. Sklena, 692 F.3d 725, 730-33 (7th Cir. 2012), relied on by Defendant (see Def. Br. (Dkt. No. 110) at 13-15), is not to the contrary. In Sklena, the Commodity Futures Trading Commission ("CFTC") had filed a civil enforcement action against Sklena and Sarvey,

9

alleging that the two had engaged in a series of non-competitive trades on April 2, 2004, that defrauded their customers out of more than $2 million. Sklena, 692 F.3d at 727. After filing the civil complaint, "the CFTC took lengthy depositions from both Sarvey and Sklena regarding these trades." Id. at 727-28. Sklena and Sarvey were later indicted for the same conduct, and the civil action was stayed pending resolution of the criminal charges. Id. at 728. Sarvey died prior to the criminal trial, however, and Sklena sought to introduce Sarvey's deposition at trial. Id. at 728, 730. The district court held that the deposition was not admissible under Rule 804(b)(1), because the CFTC and the Justice Department "may not be considered the same party," and the two agencies "did not share 'similar motive[s]' to develop Sarvey's testimony." Id. at 730 (alteration in original). The Seventh Circuit disagreed on both points, and reversed Sklena's conviction. Id. at 730-33.

As to the similar motive inquiry, there are aspects of Sklena that distinguish it from the scenario here. In Sklena, the CFTC had already brought an action against Sarvey at the time it took his deposition. Id. at 727. It was thus obvious when Sarvey's deposition was taken that portions of his testimony might be admitted at trial. This was not an investigatory deposition of the sort at issue here, but a deposition of a defendant in an action already brought. It was in this context that the Seventh Circuit found that the CFTC and the Justice Department "needed to prove the same allegations, as a comparison of the CFTC's civil complaint and the indictment demonstrates." Id. at 732. And it was in this context that the court concluded that "the CFTC and the [Justice Department] had essentially the same incentive to develop Sarvey's factual testimony about the events of April 2, 2004." Id. Because the deposition of Sarvey was taken when he was already a defendant in an action, the CFTC had every motive to conduct an extremely thorough examination. The SEC did not have a comparable motive here in conducting the investigatory deposition of Cohen. As the Second Circuit has stated, "the inquiry as to similar motive must be fact specific," DiNapoli, 8 F.3d at 914, and the facts surrounding the motive inquiry here demonstrate, for the reasons discussed above, that the SEC's motive to examine Cohen at his investigatory deposition is not comparable to the motive of the USAO to examine him at Martoma's trial.

As to whether the CFTC and the Justice Department are the same party for purposes of Rule 804(b)(1), the Sklena court noted that the CFTC "is required by statute to report on its litigation activities directly to the Justice Department," and that accordingly, "had the [Justice Department] wished, it could have ensured that the CFTC lawyers included questions of interest to the United States when they deposed Sarvey." Sklena, 692 F.3d at 731. Here, in contrast, the SEC has "complete autonomy in civil prosecutions" and is not required to report on its activities to the USAO. See S.E.C. v. Robert Collier & Co. Inc., 76 F.2d 939, 940 (2d Cir. 1935); see also 15 U.S.C. § 77t.

In sum, Sklena does not persuade this Court either that the SEC and the USAO are the "same party" for purposes of the Rule 804(b)(1) analysis here, or that similarity of motive has been established.

10

The Defendant has not demonstrated either that the SEC and the USAO are the "same party" for purposes of Rule 804(b)(1) or that similarity of motive exists. Accordingly, the Cohen deposition is not admissible under Rule 804(b)(1).

**B.    Admissibility Under Fed. R. Evid. 807**

"The traditional exceptions to the hearsay rule . . . provide the benchmark against which the trustworthiness of evidence must be compared in a residual hearsay analysis." Schering Corp. v. Pfizer Inc., 189 F.3d 218, 232 (2d Cir. 1999) (citing Fed. R. Evid. 807). "[T]he trustworthiness of the[] [hearsay] exceptions is a function of their ability to minimize some of the four classic hearsay dangers": "(1) insincerity, (2) faulty perception, (3) faulty memory and (4) faulty narration." Id. at 232, 233. Hearsay evidence is generally excluded "on the theory that cross-examination can help test for these four classes of error, thus allowing the fact-finder to weigh the evidence properly and to discount any that is too unreliable." Id. at 232.

Cohen's testimony does not bear circumstantial guarantees of trustworthiness comparable to evidence admitted pursuant to a hearsay exception. To the contrary, when Cohen's deposition was taken, SAC Capital – his company – was under investigation by the SEC for insider trading. Accordingly, Cohen had a strong motive to offer an exculpatory version of events at SAC. Allowing such self-serving testimony to be admitted, without any opportunity for cross-examination, would clearly undermine the purposes of the hearsay rule. See Kirk v. Raymark Indus., Inc., 61 F.3d 147, 167-68 (3d Cir. 1995) (finding that interrogatory response of a co-defendant "who [was] seeking to avoid liability lack[ed] . . . 'circumstantial guarantees of trustworthiness'" because the co-defendant "had every incentive to set forth the facts in a light most favorable to itself"; admitting such statements "without the opportunity for cross-examination [would] implicate[ ] many of the dangers the hearsay rule is designed to prevent");

11

Broga v. Ne. Utils., 315 F. Supp. 2d 212, 217-18 (D. Conn. 2004) (finding that plaintiffs' affidavits prepared prior to trial did not have circumstantial guarantees of trustworthiness because they were "self-interested statements"; even "[t]he most truthful of discovery or trial declarations still cannot escape the reality that they are prepared with the 'incentive to set forth the facts in a light most favorable to [the declarant]'") (quoting Kirk, 61 F.3d at 167); In re Alder, Coleman Clearing Corp., No. 95-08203 (JLG), 97/8423A, 1998 WL 160039, at *11 (Bankr. S.D.N.Y. Apr. 3, 1998) ("The self-serving nature of a statement does not support a finding of trustworthiness."). Cohen's deposition testimony will not be admitted under the residual hearsay exception.

### III. MOTION TO EXCLUDE EVIDENCE OF SAC-RELATED SETTLEMENTS AND GUILTY PLEAS

The Defendant has moved in limine (Dkt. No. 112) to exclude evidence of all civil or criminal actions, settlements, and plea agreements involving SAC or individuals related to SAC.

The Government does not seek to introduce any guilty pleas of SAC-related entities or individuals in its case-in-chief. (Govt. Br. (Dkt. No. 141) at 1) The Government has not addressed whether it will seek to admit evidence of SAC-related actions and settlements.

At this stage of the proceedings, the Court cannot predict whether any such evidence could be admissible, whether for purposes of impeachment or otherwise. Therefore, the Court reserves decision on this motion. There is to be no reference to any such evidence unless and until the matter is raised with the Court, outside the presence of the jury.

## CONCLUSION

The Defendant's motions in limine to exclude evidence of SAC's sales of Wyeth stock and the manner in which SAC sold Elan and Wyeth securities or, in the alternative, to admit portions of Steven A. Cohen's SEC deposition testimony, are denied. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 106, 109).

Dated: New York, New York
      January 7, 2014

                                    SO ORDERED.

                                    Paul G. Gardephe
                                  United States District Judge