Richard M. Strassberg
212.813.8859
rstrassberg@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
The New York Times Building
620 Eighth Avenue
New York, NY 10018
T: 212.813.8800
F: 212.355.3333

January 21, 2014

**BY ECF AND FACSIMILE**

Honorable Paul G. Gardephe
United States District Court for the
   Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

   **Re:**    <u>United States v. Martoma</u>**, No. 12 Cr. 973 (PGG) (S.D.N.Y.)**

Dear Judge Gardephe:

      We write on behalf of Mathew Martoma in response to the Government's letter sent at 7:11 p.m. yesterday evening (the "1/20/2014 Letter"). The Government effectively requests that this Court *reconsider* its January 5, 2014, Order (the "January 5 Order") denying the Government's motion to introduce evidence that Mr. Martoma obtained from Dr. Gilman and Dr. Ross confidential information pertaining to drugs other than bapineuzumab ("bapi"). Specifically, the Government seeks to introduce three e-mails (the "Placebo E-mails") in which Mr. Martoma allegedly received or sent "unpublished placebo data": (1) an e-mail dated February 10, 2007, from a friend of Dr. Ross (Bruno Imbimbo) that supposedly contained "confidential data on a 18-month, placebo-controlled study . . . done in the mid to late 1990s" (GX 348); (2) an e-mail dated April 9, 2008, from Dr. Gilman that allegedly contained "18-month placebo data" from a "not as yet published" study (GX 221); and (3) an e-mail dated April 26, 2008, to Rebecca Betensky that enclosed allegedly unpublished data on a placebo group decline at 18 months (GX 852). (1/20/2014 Letter at 2-3.) The Placebo E-mails, all of which contain confidential information pertaining to drugs other than bapi, fall within the January 5 Order. There is absolutely no basis for the Government's eleventh-hour motion for reconsideration – *more than two weeks* after this Court's order, after the examination of Dr. Ross, and in the middle of the examination of Dr. Gilman.

      *First*, this Court has previously considered the admissibility of just such e-mails. As this Court explained, "the Government . . . moved in limine (Dkt. No. 100) to introduce evidence that

Hon. Paul G. Gardephe
January 21, 2014
Page 2

Dr. Gilman and Dr. Ross also provided Martoma with confidential information regarding the clinical trials of other drugs," which included "placebo data from an unpublished study related to Alzheimer's disease, the results of which had been presented at a medical conference by the time the data was disclosed to Martoma." (January 5 Order at 2.)  This Court continued: "The Government assert[ed] that this evidence . . . is admissible as direct proof of the crimes charged, because the conduct at issue is inextricably intertwined with the alleged conspiracy, and is relevant to the background of the conspiracy and the nature of the relationship between the Defendant and the doctors, Martoma's alleged co-conspirators." (*Id.* at 3.)  This Court rejected the Government's argument:

> Evidence that Dr. Gilman and Dr. Ross provided Martoma with confidential information regarding the clinical trials of drugs other than bapineuzumab is not inextricably intertwined with the conduct charged in the Indictment.  It is not necessary for the jury to know that the doctors provided the Defendant with confidential information about other drugs in order for the jury to understand the Government's theory that the Defendant obtained material, non-public information from the doctors about bapineuzumab, which the Defendant then traded on.

(*Id.* at 5-6.)  The Government now seeks to repackage its argument that such evidence is inextricably intertwined with the charged conduct by arguing that "[t]he fact that Martoma obtained unpublished placebo data . . . is directly relevant to Martoma's ability to comprehend the weakness of the data Dr. Gilman presented." (1/20/2014 Letter at 5.)  The Government has had the slides at issue for *years* and has been preparing Dr. Gilman to testify for *18 months*.  The Government could have made such an argument when it filed its motion *in limine* in December just as well as it makes the argument now.  The Government is not entitled to a second bite at the apple in the middle of Dr. Gilman's testimony in an attempt to escape this Court's prior holding.

