GOODWIN | PROCTER

Richard M. Strassberg
212.813.8859
rstrassberg@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
The New York Times Building
620 Eighth Avenue
New York, NY 10018
T: 212.813.8800
F: 212.355.3333

January 23, 2014

**BY ECF AND HAND DELIVERY**

Honorable Paul G. Gardephe
United States District Court for the
   Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 1007

Re:   <u>United States v. Martoma</u>, No. 12 Cr. 973 (PGG) (S.D.N.Y.)

Dear Judge Gardephe:

     We write on behalf of Mathew Martoma in response to the Government's letter motion to preclude expert testimony that Mr. Martoma will offer from Professor Paul Gompers and Dr. Thomas Wisniewski ("Gov't Letter Mot."). (Dkt. No. 216.) Specifically, the Government requests that this Court (1) preclude certain portions or all of Professor Gompers's testimony or, alternatively, compel additional disclosures and (2) preclude certain portions of Dr. Wisniewski's testimony. Mr. Martoma, however, has satisfied the requirements of Federal Rule of Criminal Procedure 16 and Federal Rule of Evidence 702 with respect to both Professor Gompers and Dr. Wisniewski. The Government's motion attempts to prevent Mr. Martoma from putting on a defense in his own case. It should be denied, and Mr. Martoma should be allowed to introduce the testimony of both experts.

**I.   Professor Gompers Should Be Allowed to Offer His Expert Opinions.**

    **A.   Professor Gompers Is Plainly Qualified as an Expert.**

     Professor Gompers is the Eugene Holman Professor of Business Administration and Faculty Chair of the M.B.A. Elective Curriculum at the Harvard Business School. He teaches Ph.D., M.B.A., and Executive Education courses and conducts research in corporate finance, the behavior of institutional investors, the structure and governance of public and private companies, the valuation of companies, and entrepreneurial finance and management (including the venture capital industry, young start-ups, and high growth-potential firms). His teaching and research focus on (among other things) the valuation of pharmaceutical and biotech companies such as Elan and Wyeth and the practices of

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 2

institutional investors, including hedge funds.  In addition to his teaching responsibilities, Professor Gompers is a Research Associate at the National Bureau of Economic Research, the largest (and arguably most prestigious) economic "think tank" in the United States.

     Professor Gompers also has written numerous case studies and technical notes and published numerous articles in peer-reviewed finance and economics journals on valuation, venture capital and private equity industries, and entrepreneurial finance.  Professor Gompers is the coauthor of three books: The Venture Capital Cycle (editions 1 and 2) published by MIT Press, The Money of Invention published by Harvard Business School Press, and Entrepreneurial Finance: A Casebook published by John Wiley & Sons, Inc.  Many of these case studies, notes, research articles, and books have directly examined the valuation of pharmaceutical and biotech companies such as Elan and Wyeth and the practices of institutional investors such as hedge funds, including:

- Institutional Investors and Equity Prices, *Quarterly Journal of Economics*, 114, 229-60 (2001) (with Andrew Metrick)

- Who Underreacts to Cash Flow News?, *Journal of Financial Economics*, 66, 409-62 (2002) (with Randy Cohen and Tuomo Vuolteenaho)

- Large Blocks of Stock:  Prevalence, Size, and Measurement, *Journal of Corporate Finance*, 12 594-618 (June 2006) (with Rudiger Fahlenbrach, Jennifer Dlugosz, and Andrew Metrick)

- Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure Capital-backed Companies, *Journal of Finance*, 52, 1791-1821 (Dec. 1997) (with Alon Brav).

In addition, Professor Gompers is an Associate Editor for *Small Business Economics*, *Journal of Private Equity*, *Journal of Finance*, *Journal of Financial Economics*, *Journal of Economic Literature*, and *Journal of Economics and Management Strategy*.

     Professor Gompers has consulted for many private equity and venture capital firms, including firms such as Bessemer Venture Partners and E.M. Warburg, Pincus, both of which invest substantially in pharmaceutical and biotech companies.  Professor Gompers serves on the boards of many private equity and venture capital firms, including firms such as Evergreen Partners, Khosla Ventures, Knightsbridge Investment Advisers, and Spur Capital Partners that invest (directly or indirectly) in pharmaceutical and biotech companies.

     Professor Gompers has served as an expert in many legal matters, testifying at trial at least 12 times and in deposition approximately 25 times – including 7 pharmaceutical and biotech cases. Specifically, he has served as an expert on (*inter alia*) the valuation of public and private companies,

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 3


factors affecting public company securities prices, the efficiency of securities markets, and the custom and practice of institutional investors. He has testified about the valuation of pharmaceutical and biotech companies and the practices of institutional investors such as hedge funds in 9 cases, including:

- *In re Northfield Laboratories, Inc. Securities Litigation*, United States District Court for the Northern District of Illinois, Case No. 06 C 1493.
- *In Re Pfizer Inc. Securities Litigation*, *Henry A. McKinnell, John L. LaMattina, Karen L. Katen, Joseph M. Feczko, and Gail Cawkwell*, United States District Court for the Southern District of New York, Case No. 04 Civ. 9866.
- *In Re Schering-Plough Corporation Securities Litigation*, United States District Court of New Jersey, Case No. 01-829 (KSH).
- *In Re Bristol-Myers Squibb Securities Litigation*, United States District Court of New Jersey Case No. 00-1990 (SRC).
- *Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al.*, United States District Court for the District of Minnesota, Case No. 08-6324 PAM/AJB.
- *In Re Merck & Co., Inc. Securities Litigation*, United States District Court for the District of New Jersey, Case No. 3:05-CV-01151-SRC-MF and No. 3:05-CV-02367-SRC-MF.
- *Securities and Exchange Commission v. BioPure Corporation et al.*, United States District Court for the District of Massachusetts, Case No. 05-CV-11853.
- *Global GT LP, et al. v. Golden Telecom, Inc., Court of Chancery of the State of Delaware*, Case No. 3698-VCS.
- *IBEW Local 90 Pension Fund v. Deutsche Bank AG et al.*, United States District Court for the Southern District of New York, Case No. 1:11-cv-04209-KBF.

Professor Gompers's *curriculum vitae* is attached as Appendix A.

