UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

    -against-

MATHEW MARTOMA,

                Defendant.

---

No. 12-cr-00973 (PGG)
ECF Case

**ORAL ARGUMENT REQUESTED**

---

**DEFENDANT MATHEW MARTOMA'S MEMORANDUM OF LAW IN SUPPORT OF
HIS RENEWED MOTION FOR A JUDGMENT OF ACQUITTAL OR,
ALTERNATIVELY, FOR A NEW TRIAL**

GOODWIN PROCTER LLP

Richard M. Strassberg (RS5141)
John O. Farley (JF4402)
Daniel Roeser (DR2380)

The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

Roberto M. Braceras (RB2470)
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Defendant Mathew Martoma*

February 27, 2014

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ............................................................................................................... 3

ARGUMENT .................................................................................................................... 4

I.    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL
ON ALL COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL
PROCEDURE 29 ................................................................................................... 4

    A.    This Court Should Enter A Judgment Of Acquittal On The Substantive
Counts Of Insider Trading. ............................................................................ 5

        1.    The Government Has Failed To Prove Beyond A Reasonable Doubt
That Mr. Martoma Obtained Material, Non-Public Information. ............... 5

            a.    Vasogenic Edema ....................................................................... 5

            b.    Enrollment Data ......................................................................... 8

            c.    Dropout Rates ............................................................................. 9

            d.    Lack of Dose Response ............................................................. 10

            e.    Placebo Rate of Decline in ApoE4 Non-Carriers ........................ 12

            f.    Phase II Bapi Trial Data to Be Presented at ICAD ...................... 13

        2.    Dr. Ross's Testimony Establishes That He Did Not Provide
Mr. Martoma With Material, Non-Public Information. ............................ 14

        3.    The Government Has Failed To Prove Beyond A Reasonable Doubt
That Mr. Martoma Traded On Material, Non-Public Information. .......... 15

        4.    The Government Has Failed To Prove Beyond A Reasonable Doubt
That Dr. Gilman Or Dr. Ross Obtained A Personal Benefit ..................... 20

        5.    The Government Has Failed To Prove Beyond A Reasonable Doubt
That Mr. Martoma Had The Requisite Criminal Intent. ........................... 21

    B.    The Court Should Enter A Judgment Of Acquittal On The Count
Of Conspiracy To Commit Insider Trading. ................................................ 23

II.    THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING
COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33 ...... 25

    A.    The Jury Was Tainted By Evidence Unrelated To The Charged Offenses. ......... 26

        1.    The Government Improperly Used Evidence Regarding
SMC Meetings That It Had Disclaimed ................................................... 26

        2.    The Government Improperly Used Evidence Regarding
Dr. Ross That Was Unrelated To The Substantive Counts ...................... 29

    B.    Dr. Gilman's Testimony Should Not Be Allowed To Support A Conviction. ...... 30

C.    The Jury Was Biased By The Unsealed Motions *In Limine* Concerning Mr. Martoma's Dismissal From Harvard Law School. ....................................... 36

CONCLUSION ................................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bruton v. United States*,
    391 U.S. 123 (1968) ................................................................................37

*Coleman v. Kemp*,
    778 F.2d 1487 (11th Cir. 1985) ..............................................................37

*Condus v. Howard Sav. Bank*,
    781 F. Supp. 1052 (D.N.J. 1992) ............................................................29

*Daniels v. Woodford*,
    428 F.3d 1181 (9th Cir. 2005) ................................................................37

*Dirks v. S.E.C.*,
    463 U.S. 646 (1983) ................................................................20, 22, 23

*Estes v. Texas*,
    381 U.S. 532 (1965) ................................................................................37

*Huddleston v. United States*,
    485 U.S. 681 (1988) ................................................................................30

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    284 F. Supp. 2d 511 (S.D. Tex. 2003) ....................................................29

*Kleinman v. Elan Corp., plc*,
    706 F.3d 145 (2d Cir. 2013) ..............................................................11, 13

*S.E.C. v. Rorech*,
    720 F. Supp. 2d 367 (S.D.N.Y. 2010) ................................................20, 21

*State Teachers Ret. Bd. v. Fluor Corp.*,
    592 F. Supp. 592 (S.D.N.Y. 1984) ....................................................21, 22, 23

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) ............................................................25, 31, 34

*United States v. Bufalino*,
    285 F.2d 408 (2d Cir. 1960) ....................................................................25

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005) ..............................................................4, 19, 21

*United States* v. *Contorinis,*
   692 F.3d 136 (2d Cir. 2012)................................................................9

*United States v. D'Amato,*
   39 F.3d 1249 (2d Cir. 1994)...........................................................4, 19

*United States v. Ferguson,*
   246 F.3d 129 (2d Cir. 2001)...................................................... passim

*United States v. Guiliano,*
   644 F.2d 85 (2d. Cir. 1981)...........................................................28, 29

*United States v. Kaplan,*
   490 F.3d 110 (2d Cir. 2007).............................................................30

*United States v. Libera,*
   989 F.2d 596 (2d Cir. 1993)..............................................................9

*United States v. Lorenzo,*
   534 F.3d 153 (2d Cir. 2008)...........................................................24, 25

*United States v. Martinez,*
   54 F.3d 1040 (2d Cir. 1995)..............................................................4

*United States v. Mulheren,*
   938 F.2d 364 (2d Cir. 1991)...........................................................5, 19

*United States v. Recognition Equip. Inc.,*
   725 F. Supp. 587 (D.D.C. 1989).........................................................4

*United States v. Robinson,*
   430 F.3d 537 (2d Cir. 2005).............................................................33

*United States v. Rodriguez,*
   392 F.3d 539 (2d Cir. 2004)...........................................................4, 5

*United States v. Rosenblatt,*
   554 F.2d 36 (2d Cir. 1977)..............................................................23

*United States v. Sam Goody, Inc.,*
   518 F. Supp. 1223 (E.D.N.Y. 1981) ....................................................26

*United States v. Stewart,*
   305 F. Supp. 2d 368 (S.D.N.Y. 2004)....................................................5

*United States v. Svoboda,*
   347 F.3d 471 (2d Cir. 2003).............................................................23

*United States v. Whitman*,
    904 F. Supp. 2d 363 (S.D.N.Y. 2012).................................................21

*United States v. Wiley*,
    846 F.2d 150 (2d Cir. 1988)..........................................................4

*United States v. Yannotti*,
    415 F. Supp. 2d 280 (S.D.N.Y. 2005)...............................................4

## STATUTES AND REGULATIONS

Fed. R. Crim. P. 29 .................................................................1, 4, 25

Fed. R. Crim. P. 33 ..................................................................... passim

Fed. R. Evid. 403 ...........................................................................30

Fed. R. Evid. 404(b).......................................................................30

## SECONDARY AUTHORITIES

Jesse M. Fried, *Insider Abstention*, 113 YALE L.J. 455 (2003)..................30

Defendant Mathew Martoma respectfully submits this memorandum of law in support of his renewed motion for a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29[1] or, alternatively, for a new trial on any surviving count pursuant to Federal Rule of Criminal Procedure 33.

## PRELIMINARY STATEMENT

The Court should enter a judgment of acquittal on all counts, as the Government has failed to prove beyond a reasonable doubt that Mr. Martoma committed any of the charged offenses.  With respect to the substantive insider trading counts, the Government has failed to prove (*inter alia*) that: (1) Mr. Martoma obtained material, non-public information from Dr. Gilman or Dr. Ross; (2) Mr. Martoma traded on material, non-public information; (3) Dr. Gilman or Dr. Ross obtained a personal benefit from sharing material, non-public information with Mr. Martoma; or (4) Mr. Martoma had the requisite criminal intent.  With respect to the conspiracy count, the Government has failed to prove (*inter alia*) that Mr. Martoma agreed with Dr. Gilman or Dr. Ross to commit insider trading or had the requisite criminal intent to do so.  Should any count survive Mr. Martoma's Rule 29 motion, this Court should order a new trial for the following separate and independent reasons: (1) the jury was tainted by evidence unrelated to the charged offenses; (2) Dr. Gilman's testimony should not support a conviction; and (3) the jury was presumptively biased by the unsealed motions *in limine* concerning Mr. Martoma's dismissal from Harvard Law School.

***This Court should enter a judgment of acquittal on all counts***, as the Government failed to prove beyond a reasonable doubt the necessary elements of the charged offenses, including:

---

[1]   Mr. Martoma previously moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 at the close of the Government's case on January 28, 2014 (Tr. 2408:2-11), and again at the close of all of the evidence on January 30, 2014 (Tr. 2862:24-2863:1).  This Court reserved judgment on Mr. Martoma's motion on both occasions.  Mr. Martoma renewed his motion for a judgment of acquittal after the jury verdict entered on February 6, 2014, and this Court set a briefing schedule for the motion.  (Tr. 3235:12-3236:3.)

- That Dr. Gilman or Dr. Ross disclosed material, non-public information about the Phase II bapineuzumab ("bapi") clinical trial to Mr. Martoma.  The Government argued that Mr. Martoma obtained inside information concerning: (1) vasogenic edema; (2) enrollment data; (3) dropout rates; (4) the lack of dose response; (5) the placebo rate of decline; and (6) the "final" data to be presented at the International Conference on Alzheimer's Disease ("ICAD").  *But all such information was already public and/or immaterial to bapi's safety or efficacy.*

- That Mr. Martoma or SAC traded on material, non-public information obtained from Dr. Gilman or Dr. Ross.  The Government did not show that Mr. Martoma and SAC sold Elan and Wyeth securities based on inside information as opposed to some or all of the following *eight* independent reasons: SAC's business model was to take and sell large positions in short periods of time; the United States was facing a global economic crisis; analysts were advising investors to sell because Elan's price had increased significantly and the market for Elan was overheated; SAC healthcare specialists recommended that SAC sell its Elan and Wyeth positions; Business Intelligence Advisors ("BIA") warned Mr. Martoma that the Phase II bapi trial results would be disappointing; the science behind bapi was in doubt; rumors emerged about PML associated with Tysabri leading up to ICAD; and selling Elan and Wyeth securities would lock in profits.

- That Dr. Gilman or Dr. Ross obtained a personal benefit from allegedly sharing inside information with Mr. Martoma.  Dr. Gilman and Dr. Ross received consulting fees, but they received those fees no matter what was discussed.  Thus, the fees could not reasonably be deemed the result of providing inside information.  The Government also failed to show any non-monetary benefits.

- That Mr. Martoma had the requisite criminal intent to commit the charged offenses.  There was insufficient evidence that Mr. Martoma had any understanding of the nature or scope of any obligations that Dr. Gilman or Dr. Ross owed to Elan and Wyeth, much less knew that he had received material, non-public information in violation of those obligations.  The Government also failed to prove that Mr. Martoma knew that Dr. Gilman or Dr. Ross was disclosing information in exchange for any personal benefit.

A judgment of acquittal is likewise warranted on the conspiracy count because (*inter alia*):

- The Government has failed to prove beyond a reasonable doubt that there was an agreement between Mr. Martoma and Dr. Gilman or Dr. Ross to commit insider trading, as the testimony of both Dr. Gilman and Dr. Ross made clear.

- The Government has failed to prove beyond a reasonable doubt that Mr. Martoma had the requisite criminal intent to conspire to commit insider trading.

***This Court should order a new trial on any surviving counts,*** because (in addition to the reasons stated above supporting acquittal):

- The jury was tainted by evidence unrelated to the charged offenses, namely, the exhaustive evidence concerning consultations between Mr. Martoma and Dr. Gilman following SMC meetings between 2006 and 2008.

- Dr. Gilman's testimony should not be allowed to support a conviction. Dr. Gilman was the Government's only witness who claimed to share inside information on which Mr. Martoma allegedly traded.  Indeed, Dr. Gilman's testimony was the cornerstone of the Government's case.  The significant holes in Dr. Gilman's memory – which evolved substantially over time with respect to the key facts at issue – coupled with the numerous inconsistencies and inaccuracies in his recollections make it impossible for a rational trier of fact to rely on such testimony.

