UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| - v. - | :     S1 12 Cr. 973 (PGG) |
| | : |
| MATHEW MARTOMA, | : |
| | : |
| | : |
| | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT MATHEW MARTOMA'S MOTION FOR JUDGMENT
## OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
of America.


ARLO DEVLIN-BROWN
EUGENE INGOGLIA
Assistant United States Attorneys

# TABLE OF CONTENTS

Page

BACKGROUND ...................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.      THE DEFENDANT'S RULE 29 MOTION SHOULD BE DENIED AS A
        RATIONAL TRIER COULD HAVE FOUND SUFFICIENT EVIDENCE
        OF EACH ELEMENT OF THE CHARGED OFFENSES ........................................... 2

        A. Legal Standard ....................................................................................................... 2

        B. Discussion ............................................................................................................. 4

                1.   Martoma Obtained Material, Non-Public Information ..................................... 5

                        a.   Martoma Received Material, Nonpublic Information When Dr.
                             Gilman Gave Him the Final Efficacy Results Prior to ICAD ................... 5

                        b.   The Final Efficacy Results Were Material ................................................. 8

                2.   Martoma Traded on the Material, Non-Public Information ............................. 11

                3.   The Government Proved the Personal Benefit Element .................................. 14

                4.   Martoma Acted With Criminal Intent ............................................................ 17

                        a.   Martoma Knew That the Information Was Given to Him in
                             Breach of a Duty ...................................................................................... 17

                        b.   Martoma Knew That the Information Given to Him Was Non-Public ....... 19

                        c.   Martoma Knew That the Disclosures to Him Were For a
                             Personal Benefit to the Doctors ................................................................ 20

                5.   Martoma Conspired to Engage in Insider Trading .......................................... 21

II.     A NEW TRIAL IS UNWARRANTED UNDER RULE 33 ......................................... 24

        A. Legal Standard ....................................................................................................... 24

        B. Discussion ............................................................................................................. 25

                1.   The Government's Use Of Evidence Relating To SMC Meetings
                     Was Proper ................................................................................................. 25

i

2.  Dr. Ross's Testimony Regarding the Disclosure Of Confidential Information Does Not Warrant A New Trial ................................................... 29

3.  Dr. Gilman's Testimony Provides No Grounds For a New Trial...................... 30

4.  There Is No Evidence the Jury Was Biased By Or Even Aware Of Mr. Martoma's Dismissal From Harvard Law School ...................................... 35

CONCLUSION .....................................................................................................................36

# **TABLE OF AUTHORITIES**

Page

**Cases**

*Holland* v. *United States*, 348 U.S. 121 (1954) ......................................................4

*Jackson* v. *Virginia*, 443 U.S. 307 (1979)...........................................................2, 4

*Romero* v. *United States*, 28 F.3d 267(2d Cir. 1994) ........................................24

*SEC* v. Obus, 693 F.3d 276 (2d Cir. 2012) ..........................................................15

*United States* v. *Alcantar*, 83 F.3d 185 (7th Cir. 1996) .......................................4

*United States* v. *Aleskerova*, 300 F.3d 286 (2d Cir. 2002) ...................................3

*United States* v. *Autuori*, 212 F.3d 105 (2d Cir. 2000)................................*passim*

*United States* v. *Desena*, 260 F.3d 150 (2d Cir. 2001) ........................................3

*United States* v. *Desena*, 287 F.3d 170 (2d Cir. 2002) .....................................2, 3

*United States* v. *Falcone*, 257 F.3d 226 (2d Cir. 2001) .....................................22

*United States* v. *Ferguson*, 246 F.3d 129 (2d Cir. 2001).....................................24

*United States* v. *Gambino*, 59 F.3d 353 (2d Cir. 1995) .....................................25

*United States* v. *Glenn*, 312 F.3d 58 (2d Cir. 2002) .........................................3, 4

*United States* v. *Guadagna*, 183 F.3d 122 (2d Cir. 1999) ...................................3

*United States* v. *James*, 239 F.3d 120 (2d Cir. 2000) ..........................................3

*United States* v. *Jiau*, 734 F.3d 147 (2d Cir. 2013) ......................................15, 20

*United States* v. *Karlov*, 534 Fed. Appx. 38 (2d Cir. 2013) ...............................31

*United States* v. *Libera*, 989 F.2d 596 (2d Cir. 1993) ......................................22

*United States* v. *Martinez*, 54 F.3d 1040 (2d Cir. 1995)....................................3, 4

*United States* v. *McDermott*, 245 F.3d 133 (2d Cir. 2001)....................................3

*United States* v. *Morrison*, 153 F.3d 34 (2d Cir. 1998) ........................................................3

*United States* v. *Reyes*, 302 F.3d 48 (2d Cir. 2002) .........................................................2, 4

*United States* v. *Robinson*, 430 F.3f 537 ........................................................................31

*United States* v. *Sanchez*, 969 F.2d 1409 (2d Cir. 1992) ...........................................25, 30

*United States* v. *Stewart*, 433 F. 3d 273 (2d Cir. 2006) .................................................31

*United States* v. *Sureff*, 15 F.3d 225 (2d Cir. 1994) ........................................................4

*United States* v. *Taylor*, 92 F.3d 1313 (2d Cir. 1996) ....................................................3

*United States* v. *White*, 219 F.3d 442 (5th Cir. 2000) .....................................................4

## **Rules**

15 U.S.C.§ 78j(b) & 78ff .................................................................................................1
17 C.F.R. § 240.10b-5 .....................................................................................................1
18 U.S.C.§ 2 ....................................................................................................................2
18 U.S.C.§ 371 ................................................................................................................1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :

UNITED STATES OF AMERICA          :
                           :

        - v. -                 :      S1 12 Cr. 973 (PGG)
                           :

MATHEW MARTOMA,            :
                           :
                           :
                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT MATHEW MARTOMA'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

The Government respectfully submits this memorandum of law in opposition to the

defendant Mathew Martoma's motion pursuant to Rules 29 and 33 of the Federal Rules of

Criminal Procedure.

### BACKGROUND

On December 21, 2012, a Grand Jury sitting in this district returned Superseding

Indictment S1 12 Cr. 973 (PGG) ("the Indictment"), which charged defendant Mathew Martoma

in three counts.  Count One charged Martoma with conspiring to commit securities fraud from in

or about 2006 through in or about July 29, 2008, in violation of 18 U.S.C. § 371.  Count Two

charged Martoma with committing securities fraud in Elan, in violation of Title 15, United States

Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and

Title 18, United States Code, Section 2.  Count Three charged Martoma with committing

securities fraud in Wyeth, in violation of Title 15, United States Code, Sections 78j(b) & 78ff;

Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code,

Section 2.  Trial commenced on January 10, 2014.  After almost three days of deliberations, the

jury returned a verdict of guilty on all three counts of the Indictment.

## ARGUMENT

**I.  THE DEFENDANT'S RULE 29 MOTION SHOULD BE DENIED AS A RATIONAL TRIER COULD HAVE FOUND SUFFICIENT EVIDENCE OF EACH ELEMENT OF THE CHARGED OFFENSES**

In his post-trial motion, Martoma contends that the Government "failed to prove beyond

a reasonable doubt that Mr. Martoma committed any of the charged offenses."  (Mem. at 1.)  In

particular, Martoma contends that the Government failed to prove that (1) Martoma obtained

material non-public information; (2) Martoma traded on material, non-public information; (3)

that Dr. Gilman or Dr. Ross obtained a personal benefit from sharing material, non-public

information with Martoma; (4) Martoma acted with criminal intent; and (5) Martoma agreed to

commit insider trading with Dr. Gilman or Dr. Ross.  In fact, the Government presented ample

proof to satisfy the elements of each of the charged crimes.  Martoma's Rule 29 motion must

therefore be denied.

### A.  Legal Standard

A defendant making an insufficiency claim on a motion for a judgment of acquittal

pursuant to Rule 29 of the Federal Rules of Criminal Procedure "bears a very heavy burden."

