UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

MATHEW MARTOMA,

               Defendant.

No. 12-cr-00973 (PGG)
ECF Case

**ORAL ARGUMENT REQUESTED**

**DEFENDANT MATHEW MARTOMA'S REPLY MEMORANDUM OF LAW IN
FURTHER SUPPORT OF HIS RENEWED MOTION FOR A JUDGMENT
OF ACQUITTAL OR, ALTERNATIVELY, FOR A NEW TRIAL**

GOODWIN PROCTER LLP

Richard M. Strassberg (RS5141)
John O. Farley (JF4402)
Daniel Roeser (DR2380)

The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

Roberto M. Braceras (RB2470)
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Defendant Mathew Martoma*

April 4, 2014

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT .............................................................................................................4

I.     THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON ALL COUNTS PURUSANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29........................................................................................4

    A.     The Court Should Enter A Judgment Of Acquittal On The Counts Of Insider Trading.............................................................................5

        1.     The Government Has Failed to Prove Beyond A Reasonable Doubt That Mr. Martoma Obtained Material, Non-Public Information. ...............5

        2.     The Government Has Failed To Prove Beyond A Reasonable Doubt That Mr. Martoma Traded On Material, Non-Public Information. ........................................................................8

        3.     The Government Has Failed To Prove Beyond A Reasonable Doubt That Dr. Gilman Or Dr. Ross Obtained A Personal Benefit..........11

        4.     The Government Has Failed To Prove Beyond A Reasonable Doubt That Mr. Martoma Had The Requisite Criminal Intent. .................13

    B.     The Court Should Enter A Judgment Of Acquittal On The Count Of Conspiracy To Commit Insider Trading.................................................16

II.     THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33.................................................................................................17

    A.     The Jury Was Tainted By Evidence Unrelated To The Charged Offenses. ..........17

        1.     The Government Improperly Used Evidence Regarding SMC Meetings That It Had Disclaimed. .......................................17

        2.     The Government Improperly Used Evidence Regarding Dr. Ross That Was Unrelated To The Substantive Counts......................................18

    B.     Dr. Gilman's Testimony Should Not Be Allowed To Support A Conviction..............................................................................19

    C.     The Jury Was Biased By The Unsealed Motions *In Limine* Concerning Mr. Martoma's Dismissal From Harvard Law School. .........................................25

CONCLUSION.........................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..................................................................................7-8

*Bruton v. United States*,
  391 U.S. 123 (1968)...................................................................................26

*Caiola v. Citibank, N.A., New York*,
  295 F.3d 312 (2d Cir. 2002)..........................................................................7

*Chadbourne & Parke LLP v. Troice*,
  134 S. Ct. 1058 (2014)................................................................................10

*Fisher v. Plessey Co. Ltd.*,
  103 F.R.D. 150 (S.D.N.Y. 1984) ....................................................................8

*S.E.C. v. Bausch & Lomb Inc.*,
  565 F.2d 8 (2d Cir. 1977)..............................................................................7

*S.E.C. v. Hasho*,
  784 F. Supp. 1059 (S.D.N.Y. 1992)................................................................7

*S.E.C. v. Obus*,
  693 F.3d 276 (2d Cir. 2012).........................................................................12

*S.E.C. v. Rorech*,
  720 F. Supp. 2d 367 (S.D.N.Y. 2010)...........................................................12

*United States v. Cassese*,
  428 F.3d 92 (2d Cir. 2005).............................................................................4

*United States v. Ferguson*,
  246 F.3d 129 (2d Cir. 2001).........................................................................19

*United States v. Ferguson*,
  49 F. Supp. 2d 321 (S.D.N.Y. 1999).............................................................17

*United States v. Guiliano*,
  644 F.2d 85 (2d Cir. 1981)...........................................................................18

*United States v. Jiau*,
  734 F.3d 147 (2d Cir. 2013).........................................................................12

*United States v. Lorenzo*,
  534 F.3d 153 (2d Cir. 2008)..................................................................................... 16-17

*United States v. Martinez*,
  54 F.3d 1040 (2d Cir. 1995)............................................................................................4

*United States v. Mulheren*,
  938 F.2d 364 (2d Cir. 1991)............................................................................................4

## STATUTES AND REGULATIONS

Fed. R. Crim. P. 29 .................................................................................... passim

Fed. R. Crim. P. 33 .................................................................................... passim

Defendant Mathew Martoma respectfully submits this reply memorandum of law in further support of his renewed motion for a judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29 or, alternatively, for a new trial on any surviving count pursuant to Federal Rule of Criminal Procedure 33.

## PRELIMINARY STATEMENT

The Government's opposition papers confirm that this Court should enter a judgment of acquittal on all counts, as the Government failed to prove beyond a reasonable doubt that Mr. Martoma committed any of the charged offenses.  The Government argues that Mr. Martoma's Rule 29 motion should be denied because "the Government presented ample proof to satisfy the elements of each of the charged crimes."  (Gov. Mem. at 2; *see also id.* at 2-24.)  In fact, the evidence presented by the Government does not support its own arguments, much less Mr. Martoma's conviction.  Specifically:

1)     The evidence failed to show that Mr. Martoma obtained material, non-public information about the Phase II bapineuzumab ("bapi") clinical trial from Dr. Gilman and Dr. Ross.  The Government ignores the fact that Dr. Ross's testimony established that he did not provide Mr. Martoma with material, non-public information; and the Government does not seriously dispute that it failed to prove beyond a reasonable doubt that Mr. Martoma obtained material, non-public information about vasogenic edema, enrollment data, or dropout rates.  Instead, the Government argues that Mr. Martoma obtained inside information concerning the final Phase II bapi trial results on July 17 and/or July 19, 2008.  But the Government is wrong.  Indeed, the Government disregards the fact that the information from the final results about lack of dose response and the placebo rate of decline in ApoE4 non-carriers – the very information on which the Government focused during trial – was not material, non-public information.

2)     The evidence failed to show that Mr. Martoma or SAC traded on material, non-public information obtained from Dr. Gilman or Dr. Ross.  The Government argues that "the timing of Martoma's own actions and communications in the lead-up to the big, 'secret' sell-off, provide ample basis for the jury to conclude" that material, non-public information was a factor.  But again, the Government is wrong.  The "actions and communications" identified by the Government do not show that any inside information – as opposed to the "laundry list" of good

reasons that Mr. Martoma had – was a factor in the decision to sell Elan and Wyeth.[1]

3)    The evidence failed to show that Dr. Gilman or Dr. Ross received a monetary or non-monetary benefit from sharing inside information with Mr. Martoma. The Government argues that, "as a matter of common sense," Dr. Gilman and Dr. Ross provided inside information to Mr. Martoma to receive more consultations or make more fees. But that argument is unsupported by the evidence introduced at trial. The Government also argues that Dr. Gilman and Dr. Ross provided inside information to Mr. Martoma to obtain non-monetary benefits. But these purported "benefits" are also unsupported by the trial evidence. There is insufficient evidence that Dr. Gilman had a personal friendship of any kind with Mr. Martoma or that he had a business relationship with Mr. Martoma that furthered his own academic and research goals. Nor is there evidence that Dr. Ross provided inside information in return for business referrals but, in fact, just the opposite.

