UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     -against-

MATHEW MARTOMA,

                   Defendant.

No. 12-cr-00973 (PGG)
ECF Case

**DEFENDANT MATHEW MARTOMA'S SENTENCING MEMORANDUM**

GOODWIN PROCTER LLP

Richard M. Strassberg (RS5141)
John O. Farley (JF4402)
Daniel Roeser (DR2380)

The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

Roberto M. Braceras (RB2470)
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Defendant Mathew Martoma*

May 27, 2014

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................. 1

MR. MARTOMA'S BACKGROUND ...................................................................... 5

    A.    Mr. Martoma's Unwavering Devotion To His Family. ............................6

    B.    The Martomas Are A Fragile Family And Face Irreversible Damage From A Lengthy Sentence. ..............................................................................10

    C.    Mr. Martoma Has Dedicated Himself To A Lifetime Of Giving. .........12

    D.    Despite Recent Hardships From His Conviction, Mr. Martoma's Commitment To Family And Friends Remains Unwavering. ...............20

I.    PROBATION'S GUIDELINE RANGE IS IRRATIONAL AND SIGNIFICANTLY OVERSTATES THE GAIN ATTRIBUTABLE TO MR. MARTOMA......................... 22

    A.    The Guidelines Lead To An Unfair And Irrational Sentencing Range. ...............22

    B.    Probation's Guideline Range Is Inaccurate...........................................26

        1.    Mr. Martoma Should Be Held Liable Only For The Amount That He Personally Profited From SAC's Trading In Elan And Wyeth, Which Is Approximately $6.3 Million. ................................................................. 27

        2.    Alternatively, Mr. Martoma Should Be Liable Only For The Trading Of Elan And Wyeth In His Portfolio, Which Is At Most $49.4 Million........ 28

        3.    Even If Mr. Martoma Is Held Liable For All Of SAC's Trading In Elan And Wyeth, The "Gain" Is Less Than $200 Million. .............................. 35

II.    A SENTENCE SUBSTANTIALLY BELOW ANY POTENTIAL GUIDELINE RANGE IS WARRANTED UNDER 18 U.S.C. § 3553(**a**). ......................................... 37

        1.    The Nature And Circumstances Of The Offense And The Need To Avoid An Unwarranted Sentence Disparity Lead To A Sentence Substantially Below The Guideline Range. .................................................... 40

        2.    A Lenient Sentence Is Warranted To Mitigate The Impact On Mr. Martoma's Family And To Allow Him To Continue To Contribute To Society.......................................................................... 55

        3.    A Lenient Sentence Sufficiently Serves The Purposes Of Deterrence. .... 72

III.    A FINE IS NOT WARRANTED IN THIS CASE. ....................................... 77

CONCLUSION ....................................................................... 80

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299 (1985) ...........................................49

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ....................................33

*Kimbrough v. United States*, 552 U.S. 85 (2007) ......................................................37, 38

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ......................................... passim

*United States v. Bennett*, 252 F.3d 559 (2d Cir. 2001) ..................................................42

*United States v. Booker*, 543 U.S. 220 (2005) .................................................................37

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008)...............................................37, 38

*United States v. Drinkwine*, 133 F.3d 203 (2d Cir. 1998) ............................................78

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ....................................25, 73

*United States v. Gaind*, 829 F. Supp. 669 (S.D.N.Y. 1993) ........................................76

*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) ................................................63

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ........................................... passim

*United States v. Hines*, 88 F.3d 661 (8th Cir. 1996)......................................................79

*United States v. Johnson*, 567 F.3d 40 (2d Cir. 2009).................................................38

*United States v. Madden*, No. 09 Cr. 799 (RWS), 2011 WL 4359933 (S.D.N.Y. Sept. 19, 2011) .......................................................................................................................77

*United States v. Milne*, 384 F. Supp. 2d 1309 (E.D. Wis. 2005) ..................................................26

*United States v. Mueffelman*, 400 F. Supp. 2d 368 (D. Mass. 2005), *aff'd* 470 F.3d 33 (1st Cir. 2006) .......................................................................................................25, 33

*United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009)...........................................34

*United States v. Oakford Corp.*, No. 98 Cr. 144 (JSR), 1999 WL 1201725 (S.D.N.Y. Dec. 13, 1999) ...........................................................................................................27

*United States v. Olis*, 429 F.3d 540 (5th Cir. 2005)......................................................34

*United States v. Rajaratnam*, No. 09-cr-1184 (RJH), 2012 WL 362031 (S.D.N.Y. Jan. 31, 2012) ...................................................................................................................31

*United States v. Sachakov,* No. 11 Cr. 120 (JBW), 2013 WL 101287 (E.D.N.Y. Jan. 8, 2013) ...................................................................................................................73

*United States v. Sarna*, No. 06-cr-1067 (JFK), 2009 WL 2633153 (S.D.N.Y. Aug. 26, 2009) ...................................................................................................................71

*United States v. Spiegelman*, 4 F. Supp. 2d 275 (S.D.N.Y. 1998)................................25

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ...................................................73

*United States v. Williams*, 65 F.3d 301 (2d Cir. 1995) .................................................63

*United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007) ....................................................34

**STATUTES**

18 U.S.C. § 3553(a) ................................................................................................ passim

18 U.S.C. § 3572(a) ...........................................................................................77, 78, 79

U.S.S.G. § 2B1.1.................................................................................................... passim

U.S.S.G. § 2B1.4.............................................................................................22, 26, 29

U.S.S.G. § 5E1.2(a) .......................................................................................................78

U.S.S.G. § 5E1.2(d) ...........................................................................................77, 78, 79

**OTHER AUTHORITIES**

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* (2004) ..............74

## PRELIMINARY STATEMENT

We submit this memorandum on behalf of Mathew Martoma to seek leniency in connection with his sentencing.  After a trial of nearly 5 weeks, this Court has seen much about Mr. Martoma's work at SAC Capital ("SAC"), but it has been presented with little about Mathew Martoma the person, his tight-knit, fragile family, or his lifetime of giving.  More than 100 people, from all walks of life, have written letters in support of Mr. Martoma.[1]  Those letters speak with one voice in describing Mr. Martoma as a uniquely devoted husband and father; a man who puts his family above all else – the glue that holds together three young children (ages 8, 7, and 4) and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

This Court is in a difficult position.  The Probation Department is recommending a Sentencing Guideline Range of 15.7 to 19.6 years (188 to 235 months) ("Probation's Guideline Range").  With all due respect, a sentence in that range in this case would be outrageous.  Indeed, in other recent insider trading cases in this District, judges have agreed that "calculations under the guidelines [for securities fraud cases] have so run amok that they are patently absurd on their face."  *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006).  The reason for this is clear:

> [T]he Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment:  the amount of monetary loss or gain occasioned by the offense.  By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, ***effectively guaranteed that many such sentences would be irrational on their face***.

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (emphasis added).  We respectfully submit that Probation's Guideline Range is irrational and detached from both reality

---

[1] While we summarize aspects of many of these letters below, we respectfully refer this Court to the full letters, which are attached as Exhibits 1-113.

and the statutory sentencing factors set forth in § 3553.  As such, Probation's Guideline Range should be disregarded by this Court; it should not even form the starting point for the Court's analysis of a fair and just sentence in this matter.

To put Probation's Guideline Range in perspective, the low end of the Range (188 months) translates to a sentence of approximately ***50 percent longer*** than the prison sentence of Raj Rajaratnam.[2]  In the Government's own words: "There is no one who is Mr. Rajaratnam's equal in terms of the breadth and scope of his insider trading crimes."[3]  Notably, ***the Government itself has admitted*** that Mr. Martoma's charged conduct does not even begin to approach the charged conduct of Mr. Rajaratnam:

> While the instant case is substantial in terms of the amounts at stake, the specific allegations – relating to trading in two securities in connection with a single event – are far simpler than in the *Rajaratnam* case, which alleged insider trading spanning six years and involving dozens of stocks, dozens of co-conspirators, and a total of seven conspiracies as charged in the indictment.[4]

In fact, Mr. Martoma's charged conduct is less serious by most measures than the conduct in other recent insider trading cases, where the defendants received between two to three years imprisonment.  Take, for example, Doug Whitman.  Mr. Whitman was convicted of participating in two separate conspiracies to obtain inside information on three companies from at least seven tippers from at least January 2006 through March 2009.[5]  The Government alleged that Mr. Whitman's conduct "spanned more than three years and involved multiple companies,

---

[2]   Mr. Rajaratnam was sentenced to 132 months (*i.e.*, 11 years).  In arguing for this sentence, the Government acknowledged that "[s]urely defense counsel will be arguing in this courthouse and in other courthouses throughout the country that your Honor's sentence in this case sets the ***upper threshold*** of a prison sentence for a defendant in insider trading because many future defendants, their conduct, won't even rise to nearly the level of Mr. Rajaratnam."  Ex. 136, Sentencing Tr. 12:1-6, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), (S.D.N.Y. Oct. 13, 2011) ("*Rajaratnam* Sentencing Tr.").

[3]   *Id*. at 23:1-2.

[4]   Gov't's Opp. to Def. Mathew Martoma's Mot. for a Bill of Particulars, ECF No. 26, at 7 n.2 (emphasis and internal quotation marks omitted).

[5]   Ex. 151, *Whitman* Gov't Sentencing Mem. at 1-7.

individuals, and trades," that "Whitman repeatedly sought out Insider Information," and that "Whitman's insider trading crimes were brazen, harmful, and pervasive."[6] The Government also argued that Mr. Whitman "repeatedly lied during his two days on the witness stand," which "speak[s] volumes" about his culpability.[7] The Court agreed that Mr. Whitman "repeatedly perjured himself" and ordered a two-point increase to the Guideline range.[8] Despite all this, Mr. Whitman received a sentence of just two years. Mr. Martoma's conduct was plainly less culpable than this.[9] (And, by way of important comparison, Mr. Martoma's two "co-conspirators" were granted non-prosecution agreements and received no imprisonment at all.)

In short, Probation's Guideline Range here is unrealistic and would create precisely the sort of unwarranted sentence disparity that 18 U.S.C. § 3553 forbids. That Guideline Range should be rejected in favor of a sentence that more accurately reflects the conduct in this case.

Not only is the *conduct* at issue in this case inconsistent with any lengthy sentence, Mr. Martoma's family circumstances and lifetime of volunteer work likewise warrant special consideration. No one can dispute Mr. Martoma's devotion to his wife and three young children or the devastating, irreversible effect that a long prison term would have on his family. Mr. Martoma's ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███ As Rosemary describes in her deeply personal letter:

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

---

6   *Id.* at 22.

7   *Id.* at 13-21; Ex. 138, Sentencing Tr. 23:3-7, *United States v. Whitman*, No. 12 Cr. 125 (JSR), (S.D.N.Y. Jan. 24, 2013) ("*Whitman* Sentencing Tr.").

8   Ex. 138, *Whitman* Sentencing Tr. 5:10-6:17.

9   Mr. Martoma accepts the jury's findings only for purposes of this sentencing memorandum.



(Ex. 1, Letter from Dr. R. Martoma.)

He has always done whatever it takes for his wife Rosemary and their children.

Suffice to say, Mr. Martoma's sentence will have a far-reaching impact on Rosemary and the children. For example, Skaria Achettu, Rosemary's uncle, writes:

> In Mathew's and Rosemary's case it is even more so because of Rosemary's unusual reliance, for whatever reason, on Mathew for everything. Mathew has voluntarily and proudly taken on that role as his dutiful responsibility, rather than complaining and quibbling. Mathew has resultantly been everything to their family, Rosemary and the little kids. Your Honor, my great nightmare now is, how this frail girl Rosemary is going to support and direct these kids in a normal way, let alone see the kids reach their potential. I would request that Your Honor consider the fate of Rosemary and these three young children when deliberating Mathew's future. We do not want to lose Mathew, but we fear this verdict may ruin all the Martomas over time.

(Ex. 13, Letter from S. Achettu.)   Many defendants who come before this Court have families, but the simple truth is that

Nor can anyone dispute Mr. Martoma's commitment to a life of helping family, friends, and community in times of need – a commitment that continues to this day. Even during the extremely stressful time leading up to the trial of this case, Mr. Martoma demonstrated his care and compassion for others. For instance, in 2013, Mr. Martoma helped a family from his church deal with its own devastating loss. As his pastor, Rev. Zacharias Thottuvelil, explains:

> Last year, our community suffered a grave loss, when one of our members and his two young children lost their beloved wife and mother to an aggressive cancer. As her struggle came to a close, I was called to India. Before I left, I talked extensively with Mathew about my plans for the family and entrusted him to shepherd them through their suffering. Mathew exceeded my expectations. He waited by the wife's bedside so that the husband could go home and take a shower; he researched the particular cancer as if it were his own wife who was suffering; he reached out to experts to find new treatments; he counseled his friend to allow the children time with their mother in her last few weeks; and he helped make plans to ease her suffering.

(Ex. 100, Letter from Rev. Fr. Z. Thottuvelil.) These acts of humanity and compassion by Mr. Martoma, for which he neither sought nor received any public recognition, are the true measure of the man. As shown by the more than 100 voices speaking in unison to this Court, Mathew Martoma is a man worth supporting in his time of need, just as he has supported so many others when they needed it.

**MR. MARTOMA'S BACKGROUND**

This Court is familiar with the facts of this case and with certain events in Mr. Martoma's past. Mr. Martoma does not deny that he has made mistakes, in particular with respect to his dismissal from Harvard Law School in 1999. But his dismissal from Harvard already has had a life-altering impact, including an effect on his defense in this case. The Court should not allow

5

his conduct as a student at Harvard to have such disproportionate consequences.  Mr. Martoma has been punished enough for his dismissal from Harvard:  it should not be allowed to influence these proceedings 15 years later.

In any event, his mistakes at Harvard do not reflect the manner in which he has lived his life – as a person devoted to helping others.  As discussed in more than 100 letters submitted to the Court on Mr. Martoma's behalf, Mathew Martoma has led a lifetime of giving, positively affecting countless lives.  As Mr. Martoma's mother, Lizzy Thomas, writes: "I know this sentence is about what happened in Your Honor's courtroom, but the impacts of this case reaches far beyond those four walls."  (Ex. 94, Letter from Dr. L. Thomas.)

### A. Mr. Martoma's Unwavering Devotion To His Family.

Above all else, Mr. Martoma is deeply devoted to his family.  Mathew married his wife, Rosemary, on July 5, 2003, in Coral Gables, Florida.  Since then, they have been inseparable and, ▮▮▮▮▮▮▮▮▮▮▮ Mr. Martoma's cousin, Dr. John Varghese, explains, "Mathew and Rosemary are like a heart and lung.  Both support each other, but neither can function alone."  (Ex. 104, Letter from Dr. J. Varghese.)

Shortly after they were married, the Martomas moved to Boston, Massachusetts and started a family.  Their first child, J▮▮▮▮ was born in ▮▮ 2005.  He was named after Mr. Martoma's Uncle J▮▮▮▮, who lived in Ann Arbor, Michigan, and served as a mentor to Mr. Martoma.  (*See* Ex. 46A, Letter from S. Joshua.)  The family moved to Connecticut in 2006 and their second child, A▮▮, was born in ▮▮▮▮▮▮2007.  The Martomas' youngest child, D▮▮▮, was born in ▮▮ 2009.  The Martomas moved to Boca Raton, Florida in 2010 to be closer to their parents, to raise their children away from the hustle and bustle of city life, and ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Since moving, Mr. Martoma has devoted nearly every minute of the past four years to caring for and supporting

his wife and three young children, now ages 8, 7, and 4. Rebecca Rosenblatt, the former

admissions coordinator at the school of Mr. Martoma's youngest two children, writes:

> I first met Rose and Mathew when they came to tour the school about four years
> ago. Before they even walked through the door, I was delighted that Mathew was
> coming to tour the school; it is not often that dads take such an interest in their
> preschooler's education. . . . Since that day, Mathew has been an exemplary
> father. He is involved with his children, attending all functions as well as being
> available for pick-up almost daily. It was wonderful to see Mathew's interactions
> with his children, a beautiful exchange of love and respect.

(Ex. 84, Letter from R. Rosenblatt.)

There is no responsibility that Mr. Martoma takes more seriously than providing

unconditional love and support for his wife and children. Mr. Martoma's family members and

friends describe him as someone who always "put[s] family first." (Ex. 8, Letter from B.

Achettu.) Dr. Tarriq Haddad, who has called Mr. Martoma his best friend for more than 20

years, writes:

> I have visited Mathew and his family numerous times over the past 10 years both
> in New York and Florida, and have always been struck as well by his incredible
> dedication to his children. Mathew is the ultimate family man, putting aside
> everything in his own life for his children and wife.

(Ex. 28, Letter from Dr. T. Haddad.)

Many that know him describe Mr. Martoma's involvement in his children's lives as

particularly extraordinary. Dr. Anne Lee, another of Mr. Martoma's lifelong friends since his

college days, writes:

> J██████, now 8, was born in Boston, and thus I know how loving, doting, and
> hands-on Mathew is in his family. In fact, I never heard about what Mathew did
> for work, as his family was always the center of his life – all of his free moments
> and stories were about J██████ grins, love of green vegetables, or his utter awe of
> every "first." . . . Since leaving Boston, Mathew has continued to play a central
> role in his children's lives, ever-present for their important school events, games
> and performances.

7

(Ex. 60, Letter from Dr. A. Lee.)  Rosemary Martoma's brother, Dr. Stephen Kurian, echoes this sentiment:

> Mathew is a fundamental piece of his family's jigsaw puzzle.  He has always been a dedicated family man and father to the point of monotony.  As a new father myself, I routinely think of Mathew's generosity, kindness and love towards his children for how I want to model my own behaviors as a father.  Every activity he has planned in life since having children has been with a clear thought for how it impacts them.

(Ex. 59, Letter from Dr. S. Kurian.)

Mathew's focus on family is not surprising, given his background and upbringing.  Mr. Martoma, a United States citizen and first-generation American, was born in Rochester, Michigan, on          1974.  He is the oldest of three sons born to Mr. Bobby Martoma and Dr. Lizzy Thomas, both of whom immigrated to the United States from India.  During his childhood, Mr. Martoma's family moved from Michigan to a middle-class community in Brevard County, Florida, near the Kennedy Space Center where Mr. Martoma's father worked as an engineer.  (Ex. 67, Letter from P. Martoma.)  Mr. Martoma's mother started a medical practice in their community.  (Ex. 94, Letter from Dr. L. Thomas.)  Mr. Martoma grew up in a close-knit, hard-working family, where he developed a deep connection to his parents and younger brothers.  As his youngest brother, Philip Martoma, explains:

> Ours is an emotionally close family, and I always thought of Mathew as a family man.  He visited my parents regularly and kept in close contact with me no matter where life took him. . . . While I am physically the tallest member of my family today, I still think of Mathew as the tallest figure in our family tree.

(Ex. 67, Letter from P. Martoma.)

Mr. Martoma also is very close to his extended family, just as he has been throughout his life.  C.D. Varghese, Mr. Martoma's uncle, writes about the significant role that Mr. Martoma played in his son's early development when Mr. Martoma was just a young adult himself:

> After Ajai [Mathew] graduated from Duke University, he joined the National
> Institute of Health in Bethesda, Maryland.  While he was searching for an
> apartment, he lived with us for several months. I admired the way he cared for my
> youngest son, Manoj, who was 8 at that time.  Manoj saw Ajai as a mentor, and
> Ajai used to teach him different educational concepts, read bedtime stories for
> him and take care of Manoj whenever we needed.  We could always trust Ajai to
> be responsible with our son.  Ajai was so mature and loving at a young age, a
> genuine big brother to my son.

(Ex. 102, Letter from C.D. Varghese.)  Manoj Varghese, now 25, describes Mr. Martoma's

influence almost 20 years later:

> Who I am right now is a powerful leader in my family, my communities, and in
> the world. I am present to the influence Ajai was in my own life with his loving
> interactions, his humility, and leadership.  My commitment to family, my friends,
> my church, and charitable causes came about from the moments I got to share
> with this wonderful man. . . . I am only 25 years old and I am leading a life which
> has focused on hard work, service and family, all of which I learned from
> observing Ajai since I was 8. I observed all of the good he created in his
> community and his family.  I am now committed to create as much quantifiable
> good in the world as I can and I am not sure if this would have been my trajectory
> in life without Ajai in my corner.

