# EXHIBIT 21



1400 Eye Street NW
Suite 525
Washington, DC 20005
(202) 640-2850
(202) 280-1034 (facsimile)
www.tklf.com

May 2, 2014

The Honorable Paul G. Gardephe
United States District Court for the
 Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Gardephe,

"The Harvard cheater who didn't flip on Steve Cohen." That is what Mat Martoma has become to people who know who he is but don't know him. That is what this awful ordeal has reduced him to in the eyes of so many. And that is what, to many people, he will forever remain, no matter what Your Honor does to him at sentencing and no matter what happens to his case on appeal. He is, at age 40, ruined. As someone who has known Mat for more than 20 years and knows him to be a good man, I write to ask you, in the strongest possible terms, to take that terrible fact into account as you consider what sentence to impose on June 13.

I first met Mat during our sophomore year in college, when we both lived in the Round Table dormitory at Duke University. The three so-called "pillars" of the Round Table were (if memory serves) student-student interaction, community service, and faculty-student interaction. It was, in short, the nerd dorm. But the people who lived there—Mat and I included—truly believed in its mission. We believed in creating a place where even the most offbeat people could come together and get to know each other.

At first, I couldn't understand why Mat would want to join the dorm. With a brilliant smile and an easy, gracious manner, he would have seemed—superficially at least—far more at home in one of the more traditionally "social" selective houses on Duke's campus. But then I came to know him. And I realized that, behind the social ease, he was every bit the nerd that the rest of us were. (I trust the Court will recognize that I mean that as a compliment.) In short order, Mat became a leader at Round Table, organizing events and eventually becoming its president. That was not an easy job. Round Tablers liked to talk—and talk and talk and talk—about everything. I remember one incident in which some idiot whose name escapes me wrote ARBEIT MACHT FREI on the wall of the commons room. Said idiot was trying to make an ironic point about the

fact that we all worked too hard, not recognizing that there were perhaps better ways to do that than by appropriating the words written over the entrance to Auschwitz. A firestorm ensued. And more than anyone else, Mat did a terrific job dealing with the fallout in a way that allowed longstanding friendships to be saved and the fragile culture of the dorm to be preserved. He could talk to anyone; people trusted him, and he made them feel heard.

Mat was also a leader in other ways on campus. His name was synonymous with ethics. (I refuse to balk at the potential, and much-commented-on, irony of this; he was a serious student of ethics, and no one who knew him at the time would doubt his devotion to or interest in that work.) He worked closely with public-policy professor Bruce Payne, one of the country's foremost thinkers in the field. He started both Cub Scout and Girl Scout troops for poor children in Durham. He did volunteer work with Alzheimer's patients at the Duke Medical Center. I don't know where he found the time or the emotional energy to do those things on top of a busy course load that allowed him to graduate a semester early, but he did them.

I understand that many people who know Mat are planning to write letters on his behalf. I hope that you will understand that those letters—much more than what happened in your courtroom—define who he is. Mat Martoma is a good man, Your Honor. He is a kind man, a gentle man, and an honest man. He is a devoted friend, a loving husband, and a wonderful father. Everything he has—his wife, his three little girls, his friends, his reputation—is going to be ripped from him as a result of this case. He has already suffered immeasurably and will continue to do so for years.

As someone who has spent more time as a federal prosecutor than as a defense attorney, I have thought countless times about how much jail time to request for a defendant and what the marginal benefit of additional years might be. In this case, the government—proud to have kept its insider-trading winning streak alive—is probably going to ask for the moon. I ask you to consider whether that number, whatever it might be, is driven more by what Mat actually did or by the government's desire to measure success through jail time. No legitimate purpose of sentencing—not deterrence, not incapacitation, not retribution, not rehabilitation, and not restitution—is served by throwing the book at Mat Martoma. He is a good man. He has suffered greatly in this case. He is so much more than the government and the press have made him out to be. And he deserves your mercy. I respectfully ask that you grant it to him.

Sincerely,

Justin Dillon

# EXHIBIT 22

Agnes Dominic

█████████

Elmhurst, IL 60126-2005

March 17, 2014

Honorable Paul G. Gardephe
United States District Court for the
    Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

### Subject: Request for leniency to Mr. Mathew Martoma

Dear Honorable Judge Gardephe:

My name is Agnes Dominic.  I reside in Elmhurst, Illinois with my husband and have been an
employee of the Hospital Pharmacy at University of Illinois in Chicago for over 28 years.
Mathew Martoma is a member of our extended family, and I have known him since his wedding
to my niece, Dr. Rosemary Martoma, approximately 11 years ago. I've had the opportunity to
interact with Mathew on several occasions during family gatherings, special occasions,
weddings, Christmas holidays, funerals and so forth. I've found him to be a loyal family man, a
great husband, a loving father, and someone whom we can count on for help or assistance in any
crisis. As I was following his case very carefully, I understand the complexities of the charges
levied against him.  The verdict against him was very disappointing for me and our entire family.
As a U. S. Citizen, I trust in the judicial system and the jury's verdict.