*Second*, Mr. Martoma did not open the door to the Placebo E-mails in his opening statement.  The Government argues that it should be permitted to offer the Placebo E-mails because Mr. Martoma stated in his opening: "Anyone getting a tip from Dr. Gilman would think I have to buy this stock, not that I would sell." (1/20/2014 Letter at 2.)  There is nothing in that statement or anywhere in Mr. Martoma's opening that makes any reference to placebo data, and the Government cites to nothing. (*See id.* at 2 n.2, 3 n.3.)  Moreover, while the Government now claims that it should be permitted to introduce the Placebo E-mails "[p]articularly in light of this defense," the Government has been on notice of this defense for *more than five years*.  On *July 29, 2008*, Dr. Gilman publicly described the data in a Reuters article as "dynamite."[1]  In

---

[1] Julie Steenhuysen, *UPDATE 1 - Elan and Wyeth Alzheimer drug results mixed, shares fall*, REUTERS (July 29, 2008), *available at* http://www.reuters.com/article/2008/07/30/businesspro-alzheimers-drug-dc-idUSN293803492008073 ("When they looked at people do [sic] do not carry the gene and who completed the

Hon. Paul G. Gardephe
January 21, 2014
Page 3

interviews with the Government in *August and September 2012*, Dr. Gilman said that (1) he was "excited about the results" because he "believed that the post hoc analysis showed significant beneficial effects for non-APOE4 carriers"[2] and (2) he "thought this new information was exciting and proved that the therapy was worth pursuing."[3]  There is no reason for this Court to reconsider its January 5 Order "in light of the evidence presented and defenses raised at trial." (1/20/2014 Letter at 1 n.1.)  The Government has long known about such evidence and defenses.

*Third*, the Placebo E-mails are *not* "highly probative of [Mr. Martoma's] ability to recognize – better than an investor without this information – that the drug trial results shared by Dr. Gilman were negative." (1/20/2014 Letter at 1.)  The premise underlying the Government's request to offer the Placebo E-mails is factually incorrect for at least the following three reasons:

1. As the Government admits, the PowerPoint presentation that Dr. Gilman allegedly discussed with Mr. Martoma *included* placebo data. (*Id.* at 2.)  Therefore, Mr. Martoma did not need different placebo data from a different study to understand the results for the placebo and treated groups.  To the extent that "the drug trial's sole positive post-hoc finding of a statistically significant result among non-carriers was not due [to] the positive performance of the treated group but due to a [sic] unusual decline observed in the corresponding placebo group which cast doubt on the validity of the finding," as the Government now claims (*id.* at 1 (emphasis omitted)), "the unpublished placebo data" did not make that clear – the Phase II bapi results as reflected in the PowerPoint itself did.

2. The Government ascribes significance to the placebo group for non-carriers declining by 14 points on the ADAS-Cog scale and the placebo group for carriers declining by only 7 points. (*Id.* at 2.)  According to the Government, "[a]nyone trying to determine whether the statistically significant finding in the non-carriers was compelling would have wanted to know whether the decline of 14 points in the associated placebo group was normal." (*Id.*)  To make that determination, however, one would need placebo data *specifically* for non-carriers (as opposed to carriers).  The Government does not even suggest, much less show, that the placebo data in the Placebo E-mails concerned non-carriers.

---

study, 'we have absolutely dynamite data,' said Dr. Sid Gilman of the University of Michigan, who helped work on the study.  'There is a very strong signal among non-carriers, suggesting a beneficial effect,' Gilman told the meeting.").

[2] August 17, 2012 Form 302, p. 3 (3501-16) (After being unblinded to all the bapi Phase II data, Dr. Gilman was "excited about the results" because he "believed that the post hoc analysis showed significant beneficial effects for non-APOE4 carriers.").

[3] September 14, 2012 Form 302, p. 11 (3501-19) ("GILMAN thought this new information was exciting and proved that the therapy was worth pursuing.  Of all the treatments underway, GILMAN believed that bapineuzumab was the most promising.").

Hon. Paul G. Gardephe
January 21, 2014
Page 4

> 3. Perhaps most significantly, the Government claims that, as a result of the Placebo E-mails, Mr. Martoma "would have known better than most investors (and, indeed, Dr. Gilman) how abnormal the 14 point placebo decline actually was." (*Id.* at 4.) In the July 29, 2008, conference call with Elan and Wyeth following the ICAD presentation, however, other investors recognized the placebo group decline and specifically asked about it: "Related to that, in the non-carrier group, the placebo group cohort or placebo group showed an 11 point decline in ADAS-cog, which is quite a bit higher than the decline we've seen in other 18 month studies. Can you explain why that might be? And similarly, why that differed so significantly or differed so much from the placebo group decline we saw in the carriers?" (GX 31 at 9.) Dr. Gilman – who, contrary to the Government's claims, knew about the decline – did not think that such a decline was "abnormal": "[A] number of studies including the [cysteine] study done by the Alzheimer's Disease Cooperative Study, showed an average decline of about 6 ADAS-cog, plus or minus 7, deviation of 7. One could easily get down to 13. This is not unusual. It's within the standard of what we're seeing." (GX 31 at 10 (alterations in original).)[4] The Alzheimer's Disease Cooperative Study referenced by Dr. Gilman published the placebo data from Dr. Paul Aisen that is the subject of Placebo E-mail GX 221.