### B.  Mr. Martoma's Expert Disclosure for Professor Gompers Is Sufficient.

The Government argues that Mr. Martoma does not sufficiently disclose the bases and reasons for Professor Gompers's opinions. (Gov't Letter Mot. at 3-4) The Government is wrong. To the extent that Professor Gompers relies on his education and professional experience, Mr. Martoma has provided his *curriculum vitae*, which details his education, training, and experience. That is an acceptable basis for expert testimony. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999) ("Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the 'assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.'") (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993))); *United States v. Jackson*, 51 F.3d 646, 650-51 (7th Cir. 1995) (finding Rule 16 disclosures to be sufficient where they stated that opinions would be based "on [the experts'] years of training and experience" in the field); *United States v. Rogers*, No. 05-292 (RWR), 2006 WL 5249745, at *3 (D.D.C. July 17, 2006) ("A party sufficiently states an expert's basis for his testimony by noting the expert's education, training and experience and

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 4

attaching a resume."). In addition, Mr. Martoma has identified 169 exhibits (DX 1-122, 124, 138-141, 165, 196-208, 210-226, 236, 244-245, 247, 251-252, 254, 261-262, and 273-274) that serve as bases for Professor Gompers's opinion, as well as SAC trading records and stock price data that are in the Government's possession and/or publicly available. This is more than sufficient disclosure.

The Government seems to suggest that Mr. Martoma should expressly associate particular documents or bases with particular opinions (Gov't Letter Mot. at 3-4), but nothing in Rule 16 requires such disclosure. Rule 16 "requires only a summary of an expert's testimony, bases and reasons, and not every detail." *United States v. Cerna*, No. CR 08-0730 (WHA), 2010 WL 2347406, at *2 n.1 (N.D. Cal. June 8, 2010).[1] Indeed, courts have upheld expert disclosures with far less information on an expert's bases and reasons than Mr. Martoma's disclosure.[2] *E.g.*, *United States v. Lesniewski,* No. 11 CR 1091, 2013 WL 3776235, at *13 (S.D.N.Y. July 12, 2013) (allowing expert testimony where the disclosure stated that the expert "was expected to offer opinions based on his training and experience and his review of certain records in the case" and included the expert's *curriculum vitae*).[3]

Nevertheless, Mr. Martoma hereby provides additional disclosure in response to the Government's request to avoid further debate on the issue. Professor Gompers will offer the following opinions with the following bases:

---

[1] *Accord United States v. Nacchio*, 519 F.3d 1140, 1152 (10th Cir. 2008), *vacated in part on other grounds*, 555 F.3d 1234 (10th Cir. 2009) (noting that the expert disclosure requirements of Federal Rule of Criminal Procedure 16 are lenient compared to the more extensive disclosure required by Federal Rule of Civil Procedure 26 which, unlike Rule 16, requires disclosure of "all summary or supporting exhibits" on which the expert will rely), *vacated in part on other grounds on reh'g en banc*, 555 F.3d 1234 (10th Cir. 2009); *United States v. McCluskey*, No. CR 10-2734 (JCH), 2013 WL 3766686, at *3 (D.N.M. June 20, 2013) ("Detailed, extensive discussion is not required in the Rule 16 summary: Although the summary required by Rule 16 provides the defense with some notice, the requirement of setting forth "the bases and reasons for" the witnesses' opinions does not track the methodological factors set forth by the *Daubert* Court.'" (quoting Margaret A. Berger, *Procedural Paradigms for Applying the* Daubert *Test*, 78 Minn. L. Rev. 1345, 1360 (1994))).

[2] The cases cited by the Government (*see* Gov't Letter Mot. at 4) are not to the contrary. Both *United States* v. *Sturman*, No. 96 Cr. 318, 1998 WL 126066 (S.D.N.Y. Mar. 20, 1998), and *United States* v. *Jasper*, No. 00 Cr. 825, 2003 WL 223212 (S.D.N.Y. Jan. 31, 2003), directed supplementation of disclosures providing far less detail than Mr. Martoma's. In *Jasper*, the defendant had provided **no disclosure of the content of the expert's opinions at all**, 2003 WL 223212, at *2 ("Thus far, [Defense counsel] has not produced a summary of [expert's] prospective testimony, or any other discovery materials that he intends to use at trial."), and in *Sturman* the disclosure merely stated that the bases of the expert's opinions "will include, but not be limited to" examinations, conversations, and other unspecified records. 1998 WL 126066, at *1.

[3] *See also United States v. Duvall*, 272 F.3d 825, 828 n.1 (7th Cir. 2001) (concluding that a Rule 16 disclosure stating that the expert's testimony would be "based on his education, training and experience" and attaching a copy of his resume "conforms to the minimum that we have found adequate"); *Jackson*, 51 F.3d at 650-51 (finding Rule 16 disclosures to be sufficient where they stated that opinions would be based "on [the experts'] years of training and experience" in the field); *Rogers*, 2006 WL 5249745, at *3 ("A party sufficiently states an expert's basis for his testimony by noting the expert's education, training and experience and attaching a resume.").

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 5

- There was no pattern of trading in Elan and Wyeth securities around SMC meetings by SAC or Mr. Martoma from 2006 through 2008. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on the Government's criminal complaint and indictments (which identify the timing of the SMC meetings) and SAC's holdings data for Elan and Wyeth.

- The market for Elan securities was "overheated." More specifically, in the weeks following the June 17, 2008 press release announcing the Phase II bapi trial results, most of the potential value of bapi as a blockbuster drug was already incorporated into the price of Elan securities. As a result, there was little additional upside for Elan securities and considerable downside risk if the market's blockbuster expectations were not met. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on analysts' forecasts for bapi from analyst reports concerning Elan, market and industry data, stock price data for Elan, and other publicly available data from the Federal Reserve, Ibbotson, Alacra, and S&P Capital IQ.

- SAC had a net long position in Wyeth immediately prior to the presentation of the Phase II bapi trial results at ICAD (in connection with a large swap contract), and SAC's short positions in Elan and Wyeth securities in July 2008 are consistent with a strategy of hedging SAC's long position in Wyeth securities. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on SAC's holdings data for Elan and Wyeth and SAC's swap agreements involving Wyeth.

- It was not uncommon for SAC to sell large positions in a short period of time. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on SAC's holdings and trading data.

- The manner in which SAC sold Elan and Wyeth securities between July 21, 2008, and July 29, 2008 – specifically, its use of "dark pools" and algorithms -- was consistent with industry standards. In addition to his education and professional experience and academic research and literature, Professor Gompers bases this opinion on public press and Securities & Exchange Commission ("SEC") speeches and press releases.