- The jury was biased by the motions *in limine* concerning Mr. Martoma's dismissal from Harvard Law School that were unsealed in the midst of jury selection.  The motions garnered widespread media attention and negative publicity, rendering the jurors presumptively biased.

## BACKGROUND

On November 19, 2012, the Government charged Mr. Martoma with conspiracy to commit securities fraud (Count One) and securities fraud (Counts Two and Three) with respect to transactions in securities of Elan and Wyeth.  The Government alleged that Mr. Martoma (1) sought and obtained inside information from Dr. Gilman and Dr. Ross concerning the Phase II clinical trial for bapi from 2006 through July 2008 and (2) caused SAC to sell Elan and Wyeth securities from July 21-29, 2008, based on inside information that he obtained from Dr. Gilman concerning the results of the Phase II bapi clinical trial before such information was announced at ICAD on July 29, 2008.  On February 6, 2014, the jury returned a guilty verdict on all counts.

## ARGUMENT

**I.     THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON ALL COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29.**

Federal Rule of Criminal Procedure 29 permits this Court to set aside a guilty verdict returned by the jury and enter a judgment of acquittal where, viewing the evidence in the light most favorable to the Government, the Court concludes that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004). "[W]here a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible. [The court] must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).[2]

To satisfy its burden of proof, "the government must do more than introduce evidence at least as consistent with innocence as with guilt." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994) (internal quotation marks omitted) (holding that a conviction based on "speculation and surmise" "cannot stand").[3] "[A]t the end of the day, if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury ***must necessarily*** entertain a

---

[2]     *Accord United States v. Recognition Equip. Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989) (holding that a court is "obligated to take a hard look at the evidence and accord the government the benefit of only '***legitimate*** inferences'" (emphasis added)).

[3]     *Accord United States v. Wiley*, 846 F.2d 150, 155 (2d Cir. 1988) (reversing a conviction where the jury "engaged in false surmise and rank speculation"); *United States v. Yannotti*, 415 F. Supp. 2d 280, 288-89 (S.D.N.Y. 2005) ("While a jury may draw reasonable inferences, it may not engage in impermissible speculation.").

reasonable doubt" – and a court must enter a judgment of acquittal. *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (emphasis added) (internal quotation marks omitted).[4]

### A.    This Court Should Enter A Judgment Of Acquittal On The Substantive Counts Of Insider Trading.

#### 1.    The Government Has Failed To Prove Beyond A Reasonable Doubt That Mr. Martoma Obtained Material, Non-Public Information.

The Government argued that Mr. Martoma obtained material, non-public information about the Phase II bapi trial concerning:  (1) vasogenic edema, (2) enrollment data, (3) dropout rates, (4) the lack of dose response, (5) the placebo rate of decline in ApoE4 non-carriers, and (6) the "final" data to be presented at ICAD.  The evidence at trial showed, however, that all of this information was already public, immaterial to bapi's safety or efficacy, or in most instances both.[5]

##### a.    Vasogenic Edema

Dr. Gilman testified that, at various points between 2006 and July 2008, he shared information regarding the number of cases of vasogenic edema observed during the Phase II bapi trial, the treatments that patients received, and how patients fared.[6]  Dr. Ross testified that, in early 2007, he told Mr. Martoma that he had observed vasogenic edema in a ***single*** patient in his

---

[4]    *Accord United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991) (holding that a conviction must be reversed when it is supported only by "inferences no more valid than others equally supported by reason and experience"); *United States v. Stewart*, 305 F. Supp. 2d 368, 370, 377 (S.D.N.Y. 2004) (reversing a conviction where, "to find the essential element of criminal intent beyond a reasonable doubt, a rational juror would have to speculate" and noting that the innocent and nefarious "competing intentions appear to be nearly in equipoise"); *see also Rodriguez*, 392 F.3d at 544 ("It thus remains axiomatic that 'it would not satisfy the [Constitution] to have a jury determine that the defendant is ***probably*** guilty.'" (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993))).

[5]    Since the evidence offered at trial concerning the public and/or immaterial nature of this information is voluminous, specific documents and testimony on each point are set forth for this Court's reference in Appendix ("App.") A.

[6]    (Tr. 1342:14-23 (Gilman).)

clinical trial, who had subsequently done well.[7]  But none of the evidence concerning vasogenic edema – whether received from Dr. Gilman or Dr. Ross – was material, non-public information.

*First*, the evidence at trial showed that vasogenic edema had been publicly disclosed on many different occasions.

- Elan and Wyeth made clear that vasogenic edema was a side effect of bapi in public statements as early as April 2006, including the presentation of the Phase I bapi trial results on April 20, 2006,[8] Elan's earnings call on July 26, 2007,[9] Elan's earnings call on October 25, 2007,[10] and Elan's and Wyeth's press release of the Phase II trial results on June 17, 2008.[11]

- Dr. Gilman and Dr. Ross both publicly stated to investors that vasogenic edema was a side effect of bapi.  Dr. Gilman spoke at length about vasogenic edema at an April 15, 2008 GLG roundtable,[12] and Dr. Ross said far more about vasogenic edema on an April 9, 2008, Piper Jaffray investor call than he ever told Mr. Martoma.[13]

- Elan and Wyeth disclosed that vasogenic edema was a side effect of bapi to potential participants in the Phase II bapi trial and their families as part of the process of obtaining informed consent beginning in April 2006.[14]

*Second*, the evidence at trial showed that none of the information about vasogenic edema was material.

- Vasogenic edema was considered a manageable side effect and, therefore, did not increase the risk profile of bapi.[15]

---

[7]   (Tr. 614:15-615:21 (Ross).)

[8]   (DX 747, at 20 (Presentation of Phase I results given on April 20, 2006); *see also* App. A at 1.)

[9]   (DX 172-A, at 11 (Transcript of July 26, 2007, Elan Q2 Earnings Call); DX 172 (Audio of July 26, 2007, Elan Q2 Earnings Call); *see also* App. A at 2.)

[10]   (DX 173-A, at 14 (Transcript of October 25, 2007, Elan Q3 Earnings Call); DX 173 (Audio of October 25, 2007, Elan Q3 Earnings Call); *see also* App. A at 3.)

[11]   (GX 10, at 1-2 (Elan's and Wyeth's June 17, 2008, press release); *see also* App. A at 3-4.)

[12]   (DX 759, at 1-2 (Rene Shen's notes from an April 15, 2008, GLG roundtable with Sid Gilman); *see also* App. A at 5-6.)  Dr. Gilman also discussed the incidence of vasogenic edema in the Phase II bapi trial with investors in other instances.  (*See* App. A at 6-9.)

[13]   (DX 540, at 1 (April 10, 2008, Piper Jaffray analyst report discussing April 9, 2008, Piper Jaffray investor call); *see also* App. A at 9.)  Analyst reports also publicly discussed that vasogenic edema was a side effect of bapi in the Phase II trial.  (*See* App. A at 11-12.)

[14]   (DX 134, at 16 (April 5, 2006, SMC Meeting Minutes); DX 755, at 11 (Informed Consent Form for bapi, dated December 5, 2007); *see also* App. A at 9-11.)

- Dr. Gilman's information about the number of cases of vasogenic edema in the Phase II bapi trial results was likewise immaterial, as Dr. Thomas Wisniewski testified:

  Q:     Does it matter that the ICAD draft presentation identifies the specific number of patients who experienced vasogenic edema?

  A:     No.  One would have ***assumed*** that this complication would be occurring in a minority of the patients since the press release already indicated that they were proceeding to Phase III clinical trial.  So if vasogenic edema was found in a majority of treated patients or more than a relatively small percentage of patients, then the Phase II would not proceed to Phase III testing; it would not be designated as safe.[16]

- And Dr. Ross's single case of vasogenic edema was entirely meaningless, as both he and the Government's statistician (Rebecca Betensky) admitted.  A single case is simply not statistically significant, particularly where, as here, Dr. Ross did not know whether that particular patient (or any patient) had received bapi or a placebo.[17]

***Third***, Dr. Gilman's and Dr. Ross's hypothesis that vasogenic edema was an indicator of

bapi's efficacy was not material, non-public information.

- That hypothesis had been publicly disclosed (among other places) on Elan's earnings call on October 25, 2007,[18] and in a Credit Suisse analyst report dated March 5, 2008.[19]

- That hypothesis also was not material.  It was not proved – and could not be proved – at the time.[20]  In fact, it was ultimately disproved because,

---

[15]   (*E.g.*, Tr. 935:16-21 (Liu), 1218:5-12 (Gilman); *see also* App. A at 12-14.)

[16]   (Tr. 2721:2-11 (Wisniewski) (emphasis added); *see also* App. A at 14.)

[17]   (Tr. 749:2-750:9 (Ross), 679:8-15 (Ross) (Q.  . . . From your interaction with patients, did you develop a view one way or the other about whether their condition was improving?  A.  I could make that assumption but as I didn't know who was getting the active drug or not, I couldn't be sure.  But, yes, I thought some patients were responding, as family members reported to me and some patients as well."); *see also* App. A at 14-15.)

[18]   (DX 173-A, at 12 (Transcript of October 25, 2007, Elan Q3 Earnings Call); DX 173 (Audio of October 25, 2007, Elan Q3 Earnings Call); *see also* App. A at 15.)

[19]   (DX 992-A, at 43-44 (March 5, 2008, Credit Suisse analyst report); *see also* App. A at 15.)

[20]   (Tr. 956:4-22 (Liu), 1715:8-1716:14 (Gilman); *see also* App. A at 15-17.)  Indeed, Dr. Enchi Liu testified that no efficacy information was ever revealed during SMC meetings, including when the SMC was unblinded to all of the safety data on July 11, 2008.  (Tr. 944:8-945:25.)  Dr. Wisniewski likewise opined that none of the information in SMC meeting minutes and presentations was indicative of bapi's efficacy; he testified that only safety data was presented in those materials.  (Tr. 2759:5-11.)  Therefore, ***none*** of the information that Dr.

notwithstanding the incidence of vasogenic edema, bapi was not effective in treating Alzheimer's Disease.[21]

### b.   Enrollment Data

Dr. Ross testified that he provided Mr. Martoma with information in April 2008 concerning the number of patients enrolled in the Phase II bapi trial at his clinic, the Memory Enhancement Center.[22]  Such information, however, was neither material, nor non-public.

*First*, it is indisputable that the enrollment data for the Phase II bapi trial were already available to the public prior to any trading in July 2008.  For example:

- The government website www.clinicaltrials.gov posted enrollment information for the Phase II bapi trial on October 3, 2006.[23]

- Elan and Wyeth press releases also disclosed the enrollment figures for the Phase II bapi trial on May 21, 2007 and June 17, 2008.[24]

*Second*, the enrollment data allegedly shared by Dr. Ross were not material.

- As Dr. Ross himself acknowledged, enrollment figures say nothing about bapi's safety or efficacy.[25]

- Enrollment data for Dr. Ross's particular clinic were even less useful because it was only one of 29 different clinical investigation sites.[26]

---

Gilman claims to have shared with Mr. Martoma aside from the results of the Phase II bapi trial could possibly be considered material to bapi's efficacy.

[21] (*See, e.g.*, Tr. 1526:23-1527:4 (Gilman) (testifying that there are no drugs on the market that can cure Alzheimer's Disease); Tr. 267:24-269:10 (Hulme) (testifying that there are no drugs available that can stop the progression of Alzheimer's Disease); *see also* App. A at 17-18.)

[22] (Tr. 634:11-637:18 (Ross).)

[23] (DX 652, at 1-2 (www.clinicaltrials.gov website, updated October 3, 2006); *see also* App. A at 19.)