*United States* v. *Desena*, 287 F.3d 170, 177 (2d Cir. 2002).  A jury verdict must be upheld if

"'*any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt.'" *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *Jackson*

v. *Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original); *accord United States* v. *Reyes*, 302

F.3d 48, 52 (2d Cir. 2002).  In considering the sufficiency of the evidence, a court must "view[ ]

all of the evidence in the light most favorable to the government." *United States* v. *Aleskerova*,

300 F.3d 286, 292 (2d Cir. 2002).

"'[T]o avoid usurping the role of the jury,'" *United States* v. *Autuori*, 212 F.3d at 114

(quoting *United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)), the court must "'resolve

all issues of credibility in favor of the jury's verdict,'" *United States* v. *Desena*, 287 F.3d at 177

(quoting *United States* v. *Desena*, 260 F.3d 150, 154 (2d Cir. 2001)).  "[T]he credibility of

witnesses is the province of the jury, and [the court] simply cannot replace the jury's credibility

determinations with [its] own." *United States* v. *James*, 239 F.3d 120, 124 (2d Cir. 2000); *see*

*Autuori*, 212 F.3d at 114 (court "may not substitute [its] own determinations of credibility or

relative weight of the evidence for that of the jury"); *United States* v. *Guadagna*, 183 F.3d at

129.  Moreover, the court must "credit[ ] every inference that the jury might have drawn in favor

of the government," *United States* v. *Morrison*, 153 F.3d 34, 49 (2d Cir. 1998), because "the task

of choosing among competing, permissible inferences is for the [jury], not for the reviewing

court," *United States* v. *McDermott*, 245 F.3d 133, 137 (2d Cir. 2001); *United States* v. *Martinez*,

54 F.3d 1040, 1043 (2d Cir. 1995).

The general rule about resolving credibility determinations in favor of the Government

means that, in considering the sufficiency of a conviction based in any part on cooperator

testimony, a court must credit the testimony of cooperating witnesses.  *United States* v. *Glenn*,

312 F.3d 58, 64 (2d Cir. 2002); *United States* v. *Taylor*, 92 F.3d 1313, 1333 (2d Cir. 1996)

("Although [appellant] complains that the bulk of this testimony came from cooperating witnesses, we must defer to the jury's resolution of any questions as to the credibility of witnesses.").[1]

"[T]he jury's verdict may be based entirely on circumstantial evidence."  *United States* v. *Martinez*, 54 F.3d at 1043; *United States* v. *Sureff*, 15 F.3d 225, 228 (2d Cir. 1994).  Because the jury is entitled to choose which inferences to draw, the Government, in presenting a case based on circumstantial evidence, "need not 'exclude every reasonable hypothesis other than that of guilt.'"  *Guadagna*, 183 F.3d at 130 (quoting *Holland* v. *United States*, 348 U.S. 121, 139 (1954)); *United States* v. *Reyes*, 302 F.3d at 56 (by "discount[ing] evidence of guilty knowledge entirely because there were possible . . . innocent explanations for [defendant's] conduct," district court "failed to view the evidence in the light most favorable to the government"); *Autuori*, 212 F.3d at 114 ("the government need not negate every theory of innocence"); *see also Jackson* v. *Virginia*, 443 U.S. at 326 (rejecting argument "that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt").

### B.  Discussion

The Government's evidence at trial amply supports the jury's conclusion that the defendant committed insider trading with respect to Elan and Wyeth stock, and that he conspired

---

[1]The general rule that a court must accept a jury's decision to credit the testimony of cooperating witnesses even if "their testimony was pock-marked with inconsistencies," *United States* v. *Glenn*, 312 F.3d at 64, may not apply where testimony is "incredible as a matter of law," that is, "if it relates to facts that the witness could not have observed or to events which could not have occurred under the laws of nature." *United States* v. *White*, 219 F.3d 442, 448 (5th Cir. 2000) (internal quotations omitted); *see also United States* v. *Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996). Of course, such is not the case here.

with Dr. Gilman and Dr. Ross to do so.  Martoma's claim to the contrary distorts or ignores important evidence presented at trial, and draws from this evidence the inferences most favorable to the defendant rather the Government.  Accepting the evidence presented at trial as credible and drawing all reasonable inferences therefrom --  as this Court must -- more than suffices to establish the defendant's guilt as to all three counts of the Indictment.

### 1.  Martoma Obtained Material, Non-Public Information

a.  <u>Martoma Received Material, Nonpublic Information When Dr. Gilman Gave Him the Final Efficacy Results Prior to ICAD</u>

The evidence at trial overwhelmingly established that Martoma received material, non-public information.  The most obvious and important example of Martoma's receipt of material non-public information is his receipt of the final efficacy results of the phase II bapinuezumab drug trial from Dr. Gilman, in advance of that information's public release at the ICAD presentation on July 29, 2008.  Tellingly, the defense devotes only ***two paragraphs*** to its argument that there was insufficient evidence at trial to establish that Martoma received the material, nonpublic information about the final efficacy results (Mem. 13-14), after devoting almost eight pages to arguments that various other information Martoma received from the doctors was either non-public or immaterial (Mem. 5-13). This burying of what the defense acknowledges was "the crux of the Government's case" (Mem. 13) under other arguments about other, far less central examples of Martoma's receipt of confidential information during the course of the conspiracy, brings to mind the adage "other than that, Mrs. Lincoln, how did you enjoy the play?"  The reason the defense makes such a half-hearted effort to argue that there was insufficient evidence at trial showing that Martoma received material, non-public information,

when he received the final efficacy results from Dr. Gilman in advance of their being made public at ICAD, is because any such argument is specious.

First, Dr. Gilman testified that Elan let him know that he would present the efficacy results at ICAD; that he went to California to meet with Elan and was "unblinded"; that he received a PowerPoint draft of the efficacy results presentation on July 17, 2008 from Elan's Enchi Liu; and that he spoke on the phone with Martoma and discussed the PowerPoint slides of the efficacy results with Martoma on July 17, 2008. (Tr. 1413-1439). And Dr. Ross testified that, when he spoke to Martoma on July 28, 2008, before the ICAD presentation to the public (but after, Gilman testified, Gilman had given the results to Martoma) Martoma asked Ross questions that indicated to Ross that Martoma already knew the detailed efficacy results. (Tr. 715-717). Viewing the evidence in the light most favorable to the Government, a rational trier of fact could clearly find that Martoma received material, non-public information about the final efficacy results on the basis of Gilman and Ross's testimony, or even on that of Gilman alone.

But the jury had much more evidence to rely upon. They had the password-protected email from Enchi Liu to Dr. Gilman, sent the day after Gilman returned from California, attaching the draft PowerPoint presentation containing the final efficacy results and stating that the email was not to be distributed. (GX 11, 11A). They had the phone record evidence showing that Gilman and Martoma spoke for an hour and 45 minutes on July 17, 2008. (GX 1211). The jury also saw evidence about what Martoma did next: he booked a round-trip flight to Detroit, Michigan for the next non-work day, in order to visit Dr. Gilman and go over the results in person with him, charging the expense on his wife's credit card. (GX 1170-A). The jury saw evidence that Martoma took that trip to Detroit two days later, on Saturday July 19, 2008, in the

form of Delta records and cell site data, among other things.  (GX 1307, 1400).  The jury saw evidence that, and heard testimony from, a Detroit area taxi driver who worked the airport route and, shortly after Martoma's flight landed in Detroit, whose phone called Dr. Gilman.  (GX 1120).   And of course the jury saw evidence that upon his return, Martoma reached out to the hedge fund's owner, Steve Cohen, about something "important" (GX 459);  spoke with Cohen on Sunday, July 20, 2008 (GX 1215); emailed Cohen about the Elan position (GX 460); and Monday morning the firm began secretly to unwind, and then short, its long-held, massive position in Elan (*see, e.g.*, GX 431 ("Obviously no one else knows except you and me and Steve"), GX 436). Viewing all that evidence in the light most favorable to the Government, a rational trier of fact could clearly find that Martoma spoke with Gilman about the efficacy results on the phone call on July 17, 2008, and then went to Detroit to meet with Dr. Gilman in person and received material, non-public information about the final efficacy results.