4)    The evidence failed to show that Mr. Martoma had the requisite criminal intent to commit the charged offenses. The Government argues that the jury had "ample" reason to conclude otherwise, but again, the Government is wrong. None of the evidence presented by the Government proved that Mr. Martoma knew the nature or scope of any obligations that Dr. Gilman or Dr. Ross owed to Elan and Wyeth, let alone that Dr. Gilman or Dr. Ross was supposedly breaching those obligations in disclosing information in exchange for a personal benefit.

A judgment of acquittal is likewise warranted on the conspiracy count, as the Government failed to prove beyond a reasonable doubt that (*inter alia*) there was an agreement between Mr. Martoma and Dr. Gilman or Dr. Ross to commit insider trading. The Government presents evidence that Dr. Gilman and Dr. Ross generally understood that Mr. Martoma was an investor who consulted with them to make investment decisions about whether to buy and sell securities, but that is not enough. The Government does not and cannot dispute that: (1) Dr. Gilman testified that he never discussed with Mr. Martoma how (if at all) Mr. Martoma would use the specific information discussed during consultations or whether Mr. Martoma or SAC even owned Elan or Wyeth stock; and (2) Dr. Ross testified that he had no agreement with

---

[1]    Further, there was no "secret sell-off" by Mr. Martoma. The evidence demonstrated that Mr. Martoma sold ***his*** Elan and Wyeth positions openly for anyone with access to his account to see and that Steven Cohen (not Mr. Martoma) made the decisions about how to unwind ***the firm's*** positions in Elan and Wyeth and whether to short those positions.

Mr. Martoma to buy or sell any stock, never discussed Mr. Martoma's or SAC's purchases or sales of particular stocks, and was never told SAC's position in Elan or Wyeth.

The Government's opposition papers also confirm that, should any count survive Mr. Martoma's Rule 29 motion, this Court should order a new trial. The Government contends that Mr. Martoma's Rule 33 motion should be denied because its grounds "are a realm apart from the true miscarriages of justice" that could warrant a new trial. (Gov. Mem. at 24; *see also id.* at 36.) In fact, Mr. Martoma's grounds are precisely the sort that require a new trial:

1) The jury was tainted by evidence unrelated to the charged offenses. The Government concedes that it told the jury in its opening statement that Mr. Martoma traded Elan and Wyeth based on inside information received from Dr. Gilman in consultations following SMC meetings, but ultimately disclaimed any charges of insider trading concerning those consultations in its closing on rebuttal. Similarly, the Government presented Dr. Ross's testimony as evidence that Mr. Martoma in fact obtained inside information about the Phase II bapi trial, but now backs away from that position and downplays Dr. Ross's disclosures as "early and limited."

2) Dr. Gilman's testimony should not be allowed to support a conviction. The Government tries to minimize what Dr. Gilman himself described as the "holes in my memory," but it does not and cannot dispute the two most important facts about his testimony. Dr. Gilman recalled e-mailing the PowerPoint presentation with the Phase II bapi results to Mr. Martoma on July 17, 2008, when supposedly discussing that presentation with him; but the Government never found any evidence that the e-mail or presentation (*i.e.*, the "smoking gun" evidence in the indictment) was *ever* sent to Mr. Martoma, and Dr. Gilman ultimately admitted that he was not certain that he sent the presentation to Mr. Martoma *at all*. Dr. Gilman admitted that he did not have any recollection of meeting with Mr. Martoma on July 19, 2008, in his first *six* interviews with the Government from February 2012 to March 2013.

3) The jury was biased by the motions *in limine* concerning Mr. Martoma's dismissal from Harvard Law School that were unsealed in the midst of jury selection. The Government does not dispute that, although the evidence underlying those motions was never admitted at trial, the motions themselves garnered widespread media attention and negative publicity when they were unsealed that should render the jurors presumptively biased.

For all of these reasons, this Court should enter a judgment of acquittal on all counts or, alternatively, order a new trial on any surviving count.

## ARGUMENT

**I.     THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL ON ALL
COUNTS PURUSANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29.**

The Government concedes that a judgment of acquittal under Federal Rule of Criminal

Procedure 29 is warranted where the Government has failed to establish the essential elements of

the charged offenses beyond a reasonable doubt.  (*See* Def. Mem. at 4; Gov. Mem. at 2-3.)  The

Government then proceeds to confuse the issue.

*First*, the Government argues that it "need not negate every theory of innocence" nor

"exclude every reasonable hypothesis other than that of guilt."  (Gov. Mem. at 4.)  The

Government misconstrues Mr. Martoma's argument.  As the Second Circuit has held, a judgment

of acquittal is warranted when the evidence gives "equal or nearly equal circumstantial support

to a theory of guilt and a theory of innocence," such that "a reasonable jury *must necessarily*

entertain a reasonable doubt."  *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005)

(emphasis added) (internal quotation marks omitted); *accord United States v. Mulheren*, 938

F.2d 364, 372 (2d Cir. 1991) (holding that a conviction must be reversed where it is supported

only by "inferences no more valid than others equally supported by reason and experience").

*Second*, the Government argues that "the jury is entitled to choose which inferences to

draw" and that "the task of choosing among competing, permissible inferences is for the [jury],

not for the reviewing court."  (Gov. Mem. at 3-4.)  The Government misses the point.  To

support a guilty verdict, such inferences must be more than merely "permissible."  They must be

"*sufficiently supported* to permit a rational juror to find that the element, like all elements, is

established beyond a reasonable doubt."  *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir.

1995) (emphasis added).

Under the correct legal standard, the Government did not establish *beyond a reasonable doubt* that Mr. Martoma committed the charged offenses.  At best, the evidence at trial equally supported a theory of innocence and a theory of guilt.  As a result, a judgment of acquittal is warranted on all counts.[2]

## A.  The Court Should Enter A Judgment Of Acquittal On The Counts Of Insider Trading.

### 1.  The Government Has Failed To Prove Beyond A Reasonable Doubt That Mr. Martoma Obtained Material, Non-Public Information.

The evidence presented at trial showed that all of the supposedly "inside" information about the Phase II bapi trial supposedly shared by Dr. Gilman and Dr. Ross was already public, immaterial to bapi's safety or efficacy, or both.

*First*, the Government's Opposition ignores the fact that Dr. Ross's testimony itself established that he did not provide Mr. Martoma with material, non-public information.  Dr. Ross testified that he provided only three pieces of supposedly inside information to Mr. Martoma during the Phase II trial:  (1) that he had observed vasogenic edema in a single patient in his clinical trial; (2) that he hypothesized that vasogenic edema was an indicator of bapi's efficacy; and (3) that he provided Mr. Martoma with the number of patients enrolled in the Phase II bapi trial at his clinic.  (*See* Def. Mem. at 14.)  Dr. Ross also testified that, after he was unblinded to the Phase II bapi trial results at a presentation to all clinical investigators on July 28, 2008, *Mr. Martoma supposedly shared information with him about the results*.  (*See id.* at 15.)  As Mr. Martoma has explained – and the Government does not contest – none of this evidence proved that Dr. Ross shared material, non-public information with Mr. Martoma.  (*See id.*)

---

[2]    The Government's discussion of credibility determinations in the context of Rule 29 is misplaced.  (Gov. Mem. at 3-4.)  Mr. Martoma has not argued that this Court should enter a judgment of acquittal under Rule 29 based on a rejection of Dr. Gilman's testimony but rather that the lack of credibility and reliability of Dr. Gilman's testimony necessitates a new trial under Rule 33.  (*See* Def. Mem. at 30-36.)