(Ex. 107, Letter from M. Varghese.)

Mr. Martoma is connected to his wife Rosemary's family as well.  Rosemary and her

brother, Dr. Stephen Kurian, were born and raised in New Zealand, although they continued to

spend their summers in India.  Rosemary attended medical school in New Zealand and moved

(with her parents) to the United States to complete her pediatric residency.  Rosemary's extended

family is scattered all over the world, but physical distance did not diminish Mr. Martoma's

impact on their lives.  Rosemary's cousin, Bob Achettu, explains:

> I still remember the time that Mathew took great pains to get to know all of
> Rosemary's extended family during their wedding.  Before the event was over, he
> knew everyone, almost a hundred family members, by name and had made
> meaningful connections with them.  Over the years, as Mathew became more
> successful in his investing career, he has always remained attached to us in a very
> genuine way.

(Ex. 8, Letter from B. Achettu.)  Agnes Dominic, Rosemary's aunt, shares the same sentiment:

I've had the opportunity to interact with Mathew on several occasions during family gatherings, special occasions, weddings, Christmas holidays, funerals and so forth. I've found him to be a loyal family man, a great husband, a loving father, and someone whom we can count on for help or assistance in any crisis.

(Ex. 22, Letter from A. Dominic.)

### B. The Martomas Are A Fragile Family And Face Irreversible Damage From A Lengthy Sentence.

The Martomas are a young and vulnerable family. Mr. Martoma is the foundation of support for his wife and children and, without him, they stand to crumble. Mr. Martoma's father, Bobby Martoma, writes:

Without Mathew, Rosemary and the children will be lost. I am most worried about them. While things can be replaced, I know Mathew cannot be replaced in his family dynamics with any amount of money, goods or service. Removing Mathew from the life of his wife and children will bring irreversible damage to them all.

(Ex. 65, Letter from B. Martoma.) Grace Kannookadan, Mr. Martoma's cousin, echoes this feeling:

We have only rarely seen a father like Mathew who cares so deeply for his wife and children. He is so involved in the upbringing and day-to-day life of his kids that we cannot understand how they will function without him.

(Ex. 48, Letter from G. Kannookadan.)

Removing Mr. Martoma from the lives of his children, for whom he has been the primary support system, will undoubtedly cause irreversible emotional trauma to them. Indeed, everyone who has witnessed the bond between Mr. Martoma and his children has expressed deep-seated fear for the children's well-being should they be separated from Mr. Martoma. Anju Mathew, Rosemary Martoma's cousin, explains:

Mathew's children depend on him for emotional support and fatherly guidance. In our culture, fathers play a very active role in the upbringing of their children. Children without fathers carry intense negative psychological trauma. Mathew's children are already dealing with the public scrutiny around their father's trial, unflattering Wikipedia entries and a host of other stigmas that children should not

10

> have to endure.  At least with Mathew around, they have been able to weather the
> storm together.  Taking away their father could be the straw that breaks the
> camel's back.

(Ex. 68, Letter from A. Mathew.)  Family and friends have noticed the toll that the legal
proceedings have already taken on the children.  Dr. Anne Lee writes:

> No matter how one may attempt to shelter the children, it is impossible to evade
> the pervasive nature of the internet and media publicity of the trial.



(Ex. 60, Letter from Dr. A. Lee.)

(Ex. 90, Letter from A. J. Tharakan.)

For example, Elizebeth John,

Rosemary's cousin, writes:

(Ex. 37, Letter from E. John.)

11



As Rosemary explains:

(Ex. 1, Letter from Dr. R. Martoma.).

### C.   Mr. Martoma Has Dedicated Himself To A Lifetime Of Giving.

In addition to his incredible compassion and unconditional love for his family,

Mr. Martoma has dedicated himself to a lifetime of giving.  In the words of his mother, Dr. Lizzy

Thomas, "all of his life, Mathew has been a giver."  (Ex. 94, Letter from Dr. L. Thomas.)

Mr. Martoma's sense of civic responsibility was ingrained in him at an early age.

Growing up in Florida, his parents were actively involved in the community and their local

church, which they helped found.  (*Id.*; Ex. 70, Letter from Rev. Fr. Dr. J. Mathew.)  Mr.

Martoma's brother, Philip Martoma, explains:

> When you visit our home, you get the immediate impression that this is a family
> loved by the community – from the hand-knitted blankets by my Mom's patients,
> recognition letters from community organizations, on the wall and so on.  Mathew

grew up in a home where serving others is in our DNA and that was our second nature.

(Ex. 67, Letter from P. Martoma.)

In high school, Mr. Martoma set the tone for the rest of his life, embarking on a long journey of community involvement. Mr. Martoma's brother, Daniel Martoma, explains what it was like growing up in the same home as Mathew:

> Watching Mathew's commitment to our community was inspiring. I still remember the candy cane shirt and white pants he wore weekly to the hospital as a volunteer. He enjoyed delivering flowers, sharing stories with sick patients and turning what was often an overwhelming experience in a patient's family into a manageable situation. At school, he participated in a variety of clubs that were involved in highway cleanups; soup kitchens and other fundraisers. I especially remember how proud he was of physically constructing the local "Rotary Park" where our family and other kids would play in our younger years. Through Mathew's example, I learned that donations of time and care were as or even more important than money. Mathew often didn't get credit for his contributions, but this never slowed him down; he was always committed to causes that fueled his passion.

(Ex. 66, Letter from D. Martoma.)

From age 12 to 18, Mr. Martoma was deeply involved in a Christian-based scouting organization known as the Royal Rangers. Mr. Martoma became a senior guide and served as a peer mentor to younger Rangers by organizing regional campouts and helping others prepare for Frontiersman testing. Reverend Carmine J. DiBiase, a close personal friend, mentor, and former pastor to Mr. Martoma, explains:

> Perhaps the most intimate experience that I had with Mathew has to do with our mutual involvement in a Christian based scouting organization known as the Royal Rangers. The Ranger motto is "*Ready.*" Ready for anything. *Ready to work, play, serve, worship, live and obey. . . .* Scouting is one activity that benefited Mathew, and I knew he wanted to share that experience with others. After Mathew passed his Frontiersman's testing with flying colors, he came back to our Outpost as a Senior Guide to lead the other Rangers. He helped organize regional Jamboree campouts and guide other younger Rangers preparing for their Frontiersman testing. Later in college, Mathew tried to find a comparable scouting experience to help kids coming from difficult home situations. When he couldn't locate a local Royal Rangers Outpost, he convinced a college group to

13

help him develop a Cub Scout curriculum adapted to the needs of children from a local housing project.  They developed outdoor activity badges for kids who weren't as versed in camping and hiking and emphasized the importance of kids completing their education.  That is the Mathew I knew, always finding ways to tap into the benefits he received in life and share those gifts with others.

(Ex. 20, Letter from C.J. DiBiase.)

Mr. Martoma also was an active volunteer in high school for a non-profit youth organization called Junior Achievement, through which volunteers travel all over the world to teach children about entrepreneurship and basic democratic principles.  As a leader within this organization, Mr. Martoma traveled to several foreign countries, including England and Turkey, where he worked with children.  One particular trip to the Soviet Union stands out in the minds of his family and friends.  Ashok Malhotra, a close family friend from Mr. Martoma's high school years, writes:

When we return[ed] from the vacation, my children talked about the donated items he collected from Disney, and the Photographs he collected from Kennedy Space Center to give to kids in the Soviet Union when he visited there as a "Student Ambassador" from Florida to the Soviet Union.  Mathew believed in sharing not only the gifts but also the Liberty and Freedom that we enjoy in the USA with the Soviet Kids.

(Ex. 63, Letter from A. Malhotra).  John Johnson, Mr. Martoma's cousin, similarly recalls:

I also remember that Ajai [Mathew] travelled to the former Soviet Union, as a "goodwill" ambassador.  My kids talked about the stockpile of donated Mickey Mouse t-shirts and blue jeans he had collected to share with Russian kids.  Ajai seemed to believe that a little kindness could go a long way.

(Ex. 40, Letter from J. Johnson.)

In the fall of 1992, Mr. Martoma enrolled at Duke University in Durham, North Carolina.  He completed a double-major in biomedicine and public policy, graduating *summa cum laude* one semester early in December 1995.  At Duke, Mr. Martoma continued to be an active member of his community on and off campus.  As Dr. Tarriq Haddad explains:

> [W]hile most students I knew simply focused on staying afloat through the
> rigorous academic load thrust at them at Duke, Mathew amazed me with his
> remarkable and unwavering commitment to help others at a time when he had
> very little time or resources to give.

(Ex. 28, Letter from Dr. T. Haddad.)  Among other things, beginning in his sophomore year, Mr.

Martoma applied to and became a member of a unique dormitory at Duke called Round Table,

which focused on community service, faculty interaction, and social engagement.  Justin Dillon,

a close friend and classmate of Mr. Martoma, explains:

> I first met Mat during our sophomore year in college, when we both lived in the
> Round Table dormitory at Duke University.  The three so-called "pillars" of the
> Round Table were (if memory serves) student-student interaction, community
> service, and faculty-student interaction.  It was, in short, the nerd dorm.  But the
> people who lived there – Mat and I included – truly believed in its mission.  We
> believed in creating a place where even the most offbeat people could come
> together and get to know each other. . . . In short order, Mat became a leader at
> Round Table, organizing events and eventually becoming its president.  That was
> not an easy job. . . . He could talk to anyone; people trusted him, and he made
> them feel heard.

(Ex. 21, Letter from J. Dillon.)

Mr. Martoma also joined Alpha Phi Omega ("APO"), a nonresidential National Service

Fraternity that required a significant commitment to community service.  (Ex. 18, Letter from J.

Caravella; Ex. 28, Letter from Dr. T. Haddad; Ex. 60, Letter from Dr. A. Lee.)  Through APO,

Mr. Martoma participated in multiple service projects such as Big Brother/Big Sister, Habitat for

Humanity, college day clean-ups, and other fundraisers for local charities.  (*See* Ex. 60, Letter

from Dr. A. Lee; Ex. 111, Letter from K. Verghese.)  Dr. Anne Lee writes:

> We met through two community service organizations that we were members of
> at Duke (Alpha Phi Omega and the Roundtable dormitory).  Through these
> organizations we volunteered regularly for service activities in underprivileged
> communities of Durham NC, ranging from volunteering to teach children at
> Durham elementary schools to building houses for Habitat for Humanity.  During
> this time I witnessed Mathew's joy making children laugh or helping them with
> challenging homework sets, and since then Mathew and Rosemary have
> continued to give back to the community through their charitable foundation.

(Ex. 60, Letter from Dr. A. Lee.)  Justin Caravella, Mr. Martoma's classmate and friend,

continues:

> I got to know Mathew better because we both did volunteer work with a
> community service organization called Alpha Phi Omega.  Alpha Phi Omega
> (APO) require[d] a significant commitment – 24 hours of community service just
> as part of the application process.  We did several types of service projects
> together through those years.  One particular program was called "Pals", it was a
> weekly meeting between APO volunteers and underprivileged children who had
> escaped abusive parents.  We helped them with schoolwork and led them in other
> educational activities.  I remember that within a short period of time, Mathew
> became a favorite among the kids; in fact they would ask "Where's Mat?" on
> occasions that he was unable to attend.

(Ex. 18, Letter from J. Caravella.)

After graduating from college, Mr. Martoma pursued a job as a Fellow at the National

Institutes of Health ("NIH") in Washington, D.C.  He was hired in January 1996 and worked on

the Human Genome Project.  Dr. Ronald Green, Mr. Martoma's supervisor and mentor at the

NIH, writes:

> Hiring Mathew (at that time his name was A. Mathew Thomas) was one of the
> best decisions I made.  A very personable individual, he was able to serve as
> liaison with the many different people with whom we had to work at the NIH,
> ranging from clinical physicians and genetic counselors to leading genetic
> researchers.  Mathew kept me abreast of their interests and concerns and helped
> shape the agenda for the office's work.  For example, it soon became clear that
> there was a need for a basic course or introduction to research ethics for many of
> the Genome Center researchers.  I had experience in offering such a course at
> Dartmouth, but Mathew did yeoman's work in arranging the course sessions,
> identifying and scheduling participants, and, eventually, teaching several modules
> of the course himself.  Mathew also helped greatly with persistent personnel
> problems, interviewing and helping hire secretaries and administrative assistants
> during a period of flux in our office funding and staffing.  I could always count on
> Mathew to deal well with people and earn their respect.

(Ex. 27, Letter from R. Green.)  Only five months after starting at the NIH, Mr. Martoma was

promoted to Deputy Director of the Office of Genome Ethics, part of the National Genome

Center.

In 1997, Mr. Martoma's life changed course.  He left the NIH and enrolled at Harvard Law School.  As this Court is already aware, he was dismissed in 1999.  Mr. Martoma's reputation was severely damaged as he was humiliated and disgraced in front of family and friends.  But Mr. Martoma persevered, and he committed to perform his own personal penance.  He went back to where he began his journey, serving his community in his hometown in Florida.  Mr. Martoma's father, Bobby Martoma, writes:

> Expulsion from Harvard may have depressed Mathew, but it did not stop him from helping his community.  He volunteered without any monetary or other benefits to work with Legal Aids in Brevard County and in Jacksonville, Florida.  He became the spoke's person [sic] for the less fortunate who were living in poorer neighborhoods constructed on the hazardous waste dump site.  Despite the disappointment in his own life, Mathew prioritized helping others whose suffering seemed worse than his own.

(Ex. 65, Letter from B. Martoma.)

During this time, Mr. Martoma also traveled back and forth to India, staying with family as he dedicated time to volunteer at children's orphanages.  K.O. Abraham, the former Secretary and Director of the Nazareth Ashram Otheria Children's Orphanage in India, writes:

> Most visitors come to India for sightseeing, fun, and spiritual awakening, but they are not prepared for the unequal sufferings by our neglected children here.  Maybe visitors have only heard, but not experienced real hardship and the children's real[i]ty are too painful to accept and it is easy to ignore.  Others, like Ajai [Mathew] embrace the reality and want to help the afflicted like a Good Samaritan.  While only a student at the time Ajai visited our facilities in 2000 and helped raise donations for new space to house, bath and care for the children.  Ajai also spent many days with the children in activities, serving meals to the children with our parish sisters and teaching new games to the children including "kick the ball."

(Ex. 1A, Letter from K.O. Abraham.)  Thomas Philip, Mr. Martoma's uncle, continues:

> After visiting a local orphanage (Asharam) for abandoned children caught in the middle of religious conflict, Ajai [Mathew] donated a small fortune by Indian standards to the Asharam so they could invest in a library of English children's books.  Ajai wanted these children to benefit from great literature the way he had from my grandfather's tutelage.

(Ex. 80, Letter from T. Philip.)

In 2001, Mr. Martoma enrolled at Stanford Business School and moved to California. There, he continued to serve others in need.  James Tierney, Mr. Martoma's classmate and friend, writes:

> Generosity is a quality I have always noticed in Mathew.  While we were in business school Mathew was involved in a program benefitting Special Olympics and in another which provided affordable housing to low income senior citizens. Some of these projects involved manual labor, landscaping, clean-up, and tasks not every ambitious business school student is willing to undertake.  I know Mathew as a person willing to get his hands dirty to help another.

(Ex. 101, Letter from J. Tierney.)

At Stanford, Mr. Martoma met his future wife, Rosemary.  Since their marriage, the Martomas have faithfully continued to support their community and social justice through hands-on volunteering and substantial donations to non-profit organizations.  For instance, Kenneth Harbaugh, one of Mr. Martoma's longtime friends and a classmate from college, explains:

> In 2007 I co-founded a non-profit called The Mission Continues, which empowers military veterans to continue serving in their communities once they return to civilian life (I left the military in 2005 after nine years as a Navy pilot).  Mathew provided some of the seed funding for this organization.  Today, The Mission Continues is one of the leading veteran service organizations in the country.  In the years since Mathew's initial investment, The Mission Continues has awarded fellowships to almost one thousand US military veterans in 49 States.  These Mission Continues Fellows have been placed with 608 nonprofits and committed over 400,000 hours of community service.  They have led more than 800 service projects, engaging over 35,000 volunteers in shared service to their communities. It is quite possible that none of this would have happened without Mathew's early support.

(Ex. 29, Letter from K. Harbaugh.)

And Mr. Martoma is extremely supportive of his children's schools, reflecting the importance that he places on education.  Rebecca Rosenblatt writes:

> Mathew Martoma is a generous and charitable person.  He was supportive of our school, giving contributions to collections throughout the years.  He also gave a

generous donation to a teacher who was battling cancer.  Always giving and never asking for anything in return.

(Ex. 84, Letter from R. Rosenblatt.)

Faith is also an important part of Mr. Martoma's life, and it brings him great joy to support his church.  Reverend Fr. Zacharias Thottuvelil, the pastor at Mr. Martoma's church, writes:

> Since I have been in America now for 13 years, my calling has been to help our church grow through the dedication of new sanctuaries.  It has not always been an easy task in the current economic environment.  However, Mathew was always the first to support these endeavors through his positive outlook and financial support.  Similarly, when we had the opportunity to bring a famous Indian "movie" singer to our church for a concert fundraiser, Mathew provided funding for the event, so raised proceeds could go to church activities.  Our parishioners were inspired by his generosity, such that others contributed and we were able to raise the funds for our new church.

(Ex. 100, Letter from Rev. Fr. Z. Thottuvelil.)

Finally, in 2010, Mr. Martoma and his wife established a foundation dedicated to raising and donating money to a variety of charitable organizations.  To date, they have set aside almost $1 million for the foundation's charitable work.  Many of Mr. Martoma's friends and relatives mentioned the significance of this charitable act in their letters to this Court, particularly since these contributions have been "behind the scenes and without recognition."  (Ex. 24, Letter from J. Farrell; *see also, e.g.*, Ex. 8, Letter from B. Achettu; Ex. 76, Letter from S. Mulpuru; Ex. 69, Letter from B. Mathew; Ex. 26, Letter from B. Gerstein; Ex. 99, Letter from R. Thomson; Ex. 36, Letter from D. John; Ex. 95, Letter from S. Thomas; Ex. 91, Letter from A. Tharakan; Ex. 98, Letter from M. Thomson.)  Beneficiaries of the foundation have thus far included 30 non-profit organizations, including non-profit organizations dedicated to medical research and treatment, non-profit organizations committed to providing services to children, religious and other community-based non-profit organizations, and non-profit art organizations.

As Dr. Tarriq Haddad explains:

> [T]hese examples of charitable giving to me say so much about who this man is, a man who despite his success has always remained humble and always acted upon his belief that no human being can achieve anything without guidance and support from others.

(Ex. 28, Letter from Dr. T. Haddad.)

### D. Despite Recent Hardships From His Conviction, Mr. Martoma's Commitment To Family And Friends Remains Unwavering.

"[P]rivate acts of humanity and compassion" – which neither seek nor receive public recognition – "reveal something about the heart and conscience of the human being." Ex. 138, *Whitman* Sentencing Tr. 17:9-21. A hallmark of Mr. Martoma's unfailing generosity has been such acts of kindness. Dr. Tarriq Haddad writes:

> From that first day we met, I always marveled at how naturally he derives his identity in life and his happiness not through his personal wants and desires but by how he helps others achieve theirs. . . . I have never known anyone with a bigger heart than Mathew Martoma. . . . I pray that you get a sense from my observations that this commitment to helping others is not a fleeting phase or a behavior with secondary gain but has literally spanned a lifetime and is ingrained in every fiber of his being.

(Ex. 28, Letter from Dr. T. Haddad.)

Despite the personal heartache and embarrassment endured by the Martoma family leading up to and through trial, Mr. Martoma and his wife continue to display steadfast devotion to their family and friends. It remains Mr. Martoma's first priority to continue to be there for his children and shield them as best he can from the turmoil surrounding his legal proceedings. Linda Harris, the former director of early childhood education at the school of Mr. Martoma's youngest two children, writes:

> I have seen numerous parents convicted of crimes. Generally, these parents stop showing up at school. They drop out of sight and their children suffer for it. That has not been what Mathew has done. He has been selfless and courageous by showing up at school events even though he is aware that people are gossiping. He is much more concerned about being there for his children.