However, Mathew's fate is in your hands now, and there are many reasons to show him mercy.
A prison term will affect the well-being and character formation of his three young children who
will be raised without a father figure in their growing years. As parent to two children and two
grandchildren, my experience has taught me that it is extremely difficult to raise children without
the hard work and dedication of both parents. From my observations, I know Mathew's young
children adore him, and they need him now more than ever.

Similarly, Mathew's wife, Rosemary, has devoted herself to Mathew since their marriage. This
separation will punish Rosemary far more than Mathew, as she will be forced to adjust to a life
of solitude and have little prospects for companionship while Mathew is away.  Similarly, what
Your Honor may not know is that Rosemary chose to pause her medical career 8 years ago when
J████ was born in order to raise her children full time.  At the time she made that decision, it
was filled with uncertainty, as Mathew's work prospects were still unfolding.  It was a sacrifice
made out of love and faith.  Without Mathew around, Rosemary will be ripped away from her
children as she searches for full-time work to support her children.  Hence her children will lose

contact with both their mother and father.  These are concrete and direct harms to Mathew's innocent wife and children that must be weighed against less tangible societal benefits of incarcerating him.

Therefore, I am asking for your kindness, compassion and leniency with a minimum legally possible punishment for Mathew.  I hope that you will take my leniency petition into consideration before making your sentencing decision in early June. In case your staff needs to contact me, I am available at ███████████.

Respectfully,

Agnes Dominic

# EXHIBIT 23

# Michael P. Epstein, Ph.D.



██████████ Duluth, GA, 30096

E-Mail: ████████ ██

April 22, 2014

Honorable Paul G. Gardephe
**United States District Court for the Southern District of New York**
**United States Courthouse, 40 Foley Square**
New York, NY 10007

Dear Judge Gardephe:

Mathew Martoma has asked me to write a support letter as part of his sentencing for insider training and conspiracy to commit insider training to be held on June 10, 2014. I am more than happy to provide such a letter. As a way of an introduction, I am an Associate Professor of Human Genetics at the Emory University School of Medicine in Atlanta, GA. My research generally involves the development and application of statistical tools for identifying genes that increase risk for complex psychiatric disorders such as schizophrenia. I received a Ph.D. in Biostatistics from the University of Michigan and a Bachelors of Science in Mathematics from Duke University. I've been happily married to my better half for almost 14 years and together we have a 5-year old son

I have known Mathew for 20 years (we first met during our Sophomore year at Duke University) and, over those two decades, I have observed him to be one of the most kind, empathic, and altruistic people I have encountered. I won't go over the laundry list of service projects Mathew led or assisted during our time at Duke and beyond; only to say that he believes there are few things in life more important than helping others both on a personal level (through his community projects) as well as on a Public-Health level (directly assisting in Alzheimer's disease research to find new treatments with those affected with the disorder). Mathew was a dear friend during our college years and a person I would routinely seek out for advice on both personal and professional matters. He would talk to me at all hours for long stretches when my latest relationship fizzled and I needed someone to vent to (sadly, this was a too-frequent occurrence). While such discussions might seem increasingly shallow in present time, Mathew's thoughtful relationship advice at the time greatly assisted my psyche and confidence. On the professional side, Mathew provided sage guidance when I was debating pursuing a Ph.D. versus going to Medical school and made me realize that basic (rather than clinical) research was my true passion. Without those discussions, it is quite likely I would have never pursued my career in quantitative genetics (which I relish to this day).

As I mentioned earlier, Mathew is one of the most empathic individuals I have ever encountered and recent events further support this claim. Two months ago, my father passed away suddenly from a myocardial infarction. I went through the usual stages of grief when dealing with the sudden passing of a parent: shock, depression, anger etc. I wouldn't have made it through those first couple weeks without the generous support of friends who called and checked on me constantly. Mathew was one of the first to reach out to me; he called early and often to check on both my mom and myself. We spent many hours reminiscing about my father and Mathew provided a shoulder (through a telephone) for me to lean on during those times. Keep in mind: he did all of this while simultaneously dealing with his own grief and stress stemming from his conviction and the impending sentencing. The fact that he was able to put his own serious issues aside to come to the aide of a friend in need speaks volumes to Mathew's character.

I hope this information on Mathew will prove helpful during his sentencing. Please let me know if I can provide any further information.

Sincerely,

Michael P. Epstein, Ph.D.

# EXHIBIT 24

Jori J. Farrell

Boca Raton, FL 33432

April 25, 2014

Honorable Paul G. Gardephe
United States District Court for the
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Gardephe:

This heartfelt letter is written in support of Mathew Martoma. I fully understand the magnitude of
the crime of insider trading and it's far reaching effects on our society. My husband and I have
been personally victimized by a financial crime and we do not take the Martoma charges and
guilty verdict without the utmost careful consideration. It is my intention to provide some details
of Mathew's good character in the hopes you will take them into consideration and impose a
lenient sentence.