***Fourth***, the Government argues that the e-mails at issue are "essential with respect to Martoma's state-of-mind upon reviewing the contents of the draft PowerPoint presentation shared by Dr. Gilman." (1/20/2014 Letter at 3.) The Government's arguments are makeweights.

> 1. The Government argues that "this evidence shows that Martoma was well-versed [in] the science and . . . readily able to make an evaluation of the data independently from Dr. Gilman." (*Id.*) That is pre-text. There is plenty of other evidence from Dr. Gilman and Dr. Ross (among others) describing Mr. Martoma's science background.
>
> 2. The Government argues that the e-mails at issue "reflect that Martoma was acutely focused on the behavior of a 'normal' placebo group over an 18 month

---

[4] Dr. Ron Black, Wyeth Research – Assistant Vice President Neuroscience, agreed: "I don't really think that for this 18 month study that the deterioration in either of the groups is very much out of line and unexpected. We just saw a presentation from another sponsor that showed an 8 point decline in an 18 month study and that study was restricted to only mild patients and the mild patients on an ADAS-cog will typically decline less than a mild to moderate population. So I don't agree that this is an unusual decline in the placebo population." (GX at 10.) In addition, these placebo group declines are in line with the declines described in the Placebo E-mails. (*See, e.g.*, GX 852.)

    [period]" and, therefore, "it would make sense that Martoma would focus on the 14 point decline in the non-carrier placebo group in assessing how compelling the nominally statistically significant finding in this group actually was." (*Id.*) That is speculation on top of exaggeration. Two e-mails 14 months apart in February 2007 and April 2008, respectively, do not show that Mr. Martoma was "acutely focused" on placebo data. There is no proof presently in evidence that Mr. Martoma received the PowerPoint presentation. And there is no reason to believe that there will be any evidence that Mr. Martoma focused on placebo data in evaluating the statistical significance of the Phase II bapi results – especially when Dr. Gilman thought that the results were "dynamite" and the placebo group decline was "not unusual." *See supra* at 2, 4.

3.   The Government argues that "Martoma would have known that the 14 point decline in the non-carrier placebo group was a severe outlier and possibly a mere fluke" because the e-mails at issue "show that Martoma's information prior to reviewing the results from Dr. Gilman was that a typical placebo group decline on ADAS-Cog over 18 months was about 7 points (or even lower in the earlier study)." (1/20/2014 Letter at 3.) The PowerPoint slides themselves that Dr. Gilman supposedly shared with Mr. Martoma contain the disparity in placebo group declines that the Government now finds so persuasive. Indeed, a side-by-side comparison of the Phase II bapi results themselves – not different placebo data from a different study – makes the difference between carrier and non-carrier placebo groups clear. (*See supra* at 3.) Further, to the extent that a 14-point decline in the non-carrier placebo group was "a severe outlier and possibly a mere fluke" because a 7-point decline was "typical," the Government may elicit that information through Dr. Gilman's testimony. The Placebo E-mails are not necessary.

4.   The Government argues that, "because Martoma had obtained the 18 month placebo data from unpublished studies, he would have had a better understanding of this fact than other investors." (1/20/2014 Letter at 3.) As the July 29, 2008 investor call establishes, however, other investors did in fact have the same understanding about placebo group declines that Mr. Martoma had. (*See supra* at 3.)[5] Further, while GX 221 and GX 348 may show that Mr. Martoma requested

---

[5]  The Government asserts that "Martoma suggested in his Opposition to the Government's *in limine* motion to introduce the 'non-bapi' evidence that the placebo group data had been publicly presented prior to ICAD," but "the Government is unaware of any publication of the placebo data prior to Martoma obtaining access to the ICAD presentation from Dr. Gilman on July 17, 2008." (1/20/2014 Letter at 4 n.5.) The Government's assertion is directly contradicted by the statements of Dr. Gilman on the July 29, 2008, conference call with Elan and Wyeth following the ICAD presentation. (*See supra* at 4.)