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 6

     The Government argues at length that the deposition testimony of Steven Cohen before the SEC is not a proper basis for Professor Gompers's opinions. (Gov't Letter Mot. at 4-6.) As the Second Circuit has made clear, depositions are a proper basis for expert testimony. *Castaldi v. Land Rover N. Am., Inc.*, 363 F. App'x 761, 762 (2d Cir. 2009) ("There is no question that an expert witness of the type employed by Land Rover may rely on deposition testimony in forming an opinion."); *accord Rodriguez v. Athenium House Corp.*, No. 11 CIV. 5534 (LTS) (KNF), 2013 WL 796321, at *1, *3 (S.D.N.Y. Mar. 5, 2013) ("In his expert report, [the expert] relies upon several sources of information, including the ***deposition testimony*** of multiple witnesses, building records, and observations and measurements made during two visits to the scene of the accident, in determining why the bulletin board fell from the wall. . . . The Court therefore declines to find that [the expert] has based his conclusions on insufficient data or unreliable methods." (emphasis added)); *Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 367 (S.D.N.Y. 2003) ("[The expert's] opinion does not rely solely on any assumptions based on the recall notice. He reviewed ***witness depositions***, medical records, and scientific literature in forming his expert opinion in this case. . . . Because the record shows that [the expert's] opinion is based on more than his consideration of timing, [the defendant's] argument that [the expert's] opinion is speculative has no merit." (emphasis added)).[4]

     The Government has focused disproportionately on Mr. Cohen's SEC deposition testimony. As Mr. Martoma already explained to the Government (and as the disclosures above demonstrate), Professor Gompers does not rely on the SEC deposition testimony of Mr. Cohen (or anyone else) in reaching the conclusion that SAC's short sales of Elan and Wyeth securities in July 2008 are consistent with a strategy of hedging SAC's long position in Wyeth securities. Rather, Professor Gompers relies on his analysis of SAC's transaction documents and trading data. Professor Gompers will explain to the jury what an equity swap is, how SAC's equity swaps involving Wyeth worked, why those equity swaps constituted a long position in Wyeth, and why SAC's short positions in Elan and Wyeth are consistent with hedging its long position in Wyeth. These points involve complex financial and economic concepts that require an expert to analyze SAC's swap agreements and trading data and explain to the jury what those records show. Professor Gompers does all of that without relying on Mr. Cohen's testimony. Prior references to Mr. Cohen's testimony regarding Mr. Cohen's intent to hedge the Wyeth swap were intended to show simply that Professor Gompers's conclusion was consistent with Mr. Cohen's stated "hedging" goal. Professor Gompers's conclusion, however, remains the same even without Mr. Cohen's

---

[4] Indeed, the cases cited by the Government do not stand for that proposition. The Government cites language out of context to imply that use of deposition testimony by expert witnesses is never permissible. That is false and contrary to Federal Rule of Evidence 703. (*See* Gov't Letter Mot. at 4.) *See In re Blech Sec. Litig.*, 94 CIV. 7696 (RWS), 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) (holding that an expert cannot testify as a percipient witness, without bringing to bear his scientific expertise, regarding facts learned from reading a deposition transcript); *Pretter v. Metro N. Commuter R.R. Co.,* No. 00 Civ. 4366(JSR), 2002 WL 31163876, at *2 (S.D.N.Y. Sept. 30, 2002) (same); *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *amended on reconsideration in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001), *abrogated by Casey v. Merck & Co., Inc.*, 653 F.3d 95 (2d Cir. 2011) (excluding an expert opinion that was "permeated with inadmissible legal opinions and conclusions directed at telling the jury what result to reach" and, therefore, threatened "to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence").

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 7

testimony. Since Professor Gompers does not need Mr. Cohen's testimony to form his opinions as to the hedge, and given the Government's objection, Mr. Martoma hereby withdraws Mr. Cohen's SEC testimony as a basis for Professor Gompers's opinions and agrees not to elicit any testimony from Professor Gompers regarding Mr. Cohen's deposition.

### C. Professor Gompers Should Not Be Precluded from Offering His Expert Testimony.

The Government seeks to preclude Mr. Martoma from offering expert testimony by objecting to virtually all of Professor Gompers's conclusions. The Government, however, provides no basis for this Court to exclude any of those conclusions.

As an initial matter, the Government misstates the standard for the admissibility of expert testimony under Federal Rule of Evidence 702 and *Daubert*. The Government argues that Professor Gompers's opinions are inadmissible because they require knowledge of SAC and/or involve questions of fact. (Gov't Letter Mot. at 8-10). But expert testimony is admissible if it explains evidence that is otherwise difficult to understand and/or "beyond the ken of the average juror." *United States v. Paige*, 335 F. App'x 98, 100 (2d Cir. 2009); *accord United States v. Lombardozzi*, No. S1 02 CR. 273 (PKL), 2003 WL 1907965, at *2 (S.D.N.Y. Apr. 17, 2003). As the Second Circuit has explained, one purpose of expert testimony is to discuss facts in order to share specialized insight or identify which facts are most significant, based on the expert's knowledge and experience. *See, e.g.*, *Paige*, 335 F. App'x at 100 (admitting as appropriate expert testimony an opinion that "was not limited to abstract propositions but actually analyzed the evidence in light of those propositions"); *United States v. Mulder*, 273 F.3d 91, 101-02 (2d Cir. 2001) (allowing expert testimony that explains the facts outlining a labor organization's history and tactics when that organization's workings "[we]re not well known or commonly understood" by the jury). As the Second Circuit has also made clear, experts may "provid[e] the groundwork in the form of an opinion to enable the jury to make its own informed determination" about the facts in the case. *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).

Professor Gompers's opinions are quintessential subjects of expert testimony. Such testimony is admissible, and Professor Gompers should be allowed to testify about his opinions in this case.

### 1. Professor Gompers Should Be Allowed to Testify That There Was No Pattern of Trading in Elan and Wyeth Securities around SMC Meetings by SAC or Mr. Martoma from 2006 through 2008.

The Government argues that "this is not appropriate expert testimony" because "[t]here is no specialized knowledge required to determine associations between the timing of meetings and trades," as evidenced by the fact that "Mr. Strassberg made this argument, complete with summary chart, during his opening." (Gov't Letter Mot. at 6.) That argument makes no sense. Mr. Strassberg made those statements about the trading in Elan and Wyeth securities around SMC Meetings precisely because Mr. Martoma expected to introduce such evidence through his witnesses, including Professor Gompers.