[24] (DX 1079, at 2 (Elan's and Wyeth's May 21, 2007, press release); GX 10, at 2 (Elan's and Wyeth's June 17, 2008, press release); *see also* App. A at 19.)  Dr. Ross also discussed the Phase II bapi trial enrollment figures with investors during an April 9, 2008, Piper Jaffray investor call.  (DX 540 (April 10, 2008, Piper Jaffray analyst report discussing April 9, 2008, Piper Jaffray investor call); Tr. 2423:16-2424:4 (Cecchini) (confirming that Dr. Ross spoke on the April 9, 2008, Piper Jaffray investor call); *see also* App. A at 19-20.)

[25] (Tr. 755:15-756:1 (Ross); *see also* App. A at 20.)

[26] (GX 10, at 2 (Elan's and Wyeth's June 17, 2008 press release); *see also* App. A at 20.)

c.      **Dropout Rates**

Dr. Gilman testified that he discussed with Mr. Martoma what he viewed as the "high dropout rate" in the Phase II bapi trial on approximately March 30, 2008.[27]  Even when reviewing this evidence in the light most favorable to the Government, the dropout rate was neither material nor non-public.

*First*, the evidence confirmed that Dr. Gilman discussed the dropout rate for the Phase II bapi trial with many investors.

- Dr. Gilman discussed the dropout rate at an April 15, 2008, GLG roundtable event with dozens of investors, and the dropout rate was also discussed at a GLG Innovators Event on July 8, 2008, for which Dr. Gilman was a panelist.[28]

- Dr. Gilman also discussed the dropout rate in consultations with several analysts, including consultations with David Munno on May 1, 2008, and Rene Shen on June 17, 2008.[29]

Such open and public discussion of the dropout rate necessarily renders such information "public."  *See United States* v. *Contorinis*, 692 F.3d 136, 143 (2d Cir. 2012) (on direct appeal the district court's jury instructions are affirmed, "[I]nformation is also deemed public if it is known by only a few securities analysts or professional investors"); *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993) ("[I]nformation may be considered public for Section 10(b) purposes even though there has been no public announcement and only a small number of people know of it").

*Second*, the information about dropout rates was not material.

- Dr. Enchi Liu explained that dropouts occur in clinical drug trials for a variety of reasons.[30]  That was certainly true with respect to the dropout rate for the Phase II

---

[27]    (*E.g.*, Tr. 1361:2-1362:6 (Gilman).)

[28]    (DX 759, at 2 (Rene Shen's notes from an April 15, 2008, GLG roundtable with Sid Gilman); DX 1116-A, at 1 (Kathryn Lyndon's notes of the July 8, 2008, GLG Innovators Event); *see also* App. A at 20-21.)

[29]    (DX 839, at 1 (May 1, 2008, e-mail from Dr. Sidney Gilman to David Munno); DX 761, at 1 (Rene Shen's notes from his June 17, 2008 consultation with Sid Gilman); *see also* App. A at 22.)

bapi trial, which was reasonable.[31]  In fact, even high dropout rates are not indicative of anything about the efficacy or safety of a drug because, for example, they could be the result of problems with the trial design.[32]

- Dr. Hulme testified that any information about the dropout rate for the Phase II bapi trial provided no information about the efficacy or safety of bapi because it did not distinguish between patients who received bapi and patients who received a placebo:

> Q:    When you testified on cross-examination that the dropout rate was not particularly important to you, do you know one way or the other whether the dropout rate could be significant to investors?
>
> A:    I don't see how when they don't know whether it's bapineuzumab or placebo.[33]

### d.    Lack of Dose Response

Dr. Gilman testified that he discussed with Mr. Martoma the lack of dose response (*i.e.*, that the drug's efficacy did not consistently increase as the dose amount increased) as reflected in the results of the Phase II bapi trial.[34]  This information, likewise, was not material or non-public.

*First*, the lack of dose response was publicly discussed before any alleged insider trading in Elan or Wyeth.

- A Brean Murray analyst report dated July 11, 2008, detailed the lack of dose response previously observed in bapi and stated that its authors were "not encouraged by the lack of a dose response."[35]

---

[30]   (Tr. 915:6-9 (Liu); *see also* App. A at 22-23.)

[31]   (Tr. 415:11-20 (Hulme); *see also* App. A at 23.)

[32]   (*E.g.*, Tr. 357:3-24 (Hulme), 2797:8-2798:11 (Wisniewski), 2717:19-25 (Wisniewski); *see also* App. A at 23-26.)

[33]   (Tr. 406:4-9 (Hulme); *see also id.* at 402:23-403:5 (Hulme) (testifying that, for the same reason, information on dropouts in the Phase II bapi trial was not meaningful to her); *id.* at 915:10-25 (Liu) (testifying that the dropout rates in the slides presented at the March 15, 2008, SMC meeting did not distinguish between patients receiving bapi and patients receiving a placebo); *see also* App. A at 24-25.)

[34]   (*E.g.*, Tr. 1339:1-15, 1455:13-1456:7 (Gilman).)

[35]   (DX 9, at 6 (July 11, 2008, Brean Murray analyst report); *see also* App. A at 26.)  Exhibit 4 in the report was Wyeth-generated graphs showing the lack of dose response by comparing the dosage level to the MMSE (Mini Mental State Examination) score, which was a secondary efficacy endpoint in the trial.  (*Id.* at 7.)

- A Credit Suisse analyst report dated March 5, 2008, also reported the lack of dose response in bapi.[36]

**Second**, the lack of dose response was not material.

- Dr. Hulme publicly stated immediately after the ICAD results were announced on July 29, 2008, that the individual dose cohorts (*i.e.*, sample sizes) in the Phase II bapi trial were very small, which rendered the data about dose response inconclusive.[37]

- Dr. Gilman testified that the lack of dose response did not change his positive view of bapi's effectiveness after the Phase II trial: the information "didn't mean that the drug doesn't work"; he still believed that bapi was "marvelous"; and he was still excited about the results, which he viewed as favorable and worthy of a Phase III trial.[38]

- Dr. Ross testified that drugs may follow a "U-shaped" dose response curve where lower doses may be more effective than higher doses such that the effectiveness of a drug may decrease as the dose increases without indicating that the drug overall was ineffective.[39]

- Dr. Wisniewski testified that, "in the setting where we know that there's toxicity at a higher dose of the bapineuzumab, we – certainly one would not expect a clear dose response curve."[40]  In fact, Dr. Wisniewski explained that, in order to determine whether bapi actually had a dose response, another separate clinical trial would have been required.[41]

Indeed, the Second Circuit dismissed allegations about dose response in class actions brought against Elan and Wyeth because there was evidence in the record to "contradict [the] argument that a dose response would be of import here."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 154

---

[36]  (DX 992-A, at 42-43 (March 5, 2008, Credit Suisse analyst report) (including the same Wyeth-generated graphs, *see supra* n.35); *see also* App. A at 26.)

[37]  (DX 177-A, at 7-8 (Transcript of July 29, 2008, Elan and Wyeth Conference Call); DX 177 (Audio of July 29, 2008, Elan and Wyeth Conference Call); *see also* App. A at 26-27.)  Dr. Hulme stated: "It's very difficult with the numbers that we've got in each of those dose cohorts to really pay a huge amount of attention to individual groups and how they respond on the various outcome measures."  (*Id.*)  "So we're not going to be swayed by one individual dose cohort that doesn't behave typical with the other dose cohorts.  We combine them into all doses."  (*Id.*)  Looking at the total patient population, "you see very robust data in terms of changes in both ADAS-cog, NTB, DAD, and CDR sum of boxes."  (*Id.*)

[38]  (Tr. 1422:6-1423:5 (Gilman), 1455:13-1456:17 (Gilman); *see also* App. A at 27-28.)

[39]  (Tr. 773:19-774:9 (Ross); *see also* App. A at 29.)

[40]  (Tr. 2737:25-2738:14 (Wisniewski); *see also* App. A at 29-30.)

[41]  (Tr. 2738:15-2739:6 (Wisniewski); *see also* App. A at 30.)

(2d Cir. 2013) (citing a July 31, 2008, Credit Suisse report that stated that "the Phase 2 trial

contained 'too few patients . . . to make meaningful comparisons between individual doses'").

### e.    Placebo Rate of Decline in ApoE4 Non-Carriers

Dr. Gilman testified that he discussed with Mr. Martoma the larger rate of decline in the

placebo group of ApoE4 non-carriers compared to carriers as reflected in the results of the Phase

II bapi trial.[42]  Again, this was not material, non-public information.

Notably, the information about the placebo rate of decline in the Phase II bapi trial was

not material.

- In response to a specific question about the placebo rate of decline in the ApoE4 non-carrier group, Dr. Gilman publicly stated on an investor call following the ICAD presentation on July 29, 2008, that:

  > The study was not initially designed to compare carriers versus non-carriers . . . therefore it's not surprising that one might see differences between these two groups and the degree to which they descended at 18 months.  Moreover, as Dr. Black just indicated, a number of studies including the [cysteine] study done by the Alzheimer's Disease Cooperative Study, showed an average decline of about 6 ADAS-cog, plus or minus 7, deviation of 7.  One could easily get down to 13.  This is not unusual.  It's within the standard of what we're seeing.[43]

- Dr. Ron Black, Assistant Vice President of Neuroscience at Wyeth Research, expressed the same view on the same investor call:

  > I don't really think that for this 18 month study that the deterioration in either of the groups is very much out of line and unexpected.  We just saw a presentation from another sponsor that showed an 8 point decline in an 18 month study and that study was restricted to only mild patients on an

---

[42]   (*E.g.*, Tr. 1339:1-15, 1455:13-1456:7 (Gilman).)

[43]   (DX 177-A, at 9-10 (Transcript of July 29, 2008, Elan and Wyeth Conference Call); DX 177 (Audio of July 29, 2008, Elan and Wyeth Conference Call); *see also* App. A at 30-31.)  Similarly, Dr. Gilman testified that the placebo rate of decline in ApoE4 non-carriers did not change his positive view of bapi's effectiveness after the Phase II trial.  (Tr. 1421:19-1422:5; *see also* App. A at 31-32.)

ADAS-cog will typically decline less than a mild to moderate population. So I don't agree that this is an unusual decline in the placebo population.[44]

- Dr. Wisniewski also testified that the decline in ApoE4 non-carriers receiving the placebo was within the standard range for clinical trials and, as a result, such information was not meaningful:

> Q:   OK. And are you aware of the range of variation that can occur when looking at the decline in placebo groups involved in Alzheimer's trials?
>
> A:   So, there certainly can be quite a wide range, and the range shown here is certainly within the variation that one has from clinical trial to clinical trial and patient group to patient group.
>
> Q:   If the variation is within a range, can you draw any statistically significant finding from that variation?
>
> A:   No, you cannot.[45]

The Second Circuit's conclusions in *Kleinman* also support the point that information about the placebo rate of decline was not material:  "The July press release and presentation . . . did not disclose that the decline in that particular subgroup was larger than expected" and "[r]esearchers at the July presentation, in fact, stated that they disagreed with the proposition that the decline in the control group was atypical."  *Kleinman,* 706 F.3d at 154.

### f.   Phase II Bapi Trial Data to Be Presented at ICAD

Dr. Gilman testified that he discussed with Mr. Martoma the Phase II bapi trial data in advance of ICAD.[46]  This was the crux of the Government's case, but most important, not even this was material, non-public information.

The evidence at trial, even when viewed in the light most favorable to the Government, showed that the Phase II bapi trial results had been publicly disclosed in Elan's and Wyeth's

---

[44]   (DX 177-A, at 10 (Transcript of July 29, 2008, Elan and Wyeth Conference Call); DX 177 (Audio of July 29, 2008, Elan and Wyeth Conference Call); *see also* App. A at 31.)