 In addition, the jury saw substantial evidence that Martoma had made it a practice of arranging for consultations with Dr. Gilman shortly after each meeting of the Safety Monitoring Committee ("SMC"), and that the two men had developed a practice in which Dr. Gilman would read the PowerPoint slides that he received for the SMC meetings, to Martoma over the phone. (GX 213, GX 224, GX 111, Tr. 1275-1276).  Viewing that evidence in the light most favorable to the Government, a rational trier of fact could conclude that Dr. Gilman would continue that practice when he received the PowerPoint slides containing the final efficacy results from Elan, and read them to Martoma.

b.   The Final Efficacy Results Were Material

Martoma's argument that the content of the draft PowerPoint presentation shared with Martoma by Dr. Gilman was immaterial is based almost solely on the fact that Dr. Wisniewski and Dr. Ross testified that the final efficacy results that Dr. Gilman provided to Martoma (which consisted of a 27 page draft PowerPoint) were not meaningfully different from their perspective when compared to the information made public by Elan in its four-page June 17, 2008 press release. This argument was thoroughly debunked at trial, obviously dismissed by the jury, and should be swiftly rejected here as well.

First, your Honor correctly instructed the jury that the correct question on materiality was whether the information disclosed at ICAD was material to **investors**.   (Tr.  3184).  So while doctors such as Dr. Wisniewski might have viewed the differences between the press release and final data unimportant from their vantage point as scientists and practitioners, the question for the jury was different –- it was, would the information that Martoma received (the draft ICAD presentation data) be material to investors?  And by that appropriate standard, the jury had many fact-based reasons to conclude that the information was material to the investing public.

The jury saw evidence of the change in the stock price of Elan and Wyeth, after the ICAD announcement. (GX 1262, GX 1264).  The price of both Elan and Wyeth stock fell sharply, in the day immediately following the ICAD announcement – by 42 percent for Elan, and by about 11 percent for Wyeth, on a day when the stock market, as measured by the S&P 500 index, was up.  (GX 1265.)  And the jury saw the aftermarket trading data in Elan stock, which showed that Elan's stock price began falling sharply during or immediately after the ICAD presentation.  (GX 1263).  By contrast, when the press release was issued in June, the stock price

8

of Elan increased.  Viewing all of  that evidence in the light most favorable to the Government, a

rational trier of fact easily could conclude that the information presented at ICAD was material

to investors.

The jury also heard testimony from defense witness Mr. Shen, who had attended ICAD

on behalf of the hedge fund he then worked for, Tokem Capital.  Mr. Shen sent an email at the

time describing the ICAD data as "a disaster" (GX 1353), and testified that the data was "much

worse" than he expected, and was "as bad as it could have been" to  the point where he was

"shocked."  (Tr. 2511-12).   Mr. Shen explained that the data revealed "no dose response" and

that one thing he found "most striking" was that the placebo group among non-carriers unusually

low.  (Tr. 2511-12).  Viewing that testimony and evidence in the light most favorable to the

Government, a rational trier of fact easily could conclude that the information presented at ICAD

was material to investors.

Moreover, the jury saw analyst reports introduced into evidence that made clear that the

press release was very thin, and left many questions unanswered.  One analyst report, issued after

the press release but before ICAD, and introduced into evidence by the defense, stated of the

press release that "we have only preliminary topline data at this point"; "we note the complete

absence of any numerical data in Elan's Phase 2 press release . . . the press release lacks P-

Values, treatment deltas and anything else that would allow an investor to understand if

favorable risk/benefit really exists" (DX 9, page 8).  Viewing that, and similar language in other

analyst reports, in the light most favorable to the Government, a rational trier of fact easily could

conclude that the information presented at ICAD was material to investors.

9

On top of all of this, the defendant himself explained in an e-mail that the drop in Elan and Wyeth stock price following the announcement was due to a "disconnect btw the data presentation and press release/mgt's communication ahead of time."  (GX 466).

On the basis of any or all of this testimony and sources of evidence, the materiality of the non-public information provided to Martoma by Dr. Gilman was sufficiently established, and the jury's findings were correct.

The defense motion addresses other instances on which Dr. Gilman and Dr. Ross provided confidential information to Martoma during the course of the conspiracy, and offers various arguments concerning whether that information was material or non-public.  (Mem. 5-13).  In some instances, such as with their arguments concerning vasogenic edema, the defense glosses over important timing considerations (that is, when Martoma learned certain information, as compared to when that information first became public.)  In others, the defense omits facts that a jury could reasonably have relied upon to reach a different conclusion than that propounded by the defense (for example, ignoring Mr. Shen's testimony that about the lack of dose response, and about the rate of decline of the placebo group of non-carriers as something he noted as "striking", as negative data coming out of the final efficacy presentation at ICAD) (Tr. 2512).  But the Court need not decide which of these other disclosures were material, because it is overwhelmingly clear that the jury had more than sufficient basis to conclude that Martoma received the material, final efficacy results from Dr. Gilman prior to ICAD in the form of an early preview of the presentation Dr. Gilman delivered.

### 2.  Martoma Traded on the Material, Non-Public Information

Martoma, in his motion, simply asserts that the Government failed to prove that Martoma traded on the material nonpublic information he received (ignoring all evidence to the contrary), and then accompanies that unfounded assertion with a laundry-list of reasons the defense offered at trial as to other good reasons Martoma or investors writ large may have had prior to the ICAD announcement to sell Elan and Wyeth securities.  (Mem.15, 16-19).  Martoma's argument should be rejected.  The Government offered ample proof from which a reasonable finder of fact could conclude that Martoma traded on, and caused the hedge fund to trade on, inside information.

First, as the defense correctly notes, the Government was required to prove, as the Court instructed, that the material, non-public information be "a factor" in the decision to sell Elan and Wyeth.  (Tr. 3192 ("A person uses material, non-public information in connection with a sale or purchase of a stock where that information is *a factor, however small,* in his decision to purchase or sell the stock, or cause the purchase or sale of stock." (emphasis added)).  The Government was not required to prove that the material, non-public information was the only factor in the decision to sell – just that it was a factor, however small.

And there is no dispute that the position was in fact traded.  No one contests that Elan and Wyeth stock were sold starting on July 21, 2008, and before the public announcement of the efficacy results at ICAD on July 29, 2008, both in Martoma's own GEHC account and in other firm accounts.

Here, the evidence concerning the timing of Martoma's own actions and communications in the lead-up to the big, secret sell-off, provide an ample basis for the jury to conclude that Martoma's receipt of the material nonpublic information from Dr. Gilman was a factor in the

11

decision to sell Elan and Wyeth.  As discussed above, after Martoma learned of the secret

efficacy results from Gilman on July 17, 2008 (as Gilman testified), he took dramatic action.  He

immediately (that same day) arranged to fly to Michigan to see the results himself, first-hand.

(GX 1170-A).  Martoma took that trip to Detroit two days later, on Saturday July 19, 2008 (GX

1307, 1400), and met with Gilman (GX 1120).  And then the very next day upon his return,

Martoma reached out to the hedge fund's owner, Steve Cohen, about something Martoma

indicated was "important" (GX 459); spoke with Cohen on Sunday, July 20, 2008 (GX 1215);

and emailed Cohen that same Sunday after the call specifically about the Elan position (indeed,

the subject line of the email sent by Martoma to Cohen was "ELN and WYE position summary"

(GX 460).  Viewing that evidence in the light most favorable to the Government, a rational trier

of fact easily could conclude that Martoma and Cohen were discussing Elan and Wyeth, and

discussing it in light of what Martoma had just learned from Gilman and had just the prior day

returned from Michigan after reviewing with Gilman – the material, nonpublic efficacy results.