**Second**, the Government does not seriously dispute that it has failed to prove beyond a reasonable doubt that Mr. Martoma obtained material, non-public information about vasogenic edema, enrollment data, or dropout rates.  (*See* Def. Mem. at 5-10.)  The Government merely asserts that Mr. Martoma "glosses over important timing considerations (that is, when Martoma learned certain information, as compared to when that information first became public)" and "omits facts that a jury could reasonably have relied upon to reach a different conclusion than that propounded by the defense."  (Gov. Mem. at 10.)  None of the evidence identified by the Government, however, showed that Dr. Gilman or Dr. Ross shared any material inside information about vasogenic edema, enrollment data, or dropout rates.  Indeed, the Government has not even attempted to address Mr. Martoma's arguments that any shared information was not material, non-public information at the time of the alleged insider trading in July 2008 (*see* Def. Mem. at 5-10), instead flatly asserting that "the Court need not decide which of these other disclosures were material."  (Gov. Mem. at 10.)  In essence, the Government has conceded any argument as to inside information other than Dr. Gilman's supposed July 17 and July 19 conversations on the bapi trial results with Mr. Martoma.

**Third**, with respect to these July 17 and July 19 conversations, the Government also failed to prove beyond a reasonable doubt that Mr. Martoma obtained material, non-public information.  The Government argues that "it is overwhelmingly clear that the jury had more than sufficient basis to conclude that Martoma received the material, final efficacy results from Dr. Gilman prior to ICAD in the form of an early preview of the presentation Dr. Gilman delivered."  (Gov. Mem. at 10.)  Tellingly, the Government does not even mention, much less dispute, Mr. Martoma's arguments that the information from the Phase II bapi trial results about lack of dose response and the placebo rate of decline in ApoE4 non-carriers – the very

information on which the Government focused during trial – was not material, non-public

information.  (*See* Def. Mem. at 10-13.)

Moreover, the Government concedes that "Dr. Wisniewski [an Alzheimer's Disease

expert] and Dr. Ross [the Government's own 'Doctor No. 1'] testified that the final efficacy

results that Dr. Gilman provided to Mr. Martoma (which consisted of a 27 page draft

PowerPoint) were not meaningfully different from their perspective when compared to the

information made public by Elan in its four-page June 17, 2008 press release."  (Gov. Mem. at

8.)  The Government nevertheless claims that, "while doctors such as Dr. Wisniewski might have

viewed the differences between the press release and final data [as] unimportant from their

vantage point as scientists and practitioners, . . . the jury had many fact-based reasons to

conclude that the information was material to the investing public."  (*Id.*)  The Government's

evidence on this point is not persuasive.

- Contrary to the Government's assertions (Gov. Mem. at 8-9), the declines in Elan's and Wyeth's stock price after ICAD did not prove beyond a reasonable doubt that the Phase II results were material.  *See S.E.C. v. Bausch & Lomb Inc.*, 565 F.2d 8, 15-16 (2d Cir. 1977) (considerable decrease in stock price did not establish materiality *per se*).  The Government failed to show that the stock price declines were due to the announcement of the Phase II results as opposed to other market factors.  Moreover, the direct testimony of Dr. Ross and Dr. Wisniewski that there was no meaningful difference in the results actually presented in the press release and ICAD announcement directly rebutted any inference of materiality.

- Contrary to the Government's assertions (Gov. Mem. at 9, 10), the subjective opinions of Mr. Martoma and Mr. Shen did not establish materiality as a matter of law.  Materiality is governed by an objective standard.  *See, e.g.*, *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 328-29 (2d Cir. 2002); *S.E.C. v. Hasho*, 784 F. Supp. 1059, 1108 (S.D.N.Y. 1992).  The subjective views of Mr. Martoma and Mr. Shen did not (and could not) prove beyond a reasonable doubt that a reasonable investor would have considered the ICAD announcement material in light of the June 17, 2008, press release.  *See Basic Inc. v. Levinson*, 485 U.S.

224, 240 (1988) ("Materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information.").[3]

- Contrary to the Government's assertions (Gov. Mem. at 9), analyst reports discussing the absence of numerical data in the June 17, 2008, press release did not show that the July 29, 2008, ICAD announcement was materially different. Although the press release included less detail on certain points, that difference was not meaningful, as both Dr. Wisniewski and Dr. Ross explained.[4]

In short, none of the evidence offered by the Government was sufficient to prove beyond a reasonable doubt that the Phase II trial results announced at ICAD were materially different from those disclosed in the June 17, 2008, press release.

**2.    The Government Has Failed To Prove Beyond A Reasonable Doubt That Mr. Martoma Traded On Material, Non-Public Information.**

The Government concedes that it "was required to prove, as the Court instructed, that the material, non-public information be 'a factor' in the decision to sell Elan and Wyeth."  (Gov. Mem. at 11.)  The Government admits that Mr. Martoma offered at trial a "laundry list" of "other good reasons Martoma or investors writ large may have had prior to the ICAD announcement to sell Elan and Wyeth securities."  (*Id.*)  Indeed, the record evidence showed that Mr. Martoma and SAC made their decision to sell because *every* input and factor made it the *only* reasonable decision.  (*See* Def. Mem. at 16-19.)  The Government, however, argues that "the timing of Martoma's own actions and communications in the lead-up to the big, secret sell-off, provide ample basis for the jury to conclude" that material, non-public information was a factor.  (Gov. Mem. at 11-12.)  The evidence does not support the Government's claims.

---

[3]    *Accord Fisher v. Plessey Co. Ltd.*, 103 F.R.D. 150, 155 (S.D.N.Y. 1984) ("Because the materiality test is concerned not with whether the investment decision of a particular individual would have been affected, but only whether a prototype reasonable investor would have relied, the standard for resolving the materiality issue is obviously objective and general rather than subjective and individual.") (internal quotation marks and citation omitted).

[4]    Tr. 2696:10-2756:23 (Wisniewski); 714:4-25 (Ross).

*First*, the "actions and communications" cited by the Government were insufficient to prove beyond a reasonable doubt that Mr. Martoma traded on material, non-public information. The Government points to Mr. Martoma's trip to Michigan on July 19, 2008, and his phone call and e-mail with Mr. Cohen on July 20, 2008 (Gov. Mem. at 12), but none of that evidence proved that any inside information – as opposed to the "laundry list" of "other good reasons" that Mr. Martoma had – was a factor in his decision to sell Elan and Wyeth.