20

(Ex. 31, Letter from L. Harris.)  Jori Farrell, a neighbor and teacher of the Martomas' youngest

two children, similarly explains:

> When details of his case became public and stories of the insider trading charges
> were all over the newspapers and TV, I'm sure Mathew must have wanted to stay
> home and not face the gossip, stares and questions from the parents at school and
> people in our community.  Instead, Mathew came to every dance recital, violin
> concert and play in which his children performed.  During times when I am
> certain he needed to be meeting with lawyers, working on his legal case etc. he
> would help in our lunch room and classroom parties, or read to our students as a
> guest reader.  He has never missed a parent/teacher conference.

(Ex. 24, Letter from J. Farrell.)

And his good work most certainly is not limited to his children.  Mr. Martoma has

continued to place others' needs before his own, providing unconditional support for his friends

when they need him most.  Soye Thomas, a friend and member of Mr. Martoma's local church,

writes:

> I would be remiss in not also sharing my most personal [memory] . . . losing my
> loving wife Venus after a 3 year struggle with stage IV colorectal cancer.  In
> hindsight, I realize that Mathew was under the cloud of his investigation and legal
> case for almost as long as Venus was diagnosed with cancer, but in my greatest
> time of need Mathew never once burdened me with his own struggles.  Rather, he
> supported me through the hardest chapter of my life as a brother and friend.  If we
> had a question about a chemo regimen, Mathew was there to research and provide
> answers.  If we needed help with a child pickup from school, Mathew offered to
> take care of it.  If we needed a break, Mathew took our kids on a 'play date' with
> his children. . . . As my Venus suddenly slipped away, Mathew continued to
> support us.  In the last few weeks of Venus's life, when I called Mathew from the
> hospital to ask his opinion about how to ease my wife's pain, he insisted on
> coming to the hospital even though it was around midnight on some nights.
> Mathew and Rose made numerous calls to Venus's Oncologist to arrange her
> transfer to a specialized hospital so she could receive better pain management and
> be comfortable in her last days.  I was moved by Mathew's dedication to help all
> the while not realizing the magnitude of the problems he was facing.

(Ex. 95, Letter from S. Thomas.)

As his frequent acts of kindness and generosity demonstrate, Mr. Martoma has great

potential to provide abiding support for his family, friends, and community in the years ahead.

Dr. Lizzy Thomas, Mr. Martoma's mother, puts it best:

> While I'm sure you will get many letters about Mathew's good deeds over the years, please know, Your Honor, you are hearing from only a fraction of the many lives he has helped.  So much of Mathew's goodness won't come through in the letters or memorandums you are receiving because he has given so much of himself to everyday people when they needed it most, not where it could be documented best.

(Ex. 94, Letter from Dr. L. Thomas.)

## ARGUMENT

## I.   PROBATION'S GUIDELINE RANGE IS IRRATIONAL AND SIGNIFICANTLY OVERSTATES THE GAIN ATTRIBUTABLE TO MR. MARTOMA.

### A.   The Guidelines Lead To An Unfair And Irrational Sentencing Range.

The Guidelines calculation in insider trading cases depends almost entirely upon the

purported amount of "gain resulting from the offense."  U.S.S.G. §§ 2B1.4, 2B1.1.  Courts and

scholars alike have repeatedly recognized that the calculation of offense level based upon such

"gain" in securities fraud cases – and in insider trading cases in particular – can result in advisory

sentence ranges that are unreasonably high and that fail accurately to reflect culpability.  Courts

in this District, in particular, have found time and again – in no less than seven different insider

trading cases – that the Guidelines can lead to unfair and even absurd sentencing ranges.  *See* Ex.

126, Sentencing Tr. 51:21-52:12, *United States v. Chiasson*, No. 12 Cr. 121 (RJS), (S.D.N.Y.

May 13, 2013) ("*Chiasson* Sentencing Tr."); Ex. 135, Sentencing Tr. 50:25-51:9, *United States

v. Newman*, No. 12 Cr. 121 (RJS), (S.D.N.Y. May 2, 2013) ("*Newman* Sentencing Tr."); Ex. 138,

*Whitman* Sentencing Tr. 6:18-7:12; Ex. 137, Sentencing Tr. 3:22-4:16, *United States v. Rosen*,

No. 11 Cr. 300 (JSR), (S.D.N.Y. May 7, 2012) ("*Rosen* Sentencing Tr."); Ex. 131, Sentencing

Tr. 3:22-4:16, *United States v. Gupta*, No. 11 Cr. 907 (JSR), (S.D.N.Y. Oct. 24, 2012) ("*Gupta*

22

Sentencing Tr."); Ex. 128, Sentencing Tr. 4:17-22, *United States v. Fleishman*, No. 11 Cr. 32 (JSR), (S.D.N.Y. Dec. 21, 2011) ("*Fleishman* Sentencing Tr.") and Ex. 127, Sentencing Tr. 58:1-11, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS), (S.D.N.Y. Dec. 17, 2010) ("*Contorinis* Sentencing Tr.").

In *United States v. Adelson*, Judge Rakoff recognized that, "because of their arithmetic approach and also in an effort to appear 'objective,'" the Guidelines "tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d at 509 (citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). The court described how "calculations under the guidelines have so run amok that they are patently absurd on their face," pointing out "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guidelines calculations can visit on human beings if not cabined by common sense." *Id.* at 512, 515. The court therefore rejected the Guidelines calculation, which it found to be driven by "the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss," and instead "focuse[d] more on the statutory factors set forth in 18 U.S.C. § 3553(a)." *Id.* at 509, 512.

Judge Rakoff has echoed the same concern in a number of more recent insider trading cases as well. For example, in *United States v. Gupta*, the court again denounced the use of the Guidelines "gain" calculation:

> [T]he Sentencing Commission chose to focus largely on a single factor as the
> basis for enhanced punishment: the amount of monetary loss or gain occasioned
> by the offense. By making a Guidelines sentence turn, for all practical purposes,
> on this single factor, the Sentencing Commission effectively ignored the statutory
> requirement that federal sentencing take many factors into account, *see* 18 U.S.C.

§ 3553(a), and, by contrast, *effectively guaranteed that many such sentences would be irrational on their face*.

904 F. Supp. 2d at 351 (emphasis added).  Notably, the Court did not actually "depart downward" from the Guideline Range:  the court rejected the Guideline Range altogether and sentenced the defendant under § 3553.  The court explained:

> The sentence I have in mind would be the same, exactly the same, whether the guideline range was what the government argues for or what the defense argues for or anywhere in between, because it seems to me this is a typical case in this area where the guidelines have little to say of helpfulness to the sentencing judge.

Ex. 131, *Gupta* Sentencing Tr. 9:12-17.

Judge Sullivan has voiced the same concern in a number of recent insider trading cases. In *United States v. Newman*, Judge Sullivan noted the importance of tempering the Guidelines calculation with other considerations:

> [T]here's a lot of talk about the Sentencing Guidelines these days, particularly in fraud cases, a lot of suggestion that the guidelines are overly mechanical, that they are out of whack in many cases.  And I think that's probably true.  I think in many cases, if left to themselves, if that were the only thing, then the guidelines can lead to sometimes absurd or certainly unjust results.

Ex. 135, *Newman* Sentencing Tr. 50:25-51:7.  Courts in this District have reached the same conclusions in rejecting the Guidelines in *United States v. Whitman*, No. 12 Cr. 125 (JSR), (S.D.N.Y. Jan. 24, 2013), Sentencing Tr. 6:18-7:12 (Ex. 138); *United States v. Fleishman*, No. 11 Cr. 32 (JSR), (S.D.N.Y. Dec. 21, 2011), Sentencing Tr. 40:1-7 (Ex. 141); *United States v. Chiasson*, No. 12 Cr. 121 (RJS), (S.D.N.Y. May 13, 2013), Sentencing Tr. 58:15-22 (Ex. 126); *United States v. Contorinis*, No. 09 Cr. 1083 (RJS), (S.D.N.Y. Dec. 17, 2010), Sentencing Tr. 57:23-58:11 (Ex. 127); and *United States v. Rosen*, No. 11 Cr. 300 (JSR), (S.D.N.Y. May 7, 2012), Sentencing Tr. 43:1-5 (Ex. 137).  *See* Ex. 138, *Whitman* Sentencing Tr. 9:9-18 ("[T]he guidelines . . . place[] too much emphasis, irrational emphasis on the monetary portion of the determination of sentence . . . .   The guidelines are skewed irrationally in this respect."); Ex. 128,

*Fleishman* Sentencing Tr. 4:18-19, 11:11-13 (criticizing the Guidelines' "fetish with the calculation of loss" and observing that the Guidelines "do not really capture the reality of what's going on in many cases"); Ex. 126, *Chiasson* Sentencing Tr. 6:13-16, 52:14-18 (calling the Guidelines calculation "primitive" and observing that "[t]here's some cases where loss or gain, the numerical values that are assigned under a table in Section 2B1.1 of the guidelines lead to or can lead to absurd results"); Ex. 127, *Contorinis* Sentencing Tr. 58:4-6 (recognizing that "the fraud table is sometimes a clumsy tool to measure loss or gain or seriousness of the crime"); Ex. 137, *Rosen* Sentencing Tr. 3:22-4:5 (the Guidelines loss calculation "plays an overwhelming role that is contrary to those elementary notions of justice or even common sense").

Indeed, the use of the fraud table in Section 2B1.1 as a proxy for gain in insider trading cases dramatically overstates the offense level. That table is designed to apply when a defendant has caused a real or intended loss to a victim: "there is no denying that the 'heartland' of Section 2B1.1 is garden variety theft – theft of money or fungible property – which causes only economic harm and impacts only the immediate victim." *United States v. Spiegelman*, 4 F. Supp. 2d 275, 291 (S.D.N.Y. 1998). In a securities fraud case where the defendant himself defrauded investors (*e.g.*, a case involving a Ponzi scheme), the loss table may serve a useful function in quantifying the out-of-pocket loss ***to the victims***. But in a securities fraud case involving insider trading, the loss table is unhelpful because it has no connection to the culpability of the conduct at issue or the need for deterrence. As another court in this District has explained, the loss amount "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).[10]

---

[10]   *Accord United States v. Mueffelman*, 400 F. Supp. 2d 368, 373 (D. Mass. 2005) (reiterating that, in many cases, loss amount "'is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence'"

In sum, Mr. Martoma respectfully submits that this Court should reject Probation's Guideline Range calculation as a basis for determining an appropriate sentence. Given the "absurd" nature of the Guidelines in insider trading cases, Ex. 135, *Newman* Sentencing Tr. 50:25-51:7; Ex. 126, *Chiasson* Sentencing Tr. 52:14-18, this Court should not credit the proposed Guideline Range in any way. Nor should the proposed Guideline Range act as an artificial anchor pulling the sentence to "irrational" heights. *Gupta*, 904 F.Supp. 2d at 351; *Whitman* Sentencing Tr. 9:9-18. Instead, this Court should look to the statutory factors outlined in 18 U.S.C. § 3553(a). *See infra* Part II.

**B.**     **Probation's Guideline Range Is Inaccurate.**

Even if this Court were to undertake a "gain" calculation, Probation's calculation is inaccurate and unreliable, substantially overstating the amount that should be used to determine the Guideline range here. Probation calculates a Guideline range of 188-235 months (approximately 15.7 to 19.6 years) based on a total offense level of 36, which is calculated as follows:

| | |
|---|---|
| Base Offense Level: | 8 |
| Adjustment for Gain of > $200 million: | +28 |
| **TOTAL OFFENSE LEVEL:** | **36** |

U.S.S.G. §§ 2B1.4(a)-(b), 2B1.1(b)(1)(O). Mr. Martoma has no criminal history, and therefore his Criminal History Category is I. *Id.*

The driving force behind Probation's Guideline Range is a 28-level adjustment based upon the determination that the "gain resulting from the offense" totaled more than $200 million. That determination, in turn, is based on Probation's estimate of the profits and losses avoided

---

(quoting *Emmenegger*, 329 F. Supp. 2d at 427)), *aff'd* 470 F.3d 33 (1st Cir. 2006); *United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D. Wis. 2005) ("With their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability.")

from trading in Elan and Wyeth by all of SAC from July 21, 2008, through July 29, 2008, which Probation claims to total approximately $276 million.  But the "gain resulting from the offense" should **not** include the total profits earned and losses avoided by SAC because, if it does, the resulting Guideline Range substantially overstates the "gain" properly attributable to Mr. Martoma.

> **1.      Mr. Martoma Should Be Held Liable Only For The Amount That He Personally Profited From SAC's Trading In Elan And Wyeth, Which Is Approximately $6.3 Million.**

The "gain" in this case should be determined based upon the amount that Mr. Martoma ***personally profited***, not the amount that SAC and Steven Cohen profited.  When such a calculation of "gain" is used, the Guideline range is substantially below Probation's Guideline Range.  Mr. Martoma's only personal gain from the charged insider trading was a $9.4 million bonus that he received in 2008.  (Ex. 118, GX 555.)  The Government did not introduce any evidence that Mr. Martoma earned any other money from the trading at issue in this case.  Mr. Martoma paid at least $3.1 million in taxes on that bonus,[11] which should be offset against Mr. Martoma's "gain" because it was money paid to the U.S. Government – not personal profit to Mr. Martoma.  Consequently, Mr. Martoma personally "benefitted" by approximately $6.3 million from all of SAC's trading in Elan and Wyeth.  Using this calculation results in an offense level of 26 and a Guideline range of 63-78 months (approximately 5 - 6.5 years).

Determining the Guideline range based instead on the full amount of profits realized by all of SAC, as Probation suggests, would substantially overstate the seriousness of Mr. Martoma's conduct.  *See, e.g.*, *United States v. Oakford Corp.*, No. 98 Cr. 144 (JSR), 1999

---

[11]   *See* Ex. 116, Mr. Martoma's 2008 Tax Return.  A portion of Mr. Martoma's 2008 bonus was paid in 2009 (approximately $30,000) and another portion was deferred until a later time (approximately $1.9 million). Since the vast majority of Mr. Martoma's bonus was paid in 2008, we have estimated the total amount of taxes paid on that bonus by applying the effective tax rate that Mr. Martoma paid on his 2008 income (33 percent) to the total amount of his 2008 bonus ($9.4 million).

WL 1201725, at *10-11 (S.D.N.Y. Dec. 13, 1999) (finding that the Guidelines overstated the

seriousness of a financial offense and that a downward departure of 13 points was warranted

where, among other factors, "each of the defendants personally realized only a small portion of

the overall gains or profits").  Indeed, Judge Rakoff succinctly explained the irrationality of

including the profits of a defendant's accomplices:

> [T]here is no better illustration of the irrationality of this approach than the instant
> case: for of the total of 30 Guidelines points calculated by the Probation
> Department and endorsed by the Government as reflecting the proper measure of
> Mr. Gupta's crime and punishment, no fewer than 20 – or two-thirds of the total –
> are exclusively the product of Mr. Rajaratnam's and his companies' monetary
> gain, in which Mr. Gupta did not share in any direct sense. . . . [I]f the sentences
> so calculated are the product of placing an overwhelming emphasis on a factor
> that may be central to some frauds but largely incidental to others, the effect is to
> create, in the name of promoting uniformity, a sentencing disparity of the most
> unreasonable kind.

*Gupta*, 904 F. Supp. 2d at 351; *accord* Ex. 131, *Gupta* Sentencing Tr. 46:7-21 (same).  This

reasoning particularly applies here, where SAC and Mr. Cohen were not even alleged to be Mr.

Martoma's co-conspirators, much less proven to be his accomplices.  Probation's calculation

dramatically overstates Mr. Martoma's gain:  SAC's profits simply should not be used to

determine the Guideline range in this case.

### 2. Alternatively, Mr. Martoma Should Be Liable Only For The Trading Of Elan And Wyeth In His Portfolio, Which Is At Most $49.4 Million.

Should this Court not determine the "gain" in this case based upon the amount that

Mr. Martoma personally profited, it should determine "gain" based on the trading that

Mr. Martoma ***actually controlled*** – *i.e.*, trading in Mr. Martoma's own portfolio ("GEHC"), not

trading undertaken by SAC and controlled by Mr. Cohen directly.  The "gain" from

Mr. Martoma's trading is at most $49.4 million.

### a. Mr. Martoma Should Be Held Liable Only For GEHC's Trading In Elan And Wyeth.

Under the Guidelines, the appropriate measure of "gain" in insider trading cases is "the total increase in value realized through trading in securities by [1] the defendant and [2] persons acting in concert with the defendant or to whom the defendant provided inside information." U.S.S.G. § 2B1.4 cmt., Background. Here, that "gain" is properly determined based only on profits and losses avoided in the GEHC account. To hold Mr. Martoma liable for more would be inconsistent with the plain language of the Guidelines and with the approach followed in many prior insider trading cases.

The only "trading in securities by the defendant" that occurred in this case was trading in GEHC, which Mr. Martoma controlled. (Ex. 117, Tr. 118:23-119:2, 176:1-5, 2305:18-2306:3.) The Government identified GEHC – and only GEHC – as "Martoma's Trading Account" and the "Martoma Portfolio" at trial. (Ex. 119, GX 555; Ex. 123, GX 1266.) Mr. Cohen had ultimate control over the other SAC accounts at issue, including COHE and GGEN. (Ex. 117, Tr. 171:1-22, 175:13-176:23, 2305:23-2306:3.) Indeed, the unrebutted testimony at trial established that Mr. Cohen made the decisions about how to unwind the firm's positions in Elan and Wyeth and whether to short Elan and Wyeth. (Ex. 117, Tr. 2267:14-20, 2318:23-2319:24.) Mr. Martoma did not – and could not – make those decisions. (Ex. 117, Tr. 171:5-16, 175:19-25, 2305:23-2306:10.)

To include trading in any other SAC accounts for purposes of the Guidelines "gain" calculation, the Government would need to have established that Mr. Cohen either (1) acted "in concert" with Mr. Martoma or (2) received inside information from Mr. Martoma. U.S.S.G. § 2B1.4 cmt, Background. The Government proved neither. The Government did not even allege that Mr. Cohen was "acting in concert" with Mr. Martoma, failing to name him as a co-

conspirator.  And the Government did not prove that Mr. Martoma "provided inside information" to Mr. Cohen.  Indeed, as detailed at trial and in Mr. Martoma's post-trial briefing, there were myriad reasons to sell Elan and Wyeth securities in July 2008 that had nothing to do with the alleged inside information – including advice that Mr. Cohen was receiving from another financial advisor, Wayne Holman, who is not alleged to have possessed any inside information. (*See* Ex. 117, Tr. 3028:12-19, 3098:22-3107:6; Def. Mathew Martoma's Mem. of Law in Supp. of His Renewed Mot. for a J. of Acquittal or, Alternatively, for a New Trial, ECF No. 271, at 16-19.)  Moreover, Mr. Cohen testified under oath during an SEC deposition that Mr. Martoma did not provide him with any inside information.[12]  Since the Government has not shown that Mr. Cohen acted in concert with Mr. Martoma or received inside information from him, SAC's purported "gain" from trading in accounts other than GEHC should not be considered in determining the Guideline range.

This approach has been adopted in many other insider trading cases.  For example, in *United States v. Emanuel Goffer*, the court calculated the "gain" under the Guidelines based only on profit earned as a result of the ***defendant's*** trades and did not include profits earned from trades undertaken by Mr. Goffer's co-conspirators.  Ex. 129, Sentencing Tr. 6:5-9:14, *United States v. Emanuel Goffer*, No. 10 Cr. 56 (RJS), (S.D.N.Y. Oct. 7, 2011) ("*Emanuel Goffer* Sentencing Tr.").  Similarly, in *United States v. Kimelman*, the court calculated the "gain" based solely on profits earned on the defendant's trades, not profits earned on trades by his co-conspirators.  Ex. 133, Sentencing Tr. 4:25-5:25, *United States v. Kimelman*, No. 10 Cr. 56 (RJS), (S.D.N.Y. Oct. 12, 2011) ("*Kimelman* Sentencing Tr.").  Likewise, in *Gupta*, the court calculated the "gain" based on profits earned from trades made "directly and immediately as the

---

[12]   Ex. 172, Transcript of the deposition testimony of Steven A. Cohen, dated May 3, 2012, in *In re Elan Corp., plc*, File No. NY- 8152 ("Cohen Deposition Tr."), at 185:21-186:4 (emphasis added).

result of tips from Gupta" of specific inside information.  Ex. 131, *Gupta* Sentencing Tr. 48:3-49:16 ("[I]t seems reasonably clear to this Court that the comment limits the calculation to gains made or losses avoided in trades that were based, in whole or in part, on the inside information.").  Even in *United States v. Rajaratnam*, where the defendant – the head of Galleon Management L.P. – was held liable for all of the "gain" attributable to that fund, the court still excluded gains related to the Galleon Crossover Fund because it "conclude[d] there is insufficient evidence to find that all of these trades originate with the defendant."  Ex. 136, *Rajaratnam* Sentencing Tr. 26:21-24.