My name is Jori Farrell. I am the Martoma's neighbor and have had the privilege of teaching two
of his three children (A█ and D█) at Pine Crest School. I first met Mathew in August of 2012.
As neighbors, Mathew and Rose have been active participants in our community. They have
volunteered and contributed to various local and national charities with the intention to help those
in need and to set a positive example of philanthropy for their children. Mathew's personality is
warm and friendly. He puts everyone at ease and makes you feel as though you have been
lifelong friends. He isn't however, someone who needs the spotlight. He and his wife have
helped "behind the scenes" and without recognition at Boca Helping Hands (our local food
pantry), The Boca Raton Museum of Art, and several children's charities including the Boca
Raton Children's Museum and SOS Children's Villages.

The Martoma children - J█, A█ and D█ - are polite, honest, intelligent and loving children.
They are always kind to the other children at school and very respectful. This is a result of
excellent parenting. Mathew is an outstanding father, and he has always put his children first.
When details of his case became public and stories of the insider trading charges were all over
the newspapers and TV, I'm sure Mathew must have wanted to stay home and not face the
gossip, stares and questions from the parents at school and people in our community. Instead,
Mathew came to every dance recital, violin concert and play in which his children performed.
During times when I am certain he needed to be meeting with lawyers, working on his legal case

etc. he would help in our lunch room and classroom parties, or read to our students as a guest reader. He has never missed a parent/teacher conference.

I would be neglecting my responsibilities as an educator if I did not advocate for the Martoma children. In the years to come, they will need to be active, productive members of our society. I must point out the harm that sending Mathew to prison will cause J____, A__ and D___. As I am sure you know, parental separation due to imprisonment can have profound consequences for children. The immediate effects include feelings of shame, poor school performance, increased delinquency, social stigma, and increased risk of abuse or neglect. Long-term effects can range from the questioning of parental authority, negative perceptions of police and the legal system, and an impaired ability to cope with stress and trauma, which then can result in criminal behavior. The children, along with Mathew's loyal and loving wife have been through so much during the course of the trial and the subsequent conviction. I respectfully ask that you keep his wife and children in mind and be merciful when imposing Mathew Martoma's sentence.

Mathew still has much to offer the public and telling his story to students, or others in the financial industry would be of great benefit. Please also take into consideration all of the good Mathew has accomplished in his life, as well as the fact Mathew can still give back to society if given the chance.

Respectfully submitted,

Jori J. Farrell

# EXHIBIT 25

United States District Court for the Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

May 2 2014,

Dear Judge Gardephe,

I am writing this letter on behalf of Mathew Martoma, who was recently convicted of insider trading and is scheduled to come before your court for sentencing. As a long-time friend of Mathew and his family, I would like to provide insight to my personal experiences with him and perspective on the impact I believe this trial and upcoming sentencing will have on his family. I hope this information can be taken into consideration during his sentencing process.

Mathew and I met in college and have been friends for almost 20 years. We made our acquaintance through mutual friends who were members of the public-service housing organization Mathew belonged to at Duke. We continued our friendship when we both lived in Boston after college, and have remained close since.

Our friendship was built around simple activities: Frisbee, watching Duke basketball games, trips to Costco, meals at each other's apartments, and exploring the greater Boston area. My wife and Rosemary were pediatrics residents at overlapping periods, which meant we also commiserated over their long hours and hectic schedules. Over time we have also celebrated many wonderful life milestones together – our weddings, births of our children, and christenings.

Throughout, Mathew has been an extremely kind and thoughtful individual whose actions were sincere and considerate. The person I see portrayed in media and reports of the proceedings is an inaccurate picture of the Mathew I have known closely so many years. While they have tried to depict him as greedy or calculating, I know him to be the person who rented a basement apartment, enjoyed pizza nights, traveled hours to encourage me in my first marathon, and consoled me during the untimely death of my brother. In the hardest period of my life Mathew was incredibly supportive. He regularly visited just to check in, brought meals, and was willing to listen when I needed to talk.

When Mathew introduced me to Rosemary it was obvious they felt an immediate bond with each other, and since then they have been virtually inseparable. Family has been a key element of this bond. First for their parents and siblings, and later when Rose became pregnant with their first child, █████, it was clearly evident how excited they were at starting their own family. I remember watching them beam as █████ took his first steps, and even now hear that same excitement as they tell me of his soccer and other sports activities.

As a father of three young children, and one who knows Mat and Rose closely, my heart breaks at the trauma and punishment their children have already faced and appear destined to endure:  witnessing their home invaded by armed agents, a tumultuous year of trial preparation, and the prospect of their father's absence without understanding where or why he has gone.  I can think only of the great suffering they will endure if separated from Mathew for their most formative years. The punishment may be targeted at Mathew, but the real bearers will be his children J▮▮▮▮, D▮▮▮, and A▮▮, and they will carry it for the rest of their lives.

I ask that you please include these considerations when determining Mathew's sentence.  He and Rosemary are two of the most loving individuals and parents I know.   Before he is even sentenced Mathew, at 39, has already suffered a level of public and professional punishment that is irrevocable and beyond what most will ever endure.  I beseech you to consider this appeal and show mercy in your deliberations.