Hon. Paul G. Gardephe
January 21, 2014
Page 6

placebo data from Dr. Gilman and Dr. Ross, they show that Mr. Martoma most certainly did not request unpublished placebo data. To the extent that Dr. Gilman and Dr. Ross provided unpublished data, it was their decision and consequently reflects nothing about Mr. Martoma's state of mind.

***Fifth***, despite their protestations to the contrary (1/20/2014 Letter at 5), the Government seems to be seeking to use the Placebo E-mails as a back-door attempt to introduce Rule 404(b) evidence in contravention of this Court's January 5 Order. Tellingly, the Government strongly opposes redaction of the Placebo E-mails "because the fact that the placebo data was unpublished is relevant . . . to the import Martoma attached to obtaining placebo data (that he would look for unpublished information rather than simply relying on data from published studies)." (*Id.* at 4.) The Government's argument merely highlights the improper, prejudicial inferences that may be drawn from this Rule 404(b) evidence in disguise. In addition, the Placebo E-mails do not suggest that Mr. Martoma sought out unpublished information rather than published studies but simply that he was sent supposedly unpublished placebo data by Dr. Ross and Dr. Gilman. Moreover, the Government's arguments concerning the different placebo group declines of carriers and non-carriers have nothing to do with whether the placebo data were published or unpublished, which is relevant only for the jury to draw the improper inference of "wrongdoing" that the Government claims to disavow. (*Id.* at 5.)

\* \* \*

Finally, the Government's gamesmanship should not be tolerated. The Government and Mr. Martoma first met and conferred on the Placebo E-mails on Thursday, January 16, 2014. At that time, Mr. Martoma notified the Government of his position that the Placebo E-mails were inadmissible under this Court's January 5 Order. (1/20/2014 Letter at 1 n.1.) Rather than file its brief over the three-day weekend, the Government waited approximately ***four days*** until 5:52 p.m. on Monday, January 20, 2014, to request another conference. During that conference at 6 p.m., Mr. Martoma reiterated his position that the Placebo E-mails were inadmissible under this Court's January 5 Order. (*Id.*) At 7:11 p.m. – approximately one hour after the conference ended – the Government filed a 4½-page, single-spaced letter brief with this Court. The Government plainly prepared its letter brief well in advance and waited until the last possible moment to file it in order to gain what it perceived to be a tactical advantage. Those tactics – which can only be interpreted as an effort by the Government to put Mr. Martoma at a disadvantage – violate the spirit of this Court's request that the parties brief issues sufficiently in advance to allow the Court to consider them fully before making a decision.

Unfortunately, this conduct has repeated itself throughout the trial. Since the Government delayed identifying witnesses and exhibits for Mr. Martoma early in the trial, this Court instituted a 24-hour rule: "We've had some issues with this. So there is going to be a 24 –

Hon. Paul G. Gardephe
January 21, 2014
Page 7

24 hours before the witness will be identified the exhibits are going to be identified for the witness that are going to be used.  24 hours before that will be the rule." (1/10/2014 Tr. at 224:15-19.)  The Government has consistently violated this Court's instruction, but perhaps the most egregious example has been with respect to the examination of Dr. Gilman.  The Government began its direct examination of Dr. Gilman on Friday.  Therefore, Mr. Martoma should have received all of the exhibits to be used in his direct by Thursday at 9 a.m.  The Government identified 66 exhibits by that time.  In response to a request from Mr. Martoma, the Government identified an additional 16 exhibits Thursday night, less than 24 hours before Dr. Gilman's examination was to begin.  The Government then identified another 17 exhibits yesterday afternoon – in the middle of Dr. Gilman's examination – 7 of which had not been previously marked.  These documents were produced *months* ago.  The Government has been preparing Dr. Gilman to testify for *1½ years*.  There is no justification for providing Mr. Martoma with late notice of *33* of the Government's exhibits (*i.e.*, 16 on Thursday night and 17 on Monday afternoon).  The Government has placed its own tactical considerations above this Court's rule and, in so doing, has unfairly prejudiced Mr. Martoma's ability to prepare for his cross-examination of Dr. Gilman.  Accordingly, Mr. Martoma respectfully requests that the Government be precluded from using any exhibits with Dr. Gilman that were not timely identified.

Respectfully submitted,


/s/ Richard M. Strassberg

Richard M. Strassberg

cc:   Arlo Devlin-Brown (by e-mail)
      Eugene Ingoglia (by e-mail)
      Roberto Braceras (by e-mail)