Hon. Paul G. Gardephe
January 23, 2014
Page 8

Presumably, the Government would object – indeed, it has already objected – if the Defense simply offered evidence without a witness.[5]

      The Government also argues that "[t]he relationship between the dates of SMC meetings and SAC's trades in Elan and Wyeth can be . . . offered through a summary chart, without being parroted through the mouth of an expert." (Gov't Letter Mot. at 7.) "In securities cases, federal courts have admitted expert testimony to assist the trier of fact in understanding trading patterns." *S.E.C. v. U.S. Envtl., Inc.*, No. 94 CV 6608 (PKL) (AJP), 2002 WL 31323832, at *2-3 (S.D.N.Y. Oct. 16, 2002); *accord United States v. Russo*, 74 F.3d 1383, 1388, 1394-95 (2d Cir. 1996) (noting that expert's trial testimony included discussion of "trading patterns, using charts and lists of stock movement"). Professor Gompers's testimony that there was no pattern of trading in Elan and Wyeth securities around SMC meetings by SAC or Mr. Martoma from 2006 through 2008 is exactly the sort of expert testimony that federal courts routinely admit in securities cases. *See, e.g., S.E.C. v. Lorin*, 877 F. Supp. 192, 197 (S.D.N.Y. 1995), *vacated in part on different grounds*, 76 F.3d 458 (2d Cir. 1996) (referring to expert testimony regarding price quotes with respect to relevant trades); *see also Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 178 (S.D.N.Y. 2008) (noting that courts frequently permit "expert testimony to assist the trier of fact in understanding trading patterns"); *U.S. Envtl.*, 2002 WL 31323832, at *4 ("[C]ontrary to the defendants' argument, the conclusions [the expert] arrives at from analyzing the trading records, depositions and other documents are not ones upon which a lay person could readily hypothesize."); Trial Transcript at 4692, 4700-4703, *United States v. Rajaratnam*, 802 F. Supp. 2d 491 (S.D.N.Y. April 14, 2011) (No. 09 Cr. 1184) (permitting an expert to describe and analyze the defendant's trades).

      **2.    Professor Gompers Should Be Allowed to Testify That Most of the Potential Value of Bapi as a Blockbuster Drug Was Already Incorporated into the Price of Elan Securities Following the June 17, 2008 Press Release.**

      The Government argues: "The issue at trial is what Martoma thought of the Elan and Wyeth stocks, and what information that he had, informed that opinion. Whether some un-named third-party might or might not have thought that the Elan and Wyeth stocks were overheated, overvalued, or had little upside, is not relevant." (Gov't Letter Mot. at 7.) Not so.

---

[5] The Government similarly argues that "[t]he relationship between the dates of SMC meetings and SAC's trades in Elan and Wyeth can be argued by defense in closing." (Gov't Letter Mot. at 7.) That presents the same problem. Mr. Martoma intends to make arguments in closing about the trading in Elan and Wyeth securities around SMC Meetings by pointing, as he must, to evidence that has been introduced to support those arguments. Once again, the expert analysis and testimony of Professor Gompers is a large part of that evidence. The Government cannot use anticipated closing arguments about Professor Gompers's testimony as a reason to preclude Mr. Martoma from offering the very testimony that would support them.

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 9

The Government has charged Mr. Martoma with trading based on inside information. In his defense, Mr. Martoma should be able to meet that charge by offering evidence of alternative explanations for sales of Elan and Wyeth and to put SAC's sales into context by proffering evidence concerning the then-current state of the market for the relevant securities. That evidence may be circumstantial, including other reasons that the jury may infer influenced his trading. The Government apparently made a strategic decision not to offer evidence on whether the market for Elan was overheated, and it can always argue that SAC and Mr. Martoma sold Elan and Wyeth securities for another reason (as it already has). But Mr. Martoma is entitled to put on his own case, including evidence of other reasons to sell. Professor Gompers's testimony – which involves an analysis of the price and value of Elan securities, including (among other things) an event study, and explains what it means for a market to be overheated – is indisputably the stuff of expert testimony. Courts routinely allow such expert testimony in securities cases. *See, e.g.*, *Russo*, 74 F.3d at 1395 ("[W]e have noted that '[p]articularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.'" (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *United States v. Schiff*, 602 F.3d 152, 171-72 (3d Cir. 2010) ("[C]ourts often turn to economic experts to determine whether a particular announcement had an appreciable effect on the stock price." (internal quotation marks omitted)); *Nacchio*, 519 F.3d at 1155 ("An economic expert is permitted not only to tell the jury that an economic concept is an issue but to analyze the concept and offer informed opinions. In other words, expert testimony may assist the trier of fact to understand the facts already in the record, even if all it does is put those facts in context. That is why expert economic testimony is routine when a materiality determination requires the jury to decide the effect of information on the market." (citation and internal quotation marks omitted)). This Court should do the same.

Moreover, there can be no real dispute that Professor Gompers's testimony is relevant. Professor Gompers concludes that most of the potential value of bapi as a blockbuster drug was already incorporated into the price of Elan securities following the June 17, 2008, press release announcing the Phase II bapi trial results based on (1) analysts' forecasts for bapi from analyst reports concerning Elan, (2) market and industry data, (3) stock price data for Elan and industry competitors, and (4) other publicly available data from the Federal Reserve, Ibbotson, Alacra, and S&P Capital IQ. Those are the very sorts of materials (and, in many cases, the exact same materials) that were analyzed by Mr. Martoma in making his investment decisions in Elan (and Wyeth) securities, as the evidence in this case shows. Indeed, the documents and testimony demonstrate that Mr. Martoma was in fact considering publicly available materials speaking to the precise issue that is the subject of Professor Gompers's testimony – *i.e.*, the state of the market for Elan securities and the relative upside and downside risk for those securities – in the period leading up to SAC's trades in Elan and Wyeth in July 2008. For example:

- On July 11, 2008, Mr. Martoma received a Brean Murray Carret & Co. analyst report stating: "Despite revenue and expense estimates that we view as generous, we believe the

    existing business lines, even if they can continue the strong growth we project, are far from sufficient to support Elan's market value.  Therefore, given our projected clinical failure for bapineuzumab, *we view Elan's market value as inflated*."  (DX 9 at 12-13 (emphasis added).)

- On July 11, 2008, Mr. Martoma received a Piper Jaffray & Co. analyst report stating: "*We view the recent stock appreciation as unwarranted* based on the available data and high risks associated with any drug in development for Alzheimer's."  (DX 113 at 1 (emphasis added).)

- On July 17, 2008, Mr. Martoma received a Canaccord Adams analyst report stating that "Elan has risen 38.5% over one month on top-line Phase 2 results for bapineuzumab in Alzheimer's disease (AD). . . . While we believe that bapineuzumab will be the first disease modifying AD therapy to reach the market, *the US$10-15 billion in sales the market expects is not an achievable target, in our view*.  We believe that the market dynamics combined with the number of other products currently in development will create a strong competitive environment, limiting bapineuzumab's potential to US$6 billion in global sales."  (DX 12 at 1 (emphasis added).)

- On July 17, 2008, Mr. Martoma received a Caris & Company analyst report stating: "At its current price, *we believe ELN is factoring in 2015 bapineuzumab sales of more than $23B, implying the drug becomes the largest pharmaceutical product ever, by far*.  This is a key risk to owning ELN, especially given the early-stage nature of the results and that the valuation is being supported by a partially disclosed Phase II sub-analysis."  (DX 13 at 1 (emphasis added).)

- On July 22, 2008, Mr. Jandovitz (Mr. Martoma's trader) sent Mr. Martoma an instant message about Elan stating: "mkt horrible, *stock has had huge run*[.]"  (DX 310 (emphasis added); *see also* Trial Transcript at 208:2-4, *United States v. Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y.) ("Tr.")).