[45]   (Tr. 2744:12-21 (Wisniewski); *see also* App. A at 31.)

[46]   (Tr. 1424:2-1431:6 (Gilman), 1453:15-1456:14 (Gilman), 714:7-717:1 (Ross).)

June 17, 2008 press release.  Notably, the two most coherent experts on this subject at trial –

including the Government's own "Dr. #1" – confirmed as much.

- Dr. Ross testified: "the results were no different than the June 17, the drug failed to reach efficacy as indicated on June 17, 2008 press report."[47]

- Dr. Wisniewski testified: "It was my opinion that there was no meaningful difference in the data from the press release to the draft ICAD presentation."  As he explained, the draft ICAD presentation "gives more graphic detail and graphic representation of what's written verbally in the press release," but "there are no substantive differences between the two."[48]

Because there was no material difference between the June 17, 2008, press release and the

"final" Phase II bapi trial results that Dr. Gilman supposedly shared with Mr. Martoma on July

17 and 19, such information could ***not***  be deemed material by a rational finder of fact.

*   *   *   *

In sum, the record evidence confirms that the Government failed to prove beyond a

reasonable doubt that Mr. Martoma received any material, non-public information from Dr.

Gilman or Dr. Ross.  *See* App. A.  Accordingly, this Court should enter a judgment of acquittal.

### 2.    Dr. Ross's Testimony Establishes That He Did Not Provide Mr. Martoma With Material, Non-Public Information.

Dr. Ross testified only that he provided three supposed pieces of inside information to

Mr. Martoma during the Phase II trial:  (1) that he had observed vasogenic edema in a ***single***

patient in his clinical trial who subsequently recovered; (2) that he hypothesized that vasogenic

edema was an indicator of bapi's efficacy; and (3) that he provided Mr. Martoma with the

number of patients enrolled in the Phase II bapi trial at his clinic.  None of this was material,

non-public information when Mr. Martoma and SAC sold their Elan and Wyeth positions in July

---

[47]    (Tr. 714:4-25 (Ross); *see also* App. A at 32.)

[48]    (Tr. 2700:15-2701:6, 2756:16-23 (Wisniewski); *see also id.* at 2701:7-18 (Wisniewski) (testifying that there was also "no meaningful difference" between the final PowerPoint presentation that was shown at ICAD and the June 17, 2008 press release; *see also* App. A at 32-33.)

2008.  *See supra* § I.A.1.  In fact, Dr. Ross did not know which of his patients received bapi and which received the placebo.[49]

 Dr. Ross also testified that he was unblinded to the Phase II bapi trial results only at a presentation to all clinical investigators on July 28, 2008[50] – eight days *after* the Government alleges that Mr. Martoma and SAC decided to sell their Elan and Wyeth positions (and after SAC had sold its Elan holdings).[51]  When Dr. Ross supposedly met with Mr. Martoma later that night, he did not give Mr. Martoma *any* new information about the results; he told Mr. Martoma only that "the meeting showed that the results were *no different* than the June 17, the drug failed to reach efficacy as indicated on June 17, 2008 press report."[52]  According to Dr. Ross, it was *Mr. Martoma* who shared information about the results – not the other way around.[53]  In short, Dr. Ross adds nothing to the Government's case.

### 3. The Government Has Failed To Prove Beyond A Reasonable Doubt That Mr. Martoma Traded On Material, Non-Public Information.

 The Government failed to prove beyond a reasonable doubt that Mr. Martoma or SAC actually *traded* on material, non-public information received from Dr. Gilman or Dr. Ross.  As this Court explained to the jury, such information must have been a factor in SAC's sales of Elan and Wyeth securities to find that Mr. Martoma engaged in insider trading.  (Jury Charge at 32-

---

[49] (Tr. 679:9-15.)

[50] (*E.g.*, Tr. 714:7-21, 822:14-23.)

[51] (Tr. 2972:12-2977:2 (Closing Argument); DX 1432 (Graph of Elan common stock holdings from July 10, 2006, through July 31, 2008, in all SAC accounts); DX 1438 (Graph of Wyeth common stock holdings from July 10, 2006, through July 31, 2008, in all SAC accounts); GX 560 (Spreadsheet of SAC's trading data).)

[52] (Tr. 714:19-25 (emphasis added).)

[53] (*See generally* Tr. 715:10-717:1.)  Dr. Ross's claim that Mr. Martoma seemed to know details of the results carries no weight.  As Dr. Ross himself admitted, he had a hard time understanding the bapi results.  (Tr. 708:19-714:6.)  It is unsurprising that he believed that Mr. Martoma knew more than he did.

33.)  Indeed, the record evidence showed that Mr. Martoma and SAC made their decision to sell

because *every* input and factor made it the *only* reasonable decision.[54]

- ***SAC's business model was to take and sell large positions in short periods of time.***  It was not unusual for SAC to sell positions worth hundreds of millions of dollars in short periods of time.  Indeed, several current and former SAC employees, (*e.g.*, Dan Berkowitz, Chandler Bocklage, and Phillipp Villhauer), including Government witnesses, testified that this trading strategy was routine at SAC and at hedge funds generally.  As Mr. Bocklage explained: "That's kind of how we do things.  You are kind of in it or you are out of it.  And if a position has worked or not worked in your favor and you just changed your mind, it's time to sell it; you are out of it."[55]

- ***The United States was facing an economic crisis.***  Several current and former employees of SAC, (*e.g.*, Dan Berkowitz, Chandler Bocklage, Timothy Jandovitz, and Peter Nussbaum), including Government witnesses, testified that the volatile market conditions in July 2008 were unprecedented, causing SAC to reduce risk by (*inter alia*) re-evaluating all long positions.[56]  Moreover, on July 18, 2008 – the last trading day before SAC began selling Elan and Wyeth securities – Mr. Nussbaum alerted all portfolio managers (including Mr. Martoma) to an SEC emergency order regarding these changing market conditions that warned of "panic selling" and advised that "the price of securities may artificially and unnecessarily decline well below the price level that would have resulted from the normal price discovery process."[57]  In addition, Steven Cohen himself repeatedly sent e-mails to all portfolio managers (including Mr. Martoma) that warned of worsening market conditions.  On July 15, 2008, for example, Mr. Cohen

---

[54]  Since the evidence at trial concerning these many reasons is voluminous, relevant documents and testimony on each point are set forth in Appendix ("App.") B.

[55]  (Tr. 2549:13-21 (Bocklage); *see also* Tr. 505:16-19 (Berkowitz) (agreeing that it was "routine practice" for SAC "to build very large positions, hundreds of millions of dollars, and then exit or sell those positions very rapidly"); Tr. 2318:1-8 (Villhauer) (testifying that it was "not unusual" for SAC to "unwind or sell very large positions in relatively short periods of time" and that he recalled instances in 2008 where he sold "more than $300 million worth of stock within a week or so"); *see also* App. B at 1-2.)

[56]  (*See, e.g.,* Tr. 2470:15-23 (Nussbaum) ("Q.  OK, Mr. Nussbaum, let me change topics on you.  And let's talk about the state of the market in July of 2008.  Can you tell us about, in general, what the state of the financial markets were in around mid-2008, July 2008?  A.  Well, 2008, and particularly July, was a period of extreme I would say anxiety.  It only appears not to be so anxious such an extreme period because of what happened in September and October, but I would say it was a relatively unprecedented period certainly in my career."); Tr. 510:22-511:3 (Berkowitz) ("Q. Do you recall in 2008 Bear Stearns collapsed in March of 2008?  A.  Yes.  Q. And is it fair to say that there were concerns within SAC about the volatility of the market in late spring/early summer, after Bear Stearns' collapse?  A.  Yes."); *see also* App. B at 2, 6.)

[57]  (DX 1196, at 1 (Securities Exchange Act of 1934 Release No. 58166, dated July 15, 2008); Tr. 2471:17-2472:7 (Nussbaum) (explaining that his staff distributed the SEC emergency order to all SAC portfolio managers on July 18, 2008); *see also* App. B at 3.)

cautioned all portfolio managers: "Let me reiterate that the indexes could see new lows over the next couple of weeks before a short term bottom is put in place."[58]

- ***Analysts were advising investors to sell because the price of Elan stock had increased significantly and the market for Elan was overheated.*** Analyst reports received by Mr. Martoma in July 2008 warned that the market for Elan was overheated because market expectations that bapi would be a blockbuster drug were already built into the stock price.[59] For example, a Cowen and Company report dated July 21, 2008, stated: "ELN priced to perfection and then some, in our view," with the result that, "if the product falls short in clinical studies, the current value of ELN could drop significantly and that a major success is mostly priced in."[60] A Canaccord Adams report dated July 17, 2008, stated: "While we believe that bapineuzumab will be the first disease modifying AD therapy to reach the market, the US \$10-15 billion in sales the market expects is not an achievable target, in our view."[61] A Brean Murray Carret & Co. report dated July 11, 2008, stated: "[G]iven our projected clinical failures for bapineuzumab, we view Elan's market value as inflated."[62] Professor Gompers explained that such analyst reports were a strong reason to sell in the case of Elan because for most stocks two thirds of analysts usually have a "buy" rating, but for Elan in July 2008 two thirds of analysts had either a "sell" or a "hold" rating.[63]

- ***SAC healthcare specialists recommended that SAC sell its Elan and Wyeth positions.*** Several SAC healthcare specialists (*e.g.*, Edmund Debler, David Munno, and Benjamin Slate) recommended selling Elan and Wyeth in advance of ICAD. Mr. Munno and Mr. Slate "were very vocal about their opposition to the idea – to the long Wyeth and Elan position."[64] Mr. Debler stated that he was "concerned about a sell-off after ICAD."[65] In fact, Ms. Lyndon – Mr. Martoma's

---

[58] (DX 241 (July 15, 2008, e-mail from Mr. Cohen to all SAC analysts and portfolio managers); *see also* DX 505 (July 6, 2008, e-mail from Mr. Cohen to all SAC analysts and portfolio managers stating: "Unless oil trades down dramatically, I don't see how the market holds these levels – I would use rallies to sell."); App. B at 2-3.)

[59] Professor Gompers explained these analysts' expectations. (*See, e.g.*, Tr. 2587:11-2588:1 ("Q:…Why does the 16 billion valuation imply \$7 to \$8 billion in bapineuzumab sales in 2015? A. So, when you do a discounted cash flow, you don't discount the sort of best-case or worst-case scenario. You discount what you expect to happen, what's going to happen? And so what this means is you have to be nearly a hundred percent certain that you're going to get \$7 to \$8 billion of bapi sales in order to back into that \$16 billion. So there is no probability adjustment that you don't hit that. It's sort of that's what you're expecting to hit. Q. OK. And how does \$7 to \$8 billion of sales compare with other drugs in the market at that time? A. It would be an absolute blockbuster. . . . if it was between 7 and 8 billion, it would be the second best-selling drug in the world."); *see also* App. B at 7-8.)

[60] (DX 1144-A, at 1 (July 21, 2008 Cowen & Co. report); *see also* App. B at 6-8.)

[61] (DX 11-B, at 1 (July 17, 2008 Canaccord Adams report); *see also* App. B at 10-11.)

[62] (DX 9, at 12-13; *see also* App. B at 9.)

[63] (Tr. 2648:4-18 (Gompers); *see also* App. B at 9-11.)

[64] (Tr. 2549:2-12 (Bocklage); *see also* Tr. 2094:4-10 (Lyndon) (testifying that Mr. Munno was "quite vocal" about his opposition to the Elan long position); App. B at 12-13.)