Moreover, the jury also had evidence of what happened after Martoma and Cohen

discussed the Elan and Wyeth positions:  Monday morning, the firm began secretly to unwind,

and then short, its long-held, massive position in Elan, and later its position in Wyeth, ahead of

the ICAD announcement. (*see, e.g.*, GX 431 ("Obviously no one else knows except you and me

and Steve"), GX 436; GX 1258; GX 1259).  The trader responsible for executing the trades

provided updates to Martoma about how much stock had been sold, associated with which

accounts.  (GX 431).  And the jury saw evidence that Martoma sold the Elan and Wyeth

positions in his own account prior to ICAD announcement.  (GX 1256, GX 1259).

12

The jury also saw evidence that Martoma was compensated in 2008 specifically on the basis of his recommendations concerning Elan and Wyeth securities to Cohen.  (Tr. 472-481; 492-494; 497-502).  Indeed, his $9.3 million bonus for 2008 was driven by his recommendations concerning Elan and Wyeth.  (Tr. 472; GX 555; GX 556).  Mr. Berkowitz of SAC Capital testified that it would be "inconceivable" for someone to be tagged to be compensated for a position -– as Martoma was for Elan and Wyeth in 2008 –- if that person had not recommended that security to Cohen.  (Tr. 527).  Martoma himself, in an email he sent after the fact, claimed credit for the successful Elan trades, while making an argument about how much money he had made the firm through his recommendations.  (GX 550).  In an attachment to that email, Martoma estimated he made the firm some $212.6 million dollars;  and took credit for performance in multiple firm accounts such as the GEHC account, the GGEN account, the COHE account and other accounts, in which the Elan short sales took place.  (GX 550).  Viewing that evidence in the light most favorable to the Government, in combination with the other evidence concerning Martoma's acquisition of material, non-public information from Dr. Gilman, a rational trier of fact easily could conclude that Martoma was compensated for the Elan and Wyeth positions because he recommended that Cohen sell them, after Martoma received the secret efficacy results from Gilman.  Indeed, Martoma's email (GX 550) is essentially an admission that he caused the Elan sales, and it would be reasonable for a rational trier of fact to view it that way.  And while there may or may not have been other reasons that factored into the decision to sell, as the defense argued after-the-fact, the Government presented more than sufficient evidence from which a rational trier of fact easily could conclude that inside

13

information was a factor in Martoma's decision to trade, and cause the hedge fund to trade, Elan and Wyeth stock.

### 3.  The Government Proved the Personal Benefit Element

Martoma argues that the Government failed to prove the personal benefit element, because (it asserts) the consulting fees would have been paid whether or not material nonpublic information was exchanged; because the friendship between Gilman and Martoma does not qualify as a benefit; and because the referrals Ross hoped to receive from Martoma did not materialize.  Martoma is simply wrong across the board.

First, it is not disputed that Dr. Ross and Dr. Gilman each received financial compensation for their consultations with Martoma.  As a matter of logic and mathematics, it follows that the amount of financial compensation Dr. Ross and Dr. Gilman received increased, the more often Martoma chose to consult with them.  In addition, Dr. Gilman testified that one of the reasons he did consultations was to obtain money.  (Tr. 1228).  Indeed, Gilman consulted with Martoma much more than any of his other consulting clients.  (GX 603).  Dr. Ross testified that he did the consultations to earn money  (Tr. 556) including, in Martoma's case, to earn future income from referrals Martoma had promised to make to him.  Viewing that evidence in the light most favorable to the Government, a rational trier of fact easily could conclude that Martoma consulted with Gilman and Ross more often because of the practice they developed of sharing confidential information with Martoma; and the more often they consulted, the higher the financial benefit to Ross and Gilman.  Likewise, a jury could readily have concluded, as a matter of common sense, that Dr. Gilman and Dr. Ross understood that Martoma continued to contact them for financially lucrative consultations based at least in part on the fact that they were

providing him with useful information, to wit, confidential information about the ongoing Drug
Trial.

Second, Martoma asserts that the relationship between Dr. Gilman and Martoma lacked
any "social component" and therefore is insufficient to establish a personal benefit on that
alternative ground.  But, to the contrary, Dr. Gilman testified that Martoma told him that he
"wanted to be friends" (Tr. 1236); they met to have coffee and chat (Tr. 1237); Martoma talked
with Gilman "about his family, about his wife, about having children in fairly rapid succession,
and told me about his parents emigrating from India." (Tr. 1237-1238).  Dr. Gilman testified that
Martoma worried when he could not reach Dr. Gilman by phone, on an occasion on which
Gilman was traveling abroad, and Gilman was touched by that.  (Tr. 1239-1240).  Dr. Gilman
testified that his relationship with Martoma was different than the relationship he had with other
clients; that he liked Martoma; that Martoma reminded him of his son whom he had lost to
suicide.  (Tr. 1893).  Viewing that evidence in the light most favorable to the Government, a
rational trier of fact easily could conclude that Dr. Gilman and Martoma had a kind of friendship,
with a social component, such that Dr. Gilman received a non-monetary benefit -– that is, the
maintaining or developing a personal friendship -- in connection with his disclosure of material
nonpublic information to Martoma.  *See United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)
(personal benefit is "broadly defined" to include making a gift of the confidential information  to
a trading relative or friend); *SEC* v. *Obus*, 693 F.3d 276, 292 (2d Cir. 2012) (stating that the SEC
had to prove tipper derived some benefit from tip, but that, "[i]n light of the broad definition of
personal benefit set forth in *Dirks*, this bar is not a high one").

15

Similarly, the exchange of information about bapineuzumab between Martoma, who was knowledgeable about a range of Alzheimer's diseases treatments in addition to bapineuzumab, and Dr. Gilman, might reasonably have been viewed by a finder of fact as business relationship that Dr. Gilman saw fit to maintain because it furthered Dr. Gilman's academic and research goals in the field.

Finally, Martoma argues that the Government has failed to prove the personal benefit element because Ross never received the business referrals he openly sought from Martoma. (Mem. 21).  But it is not required that Ross actually received the hoped-for business referrals; only that he sought or anticipated the benefit of developing a business contact, in return for the provision of inside information.  Indeed, the Court correctly instructed the jury that the Government was required to prove that Dr. Gilman or Dr. Ross "received or ***anticipated receiving*** some personal benefit, direct or indirect, from disclosing the material, non-public information at issue." (Tr. 3191) (emphasis added).   Your Honor correctly instructed that the benefit "could include obtaining some future advantage, ***developing or maintaining a business contact or a friendship***, or enhancing the tipper's reputation." (Tr. 3191) (emphasis added). There was ample evidence from which the jury could conclude that Ross provided inside information in the hope of developing a business contact that might yield referrals to his clinic. Dr. Ross expressly testified that was his motivation.  (Tr. 642)  And Dr. Ross made this clear to Martoma in his communications with Martoma at the time, in numerous emails, telling Martoma that he was looking for business contacts for his clinic, inviting Martoma to the grand opening of

16

his new clinic (Martoma attended), and offering to return the courtesy of referrals "in other ways".  (GX 342, GX 366, GX 980).[1]

### 4.  Martoma Acted With Criminal Intent

Martoma asserts that the Government failed to demonstrate that Martoma acted with criminal intent in three respects.  First, Martoma argues that the Government failed to show that Martoma knew that Dr. Gilman and Dr. Ross breached a duty to Elan or Wyeth.  Second, Martoma argues that the Government failed to prove that Martoma knew that the information he received was non-public.  Third, Martoma argues that the Government failed to prove that Martoma knew that the doctors were disclosing the information for their personal benefit.  (Mem. 22-23.)   Martoma is wrong.