*Second*, there was no "secret sell-off" by Mr. Martoma.  The evidence demonstrated that *Mr. Martoma* sold his Elan and Wyeth positions *openly* for anyone with access to his account to see.  (GX 560, 564; DX 378.)  The Government argues that "the firm began secretly to unwind, and then short, its long-held, massive position in Elan, and later its position in Wyeth, ahead of the ICAD announcement."  (Gov. Mem. at 12.)  The unrebutted testimony established, however, that *Mr. Cohen* made the decisions about how to unwind *the firm's* positions in Elan and Wyeth in *the firm's* accounts, *not* in GEHC.[5]  Mr. Martoma is not Mr. Cohen; he did not and could not make those decisions for SAC.[6]

*Third*, "that Martoma was compensated in 2008 specifically on the basis of his recommendations concerning Elan and Wyeth securities to Cohen" does not mean that those recommendations were the result of material, non-public information.  (Gov. Mem. at 13.)  The Government highlights evidence that Mr. Martoma made recommendations about Elan and Wyeth to Mr. Cohen (*id.*), but that fact (even if true) would prove nothing.  The question is whether Mr. Martoma recommended to Mr. Cohen that SAC sell its Elan and Wyeth positions on the basis of *inside information*.  The evidence that the Government has presented about Mr. Martoma's compensation does not address – let alone answer – that question.

---

[5]    Tr. 2267:14-20; 2318:23-2319:24 (Villhauer).

[6]    Tr. 175:19-25 (Jandovitz); 2305:23-2306:10 (Villhauer).

In addition, the Government has failed to prove that Mr. Martoma's charged conduct occurred "in connection with" the purchase or sale of Elan or Wyeth securities.  For purposes of Section 10(b), Mr. Martoma's charged conduct is not "in connection with" a purchase or sale of a security unless the charged conduct is material to a decision to buy or sell that security by an investor who is *harmed* by the purchase or sale (*i.e.*, a "victim").  *See Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1066 (2014).  As the Supreme Court recently explained, "every securities case in which this Court has found a fraud to be 'in connection with' a purchase or sale of a security has involved victims" – *i.e.*, "a victim who took, tried to take, or maintained an ownership position in the statutorily relevant securities through 'purchases' or 'sales' *induced by the fraud*."  *Id.* at 1066-67 (emphasis added).  Indeed, Section 10(b) "refer[s] to persons engaged in securities transactions that lead to the taking or dissolving of ownership positions" and "make[s] it illegal to *deceive* a person when he or she is doing so."  *Id.* at 1067 (emphasis added). In other words, if the only investors who decided to buy or sell Elan or Wyeth securities as a result of Mr. Martoma's charged conduct *benefited* from that conduct and were *not deceived* by it, there is no "connection" between the charged conduct and the purchase/sale, as necessary to establish a violation of Section 10(b).  *See id.* at 1066-67.  The Government has argued that only Mr. Martoma and SAC sold Elan and Wyeth securities based on Mr. Martoma's charged conduct and that both benefited from those sales.  Therefore, the Government has not shown, in the words of the Supreme Court, "a connection that matters."  *Id.* at 1066-67.[7]

---

[7]  This argument is related to the Government's failure to prove beyond a reasonable doubt that Mr. Martoma traded on material, non-public information, but it is also a standalone argument based on the Supreme Court's recent decision in *Chadbourne*.

3.      **The Government Has Failed To Prove Beyond A Reasonable Doubt That Dr. Gilman Or Dr. Ross Obtained A Personal Benefit.**

The Government did not prove beyond a reasonable doubt that Dr. Gilman or Dr. Ross received either a financial or a non-monetary benefit for providing Mr. Martoma with inside information, much less that Mr. Martoma was aware of any such benefit to either Dr. Gilman or Dr. Ross (*see infra*, § I.A.4).

*First*, the Government did not prove a financial benefit to Dr. Gilman or Dr. Ross from allegedly sharing material, non-public information with Mr. Martoma.  The Government argues that, "as a matter of common sense, . . . Dr. Gilman and Dr. Ross understood that Martoma continued to contact them for financially lucrative consultations based at least in part on the fact that they were providing him with useful information, to wit, confidential information about the ongoing Drug Trial."  (Gov. Mem. at 14-15.)  The Government, however, does not point to any *evidence* to support its assertions, offering nothing to suggest that Dr. Gilman or Dr. Ross ever provided Mr. Martoma with inside information to receive more consultations or make more money.  In fact, both Dr. Gilman and Dr. Ross admitted that they received consulting fees no matter what was discussed (*see* Def. Mem. at 20) and, on the two dates when Dr. Gilman supposedly revealed the Phase II bapi trial results to Mr. Martoma (*i.e.*, July 17 and 19, 2008), Dr. Gilman testified that he did *not* submit a bill or receive a payment (*see id.*).  The consulting fees were compensation for consultations and not the disclosure of inside information; there is insufficient evidence to the contrary.  The Government may not now mask its failure to prove a financial benefit with appeals to "common sense."

*Second*, the Government did not prove a non-monetary benefit to Dr. Gilman or Dr. Ross from allegedly sharing material, non-public information with Mr. Martoma.  The Government argues that Dr. Gilman received the non-monetary benefit of "maintaining or developing a

11

personal friendship" with Mr. Martoma.  (Gov. Mem. at 15.)  None of that testimony, however, can change the undisputed facts that Dr. Gilman did not share details about his own life with Mr. Martoma; did not meet Mr. Martoma's wife and children; and did not meet or socialize with Mr. Martoma outside of a handful of occasions at Alzheimer's Disease conferences, investor roundtables, or consultations.  (*See* Def. Mem. at 20.)  Dr. Gilman's relationship with Mr. Martoma was not "a kind of friendship" (Gov. Mem. at 15), but rather lacked the hallmarks of friendship necessary to establish a personal benefit, *see S.E.C. v. Rorech*, 720 F. Supp. 2d 367, 415-16 (S.D.N.Y. 2010) (finding that a relationship that lacks any "social component" is insufficient to establish a personal benefit).[8]  As a fallback, the Government argues that there was a "business relationship that Dr. Gilman saw fit to maintain because it furthered Dr. Gilman's academic and research goals in the field."  (Gov. Mem. at 16.)  The assertion that Mr. Martoma's consultations with Dr. Gilman furthered ***Dr. Gilman's*** professional goals makes no sense.  Not surprisingly, the Government never even suggested such a theory to the jury.

The Government also argues that Dr. Ross received the non-monetary benefit of "developing a business contact that might yield referrals to his clinic."  (Gov. Mem. at 16.)  According to the Government, "it is not required that Ross actually received the hoped-for business referrals; only that he sought or anticipated the benefit of developing a business contact, ***in return for the provision of inside information***."  (*Id.* (emphasis added).)  But the Government failed to establish such a *quid pro quo* by showing that Dr. Ross shared material, non-public information to develop Mr. Martoma as a business contact.  In fact, the evidence showed that

---

[8]   The cases cited by the Government are not to the contrary.  In those cases, unlike here, there ***was*** evidence of friendship.  *See United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013) ("Jiau treated [the tipper] to meals at restaurants and gave him gifts including an iPhone, live lobsters, a gift card, and a jar of honey.  She also provided [him] with insider information about other stocks and the two formed an investment club."); *S.E.C. v. Obus*, 693 F.3d 276, 291 (2d Cir. 2012) ("[T]he undisputed fact that Strickland and Black were friends from college is sufficient to send to the jury the question of whether Strickland received a benefit from tipping Black.").

Mr. Martoma explicitly told Dr. Ross that there was "no need to return the courtesy" and never

provided the hoped-for referrals. (*See* Def. Mem. at 21.)  Moreover, there was no proof that Dr.