>    **b.     The "Gain" From GEHC's Trading In Elan And Wyeth Is At Most $49.4 Million.**

At trial, the Government calculated a "gain" of $62.7 million to GEHC from the charged insider trading.  (Ex. 123, GX 1266.)  The Government's calculation substantially overstates the amount of GEHC's profits and losses avoided, as it uses incorrect prices of Elan and Wyeth securities to measure market reaction following the presentation of the final results of the Phase II bapineuzumab ("bapi") trial at the International Conference on Alzheimer's Disease ("ICAD").

As we understand it, the Government multiplied the total number of Elan and Wyeth shares that SAC sold during the relevant time period by the difference between the price at which SAC sold those shares and the closing prices of the stocks on July 30, 2008 – *i.e.*, the day ***after*** the final Phase II bapi results were announced at ICAD.  (Ex. 117, Tr. 2385:18-2386:18.)  That approach is incorrect.  The "gain" calculation in insider trading cases should be based upon the difference between the value of the shares at the time that the defendant sold them and "the time that the public learned" of the information at issue.  *United States v. Rajaratnam*, No. 09-cr-1184 (RJH), 2012 WL 362031, at *15 (S.D.N.Y. Jan. 31, 2012).  There can be no dispute that the

market learned the final results of the Phase II bapi trial well before the close of trading on July

30, 2008.  As the Government argued both during and after trial, "the aftermarket trading data in

Elan stock . . . showed that Elan's stock price began falling sharply during or immediately after

the ICAD presentation."[13]  That is not surprising:  the ICAD presentation on July 29, 2008, was

"well attended."  (Ex. 117, Tr. 2064:11-19.)  It is unreasonable to assume that market prices did

not reflect the final results announced at ICAD until the end of the ***following trading day***.

Instead, because it is impossible to pinpoint the precise moment when the alleged inside

information was incorporated into Elan's and Wyeth's security prices, this Court should adopt

the most conservative calculation of "gain."  *Contorinis* is on point.  There, as here, the inside

information at issue was disclosed at the close of a trading day, and the Government sought to

use the closing price of the relevant securities on the following trading day to calculate the

defendant's "gain."  Ex. 127, *Contorinis* Sentencing Tr. 21:10-22:25.  The court rejected the

Government's approach, concluding that investors reacted immediately to the information:  "I

guess it's logic.  If you liquidated upon receipt of this news when it was provided as inside

information, why would one not have liquidated had they first obtained that information in the

normal course?"  *Id*. at 23:25-24:3.  Finding the precise moment when the inside information had

been incorporated into the share price impossible to pinpoint with precision, the court

conservatively used the price that would result in the smallest "gain":

> I take the point it's a little hard to pinpoint so I am prepared to basically take I
> guess whatever the price during the day is that results in the least loss, so whether
> that is the starting selling price or the closing selling price I think in the interest of
> being conservative I will use that as the basis to conclude what the loss avoided
> was for December and so that will be part of my order.

---

[13]   Gov't Mem. of Law in Opp. to Def. Mathew Martoma's Mot. for J. of Acquittal or, in the Alternative, for a
New Trial, ECF No 282, at 8 (citing Ex. 122, GX 1263); *see also* Ex. 117, Tr. 2978:21-2979:6 (Closing
Argument) ("We don't know exactly when Dr. Gilman begins to speak, it is scheduled for 5:15 Eastern, but
around that time the stock starts going down dramatically it continues into the evening and it just tanks."); Ex.
122, GX 1263; Ex. 120, GX 559.

*Id.* at 59:9-15.[14]  Following the conservative approach of *Contorinis*, this Court should calculate GEHC's "gain" using the Elan and Wyeth prices on July 30, 2008, that result in the smallest profits and losses avoided, which reduces GEHC's "gain" to $49.4 million.  (Ex. 115, Report of John F. Gould ¶¶ 6-11.)

In fact, even a calculation of $49.4 million likely overstates GEHC's "gain," because it fails to account for extrinsic factors unrelated to the charged insider trading.  The Guidelines allow for a reasonable estimate of loss based on the evidence in the case.  U.S.S.G. § 2B1.1 cmt. n.3(C).  Courts have long recognized the "fortuities" of the market that affect a defendant's "gain" or loss, *Mueffelman*, 400 F. Supp. 2d at 373, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events," *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).  It is undisputed that the market in 2008, and particularly in July 2008, was highly volatile.  Investor reactions to negative news were more extreme and more pronounced than in previous years, as the SEC warned of "panic selling" and advised that "the price of securities may artificially and unnecessarily decline well below the price level that would have resulted from the normal price discovery process."  (*See, e.g.*, Ex. 118, DX 1196 (Exchange Act Release No. 58166 (July 15, 2008).)[15]  Simply put, the declines in Elan and Wyeth following the ICAD presentation were magnified by the extreme market volatility at that time.  (Ex. 117, Tr. 206:20-207:23, 2312:19-22, 2384:1-2391:13.)

---

[14]   The court applied this calculation in determining the forfeiture amount because the difference in price did not affect the "gain" calculation under the Guidelines, but the same logic applies to the "gain" calculation in determining the sentence range.

[15]   *See also* Ex. 174, Krishna Guha, *Blowing in the Wind; America Braces Itself for the Risk of a Second Dip*, FIN. TIMES, July 18, 2008; Ex. 175, Krishna Guha, *IMF Gloom Over "Fragile" Markets and Global Risk*, FIN. TIMES, July 29, 2008.

Ignoring these extrinsic market factors, which were outside of Mr. Martoma's control and far removed from anyone's culpability, overstates the "gain" that should be attributed to Mr. Martoma.  Indeed, other courts have rejected "gain" calculations that do not account for extrinsic market factors.  For example, in *United States v. Rutkoske*, the Second Circuit recognized that even "where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of the loss caused by the fraud," there could still be extrinsic market factors that "would merit consideration."  506 F.3d 170, 179-80 (2d Cir. 2007) (rejecting the trial court's method of calculating losses caused by the defendant's conduct in a securities fraud case where the method "implicitly attributed the total amount of the decline in the value of [the] shares to Rutkoske's offense conduct").  The Second Circuit held that "[t]he District Court's basic failure at least to approximate the amount of the loss caused by the fraud without even considering other factors relevant to a decline in . . . share price require[d] a remand to redetermine the amount of the loss."  *Id.* at 180.[16]

---

[16]   *Accord United States v. Nacchio*, 573 F.3d 1062, 1081-84 (10th Cir. 2009) (rejecting a calculation of an insider trading defendant's "gain" that failed to account for market factors outside of the defendant's control because "if the impact of unrelated twists and turns of the market is ignored in the sentencing calculus then an insider trading defendant is likely to suffer a sentence that is detached from his or her individual conduct and circumstances"); *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) ("[B]ecause the stock continues to have residual value after the fraudulent scheme is revealed, the court may not assume that the loss inflicted equals the full pre-disclosure fall of the stock; rather, the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."); *United States v. Olis*, 429 F.3d 540, 548-49 (5th Cir. 2005) (ordering resentencing because "the district court's approach to the loss calculation did not take into account the impact of extrinsic factors on . . . stock price decline" and finding that such an approach "would greatly overstate [the defendant's] personal criminal culpability").

In short, GEHC's "gain" was *at most* $49.4 million, which would result in an offense level of 30 and a Guidelines sentence range of 97-121 months (approximately 8-10 years), and should be deemed much less given the external market factors.[17]

> ### 3.      Even If Mr. Martoma Is Held Liable For All Of SAC's Trading In Elan And Wyeth, The "Gain" Is Less Than $200 Million.

Should this Court determine the "gain" in this case based upon all trading undertaken by SAC, Probation's calculation of profits and avoided losses still substantially overstates that "gain."  Probation's calculation of a $276 million "gain" to SAC from the charged insider trading overstates the amount of SAC's profits and losses avoided for at least four reasons: (1) it fails to account for SAC's long position in Wyeth through an equity swap (the "Wyeth Swap"), (2) it uses the wrong price of Elan and Wyeth securities to measure market reaction following the ICAD presentation, (3) it fails to account for extrinsic market factors unrelated to the charged conduct, and (4) it includes sales of Wyeth securities based not on the recommendation of Mr. Martoma but rather on the recommendation of Mr. Holman, who is not alleged to have possessed any inside information.

Probation's "gain" calculation does not include SAC's losses on the Wyeth Swap.  (*See* Ex. 117, Tr. 2393:10-16, 2234:18-2235:18.)  As of July 21, 2008, SAC held 12 equity swap agreements with Merrill Lynch, UBS, and Morgan Stanley that constituted a *long* position of 12 million Wyeth shares worth $541.3 million at the close of trading on July 29, 2008.  (Ex. 121, GX 560; *see also* Ex. 117, Tr. 2609:2-18.)  Between July 21, 2008 (*i.e.*, the day on which the Government argues that Mr. Martoma and SAC began to engage in insider trading) and July 30, 2008 (*i.e.*, the day after the ICAD announcement), the Wyeth Swap lost approximately $75.6 million in market value.  (*See* Ex. 121, GX 560.)  Therefore, Probation's calculation of profits

---

[17]     In addition, GEHC's 'gain' should be further reduced by $4.5 million because profits from short sales of Wyeth securities in GEHC resulted from internal transfers by Mr. Cohen and should not be attributed to Mr. Martoma.

and avoided losses overstates SAC's "gain" from its trading in Elan and Wyeth by failing to account for the amount of the losses reflected in the decline in market value of the Wyeth Swap that SAC continued to hold throughout this same time period.[18]

Moreover, the Government uses the wrong Elan and Wyeth prices to calculate SAC's "gain." *See supra* at 31-33. Following the conservative approach in *Contorinis* and calculating SAC's "gain" using the Elan and Wyeth prices on July 30, 2008, that result in the smallest profits and losses avoided reduces SAC's "gain" to $131.9 million. (Ex. 115, Report of John F. Gould ¶¶ 12-21.)

Further, even a calculation of $131.9 million overstates SAC's "gain," as it fails to account for extrinsic market factors unrelated to the charged insider trading. *See supra* at 33-35.

Finally, the Government also overstates SAC's "gain" by including sales of Wyeth securities that were not based on the recommendation of Mr. Martoma. Mr. Cohen testified under oath in an SEC deposition that he decided to sell SAC's Wyeth position based ***not*** on the views of Mr. Martoma but rather (at least in part) on the views of Mr. Holman, who is not alleged to have possessed any inside information. As Mr. Cohen explained:

> Q. At some point prior to July 29, 2008, did you make a decision concerning your investment in Wyeth?
> Mr. Cohen: Yes.
> Q. When was that?
> Mr. Cohen: At some point during that week.
> ***Q. What prompted you to make a decision concerning your investment in Wyeth the week of July 21st?***
> ***Mr. Cohen: I spoke to Wayne [Holman] at some point and he was telling me he was selling his Wyeth.***[19]

---

[18]   The losses on the Wyeth Swap are calculated as the difference between the opening price of Wyeth on July 21, 2008, and the highest price of Wyeth on July 30, 2008 (*i.e.*, the correct price for calculating "gain," as discussed above).

[19]   Ex. 172, Cohen Deposition Tr. 185:21-186:4 (emphasis added).

Mr. Martoma did **_not_** cause SAC to sell its holdings in Wyeth securities, and any "gain" from those sales should not be attributed to him.

Therefore, SAC's "gain" from trading Elan and Wyeth is **_at most_** $131.9 million, which would result in an offense level of 34 and a Guideline sentence range of 151-188 months (approximately 12.5-15.5 years), and is actually much smaller after accounting for extrinsic market factors and SAC's Wyeth trading that has been improperly attributed to Mr. Martoma.

*       *       *

For all of these reasons, this Court should reject Probation's "gain" calculation and Guideline sentence range.

## II.     A SENTENCE SUBSTANTIALLY BELOW ANY POTENTIAL GUIDELINE RANGE IS WARRANTED UNDER 18 U.S.C. § 3553(a).

Following *United States v. Booker*, 543 U.S. 220 (2005), a district court is not required to impose a sentence within the Guideline range.  "*Booker* rendered the Guidelines 'effectively advisory,' and permitted sentencing courts to tailor the appropriate punishment to each offense in light of other concerns."  *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (quoting *Booker*, 543 U.S. at 245) (en banc), *cert. denied*, 129 S. Ct. 2735 (2009).  In fact, a district court may not even "presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and the defense."  *Id.* at 189.

As this Court has recognized, in fashioning an appropriate sentence, sentencing courts have a "duty to impose a sentence that is sufficient **_but not greater than necessary_** to accomplish the purposes of sentencing as explained in Section 3553."  Ex. 134, Sentencing Tr. 24:21-24, *United States v. Koulouroudis*, No. 09 Cr. 440 (PGG), (S.D.N.Y. Apr. 9, 2010) ("*Koulouroudis* Sentencing Tr.") (emphasis added); *accord Kimbrough v. United States*, 552 U.S. 85, 101 (2007)

(noting that the overarching objective is to determine a sentence that is "sufficient, but not greater than necessary" to meet the ends of justice); *Adelson*, 441 F. Supp. 2d at 515 (same).  To guide sentencing courts in applying this "parsimony principle," Ex. 134, *Koulouroudis* Sentencing Tr. 24:21, Section 3553(a) sets forth a number of factors to take into account, including:

> (i)    the nature and circumstances of the offense;
>
> (ii)   the need to avoid unwarranted sentence disparities among defendants with similar records and conduct;
>
> (iii)  the history and characteristics of the defendant; and
>
> (iv)   the need for the sentence imposed to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant.

18 U.S.C. §§ 3553(a)(1), (a)(2)(B)-(C), (a)(6).

The Second Circuit has made clear that these factors must be considered in "undertak[ing] an individualized assessment based on the facts presented."  *United States v. Johnson*, 567 F.3d 40, 50 (2d Cir. 2009) (internal quotation marks omitted).  "[A] district court may find that even after giving weight to the large or small financial impact, there is a wide variety of culpability amongst defendants and, as a result, impose different sentences based on the factors identified in § 3553(a)."  *Cavera*, 550 F.3d at 192.  Indeed, this Court has wide latitude to find that a "Guidelines sentence should not apply" when "the Guidelines sentence itself fails to properly reflect § 3553(a) considerations, or . . . the case warrants a different sentence regardless."  *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)).  Even the comments to the Guidelines themselves state: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense.  In such cases, a downward departure may

38

be warranted." U.S.S.G. § 2B1.1 cmt. n.19(C). Here, as in other recent securities fraud cases, the Guidelines should be rejected entirely as they are irrational. *See supra* at 22-26.

For example, Judge Rakoff has concluded in numerous securities fraud and insider trading cases that the "Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and the human being who will bear the consequences." *Adelson*, 441 F. Supp. 2d at 515. As the court explained in *Gupta*:

> But this guidelines range does not rationally square with the facts of this case, not only for the reasons already stated but also because it does not take adequate account of the factors this Court is required by law to consider in imposing sentence. The Court therefore turns to the bedrock of all federal sentencing, Section 3553(a) of Title 18.

Ex. 131, *Gupta* Sentencing Tr. 50:8-14; *see also id.* at 9:15-22 (dismissing the Guidelines as having "little to say of helpfulness to the sentencing judge" and describing Section 3553(a) as "much more important to the Court").[20] Judge Sullivan has also emphasized the importance of Section 3553(a) factors in several insider trading cases. In *Newman*, he found that "the guidelines range is higher than necessary" and explained that the Court usually makes its own assessment of what is an appropriate sentence. Ex. 135, *Newman* Sentencing Tr. 57:5-10.[21]

This Court should reach the same conclusion in this case. Regardless of the "gain" calculation used – and especially if the Court adopts the substantially overstated "gain" calculation espoused by Probation – any application of the Guideline range would result in a

---

[20]    *Accord* Ex. 138, *Whitman* Sentencing Tr. 7:18-22 ("[H]ere, as in so many cases, I find that the guidelines place far too much emphasis on the alleged monetary gain and don't really address the more important aspects of sentencing reflected in Section 3553(a), which is binding on the Court."); Ex. 132, Sentencing Tr. 38:15-19, *United States v. Jiau*, No. 11 Cr. 161 (JSR), (S.D.N.Y. Sept. 21, 2011) ("*Jiau* Sentencing Tr.") (The actual monetary gain calculation is not "central to the evaluation of all the factors under § 3553(a).").

[21]    *Accord* Ex. 127, *Contorinis* Sentencing Tr. 42:4-7 (stating in response to the defendant's concerns about the gain amount and Guideline calculation that, "[i]n post Booker, which is a case that made these guidelines advisory and not mandatory, courts ought not to be doing anything in a mechanical way").

sentence far more severe than necessary to accomplish the purposes of sentencing.  As set forth below, an analysis of the relevant Section 3553(a) sentencing factors shows that a sentence significantly below any potential Guideline range is sufficient to satisfy the objectives of sentencing.

       **1.**       **The Nature And Circumstances Of The Offense And The Need To Avoid An Unwarranted Sentence Disparity Lead To A Sentence <u>Substantially Below The Guideline Range.</u>**

The circumstances of this case and the need to avoid an unwarranted sentence disparity both weigh in favor of a lenient sentence.  Although the Government alleged that Mr. Martoma received inside information from Dr. Sidney Gilman during consultations from mid-2006 through July 2008, it expressly and repeatedly disclaimed that Mr. Martoma ever traded on any of that information prior to July 21, 2008.  There can be no serious dispute that the Government's evidence ultimately turned on Mr. Martoma's trading of Elan and Wyeth securities in the last two weeks of July 2008.  In short, Mr. Martoma was convicted of insider trading over the course of at most *two weeks* based on *one* piece of information from *one* tipper about *one* event.  As the Government itself has explained: "This is a one defendant case, involving trades in two securities, both relating to the outcome of a single event: the public announcement of the Drug Trial results on July 29, 2008."  (Gov't's Opp. to Def. Mathew Martoma's Mot. for a Bill of Particulars, ECF No. 26, at 7.)