Sincerely,


Marty Frenzel

# EXHIBIT 26

April 6, 2014

Beth Gerstein

San Francisco, CA 94115

Honorable Paul G. Gardephe
United States District Court for the Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Gardephe,

Please accept this letter in consideration of the sentencing of Mathew Martoma. I understand
that Mat was convicted of insider trading recently, and would like to provide additional
background to you about Mat.

I have known Mat for over 20 years - I had the pleasure of attending both undergraduate school
at Duke University and graduate school at Stanford Graduate School of Business with Mat.  He
is a thoughtful and compassionate individual, who truly cares about his community, his
classmates, and his family.

When Mat and I first ran into each other at orientation at Stanford (over 10 years ago now), I
remember that we were excited to reconnect. I had met several other Duke undergraduates that
same weekend, but I felt a special kinship with Mat given our similar values and beliefs about
the importance of community service. I knew Mat from when we both tutored chemistry to other
undergraduates while we were at Duke. I also spent time with Mat at a dormitory focused on
community service, called Round Table, where many of my close friends lived, and where he
actively participated as president his sophomore year. I would also sometimes run into Mat at
the Duke Medical Center where I had a work study job, and he volunteered a few hours per
week in the Alzheimer's patient wing. I was always impressed by Mat's commitment to service
at Duke, from the Cub Scout troops he organized for underprivileged children to his dedication
to fighting Alzheimer's.

At the Stanford GSB, Mat and I would often socialize, debating topics ranging from finance to
entrepreneurship. When he told me he was going into finance, I remember thinking that he
didn't fit the mold for the hedge fund industry, which tended to be represented by the individuals
in our class that were more financially driven, and more aggressive and cut-throat by nature.
Mat was much more thoughtful and analytical, and was more attracted by the theoretical
aspects of financial research.

After business school, I started a social enterprise called Brilliant Earth, which offers ethical and
eco-friendly fine jewelry while also giving back 5% of profits to communities in Africa harmed by
the jewelry trade. I am currently CEO of Brilliant Earth, and live in San Francisco with my
husband and children.

My professional path diverged from Mat's after business school, though I have continued to admire his charitable giving from efforts ranging from Hurricane Sandy Relief to supporting efforts for disadvantaged children - certainly not many of my classmates have donated 10% of their savings to charitable causes like Mat have.

I know Mat also cares deeply for his family, and is especially saddened at the thought of not being there for his children while they are growing up. As a mother of 2 small children (4 and 3), I can only imagine how this must feel.

I ask that you consider Mat's compassion for others and his dedication to community service when determining what you consider the appropriate sentence for Mat. Thank you very much for your time and consideration.

Best Regards,

Beth Gerstein

# EXHIBIT 27



**Dartmouth College** HANOVER · NEW HAMPSHIRE · 03755-3592

*Department of Religion · 6036 Thornton Hall ·* TELELPHONE: (603) 646-3738 · FAX: (603) 646-1699

*Ronald M. Green,*
 *Professor for the Study of Ethics*
 *and Human Values*

March 16, 2014

Honorable Paul G. Gardephe
United States District Court for the
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Gardephe:

I understand that you are responsible for sentencing Mathew Martoma. I am
writing on Mathew's behalf to provide some information that I hope you will
consider in imposing a sentence upon him.

I came to know Mathew when I agreed in late 1995 to serve as a consultant to the
National Genome Center of the National Institutes of Health (the Center
subsequently became a full institute of the NIH). I was asked to establish an
"Office of Genome Ethics" at the Center, and it was understood that, as a
Dartmouth professor, I would perform this service on a part time basis: one week
on and one week off, commuting from Dartmouth to Bethesda. This meant that I
would need an assistant, a deputy, on the ground at the Center at all times to
provide continuity for the work of the office. Mathew's name had previously
appeared on a short list of candidates for a bioethics position, and others at the
Center recommended him to me. Reviewing his credentials as a recent honors
graduate of Duke with a specialization in bioethics, I met with Mathew and then
enthusiastically invited him to serve in this position. I believed that Mathew was
not only well equipped for this position, helping with administrative tasks while
understanding the substance of bioethics, but I also thought it a wonderful
opportunity for a young person between college and graduate school.

Hiring Mathew (at that time his name was A. Mathew Thomas) was one of the
best decisions I made. A very personable individual, he was able to serve as
liaison with the many different people with whom we had to work at the NIH,
ranging from clinical physicians and genetic counselors to leading genetic
researchers. Mathew kept me abreast of their interests and concerns and helped
shape the agenda for the office's work. For example, it soon became clear that
there was a need for a basic course or introduction to research ethics for many of
the Genome Center researchers. I had experience in offering such a course at
Dartmouth, but Mathew did yeoman's work in arranging the course sessions,
identifying and scheduling participants, and, eventually, teaching several
modules of the course himself. Mathew also helped greatly with persistent

personnel problems, interviewing and helping hire secretaries and administrative assistants during a period of flux in our office funding and staffing. I could always count on Mathew to deal well with people and earn their respect.