- On July 22, 2008, Mr. Jandovitz sent Mr. Martoma an e-mail about Wyeth stating: "Profit taking in front of qtr, blah blah blah.  *Profit taking in front of icad.*"  (DX 369 (emphasis added); *see also* Tr. at 241:9-21.)

- On July 25, 2008, Mr. Martoma sent an instant message to Mr. Jandovitz stating: "*seems like we should be selling down our long biotechs.*"  Mr. Jandovitz replied: "Y, agree." (DX 324 (emphasis added); *see also* Tr. at 242:3-25.)

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 11


Indeed, even the Government admits that, "if the defense wants to offer evidence that Martoma thought the stock was overheated, or discussed such an issue with someone at SAC at the time, such evidence would be relevant because it would go to the defendant's state of mind at the time." (Gov't Letter Mot. at 7 n.3.) Professor Gompers's testimony, which concerns those very issues, is just as relevant.

The Government also argues that whether the drug approval process is challenging "is irrelevant" because (1) "[t]his generalization provides no insight into the drug at issue in this case, much less what Martoma thought about bapineuzumab at the time he made his trades"; (2) Professor Gompers "does not seem, from the face of the defense disclosures, to be qualified to give expert testimony on the subject of drug trials and their success rates"; and (3) SAC's trading records and Mr. Martoma's exhibits do not provide a basis for Professor Gompers's opinion. (Gov't Letter Mot. at 8.) That, too, is wrong.

Professor Gompers will offer expert testimony on the *narrow* point that blockbuster status was necessary to support bapi's valuation and Elan's stock price, but, even given Dr. Gilman's optimism about bapi *and* the approval of Phase III trials for bapi, blockbuster status for any drug at bapi's stage of development was a remote possibility. Professor Gompers also will testify that Elan's stock price following the June 17, 2008, press release supported projected peak sales of bapi of over $7.4 billion per year, which would have made it the second highest selling drug in the United States at the time. Contrary to the Government's claims, the challenging nature of the drug approval process is directly relevant to the valuation of drugs in development and production such as bapi, as well as the valuation and stock price of the pharmaceutical and biotech companies that are developing and manufacturing those drugs such as Elan. In other words, the key to valuing Elan is valuing the drug pipeline of that company (including bapi), and the key to valuing the drug pipeline is valuing the likelihood of success of the drugs in the pipeline (including bapi). Accordingly, a key question for anyone evaluating a position in Elan or Wyeth on the eve of ICAD would be whether the then-current valuation of the securities already accounted for anticipated blockbuster sales.

Professor Gompers has extensive experience with the drug approval process as part of his experience valuing pharmaceutical and biotech companies and consequently is more than qualified to provide expert testimony on the subject of drug trials and their success rates, which have been a subject of his professional experience, academic research, and prior expert testimony.[6] That experience and research – not SAC's trading records or Mr. Martoma's exhibits – provide the basis for Professor Gompers's opinion. Professor Gompers should be permitted to testify about the drug approval process and the hurdles to blockbuster status as they relate to the valuation of bapi and the stock price of Elan.

---

[6] For example, he has written the following case studies: "BioTransplant, Inc.: Initial Public Offering, January 1996." Harvard Business School Case 297-095; "Elliot Lebowitz." Harvard Business School Case 297-04; "Genset Initial Public Offering (A)." Harvard Business School Case 297-06; "Genset Initial Public Offering (B)." Harvard Business School Case 297-097; "Genset: 1989." Harvard Business School Case 298-070. He has also testified in seven cases concerning pharmaceutical and biotech companies. (*See supra* at 3.)

Hon. Paul G. Gardephe
January 23, 2014
Page 12

        3.      **Professor Gompers Should Be Allowed to Testify That SAC Had a Net Long Position in Wyeth Immediately Prior to the ICAD Presentation, and SAC's Short Sales Are Consistent with a Strategy of Hedging That Long Position.**

      The Government argues that "Prof. Gompers should not be permitted to provide expert testimony that goes to the reasons behind the Wyeth trades at issue in the case" because "[t]he facts surrounding the trading at SAC, and the reasons for such trading, are factual issues in the case." (Gov't Letter Mot. at 9.) That is wrong as a matter of fact and law. Professor Gompers will not testify as to why SAC engaged in certain trades. Rather, he will testify as to the net economic effect of the trades at issue which (not coincidentally) is consistent with a hedge. In other words, Professor Gompers will not testify that SAC did in fact short Elan and Wyeth in order to hedge its long Wyeth position, but rather that SAC's trades as a whole had the economic effect of, and were consistent with, a hedge. Since the Government argues that the Elan and Wyeth short sales in isolation are evidence of malfeasance tending to inculpate Mr. Martoma, Mr. Martoma must be permitted simply to point to the whole picture, which tends to counter that argument. Expert testimony that discusses facts in order to share specialized insight or identifies which facts are most significant, based on the expert's knowledge and experience, is admissible. *See, e.g.*, *Paige*, 335 F. App'x at 100 (admitting as appropriate expert testimony an opinion that "was not limited to abstract propositions but actually analyzed the evidence in light of those propositions"); *Mulder*, 273 F.3d 91, 101-02 (2d Cir. 2001) (allowing expert testimony that explains the facts outlining an organization's history and tactics when that organization's workings "[we]re not well known or commonly understood" by the jury). That is precisely the testimony that Professor Gompers will offer.

      Moreover, Professor Gompers's conclusions are based on his analysis of SAC's trading records surrounding ICAD. Those trading records show that SAC had engaged in equity swaps with respect to Wyeth and short sales with respect to both Elan and Wyeth. These are the very sort of complicated financial concepts that require explanation for the jury and are properly the subject of expert testimony. *See, e.g.*, *Russo*, 74 F.3d at 1395 ("[W]e have noted that '[p]articularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts.'" (quoting *Bilzerian*, 926 F.2d at 1294)).[7] That is all the more true given that the Government has raised the issue of SAC's short sales of Elan securities. (Tr. at 60:11-16 ("SAC Capital also shorted Elan and Wyeth stock, which is basically a stock trade that will profit if the price of the stock falls.").)

      Further, since the Government already has argued that the Elan short sales evidence Mr. Martoma's guilt, Mr. Martoma must be allowed to offer evidence of alternative explanations for SAC's trading in his defense, such as the explanation that SAC's short sales are consistent with a

---

[7] *Accord In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *41 (N.D. Ohio June 4, 2010) (permitting expert testimony to decipher "complicated" "documents and articles" and to explain to the jury the logical inferences warranted by such documents).