[65] (DX 1424, at 2 (July 27, 2008 e-mail from Mr. Debler to Cohen Account – Healthcare); *see also* App. B at 13.)

own analyst – concluded that market expectations were too high in July 2008 "to the point where they were pretty impossible to meet."[66]

- ***BIA[67] warned Mr. Martoma that the Phase II bapi trial results would be disappointing.***  Mr. Martoma engaged BIA to analyze public statements by Elan and Wyeth concerning the Phase II bapi trials.  BIA prepared at least eight reports for Mr. Martoma, which warned him that the bapi results would be disappointing.[68]  On July 15, 2008 – just days before SAC began selling Elan and Wyeth securities – Terry Freedy of BIA emailed Mr. Martoma: "I believe that something occurred to cause Elan and Wyeth to back down from their positive comments about P2, and the only thing that we know occurred was the first interim look.  I think that look told them that the results were not going to be as 'spectacular' as they hoped, even though there were some positive outcomes worthy of pursuit."[69]

- ***The science behind bapi was in doubt.***  On July 18, 2008 – again, the last trading day before SAC began selling Elan and Wyeth securities – *The Lancet* published an article on the results of the clinical trial for AN 1792, the predecessor drug to bapi.[70]  The article concluded: "our findings suggest that removal of Aβ plaques might not be sufficient to prevent the progressive neurodegeneration in Alzheimer's disease."[71]  This article by a well-respected medical journal cast doubt on the amyloid-beta hypothesis, the mechanism by which bapi was supposed to treat Alzheimer's Disease.[72]  Indeed, Dr. Gilman testified that this

---

[66]  (GX 294, at 1 (July 30, 2008 e-mail from Ms. Lyndon to Mr. Martoma); *see also* App. B at 12.)

[67]  BIA was a group of specially-trained individuals who helped clients assess whether public statements of companies were made with confidence or uncertainty.  In particular, BIA offered services to investment professionals to help analyze the public statements of company executives to assist them in making investment decisions.  (*See* Tr. 2111:15-2112:10 (Lyndon).)

[68]  (DX 1109-A (April 3, 2008, BIA report with an analysis of the Corporate Disclosures from Elan and Wyeth Earnings Calls, and an Elan Investor Conference Presentation); DX 1128-A (July 9, 2008, BIA report with an analysis of recent ELN disclosures at the June 11, 2008, Goldman Sachs Health Care Conference); DX 1128-B (July 9, 2009, BIA report with an analysis of Elan's June 17, 2008, press release); DX 1134-A (April 11, 2008, BIA report with an analysis of Elan disclosures at March 13, 2007, Cowen and Company Annual Health Care Conference); DX 1145-A (May 2, 2008, BIA report with an analysis of Elan's Remarks at the Morgan Stanley 2008 Global Healthcare Unplugged Conference); DX 1146-A (April 30, 2008, BIA report with an analysis of Elan Q1 2008 Earnings Call on April 24, 2008); DX 1146-B (April 29, 2008, BIA report with an analysis of Wyeth Q1 2008 Earnings Call on Apr. 22, 2008); DX 1148-A (May 8, 2008, BIA report with an analysis of ELN Company Day held on May 7, 20080; *see also* App. B at 13-17.)

[69]  (DX 1163 (July 15, 2008 e-mail from Ms. Freedy to Mr. Martoma); *see also* App. B at 17.)

[70]  (DX 875 (Clive Holmes et al., *Long-term effects of Aβ42 immunisation in Alzheimer's disease: follow-up of a randomized, placebo-controlled phase I trial*, THE LANCET (July 19, 2008); *see also* App. B at 17-18.)

[71]  (*Id.* at 7; *see also* App. B at 17-18.)

[72]  (Tr. 1727:22-1728:3 (Gilman) ("Q.  Are you familiar, Dr. Gilman, that at this time – the date is July 18th in this email, but in or about that time, that there was an article – this article published in the Lancet Journal that questioned whether the beta-amyloid theory . . . would actually be successful in treating Alzheimer's disease? A.  Yes."); *see also* App. B at 18.)

article was a focus of his consultations with investors interested in Alzheimer's Disease.[73]

- ***Rumors about PML associated with Tysabri emerged leading up to ICAD.*** Tysabri was Elan's main drug on the market in 2008. The drug had been associated with the fatal virus Progressive Multifocal Leukoencephalopathy ("PML"), which in fact caused the FDA to take Tysabri off the market for a period in 2005 and 2006.[74] Leading up to ICAD, rumors emerged about additional PML cases associated with Tysabri.[75] Mr. Martoma himself was focused on the risks associated with Tysabri and particularly the negative impact of additional PML cases on Elan's stock price, as Ms. Lyndon testified.[76]

- ***Selling Elan and Wyeth securities would lock in profits.*** SAC's sales of Elan and Wyeth securities locked in its profits. Elan's stock price had increased by 36 percent in June and July 2008 while the S&P 500 index had decreased by 7.8 percent.[77] Selling before ICAD would lock in those profits. Indeed, SAC risk manager Benjamin Dunn – who advised Mr. Martoma on his portfolio – stated: "markets are f*cked up right now. . . . This is a tough environment with institutions most likely going to cash right now . . . ."[78]

Given this context and the overwhelming pressure to sell, the Government failed to prove that

SAC's sales of Elan and Wyeth securities were "based on" alleged "inside information." Since

the evidence at trial provided at least "nearly equal circumstantial support to a theory of guilt and

a theory of innocence," this Court should enter a judgment of acquittal. *Cassese*, 428 F.3d

at 103; *accord D'Amato*, 39 F.3d at 1256; *Mulheren*, 938 F.2d at 372.

---

[73] (Tr. 1727:22-1728:9 (Gilman), *see also* App. B at 18.)

[74] (Tr. 1535:13-15 (Gilman); *see also* App. B at 19-21.)

[75] (*See* DX 122 (July 25, 2008, UBS Investment Research report regarding Tysabri); DX 163-A (July 8, 2008, Summer Street Research Partners Morning Call summary); DX 163-B (July 8, 2008, Summer Street Research Partners report (entitled "No Confirmed PML Yet, but Expected at Some Point")); DX 1117 (July 8, 2008 e-mail from Ms. Lyndon to Mr. Martoma forwarding a July 8, 2008 Cowen report); *see also* App. B at 20-21.)

[76] (*See, e.g.*, Tr. 2087:25-2088:10 (Lyndon) ("Q. Was this Tysabri drug a drug that Elan was co-developing with another company called Biogen? A. Yes. Q. Is it fair to say that you followed developments with respect to Tysabri both as it related to Elan and as it related to Biogen? A. Yes. Q. Am I right that this is consistent with what you described as Mathew's concern as well throughout that the threat of PML could have a negative impact on Elan stock? A. That's right."); *see also* App. B at 20-21.)

[77] (DX 1512 (Chart of S&P 500 Index Market Value, May 2008 – July 29, 2008); DX 1513 (Chart of Elan Share Price, January 2007 – July 29, 2008).)

[78] (DX 1423 (July 3, 2008 e-mail from Mr. Dunn to Mr. Martoma; *see also* App. B at 22.)

**4.      The Government Has Failed To Prove Beyond A Reasonable Doubt That Dr. Gilman Or Dr. Ross Obtained A Personal Benefit.**

*First*, the Government failed to prove a credible *financial benefit to Dr. Gilman or Dr. Ross* from this supposed collaboration with Mr. Martoma.  The only financial benefit identified by the Government was the consulting fees.  Both Dr. Gilman and Dr. Ross admitted, however, that they received those fees no matter what was discussed:[79] those fees were not related to any sharing of inside information.  In fact, on the two dates when Dr. Gilman claimed that he revealed the Phase II bapi trial results to Mr. Martoma (*i.e.*, July 17 and 19, 2008), Dr. Gilman testified that he did *not* submit a bill or receive a payment.[80]  In short, the consulting fees were compensation for consultations – not for the disclosure of inside information.  That is not a financial benefit under the federal securities laws.  *See Dirks v. S.E.C.*, 463 U.S. 646, 664 (1983).

*Second*, the Government did not prove a non-monetary benefit to Dr. Gilman or Dr. Ross.

- According to Dr. Gilman, he believed that Mr. Martoma and he were friends, and he shared inside information with Mr. Martoma "primarily based on our relationship."[81]  The evidence at trial, however, did not reflect any such friendship.  Dr. Gilman did not share details about his own life with Mr. Martoma; he did not meet Mr. Martoma's wife and children; and he did not meet or socialize with Mr. Martoma outside of a handful of occasions at Alzheimer's Disease conferences, investor roundtables, or consultations.[82]  This type of relationship, which lacks any "social component," is insufficient to establish a personal benefit.  *See S.E.C. v. Rorech*, 720 F. Supp. 2d 367, 415-16 (S.D.N.Y. 2010).

---

[79]   (Tr. 1538:25-1539:2 (Gilman), 1539:9-1540:17 (Gilman); Tr. 779:8-11 (Ross).)

[80]   (Tr. 1917:19-1918:7 (Gilman).)  The Government specifically noted this testimony from Dr. Gilman in its summation.  (Tr. 2967:13-16 ("How else do you know that the two men discussed the secret results during this call, this hour and 45 minute call?  Well, Martoma didn't arrange this call through GLG.  Dr. Gilman did not bill this call to GLG.").)

[81]   (Tr. 1273:21-24 (Gilman).)

[82]   (*See, e.g.*, Tr. 1237:16-1238:3 (Gilman).)

- According to Dr. Ross, he hoped to receive referrals from Mr. Martoma for his business ventures[83] and offered "to return the courtesy in othe[r] ways."[84]  Yet Mr. Martoma unequivocally stated that there was "no need to return the courtesy,"[85] and Dr. Ross himself *admitted* that Mr. Martoma never provided useful referrals.[86]

### 5.   The Government Has Failed To Prove Beyond A Reasonable Doubt That Mr. Martoma Had The Requisite Criminal Intent.

As this Court explained, the Government was required to show "that Mr. Martoma knew that the information he obtained had been disclosed in breach of a duty owed by Dr. Gilman or Dr. Ross to Elan or Wyeth and in exchange for a personal benefit to Dr. Gilman or Dr. Ross." (Jury Charge at 26; *see also id.* at 32-33.)[87]  The Government failed to establish Mr. Martoma's knowledge of either element.

*First*, there was insufficient evidence that Mr. Martoma knew that Dr. Gilman or Dr. Ross breached a duty to Elan or Wyeth in disclosing information.  Mr. Martoma was not a party to any agreements between Dr. Gilman or Dr. Ross and Elan or Wyeth,[88] and there is no evidence that Mr. Martoma had any understanding of the nature or scope of any obligations that they owed to Elan and Wyeth.  *See Cassese*, 428 F.3d at 102-03 (holding that a confidentiality agreement had "no probative value with respect to [the defendant's] intent" because "the Government adduced no evidence" that the defendant had ever read the agreement).

---

[83]   (Tr. 642:12-17 (Ross).)

[84]   (Tr. 641:15-642:5 (Ross); GX 366, at 1 (May 5, 2008, e-mail from Dr. Ross to Mr. Martoma).)

[85]   (GX 366, at 1 (May 9, 2008, e-mail from Mr. Martoma to Dr. Ross).)

[86]   (*See* Tr. 720:7-9 (Ross) (Q. Did he ever refer anyone to you that proved helpful with respect to your Iberica venture? A.  No.).)

[87]   *Accord United States v. Whitman*, 904 F. Supp. 2d 363, 371 (S.D.N.Y. 2012) ("[I]f the only way to know whether the tippee is violating the law is to know whether the tipper is anticipating something in return for the unauthorized disclosure, then the tippee must have knowledge that such self-dealing occurred, for, without such a knowledge requirement, the tippee does not know if there has been an 'improper' disclosure of inside information."), *aff'd*, 2014 WL 628143 (Feb. 19, 2014); *State Teachers Ret. Bd. v. Fluor Corp.*, 592 F. Supp. 592, 594 (S.D.N.Y. 1984) ("The second prerequisite to tippee liability – tippee knowledge of tipper breach – necessitates tippee knowledge of *each element*, including the personal benefit, of the tipper's breach.").