### a.   Martoma Knew That the Information Was Given to Him in Breach of a Duty

There was ample evidence at trial from which a rational trier of fact could conclude that Martoma knew the information he received from Dr. Ross and Dr. Gilman was provided in violation of a duty to Elan and Wyeth.

Among this evidence was a series of emails that Martoma received from the Gerson Lehrman Group ("GLG") that expressly notified him of the obligations of the doctors with which he was consulting.  For example, Martoma received an email from GLG in October 2006, in connection with a consultation with Dr. Gilman, in which GLG stated that Martoma was

---

[1]      Martoma argues that he told Dr. Ross that there was "no need to return the courtesy" (Mem.  21); but that disclaimer notwithstanding, viewing that evidence in the light most favorable to the Government, a rational trier of fact easily could conclude that Dr. Ross agreed to provide inside information to Martoma in order to develop a business contact that might provide him with referrals for his clinic in the future.

agreeing not to seek material, nonpublic information from Dr. Gilman; that Martoma had to

respect any agreements that Gilman had; and that Martoma understood that Gilman (and other

experts) may be constrained by obligations or agreements in what they could discuss.  (GX 265).

In addition, the email provided, as an example, the scenario in which a doctor participated in a

clinical drug trial, and advised that such a doctor may have obligations to keep certain

information confidential.  More specific emails were received by Martoma in 2007 and the first

half of 2008, in which GLG specifically advised that Dr. Gilman could not speak about

bapineuzumab, due to his role on the SMC.  (GX 267, GX 268, GX 269, GX 272).

     In addition, the SAC Code of Conduct that Martoma received provided a specific

warning, in the context of insider trading, about doctors participating in clinical drug trials.  (GX

599 at page 19).  And Dr. Gilman testified that, in the beginning of their relationship, when

Martoma asked for confidential information, Gilman told him he could not provide that

information; only after time passed, and Martoma continued to ask, did Gilman provide the

confidential information.  (Tr. 1265-1267).

     Moreover, the jury saw evidence that Martoma specifically sought out for consultations

doctors who were serving as principal investigators on the bapineuzumab drug trial; doctors who

by virtue of their roles had information that was non-public about the drug trial.  (GX 262, GX

324).  Viewing that evidence in the light most favorable to the Government, a rational trier of

fact easily could conclude that Martoma deliberately sought out consultations with doctors who

had inside information about the drug trial, for the purpose of illicitly obtaining it from them.

     Finally, the very nature of the information that Martoma received from Dr. Gilman in

July 2008 was such that it was obvious to anyone, especially someone sophisticated and

18

knowledgeable about drug trials such as Martoma, that it had been obtained in violation of a duty to Elan and Wyeth.  Dr. Gilman told Martoma that he was to be unblinded to the efficacy results and was going to give the presentation of the efficacy results at ICAD.  (Tr. 1423-1424).  The fact that Dr. Gilman was getting the final efficacy results in advance of their presentation to the public, itself strongly suggested a duty on the part of Gilman to maintain the secrecy of the information, as someone of Martoma sophistication (Tr. 617; 1234) would understand.

Viewing all that evidence in the light most favorable to the Government, a rational trier of fact easily and appropriately could conclude that Martoma understood that he was receiving information from Dr. Gilman and Dr. Ross in violation of a duty.

> b.    Martoma Knew That the Information Given to Him Was Non-Public

Martoma baselessly asserts that there is no evidence that Martoma knew the information he received was non-public. (Mem. 22).  But he fails to address whatsoever Martoma's receipt of the ***efficacy*** information, about which none of his arguments concerning disclosure to other analysts or at other consultations remotely apply.  Indeed, the jury was presented with ample evidence from which to conclude that the Martoma knew that the efficacy information he received from Dr. Gilman was non-public.  Martoma argues that Dr. Gilman shared similar information with other investors.  (Mem. at 22).  But there was no evidence that Dr. Gilman provided the final efficacy results to anyone but Martoma.  And Martoma clearly understood that the final efficacy results were non-public at that point.  Among other things, analyst reports in June and July 2008 were speculating about what the data would show when it finally was made public at ICAD.  *See, e.g.,* DX 9; DX 1144A; GX 1372.  Elan's June 2008 press release had informed the public that the final efficacy data would be released at ICAD on July 29, 2008.

(GX 10).   In addition, Martoma's secrecy efforts (listing Dr. Gilman's phone number backwards in his calendar entry, not booking key calls with Gilman in July though GLG)  provide a reasonable basis for a trier of fact to conclude that Martoma knew the information he received was non-public. (GX 522; GX 600).  There simply is no credible argument that someone as sophisticated as Martoma about drug trials, thought the efficacy data, which Dr. Gilman read to Martoma over the phone and which Martoma made special arrangement to fly to Detroit to see in person, were already public.

        c.      <u>Martoma Knew That the Disclosures to Him Were For a Personal Benefit to the Doctors</u>

The jury had ample reason to conclude that Martoma knew about the personal benefits to Dr. Gilman and Dr. Ross. [2]  First of all, no one has disputed that Martoma knew that the doctors were paid for each consultation, which provided each doctor with a direct financial benefit.

In addition, with respect to Dr. Gilman, it was Martoma who took the steps (described above) to befriend and ingratiate himself with Dr. Gilman, telling Dr. Gilman that he "wanted to be friends" (Tr. 1236); meeting him for coffee to chat (Tr. 1237); talking with Dr. Gilman "about his family, about his wife, about having children in fairly rapid succession" and "about his parents emigrating from India." (Tr. 1237-1238); and leading Dr. Gilman to believe that Martoma was worried about him and had made special efforts to locate him by phone, on an

---

[2] We note that the law does not require that Martoma knew that the doctors were receiving a personal benefit.  *See, e.g., United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)(articulating the elements the Government has to prove to establish insider trading liability; the tippee's knowledge of the personal benefit is not listed among the elements.)   However, the issue is currently being litigated before the Second Circuit, and the Government in this case took a conservative approach and proceeded with the instruction to the jury indicating that the Government had to prove that the defendant was aware of the benefit.

occasion on which Dr. Gilman was traveling abroad.  (Tr. 1239-1240).   Even Dr. Gilman's tone

in his correspondence with Martoma (*e.g.,* GX 235) demonstrates that the relationship was more

than strictly professional.   Viewing that evidence in the light most favorable to the Government,

a rational trier of fact could conclude that Martoma (aware of his own actions) knew that his

befriending of Dr. Gilman was, over time, bringing Martoma access to inside information about

the bapineuzumab drug trial.

      With respect to Dr. Ross, the evidence was clear that Ross repeatedly voiced his interest

in getting referrals from Martoma for his Iberica clinic (as discussed above).  Indeed, Martoma

personally attended the grand opening of Ross' Iberica clinic (GX 980), and encouraged Ross

with the prospect that Martoma might have some contacts for Ross (*e.g.,* GX 366 ("Am working

on this for you.").  Viewing that evidence in the light most favorable to the Government, a

rational trier of fact could conclude that Martoma knew that Ross was providing information to

Martoma in return for the hopes of future business contacts, based on Martoma's hearing Dr.

Ross' repeated entreaties for business contacts, as well as Ross' blatant invitation to "return the

courtesy" (Tr. 645), and Martoma's decision to attend the Iberica opening was a way of

providing hope to Dr. Ross that Martoma could be helpful in that way.  Viewing all of this

evidence in the light most favorable to the Government, a rational trier of fact easily could

conclude that Martoma understood that Dr. Ross and Dr. Gilman were receiving a benefit.

    **5.   Martoma Conspired to Engage in Insider Trading**

      Martoma argues that because Dr. Ross and Dr. Gilman did not know what securities

Martoma held, and did not discuss Martoma's trading strategies, that the Government failed to

prove a conspiracy to commit insider trading between Martoma, Dr. Ross and Dr. Gilman. Martoma is wrong.