Ross ever gave Mr. Martoma any inside information in the first place. (*See supra* at 5.)

>    **4.** **The Government Has Failed To Prove Beyond A Reasonable Doubt That Mr. Martoma Had The Requisite Criminal Intent.**

The Government does not dispute that it was required to show that Mr. Martoma knew

that the information that he obtained had been disclosed (1) in breach of a duty owed by

Dr. Gilman and Dr. Ross to Elan and Wyeth, and (2) in exchange for a personal benefit to

Dr. Gilman or Dr. Ross. (*See* Def. Mem. at 21.)  The Government did not prove either beyond a

reasonable doubt.

*First*, there is insufficient evidence that Mr. Martoma knew that Dr. Gilman or Dr. Ross

breached a duty to Elan or Wyeth in disclosing information.  The Government relies on (1) e-

mails from the Gerson Lehrman Group ("GLG") concerning the obligations of the doctors with

which Mr. Martoma was consulting, (2) the SAC Code of Conduct, (3) Dr. Gilman's alleged

initial refusal to provide confidential information to Mr. Martoma, (4) Mr. Martoma's request for

consultations with certain doctors who also served as principal investigators on the bapi trial, and

(5) "the very nature of the information that Martoma received from Dr. Gilman in July 2008,"

which supposedly made it "obvious to anyone" that the information had been obtained in

violation of a duty to Elan and Wyeth. (Gov. Mem. at 17-19.)[9]  Such evidence is a distraction

and does not show that Mr. Martoma knew about Dr. Gilman's or Dr. Ross's specific

obligations, much less that Mr. Martoma knew that Dr. Gilman or Dr. Ross was supposedly

breaching such obligations.  More to the point:

---

[9]    The Government refers to the "SAC Code of Conduct" as GX 599. (Gov. Mem. at 14.)  This appears to be a reference to GX 588, which is entitled "Compliance Policies and Procedures Manual and Code of Ethics."

- E-mails from GLG about the general obligations of consulting doctors did not establish that Mr. Martoma knew about Dr. Gilman's specific obligations or that Dr. Gilman supposedly breached those obligations.

- The SAC Code of Conduct provided absolutely no information about the obligations and agreements to which Dr. Gilman (or Dr. Ross) was a party. Moreover, the Code of Conduct did not prohibit Mr. Martoma from consulting with doctors who were involved in clinical drug trials.[10]

- Mr. Martoma's initial request for consultations with doctors who served as principal investigators on the bapi trial did not show that Mr. Martoma was aware of Dr. Gilman's or Dr. Ross's obligations to Elan and Wyeth or of their supposed breaches of those obligations.

- The Government cannot demonstrate Mr. Martoma's intent by baldly asserting that Dr. Gilman's violation of his duty was "obvious to anyone." Such assertions are proof of nothing.

The salient facts are straightforward: Mr. Martoma was not a party to any agreements between Dr. Gilman and Elan or Wyeth, and the evidence presented by the Government did not prove that Mr. Martoma had any understanding of the nature or scope of any obligations that Dr. Gilman owed to Elan and Wyeth. (*See* Def. Mem. at 21.)

Nor did the Government show that Mr. Martoma ***knew*** that he received material, non-public information in violation of Dr. Gilman's and Dr. Ross's obligations. The Government argues that "[t]here simply is no credible argument that someone as sophisticated as Martoma about drug trials, thought the efficacy data [from the Phase II bapi trial results] . . . were already public." (Gov. Mem. at 20.) Yet the Government ignores evidence that information contained in the final efficacy data about, for example, the lack of dose response was in fact public. (*See* Def. Mem. at 10-14, 22.) Moreover, the Government failed to establish that Mr. Martoma knew that he received ***material***, non-public information. Sophisticated Alzheimer's Disease experts like Dr. Ross and Dr. Wisniewski testified that the efficacy data were not meaningfully different from

---

[10]   GX 588 at 19.

the information disclosed in the June 17, 2008, press release.  (*See supra* at 7.)  Therefore, "someone as sophisticated as Martoma about drug trials" (as the Government argues) might well have reached the same conclusion and thought that the efficacy data did *not* constitute material, non-public information.

    *Second*, there was insufficient evidence that Mr. Martoma *knew* that Dr. Gilman and/or Dr. Ross were disclosing information in exchange for a personal benefit.  The Government argues that Mr. Martoma knew that the doctors were paid for each consultation (Gov. Mem. at 20); but those fees did not constitute a financial benefit for *inside information*.  (*See* Def. Mem. at 20, 23; *supra* at 10-12.)  The Government contends that "Martoma (aware of his own actions) knew that his befriending of Dr. Gilman was, over time, bringing Martoma access to inside information about the bapineuzumab drug trial" (Gov. Mem. at 21); but there was no proof that Mr. Martoma actually befriended Dr. Gilman, as their relationship bore none of the hallmarks of a friendship (*see* Def. Mem. at 20, 23; *supra* at 11-12.)[11]  The Government claims that "Martoma knew that Ross was providing information to Martoma in return for the hopes of future business contacts" and that Mr. Martoma "provid[ed] hope to Dr. Ross that Martoma could be helpful in that way" (Gov. Mem. at 21); but, again, Mr. Martoma expressly stated that there was "no need to return the courtesy" and never provided the hoped-for referrals (and, in any event, there was no proof that Dr. Ross ever gave Mr. Martoma any inside information) (*see* Def. Mem. at 21, 23;

---

[11]    The Government asserts that "[e]ven Dr. Gilman's tone in his correspondence with Martoma demonstrates that the relationship was more than strictly professional."  (Gov. Mem. at 21 (citation omitted).)  The Government did not and cannot cite any e-mails in which *Mr. Martoma's* tone suggested a personal friendship because no such e-mails exist; and it was Mr. Martoma's tone that mattered, because it was Mr. Martoma's knowledge that was at issue.

*supra* at 5, 12).[12]  The Government simply did not establish that Mr. Martoma had the requisite knowledge.

### B.   The Court Should Enter A Judgment Of Acquittal On The Count Of Conspiracy To Commit Insider Trading.

The Government failed to show an agreement between Mr. Martoma and Dr. Gilman or Dr. Ross to commit insider trading.  The Government argues that "[t]he evidence was compelling that Dr. Ross and Dr. Gilman understood that Martoma would use the confidential information they were disclosing in connection with the purchase and sale of securities."  (Gov. Mem. at 22.) Yet the Government relies on evidence only that Dr. Gilman and Dr. Ross generally understood that Mr. Martoma was an investor who consulted with them to make investment decisions about whether to buy and sell securities.  (*See id.* at 22-24.)[13]  That is not enough.  Indeed, the Government does not and cannot dispute:

- Dr. Gilman testified that he never discussed with Mr. Martoma (1) how (if at all) Mr. Martoma would use the specific information discussed during consultations or (2) whether Mr. Martoma or SAC even owned Elan or Wyeth stock.[14]

- Dr. Ross testified that he had no agreement with Mr. Martoma to buy or sell any stock, explaining that they never discussed Mr. Martoma's or SAC's purchases or sales of particular stocks and that Mr. Martoma never told him about SAC's position in Elan or Wyeth.[15]

Thus, the Government failed to prove that Dr. Gilman or Dr. Ross shared inside information for Mr. Martoma "to trade on it" (Gov. Mem. at 24), much less an agreement between Mr. Martoma and Dr. Gilman or Dr. Ross to commit insider trading.  *See United States v. Lorenzo*, 534 F.3d

---

[12]   The Government asserts that Mr. Martoma provided Dr. Ross with encouragement and "hope" primarily by attending the opening of Dr. Ross's Iberica clinic.  (Gov. Mem. at 21.)  The Government has presented no evidence to support that naked assertion; Dr. Ross certainly never testified to it.