Notwithstanding the limited nature of Mr. Martoma's charged conduct, Probation's Guideline Range is *several times* the sentence received by other recent insider trading defendants who have gone to trial and been convicted in the Southern District of New York, and the high-end of Probation's Guideline Range is *nearly twice as long* as the sentences received by Raj Rajaratnam and Zvi Goffer.  A comparison of Probation's Guideline Range in Mr. Martoma's

case to the sentences in the twelve other recent insider trading cases that resulted in convictions after trial is instructive:

| Case | Prison Sentence |
|------|-----------------|
| *United States v. Doug Whitman*, No. 12 Cr. 125 | 2 years incarceration; 1 year of supervised release |
| *United States v. Rajat Gupta*, No. 11 Cr. 907 | 2 years incarceration; 1 year of supervised release |
| *United States v. James Fleishman*, No. 11 Cr. 32 | 2.5 years incarceration; 2 years supervised release |
| *United States v. Michael Kimelman*, No. 10 Cr. 56-6 | 2.5 years incarceration; 3 years supervised release |
| *United States v. Emanuel Goffer*, No. 10 Cr. 56-5 | 3 years incarceration; 3 years supervised release |
| *United States v. Michael Steinberg*, No. 12 Cr. 121-4 | 3.5 years incarceration; 3 years supervised release |
| *United States v. Winifred Jiau*, No. 11 Cr. 161 | 4 years incarceration; 2 years supervised release |
| *United States v. Todd Newman*, No. 12 Cr. 121-1 | 4.5 years incarceration; 2 years supervised release |
| *United States v. Joseph Contorinis*, No. 09 Cr. 1083 | 6 years incarceration; 2 years supervised release |
| *United States v. Anthony Chiasson*, No. 12 Cr. 121-2 | 6.5 years incarceration; 1 year supervised release |
| *United States v. Zvi Goffer*, No. 10 Cr. 56-1 | 10 years incarceration; 3 years supervised release |
| *United States v. Raj Rajaratnam*, No. 09 Cr. 1184 | 11 years incarceration; 2 years supervised release |

Mr. Martoma is less culpable than other recent insider trading defendants. Indeed, his charged conduct is less serious by most measures than those defendants who received between two to three years imprisonment. Mr. Martoma should receive a sentence reflecting that fact. And, of course, Mr. Martoma's charged conduct is not even in the same ballpark as Raj Rajaratnam's and Zvi Goffer's, which the Government called "extraordinarily serious, multi-faceted, and damaging to the capital markets" and "brazen, sophisticated, and extensive,"

respectively.[22]  The Government has described Zvi Goffer as someone who "basically set up an entire infrastructure for insider trading activity" and "basically set up a criminal organization on his own," and it has described Raj Rajaratnam as "arguably the most egregious insider trader to face sentencing in a federal courthouse in the United States."[23]  Yet, although those sentences should be considered the upper bound for any insider trading sentences, the high-end of Probation's Guideline Range would impose a sentence ***nearly twice as long.***  That is precisely the sort of unwarranted sentence disparity that is forbidden by Section 3553(a).[24]

In other recent insider trading cases, the Government has relied on several of the following "aggravating factors" as justifications for higher sentences within the applicable Guideline ranges:

- The scope of unlawful trading;

- The number of co-conspirators;

- The defendant's role as a tipper or tippee;

- The number of tippers;

- The defendant's bribing of any tippers or otherwise directly paying for inside information;

- The defendant's perjury or obstruction of justice; and

- The amount of any "gain" based on profits or losses avoided.

---

[22]  Ex. 148, *Rajaratnam* Gov't Sentencing Mem. at 24; Ex. 143, *Zvi Goffer* Gov't Sentencing Mem. at 1, 6-7.

[23]  Ex. 130, Sentencing Tr. 29:19-23, *United States v. Zvi Goffer*, No. 10 Cr. 56 (RJS), (S.D.N.Y. Sept. 21, 2011) ("*Zvi Goffer* Sentencing Tr."); Ex. 136, *Rajaratnam* Sentencing Tr. 10:19-21.

[24]  The fact that Mr. Martoma exercised his constitutional right to go to trial should not be considered or used to penalize him in sentencing.  *E.g.*, *United States v. Bennett*, 252 F.3d 559, 562 n.5 (2d Cir. 2001) (recognizing that the Second Circuit prohibits a court from increasing a defendant's sentence as a penalty for exercising his constitutional right to stand trial); Ex. 132, *Jiau* Sentencing Tr. 55:25-56:2 ("We don't want to place such a premium on that aspect of it that we discourage people from exercising their constitutional rights [to go to trial]."); Ex. 131, *Gupta* Sentencing Tr. 33:13-17 ("I respect that the defendant has the full right of appeal and has chosen to maintain that he is not guilty, and that is totally his right and will not be held against him in any shape or form.").

As discussed, the amount of purported "gain" is a particularly poor determinant of an appropriate sentence in insider trading cases in general and in this case in particular. *See supra* at 22-26. Sentencing courts have recognized that the amount of "gain" does not in and of itself warrant a sentence disparity:

> The guidelines are one factor, but only one factor. But there is overall an objective of making sure that the sentence imposed in any one case is roughly equivalent to those imposed on others who are similarly situated. It's the desire to make sure that people who are roughly equal, who have engaged in similar conduct, who have similar backgrounds, should be treated roughly equally, knowing of course that no two people are exactly the same. No two people are exactly equal. But that is the goal I think of the guidelines in many ways and that is the goal of sentencing, is to take that into account.

Ex. 127, *Contorinis* Sentencing Tr. 53:7-17. And, more to the point, the Government itself has argued in this case that "the amount of money involved in the scheme says ***nothing*** about its ***complexity***." (Gov't's Opp. to Def. Mathew Martoma's Mot. for a Bill of Particulars, ECF No. 26, at 6-7 (emphasis in original).)

On each and every other factor upon which the Government has relied in arguing for higher sentences in other insider trading cases, Mr. Martoma's charged conduct was far more limited than that of other defendants. *See infra* at 44-54. Even in the few instances where Mr. Martoma's charged conduct was similar to that of other defendants, such defendants received sentences in the vicinity of two to three years. *Id.* Comparing Mr. Martoma's case to other recent insider trading cases makes clear that a lenient sentence, completely detached from Probation's Guideline Range, is necessary to avoid a dramatic unwarranted sentence disparity.

### a.   <u>The Scope Of Unlawful Trading.</u>

Mr. Martoma was convicted of ***one*** instance of obtaining material, non-public information from ***one*** tipper, and he traded on that information over approximately ***two*** weeks in

connection with *one* event.  This is far narrower than the scope of trading in other recent insider

trading cases:

- Doug Whitman was convicted of participating in two separate conspiracies to obtain inside information on three companies from at least seven tippers and insider trading involving the securities of two of those companies from at least January 2006 through March 2009.[25]  The Government explained that Mr. Whitman's conduct "spanned more than three years and involved multiple companies, individuals, and trades."[26]  Whitman was sentenced to 2 years imprisonment.

- Rajat Gupta was charged with ***repeatedly*** providing or conspiring to provide Raj Rajaratnam with inside information about at least three companies.[27]  Mr. Gupta was convicted of securities fraud for two tips in particular but, according to the Government, "[t]he evidence at trial also established tips by Gupta on several other occasions."[28]  Gupta was sentenced to 2 years imprisonment.

- James Fleishman was convicted of conspiring with insiders from at least four different companies in order to provide hedge fund clients with inside information.[29]  The Government explained that "[t]he scope of the criminal activity jointly undertaken by Fleishman and others was to funnel confidential business information, including Inside Information," from these insiders to clients.[30]  The Government described this as "a corrupt business that knowingly trafficked in Inside Information."[31]  Fleishman was sentenced to 2.5 years imprisonment.

- Michael Kimelman was convicted of conspiring to obtain inside information about at least three separate corporate acquisitions and insider trading involving two different trades (with respect to the same company).[32]  The Government emphasized, however, that Mr. Kimelman made additional trades based on inside information and argued that "Kimelman's continued trading on inside information should be considered in fashioning an appropriate sentence."[33]  Likewise, as Judge Sullivan explained when sentencing Mr. Kimelman, "the conspiracy [which involved Zvi Goffer, Emanuel Goffer, and Mr. Kimelman, among others] was an agreement among people to engage in insider

---

[25]    Ex. 151, *Whitman* Gov't Sentencing Mem. at 1-7.

[26]    *Id.* at 22.

[27]    Ex. 157, Indictment ¶ 12, *United States v. Gupta*, No. 11 Cr. 907 (JSR), ECF No. 25, Jan. 31, 2012.

[28]    Ex. 144, *Gupta* Gov't Sentencing Mem. at 2 n.1.

[29]    Ex. 141, *Fleishman* Gov't Sentencing Mem. at 2-10.

[30]    *Id.* at 15.

[31]    *Id.* at 20.

[32]    Ex. 146, *Kimelman* Gov't Sentencing Mem. at 1; Ex. 159, Verdict Form at 1, *United States v. Goffer* et al., No. 10 Cr. 56 (RJS), ECF No. 212, June 13, 2011 ("*Goffer* Verdict Form"); Ex. 158, Indictment ¶¶ 29-30, *United States v. Goffer* et al., No. 10 Cr. 56 (RJS), ECF No. 167, Apr. 7, 2011 ("*Goffer* Indictment").

[33]    Ex. 146, *Kimelman* Gov't Sentencing Mem. at 1.

trading not just one incident, not on one occasion, but over a long period of time . . . so it is a more serious conspiracy than most insider trading cases that get brought in this court house."[34]  Kimelman was sentenced to 2.5 years imprisonment.

- Emanuel Goffer was convicted of conspiring to obtain inside information from three tippers about at least five separate corporate acquisitions and insider trading involving two different trades (with respect to the same company).[35]  The court described the conduct as "pretty elaborate" and "a pretty calculated and pretty long-term scheme."[36] Goffer was sentenced to 3 years imprisonment.

- Michael Steinberg was convicted of insider trading involving two companies (Dell, Inc. and NVIDIA Corp.) and four trades.[37]  The Government alleged, however, that "Steinberg was a member of a criminal club that exchanged insider information about technology stocks over a nearly-two year period," that he obtained insider information on at least three other companies, and that he executed several trades other than the charged trades that were based on inside information.[38]  With respect to Dell, Steinberg allegedly received inside information from his analyst "for seven or eight quarters in a row."[39] Steinberg was sentenced to 3.5 years imprisonment.

- Winifred Jiau was convicted of both trading on and providing tips related to "detailed financial earnings and other material information" for two companies over the course of nearly two years, "[q]uarter after quarter."[40]  The Government explained that this "scheme . . . involved a repeated, long-term, and brazen effort to steal and sell sensitive corporate secrets."[41]  Jiau was sentenced to 4 years imprisonment.

- Todd Newman was convicted of insider trading involving two companies and four trades.[42]  The Government alleged, however, that Mr. Newman also obtained inside information on at least four more companies.[43]  The Government described the insider trading scheme as "pervasive" and explained that Mr. Newman received "hundreds of emails . . . which contained detailed, secret financial information about the securities he

---

[34]  Ex. 133, *Kimelman* Sentencing Tr. 25:2-15.

[35]  Ex. 142, *Emanuel Goffer* Gov't Sentencing Mem. at 1-2; Ex. 159, *Goffer* Verdict Form at 1.

[36]  Ex. 129, *Emanuel Goffer* Sentencing Tr. 23:12-22.

[37]  Ex. 169, Superseding Indictment ¶ 15, *United States v. Steinberg*, No. 12 Cr. 121-4, ECF No. 230, Mar. 29, 2013 ("*Steinberg* Indictment").

[38]  Ex. 150, *Steinberg* Gov't Sentencing Mem. at 1, 3-4, 7, 15-17, 22 (explaining that Steinberg also received inside information on Sun Microsystems, AMD, and Intel); Ex. 169, *Steinberg* Indictment ¶ 31.

[39]  Ex. 150, *Steinberg* Gov't Sentencing Mem. at 5-6.

[40]  Ex. 145, *Jiau* Gov't Sentencing Mem. at 1, 13-14.

[41]  *Id.* at 22.

[42]  Ex. 152, Superseding Indictment ¶ 33, *United States v. Newman* et al., No. 12 Cr. 121 (RJS), ECF No. 112, Aug. 28, 2012 ("*Newman* Indictment").

[43]  Ex. 147, *Newman* Gov't Sentencing Mem. at 7-9.

traded on a regular basis."[44]  Indeed, the Government argued that it "introduced evidence of numerous other stocks that were the subject of the insider trading conspiracy, indicating that the fraudulent scheme was far more extensive than simply illicit trading in two stocks."[45]  Newman was sentenced to 4.5 years imprisonment.

- Joseph Contorinis was convicted of obtaining inside information about one company and insider trading involving seven trades that occurred over more than a month.[46]  The Government alleged that Mr. Contorinis sought "frequent updates" on an impending transaction and made "gigantic trades" based on the inside information he received.[47]  Contorinis was sentenced to 6 years imprisonment.

- Anthony Chiasson was convicted of insider trading involving two companies and five trades.[48]  The Government alleged, however, that Mr. Chiasson also obtained inside information on at least three more companies.[49]  The Government explained that Mr. Chiasson "was a member of a criminal club that exchanged inside information about multiple technology stocks over a nearly two year period."[50]  The court determined that a below-Guidelines sentence was appropriate even though the insider trading was "committed over a pretty long period of time" and, therefore, "it wasn't just one error in judgment.  It was repeated over multiple months and even years."[51]  Chiasson was sentenced to 6.5 years imprisonment.

- Zvi Goffer was convicted of conspiring to obtain inside information about at least five separate corporate acquisitions and insider trading involving 12 different trades.[52]  According to the Government, Mr. Goffer "set up an entire infrastructure for insider trading activity."[53]  The Government summarized Mr. Goffer's conduct as follows:  "Goffer organized and operated the insider trading ring.  He sought out corruptible lawyers who would disclose confidential information from their law firm in exchange for cash bribes.  He collected cash from co-conspirators to help fund the bribe payments.  He personally delivered to Jason Goldfarb $97,500 in cash bribes.  Goffer also distributed

---

[44]  *Id.* at 1, 7.

[45]  *Id.* at 7-8; *accord* Ex. 135, *Newman* Sentencing Tr. 46:25-47:4 (emphasizing that "there were a dozen stocks in which the defendant obtained inside information").

[46]  Ex. 140, *Contorinis* Gov't Sentencing Mem. at 1-2, 7; Ex. 155, Verdict Form at 1-2, *United States v. Contorinis*, No. 10 Cr. 1083 (RJS), ECF No. 101, Mar. 11, 2011 ("*Contorinis* Verdict Form").

[47]  Ex. 127, *Contorinis* Sentencing Tr. 49:6-9.

[48]  Ex. 152, *Newman* Indictment ¶ 35.

[49]  Ex. 139, *Chiasson* Gov't Sentencing Mem. at 1, 15.

[50]  *Id.* at 1; *accord* Ex. 126, *Chiasson* Sentencing Tr. 47:8-14 ("This was not a case of a one-off receipt of inside information.  In each quarter for which Mr. Chiasson received inside information, he received numerous updates as to what Dell's and Nvidia's earnings would be when they announced their earnings to the public.  When he got that information, he made huge bets on that inside information.").

[51]  Ex. 126, *Chiasson* Sentencing Tr. 54:7-11.

[52]  Ex. 143, *Zvi Goffer* Gov't Sentencing Mem. at 2-4; Ex. 159, *Goffer* Verdict Form at 1.

[53]  Ex. 130, *Zvi Goffer* Sentencing Tr. 29:19-20.

numerous prepaid cellular telephones to his co-conspirators in an effort to evade detection by law enforcement."[54]  Goffer was sentenced to 10 years imprisonment.

- Raj Rajaratnam was convicted of five separate insider trading conspiracies and substantive insider trading in connection with nine trades in the securities of five companies, occurring over the span of 32 months.[55]  According to the Government, the true scope of Mr. Rajaratnam's illicit trading was far greater.  He "committed his crimes repeatedly – over and over and over again, year after year after year – with multiple corrupt insiders, subordinates looking for his approval and financial payback, and loyal co-conspirators."[56]  The Government emphasized that insider trading occurred in the securities of at least 19 companies, "countless securities trades [were] executed at Galleon based on inside information," and "[c]ommon sense dictates that the Government's wiretap caught only a fraction of Rajaratnam's crimes."[57]  Rajaratnam was sentenced to 11 years imprisonment.

Simply put, the scope of unlawful trading at issue in Mr. Martoma's case is far narrower in many important respects than the unlawful trading in nearly *all* other recent insider trading cases, including those where the defendants received sentences of 2-4 years.

### b.    The Number Of Co-conspirators.

Mr. Martoma was convicted of conspiring with two individuals, Dr. Gilman and Dr. Ross (and actually obtaining inside information from only one, Dr. Gilman).  According to the Government, other recent insider trading cases have involved numerous co-conspirators in elaborate insider trading rings:

- Doug Whitman allegedly conspired with at least seven co-conspirators in connection with his multiple insider trading schemes.[58]

- James Fleishman allegedly conspired with at least three co-workers, between four and eight corporate insiders, and two hedge fund clients as part of his insider trading

---

[54]   Ex. 143, Zvi *Goffer* Gov't Sentencing Mem. at 1.

[55]   *See* Ex. 167, Indictment ¶¶ 4, 11, 18, 25, 32, 37, 39, 41, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), ECF. No. 165, Jan. 20, 2011 ("*Rajaratnam* Indictment"); Ex. 168, Order, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), ECF. No. 272, May 11, 2011 (noting that Mr. Rajaratnam was convicted on all fourteen counts of the superseding indictment filed on January 20, 2011).

[56]   Ex. 148, *Rajaratnam* Gov't Sentencing Mem. at 24.

[57]   *Id.* at 9, 20.

[58]   Ex. 151, *Whitman* Gov't Sentencing Mem. at 2.

scheme.[59]  The Government argued that Mr. Fleishman "plainly recruited clients to PGR, including clients that Fleishman knew wanted confidential business information," and that Fleishman "facilitate[d] communications in which experts provided Inside Information to PGR clients."[60]

- Michael Kimelman allegedly conspired with six other co-conspirators and served "as an advisor to [Zvi] Goffer, helping him to understand the significance of the insider information that Goffer received."[61]

- Emanuel Goffer allegedly conspired with six other co-conspirators in a "brazen insider trading scheme" that involved "brib[ing] lawyers to obtain valuable inside information regarding corporate mergers and acquisitions."[62]

- Michael Steinberg allegedly conspired with at least fifteen co-conspirators.[63]  The Government alleged that Steinberg obtained inside information from his analyst Jon Horvath and "was aware that Horvath exchanged information, including inside information with a group of analysts at different hedge funds on a number of stocks."[64] The Government explained that, compared to other recent insider trading defendants, "Steinberg benefited from a much more wide-ranging conspiracy in which multiple analysts pursued multiple sources."[65]

- Todd Newman allegedly conspired with at least ten co-conspirators.  According to the Government, "Newman was a central and active participant in a large-scale conspiracy" and the "participants in the conspiracy included at least five analysts at different hedge funds and investment firms and five portfolio managers at those same firms."[66]  The Government explained that "the size or the number of the coconspirators in the scheme . . . makes it different from others."[67]

---

[59]   Ex. 141, *Fleishman* Gov't Sentencing Mem. at 2, 11, 12-14 19.

[60]   *Id.* at 19.

[61]   Ex. 146, *Kimelman* Gov't Sentencing Mem. at 1; Ex. 159, *Goffer* Verdict Form at 1; Ex. 158, *Goffer* Indictment ¶¶ 28-29.

[62]   Ex. 142, *Emanuel Goffer* Gov't Sentencing Mem. at 1, 3; Ex. 159, *Goffer* Verdict Form at 1; Ex. 158, *Goffer* Indictment ¶¶ 28-29.

[63]   Ex. 170, Bill of Particulars at 2, *United States v. Steinberg*, No. 12 Cr. 121 (RJS), ECF No. 299, Sept. 18, 2013.

[64]   Ex. 150, *Steinberg* Gov't Sentencing Mem. at 21, 28 (explaining that Steinberg "encouraged Horvath to leverage this network of contacts and, at times, specifically pressed Horvath to obtain updates on the inside information Horvath had provided him from that circle of analyst friends").

[65]   *Id.* at 36.

[66]   Ex. 147, *Newman* Gov't Sentencing Mem. at 1.

[67]   Ex. 135, *Newman* Sentencing Tr. 48:14-16.

- Anthony Chiasson allegedly conspired with at least six co-conspirators.[68]  The Government asserted that there is no doubt that Chiasson knew that his research analyst "was sharing and receiving information from his circle of friends."[69]

- Zvi Goffer allegedly conspired with eight other co-conspirators in a scheme that the Government described as "brazen, sophisticated, and extensive."[70]

- Raj Rajaratnam allegedly conspired with nineteen other individuals.[71]  Indeed, the Government asserted that, "at one point or another during the course of the illegal schemes, Rajaratnam was the supervisor and employer of no fewer than eight participants" in his criminal conspiracies.[72]

The conspiracy for which Mr. Martoma was convicted simply does not compare to any of the conspiracies in these other recent insider trading cases.

### c.       The Defendant's Role As Tipper Or Tippee.

Mr. Martoma was convicted as a tippee based on allegations that he traded on inside information obtained from Dr. Gilman.  ***The Government did not allege, much less prove, that Mr. Martoma "tipped" that information to anyone else.***  The Supreme Court has recognized that tippees are less culpable than "insiders and broker-dealers who selectively disclose material nonpublic information."  *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 313-14 (1985).  As the Supreme Court explained: "In the context of insider trading, we do not believe that a person whose liability is solely derivative can be said to be as culpable as one whose breach of duty gave rise to that liability in the first place."  *Id.* at 313.  Indeed, the Government and the courts have repeatedly emphasized the heightened culpability of ***tippers*** of inside information in other recent insider trading cases:

---

[68]   Ex. 152, *Newman* Indictment ¶¶ 1-27.