I could itemize the many other contributions Mathew made to our work during this period, but I want to emphasize one. In the course of our work, it soon became clear that our program at the NIH could not flourish in isolation from the other programs in bioethics in the greater Washington, D.C., area. Thus Mathew and I conceived the idea of the "Genethics Consortium." This was a kind of floating seminar, focusing on discussion of challenging new cases in genetic ethics. The Consortium initially met at the NIH and George Washington University, but because some urgent issues in genetic ethics have to do with the genetics of race, Mathew urged me to consider extending our collaboration to Howard, from which his own father had graduated years before following his immigration to this country. Since I did not have any close relationships with people at Howard, I left it up to Mathew to make the contacts and set up the events. He did so brilliantly, and our relationship with Howard became one of the high points of the Consortium's experience. Cases discussed at a Howard session and other institutions later became the basis of collaborative publications in *The Journal of Genetic Counseling* and *The Cambridge Quarterly of Healthcare Ethics*. Long after I left the Office of Genome Ethics, I continued my relationship with Howard faculty. The memory of Mathew's involvement and leadership remains a source of pride for all of us.

From all these experiences, I learned to greatly value Mathew for his respect for others and his sensitivity to them regardless of their background. In my eighteen months at the NIH I always counted on Mathew's honesty and reliability. I was never disappointed.

Like many people, I am shocked by the allegations of Mathew's involvement in wrongful and criminal acts since the days that I worked with him. This is not the Mathew that I knew. That Mathew was passionately committed to the ethical conduct of biomedical research and clinical care, and he was a morally sensitive, honest, and compassionate individual. If events in his life led Mathew to deviate from the lofty character ideals to which he aspired, I sincerely hope that he will be given the opportunity to redeem himself and return to the dreams and the

promise of his youth. I understand that Mathew must accept punishment if his conviction is upheld, but I sincerely hope that whatever punishment Mathew receives will allow him to continue to serve his family and his community, as I believe he has always deeply wanted to do.

Sincerely,

Ronald M. Green, Ph.D.
Eunice and Julian Cohen
 Professor for the Study of Ethics
 and Human Values

# EXHIBIT 28

Honorable Paul G. Gardephe
United States District Court for the
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007


Dear Judge Gardephe,

       I am writing to you with regards to your upcoming sentencing decision
involving Mathew Martoma, whom I am aware was convicted of insider trading in
February of this year. I daresay that as Mathew's best friend throughout his adult
life since we first met 22 years ago in college, few people in this world have a more
intricate knowledge of Mathew's character, values, motivations, and passions than I
do. My hope and desire is that my intricate and very detailed understanding of
Mathew's character, humanity, and his lifelong desire to help others will provide
you with a deeper understanding of Mathew that I hope will be helpful to you as you
consider the most appropriate sentence for him.

       By way of introduction, my name is Dr. Tariq M. Haddad. I am a Clinical
Assistant Professor of Medicine at the Virginia Commonwealth University School of
Medicine and a practicing cardiologist at Virginia Heart, the largest cardiology
practice in northern Virginia consisting of 37 cardiologists. I also serve as Director
of Clinical Research for Virginia Heart, and as a result have been a principal
investigator in over 10 international multicenter clinical trials of various cardiac
medications.

       Mathew and I first met in August of 1992 when we were in adjacent
dormitory rooms our freshman year at Duke University. We rapidly became best
friends, always seemingly linked by our desire to help others and make a difference.
From that first day we met, I always marveled at how he naturally derives his
identity in life and his happiness not through his personal wants and desires but by
how he helps others achieve theirs. At the time, I was two continents away from my
family with no extended family at all in the United States. Knowing that well, he
took it upon himself to provide me what my family could not. When he knew I had
nowhere to go over the thanksgiving holidays but stay alone in the ghost town that
our college campus turns into over the holidays, he insisted on taking me with him
to spend thanksgiving with his family, despite the fact that it was purely a family
gathering. He would take me to visit cousins and uncles of his, knowing that it
would help me get through the isolation to make me feel a part of his extended
family. I am naturally drawn to selfless people with big hearts, and from that first
summer as a lonely college freshman in 1992 through today, I have never known
anyone with a bigger heart than Mathew Martoma.

       After our freshman year, we applied together, and were accepted to, a
selective community service living group at Duke called the Round Table dedicated
to providing meaningful community service to the underserved. Mathew loved the
idea of us living among colleagues who shared his passion for helping others

through community service. Mathew was then my roommate in this community service dormitory for the remaining two and a half years of his undergraduate time at Duke.

During that time as his roommate in college, while most students I knew simply focused on staying afloat through the rigorous academic load thrust at them at Duke, Mathew amazed me with his remarkable and unwavering commitment to help others at a time when he had very little time or resources to give. Despite his rigorous academic load, he used his past high school experience attaining the equivalent of an Eagle Scout to start and organize both a Cub Scout troop and a Girl Scout troop for underprivileged children in Durham, North Carolina.   Through our community service dormitory, we worked together to set up a tutoring and mentorship program for an impoverished and woefully underfunded school called the Agape House.  Partly because of the admiration all his fellow classmates in our community service living group had for his unwavering commitment to help others, he was elected as president of the living group, and subsequently guided the dormitory through even more service opportunities during his tenure.  As if this dizzying array of service projects during his time at Duke wasn't enough, Mathew also became a member of Alpha Phi Omega for his last 2-3 years in college, a national community service fraternity dedicated to providing community service to the underserved.  Through Alpha Phi Omega and on his own afterwards, Mathew worked with Habitat for Humanity to build and repair homes for the underserved.