Hon. Paul G. Gardephe
January 23, 2014
Page 13

strategy of hedging its long position in Wyeth.  (*See supra* at 6-7.)  Indeed, even the Government admits that Professor Gompers may testify about the concept of hedging.  (Gov't Letter Mot. at 9.)  Courts hearing securities cases frequently admit this type of "expert testimony to assist the trier of fact in understanding trading patterns, securities industry regulations, and complicated terms and concepts inherent in the practice of the securities industry."  *Highland*, 551 F. Supp. 2d at 178.[8]

In fact, in recently admitting similar testimony from Professor Gompers, the District of Connecticut held that "testimony will be admitted if it helps the fact finder 'understand the facts already in the record, even if all it does is put those facts in context.'"  *In re Xerox Corp. Sec. Litig.*, No. 3:99 CV 02374 (AWT), 2009 WL 8556135, at *3 (D. Conn. Apr. 22, 2009) (quoting *United States v. Schiff*, 538 F. Supp. 2d 818, 844 n.26 (D.N.J. 2008)).  As that court noted: "Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts."  *Id.* (quoting *United States v. Duncan*, 42 F.3d 97, 1010 (2d Cir. 1994)).  For the same reasons, this Court should allow Professor Gompers to offer his opinions about SAC's trading around the ICAD presentation.

        **4.**      **Professor Gompers Should Be Allowed to Testify That SAC Commonly Sold Large Positions in a Short Period of Time.**

The Government has "question[ed] the relevance of certain other trades at SAC not involving Martoma, and argu[ed] that the defense should not be able to characterize SAC's business model without an opportunity for the Government to offer other evidence concerning inappropriate trading that happened at SAC."  (Gov't Letter Mot. at 8.)  The Government is wrong on both points.

As an initial matter, "the Government does not dispute that a summary witness could potentially synthesize SAC trading data to show SAC's positions in securities at particular times."  (Gov't Letter Mot. at 9.)  That is essentially all that Professor Gompers would do on this point.  As a result, there may be no dispute between the parties.

To the extent that the Government continues to object to such testimony on relevance grounds, the Government has no basis.  The Government has focused in its press release announcing the charges, its Superseding Indictment, and its opening statement on the fact that SAC completely reversed a large position in Elan and Wyeth securities in a very short period of time, suggesting that this quick reversal of position is so unusual that it is itself probative of Mr. Martoma's guilt.  (Tr. at 60:3-10 ("In the seven trading days before the results would be announced to the world, Mathew Martoma sold all of the $100

---

[8] *See also United States v. Valle*, No. 12 CR. 847 (PGG), 2013 WL 440687, at *7 (S.D.N.Y. Feb. 2, 2013) (Gardephe, J.) (admitting expert testimony and noting that, "although some jurors may have familiarity with Internet messaging, it is unlikely that the average juror is familiar with the role-playing activity that [the expert] was prepared to explain in the specific context of sexually oriented conversations in cyberspace" (quoting *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008)).

**GOODWIN | PROCTER**

Hon. Paul G. Gardephe
January 23, 2014
Page 14

million of Elan and Wyeth that was in his portfolio. And Mr. Cohen sold all of the Elan and Wyeth stock that Mathew Martoma had been recommending that he buy.").)[9] Professor Gompers's testimony that SAC commonly sold large positions in a short period of time is therefore directly relevant to the Government's allegation that, based on inside information, SAC sold its approximately $700 million position in Elan and Wyeth securities over the span of seven trading days. (Superseding Indictment ¶ 14.) Based on the speed with which SAC adjusted its position in Elan and Wyeth securities, the Government would have the jury infer that SAC was trading on inside information. Professor Gompers's testimony will demonstrate that Elan and Wyeth were not the only examples of such reversals by SAC but rather that there were a number of other examples in 2008 for which there have been no allegations of insider trading. This is not some form of "cherry-picking" by Professor Gompers. The Government has held up Elan and Wyeth to the jury as a sufficiently unique instance of SAC reversing a large position in a very short period of time as to constitute evidence of insider trading. Professor Gompers will simply present other examples where SAC did so, thereby meeting the Government's argument head on and disproving the inference that the Government would have the jury draw. That is the very definition of relevant evidence. *See, e.g.*, *S.E.C. v. Moran*, 922 F. Supp. 867, 892-93 (S.D.N.Y. 1996) (finding that the defendant's history of purchasing large quantities of other stocks weighed against a finding of insider trading because "the amount of purchases were not aberrational to [the defendant's] style of investing in securities"); *Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (finding admissible "probative rebuttal evidence countering the [opposing party's] evidence").

In this respect, Professor Gompers's testimony does not open the door to "other evidence concerning inappropriate trading that happened at SAC." (Gov't Letter Mot. at 8.) Professor Gompers will not offer testimony that any trade at SAC was or was not appropriate; he will testify only to the very narrow point that, contrary to the Government's implication, there are several other instances where SAC reversed large positions in a very short period of time. There is also no factual connection between Professor Gompers's testimony and insider trading at SAC because it is undisputed that the examples that Professor Gompers will discuss have not been the subject of insider trading charges. And it would be plainly unfair for the Government to be permitted to argue Mr. Martoma's guilt from an inarguably false premise (that the Elan and Wyeth trades were uniquely large and rapid), but Mr. Martoma not to be permitted simply to counter that premise by pointing to relevant counter-examples. "Indeed, the Government agrees with the defendant that the guilty pleas of others at SAC Capital (or the entity itself) have no relevance under the law as to the guilt or innocence of the defendant. And the Government

---

[9] *See also United States v. Mathew Martoma – Prepared Remarks for U.S. Attorney Preet Bharara* (Nov. 20, 2012), available at http://www.justice.gov/usao/nys/pressconference/martoma/remarks.pdf , at 1("[I]n a matter of just days, [Mr. Martoma] caused the hedge fund not only to dump its shares but also to short the two drug stocks in advance of the negative drug trial becoming public."); Superseding Indictment (ECF No. 61) ¶ 14.

Hon. Paul G. Gardephe
January 23, 2014
Page 15

commits that it will not seek to offer evidence of the SAC Guilty Pleas as evidence that Martoma too committed insider trading."[10]  Yet that is exactly what the Government now proposes to do.

> 5. **Professor Gompers Should Be Allowed to Testify That SAC's Use of "Dark Pools" and Algorithms to Sell Elan and Wyeth Securities Was Consistent with Industry Standards.**

The Government concedes that Professor Gompers may testify "about the meaning of things such as hedging, dark pools and algorithmic trading" but objects to his opinion that the "use of dark pools and algorithmic trading" was "routine in the industry in 2008" because "it is not clear from the disclosed materials what methodology he has used to come to that conclusion or what the bases are for that opinion." (Gov't Mot. at 9 (internal quotation marks omitted).)  The Government's argument is a makeweight.