[88]   (*See* GX-2, GX 4, GX 20, GX 801.)

21

Nor did the Government show that Mr. Martoma **knew** that he received any material, non-public information in violation of Dr. Gilman's and Dr. Ross's obligations.

- Both Dr. Gilman and Dr. Ross admitted that it was **their** responsibility to draw the line between public and non-public information.[89]

- Dr. Gilman shared the same sorts of information about issues such as vasogenic edema, dropout rates, and dose response with other investors both at investor roundtables and in individual consultations that he supposedly shared with Mr. Martoma.[90]

- Dr. Ross shared the same sorts of information about issues such as vasogenic edema and enrollment data with other investors on a Piper Jaffray investor call (and in a Piper Jaffray analyst report) that he allegedly shared with Mr. Martoma.[91]

The Government failed to prove that Mr. Martoma (who attended Dr. Gilman's roundtable and Dr. Ross's investor call)[92] **knew** that the information that he allegedly received from Dr. Gilman or Dr. Ross on such topics was material, non-public information.  Indeed, given that Mr. Martoma was fully aware that both doctors were sharing similar, if not identical, information with so many other investors, the only reasonable inference is that Mr. Martoma believed that **all** such information was public.  *See Dirks*, 463 U.S. at 659-60 (holding that tippee liability under the misappropriation theory arises from the tippee's "role as a participant after the fact in the insider's breach of a fiduciary duty"); *State Teachers Ret. Bd.*, 592 F. Supp. at 594-95 ("[U]nless the tippee knew or had reason to know that the tipper had satisfied the elements of tipper liability, the tippee cannot be said to be a knowing participant in the tipper's breach.").

---

[89]   (Tr. 1571:15-20 (Gilman); Tr. 780:8-781:3 (Ross).)

[90]   (DX 759 (Rene Shen's notes from an April 15, 2008, GLG roundtable with Sid Gilman); DX 760 (Rene Shen's notes from his May 1, 2008, consultation with Sid Gilman); DX 761 (Rene Shen's notes from his June 17, 2008, consultation with Sid Gilman).)

[91]   (DX 540, at 1 (April 10, 2008, Piper Jaffray analyst report discussing April 9, 2008, Piper Jaffray investor call); Tr. 2420:12-2423:25 (Cecchini).)

[92]   (Tr. 1608:9-1610:11 (Gilman); Tr. 2425:3-2427:15 (Cecchini).)

***Second***, there is no evidence that Mr. Martoma knew that Dr. Gilman and/or Dr. Ross were disclosing information for their personal benefit.

- Mr. Martoma knew that Dr. Gilman and Dr. Ross received fees for their consultations with him, but those fees did not constitute a financial benefit.  (*See supra* at 20.)

- Dr. Gilman claimed that he disclosed information based on his friendship with Mr. Martoma, but there was no proof that Mr. Martoma was aware of such a "friendship," especially where his relationship with Dr. Gilman (such as it was) bore none of the hallmarks of a friendship necessary to constitute a personal benefit.  (*See supra* at 20.)

- Dr. Ross might have been willing "to return the courtesy" in exchange for useful referrals from Mr. Martoma, but there was no evidence that Mr. Martoma ***knew*** that Dr. Ross was disclosing information for that reason, especially when Mr. Martoma said that there was "no need to return the courtesy" and never provided the useful referrals for which Dr. Ross hoped.[93]  (*See supra* at 21.)

Here again, the Government has not proved that Mr. Martoma had the necessary intent.  *See Dirks*, 463 U.S. at 659-60; *State Teachers Ret. Bd.*, 592 F. Supp. at 594-95.

### B.   The Court Should Enter A Judgment of Acquittal On The Count Of Conspiracy To Commit Insider Trading.

"[T]o find that an agreement existed amongst the alleged conspirators, the finder of fact must necessarily find some knowledge of the aims of the agreement and the intent to bring them about."  *United States v. Svoboda*, 347 F.3d 471, 476 n.6 (2d Cir. 2003).[94]  The Government, however, failed to show either (1) an agreement between Mr. Martoma and Dr. Gilman or Dr. Ross to commit insider trading, or (2) the requisite criminal intent by Mr. Martoma to join any such agreement.

---

[93]   If Mr. Martoma thought Dr. Ross was providing him material, non-public information in exchange for referrals, certainly it would have been easy enough for Mr. Martoma to do so.  The Government's argument on this point makes no sense.

[94]   *Accord United States v. Rosenblatt*, 554 F.2d 36, 39 (2d Cir. 1977) ("Proof of the essential nature of the plan is required because the gist of the offense remains the agreement, and it is therefore essential to determine what kind of agreement or understanding existed as to each defendant." (internal quotation marks omitted)).

**First**, the Government has not proved an agreement between Mr. Martoma and

Dr. Gilman or Dr. Ross to commit insider trading.

- Dr. Gilman testified that he never discussed with Mr. Martoma (1) how (if at all) Mr. Martoma would use the information discussed during consultations or (2) whether Mr. Martoma or SAC even owned Elan or Wyeth stock.[95]

- Dr. Ross testified that he had no agreement with Mr. Martoma to buy or sell any stock, explaining that they never discussed Mr. Martoma's or SAC's purchases or sales of particular stocks and that Mr. Martoma never told him about SAC's position in Elan.[96]

*See* Jury Charge at 43 (The question in this case is whether "Mr. Martoma agreed with Dr.

Gilman or Dr. Ross to accomplish the illegal object charged in the conspiracy count – namely,

**insider trading**." (emphasis added)).[97]  Absent such an agreement, a judgment of acquittal should

enter on the conspiracy charge.

**Second**, for the same reason that the Government failed to prove Mr. Martoma's criminal

intent on the substantive counts – namely, there was insufficient evidence that (1) Mr. Martoma

had any understanding of the nature or scope of any obligations that Dr. Gilman or Dr. Ross

owed to Elan and Wyeth, much less knew that he had received material, non-public information

in violation of those obligations, or that (2) Mr. Martoma knew that Dr. Gilman or Dr. Ross was

disclosing information in exchange for any personal benefit – the Government has failed to prove

the requisite criminal intent by Mr. Martoma to join an agreement to commit insider trading.

"[W]here the crime charged is conspiracy, a conviction cannot be sustained unless the

Government establishes beyond a reasonable doubt that the defendant had the specific intent to

---

[95] (Tr. 1536:5-1537:15 (Gilman).)

[96] (Tr. 760:6-20 (Ross).)

[97] *See also United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) ("[W]here the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that . . .  there was a conspiracy to commit a particular offense and not merely a vague agreement to do something wrong." (internal quotation marks omitted)).

violate the substantive statute[s]." *Lorenzo*, 534 F.3d at 159; *accord United States v. Bufalino*, 285 F.2d 408, 416 (2d Cir. 1960) ("Evidence of the same intent or knowledge would be required to convict conspirators as to convict those charged with the substantive offense.").

## II.   THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33.

Federal Rule of Criminal Procedure 33 permits this Court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The rule by its terms gives the trial court broad discretion… to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (citation and internal quotation marks omitted)). "[T]he trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29." *Id.*  It is expressly permitted to weigh the evidence and assess the credibility of witnesses, and it may draw inferences against the Government in so doing: "The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* at 133-34; *accord United States v. Autuori*, 212 F.3d 105, 121 (2d Cir. 2000) ("[T]he district court may evaluate witness credibility and draw some inferences against the government in deciding whether a new trial is warranted."). "A guilty verdict might survive a Rule 29(c) motion – because a rational jury, viewing the evidence through the government's eyes, could convict – but fail to meet the Rule 33 standard because the momentum of the evidence as a whole would make a guilty verdict irrational." *Ferguson*, 246 F.3d at 139 & n.1.

Should any count survive Mr. Martoma's Rule 29 motion, this Court should order a new trial for both the reasons stated above in support of Mr. Martoma's Rule 29 motion and for the following separate and independent reasons.

A. **The Jury Was Tainted By Evidence Unrelated To The Charged Offenses.**

    1. **The Government Improperly Used Evidence Regarding SMC Meetings That It Had Disclaimed.**

Throughout the trial, the Government introduced evidence of consultations between Mr. Martoma and Dr. Gilman following SMC meetings between 2006 and 2008 (the "SMC Evidence"). Yet the Government ultimately disclaimed any charges of insider trading concerning the SMC meetings and the SMC Evidence in its closing. But that was too late. The Government already improperly influenced the jury. In attempting to benefit from the "possible cumulative adverse effect of evidence of unproven charges" from the Indictment that were effectively abandoned at trial, the Government tainted the jury's determination of whether Mr. Martoma was guilty of insider trading. *Ferguson,* 246 F.3d at 137 (affirming the district court's decision to grant a new trial under Rule 33); *accord United States v. Sam Goody, Inc.*, 518 F. Supp. 1223, 1225-26 (E.D.N.Y. 1981) (holding that "the taint of the RICO count, to wit, tarring the defendant with the label of racketeer" might have had "some prejudicial impact particularly when the jury came to consider the slim (albeit sufficient) circumstantial evidence produced" on other issues (citation and internal quotation marks omitted)).

From the beginning, the Government sought to have it both ways with respect to the SMC Evidence.

- In the Indictment, the Government alleged that, based in part on SMC meetings, "MARTOMA bought shares of Elan and Wyeth stock for his own portfolio and recommended that the founder and principal owner of the SAC Hedge Fund (the "SAC Owner") buy additional shares for the SAC hedge fund, which the SAC Owner did."[98]

- At the pre-trial conference on January 6, 2014, however, the Government changed its position and sought to admit SMC Evidence under a "canary in the coal mine" theory: "The defendant is alleged to have accumulated a long position based on

---

[98]  (Superseding Indictment ¶ 10.)

all sorts of things he was doing, some of which were legitimate but some of which he was getting information that was generally positive about the safety results and gave him this confidence that he could hold the position, maybe trade up and down a little bit, but hold the long position through the trial without fear that it would suddenly be canceled."[99]

- During its opening statement, the Government reversed course again and argued to the jury that Mr. Martoma did in fact accumulate a large position based on the SMC Evidence.  Just after detailing the alleged inside information that Dr. Gilman supposedly provided to Mr. Martoma after SMC meetings, the Government turned to trading in Elan and Wyeth: "[B]oth Mathew Martoma's portfolio and the accounts that are controlled by Steven Cohen, the position that SAC Capital had in Elan and Wyeth, the amount of stock they had, it increased over time . . . The strategy was to buy a large position and hold this large position up until the drug trial results were announced when Mathew Martoma told Mr. Cohen he expected the stock to go even further up."[100]

- During the trial, the Government then introduced evidence concerning Dr. Gilman's consultations with Mr. Martoma immediately following SMC meetings, focusing in great detail on the timing of such consultations and the information allegedly disclosed by Dr. Gilman during the consultations.[101]

- In its closing, the Government first argued that Mr. Martoma "continue[d] to build his position" in Elan and Wyeth in response to the SMC Evidence, and that "[h]e had long been buying shares of Elan and Wyeth while getting secret safety information about the drug," as well as recommending such purchases.[102]  On rebuttal, however, the Government completely walked away from this argument, and told the jury that its charges had nothing to do with the SMC Evidence: "[Y]ou heard a lot of argument about how the company Elan said at various points certain things about vasogenic edema publicly, about how the dropout rate wasn't all that significant ultimately, about how the data lock other people talked about, too.  All of that – maybe we are in agreement on this.  **But all of that is totally irrelevant**.  Nobody is on trial here, nobody is on trial for getting an additional detail about vasogenic edema that was one degree beyond what the company had said publicly.  There is no relevance to the data lock as being an offense that Mr. Martoma is charged with."[103]

---

[99]   (1/6/14 Pre-Trial Conference Tr. 23:16-23.)