In order to prove a tipeee's involvement in an insider trading conspiracy, it is more than sufficient, as here, that the Government prove that the tipper (in this case, Dr. Gilman and Dr. Ross) knew that the tippee was using the inside information that he received in order to make decisions about trading. For example, in *United States* v. *Libera*, 989 F.2d 596 (2d Cir. 1993), a misappropriation tippee case, the defendant unsuccessfully argued that the Government had to prove that the tipper specifically knew that his breach of fiduciary obligation in misappropriating the information would lead to trading on the information. The Court of Appeals rejected the argument, holding that the tipper's knowledge that he breached was sufficient to establish his expectation that the breach would lead to some kind of misuse of the information. "This is so because it may be presumed that the tippee's interest in the information is, in contemporary jargon, not for nothing." 989 F.2d at 600. *See also United States* v. *Falcone*, 257 F.3d 226 (2d Cir. 2001) (Government required to prove a breach by the tipper of a duty, and the defendant tipee's knowledge that the tipper had breached the duty).

The evidence was compelling that Dr. Ross and Dr. Gilman understood that Martoma would use the confidential information they were disclosing in connection with the purchase and sale of securities, and that this was an implicit part of the conspiratorial agreement. At trial, Dr. Ross testified that he knew Martoma was an investor; and that he understood that investors buy and sell stock. (Tr. 826). The purpose of the consultations was expressly for doctors to share their knowledge with investors. Dr. Ross further testified that he agreed to meet with Martoma on the night of July 28, 2008, for the purpose of providing  Martoma with the confidential

22

efficacy results that were to be disclosed at the principal investigators' meeting. (Tr. 826).

After Dr. Ross learned that he, along with other principal investigators, would be given access to

the final efficacy results on July 28, 2008 -- the night before they were to be announced to the

public at the ICAD conference in Chicago -- on May 28, 2008, Dr. Ross told Martoma about the

meeting schedule (GX 365). Martoma made an appointment in his electronic calendar while

still on the phone with Ross. (GX 529). The calendar appointment included the meeting

location – the lobby of the Hyatt McCormick hotel where the presentation was to be held. (GX

529). The next day, Ross confirmed the date of the meeting with Martoma (GX 367). And later,

in July, Ross sent a confirmation email to Martoma, in which they agreed on a revised time for

the meeting. (GX 375.) Dr. Ross testified that the purpose of that agreed-to meeting was to give

Martoma the secret final results about the drug's efficacy, the day before they were to be made

public. (Tr. 826).

Dr. Gilman testified that he knew that Martoma was a fund manager for his company,

which he understood meant Martoma bought and sold securities (stocks and bonds). (Tr. 1236-

1237). Dr. Gilman testified that the reason Martoma was consulting with him, was so that

Martoma could make decisions about purchasing or selling securities in light of the information

he learned about pharmaceuticals from Dr. Gilman. (Tr. 1236-1237). Dr. Gilman testified that

he understood that Martoma was using the inside information that Gilman was providing him, to

buy or sell stocks. (Tr. 1369-1370). And of course, Dr. Gilman testified that Elan let him know

that he would present the efficacy results at ICAD; that he went to California to meet with Elan

and was "unblinded"; that he received a PowerPoint draft of the efficacy results presentation on

July 17, 2008 from Elan's Enchi Liu; and that he spoke on the phone with Martoma and

23

discussed the powerpoint slides of the efficacy results with Martoma on July 17, 2008.  (Tr. 1413-1439).   And that he met with Martoma in person in Detroit and went over the results again.

Viewing all of that evidence in the light most favorable to the Government, a rational trier of fact could easily conclude that Ross and Martoma had agreed to violate the law by engaging in insider trading – Ross by gaining the inside information and passing it to Martoma, the trader, to trade on it.  This more than satisfies the elements of the conspiracy charge.

## II.     A NEW TRIAL IS UNWARRANTED UNDER RULE 33

The defendant's claim that he is entitled to a new trial pursuant to Federal Rule of Criminal Procedure 33 is also baseless and should be denied.  The new trial motion is based on the allegedly improper use of particular evidence to support certain arguments (none of which were objected to at trial), the defendant's position that Dr. Gilman's highly inculpatory testimony was unpersuasive, and the defendant's claim – flatly rebutted by the trial record – that the jury "presumptively" read media articles relating to the defendant's dismissal from Harvard Law School and reached a verdict based on these media reports.  None of the defendant's particular claims have any merit, and are a realm apart from the true miscarriages of justice that could warrant the extraordinary remedy of a new trial provided by Rule 33.

### A.     Legal Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).   A new trial should be ordered "[s]paringly and in the most extraordinary circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)*; Romero* v. *United States*, 28 F.3d 267, 268 (2d Cir. 1994).  Because "motions for a new trial are disfavored in this Circuit," *United States* v. *Gambino*, 59 F.3d 353,

364 (2d Cir. 1995), district courts, after examining the totality of the evidence and considering objectively all of the facts and circumstances, should grant the motion only if the court finds ☐a real concern that an innocent person may have been convicted." *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "It is only when it appears that an injustice has been done that there is a need for a new trial 'in the interests of justice.'" *Id.* As such, a district court must exercise its Rule 33 authority "sparingly" and in only "the most extraordinary circumstances." *Id.*

**B      Discussion**

**1.      The Government's Use Of Evidence Relating To SMC Meetings Was Proper**

Martoma's lead argument for a new trial is that the Government improperly introduced evidence of consultations between the defendant and Dr. Gilman following SMC meetings through the course of the Drug Trial only to allegedly "disclaim[]" such evidence in its jury addresses. (Def. Mem. at 26). The evidence regarding the SMC meetings was entirely proper and the Government, rather than "disclaiming" such evidence, embraced the evidence in its summation and rebuttal as evidence establishing the conspiratorial relationship between the defendant and Dr. Gilman.

Count One of the Indictment charged the defendant with conspiring with Dr. Gilman between 2006 and July 2008 to obtain material non-public information about the Drug Trial. (Indictment ¶ 8). The Indictment alleged that, as part of this conspiracy, the defendant arranged consultations with Dr. Gilman following the Drug Trial SMC meetings in order to learn from Dr. Gilman the latest confidential safety information about the ongoing Drug Trial. (Indictment ¶ 10). The conspiracy count did not require proof that the conspiracy was successful at all,

25

much less proof that the defendant actually obtained confidential information following the SMC meetings, that such information was material and non-public, or that the defendant traded based on the SMC information.[3]

      This did not, of course, mean that the post SMC meeting consultations were irrelevant to Count One of the Indictment or that evidence relating to these meetings – introduced without objection – was improper.  The defendant's desire to meet with Dr. Gilman after he obtained confidential information at such meetings – and Dr. Gilman's willingness to schedule such meetings – was important proof of the conspiratorial relationship between Dr. Gilman and the defendant as well as proof of the defendant's intent to obtain from Dr. Gilman whatever new confidential data Dr. Gilman learned about the Drug Trial as soon as he learned it.