[13]   The Government also cites evidence of the circumstances under which Dr. Gilman and Dr. Ross allegedly shared material, non-public information with Mr. Martoma (Gov. Mem. at 22-24), but absent from that evidence is proof of any ***agreement*** between Mr. Martoma and Dr. Gilman or Dr. Ross to commit insider trading.

[14]   (*See* Def. Mem. at 24.)

[15]   *Id.*

153, 159 (2d Cir. 2008) ("[W]here the crime charged is conspiracy, a conviction cannot be

sustained unless the Government establishes beyond a reasonable doubt that . . . . there was a

conspiracy to commit a particular offense and not merely a vague agreement to do something

wrong.") (internal quotation marks and citations omitted).[16]

## II.   THE COURT SHOULD ORDER A NEW TRIAL ON ANY SURVIVING COUNTS PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33.

The Government does not dispute that this Court is permitted to weigh the evidence,

assess the credibility of witnesses, and draw inferences against the Government in deciding

whether a new trial is warranted under Federal Rule of Criminal Procedure 33.  (*See* Def. Mem.

at 25.)  "Where there is any doubt that the evidence fully supports a jury determination, a new

trial is the appropriate remedy to insure defendant the full extent of his rights."  *United States v.

Ferguson*, 49 F. Supp. 2d 321, 329 (S.D.N.Y. 1999), *aff'd* 246 F.3d 129 (2d Cir. 2001).  Should

any count survive Mr. Martoma's Rule 29 motion, this Court should order a new trial for both

the reasons stated above in support of Mr. Martoma's Rule 29 motion and for the following

separate and independent reasons.

### A.   The Jury Was Tainted By Evidence Unrelated To The Charged Offenses.

#### 1.   The Government Improperly Used Evidence Regarding SMC Meetings That It Had Disclaimed.

The opposition papers exemplify the Government's continuing attempt to have it both

ways with respect to evidence of consultations between Mr. Martoma and Dr. Gilman following

SMC meetings between 2006 and 2008 (the "SMC Evidence").  The Government concedes that

it told the jury in its opening statement that Mr. Martoma traded Elan and Wyeth based on inside

information received from Dr. Gilman in those consultations.  (Gov. Mem. at 27.)  Yet the

---

[16]    In addition, for the same reason that the Government failed to prove Mr. Martoma's criminal intent on the substantive counts, the Government failed to prove the requisite criminal intent by Mr. Martoma to join an agreement to commit insider trading.  (*See* Def. Mem. at 24-25.)

Government admits that it ultimately disclaimed any charges of insider trading concerning the SMC meetings and the SMC Evidence in its closing on rebuttal:  "[T]he real benefit was that he [*i.e.*, Mr. Martoma] got these doctors to a point where when they had something really good, like the actual results, that's when he could make the big money."  (*Id.* at 29.)  The Government's decision to (1) introduce and emphasize the SMC Evidence as proof of insider trading but then (2) abandon that evidence and instead "focus[ ] the jury on [the] significance of these meetings being the development of the conspiratorial relationship" was improper, confused the jury, and influenced the jury to convict Mr. Martoma.  (*See id.*)

   *United States v. Guiliano*, 644 F.2d 85 (2d Cir. 1981) – which the Government does not attempt to distinguish – is on point.  There, the Second Circuit ordered a re-trial on a conviction because of (*inter alia*) "the distinct risk that the jury was influenced in its disposition . . . by improper evidence" offered in support of a theory that the Government "expressly disclaimed."  *Id.* at 88-89.  Here, this Court should order a re-trial because the Government focused the jury on the SMC Evidence even as the Government disclaimed any insider trading associated with that evidence.  As a result, the "scant probative value" of the SMC Evidence "was plainly outweighed by the risk that the jury would make the very inference that the Government had specifically disclaimed" – *i.e.*, that the SMC Evidence proved insider trading.  That warrants a new trial for the same reasons as in *Guiliano*.[17]

### 2.   The Government Improperly Used Evidence Regarding Dr. Ross That Was Unrelated To The Substantive Counts.

   The Government also tainted the jury by stating and arguing that Dr. Ross himself (Dr. #1 in the Opening) provided inside information to Mr. Martoma.  (*See* Def. Mem. at 29-30.)  In

---

[17]   The Government does not address, let alone dispute, the point that its "canary in the coal mine" theory cannot justify the admission of the SMC Evidence, as that theory amounts to nothing more than allegations of "insider holding" or conspiracy to commit "insider holding," which do not violate the federal securities laws.  (*See* Def. Mem. at 29.)

its opposition papers, the Government backs away from that position. (*See* Gov. Mem. at 29-30.)

That is not surprising. Dr. Ross did *not* provide Mr. Martoma with any material, non-public

information. (*See* Def. Mem. at 14-15.)[18] His testimony added nothing to the Government's

case. Rather, it amounted to unsubstantiated testimony about what the Government effectively

claimed to be other bad acts – testimony that was inadmissible under Rule 404(b) – which

influenced the jury to convict Mr. Martoma based on unproven charges. Dr. Ross's testimony is

improper and necessitates a new trial.

### B. Dr. Gilman's Testimony Should Not Be Allowed To Support A Conviction.

The Government does not dispute that, in determining whether a new trial is warranted

pursuant to Rule 33, this Court has discretion to discount a witness's testimony and order a new

trial. (Gov. Mem. at 30.) To be clear, Mr. Martoma is not "asking the Court to usurp the role of

the jury" (*id.*) but simply to exercise that discretion appropriately. The Government argues that

this Court should not "parse each alleged inconsistency or defect with Dr. Gilman's testimony to

come to an independent determination as to the testimony's proper weight" (*id.*), but that is

exactly what the Court must do. *See United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir.

2001) ("The district court must examine the entire case, take into account all facts and

circumstances, and make an objective evaluation."). According to the Government, the evidence

is overwhelming that Dr. Gilman routinely shared the confidential Phase II bapi trial data,

including the final results, with Mr. Martoma. (Gov. Mem. at 30.) Not so.