[69]   Ex. 139, *Chiasson* Gov't Sentencing Mem. at 16.

[70]   Ex. 143, *Zvi Goffer* Gov't Sentencing Mem. at 1, 6-7; Ex. 159, *Goffer* Verdict Form at 1; Ex. 158, *Goffer* Indictment ¶¶ 18, 28-29.

[71]   Ex. 148, *Rajaratnam* Gov't Sentencing Mem. at 40.

[72]   *Id.* at 39.

- Rajat Gupta was convicted as a tipper.  The Government argued that his conduct "carrie[d] an added layer of harm because of Gupta's status as a member of the Board of Directors" of Goldman Sachs.[73]  The court found that Mr. Gupta's tipping was a "huge abuse of trust to Goldman Sachs," "disgusting in its implications," and "the functional equivalent of stabbing Goldman in the back."[74]

- James Fleishman was convicted as a tipper.  The court observed that "the basic conspiracies of which Mr. Fleishman was convicted consisted of his unlawfully, willfully and knowingly joining in a plan to facilitate the distribution of insider information by others."[75]

- Winifred Jiau was convicted as a tipper.  The Government argued that she "was in a position of great trust at NVIDIA" and "abused [that] position of private trust in a manner that significantly facilitated the commission of the insider trading offense."[76]  The court concluded that Ms. Jiau's conduct "was not a one-time aberration," as "she spent between one to two years purveying inside information."[77]

Mr. Martoma was convicted only as a tippee.  Meanwhile, the alleged tipper in this case, Dr. Gilman, will receive no jail time pursuant to his non-prosecution agreement, even though the Supreme Court, the Government, and sentencing courts would have considered his conduct as the tipper to be *more* culpable.

### d.    The Number Of Tippers.

Mr. Martoma was convicted of trading on inside information obtained from only one source, Dr. Gilman.[78]  According to the Government, defendants in most of the other recent insider trading cases have received inside information from multiple different tippers:

- Doug Whitman allegedly obtained inside information from at least seven different tippers.[79]

---

[73]   Ex. 144, *Gupta* Gov't Sentencing Mem. at 5.

[74]   Ex. 131, *Gupta* Sentencing Tr. 32:8-10, 33:17-18, 52:15-16.

[75]   Ex. 128, *Fleishman* Sentencing Tr. 3:6-10.

[76]   Ex. 145, *Jiau* Gov't Sentencing Mem. at 16.

[77]   Ex. 132, *Jiau* Sentencing Tr. 39:10-11.

[78]   Despite initial allegations to the contrary, the Government did not offer any evidence that Mr. Martoma received or traded on any inside information obtained from Dr. Ross.  (*See* Def. Mathew Martoma's Mem. of Law in Support of His Mot. for a J. of Acquittal or, in the Alternative, a New Trial, ECF No. 271, at 14-19.)

[79]   Ex. 151, *Whitman* Gov't Sentencing Mem. at 2.

- James Fleishman allegedly facilitated the sharing of inside information from between four and eight different tippers to his tippee-clients.[80]

- Michael Kimelman allegedly participated in an insider trading conspiracy that obtained inside information from three different tippers.[81]

- Emanuel Goffer allegedly participated in an insider trading conspiracy that obtained inside information from three different tippers.[82]

- Michael Steinberg allegedly participated in an insider trading conspiracy that obtained inside information from at least 13 different tippers.[83]

- Todd Newman allegedly participated in an insider trading conspiracy that obtained inside information from 12 different tippers.[84]

- Anthony Chiasson allegedly participated in an insider trading conspiracy that obtained inside information from 12 different tippers.[85]

- Zvi Goffer allegedly participated in an insider trading conspiracy that obtained inside information from three different tippers.[86]

- Raj Rajaratnam allegedly obtained inside information from at least sixteen different tippers.[87]

By the Government's own description, these insider trading defendants repeatedly obtained and traded on inside information from several different tippers, making their conduct more culpable than Mr. Martoma's.

---

[80] Ex. 141, *Fleishman* Gov't Sentencing Mem. at 2, 11, 12, 19.

[81] *See* Mem. in Opp. to Defs.' Joint Disc. Mot., *United States v. Goffer et al.*, No. 10 Cr. 56 (RJS), ECF No. 75, June 11, 2010.

[82] *See* Ex. 142, *Emanuel Goffer* Gov't Sentencing Mem. at 1-3.

[83] Ex. 170, Bill of Particulars at 4, *United States v. Steinberg*, No. 12 Cr. 121 (RJS), ECF No. 299, Sept. 18, 2013.

[84] Ex. 171, Bill of Particulars at 4, *United States v. Newman*, No. 12 Cr. 121 (RJS), ECF No. 111, Aug. 29, 2012.

[85] *Id.*

[86] *See* Ex. 143, *Zvi Goffer* Gov't Sentencing Mem. at 1-3.

[87] Ex. 149, *Rajaratnam* Gov't Sentencing Reply Mem. at 10-12.

### e.   The Defendant's Bribing Of Any Tippers Or Otherwise Directly Paying For Inside Information.

The evidence at trial proved that Mr. Martoma did not bribe or otherwise directly pay Dr. Gilman or Dr. Ross for any inside information.  Dr. Gilman testified that he did not ask for – and Mr. Martoma did not offer – "anything of value" either "in the form of a gift," "bags of cash," or money in "secret accounts."  (Ex. 117, Tr. 1537:16-1539:2.)  Dr. Ross likewise confirmed that Mr. Martoma never provided him with any direct payments and never gave him "any money or any gifts."  (Ex. 117, Tr. 779:10:17.)  In fact, the only money that Dr. Gilman or Dr. Ross received was consulting fees from the expert consulting networks.  Both admitted, however, that they received those fees no matter what was discussed.  (Ex. 117, Tr. 1538:25-1539:2, 1539:9-1540:17 (Gilman); Tr. 779:8-11 (Ross).)  The consulting fees were *not* in exchange for inside information.  According to the Government, many other insider trading defendants brazenly and unabashedly offered insiders bribes or gifts in exchange for inside information:

- Emanuel Goffer "helped fund the bribes paid to the Ropes & Gray attorneys" for inside information.[88]  The court stated: "[T]hat's what this scheme was about, paying cash to corrupt lawyers."[89]

- Winifred Jiau provided tippers with "free meals at restaurants and other gifts and consideration" in return for their tips.[90]  In addition, she periodically "demanded and received greater remuneration for her services, claiming that her sources at these public companies needed additional compensation."  ("In reality, . . . Jiau simply pocketed the money for herself.").[91]

- Todd Newman "was a critical link in the chain" of inside information because he authorized $175,000 in payments in return for inside information.[92]  The Government considered those payments "perhaps the most significant" aspect of Mr. Newman's

---

[88]   Ex. 142, *Emanuel Goffer* Gov't Sentencing Mem. at 1-2.

[89]   Ex. 129, *Emanuel Goffer* Sentencing Tr. 24:11-12.

[90]   Ex. 145, *Jiau* Gov't Sentencing Mem. at 5.

[91]   *Id*. at 1-2.

[92]   Ex. 147, *Newman* Gov't Sentencing Mem. at 1-3.

conduct, and the court agreed that "the details of the scheme are ones that bother me" – specifically, that Mr. Newman "was the one authorizing substantial payments to Mr. Goyal, knowing that Mr. Goyal's only value-added was this inside information."[93]

- Zvi Goffer helped bribe attorneys at Ropes & Gray for inside information. The Government claimed that he "collected cash from co-conspirators to help fund the bribe payments" and "personally delivered Jason Goldfarb $97,500 in cash bribes."[94]

- Raj Rajaratnam allegedly "paid off insiders indirectly" and developed "elaborate schemes" – such as wiring payments to offshore accounts – to conceal payments to tippers.[95] For example, Mr. Rajaratnam paid Anil Kumar, a senior partner at McKinsey & Company, Inc., "through wire transfers to an offshore account not in Kumar's name and then invested Kumar's money at Galleon in the name of Manju Das," and also approved of efforts to pay a McKinsey consultant "through that consultant's wife."[96] In addition, he "corrupted Goel [*i.e.*, a tipper] through 'charitable' gifts to Goel."[97]

Based on the testimony of the Government's own witnesses, Mr. Martoma never offered any bribes or cash payments for inside information, making his conduct less blameworthy than the conduct of many other insider trading defendants. *See* Ex. 126, *Chiasson* Sentencing Tr. 57:11-19 (finding that Anthony Chiasson was "less involved, less culpable" than Mr. Newman and other defendants in part because Mr. Chiasson did not "pay[] tens of thousands of dollars to a source using surreptitious means to do it and fraudulent means to do it"); Ex. 150, *Steinberg* Gov't Sentencing Mem. at 34 ("The Government does not dispute that Steinberg was not aware that Newman paid . . . tens of thousands of dollars . . . in exchange for the inside information, and, accordingly, Steinberg [is] less culpable than Newman in that respect.").

### f.    No Perjury Or Obstruction Of Justice.

The Government did not (and could not) allege that Mr. Martoma perjured himself or obstructed the Government's investigation. That stands in stark contrast to a number of other

---

[93]   Ex. 135, *Newman* Sentencing Tr. 49:12-17, 54:20-25.

[94]   Ex. 143, *Zvi Goffer* Gov't Sentencing Mem. at 1.

[95]   Ex. 148, *Rajaratnam* Gov't Sentencing Mem. at 2, 5-7.

[96]   *Id.* at 13.

[97]   *Id.* at 7.

recent insider trading defendants, for whom the Government sought longer sentences because the

defendants had testified falsely at trial or obstructed justice:

- The Government argued for a longer sentence for Doug Whitman because he "repeatedly lied during his two days on the witness stand."[98]  The Government contended that Mr. Whitman's false testimony "speak[s] volumes" about his culpability.[99]  The court agreed that Mr. Whitman "repeatedly perjured himself" and ordered a two-point increase to the Guideline range.[100]

- The Government argued for a longer sentence for Winifred Jiau because she "made material misrepresentations to PTS, Magistrate Judges, and District Court Judges" and offered testimony at a bail hearing that the court found "incredible in certain respects."[101]  While the court did not make an obstruction finding, it did note "that there was certainly indications that [Ms. Jiau] was prepared to flee."[102]

- The Government argued for a longer sentence for Joseph Contorinis because he "lied repeatedly under oath during the trial."[103]  In fact, the Government identified eight different examples of false statements by Mr. Contorinis at trial.[104]  The court agreed that Mr. Contorinis had committed perjury and found that he deserved to be "punished more harshly" than those who don't testify falsely.[105]

- The Government argued for a longer sentence for Raj Rajaratnam because he gave false sworn testimony to the SEC.[106]  The court agreed that a longer sentence was appropriate, finding that Mr. Rajaratnam "acted with the specified intent to obstruct the SEC's investigation" by giving "clearly false" testimony.[107]

*        *        *

In sum, Probation's Guideline Range is simply irrational and disconnected from other

recent insider trading cases where there was far greater culpability than in this case with Mr.

---

[98]  Ex. 151, *Whitman* Gov't Sentencing Mem. at 13-21.

[99]  Ex. 138, *Whitman* Sentencing Tr. 23:3-7.

[100]  *Id.* at 5:10-6:17.

[101]  Ex. 145, *Jiau* Gov't Sentencing Mem. at 17-21.

[102]  Ex. 132, *Jiau* Sentencing Tr. 51:2-5.

[103]  Ex. 140, *Contorinis* Gov't Sentencing Mem. at 2.

[104]  *Id.* at 2-3.

[105]  Ex. 127, *Contorinis* Sentencing Tr. 57:9-22.

[106]  Ex. 148, *Rajaratnam* Gov't Sentencing Mem. at 42-47; Ex. 149, *Rajaratnam* Gov't Sentencing Reply Mem. at 39-44.

[107]  Ex. 136, *Rajaratnam* Sentencing Tr. 27:9-19.

Martoma.  The Guideline range should not act as an "anchor" or reference point of any kind, as it would result in a sentence disparity that is unfair and contrary to the letter and spirit of Section 3553(a).

**2.     A Lenient Sentence Is Warranted To Mitigate The Impact On Mr. Martoma's Family And To Allow Him To Continue To Contribute To Society.**

In addition to the nature of the offense and the need to avoid sentence disparities, Section 3553(a) asks the Court to consider the characteristics of the defendant in determining an appropriate sentence.  As the letters submitted to this Court make clear, Mr. Martoma is genuinely and unconditionally devoted to his family as a loving husband to his wife Rosemary and a committed father to their three young children.  Any prison time will have a profound effect on Mr. Martoma's family, but a long sentence would be truly devastating to his children, and to his wife ██████████████████████████████████████ ██████████████████████████████    Indeed, to the extent any incarceration is necessary, it should be limited to minimize Mr. Martoma's separation from Rosemary and his children.

Mr. Martoma's community also would be better off with him as an active contributor. From childhood until today, Mr. Martoma has dedicated a meaningful amount of his time and resources to family, friends, and community with acts of kindness and generosity both large and small.

**a.     Mr. Martoma's Dedication To And Support Of His Wife And Children.**

What comes across most strongly in the letters written on Mr. Martoma's behalf is his unwavering devotion to his wife and three young children.  Johnson and Neetha Achettu, Rosemary Martoma's cousin and his wife, write: "The most noticeable aspect of Mathew's character is the care and thought that he displays for his children, and the selfless and kind

55

attitude to Rosemary." (Ex. 10, Letter from J. and N. Achettu.) Kenneth Harbaugh, who has

known Mr. Martoma for over 20 years, echoes this sentiment:

> He is a devoted father and husband, and gives of himself unconditionally to his
> family. When our children have played together, Mathew joins right in. His three
> kids could not ask for a better dad, and his wife Rose could not ask for a more
> committed husband.

(Ex. 29, Letter from K. Harbaugh.) It is clear that Mr. Martoma's kindness, strength, and

devotion have been essential to his wife and children, and that they have each come to rely on

Mr. Martoma to hold the family together and support them through life's ups and downs. Mr.

Martoma is irreplaceable in their world.

### i. Mr. Martoma Has Been An Extraordinary Father To His Three Young Children.

The letters make clear that Mr. Martoma has always been intimately involved in every

aspect of his children's lives, even while working long and often grueling hours; the children

have been his first priority. Rosemary's mother, Omana Kurian, emphasizes the important role

that Mr. Martoma has played in his children's lives:

> During the time I have spent with the Martomas, I have known Mathew as a great
> family man. In the midst of his busy work schedule, he finds time to spend with
> the children, pray together, play together and eat dinner together; this way he kept
> the family united to the best of his ability.

(Ex. 58, Letter from O. Kurian.) As do Aleyamma and Antony Paul, , Rosemary Martoma's aunt

and uncle:

> No matter how busy his job was, [Mathew] has always been there for his family,
> and they have come to rely on him in their lives. We remember hearing stories
> about how Mathew, Rosemary and the children always travelled together even
> when Mathew was working out of state. Having lived in many places, we knew
> such travel couldn't be easy for them to do, but it told us the importance they
> place on being together as a family. We are not at all confident what will happen
> to his family if Mathew is removed from the equation.

(Ex. 79, Letter from A. and A. Paul.) Mariakutty John, Mr. Martoma's aunt, similarly writes:

At home he is not afraid of "getting his hands dirty". Never afraid to "experiment" in the kitchen with the kids, to try braiding A█ hair, or to delve into J█████ homework, Mathew is a fearless father. He is also the tireless father, who drives the children to school and extracurricular activities, cheers for his children during their practices and sporting events, watches A█ twirl on stage, congratulates the kids on their successes, consoles them when they lose, and wipes away the tears. After school, Mathew always makes it a point to talk with each child in detail about the highs and lows of their day.

(Ex. 38, Letter from M. John.) And Angeleigha Richeson, a youth coach for Mr. Martoma's

children, continues:

Mathew is a very loving caring father who leads and provides guidance for his 3 young children in such a loving and caring way. Mathew is not our average parent who drops off their child(ren) and returns for pick up. He attended the vast majority of their lessons until his legal situation. He would watch silently while effortlessly producing a huge smile when they glance his way looking for reassurance a child needs from their parents while providing them with the confidence they need to pursue their dreams and passions. J█████ A█ and D███ look to their father (Mathew) for love, guidance and strength that all children need for positive and healthy development. All of our staff (instructors, junior coaches, management, seasonal help, etc.) notice without a doubt Mathew's parenting skills are extraordinary as he exemplifies great stature and presence in his children's lives. He is intimately involved with them producing a strong positive impact on their lives.

(Ex. 83, Letter from A. Richeson.)

That devotion has never wavered, even during the extremely difficult circumstances of

this case. In what has been the most emotionally exhausting period of his life, Mr. Martoma has

never given less than 100 percent to his children. Dr. Tarriq Haddad writes:

I recall on two recent trips to visit Mathew in February of 2013 and March of 2014, how I watched him literally spend hours each day tending to his children's needs, driving them from activity to activity, guiding them patiently and lovingly anytime one of them would make a mistake or misbehave, and teaching them important values of honesty, respect and selflessness.

(Ex. 28, Letter from Dr. T. Haddad.)

Not only do the letters submitted on behalf of Mr. Martoma reflect his unconditional love

and devotion to his children, the letters also show how crucial his support and guidance have

been to his children's development.  Omana Kurian, Rosemary Martoma's mother, writes:

> Mathew is an educator to their children.  On the way to school, while Rosemary
> drives, Mathew talks to them about various topics of interest.  Same thing
> happens on the way to Church on Sundays; only that the discussion is after the
> bible reading.  Every day, Mathew leads the kids in discussion at the table about
> what each child did at school and at play that day.  The rest of the family
> contributes and makes it into a family time.  Mathew also extends his involvement
> in household matters especially shopping, making breakfast omelets or pancakes
> on a regular basis, involving the children in weekend breakfast cooking, and
> readily helping out whenever David or I did the cooking; his patience in all these
> is admirable.  He never takes time away from the family.  Mathew has no identity
> different from his family's; he is so integrated with the family.

(Ex. 58, Letter from O. Kurian.)        And based on their personal history, the Martoma family

knows the importance of a father in the lives of his children.  As Rosemary Martoma explains:

> I know from my own father's experience that separation from a loving father is
> most often accompanied by unintended and long-term damaging consequences for
> the children left behind.  In the 1940's, my paternal grandfather, a highly
> esteemed lawyer, crusaded alongside Mahatma Gandhi in India's peaceful
> struggle for Independence from British Rule.  That crusade, along with my
> grandfather's refusal to pledge allegiance to the King of England led to his
> imprisonment and torture for years.
>
> As a child, I listened proudly to my grandfather regale tales of his battle for
> India's Independence.  However, today I wonder about those war hero stories
> from a very different perspective.  I wish that my grandmother was still here to
> counsel me on how she managed through her own fears and uncertainty.  I don't
> know if anyone can prepare you for the loss of a child to depression and later
> suicide, as happened with my Uncle.

(Ex. 1, Letter from Dr. R. Martoma).  Dr. Stephen Kurian, Rosemary Martoma's brother,

continues:

> I directly know of an example of childhood separation from a father causing
> havoc.  My paternal uncle Joseph was the most affected by his father (my
> Grandpa) being in prison for his nonviolent protest against the British to secure
> India's independence.  Uncle Joseph was at a vulnerable age when Grandpa was
> taken away.  When Grandpa was released he needed extensive medical treatment
> to recover from the long bouts of cholera he had contracted in prison.  This again

meant he could not be home with Uncle Joseph.  How the whole family suffered
created a deep trauma for Uncle Joseph.  He grew up into a wonderful man but
with a wound in him that led to his suicide at a stage no one expected it to happen.

(Ex. 59, Letter from Dr. S. Kurian.)  Rosamma Mathew, Mr. Martoma's aunt, also recounts:

Any history book will tell you that India prevailed in that peaceful battle for
Independence.  But, what is not recorded is the plight of the family that is left
behind when a father goes to jail.  For my mother and four siblings, the
consequences were excruciatingly painful.  It was a process that thrust us into a
world of insecurity and fear.  I wish I could say we managed to come through that
period stronger, but in fact we came out weaker.  The emotional wounds that
developed over this time cut deep, and not all of my siblings were able to
overcome them even after long periods of time and could have contributed to my
beloved younger brother taking his own life.