In college, he also became academically interested in the incredibly complex mystery of Alzheimer's Disease.  Unlike most people though, Mathew's interest in Alzheimer's from the beginning stemmed not just from a scientific interest but from his desire to help others through a disease that ravages the lives of millions.  For example, he didn't stop at just studying the disease through science classes at Duke. As is a theme throughout his life, he found ways to give back to those less fortunate than him living with the disease, volunteering in the Alzheimer's patient wing at Duke Medical Center for 1-2 hours a week for most of his 3.5 years at Duke as well as participating in several 5 kilometer runs to raise money for the local chapter of the Alzheimer's Association.  As a physician, I believe there are few diseases in this world that require more care and assistance than Alzheimer's Disease.  Some diseases are treatable with medications, while others debilitate patients physically. Alzheimer's tragically not only makes patients lose their mental and eventually their physical capacities, but it also leads to suffering among family and friends who love those afflicted by the disease.  Some diseases can be treated simply with a medication or surgery.  Alzheimer's, however, is an entirely different beast, treated by massive resources of social support, physical therapy, mental therapies, physician follow-up, and social interventions.  Mathew recognized from an early age that few diseases could benefit from his passion to help others more than Alzheimer's.  Given all I know about his life-long passion to find the most effective ways to help others, it is quite symbolic and appropriate that he has spent his whole life finding ways to help people through a disease that arguably requires more help than any other in existence.

What is most remarkable to me about Mathew's incredible commitment to providing service to others during our time at Duke is the timing.  This was long

before Mathew ever made any money and long before he discovered success in the workplace. In my humble opinion, it can be quite easy for people to be generous when they are comfortable financially, but to show this kind of unwavering commitment to help the less fortunate when one is a poor college student at a time when most students focus on themselves truly speaks to Mathew's character and lifelong desire to help others.

While Mathew and I took different academic directions after our graduation from Duke, we have remained the best of friends since that time, something that allows me to speak very confidently and accurately about who he has been as a person from 1996 until today. We spent hours every day discussing the philosophy of life on a five week cross country road trip we took in 1997, during which we hiked in over 20 national parks across the country. Rather than making it an extravagant trip beyond the means of many less fortunate than us that he saw every day in his volunteer work, it was Mathew's idea that we camp for free in national forests nearly every night of those five weeks, which we did. When Mathew had a summer internship in New York in 1998 during the time I was in medical school in New York, he spent the whole summer living with me. He was the best man in my first wedding in 2000 and I was his best man in his 2003 wedding. When my first marriage unfortunately failed, as is typical for this man whose whole life has been spent helping others, he spent hours every day helping me through the grief of a failed marriage and helped get me back on my feet emotionally in a way no one else could. When I got remarried in 2007, Mathew was predictably again my best man. In short, very few people are more qualified to attest to Mathew's character than me even since our time as roommates in college.

His lifelong dedication to community service has continued to speak for itself since our days together in college. I recall that when he moved back to Florida in 1999, he worked as an unpaid volunteer in 1999-2000 at the Brevard County Legal Aid Society helping low-income clients in landlord-tenant disputes and child advocacy issues. He also worked as an unpaid volunteer at the Jacksonville Legal Aid Society in 1999-2000 on toxic tort cases involving corporations who dumped toxic pollutants in local communities unaware of the associated environmental risks. After moving to Palo Alto, California in 2001 to attend business school, he volunteered at the Stevenson House from 2001-2003, an organization working to provide affordable housing to independent low-income seniors in a region with otherwise incredibly expensive housing prices. At the Stevenson House, he worked on projects such as grounds cleanup, landscaping, and gardening.

After completing business school and years later moving to Florida in 2008, he subsequently established the Mathew and Rosemary Martoma Foundation dedicated to donating money to worthy charitable causes. Overall, mainly through this foundation, Mathew has donated an incredible 10% of his life savings to charitable causes, nearly a million dollars. His foundation has donated to over 25 different worthy causes. While his specific donations are too many to list, it bares mention that as is a trend in his life, Mathew yet again found ways to always think of those less fortunate than he and never forgot the people and places about which he was passionate. Knowing Mathew's passion for helping those with Alzheimer's Disease that dates all the way back to college, it is no surprise to me that he donated

to the Southeast Florida Chapter of the Alzheimer's Association as well as to neuroscience research at Boca Raton Regional Hospital, to help find treatment and support for those afflicted by this terrible disease.