Dark pools and algorithmic trading are precisely the type of complicated financial concepts that require explanation for the jury and are properly the subject of expert testimony. (*See supra* at 12-13.) The Government agrees that Professor Gompers may testify about the concepts. (Gov't Mot. at 9.) There should be no doubt that Professor Gompers may also testify that the manner in which SAC sold Elan and Wyeth securities between July 21, 2008, and July 29, 2008 – including specifically its use of dark pools and algorithms -- was consistent with industry standards.  Industry standards are an extraordinarily commonplace subject of expert testimony.  That is because, "without industry context, the jury may have no understanding of the importance, or lack of importance" of particular documents or actions in the case. *Highland*, 551 F. Supp. 2d at 180, 185 ("[Securities] [i]ndustry custom and practice is relevant to the issues remaining in this case.  Therefore, this testimony is admissible and helpful to the jury.").[11]

With respect to the securities business, the Second Circuit has conclusively resolved this issue in Mr. Martoma's favor:  "Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs:  to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry." *Marx & Co. v. Diners' Club, Inc.*, 550 F. 2d 505, 508 (2d Cir. 1977) (citing 7 *Wigmore on Evidence* § 1949, at 66 (3d ed. 1940)).  In fact, courts in this District have allowed expert testimony specifically on a hedge fund's characteristics, including its "investment strategy, objectives, risk factors, etc." *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 461-62 (S.D.N.Y. 2010).  Expert testimony is of particular

---

[10] Government's Memorandum in Opposition to the Defendant's Fourth Motion *in Limine* to Exclude Evidence of Other SAC Actions, Settlements and Plea Agreements (ECF No. 141) at 1.

[11] *Accord In re Blech Sec. Litig.*, No. 94 Civ. 7696 (RWS), 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003) ("[An expert] can testify as to what ordinary broker activity entails and as to the customs and practices of the industry.").

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 16

importance in this instance, where the Government has implied that these practices are somehow nefarious, yet now resists the introduction of expert testimony explaining that they are commonplace and have well-known legitimate purposes.

Moreover, this letter brief addresses the Government's stated concern that the bases for Professor Gompers's opinion are unclear. Those bases are Professor Gompers's education and professional experience, academic research and literature, public press, and SEC speeches and press releases. Those materials are plainly sufficient support for Professor Gompers's opinion. *See, e.g.*, *S.E.C. v. Badian*, 822 F. Supp. 2d 352, 363 (S.D.N.Y. 2011) *amended on reconsideration in part,* No. 06 CIV. 2621 LTS, 2012 WL 2354458 (S.D.N.Y. June 20, 2012) (holding that business school professors who taught classes, conducted research, and wrote papers regarding financial markets had the requisite "knowledge, skill and experience in finance" to "make them more than qualified to opine on the securities and issues involved"); *Blech*, 2003 WL 1610775, at *19-*20, *25, *27 (holding that an expert was qualified to give economic testimony on the securities trades at issue based on his "extensive background as a financial economist and 22 years of experience as a consultant and expert witness" and that another expert was also qualified to testify on securities trading based on his experience as a "professor at the University of Chicago, who has written and lectured on economic issues").

### II.     Mr. Martoma Should Be Allowed to Offer the Expert Testimony of Dr. Wisniewski.

Seemingly as an afterthought, the Government argues that Dr. Wisniewski should not be able to offer certain of his opinions. The Government does not dispute that Mr. Martoma has satisfied the requirements of Rule 16 with respect to Dr. Wisniewski's testimony. The Government also does not take issue with Dr. Wisniewski's qualifications or methodology. Instead, the Government objects to aspects of Dr. Wisniewski's testimony on relevance grounds. Specifically, the Government argues that Dr. Wisniewski's expert opinions on the following three subjects are irrelevant: (1) the meaningfulness of the information and differences between the Phase II bapi results disclosed in the June 17, 2008, press release and in the draft (and final) ICAD presentations; (2) the role of the SMC in the drug testing approval process and clinical trials, including the drug testing approval process for bapi and the Phase I, Phase II, and Phase III clinical trials; and (3) the responsibility of doctors participating in clinical trials to maintain the confidentiality of clinical trial results. (Gov't Letter Mot. at 9-10.)

Once again, the Government misunderstands the standard for the admissibility of expert testimony under Rule 702 and *Daubert*. The Government argues that Dr. Wisniewski's opinions are inadmissible because they involve questions of fact and go to an ultimate issue in the case. (Gov't Letter Mot. at 9.) Experts may offer opinions that concern the facts of the case. (*See supra* at 7.) They may also offer opinions that go to an ultimate issue. Indeed, the text of Federal Rule of Evidence 704, the advisory committee's note to that Rule, and courts in this District all agree that such testimony is permissible. *See* Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue."); Fed. R. Evid. 704 advisory committee's note ("[T]he so-called 'ultimate issue' rule is

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 17

specifically abolished by the instant rule."); *Lombardozzi*, 2003 WL 1907965, at *2 ("[E]xpert testimony is not excludable merely because it encompasses an ultimate issue of fact to be decided by the jury.").[12] An expert may properly give testimony that is relevant to, and encompasses ultimate issues in, the case; he simply cannot explain to the jury the legal standard applicable to the ultimate issues or offer flat legal conclusions by stating the legal significance of a certain fact. *Russo*, 74 F.3d at 1395 (admitting testimony that "focused solely on factual conclusions and did not involve any legal characterizations" where the expert "gave no opinion as to whether the appellants had violated the securities laws and did not make any statements about their intent; he simply described certain stock transactions and his opinion of their effect on the market").[13] Dr. Wisniewski's testimony is admissible, and he should be allowed to testify about his opinions in this case.

> **A.  Dr. Wisniewski Should Be Allowed to Testify about the Meaningfulness of the Information in, and Differences between, the Disclosures of the Phase II Bapi Trial Results.**

The Government argues that "Dr. Wisniewski's opinion on whether information was 'meaningful' is irrelevant – the real question is whether the information was meaningful to investors" and "Dr. Wisniewski is not qualified to testify on this subject." (Gov't Letter Mot. at 10.) Not so. Dr. Wisniewski's testimony is clearly relevant to whether Mr. Martoma obtained and traded on material, non-public information concerning the Phase II bapi trial results – the Government's central allegation in this case.

The Government has charged Mr. Martoma with obtaining material, non-public information when he received SMC data and the draft ICAD presentation from Dr. Gilman. Therefore, whether the SMC data and the draft ICAD presentation contained material, non-public information is directly relevant to the charges against Mr. Martoma. That question can only be answered by determining whether the information in the SMC data and the draft ICAD presentation altered the total mix of information available. *See U.S. v. Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) (citing *U. S. v. Cusimano*, 123 F.3d 83, 88 (2d Cir. 1997)). The SMC data and the draft ICAD presentation are rife with specialized medical terminology and statistical information. "[E]xpert analysis is necessary to help the jury understand the evidence" when the "documents [the expert] would review at trial are complicated, and the inferences that may be drawn from them are not simple." *In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d 164, 194 (S.D.N.Y. 2009) (allowing an expert "to interpret [published clinical trial] data

---

[12] Experts may not offer opinions that go to an ultimate issue if that testimony relates to a mental state or condition that constitutes an element of the crime charged or of a defense, which is plainly not the case here. Fed. R. Evid. 704(b).