[100]   (Tr. 48:10-13, 48:23-49:1 (Opening Statement); *see also* Tr. 48:10-50:8 (stating that when Mr. Martoma started "there was basically virtually no Elan and Wyeth stock that the hedge fund owned," and then providing details regarding the total amount of Elan and Wyeth stock held at the end of 2006, the fall of 2007, and the spring of 2008).)

[101]   (Tr. 1272:20-1286:12, 1329:23-1333:1, 1348:25-1353:4, 1355:8-1356:17, 1359:23-1364:2 (Gilman).)

[102]   (Tr. 2933:11-18, 2959:23-2960:2 (Closing Argument).)

[103]   (Tr. 3134:11-21 (Closing Argument) (emphasis added).)

The Government's decision to introduce and emphasize the SMC Evidence only to abandon that evidence during its rebuttal was improper, confusing to the jury, and influenced it to convict Mr. Martoma.

*United States v. Guiliano,* 644 F.2d 85 (2d. Cir. 1981), is on point. In that case, the Second Circuit ordered a re-trial on a conviction for bankruptcy fraud because of (*inter alia*) "the distinct risk that the jury was influenced in its disposition . . . by improper evidence." *Id*. at 88-89.[104] The Government alleged that the defendant fraudulently concealed certain assets from the bankruptcy trustee of a store that filed for bankruptcy after sustaining losses from a fire. *Id.* at 86-87, 88. Even as it "expressly disclaimed" a theory that the fire had been set, the Government offered evidence that the defendant and two others left the building shortly before the fire occurred, arguing that "the testimony was relevant because the fire helped precipitate the bankruptcy." *Id*. at 89. The Second Circuit affirmed a new trial because the "scant probative value" of this evidence "was plainly outweighed by the risk that the jury would make the very inference that the Government had specifically disclaimed" – *i.e.*, that the defendant had committed arson. *Id*.

In this case, while it disclaimed any insider trading associated with the SMC Evidence, the Government introduced such evidence, arguing that it was relevant because the consultations between Dr. Gilman and Mr. Martoma around SMC meetings helped precipitate the insider trading – *i.e.*, the SMC Evidence "showed that Dr. Gilman and Dr. Ross were giving Mathew Martoma whatever they had access to."[105] By focusing the jury on the SMC Evidence, the

---

[104] This decision arose in the context of the defendant's direct appeal from a conviction following a jury trial. The Second Circuit evaluated the evidence "in a light most favorable to the Government," *id.* at 89, which is a higher standard than that applicable to Mr. Martoma's arguments under Rule 33. *See Ferguson*, 246 F.3d at 133.

[105] (Tr. 3134:22-3135:1 (Closing Argument); *see also* Tr. 3128:5-23 (Closing Argument) (arguing that the SMC evidence showed a nefarious pattern).)

Government sought to take advantage of what it considered to be the suspicious timing of the SMC meetings and subsequent consultations between Dr. Gilman and Mr. Martoma. The "scant probative value" of the SMC Evidence, however, "was plainly outweighed by the risk that the jury would make the very inference that the Government had specifically disclaimed" – *i.e.*, that the SMC Evidence proved insider trading. That warrants a new trial here for the same reasons as in *Guiliano*.[106]

### 2. The Government Improperly Used Evidence Regarding Dr. Ross That Was Unrelated To The Substantive Counts.

Just as the Government tainted the jury with the SMC Evidence, it also tainted the jury with Dr. Ross's testimony. The Government offered Dr. Ross's testimony as evidence that Mr. Martoma obtained inside information about the Phase II bapi trial:

- In its opening statement, the Government told the jury that "Dr. Ross had signed a strict legal agreement with Elan, and it required to him to keep virtually everything he was learning during that drug trial secret" – but that "it didn't take long, you'll learn, for Dr. Ross to break that promise" and, in fact, Dr. Ross told Mr. Martoma "virtually everything he knew about the drug trial."[107]

- During the trial, the Government introduced evidence that Dr. Ross discussed the Phase II bapi trial with Mr. Martoma on multiple occasions.[108]

- In its closing, the Government asserted that these discussions were improper: "Mr. Martoma identified and sought out Dr. Ross who soon thereafter did begin giving Martoma confidential information about the drug trial."[109]

---

[106] Nor does the Government's "canary in the coal mine" theory justify the admission of the SMC Evidence. That theory amounts to nothing more than allegations that Mr. Martoma could "hold the long position through the trial without fear that it would suddenly be canceled." (1/6/14 Pre-Trial Conference Tr. 23:16-23.) The Government, however, may not bring charges for "insider holding" or conspiracy to commit "insider holding" because abstaining from transactions in a security does not violate the federal securities laws. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 566 (S.D. Tex. 2003) ("[T]he 'disclose or abstain' securities law rule is entirely consistent with, and indeed contemplates a decision not to purchase a particular stock."); Fried, *Insider Abstention*, 113 YALE L.J. 455, 456 (2003) ("Although Rule 10b-5 prohibits insiders from trading while in possession of material nonpublic information, it does not prohibit them from using such information to **abstain** from trading." (emphasis in original)); *see also Condus v. Howard Sav. Bank*, 781 F. Supp. 1052, 1056 (D.N.J. 1992) ("[T]his Court concludes that there is no proscription under New Jersey law against an 'insider' relying on favorable 'inside' information in making the decision to retain stock.").

[107] (Tr. 39:16-23, 40:6-41:1 (Opening Statement).)

[108] *See supra*, § I.A.1.

Dr. Ross, however, did not provide Mr. Martoma with any material, non-public information; and his testimony adds nothing to the Government's case. *See supra* § I.A.1. By offering such testimony, the Government created "a danger of prejudicial spillover" that confused and tainted the jury and resulted in an improper conviction based on seemingly nefarious – but unproven – charges. *Ferguson,* 246 F.3d at 137. It also amounted to unsubstantiated testimony about what the Government effectively claims were other bad acts – without the requisite notice to Mr. Martoma – that was inadmissible under Rule 404(b). *See Huddleston v. United States*, 485 U.S. 681, 689 (1988). The Government may not avoid this Rule by characterizing Dr. Ross's testimony, which did not involve sharing inside information, as evidence of the alleged conspiracy.[110] Dr. Ross's testimony necessitates a new trial.

### B.       Dr. Gilman's Testimony Should Not Be Allowed To Support A Conviction.

In determining whether a new trial is warranted pursuant to Rule 33, the Court should weigh the evidence and assess witness credibility. *Ferguson*, 246 F.3d at 133. Here, that begins and ends with Dr. Gilman's testimony. He was the Government's star witness. He was the ***only*** witness who claimed to share inside information on which Mr. Martoma allegedly traded.[111] His testimony goes to the heart of the case and, without it, there can be no real dispute that the evidence is insufficient to convict Mr. Martoma. Indeed, until Dr. Gilman agreed to cooperate, the Government did not even ***charge*** Mr. Martoma. Without his testimony, the guilty verdict cannot stand.

As a cooperating witness testifying pursuant to a non-prosecution agreement, Dr. Gilman's testimony "must be scrutinized with special care and caution." (Jury Charge at 12.)

---

[109]   (Tr. 2949:13-15,  2951:8-20 (Closing Argument).)

[110]   (*E.g.*, Tr. 2938:17-2939:20, 2946:9-20 (Closing Argument).)

[111]   As discussed above, Dr. Ross's testimony does not show that Mr. Martoma either received or traded on inside information.  (*See supra* at § II.A.2.)

In light of the significant holes in Dr. Gilman's memory – which evolved substantially over time with respect to the key facts at issue – coupled with the numerous inconsistencies and inaccuracies in his recollections, this Court should reject Dr. Gilman's testimony.  *See Autuori*, 212 F.3d at 120-21 (affirming the district court's order granting a new trial because, "guided by the district court's observations and analysis, we agree that the credibility of the principal witnesses was weak and that the soundness of the verdict is highly doubtful"); *Ferguson*, 246 F. 3d at 133-34.  Dr. Gilman's testimony cannot support a conviction for the following reasons.

*First*, Dr. Gilman had an unreliable and evolving memory about providing Mr. Martoma with the final results of the Phase II bapi trial.  Dr. Gilman recalled first sharing the final results with Mr. Martoma on July 17, 2008, when he e-mailed Mr. Martoma the PowerPoint presentation with the results and supposedly discussed that presentation with him.[112]  In fact, Dr. Gilman had a "vivid recollection" that Mr. Martoma called and asked for the password for the presentation.[113]  Yet the Government has never found any evidence that the email or presentation was *ever* sent to Mr. Martoma.  Moreover, Dr. Gilman later admitted that he was not certain that he sent the PowerPoint presentation to Mr. Martoma *at all*, let alone on July 17, 2008:

> Q:   How certain are you that the document you remember emailing him was the ICAD presentation?
>
> A:   I'm not absolutely certain.
>
> Q:   What is your best recollection as to when you sent him the ICAD presentation?
>
> A:   I'm not certain of the time I sent him the document.
>
>       . . .
>
> Q:   How confident -- are you confident that it was the 17th of July?

---

[112]   (Tr. 1485:12-1486:2 (Gilman).)

[113]   (Tr. 1485:20-1486:2 (Gilman).)

A:      I'm not. … I'm not very confident of that.[114]

The lack of any evidence that the presentation was ever sent to Mr. Martoma **and** Dr. Gilman's own admissions render his entire account of providing the Phase II bapi trial results to Mr. Martoma on July 17 unreliable.

Dr. Gilman recalled next sharing the final results with Mr. Martoma on July 19, 2008, when he discussed the PowerPoint presentation with Mr. Martoma at his office in Ann Arbor, Michigan.  Dr. Gilman admitted, however, that he did not have any recollection of a meeting at all in his first **six** interviews with the Government from February 2012 to March 2013.[115]  Indeed, Dr. Gilman admitted that he recalled the critical details of this supposed meeting (*i.e.*, discussing the Phase II bapi results with Mr. Martoma) just **two weeks** before he testified (and almost two years after the Government first asked him about it): "About two weeks ago I recalled what I related today.  There still remains some holes in my memory though."[116]  Dr. Gilman conceded that his memory on this point – the core of the Government's case – "was an evolutionary process."[117]  It is **incredible** that Dr. Gilman could not remember the first and only time that Mr. Martoma met him in his office in Ann Arbor, especially since it was the first and only time that they supposedly discussed the Phase II bapi trial results in person.  These circumstances "seriously impeached" Dr. Gilman's testimony.  *See United States v. Robinson*, 430 F.3d 537, 539-40, 543 (2d Cir. 2005) (affirming the district court's order granting a new trial where the defense "seriously impeached" the cooperating witness, the "primary impeachment" being the witness's admission that he had twice told the police that he could not identify the man

---

[114]   (Tr. 1487:4-21 (Gilman).)

[115]   (Tr. 1778:14-1779:3, 1819:23-1820:13, 1824:19-1825:18, 1825:19-1826:9, 1827:11-1830:7, 1832:10-1835:1 (Gilman).)

[116]   (Tr. 1469:9-18 (Gilman).)

[117]   (Tr. 1843:11-1844:4 (Gilman).)

who shot him and that he did not identify the defendant as the shooter until cooperation

negotiations began).

**Second**, Dr. Gilman's testimony was rife with inaccuracies and inconsistencies that

underscored his lack of reliability.

- Dr. Gilman's testimony about when he began sharing inside information with Mr. Martoma was incorrect. On direct examination, Dr. Gilman testified in great detail that he began sharing inside information with Mr. Martoma when he described minor adverse events from the Phase II bapi trial in late 2006 or early 2007.[118] Later on direct examination, however, Dr. Gilman admitted that he did not receive information about such minor adverse events until the end of the trial on July 11, 2008.[119] Dr. Gilman's testimony about the very start of the "conspiracy" – which ultimately led to the charges against Mr. Martoma – was **wrong**.