      Although the Government was not required to prove that Martoma actually traded on the SMC data to establish the defendant's guilt as to the conspiracy charge, the Government set forth in the Indictment – and took the position at trial – that that the information obtained through the SMC consultations was "in part" the reason that Martoma (and SAC Capital) bought shares in Elan and Wyeth prior to the negative information disclosed to Martoma by Dr. Gilman in July 2008.  (Indictment ¶ 8).  The Government explained its theory with respect to the SMC meetings *early on* in pretrial proceedings, in connection with its opposition to the defendant's motion for particulars.  *See* Docket Entry #26, filed on Mary 13, 2013.  In that opposition, the Government wrote that in addition to the generally positive safety data Martoma learned from these meetings, "the defendant's continuing access to [Dr. Gilman], as chair of the SMC, allowed

---

[3]     The substantive insider trading counts, Count Two and Count Three, were limited to the sale of Elan and Wyeth securities in July 2008, after Dr. Gilman provided Martoma with the final results.

the development of a long position while minimizing the risk that the defendant would be blind-sided by a bad news announcement, such as the trial being terminated early due to serious safety problems, or – just as is alleged to have occurred – detailed Drug Trial results likely to fall short of investor expectations."  Docket Entry #26 at 12 & n.5.  a 12, n.5.[4]

The Government's proof and argument at trial relating to the SMC meetings was consistent with both the charges in the Indictment and the position articulated prior to trial.  The Government offered evidence that Martoma arranged consultations with Dr. Gilman following SMC meetings in order to be briefed on the confidential safety data being presented to Dr. Gilman and that Dr. Gilman provided Martoma with this safety data during the consultations, including by discussing the PowerPoint presentations distributed to SMC members.  Consistent with its pretrial position, the Government argued in its opening that the evidence would show that Martoma increased the Elan and Wyeth positions only *in part* based on the safety disclosures by Dr. Gilman, and that a benefit Martoma obtained through the post-SMC consultations was the "opportunity . . . that if Dr. Gilman learned something bad about the drug trial, if he learned that there was bad safety information, Mathew Martoma would learn it himself right away and would have an opportunity to sell the stock or take whatever steps he needed to do before other people found out about the problem."  (Tr. 49).  The Government articulated the same argument in summation.  *See, e.g.* Tr. 2960 (arguing that the positive SMC information meant Martoma "could continue to buy without fear of being unexpectedly blindsided by bad safety news.")

---

[4]     The defendant's claim that the Government first articulated this "canary in the coal mine" theory on January 6, 2014 (Mem. at 26) is therefore incorrect.

27

The defendant's argument that the SMC evidence became irrelevant (and thus prejudiced the defendant to the point requiring a new trial) therefore rests solely on an incomplete and misleading quotation from the Government's rebuttal summation that, the defendant claims, proves that the Government "walked away from this argument and told the jury that its charges had nothing to do with the SMC Evidence" (Def. Mem. at 27).  The Government did no such thing.  A substantial part of the three-hour defense summation was devoted to the argument that certain information about vasogenic edema was disclosed by Elan and others to the investing public, and that particular details provided by Dr. Gilman to the defendant about this side effect were not materially different from the public disclosures.  (Tr. 3053-3061).  But whether each particular detail disclosed by Dr. Gilman to Martoma about vasogenic edema was public or material irrelevant; the Government had not charged and was not required to prove that particular trades were made based on vasogenic edema data disclosed following SMC meetings or that each disclosure of confidential vasogenic edema information was material.  In the rebuttal, the Government therefore reminded the jury of the insignificance of large portions of the defense argument, stating that while "you heard a lot of argument about how the company Elan said at various points certain things about vasogenic edema publicly" that was "totally irrelevant" because "nobody is on trial for getting an additional detail about vasogenic edema." (Tr. 3134:11-21).  While the defense quotes this portion of the Government's argument (Def. Mem. at 27), it leaves out the Government's very next sentence, which rebuts the defendant's claim that the Government conceded that the SMC disclosures were *entirely* irrelevant.  In the omitted part of the quotation, the Government went on:

28

> Now why did we talk about those things you might then say? Well, why we talked about them, why we brought out evidence is because it showed the corrupt relationship. It showed that Dr. Gilman and Dr. Ross were giving Mathew Martoma whatever they had access to. And Mathew Martoma got some benefit from that, especially the positive safety news, the whole canary in the coal mine bit. But the real benefit was that he got these doctors to a point where when they had something really good, like the actual results, that's when he could make the big money.

(Tr. 3134:22 – 3135:6). Thus the Government did not "abandon" the significance of the SMC meetings in rebuttal; it properly focused the jury on significance of these meetings being the development of the conspiratorial relationship between the defendant and Dr. Gilman not on whether each data point disclosed by Dr. Gilman after such meetings was of great moment. The admission of this highly relevant (and unobjected to) evidence in no way justifies a new trial.

### 2. Dr. Ross's Testimony Regarding The Disclosure Of Confidential Information Does Not Warrant A New Trial

The defendant's second argument for a new trial is that the Government "tainted" the jury through Dr. Ross's *unobjected to* testimony about providing confidential information to Martoma about the Drug Trial because "Dr. Ross . . . did not provide Mr. Martoma with any material, non-public information." The defendant's argument misrepresents the trial evidence and makes little sense. Dr. Ross testified that in consultations with Martoma while the Drug Trial was ongoing, Dr. Ross told Mr. Martoma confidential information the Drug Trial even though – as the Government itself acknowledged in its opening – Dr. Ross's limited information was "not the end-all be-all." (Tr. 40). The principal relevance of Dr. Ross's early and limited disclosures, as argued at trial, was that it established the defendant's effort to corrupt Dr. Ross such that Dr. Ross would provide Mr. Martoma with whatever confidential information he did manage to

learn, an effort that paid off more fully when Dr. Ross agreed to meet with Martoma and provide

Martoma with the full results when he was unblinded to them one day in advance of the

investing public (and before Martoma knew that Dr. Gilman would have those results earlier

still).

### 3.    Dr. Gilman's Testimony Provides No Grounds For A New Trial

The defendant also argues that Dr. Gilman's testimony warrants a new trial on the

grounds that the testimony was "unreliable" due to Dr. Gilman's imperfect memory, alleged

inconsistencies in his testimony, and various other perceived defects.  This argument fails on two

scores.  First, the defendant is essentially asking the Court to usurp the role of the jury, which

was well-positioned to assess Dr. Gilman's testimony and which reached a verdict consistent

with that testimony, as corroborated by other evidence.  Second, even if the Court were to

independently reassess Dr. Gilman's credibility, the evidence is overwhelming that Dr. Gilman's

testimony implicating Martoma – namely, that Dr. Gilman routinely shared the confidential Drug

Trial data he obtained from Elan, including the final results – was accurate, and that testimony

was substantially corroborated by other evidence.

As an initial matter, the defendant's suggestion that Court should parse each alleged

inconsistency or defect with Dr. Gilman's testimony to come to an independent determination as

to the testimony's proper weight should be rejected. While the defendant is correct that under

certain circumstances a district court, in exercising its Rule 33 discretion, may discount as

witness's testimony and order a new trial, it is "only where exceptional circumstances can be

demonstrated that the trial judge may intrude upon the jury function of credibility assessment."

*See United States v. Sanchez*, 969 F. 2d 1409, 1414 (2d Cir. 2009).   For example, even in cases

where it is demonstrated that a Government witness committed perjury – certainly not the case here – "a new trial is warranted only if the false testimony was material to the jury's verdict, leaving the trial court with a firm belief that, but for the perjured testimony, the defendant most likely would not have been convicted." *See United States v. Karlov*, 534 Fed. Appx. 38 (2d Cir. 2013), *citing United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ("[E]ven where newly discovered evidence indicates perjury, new trial should be granted only with great caution and in the most extraordinary circumstances") (internal citations omitted).[5]

Nothing in Dr. Gilman's testimony should give the Court any pause that such testimony was so deficient and uncorroborated that the jury's verdict represents a miscarriage of justice. Dr. Gilman testified, consistently on both direct and cross-examination, that he provided Martoma with confidential information Elan had entrusted to him with respect to the Drug Trial, including the final results of the Drug Trial that Dr. Gilman was unblinded to on July 15 and July 16 of 2008. Dr. Gilman testified that he described in detail the draft PowerPoint presentation he was to publicly present on July 29, 2008 both in an lengthy phone call on the afternoon of July 17, 2008 (e.g. Tr. 1424) and during an in-person meeting ion Dr. Gilman's office on July 19, 2008 (Tr. 1440-1456). Dr. Gilman did not equivocate on these points and his testimony was corroborated by compelling circumstantial evidence. In particular, the July 17, 2008 telephone