***First,*** Dr. Gilman had an unreliable and evolving memory about providing Mr. Martoma

with the final results of the Phase II bapi trial. The Government argues that "Dr. Gilman did not

---

[18]  The Government seemingly does not dispute that Dr. Ross never provided Mr. Martoma with material, non-public information. At most, the Government claims that Dr. Ross shared "confidential information" with Mr. Martoma. (Gov. Mem. at 29-30.) As this Court's instructions to the jury made clear, confidential information is not the same as material, non-public information. (Jury Charge at 31.)

equivocate" when he testified about first sharing the final results with Mr. Martoma on July 17, 2008, and that "his testimony was corroborated by compelling circumstantial evidence." (Gov. Mem. at 31; *see also id.* at 31-32.) Yet the Government does not dispute – and blatantly ignores – the most compelling evidence of all: Dr. Gilman recalled e-mailing Mr. Martoma the PowerPoint presentation with the results when supposedly discussing that presentation with him. The Government, however, ***never*** found any evidence that the e-mail or presentation was ***ever*** sent to Mr. Martoma. And, notably, Dr. Gilman ultimately admitted that he was not certain that he sent the presentation to Mr. Martoma ***at all***. (*See* Def. Mem. at 31-32.) The lack of any evidence that the presentation was ever sent to Mr. Martoma, and Dr. Gilman's own admissions that his recollection about what he did on July 17 could have been mistaken, render his entire account of providing the Phase II bapi trial results to Mr. Martoma on July 17 unreliable.

The Government similarly argues that "Dr. Gilman did not equivocate" when he testified about next sharing the final results with Mr. Martoma on July 19, 2008, and that "[t]he July 19, 2008 meeting in Dr. Gilman's office was supported by overwhelming circumstantial evidence." (Gov. Mem. at 31-32.) That misses the point. Regardless of whether the meeting occurred, the question is whether Dr. Gilman discussed the PowerPoint presentation with Mr. Martoma during the meeting. (*See* Def. Mem. at 32-33.) As Mr. Martoma has described, Dr. Gilman admitted that he did not have any recollection of a meeting at all in his first ***six*** interviews with the Government from February 2012 to March 2013. (*See* Def. Mem. at 32.) Indeed, he recalled the critical details of this supposed meeting (*i.e.*, discussing the Phase II bapi results with Mr. Martoma) just ***two weeks*** before he testified (and almost two years after the Government first asked him about it). (*See id.*) The Government claims that "the fact that a witness may not initially remember an event or may remember additional details about an event over time is not

an uncommon occurrence." (Gov. Mem. at 32.) The Government may be correct in theory, but it is a vast understatement of what occurred here. In this case, it is impossible to believe that Dr. Gilman could not remember the first and only time that he supposedly discussed the Phase II bapi trial results with Mr. Martoma in person, but then, all of a sudden, "remembered" the meeting only two weeks before he testified, while we were picking a jury.

The Government tries to minimize what Dr. Gilman himself described as the "holes in my memory." (Def. Mem. at 32.) The Government argues that "the defendant does not dispute that Dr. Gilman's testimony with respect to prov[id]ing Martoma with the contents of the draft presentation in a phone call on July 17, 2008 was consistent with statements Dr. Gilman made to the Government since the summer of 2012, when he first acknowledged sharing inside information with Martoma in any fashion." (Gov. Mem. at 33.) That is wrong. In the summer of 2012, Dr. Gilman told the Government that he recalled e-mailing Mr. Martoma the PowerPoint presentation with the results and supposedly discussing that presentation with Mr. Martoma.[19] At trial, Dr. Gilman admitted that he was not certain that he sent the presentation to Mr. Martoma at all, let alone on July 17, 2008. (*See* Def. Mem. at 31-32.) Those statements are anything but consistent.[20] The Government also contends that "Dr. Gilman testified unequivocally that he had never forgotten that he had shared the confidential PowerPoint presentation with Martoma, and it was only details as to certain of the . . . means

---

[19]   Tr. 1819:11-22 (Gilman).

[20]   Apparently recognizing this, the Government contends that "Dr. Gilman's testimony that he had some memory of e-mailing the presentation to Martoma – but that he could not be certain it was the PowerPoint presentation containing the results or that he e-mailed it prior to the announcement – is actually **consistent** with the available evidence." (Gov. Mem. at 33 n.6 (emphasis in original).) The Government speculates that Mr. Martoma might have traveled to Michigan to obviate the need for Dr. Gilman to e-mail him the results and that "there was some evidence in discovery (though neither party choose [sic] to offer it)" that Dr. Gilman might have e-mailed other Elan documents to Mr. Martoma. (*Id.*) Of course, the Government's speculation (and evidence not offered at trial) is not "available evidence." And the fact that Dr. Gilman might have been confused about the documents that he sent to Mr. Martoma is the whole point – it does anything but support the reliability of his testimony. Finally, the fact that the Government needs to reach to evidence **not** admitted at trial to support the conviction is proof by itself that there was **insufficient** evidence at trial.

through which he had shared it about which he ever had uncertainty." (Gov. Mem. at 33 (emphasis omitted).) Dr. Gilman did not forget some minor "details." The non-existent e-mail with the presentation was the Government's "smoking gun" evidence when it indicted Mr. Martoma; and the July 19, 2008, meeting was the core of the Government's case. Because Dr. Gilman's testimony on those points is unreliable, and because Dr. Gilman's testimony is essential to sustain the conviction, the guilty verdict cannot stand.

*Second*, the Government does not dispute that Dr. Gilman's testimony contained inaccuracies and inconsistencies. Rather, the Government argues that all of those inaccuracies "can be explained by a failure of memory with respect to irrelevant details." (Gov. Mem. at 33-34.) But Dr. Gilman's testimony about (1) the very start of the "conspiracy" (which ultimately led to the charges against Mr. Martoma), (2) the end of his "friendship" with Mr. Martoma,[21] (3) the nature of the information that he shared with Mr. Martoma, and (4) basic facts regarding the Phase II bapi trial (for which he served as chairman of the SMC for more than three years) ***does not concern "irrelevant details."*** (*See* Def. Mem. at 33-34.) This testimony addresses key aspects of the Government's case.

*Third*, the Government does not seriously challenge that Dr. Gilman's testimony about the basis for his recollections was false. Although Dr. Gilman claimed on direct examination that he only "glanced" at documents in preparation for his testimony, he admitted on cross-examination that he had in fact reviewed documents in detail. The Government tries to parse

---

[21] The Government claims that "evidence that Dr. Gilman had two further phone consultations with Martoma on unrelated topics months after the public announcement is not inconsistent with Dr. Gilman's testimony that he never saw Martoma in person again after July 2008." (Gov. Mem. at 34 n.8 (emphasis omitted).) The Government misstates Dr. Gilman's testimony. On direct examination, Dr. Gilman testified that he ***never*** had another consultation with Mr. Martoma after they had lunch following ICAD on July 30, 2008. (*See* Def. Mem. at 33.) The evidence showed that Dr. Gilman consulted with Mr. Martoma on two subsequent occasions in late 2008 and early 2009 – before Mr. Martoma stopped using GLG altogether due to cost considerations – when they spoke for nearly four hours (and for which Dr. Gilman was paid nearly $4,000). (*Id.*) Dr. Gilman's testimony is, in fact, inconsistent.

Dr. Gilman's testimony by arguing that, "[w]hile Dr. Gilman testified that he had not reviewed records of GLG consultations 'in depth,' he did not deny reviewing various other documents such as his own calendar entries and e-mails prior to trial or being shown other documents by the Government." (Gov. Mem. at 34 n.8 (citation omitted).) This argument ignores a fundamental point (which the Government does not dispute): Dr. Gilman admitted that his testimony on many points *merely repeated what he had seen in those documents*. (*See* Def. Mem. at 34-35.) The concession that he was testifying to the contents of documents rather than his own independent recollection of events – particularly where it concerns the heart of the Government's case – renders his testimony unreliable.