(Ex. 71, Letter from R. Mathew.)

Every father plays a critical role in the lives of his children – none more so than Mr.

Martoma.

### ii.    Mr. Martoma Is A Critical And Necessary Presence In His Wife's Life.

The letters also explain how Mr. Martoma has served as a source of constant love and

support for his wife, Rosemary, from the very beginning of their relationship until today.

Several of the Martomas' friends write of the important role Mr. Martoma played in Rosemary's

life even in the early years of their relationship.  Dr. Remy Lim, Rosemary Martoma's friend and

former classmate from New Zealand, writes:

As Rosemary's friend, I was touched to see how supportive Mathew was of her
residency training.  For example, because of her very long hours, she described
how he would come to spend time with her during her overnight shifts which gave
her great moral support.

(Ex. 61, Letter from Dr. R. Lim.)  Mariamma and Joseph Tharakan, Rosemary Martoma's aunt

and uncle, provide another example:

Rosemary and Mathew came to visit us shortly after the wedding. . . . As fate
would have it, Rosemary caught a stomach bug somewhere by the time she
arrived at our home and was miserable.  It was unfortunate that Rosemary got sick

during the visit, but it allowed me to see the real Mathew in a time of stress.  I was so impressed and awed by the way he took care of Rosemary.  He was so caring, so loving and so pleasant, even as his wife lay sick in bed and in need of constant assistance.

(Ex. 92, Letter from M. and J. Tharakan.)

Perhaps Mr. Martoma's care and concern is best reflected in the life-altering decisions

that he has made to put her needs above his own.  Dr. Tarriq Haddad writes:

From his wedding day on, I have always been amazed by how Mathew commits himself tirelessly to his wife and the unique and unshakable bond the two of them have as a result.  I recall, for example, how Rosemary developed  while they lived in Connecticut and New York that dramatically affected Rosemary's health.  Despite the fact that Mathew's career in finance was rooted in the financial hub of New York, he made a decision to move his whole family to Florida in 2008-2009 to get her to an environment that was easier ▮ I remember marveling at the selflessness of that decision when he told me at the time, leaving an area that provided unlimited career opportunities in his field for the state of Florida for which there were nearly no viable opportunities in his chosen field, simply for the betterment of his wife's health.

(Ex. 28, Letter from Dr. T. Haddad.)

Mr. Martoma's continuous support is particularly critical to Rosemary ▮

▮ Johnson and Neetha

Achettu, Rosemary Martoma's cousin and his wife, write: ▮

▮ (Ex. 10,

Letter from J. and N. Achettu.)  Aleyamma and Antony Paul echo this sentiment:

Mathew has been her sole support and leader in bringing up their three beautiful children.  I have considered Rosemary as if she is my own daughter. ▮

(Ex. 79, Letter from A. and A. Paul.)  Dr. Lizzy Thomas, Mr. Martoma's mother, also explains:

Mathew's wife is so broken hearted by recent events. ▮

(Ex. 94, Letter from Dr. L. Thomas.)



### iii.    Mr. Martoma's Wife And Children Will Suffer Greatly From His Absence.

No one can dispute the profound, devastating effect that a long prison term would have on Mr. Martoma's wife and children. The Martomas, their family, and their friends are all extremely concerned about the ramifications of removing Mr. Martoma from his children's lives for a lengthy period of time. Lorraine Strasser, who has taught Mr. Martoma's older son and daughter, writes:

> Mathew and Rose have created a loving family environment which truly puts emphasis on their children. Therefore, I feel taking Mathew away from his three young children would greatly impede their development, and overall well-being.

(Ex. 89, Letter from L. Strasser.) Dr. Tarriq Haddad has the same fear:

> Not surprisingly, given his incredible dedication as a father, these children love Mathew and depend on his emotional guidance so much that I truly fear what will happen to them should he be away from them for too long when he is incarcerated.

(Ex. 28, Letter from Dr. T. Haddad.) Agnes Dominic, Rosemary Martoma's aunt, explains:

A prison term will affect the well-being and character formation of [Mr. Martoma's] three young children who will be raised without a father figure in their growing years. . . . From my observations, I know Mathew's young children adore him, and they need him now more than ever.(Ex. 22, Letter from A. Dominic.) Dr. Stephen Kurian describes:

> They are three sweet souls in development, barely touched by the world outside, and their futures are so tightly linked to that of Mathew. . . I understand if it seems like I'm putting a lot on those kids, but without Mathew and Rosemary together, there is no one to protect them and Rosemary cannot do it alone.

(Ex. 59, Letter from Dr. S. Kurian.)

Mr. Martoma's family and friends express a similar concern for Rosemary if she is separated from Mr. Martoma for an extended period of time.  Dr. Anne Lee writes:



(Ex. 60, Letter from Dr. A. Lee.)  Agnes Dominic echoes this concern:

> Mathew's wife, Rosemary, has devoted herself to Mathew since their marriage. This separation will punish Rosemary far more than Mathew. . . . Without Mathew around, Rosemary will be ripped away from her children as she searches for full-time work to support her children.  Hence her children will lose both their mother and father.

(Ex. 22, Letter from A. Dominic.)

Several of the letters submitted to this Court discuss the heartbreaking effect that the case has already had on Mr. Martoma's wife and children.  Russell Bacigalupi, who runs a sport program in which Mr. Martoma's children participate, writes of the changes that he has seen in Mr. Martoma's oldest son, J▮▮▮:

> I'm deeply concerned about the negative impact of Mathews absence will have on J▮▮▮, A▮ and D▮▮▮.  Mathew exemplifies a strong, positive, loving father figure in his 3 children's lives and I've already witnessed the negative impact it has brought upon the children, especially J▮▮▮.

(Ex. 15, Letter from R. Bacigalupi.)  Dr. Tarriq Haddad writes of the negative impact that he has seen on Rosemary:

> In addition to the children, and partly because of Mathew's unwavering commitment to Rosemary and the countless ways he puts aside his own needs for those of his family, I also worry tremendously ▮▮▮▮▮▮▮▮▮▮▮▮
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



(Ex. 28, Letter from Dr. T. Haddad.)

We recognize that many defendants who come before the Court have families, but the simple truth is that Mr. Martoma's wife and children are the ones who will be most affected by the sentence imposed in this case. Their lives will be forever changed, and that impact will be most severe should Mr. Martoma be taken from them for a significant period of time. This Court should consider such family circumstances in determining an appropriate sentence. *See United States v. Williams*, 65 F.3d 301, 309-10 (2d Cir. 1995) (noting that the Guidelines are just a guide: they are not meant to "displace the traditional role of a district judge in bringing compassion and common sense to the sentencing process" (internal quotation marks omitted)). Indeed, discretion in fashioning non-Guidelines sentences to account for family circumstances is particularly warranted where, as here, young children are involved. *See United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1997) (affirming a downward departure where the "removal of the father from this unit at this particular point in time would have a disastrous effect on the [8 and 9 year-old] children in terms of possibilities of their education and upbringing" (internal quotation marks omitted)). As Deepa Sebastian, Rosemary Martoma's cousin, writes: "Rosemary and the children are so emotionally interconnected with Mathew that I can't even begin to imagine what they would do without him present as an integral part of their lives. . . . I am deeply concerned that they will bear a disproportionate share of any punishment." (Ex. 86, Letter from D. Sebastian.) This concern weighs strongly in favor of leniency ▮▮▮

██████████; it argues in favor of a sentence that minimizes Mr. Martoma's separation from his children.

        **b.**      **Mr. Martoma's Altruism And Generosity To Others.**

Not only is Mr. Martoma a dedicated family man, but he also has been unfailingly kind and generous to others throughout his life. The letters attest to the many instances in which Mr. Martoma has gone out of his way to help extended family, friends, and those less fortunate. Mr. Martoma has never lost sight of what is most important – making a difference in the lives of others.

Mr. Martoma's genuine care and concern for those close to him does not end with his devotion to his wife and children. Mr. Martoma has always been a significant source of support to his younger brothers. As his mother explains:

> Mathew was an only child until the age of six, but I think his life really took shape once his siblings were born. He easily fit the role of big brother to his younger siblings and several of his cousins, and I recognized in him the same desire as I had to help others. Sometimes I gave him more responsibility than appropriate in those early years, but he never refused hard work.

(Ex. 94, Letter from Dr. L. Thomas.)

Philip Martoma, his youngest brother, describes the impact that Mr. Martoma has had in his life:

> One of my earliest memories is of Mathew running alongside me as he taught me how to ride a bike. I always felt confident that he wouldn't let me go until I was ready. I know it wasn't as easy for Mathew.

(Ex. 67, Letter from P. Martoma.) He continues:

> After college, the three of us boys ended up in completely different places. But, Mathew has always been right beside me. Whether I was supporting right to life issues in my youth or marching for Howard Dean's presidency in college; eating a Big Mac or making vegan tofurkey; majoring in pre-law or pre-literature, whatever was happening to me at the time, Mathew always embraced me on my path of self-discovery.

(Ex. 67, Letter from P. Martoma.)

Daniel Martoma, Mr. Martoma's middle brother, echoes these sentiments:

Throughout our childhood, Mathew endeavored to teach me lessons and skills
about life that ranged from sports to academics to social culture.  My earliest
memories of Mathew are the countless hours he spent teaching me basketball on
the backboard we built on our driveway. . . . Just as he was with basketball drills,
Mathew was equally as passionate in helping me with whatever activity I was
pursuing at the time.  Whether it was tying my shoes, whistling, blowing bubbles
with chewing gum, or riding a bicycle, in every situation, he instilled in me the
ideal that goals were the product of a firm resolve and strong work ethic (and
plenty of skinned elbows and knees).  It wasn't always easy, but Mathew kept me
going even when I wanted to quit.

(Ex. 66, Letter from D. Martoma.)

Mr. Martoma's compassion and genuine concern for others does not end with his

immediate family.  The letters show Mr. Martoma to be a person who consistently does whatever

he can to help make the lives of others easier, particularly in times of need.  Many of the letters

attest to Mr. Martoma's efforts in helping members of his extended family immigrating to the

United States.  Teena Thomas, Mr. Martoma's cousin, writes:

In 1997, our family moved to the United States and settled in Rockledge, Florida
where Mathew's parents live.  It was a difficult transition for our family as a
whole, especially for my brother and I, because we were not at all familiar with
American customs.  We did not expect the intense stress that comes with
American opportunity and missed our family and friends abroad.  Mathew made
the transition much easier.  He came down from Boston regularly to visit us and
immediately took my brother and I under his wing.  He talked to us about schools
and careers giving us confidence to take risks and strategies to manage
uncertainty.  He was our big brother and took the role seriously, celebrating 21st
birthdays, graduations and big events.

(Ex. 96, Letter from T. Thomas.)  Similarly, Abraham Tharakan writes:

When my children first moved to America from Australia, Mathew went out of
his way to ensure that they transitioned smoothly.  He didn't induce them with
toys or video games, but rather connected with their personal interests.  My
children would always ask for Uncle Mathew to come and visit, and while he
lived in the New York area, we had many fun gatherings and memorable social
events with all the children.

(Ex. 90, Letter from A. J. Tharakan.)

Mr. Martoma has consistently shown the same compassion and concern to friends who

needed him.  Dr. Tarriq Haddad writes:

> Mathew and I first met in August of 1992 when we were in adjacent dormitory
> rooms our freshman year at Duke University. . . . At the time, I was two
> continents away from my family with no extended family at all in the United
> States.  Knowing that well, he took it upon himself to provide me what my family
> could not.  When he knew I had nowhere to go over the thanksgiving holidays but
> stay alone in the ghost town that our college campus turns into over the holidays,
> he insisted on taking me with him to spend thanksgiving with his family, despite
> the fact that it was purely a family gathering.  He would take me to visit cousins
> and uncles of his, knowing that it would help me get through the isolation to make
> me feel a part of his extended family.

(Ex. 28, Letter from Dr. T. Haddad.)

Dr. Haddad is not alone.  Scott Birdwell, Mr. Martoma's friend for over 12 years and his

roommate during his time at Stanford, writes:

> I had insecurities about mingling with the MBAs, and more importantly, was
> concerned about being welcomed by his class since I could have been perceived
> as an outsider.  Mat could not have been more welcoming, and embraced me
> quickly as one of the group.  Stanford academics set aside; Mat and my other
> roommates had a profound impact on my experience at Stanford.

(Ex. 16, Letter from S. Birdwell.)  And Marty Frenzel, a college friend of Mr. Martoma,

explains:

> I know him to be the person who rented a basement apartment, enjoyed pizza
> nights, traveled hours to encourage me in my first marathon, and consoled me
> during the untimely death of my brother.  In the hardest period of my life Mathew
> was incredibly supportive.  He regularly visited just to check in, brought meals,
> and was willing to listen when I needed to talk.

(Ex. 25, Letter from M. Frenzel.)

Perhaps even more significantly, the letters from Mr. Martoma's family and friends show

that he has always been among the first to reach out in times of need, helping them through

difficult times.  For example, Teena Thomas writes:

> My brother passed away in 2006 from an epileptic seizure and it was devastating for my family. We still haven't come to grips with it and probably never will. At the time of the crisis, Mathew came down immediately and made sure that we had the emotional support we needed to make it through the crisis. He is still doing that eight years later. He still calls my parents to makes [sic] sure we are ok, to say prayers for Terry and let us know we still have a brother. He is such a thoughtful, considerate and conscientious person, and I don't know how we will all be without him around.

(Ex. 96, Letter from T. Thomas.)  Thomas Philip continues:

> In 2006, my only son passed away tragically from an epileptic seizure. It was a sudden medical event that nobody could have predicted. I still carry a broken heart and have lost years of my life trying to understand what cannot be understood. At the time of my son's passing, Ajai [Mathew] along with wife and children were there for us, even though Ajai was working his demanding finance job at the time. He didn't want our family to be alone. Over the years, Ajai has loved me like a son and helped ease the pain of my suffering.

(Ex. 80, Letter from T. Philip.)  Dr. Anne Lee similarly explains:

> At a personal level, Mathew has always been there for his friends in times of greatest need. When our close friend and my husband both lost loved ones, Mathew and Rosemary were the first to call and be physically and consistently present for support – from bringing over meals, weekly phone calls or surprise visits including playing mini-golf or Frisbee for a good distraction. We have directly witnessed and benefitted from their goodness of heart and altruism for over two decades.

(Ex. 60, Letter from Dr. A. Lee.)

Even during the stressful period of the past two years – through the Government's investigation, the seizure of his assets, a grueling trial, and his conviction – Mr. Martoma has remained steadfastly focused on the welfare and happiness of his family and friends. For example, in February 2013, when Rosemary Martoma's uncle passed away, Mr. Martoma sought special permission from the Court to attend the funeral. As Rosemary's cousin, Joseph Achett, explains:

> Despite the tensions of his trial, Mathew made it a priority to come to my father's funeral, knowing how closely connected my father was to Rosemary and her family. Not sure of whether Your Honor would approve his request to travel prior to my father's passing, he sent Rosemary ahead so she could be with my father

during his last moments alive.  I think people like Mathew and Rosemary are rare; they do a lot for others, whatever the personal costs.

(Ex. 6, Letter from J. Achett.)  Aleyamma and Antony Paul, Rosemary Martoma's cousin and

her husband, write:

> While we have many specific memories of our interaction together [with Mathew], one that stands out is our recent gathering in Chicago to pay our respects to a recently departed family member.  I knew Mathew was there with special permission from Your Honor to attend a funeral, and in the midst of such great instability in his life, Mathew seemed so calm. I was amazed that he could muster the composure to perform all the duties of the young man paying his respects to a departed elder. At the funeral, he helped senior family members walk through the snow, holding their hands, and made sure children were taken care of and stood in the right places with respect.

(Ex. 79, Letter from A. and A. Paul.)

In fact, just a few months ago, after Mr. Martoma was convicted, his close friend

Dr. Michael Epstein suddenly lost his father.  Notwithstanding his personal circumstances,

Mr. Martoma put his friend first.  As Dr. Epstein explains:

> Mathew was one of the first to reach out to me; he called early and often to check on both my mom and myself.  We spent many hours reminiscing about my father and Mathew provided a shoulder (through a telephone) for me to lean on during those times.

(Ex. 23, Letter from Dr. M. Epstein.)

It is also important to recognize that Mr. Martoma's family and friends have

demonstrated the same commitment to him throughout the proceedings in this case.  Rosemary

attended the trial each day, along with both of Mr. Martoma's parents and her own parents.

Many of Mr. Martoma's other family and friends also attended the trial, taking time off from

work and flying from other cities just to be there.  (*See, e.g.*, Ex. 104, Letter from Dr. J.

Varghese; Ex. 47, Letter from J. Kaniyamparampil and M. Chathoth; Ex. 91, Letter from A.

Tharakan.)  The unyielding support that Mr. Martoma's family, friends, and community have

shown him both inside and outside of the courtroom during the past two years – and particularly

throughout this highly publicized trial – is a testament to their commitment to him.  Mr. Martoma is a man worth standing by, even under these most difficult circumstances.

### c.      Mr. Martoma's Devotion To Charity Reflects A Deep Commitment To Community.

Finally, throughout his life, Mr. Martoma has dedicated a significant amount of his time and resources to a wide variety of charitable causes and organizations.  *See supra* at 12-20.  Mr. Martoma has shown a lifelong commitment to giving, which is particularly unique in light of the young age at which he became involved in such community service.  Indeed, he stands out in the eyes of family, friends, colleagues, and acquaintances alike for his innate generosity and charitable work.  Binu Mathew, Rosemary Martoma's cousin, writes:

> It is his desire to help others that really stands out to me for someone as young as he is.  Whether it is volunteering with a variety of community groups, giving to his church, or helping a friend in need, Mathew is not at all what I picture of a typical financier.

(Ex. 69, Letter from B. Mathew.)  Soye Thomas describes:

> Mathew befriended and helped many elderly who had difficulty attending services due to transportation problems.  His children participated in Angel's Choir and CCD classes, while he helped clean up the Church after mass. . . . I personally watched Mathew pick up many dirty towels from the bathroom floors after mass, so that the school children would not be disgusted with the mess.  As a Restauranteur, I've been known to get my hands dirty, but I certainly didn't expect that from a "finance" guy.

(Ex. 95, Letter from S. Thomas.)

Mr. Martoma's commitment to social responsibility was instilled in him during his childhood, and remains a priority in his life through and including the present. In high school, Mr. Martoma volunteered at the Wuesthoff Medical Center as a candy striper, raised money for soup kitchens through the Royal Ranger scouting organization from the ages of 12 to 18 years, and participated in park, highway, and river development projects.  (*See* Ex. 66, Letter from D. Martoma; Ex. 57, Letter from Dr. S. Kumar; Ex. 20, Letter from Rev. C.J. DiBiase.)  Mathew

also travelled all over the world with the non-profit group Junior Achievement, educating children on the values of entrepreneurship and democratic principles.  (*See* Ex. 65, Letter from B. Martoma; Ex. 63, Letter from A. Malhotra; Ex. 40, Letter from J. Johnson.)  In college, his dedication to community service was fostered by the student living group Round Table, as well as the national service fraternity Alpha Phi Omega – within both of which Mr. Martoma was an active participant and leader.  (*See* Ex. 28, Letter from Dr. T. Haddad; Ex. 21, Letter from J. Dillon; Ex. 60, Letter from Dr. A. Lee.)  Off campus, he even initiated the organization of Cub Scout programs for underprivileged children in the surrounding community.  (*See* Ex. 20, Letter from Rev. C.J. DiBiase; Ex. 111, Letter from K. Verghese.)