Mathew has always been humble and believed that he only accomplished what he did through the help of great teachers and mentors, so it comes as no surprise that he also donated to the Brevard County Schools where he grew up, to help other gifted students achieve their dreams in the same classrooms in which he grew up. I recall Mathew telling me throughout college how much it helped his growth to participate in Junior Achievement in high school, a program through which high school students learn to run real businesses. So it comes as no surprise as well that he has donated to Junior Achievement to help other young high schoolers grow intellectually in the same way he recalls benefiting from the experience. I recall how Mathew shadowed officers in the United States Military's Reserve Officers' Training Corps (ROTC) in 1995-1996 while at Duke. While many students volunteered for ROTC in part to attain financial assistance with college expenses, it is a testament to how pure Mathew's intentions to help others is that Mathew already had a scholarship for college and therefore shadowed officers in ROTC mostly as a way to serve his country in the military without the need for many of the financial incentives. Knowing his patriotism and desire to help his country as well, he found yet another way to give back, donating to a non-profit organization named the Mission Continues that helps military veterans adjusting to life at home. I have always known Mathew to be a very spiritual man who relies heavily on his faith in God, so it again comes as no surprise that he found a way to support those less fortunate than him who require that spiritual guidance, by donating to the Our Lady of Health Catholic Church and the St. Paul's Orthodox Church.

These examples of charitable giving to me say so much about who this man is, a man who despite his success has always remained humble and always acted upon his belief that no human being can achieve anything without guidance and support from others. He received much of that support growing up, and unlike many who forget this, he never does, and gives back so others can have the same opportunities he had.

While these dozens of acts of selflessness over the past 22 years are more than many accomplish in a lifetime, they don't even skim the surface of how much Mathew has bettered the lives of those closest to him, his direct family. As I mentioned above, I had the honor of being Mathew's best man in his 2003 wedding to his wife Rosemary. From his wedding day on, I have always been amazed by how Mathew commits himself tirelessly to his wife and the unique unshakable bond the two of them have as a result. I recall, for example, how Rosemary developed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ while they lived in Connecticut and New York that dramatically affected Rosemary's health. Despite the fact that Mathew's career in finance was rooted in the financial hub of New York, he made a decision to move his whole family to Florida in 2008-2009 to get her to an environment that was easier ▮▮▮▮▮▮▮▮▮▮▮▮▮ I remember marveling at the selflessness of that decision when he told me at the time, leaving an area that provided unlimited career opportunities in his field for the state of Florida for which there were nearly no

viable opportunities in his chosen field, simply for the betterment of his wife's
health.

      Mathew and Rosemary also have three wonderful young children J█████
A██, and D██ to whom I consider myself a second uncle. I have visited Mathew
and his family numerous times over the past 10 years both in New York and Florida,
and have always been struck as well by his incredible dedication to his children.
Mathew is the ultimate family man, putting aside everything in his own life for his
children and wife. I recall on two recent trips to visit Mathew in February of 2013
and March of 2014, how I watched him literally spend hours each day tending to his
children's needs, driving them from activity to activity, guiding them patiently and
lovingly anytime one of them would make a mistake or misbehave, and teaching
them important values of honesty, respect, and selflessness that epitomize his own
character. Through that daily attentive selfless guidance he shows every day to
their development, his children are a spitting image of Mathew's character. At an
age when we as physicians are taught that children cannot psychologically think
beyond themselves, it is a testament to Mathew's constant guidance that these
children are giving, loving, thoughtful, honest, kind, and empathetic in ways I rarely
see in children their age. Not surprisingly, given his incredible dedication as a
father, these children love Mathew and depend on his emotional guidance so much
that I truly fear what will happen to them should he be away from them for too long
when he is incarcerated.

      In addition to the children, and partly because of Mathew's unwavering
commitment to Rosemary and the countless ways he puts aside his own needs for
those of his family, I also worry tremendously █████████████████████████
█████████████████████████████████████████████████████████████████. I
recall back in 2004 when Mathew's work took him to Boston while Rosemary was
completing her pediatrics training in Chicago ███████████████████████████
████████████████████████████████████████████████████████████████
██████████ leading her to transfer her training to a Boston area hospital that was
closer to him. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████. He has
been such an indispensable and irreplaceable part of her life and that of her children
that this comes as no surprise to anyone who knows them well.

      Finally, Judge Gardephe, I would like to humbly add one final but crucial
personal observation from my last few years of friendship with Mathew that I
believe may help you gain a better insight into the kind of person Mathew is. As I

mentioned earlier in my letter, in my position as Director of Research for my practice, I am involved as a principal investigator in numerous clinical trials involving cardiac drugs of crucial importance. My friendship with Mathew goes back over 20 years and he could have at any point tried to obtain confidential clinical information I was involved with that could have been tremendously useful to him in his role in finance. It is a testament to his character that despite that fact, not once in all my years of doing clinical research has Mathew ever asked me a single question about my work that would compromise my ethical responsibility to the studies I am involved in or compromise his own ethical responsibilities.