[13] *Accord Duncan*, 42 F.3d at 102-03 (holding that expert could properly answer questions about whether a tax return was "false" or whether he believed there had been "money laundering," because "although the answer sought is a factual conclusion, it does not simply tell the jury what decision to make"); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763 (RMB) (JCF), 2006 WL 2136249, at *16 (S.D.N.Y. Aug. 1, 2006) (experts may properly "discuss[ ] the conduct that is the basis for such a legal conclusion" and "point to factors" tending to show that conclusion).

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 18


as it relates to the efficacy and safety of Fosamax treatment"); *In re Pfizer Inc. Sec. Litig.*, 04 Civ. 9866 (LTS) (JLC), 2010 WL 1047618, at *3 (S.D.N.Y. Mar. 22, 2010) (holding that each plaintiff expert's "opinion regarding the interpretation of clinical trials and/or analysis and interpretation of data" was proper); *accord In re Yasmin & YAZ (Drospirenone) Mktg., Sales Practices & Products Liab. Litig.*, No. 09-MD-02100 (DRH), 2011 WL 6302573, at *5-*8 (S.D. Ill. Dec. 16, 2011) (allowing an expert to testify about the "degree of efficacy, if any, demonstrated by the clinical studies"). The SMC data and the draft ICAD presentation are just the sort of complicated documents about which expert testimony is particularly helpful.

      Moreover, the Government has opened the door to Dr. Wisniewski's expert testimony through the testimony that it has elicited from Dr. Ross and Dr. Gilman. The Government has made the placebo group decline and dose response reflected in the Phase II bapi trial results a focus of its case. Tr. at 704:6-706:23, 1420:1-1424:122, 1426:25-1427:9, 1439:5-11. In fact, the Government has specifically asked Dr. Ross and Dr. Gilman – whom the Government has described as "hav[ing] expertise in Alzheimer's Disease and bapineuzumab" that "informed their actions and views at the time of events"[14] – about placebo group declines and dose response in connection with (1) the June 17, 2008, press release, (2) the draft (and final) ICAD presentation, and (3) the differences between the two documents. Tr. at 704:6-706:23, 1420:1-1424:122, 1426:25-1427:9, 1439:5-11. Dr. Wisniewski should be allowed to offer his expert opinions about those same documents – including on the topics of placebo group declines and dose response – to rebut Dr. Ross's and Dr. Gilman's testimony. *See United States v. Wilson*, No. 04 Cr. 1016 (NGG), 2013 WL 1338710, at *3 (E.D.N.Y. April 1, 2013) (warning that the Government would be permitted to introduce an expert to rebut evidence that the defendant submitsthrough lay witnesses or documentary evidence, so that the jury will not be "left with a lopsided view of the facts").

      **B.**    **Dr. Wisniewski Should Be Allowed to Testify about the Role of the SMC in the Drug Testing Approval Process and Clinical Trials, Including the Drug Testing Approval Process and Clinical Trials for Bapi.**

      The Government argues that "[s]uch testimony is merely factual evidence coming from a witness with no firsthand knowledge" and that "Dr. Wisniewksi should not be permitted to testify on such factual matters that do not call for an expert's opinion." (Gov't Letter Mot. at 9.) Again, experts may offer opinions that concern the facts of the case. (*See supra* at 7.) Moreover, the role of an SMC, the drug testing approval process, and clinical trials are all clearly proper subjects of expert testimony, as courts have held time and again. *See Fosamax*, 645 F. Supp. 2d at 191 (admitting an expert's testimony about "general FDA regulatory requirements and procedures" because "[a] lay jury cannot be expected to understand the complex regulatory framework . . . in the pharmaceutical industry" and, therefore, the expert's assessment and understanding "will be helpful to the jury"); *Lyman v. Pfizer, Inc.*, No. 09 Civ.

---

[14] (E-mail dated December 18, 2013, from AUSA Arlo Devlin-Brown to Richard Strassberg.)

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 19

262, 2012 WL 2971550, at *6-*7 (D. Vt. July 20, 2012) (permitting an expert to testify about evidence relating to drug approval process because her knowledge would be helpful to the jury).[15]

### C. Dr. Wisniewski Should Be Allowed to Testify about the Responsibility of Doctors Participating in Clinical Trials to Maintain the Confidentiality of Clinical Trial Results.

The Government argues that "the responsibilities of doctors writ large are not relevant to this trial" and that "[t]he only relevant duties of confidentiality are those owed by Dr. Ross and Dr. Gilman to Elan and Wyeth," which "are questions of fact going to an ultimate issue that are properly evaluated through witness testimony and related documentary evidence." (Gov't Letter Mot. at 9.) Once again, experts may offer opinions that relate to the facts or a supposed ultimate issue in the case. (*See supra* at 7, 16-17.) The responsibilities of doctors in clinical trials – including the responsibilities of Dr. Ross and Dr. Gilman in the Phase II bapi trial – are exactly the sort of industry custom and practice about which courts routinely allow experts to testify. (*See supra* at 15-16.) Accordingly, this Court should allow Dr. Wisniewski to testify on this subject.

\*   \*   \*

For the foregoing reasons, Mr. Martoma respectfully requests that this Court deny the Government's motion for additional expert disclosure and to preclude certain expert testimony and allow Mr. Martoma to introduce the expert testimony of both Professor Gompers and Dr. Wisniewski.

Respectfully submitted,

/s/ Richard M. Strassberg


Richard M. Strassberg

---

[15] *Accord Hanrahan v. Wyeth, Inc.*, No. 04 Civ. 01255 (ERW), 2012 WL 2395881, at *8-*9 (E.D. Mo. June 25, 2012) (holding that experts' testimony to "explain complex, technical subjects to the jury, including the process of drug development [and] the procedures involved in FDA approval" would be reliable and helpful to the jury); *Lemons v. Novartis Pharm. Corp.*, 849 F. Supp. 2d 608, 614 (W.D.N.C. 2012) (finding that an expert with "significant experience with the FDA and its regulatory requirements and procedures" was permitted to testify about the "new drug approval" process, among other things, as this "testimony will be helpful to the jury").

GOODWIN | PROCTER

Hon. Paul G. Gardephe
January 23, 2014
Page 20

cc: Arlo Devlin-Brown (by e-mail)
      Eugene Ingoglia (by e-mail)
      Roberto Braceras (by e-mail)