- Dr. Gilman's testimony about when he **finished** consulting with Mr. Martoma was likewise incorrect. On direct examination, Dr. Gilman testified that he never had another consultation with Mr. Martoma after they had lunch following ICAD on July 30, 2008.[120] However, the evidence showed that Dr. Gilman consulted with Mr. Martoma on two subsequent occasions in late 2008 and early 2009 – before Mr. Martoma stopped using GLG altogether due to cost considerations. Dr. Gilman and Mr. Martoma actually spoke for nearly four hours (and for which Dr. Gilman was paid nearly $4000).[121] Dr. Gilman's testimony about how his "friendship" with Mr. Martoma ended was **wrong**.

- Dr. Gilman's testimony that he did not share information in violation of his obligations with anyone other than Mr. Martoma (and Mr. Munno) also was incorrect. On direct examination, Dr. Gilman testified that he shared such information only with Mr. Martoma and with Mr. Munno at Mr. Martoma's request.[122] On cross-examination, however, Dr. Gilman admitted, after being confronted with the documentary evidence, that he might have shared the same information at roundtable discussions with many investors and during individual

---

[118]   (Tr. 1168:11-16, 1275:19-1276:2, 1240:19-1242:8 (Gilman).)

[119]   (Tr. 1245:15-22 (Gilman); *see also* Tr. 930:7-932:8 (Liu).)

[120]   (Tr. 1232:8-16, 1487:24-1488:7, 1491:23-1492:13 (Gilman).)

[121]   (GX 600 (GLG log of Dr. Gilman's consultations showing that he consulted with Mr. Martoma on November 2, 2008, for which he was paid $2,167, and again on January 30, 2009, for which he was paid $1,667; *see also* Tr. 1540:14-1541:1 (Gilman) (testifying that he would not have been paid by GLG unless a consultation actually took place).)

[122]   (Tr. 1201:18-25 (Gilman) (testifying that he only shared confidential information with Mr. Martoma); Tr. 1389:10-20 (Gilman) (testifying that he only shared confidential information with Mr. Munno at Mr. Martoma's request).)

consultations with investors such as Rene Shen.[123]  Dr. Gilman's testimony about the nature of the information that he shared with Mr. Martoma was **wrong**.

- Even Dr. Gilman's testimony about certain basic facts regarding the Phase II bapi trial – including the basic dosing procedures – was incorrect.  On direct examination, he testified that patients first received a low dose and then received progressively higher doses as the trial proceeded.[124]  On cross-examination, however, Dr. Gilman admitted that, in fact, each patient received the same dose throughout the trial.[125]  Dr. Gilman's testimony about the Phase II bapi trial, for which he served as chairman of the SMC for more than three years, was **wrong**.

Such inaccuracies and inconsistencies, which were pervasive in Dr. Gilman's testimony, render his testimony unreliable.  *See Autuori*, 212 F.3d at 120-21 (affirming the district court's grant of a new trial where the testimony of the government's two main witnesses was "dubious," "problematic," "riddled with inconsistency," and "contradicted by other government witnesses").

*Third*, Dr. Gilman's testimony about the basis for his recollections was false.  On direct examination, Dr. Gilman claimed that he only "glanced" at documents in preparation for his testimony.[126]  On cross-examination, however, he admitted not only that he had in fact reviewed documents in detail in advance of his testimony,[127] but also that his testimony on many points merely repeated what he had seen in those documents:

- When asked if he recalled his first consultation with Mr. Martoma, Dr. Gilman stated:  "I never said that I recall that first consultation.  I only know that it occurred because I've seen documents showing that that consultation occurred."[128]

- When asked if he recalled telling prosecutors that he did not share confidential information with Mr. Martoma until Spring 2007, Dr. Gilman stated:  "I

---

[123]  (Tr. 1389:10-20, 1628:21-1629:3 (Gilman).)

[124]  (Tr. 1181:14-19, 1187:7-16 (Gilman).)

[125]  (Tr. 1878:8-1879:13 (Gilman).)

[126]  (Tr. 1246:2-10 (Gilman).)

[127]  (Tr. 1772:19-1773:1, 1776:19-23 (Gilman).)

[128]  (Tr. 1646:15-1647:9 (Gilman); *see also id.* at 1648:3-19 (Gilman).)

remember telling them that, but I've since seen documents that suggest it was earlier.  It may have been as early as late 2006."[129]

Dr. Gilman's concessions that he was testifying to the contents of documents rather than his own independent recollection of events – particularly where it concerns the heart of the Government's allegations against Mr. Martoma – render his testimony unreliable.[130]

**Fourth,** Dr. Gilman's testimony on direct examination calls into question his competence to testify.  For example, in response to some of the very first questions from the Government on direct examination, Dr. Gilman testified that the University of Michigan student body was about 1,500 people and that approximately 1,500 people lived in Ann Arbor.[131]  Later, on cross-examination, Dr. Gilman admitted that this testimony was "totally wrong," as the study body of the University of Michigan is in fact "around 40,000" and the population of Ann Arbor is actually "about 150,000 people."[132]  Notably, these were not "gotcha" trivia-type questions from the defense; they were background questions on direct from the Government.  If Dr. Gilman was so confused about the University and the town where he spent his career and life, how could a rational finder of fact trust that he was not similarly confused about (1) the timing of when he shared information with Mr. Martoma, or (2) the identities of the investors with whom he spoke?  Dr. Gilman's initial responses to these basic questions reflect a complete detachment from reality that pervades his testimony.  Coupled with his unpredictable reactions to the examiner and the Court, as well as his answers that were often non-responsive or *non sequiturs*, that detachment from reality raises serious questions about his competence and further belies the reliability of his testimony.

---

[129]   (Tr. 1857:20-1858:6 (Gilman).)

[130]   Indeed, this Court repeatedly had to instruct Dr. Gilman that he was being asked for his own recollection rather than simply to read from documents placed in front of him.  (*E.g.*, Tr. 1874:14-1876:6, 1834: 8-10 (Gilman).)

[131]   (Tr. 1163:15-1164:1 (Gilman).)

[132]   (Tr. 1879:14-1880:1 (Gilman).)

*Fifth*, the stark difference in Dr. Gilman's demeanor on direct examination and cross-examination underscores the unreliability of his testimony.  In answering the Government's questions, Dr. Gilman was open, forthcoming, and responsive.  In answering Mr. Martoma's questions, Dr. Gilman was evasive, hostile, and even obstructionist – repeatedly expressing "confusion" about questions and necessitating intervention from the Court.  Dr. Gilman's change in demeanor at best reflects an unwillingness to answer Mr. Martoma's questions and, at worst, an attempt to hide facts.  Either way, it further undermines the reliability of his testimony.

For all of these reasons, Dr. Gilman's testimony cannot be trusted.  Without the testimony of its star witness, the only witness who testified that he shared inside information on which Mr. Martoma allegedly traded, the Government's case collapses.  This Court should reject Dr. Gilman's testimony and order a new trial.

### C.      The Jury Was Biased By The Unsealed Motions *In Limine* Concerning Mr. Martoma's Dismissal From Harvard Law School.

The jury was presumptively biased by the motions *in limine* concerning Mr. Martoma's dismissal from Harvard Law School that were unsealed in the midst of jury selection.  Although the evidence underlying the motions *in limine* was never admitted at trial, the motions themselves garnered widespread media attention and negative publicity.  When the motions *in limine* were made public on the court docket on January 9, 2014, the underlying facts relating to Harvard Law School were immediately reported by a number of national and local publications.[133]  The next day, the Court appropriately polled the jurors, who did not report

---

[133]  *See, e.g.*, Matthew Goldstein & Alexandra Stevenson, *Ex-SAC Trader Was Expelled from Harvard Law School*, N.Y. TIMES, Jan. 9, 2014; Sam Gustin, *Here's Why Former SAC Trader Martoma Was Booted From Harvard*, TIME, Jan. 10, 2014; Patricia Hurtado & Bob Van Voris, *Ex-SAC's Martoma Said Expelled From Harvard Law School in 1999*, BLOOMBERG, Jan. 9, 2014; Matthew Goldstein, *Ex-SAC Trader Was Expelled from Harvard Law School*, N.Y. TIMES, Jan. 9, 2014; Christopher Matthews, *Ex-SAC Portfolio Manager Martoma Was Expelled from Harvard Law School*, WALL ST. J., Jan. 9, 2014; Nate Raymond et al., *SAC's Martoma Tried to Cover Up Fraud at Harvard, Documents Show*, REUTERS, Jan. 9, 2014; *NY Judge Orders Unsealing of Claims on SAC Ex-Trader's Tainted Harvard Law School Records*, ASSOCIATED PRESS, Jan. 9, 2014; Christopher

seeing those articles.[134]  The negative publicity continued throughout the trial, however, with at least 65 articles regarding Mr. Martoma's dismissal between January 9, 2014, and February 6, 2014.

Notwithstanding the Court's instructions to avoid such press coverage, the amount of negative publicity renders the jurors presumptively biased.  *See, e.g.*, *Estes v. Texas*, 381 U.S. 532, 536 (1965) (granting a new trial on direct appeal where the media's overzealous reporting efforts "led to considerable disruption of the hearings" and deprived defendant of his right to a fair trial).[135]  That is particularly true in this age of news alerts and social media, where press coverage of newsworthy events is sent automatically to many people (often directly to their phones) in real time throughout the day.  *Cf. Bruton v. United States*, 391 U.S. 123, 135 (1968) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.").  Given the prejudicial nature of the press reports and the likelihood that all jurors could not avoid the information in this age of social media and real-time alerts delivered directly to their personal devices, the jurors should be deemed presumptively biased; thus, a new trial is warranted.

---

Matthews, *Ex-SAC Portfolio Manager Martoma Was Expelled from Harvard Law School*, WALL ST. J., Jan. 9, 2014; Sam Gustin, *Here's Why Former SAC Trader Martoma Was Booted From Harvard*, TIME, Jan. 10, 2014.)

[134]   (Tr. 22:12-16 (Voir Dire).)

[135]   *Accord Daniels v. Woodford*, 428 F.3d 1181, 1211-12 (9th Cir. 2005) (applying presumption of prejudice when ruling on a due process challenge in a habeas petition where "the venue was saturated with prejudicial and inflammatory media publicity about the crime," including information that "was highly prejudicial and would not have been admissible at the guilt phase" of the trial) (internal quotation marks and alterations omitted); *Coleman v. Kemp*, 778 F.2d 1487, 1540 (11th Cir. 1985) (applying presumption of prejudice when ruling on a habeas petition  in a  case involving "inflammatory and prejudicial pretrial publicity" where "[m]any of the widely publicized facts were not admissible" at trial).

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Martoma respectfully requests that the Court enter a judgment of acquittal on all counts or, alternatively, order a new trial on any surviving count.

Dated: February 27, 2014  
     New York, NY

Respectfully submitted,

GOODWIN PROCTER LLP

By: /s/ Richard M. Strassberg
    Richard M. Strassberg (RS5141)
     (rstrassberg@goodwinprocter.com)
    John O. Farley (JF4402)
     (jfarley@goodwinprocter.com)
    Daniel Roeser (DR2380)
     (droeser@goodwinprocter.com)
    The New York Times Building
    620 Eighth Avenue
    New York, New York 10018
    Telephone:  (212) 813-8800
    Facsimile:  (212) 355-3333

    Roberto M. Braceras (RB2470)
     (rbraceras@goodwinprocter.com)
    53 State Street
    Boston, Massachusetts 02109
    Telephone:  (617) 570-1000
    Facsimile:  (617) 523-1231

    *Attorneys for Defendant Mathew Martoma*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2014, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.   I also certify that I have caused copies of the aforementioned document to be served via first class mail, postage prepaid upon all non-CM/ECF participants.

/s/ Richard M. Strassberg
Richard M. Strassberg (RS5141)