---

[5] The cases cited by the defendant only serve to make this highly limited role in assessing witness credibility clear. *See United States v. Robinson*, 430 F.3f 537 at 543 (affirming trial court's decision to grant a new trial under Rule 33 where sole witness linking defendant to shooting and absence of other evidence had been "seriously impeached" with respect to the core issue of identification); *United States v. Autuori*, 212 F.3d 105, 120-121 (2d Cir. 200) (affirming trial court's decision to grant a new trial where trial court found that testimony of two main witnesses was "dubious" and the Second Circuit agreed that the "soundness of the verdict was highly doubtful").

conversation in which Dr. Gilman relayed the confidential PowerPoint presentation was supported by calendar entries indicating that a meeting had been planned for this date (GX 520, 522 752), phone records that showed the call occurred (GX 1211), and evidence suggesting that Martoma wanted to keep this call secret (such as the fact the call was not reported to GLG, that Martoma arranged a car service so he could conduct the call at home (GX 521), and that Martoma entered Dr. Gilman's telephone number backwards on his calendar (GX 522)).  The July 19, 2008 meeting in Dr. Gilman's office was supported by overwhelming circumstantial evidence, including a calendar entry for that meeting (GX 753), airline tickets (GX 1307, 1308), cell site records (GX 1002A, 1400, 1401, 1402), and door swipe records from the University (GX 795).  Likewise, the evidence showed that Martoma sought to keep this trip too a secret, not arranging it through GLG, using his wife's credit card to buy the plane tickets (GX 1170), and relying on a taxi driver's phone to communicate with Dr. Gilman that day even while the defendant used his own phone for other calls (GX 1120).

The defendant's arguments as to why this substantially corroborated testimony should be disregarded are entirely uncompelling.   The defendant's principal argument is that Dr. Gilman did not initially remember the July 19, 2008 in-person meeting and recalled increasing details about the meeting over time.  However, the fact that a witness may not initially remember an event or may remember additional details about an event over time is not an uncommon occurrence, and the jury is well-positioned to assess the weight to assign to such testimony in light of limited or changing memories.  Given that the evidence that a meeting took place was overwhelming, the jury could readily elect to conclude that Dr. Gilman's testimony that he discussed the Drug Trial results during a July 19 in-person meeting was accurate notwithstanding

his imperfect memory on this point.  The defense also entirely ignores that Dr. Gilman testified

unequivocally that he had *never* forgotten that he had shared the confidential PowerPoint

presentation with Martoma, and it was only details as to certain of the he means through which

he had shared it about which he ever had uncertainty.  (Tr. 1376).  Likewise, the defendant does

not dispute that Dr. Gilman's testimony with respect to proving Martoma with the contents of the

draft presentation in a phone call on July 17, 2008 was consistent with statements Dr. Gilman

made to the Government since the summer of 2012, when he first acknowledged sharing inside

information with Martoma in any fashion.[6]

   The defendants remaining arguments are of little moment.  While the defendant claims

that the defendant's testimony was "rife with inaccuracies and inconsistencies" (Def. Mem. at

33) the defendant's proof of such inaccuracies is unpersuasive, and the jury was not required to

attribute meaningful significance to them.  None of the supposed inaccuracies relate to the core

allegation – that Dr. Gilman shared the final drug trial results with Martoma in advance –  and

the jury properly rejected the defendant's argument as to the significance of these alleged

---

[6]     Finally, Dr. Gilman's testimony that he had some memory of  e-mailing the presentation
to Martoma – but that he could not be certain it was the PowerPoint presentation containing the
results or that he e-mailed it prior to the announcement – is actually *consistent* with the available
evidence.  The fact that the defendant met with Dr. Gilman in person to review the PowerPoint
prior to the announcement would have obviated the need for Dr. Gilman to send such an e-mail
containing the PowerPoint presentation prior to the public announcement, and the defendant –
particularly given his experience with e-mail forensics – may have travelled to Dr. Gilman in
Michigan precisely because he did not want such an incriminating document sent by e-mail
before the announcement took place.  And there was some evidence in discovery (though neither
party choose to offer it) that Martoma may have received confidential Elan documents in
electronic form from Dr. Gilman, potentially by e-mail, at some point during their relationship
(most notably, Martoma wrote a one word note in Outlook a day after the announcement
containing a confidential password used by Elan).  Accordingly, Dr. Gilman's general memory
of sending a confidential Elan documents may well be correct.

inaccuracies, all of which can be explained by a failure of memory with respect to irrelevant details (such as the precise piece of confidential information Dr. Gilman first disclosed to the defendant, or whether he disclosed certain limited safety data to other hedge fund clients), by a miscommunication or misstatement (such as Dr. Gilman's initially erroneous testimony about the population of Ann Arbor)[7] or by the fact that the alleged inconsistencies are not inconsistencies at all.[8]   Finally, the defendant's argument that the defendant is entitled to a new trial merely because, in the defense's view, Dr. Gilman expressed "confusion" about various defense questions more often than in direct exam and was more "hostile" to the defense counsel's questions fails entirely.   Any change in posture by Dr. Gilman would not be unnatural given the leading questions permitted on cross-examination and the sometimes skeptical approach of the cross-examiner, and the jury was quite properly able to consider – and indeed was instructed to consider – what relevance, if any, this had as to Dr. Gilman's credibility.

---

[7]     The defendant's claim that Dr. Gilman's misstatement in the first minute of his testimony about the population of the University of Michigan calls into question his "competence" to testify is likewise.  Dr. Gilman was obviously nervous as he began testifying and misspoke, corrected the statement later, and testified in great detail on other subjects, including scientific matters, with obvious competence.

[8]     For example, evidence that Dr. Gilman had two further *phone* consultations with Martoma on unrelated topics months after the public announcement is not inconsistent with Dr. Gilman's testimony that he never saw Martoma in person again after July 2008, and that Martoma failed to appear for a planned meeting in April 2009.  By the same token, the defendant's claim that Dr. Gilman gave "false" testimony about his review of documents prior to trial is not borne about by the citations provided by the defendant.  While Dr. Gilman testified that he had not reviewed records of GLG consultations "in depth" (Tr. 1246), he did not deny reviewing various other documents such as his own calendar entries and e-mails prior to trial or being shown other documents by the Government.

### 4.      There Is No Evidence The Jury Was Biased By Or Even Aware Of Mr. Martoma's Dismissal From Harvard Law School

The defendant's claim that he is entitled to a new trial because the jury was "presumptively biased" by press reports about (properly) unsealed *in limine motions* is worse than speculative; it is actually contradicted by the trial record.  The Court repeatedly warned the jury not to read media coverage about the trial (including prior to the widespread publication of information relating to the Harvard Law School dismissal) and each juror, polled at the defendant's request, affirmed that he or she had complied with the Court's order.  The defendant's argument asks the Court to assume that one or more members of the jury violated the Court's repeated instructions, lied to the Court about such a violation, and that the juror's awareness of the Harvard Law School dismissal affected the jury's deliberations.  There is simply no reason for the Court to make this series of groundless assumptions.

35

CONCLUSION

For the reasons stated above, the Court should deny the defendant's motions for judgment

of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), or for a new trial pursuant to

Federal Rule of Criminal Procedure 33(a).

Dated: March 21, 2014
       New York, New York

                              Respectfully submitted,
                              PREET BHARARA
                              United States Attorney


                    By:   _____\s_____
                              Arlo Devlin-Brown
                              Eugene Ingoglia
                              Assistant United States Attorneys
                              (212) 637-2506 / 1113

## AFFIRMATION OF SERVICE

    Arlo Devlin-Brown hereby affirms pursuant to Section 1746 of Title 28, United States Code:

    1.  I am an Assistant United States Attorney in the office of Preet Bharara, United States Attorney for the Southern District of New York.

    2.  On March 21, 2014, I caused a true and correct copy of the foregoing Government's Memorandum of Law to be served by electronic mail and the Court's Electronic Case Filing system on:

    Richard Strassberg, Esq.
    Counsel for Mathew Martoma

    3.  I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Dated:  New York, New York
    March 21, 2014

      _____/s_____
      ARLO DEVLIN-BROWN