*Fourth*, the Government does not contest that Dr. Gilman got "totally wrong" (*inter alia*) even the most basic background questions on direct examination about the University of Michigan and Ann Arbor. Such errors call into question Dr. Gilman's competence to testify. The Government asserts that "Dr. Gilman was obviously nervous as he began testifying and misspoke, corrected the statement later, and testified in great detail on other subjects, including scientific matters, with obvious competence." (Gov. Mem. at 34 n.7.) That assertion simply assumes that Dr. Gilman testified about other matters "with obvious competence" and begs the question posed by Mr. Martoma in his opening brief: If Dr. Gilman was so confused about the University and the town where he spent his career and life, how could a rational finder of fact trust that he was not similarly confused – or, in the Government's words, made a similar "miscommunication or misstatement" or provided similar "erroneous testimony" (*id.* at 34) – about (1) the timing of when he shared information with Mr. Martoma or (2) the identities of the investors with whom he spoke? This is particularly relevant here, where the precise timing is so

critical.  A simple mistake of one or two days could mean the difference between guilt and innocence.

*Fifth*, the Government does not dispute the difference in Dr. Gilman's demeanor on direct examination where he was open, forthcoming, and responsive and cross-examination where he was evasive, hostile, and even obstructionist.  Instead, the Government claims that "[a]ny change in posture by Dr. Gilman would not be unnatural given the leading questions permitted on cross-examination and the sometimes skeptical approach of the cross-examiner" and argues that "the jury was quite properly able to consider – and indeed was instructed to consider – what relevance, if any, this had as to Dr. Gilman's credibility."  (Gov. Mem. at 34.) That misses the point.  This Court should make an independent determination of Dr. Gilman's credibility, and Dr. Gilman's change in demeanor at best reflects an unwillingness to answer Mr. Martoma's questions and at worst an attempt to hide facts.

For all of these reasons, Dr. Gilman's testimony could not be trusted.  As a cooperating witness testifying pursuant to a non-prosecution agreement, Dr. Gilman's testimony "must be scrutinized with special care and caution."  (Jury Charge at 12.)  In light of the significant holes in Dr. Gilman's memory – which evolved substantially over time with respect to the key facts at issue – and the numerous inconsistencies and inaccuracies in his recollections, this Court should reject Dr. Gilman's testimony.  Without the testimony of its star witness, the only witness who testified that he shared inside information on which Mr. Martoma allegedly traded, the Government's case collapses.  Because the Government's single essential witness was fundamentally flawed and unreliable, the Court should order a new trial.

**C.     The Jury Was Biased By The Unsealed Motions *In Limine* Concerning Mr. Martoma's Dismissal From Harvard Law School.**

The Government does not dispute that, although the evidence underlying the motions *in limine* concerning Mr. Martoma's dismissal from Harvard Law School was never admitted at trial, the motions themselves garnered widespread media attention and negative publicity when they were unsealed in the midst of jury selection.  (*See* Def. Mem. at 36-37.)  The Government claims that, by arguing that the jury was presumptively biased by those motions, Mr. Martoma "asks the Court to assume that one or more members of the jury violated the Court's repeated instructions, lied to the Court about such a violation, and that the juror's awareness of the Harvard Law School dismissal affected the jury's deliberations."  (Gov. Mem. at 35.)  That is not correct; the Government distorts Mr. Martoma's argument.  The argument is not that one or more of the jurors intentionally violated the Court's instructions and then lied to the Court about having done so.  Rather, the point is merely that the Court should recognize the likelihood that sophisticated jurors could not avoid completely the barrage of sensational and prejudicial news coverage throughout the five-week trial – despite their best efforts – in this age of social media and real-time alerts delivered directly to their personal devices.  That is neither "speculative" nor "contradicted by the trial record."  (*Id.*)  Rather, it is the practical reality for sophisticated jurors, who fully disclosed that they were "plugged in" to the news (financial and otherwise) and aware of the coverage of SAC.

In fact, many jurors disclosed during *voir dire* that they regularly read publications with extensive coverage of financial issues in general and Mr. Martoma's trial in particular:

- Juror No. 1 said that she regularly read the *New York Times*, *New York Daily News*, and *New York Post*.[22]

---

[22]    Tr. 164:20-22 (Voir Dire).

25

- Juror No. 2 said that the *New York Times* and *Bloomberg* were his regular sources of news and that he frequently read about "current events, particularly business related."[23]

- Jurors No. 7 and No. 10 both regularly read the *New York Times*.[24]

- Juror No. 9 said that she regularly read "finance magazines."[25]

- Juror No. 11 said that he regularly read the *Financial Times* and *The Economist*.[26]

Not surprisingly, several jurors also disclosed on their juror questionnaires that they were aware specifically of the insider trading cases against SAC and/or Mr. Martoma:

- Juror No. 2 stated on his questionnaire that he understood that "SAC Capital and Steven Cohen were convicted of securities fraud due to insider trading."

- Juror No. 8 disclosed on her questionnaire that she "read that Mr. Martoma had engaged in insider trading" in either the *New York Times* or *Huffington Post*.

- Juror No. 6 wrote on his questionnaire that he "briefly noted a photo and caption" in the *New York Times* about Mr. Martoma's trial and "was curious, since I am serving jury duty."

To conclude that so many jurors would have been able to ignore so many headlines about Mr. Martoma's trial in the publications that they read every day is at odds with reality under these circumstances. *See Bruton v. United States*, 391 U.S. 123, 135 (1968) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."). Thus, the jury should be deemed presumptively biased, and a new trial should be ordered.

---

[23]   Tr. 166:20-167:2 (Voir Dire).

[24]   Tr. 184:7-10; 218:2-5 (Voir Dire).

[25]   Tr. 212:1-5 (Voir Dire).

[26]   Tr. 219:21-25 (Voir Dire).

## CONCLUSION

For the foregoing reasons and those in his opening brief, Mr. Martoma respectfully requests that this Court enter a judgment of acquittal on all counts or, alternatively, order a new trial on any surviving count.

Dated: April 4, 2014       Respectfully submitted,
   New York, NY

             GOODWIN PROCTER LLP

             By: /s/ Richard M. Strassberg
              Richard M. Strassberg (RS5141)
               (rstrassberg@goodwinprocter.com)
              John O. Farley (JF4402)
               (jfarley@goodwinprocter.com)
              Daniel Roeser (DR2380)
               (droeser@goodwinprocter.com)
              The New York Times Building
              620 Eighth Avenue
              New York, New York 10018
              Telephone:  (212) 813-8800
              Facsimile:  (212) 355-3333

              Roberto M. Braceras (RB2470)
               (rbraceras@goodwinprocter.com)
              53 State Street
              Boston, Massachusetts 02109
              Telephone:  (617) 570-1000
              Facsimile:  (617) 523-1231

              *Attorneys for Defendant Mathew Martoma*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 4, 2014, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices.   I also certify that I have caused copies of the aforementioned document to be served via first class mail, postage prepaid upon all non-CM/ECF participants.


/s/ Richard M. Strassberg
Richard M. Strassberg (RS5141)