Even after college, Mr. Martoma's dedication to those in need never wavered.  In 1996 through 1997, while working in Washington, D.C., Mr. Martoma participated in several projects with Habitat for Humanity in the Greater Washington Metro area.  In 1999 through 2000, after moving back to Florida, Mr. Martoma volunteered at Brevard County and Jacksonville Legal Aid, where he helped provide various legal services to low-income individuals.  (*See* Ex. 28, Letter from Dr. T. Haddad; Ex. 65, Letter from B. Martoma.)  During this time, he also traveled to India, volunteering his time and resources to local orphanages.  (*See* Ex. 1A, Letter from K.O. Abraham; Ex. 80, Letter from T. Philip.)  From 2001 through 2003, while he attended Stanford Business School, Mr. Martoma supported the Special Olympics and provided landscaping work for Stevenson House in Palo Alto, an organization that provided affordable housing to independent, low-income senior citizens.  (*See* Ex. 101, Letter from J. Tierney; Ex. 28, Letter from Dr. T. Haddad.)  And since his marriage to Rosemary, they have donated or set aside upwards of $1 million for at least 30 charitable organizations.  (*See* Ex. 28, Letter from Dr. T.

Haddad; Ex. 95, Letter from S. Thomas; Ex. 91, Letter from A. Tharakan; Ex. 59, Letter from

Dr. S. Kurian.)

### d.    Mr. Martoma Should Not Be Punished Further For His Dismissal From Harvard Law School.

Mr. Martoma recognizes that he has made errors in judgment, especially with respect to

his dismissal from Harvard Law School, but we respectfully submit that the conduct surrounding

his dismissal should have no impact on this Court's determination of his sentence.

Mr. Martoma has already been punished for his mistakes at Harvard Law School.  Mr.

Martoma was initially punished when he was dismissed halfway through his second year.  Not

only was Mr. Martoma unable to receive a law degree, he also suffered shame and

embarrassment among his family, friends, peers, and professors.  Fifteen years later,

Mr. Martoma was punished again when his dismissal was brought to light in the most public way

imaginable in connection with this case, compounding his shame and embarrassment and forcing

his entire family to suffer right alongside him in the midst of a barrage of negative publicity.  His

dismissal also played a significant role in Mr. Martoma's defense strategy.  And the media

coverage of his Harvard dismissal during the trial ultimately cost him his Stanford degree as

well.  Suffice to say, Mr. Martoma has been punished enough for his conduct at Harvard; he need

not be punished any further.[108]

*        *        *

---

[108]    Moreover, Mr. Martoma's dismissal from Harvard Law School is in no way related, connected, or even remotely similar to the charged conduct at issue here.  Indeed, this Court has expressly found that "there is no direct connection between the Law School Evidence and the insider trading charges the Defendant faces."  (Order, ECF No. 196, at 13.)  Where character evidence is wholly irrelevant to the charged conduct, courts should not place weight on it for sentencing purposes.  *See, e.g.*, *United States v. Sarna*, No. 06-cr-1067 (JFK), 2009 WL 2633153, at *1 n.1 (S.D.N.Y. Aug. 26, 2009) (refusing to consider uncharged, pre-conviction conduct under Section 3553(a) where the court found it "immaterial" to the charged offense).

Mr. Martoma has made mistakes but, as the many letters of friends, family, colleagues, and acquaintances show, he is a good person.  That distinction matters under Section 3553(a).  As Judge Rakoff explained in a recent insider trading case:

> There is, in the common sense of it, and it's reflected in Section 3553(a) as well, a huge difference between a person who is essentially a grasping, evil, crooked, despicable human being and someone who is basically a good person but has made some intentional mistakes.  And the notion, if ever our legal system ceases to recognize that distinction, we will have lost our own humanity.  We will be a system without justice, without mercy, without a feeling for the complexity of human existence.

Ex. 138, *Whitman* Sentencing Tr. 27:23-28:10.  For all of these reasons, the Court should credit Mr. Martoma's good works over the years and impose a sentence that minimizes the impact on his family.

### 3.     A Lenient Sentence Sufficiently Serves The Purposes Of Deterrence.

Finally, Section 3553(a) requires this Court to consider deterrence.  Candidly, given the massive publicity surrounding Mr. Martoma's trial and conviction, any sentence would be sufficient to "protect the public from further crimes of the defendant" and "afford adequate deterrence to criminal conduct" – *i.e.*, to serve the purposes of both specific and general deterrence.  18 U.S.C. § 3553(a)(2)(B)- (C).

### a.     Specific Deterrence.

No sentence is necessary to deter Mr. Martoma from committing any crime.

*First*, the destruction of Mr. Martoma's career and the steep financial penalties that he faces eliminate the need for further deterrence.  Mr. Martoma will never work in finance again.  He faces a lifetime ban from the industry as a result of the pending SEC action against him, and his reputation has been ruined by the stigma of his very public criminal conviction.  Mr. Martoma also faces severe financial consequences from this case.  He has already had the bulk of his assets frozen and likely will be required to forfeit them, he may receive a criminal fine on top

of that substantial forfeiture, and he also faces monetary penalties in the SEC and private securities class actions pending against him.  There is no legitimate risk that Mr. Martoma will engage in insider trading in the future; no further punishment is necessary to accomplish that result.  *See Adelson*, 441 F. Supp. at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."); *Emmenegger*, 329 F. Supp. 2d at 428 (finding the risk of recidivism eliminated by the fact that the offenses at issue were "particularly adapted to [the defendant's] chosen career," "[t]hat career is over, and his potential to commit this particular type of crime has been eliminated"); Ex. 131, *Gupta* Sentencing Tr. 54:3-6 ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result.").[109]

*Second*, Mr. Martoma has already been severely punished by the mere fact of his very public trial and ultimate conviction.  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("[T]he need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant." (internal quotation marks omitted)).  Mr. Martoma and his entire family have been living under the shadow of this case for years, which has taken a significant emotional and financial toll.

*Third*, the charged conduct in this case stopped years before Mr. Martoma left SAC, let alone was arrested, despite the fact that he had many more opportunities to engage in insider trading.  The Government's own cooperating witness, Dr. Gilman, testified that Mr. Martoma largely stopped communicating with him after the trading at issue – even though Dr. Gilman continued to work on drug trials and continued to have access to material, non-public

---

[109]   *Accord United States v. Sachakov,* No. 11 Cr. 120 (JBW), 2013 WL 101287, at *2 (E.D.N.Y. Jan. 8, 2013) (considering the likelihood that the defendant would lose his medical license as a result of his conviction in fashioning an appropriate sentence).

information.  (Ex. 117, Tr. 1232:8-16, 1487:24-1488:7, 1491:23-1492:13.)  Indeed, Mr. Martoma did not even attempt to contact Dr. Gilman for help even when his job at SAC was at risk.

### b.    **General Deterrence.**

A long sentence also is not necessary to achieve the goal of deterring criminal conduct generally.

***First***, as this Court recently noted, a long sentence is not necessary to achieve sufficient general deterrence in an insider trading case because "imposing ***any sentence of imprisonment*** in this type of case has a great effect in and of itself."  Ex. 134, *Koulouroudis* Sentencing Tr. 28:6-7 (emphasis added).  Judge Rakoff has echoed this Court's sentiment, pointing to "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  *Adelson*, 441 F. Supp. 2d at 514 (citing Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)).[110]  As Judge Rakoff recognized:

> [N]o one really knows how much jail time is necessary to materially deter insider trading; but common sense suggests that most business executives fear even a modest prison term to a degree that more hardened types might not.  Thus, a relatively modest prison term should be "sufficient, but not more than necessary" for this purpose.

Ex. 131, *Gupta* Sentencing Tr. 54:19-24.  Indeed, the Sentencing Commission itself has acknowledged that the Guidelines were written in part to "ensure a ***short but definite*** period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence."  United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (emphasis added; internal quotation marks omitted).

---

[110]  Notably, Judge Rakoff found the three-and-a-half year sentence imposed upon the defendant in *Adelson* not to be "a short sentence in any practical sense," but, in fact, a sentence many times longer than the sentences imposed upon others, including "such high visibility 'white collar' offenders as Martha Stewart."  *Id.* at 514.

Consistent with these views, courts in this Circuit have repeatedly held that sentences well below the Guideline range serve the purpose of general deterrence in insider trading cases:

- In *Koulouroudis*, this Court determined that "the guideline range of 18 to 24 months' imprisonment is more than necessary" to achieve deterrence and other sentencing objectives and instead imposed a below-Guidelines sentence of three months imprisonment, three months home confinement, and three years supervised release.[111]

- Judge Rakoff has done the same.  In *Gupta*, the Court imposed a sentence of 24 months, well below the Guideline range of 97-121 months, because it "most fulfills all the requirements of Section 3553(a)," including deterrence.[112]  In *Whitman*, the Court also imposed a sentence of 24 months, well below the Guideline range of 51-63 months, because it was "the right sentence in this case" after weighing the Section 3553(a) factors, including deterrence.[113]

- As has Judge Sullivan.  In *Newman*, the court imposed a "pretty significant sentence" of 54 months, well below the Guideline range of 63-78 months, because: "Four and a half years is a round number, sends a clear message.  It's a long enough sentence to make that message palpable but not longer than necessary to achieve those objectives."[114]  In *Contorinis*, the court imposed a sentence of 72 months, well below the Guideline range of 97-121 months, because it sent a message to the "audience out there, professionals, people like you in your profession who will look to this sentence, will read about it, who will learn about it and who will be affected by it and will understand that a statement has been made."[115]

*Second*, the severe consequences that Mr. Martoma faces as a result of this case serve a strong general (as well as specific) deterrence purpose.  Mr. Martoma has lost his livelihood, his source of income, and the bulk of his assets.  *See supra* at 73-74.  That in itself will deter others from engaging in insider trading:

Elimination of the defendant's ability to engage in similar or related activities – or indeed any major business activity – for some time, and the substantial loss of assets and income resulting from this have decreased for the foreseeable future his ability to commit further crime of the type he was tempted to undertake, and constitutes a source of both individual and general deterrence.

---

[111] Ex. 134, *Koulouroudis* Sentencing Tr. 28:4-6.

[112] Ex. 131, *Gupta* Sentencing Tr. 55:18-21.

[113] Ex. 138, *Whitman* Sentencing Tr. 29:14-16.

[114] Ex. 135, *Newman* Sentencing Tr. 56:3-4, 57:12-15.

[115] Ex. 127, *Contorinis* Sentencing Tr. 56:25-57:5.

*United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993).

***Third***, "U.S. Attorney Preet Bharara has a perfect track record in insider trading convictions since the government's massive crackdown began in the fall of 2009."[116] From the beginning of these prosecutions, U.S. Attorney Bharara – who has been called "The Sheriff of Wall Street" – has publicly described them as "a wake up call for every hedge fund manager and every Wall Street trader and every corporate executive who is even thinking about engaging in insider trading."[117] Indeed, after the conviction in this case, the Government touted Mr. Martoma as "the 79th person convicted of insider trading after trial or by guilty plea in this District in the last four years."[118] That the United States Attorney's Office in this District alone has aggressively and ***successfully*** prosecuted nearly 80 individuals for insider trading over the past several years – without a single acquittal – compounds the significant general deterrence that already has been achieved by this case. A long sentence is similarly not necessary.

*     *     *

Mr. Martoma is not perfect, but he is a good man. To prevent a sentence disparity; to recognize his lower level of culpability relative to other insider trading cases; to credit his ***lifetime*** of volunteer and charitable work; to mitigate the horrible effects on a ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ we respectfully request leniency in his sentence.

---

[116]  Ex. 173, *Here's Preet Bharara's Amazing 79-0 Insider Trading Conviction Score Card*, BUS. INSIDER (Feb. 6, 2014), available at http://www.businessinsider.com/bharara-insider-trading-convictions-2014-2.

[117]  Ex. 176, Prepared Remarks for U.S. Attorney Preet Bharara, *U.S. v. Raj Rajaratnam, et al.*; *U.S. v. Danielle Chiesi, et al.* – Hedge Fund Insider Trading Takedown (Oct. 16, 2009), available at www.justice.gov/usao/nys/hedgefund/hedgefundinsidertradingremarks101609.pdf.

[118]  Ex. 177, Press Release, United States Attorney's Office for the Southern District of New York, SAC Capital Portfolio Manager Mathew Martoma Found Guilty In Manhattan Federal Court Of Insider Trading Charges (Feb. 6, 2014), available at http://www.justice.gov/usao/nys/pressreleases/February14/MathewMartomaVerdictPR.php.

## III.   <u>A FINE IS NOT WARRANTED IN THIS CASE.</u>

Mr. Martoma should not be subject to a fine as part of any sentence imposed by the

Court.  Under 18 U.S.C. §§ 3553(a) and 3572(a) and the Guidelines, this Court should consider

(*inter alia*) the following factors in determining whether to impose a fine:

> (1) the need to deprive the defendant of illegally obtained gains from the offense, as well as any collateral consequences of conviction, including civil obligations arising from the defendant's conduct, 18 U.S.C. § 3572(a)(5); U.S.S.G. § 5E1.2(d)(5);

> (2) the defendant's ability to pay the fine in light of his current and future earning capacity and financial resources, 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d)(2);

> (3) the burden that a fine would impose on the defendant and his family relative to the burden that alternative punishments would impose, 18 U.S.C. § 3572(a)(2); U.S.S.G. § 5E1.2(d)(3); and

> (4) the need for the combined sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence, U.S.S.G. § 5E1.2(d)(1).

All of these factors weigh heavily against the imposition of a fine.

*First*, Mr. Martoma already faces significant financial penalties as a result of the charged

conduct.  Specifically, he is subject to forfeiture allegations and likely to be required to forfeit

the proceeds from the allegedly illegal trading.  There is no need to deprive Mr. Martoma of

more.  *See* 18 U.S.C. § 3572(a)(5); U.S.S.G. § 5E1.2(d)(1); *accord United States v. Madden*, No.

09 Cr. 799 (RWS), 2011 WL 4359933, at *9 (S.D.N.Y. Sept. 19, 2011) ("In consideration of the

significant amount of restitution and forfeiture Defendant will be paying, the fine in this case

shall be waived.").  Moreover, as a result of his conviction in this case, Mr. Martoma faces

substantial financial exposure in the parallel SEC and private securities class actions currently

pending against him.  These "collateral consequences of conviction" also militate against

imposing an additional fine here.  *See* U.S.S.G. § 5E1.2(d)(5).

**Second**, Mr. Martoma has no ability to pay any fine contemplated by the Government. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d)(2).  Mr. Martoma's ability to pay should "not be measured by the fine standing alone."  *United States v. Drinkwine*, 133 F.3d 203, 204 (2d Cir. 1998).  Rather, "a fine that might be deemed reasonable if considered in isolation could be very onerous" in light of other payments that the defendant has been ordered to make.  *Id.*  Once all of the litigation related to the charged conduct has concluded, Mr. Martoma will be wiped out financially.  Mr. Martoma has no ability to earn substantial income – not only during any period of incarceration, but also in the foreseeable future thereafter.  *See supra* at 73-74; *see also* U.S.S.G. § 5E1.2(a) (stating that a court should not impose a fine "where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine"); *Drinkwine*, 133 F.2d at 204 ("[I]t is an incorrect application of the guidelines to impose a fine that a defendant has little chance of paying.").

**Third**, a fine will impose an unnecessarily onerous burden on Mr. Martoma's family. Mr. Martoma's wife and children have already suffered on many different levels as a result of this case, and now they will suffer financially as well.  As detailed in the letters submitted to this Court, Mr. Martoma is the **only** source of financial support for his wife and their three young children.  (*See, e.g.*, Ex. 70, Letter from Rev. Fr. Dr. J. Mathew; Ex. 43, Letter from J. and S. Joseph; Ex. 22, Letter from A. Dominic.)  After his conviction, his earnings potential is extremely limited.  Moreover, the family's assets are depleted.  The Government has frozen the bulk of the assets in joint bank accounts held by Mr. Martoma's wife, as well as the house where Mr. Martoma and his family currently live.  Like Mr. Martoma, his wife and children will lose a great deal in connection with this sentencing, and they will be left with few assets and fewer prospects when all of the related litigation has been resolved.  A fine would compound this

already tremendous burden, which is another reason not to impose one. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d)(3); *United States v. Hines*, 88 F.3d 661, 662 (8th Cir. 1996) (reversing a fine for failure to take into account the burden that the fine would impose on the defendant's financial dependents).

     **Fourth**, a fine is not necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, or afford adequate deterrence. 18 U.S.C. §§ 3553(a)(2)(A), (B), (C); U.S.S.G. § 5E1.2(d)(1). Indeed, imposing a fine would create an unwarranted sentence disparity between Mr. Martoma and many other recent insider trading defendants, who were not fined:

- James Fleishman was convicted by a jury on one count of conspiracy to commit securities fraud and one count of attempt and conspiracy to commit wire fraud. The court did not impose a fine. Ex. 156, Judgment, *United States v. Fleishman*, No. 11 Cr. 32 (JSR) (S.D.N.Y. Dec. 23, 2011), ECF No. 154. The court explained: "I don't think this defendant, given the fact that he just lost another job, is really in a position to pay any meaningful fine now or in the foreseeable future." Ex. 128, *Fleishman* Sentencing Tr. 41:1-5.

- Michael Kimelman was convicted by a jury on one count of conspiracy and two counts of insider trading. The court did not impose a fine. Exs. 164, 165, Order of Forfeiture, Judgment, *United States v. Kimelman*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 13, 2011), ECF Nos. 287, 288. The court explained: "I don't think Mr. Kimelman has the ability to pay a fine once I factor in the forfeiture order." Ex. 133, *Kimelman* Sentencing Tr. 31:2-5.

- Emanuel Goffer was convicted by a jury on one count of conspiracy and two counts of insider trading. The court did not impose a fine. Exs. 162, 163, Order of Forfeiture, Judgment, *United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 7, 2011), ECF Nos. 282, 283. The court explained that a fine was unnecessary because forfeiture was imposed. Ex. 129, *Emanuel Goffer* Sentencing Tr. 28:6-8.

- Winifred Jiau was convicted by a jury on one count of conspiracy and one count of insider trading. The court did not impose a fine. Ex. 166, Judgment, *United States v. Jiau*, No. 11 Cr. 161 (JSR) (S.D.N.Y. Oct. 4, 2011), ECF No. 124. The court explained that Ms. Jiau was not "in a position to pay any meaningful fine now or in the foreseeable future." Ex. 132, *Jiau* Sentencing Tr. 68:24-69:1.

- Joseph Contorinis was convicted by a jury on one count of conspiracy and seven counts of insider trading.  The court did not impose a fine.  Exs. 153, 154, Judgment, Order of Forfeiture, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 22, 2010), ECF Nos. 94, 95.  The court explained that a fine was unnecessary in that case because forfeiture was imposed.  Ex. 127, *Contorinis* Sentencing Tr. 59:4-5.

- Zvi Goffer was convicted by a jury on two counts of conspiracy and twelve counts of insider trading.  The court did not impose a fine.  Exs. 160, 161, Order of Forfeiture, Order, *United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Sept. 22, 2011), ECF Nos. 270, 271.  The court explained that it would not impose a fine because "I don't think you have the ability to pay a fine."  Ex. 130, *Zvi Goffer* Sentencing Tr. 46:4-9.

In sum, a fine is unwarranted in this case; the Court should not impose Probation's proposed fine.

## **CONCLUSION**

For the foregoing reasons, Mr. Martoma respectfully requests that this Court impose a lenient sentence consistent with an analysis under 18 U.S.C. § 3553(a) and that the Court grant the other relief requested herein.

Dated: May 27, 2014    Respectfully submitted,
   New York, NY

GOODWIN PROCTER LLP

By: _/s/ Richard M. Strassberg_
  Richard M. Strassberg (RS5141)
   (rstrassberg@goodwinprocter.com)
  John O. Farley (JF4402)
   (jfarley@goodwinprocter.com)
  Daniel Roeser (DR2380)
   (droeser@goodwinprocter.com)

  The New York Times Building
  620 Eighth Avenue
  New York, New York 10018
  Telephone:  (212) 813-8800


  Roberto M. Braceras (RB2470)
   (rbraceras@goodwinprocter.com)
  53 State Street
  Boston, Massachusetts 02109
  Telephone:  (617) 570-1000

  *Attorneys for Defendant Mathew Martoma*

81

**CERTIFICATE OF SERVICE**

I hereby certify that, on May 27, 2014, I caused a true and correct copy of the foregoing to be served by electronic mail and hand delivery on all counsel of record.


 */s/ Richard M. Strassberg*
Richard M. Strassberg (RS5141)