Judge Gardephe, I hope that my personal observations from my 22 years of friendship with Mathew help give you a better sense of the kind of person Mathew is and how his commitment to help others has influenced the lives of hundreds if not thousands of people. I pray that you get a sense from my observations that his commitment to helping others is not a fleeting phase or a behavior with secondary gain but has literally spanned a lifetime and is ingrained in every fiber of his being. Your Honor, I hope I have demonstrated to you that the ultimate tragedy in Mathew having to put his life on hold while incarcerated is not the effect on his own life, but that it deprives so many people of all the good that he dedicates every minute of his life trying to do to help others. The longer Mathew is incarcerated, the less time he has to use his foundation to continue to help the numerous causes and social issues he holds dear, and the less time this incredible man has to continue to fulfill his destiny of helping others. Furthermore, I pray you understand from my observations the dramatic effect a prolonged incarceration may have on his wife and children.

, and I shudder to see what will happen to his precious children without the single most important influence in their life, their father. Your Honor, my humble belief is that incarceration for a committed crime is ultimately for the purposes of rehabilitation to help improve the lives of everyone around the person involved. My hope is that by taking into account the incredible good that Mathew has brought to countless people, that you are able to recognize that leniency in Mathew's sentence could provide Mathew even more opportunities to not just rehabilitate but make a difference in the lives of those around him for decades to come.

I thank you sincerely for taking the time to read my thoughts. Please do not hesitate to contact me by email at                              or phone at           or by mail at my address below if I can be of any further assistance.

Humbly and sincerely yours,

Tariq M. Haddad, MD

Oakton, Virginia 22124

# EXHIBIT 29

March 13, 2014

Honorable Paul G. Gardephe
United States District Court for the
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Gardephe,

I am writing you on behalf of my friend Mathew Martoma, who was convicted of insider trading
last month. Mathew and I have known each other for more than 20 years. We attended Duke
together, and lived in the same dorm for most of that time. Our home was a place called
Roundtable, a living community dedicated to serving others. Mathew was one of Roundtable's
leaders, and was widely admired by peers and professors alike.

In the years since leaving Duke, I have seen Mathew embrace that spirit of service. He is a devoted
father and husband, and gives of himself unconditionally to his family. When our children have
played together, Mathew joins right in. His three kids could not ask for a better dad, and his wife
Rose could not ask for a more committed husband. I was always struck by the great effort Mathew
made to bring his family along with him, whenever possible, when he travelled for work.

Mathew has also given of himself to causes beyond his family. In 2007 I co-founded a non-profit
called The Mission Continues, which empowers military veterans to continue serving in their
communities once they return to civilian life (I left the military in 2005 after nine years as a Navy
pilot). Mathew provided some of the seed funding for this organization. Today, The Mission
Continues is one of the leading veteran service organizations in the country.

In the years since Mathew's initial investment, The Mission Continues has awarded fellowships to
almost one thousand US military veterans in 49 States. These Mission Continues Fellows have
been placed with 608 nonprofits and committed over 400,000 hours of community service. They
have led more than 800 service projects, engaging over 35,000 volunteers in shared service to their
communities. It is quite possible that none of this would have happened without Mathew's early
support.

Mathew believes in service to others. I am heartbroken over having to write this letter, but will
always consider myself lucky to have him as a friend.

Sincerely,

Kenneth E. Harbaugh
Chief Operations Officer
Team Rubicon

# EXHIBIT 30

Rena Abraham Harrington, MD

Gainesville, FL 32605

March 27, 2014

Honorable Paul G. Gardephe
United States District Court for the
Southern District of New York
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Gardephe,

I am writing to you as a friend of Mathew Martoma and his family. I understand he has been convicted of insider trading, and that you will be determining his sentence. Through this letter, I respectfully ask that you grant him leniency.

I appreciate the difficulty and complexity of the task set before you, as seeking justice for all involved is not a straightforward matter. The concept of justice has been very important to me in my role as a young pediatrician and I have sought to serve all children in a fair manner. However, through my experiences I have found that justice is not synonymous with treating all patients the same. While it may be appropriate to ask a patient arriving an hour late for a routine physical to reschedule, it may be better to "squeeze in" the late child with an illness or the one whose family took two buses to reach me. My reason-- identical response to different situations does not result in equal outcomes. I have sometimes found that I can only be comfortable that I am acting justly when I show mercy to those in need.

Similarly, I feel merciful consideration of Mathew's situation is warranted to ensure that justice is achieved. I have known Mathew's family for over 20 years. Both his parents and my parents were immigrants from the same state in India. I have watched his parents grow into pillars of the community through humility, hard work, and faith. I have known Matthew to show those same qualities in his life endeavors, whether it was working with the Florida Children's Campaign in the 1990's to promote child welfare issues, volunteering with the Florida Legal Aid Society in the early 2000's, or to help children be placed in foster care.

If shown leniency, I am confident that Mathew will use his additional years of freedom to rebuild his life, care for his family, and be a positive addition to society. As a family man and father of three children, motivation is not a question. Also, I know he has the strength to do this, because I know his roots and the strength and spirit with which he was raised.

Thank you for your time. I will continue to pray for the best outcome for the Martoma family as we wait for your decision.

Sincerely,

Rena Abraham Harrington, MD