# EXHIBIT 166

AO 245B   (Rev. 06/05) Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

**SOUTHERN**      District of      **NEW YORK**

| UNITED STATES OF AMERICA | JUDGMENT IN A CRIMINAL CASE |
|---|---|
| V. | |
| **WINIFRED JIAU** | |

| | |
|---|---|
| Case Number: | 1:11CR161-01 (JSR) |
| USM Number: | 15221-111 |
| Joanna C. Hendon, Esq. | |
| Defendant's Attorney | |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

X was found guilty on count(s)    S1 and S2 _____
after a plea of not guilty.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. 371 | Conspiracy to Commit Securities Fraud and Wire Fraud | 2008 | 1 |
| 15 U.S.C. 78j(b) and 78ff; 17 CFR 240.10b-5; 18 U.S.C. 2 | Securities Fraud | 2008 | 2 |

    The defendant is sentenced as provided in pages 2 through  6  of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

| X Count(s) | SS1 , SS2, S3 & SS3, S4 & SS4, S5 & SS5 | ☐ is | X are dismissed on the motion of the United States. |
|---|---|---|---|
| X Underlying | indictment | X is | ☐ are dismissed on the motion of the United States. |
| X Motion(s) | to Remand, Doc. 6 | X is | ☐ are denied as moot. |

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

September 21, 2011
Date of Imposition of Judgment

Signature of Judge

Jed S. Rakoff, United States District Judge
Name and Title of Judge

10/3/11
Date

AO 245B    (Rev. 06/05) Judgment in Criminal Case
Sheet 2 — Imprisonment

**DEFENDANT:**        **WINIFRED JIAU**
**CASE NUMBER:**    **1:11CR161-01 (JSR)**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:      **On Counts S1 and S2: FORTY EIGHT MONTHS, CONCURRENT ON BOTH COUNTS**

X    The court makes the following recommendations to the Bureau of Prisons:
     **The Court recommends the defendant be incarcerated in either Coleman or Mariano Camps in Florida if defendant qualifies.**

X    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

    ☐    at    _____    ☐ a.m.    ☐ p.m.    on    _____ .

    ☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐    before 2 p.m. on    _____ .

    ☐    as notified by the United States Marshal.

    ☐    as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on    _____    to    _____

a _____ , with a certified copy of this judgment.

_____
**UNITED STATES MARSHAL**

By    _____
**DEPUTY UNITED STATES MARSHAL**

AO 245B    (Rev. 06/05) Judgment in a Criminal Case
Sheet 3 — Supervised Release

| | | Judgment—Page | 3 | of | 6 |

**DEFENDANT:**    **WINIFRED JIAU**
**CASE NUMBER:**    **1:11CR161-01 (JSR)**

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

     **On Counts S1 & S2: TWO (2) YEARS , TO RUN CONCURRENT.**

     The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

X    **The above drug testing condition is suspended and instead replaced by special condition number one on page four.**

X    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if

X    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

     If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

     The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)    the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)    the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)    the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)    as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT:        **WINIFRED JIAU**
CASE NUMBER:   **1:11CR161-01 (JSR)**

## SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall participate in a program approved by the untied States probation Office for substance abuse, which program may include testing to determine whether the defendant has reverted to the use of drugs or alcohol. The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer.   The defendant will be required to contribute to the costs of services rendered (copayment) in an amount to be determined by the Probation Officer, based on ability to pay or availability or third party payment.

2. The defendant shall participate in a mental health program approved by the U.S. Probation Office.  The defendant shall continue to take any prescribed medications unless otherwise instructed by the health care provider.  The defendant shall contribute to the costs of services rendered not covered by third-party payment, if the defendant has the ability to pay.  The Court authorizes the release of available psychological and psychiatric evaluations and reports to the health care provider.

3. The defendant shall provide access to any requested financial information.

4. The defendant shall participate in an alcohol aftercare treatment program under co-payment plan, which may include testing to via breathalyzer at the direction and discretion of the Probation Officer.

5. The defendant shall be supervised in her district of residence.

Judgment — Page __5__ of __6__

**DEFENDANT:**      **WINIFRED JIAU**
**CASE NUMBER:**    **1:11CR161-01 (JSR)**

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| TOTALS | $ 200 | $ | $ |

☐ The determination of restitution is deferred _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
|  |  |  |  |

| TOTALS | $ _____ $0.00 | $ _____ $0.00 |
|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for  ☐ fine  ☐ restitution.

☐ the interest requirement for  ☐ fine  ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT:       **WINIFRED JIAU**
CASE NUMBER:     **1:11CR161-01 (JSR)**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A   **X**   Lump sum payment of $ __200_____   due immediately, balance due

    ☐   not later than_____ , or
    ☐   in accordance    ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B   ☐   Payment to begin immediately (may be combined    ☐ C,    ☐ D, or    ☐ F below); or

C   ☐   Payment in equal_____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to _____ (e.g., 30 or 60 days) after the date of this judgment; or

D   ☐   Payment in equal_____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E   ☐   Payment during the term of supervised release will commence _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time;

F   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several and corresponding payee, if appropriate.

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

X   **The defendant shall forfeit the defendant's interest in the following property to the United States:**

**$3,118,158.24 in U.S. currency.**

# EXHIBIT 167

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - -x
                                  :

UNITED STATES OF AMERICA          :

        -v.-                       :

RAJ RAJARATNAM,                    :         S2 09 Cr. 1184 (RJH)

            Defendant.            :

- - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: _____

INDICTMENT

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Entities and Individuals

        1.    At certain times relevant to this Indictment, the
Galleon Group ("Galleon") operated a family of hedge funds based
in New York, New York.  During certain times relevant to this
Indictment, Galleon had as much as $7 billion in assets under
management.  Galleon Management, L.P. ("Galleon Management")
managed a number of Galleon's hedge funds including, but not
limited to, Galleon Technology Offshore, Ltd. and Galleon
Diversified Fund, Ltd.  At all times relevant to this Indictment,
RAJ RAJARATNAM, the defendant, served as the Managing Member of
Galleon Management LLC, the general partner of Galleon Management.

        2.    At all times relevant to this Indictment, RAJ
RAJARATNAM, the defendant, served as the portfolio manager for
Galleon Technology Offshore, Ltd. (referred to herein, along with
any of its successors and predecessors, as "Galleon Tech"), as

well as certain accounts of Galleon Diversified Fund, Ltd.
(referred to herein, along with any of its successors and
predecessors, as "Diversified").

### The Rajaratnam-Galleon Insider Trading Scheme

3.     From in or about 2003 through in or about March
2009, RAJ RAJARATNAM, the defendant, certain then-current Galleon
employees, certain former Galleon employees, and others known and
unknown, participated in a scheme to defraud by obtaining, sharing
and disclosing material, nonpublic information ("Inside
Information") and/or executing securities transactions based on
Inside Information pertaining to various companies.  The Inside
Information related to merger and acquisition activity, quarterly
earnings announcements, business updates, and other corporate
events.  RAJARATNAM and his co-conspirators engaged in this
conduct for the purpose of executing profitable securities
transactions in accounts affiliated with Galleon, and with
knowledge that the Inside Information had been disclosed in
violation of duties of trust and confidence.

### The Conspiracy

4.     From at least in or about 2003 up to and including
in or about March 2009, in the Southern District of New York and
elsewhere, RAJ RAJARATNAM, the defendant, certain then-current
Galleon employees, certain former Galleon employees, and others
known and unknown, unlawfully, willfully, and knowingly did

2

combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

5.   It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, certain then-current Galleon employees, certain former Galleon employees, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-

3

5 and 240.10b5-2.

## Means and Methods of the Conspiracy

6.     Among the means and methods by which RAJ
RAJARATNAM, the defendant, certain then-current Galleon employees,
certain former Galleon employees, and others known and unknown,
would and did carry out the conspiracy were the following:

a.     Certain individuals with access to Inside
Information misappropriated that Inside Information in violation
of: (a) the fiduciary and other duties of trust and confidence
that these individuals owed to their respective employers and/or
their shareholders; (b) the expectations of confidentiality of
their respective employers; and (c) their respective employers'
written policies regarding the use and safekeeping of confidential
and material, nonpublic information.

b.     These individuals disclosed Inside Information
to RAJARATNAM, his co-conspirators or others in violation of
duties of trust and confidence, with the understanding that the
Inside Information would be used for the purpose of purchasing or
selling securities.

c.     RAJARATNAM and his co-conspirators shared
certain of this Inside Information with one another, all for the
purpose of engaging in profitable securities transactions in
accounts affiliated with Galleon, and with knowledge that the
Inside Information had been disclosed in violation of duties of

4

trust and confidence.

d.   RAJARATNAM and his co-conspirators, while in possession of the Inside Information that had been disclosed in violation of duties trust and confidence, purchased and sold securities based on Inside Information and thereby received substantial illegal profits.

## Overt Acts

7.   In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about 2005, a co-conspirator provided RAJARATNAM with Inside Information relating to Integrated Circuit Systems, Inc.

b.   In or about 2006, RAJARATNAM obtained Inside Information relating to Xilinx, Inc.

c.   In or about March 2008, RAJARATNAM provided a co-conspirator with Inside Information relating to Clearwire Corporation.

d.   In or about May 2008, in New York, New York, a co-conspirator provided RAJARATNAM with Inside Information relating to Vishay Intertechnology, Inc.

e.   In or about May 2008, RAJARATNAM provided one or more co-conspirators with Inside Information relating to

Spansion Inc.

      f.  In or about August 2008, RAJARATNAM provided a co-conspirator with Inside Information relating to Advanced Micro Devices Inc. ("AMD").

      g.  In or about October 2008, RAJARATNAM provided a co-conspirator with Inside Information relating to Goldman Sachs Group, Inc.

      h.  In or about January 2009, a co-conspirator called RAJARATNAM in New York, New York, and provided him with Inside Information relating to Atheros Communications, Inc.

      i.  In or about January 2009, a co-conspirator called RAJARATNAM in New York, New York, and provided him with Inside Information relating to Marvell Technology Group, Ltd.

      (Title 18, United States Code, Section 371.)

### COUNT TWO

      (Conspiracy to Commit Securities Fraud)

      The Grand Jury further charges:

### Relevant Entities and Individuals

      8.  The allegations contained in paragraphs 1 and 2 of this Indictment are repeated and realleged as though fully set forth herein.

      9.  At all times relevant to this Indictment, Roomy Khan, a co-conspirator not named as a defendant herein, traded securities on her own behalf and, at certain times relevant to

this Indictment, exchanged Inside Information about certain companies with RAJ RAJARATNAM, the defendant.

## The Rajaratnam-Khan Insider Trading Scheme

10.  From in or about January 2006 through in or about July 2007, RAJ RAJARATNAM, Roomy Khan, and others known and unknown, participated in a scheme to defraud by disclosing Inside Information and/or executing securities transactions based on Inside Information pertaining to at least the following publicly traded companies: Polycom, Inc. ("Polycom"), Hilton Hotels Corp. ("Hilton"), and Google Inc. ("Google"). The means by which RAJARATNAM and Roomy Khan effectuated the scheme were as follows: Khan obtained Inside Information regarding Polycom, Hilton and Google from various sources (the "Khan Inside Sources"), who disclosed the Inside Information in violation of duties of trust and confidence that the Khan Inside Sources owed to their respective employers, their employers' shareholders, and/or their employers' clients. Khan communicated this Inside Information to RAJARATNAM, who, knowing that the Inside Information had been disclosed in violation of duties of trust and confidence, caused Galleon Tech and Diversified to execute securities transactions on the basis of this Inside Information, earning a total profit of approximately $14 million from the scheme. In exchange, RAJARATNAM provided Khan with information regarding Intel and other technology companies.

## The Conspiracy

11.  From at least in or about January 2006 up to and including in or about July 2007, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, Roomy Khan, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

12.  It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, Roomy Khan, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

8

(c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Means and Methods of the Conspiracy

13.  Among the means and methods by which RAJ RAJARATNAM, the defendant, Roomy Khan, and others known and unknown, would and did carry out the conspiracy were the following:

a.   The Khan Inside Sources misappropriated Inside Information in violation of: (a) the fiduciary and other duties of trust and confidence that these sources owed to their respective employers, their shareholders, and/or their employers' clients; (b) the expectations of confidentiality of their respective employers; and (c) their respective employers' written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b.   The Khan Inside Sources disclosed the Inside Information to Roomy Khan in breach of their duty of confidentiality to their respective employers, their shareholders, and/or their employers' clients, with the understanding that Khan and others would use the Inside Information to purchase and sell securities, and thereby receive substantial illegal profits.

9

c.   Khan disclosed the Inside Information to RAJARATNAM, knowing that the Khan Inside Sources had disclosed the Inside Information to her in breach of their duty of confidentiality to their respective employers, their shareholders, and/or their employers' clients.

d.   RAJARATNAM, while in possession of the Inside Information that he knew had been misappropriated by the Khan Inside Sources in breach of their duty of confidentiality to their respective employers, their shareholders, and/or their employers' clients, purchased and sold securities based on such information and thereby received substantial illegal profits.

## Overt Acts

14.   In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, and Roomy Khan and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about January 9, 2006, Khan sent the following instant message to RAJARATNAM, in New York, New York: "donot [sic] buy plcm till i het [sic] guidance; want to make sure guidance OK."

b.   In or about January 2006, in New York, New York, RAJARATNAM caused Galleon Tech to purchase shares of Polycom common stock, which traded under the symbol "PLCM."

c.   On or about July 3, 2007, in New York, New

York, RAJARATNAM caused Galleon Tech to purchase approximately 400,000 shares of Hilton common stock, which traded under the symbol "HLT."

        d.  In or about July 2007, in New York, New York, RAJARATNAM caused Galleon Tech and Diversified to execute transactions in the securities of Google.

        (Title 18, United States Code, Section 371.)

## COUNT THREE

(Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

### Relevant Entities and Individuals

15.  The allegations contained in paragraphs 1 and 2 of this Indictment are repeated and realleged as though fully set forth herein.

16.  At all times relevant to this Indictment, Rajiv Goel, a co-conspirator not named as a defendant herein, worked at Intel.  Goel worked in Intel's Treasury Group and was responsible for assisting Intel Capital, the investment arm of Intel, with its strategic investment decisions.

### The Rajaratnam-Goel Insider Trading Scheme

17.  From at least in or about 2007 through in or about 2009, RAJ RAJARATNAM, the defendant, Rajiv Goel, and others known and unknown, participated in a scheme to defraud by disclosing Inside Information and/or executing securities transactions based

on Inside Information relating to Intel. The means by which
RAJARATNAM and Goel effectuated the fraudulent scheme were as
follows: Goel obtained Inside Information relating to Intel,
including (i) in or about April 2007, Inside Information relating
to Intel's earnings announcement for the quarter ending in March
2007, and (ii) in or about 2008, Inside Information relating to
Intel's plans to invest in a joint venture involving Clearwire
Corp. (collectively, the "Intel Inside Information"). Goel
disclosed the Intel Inside Information to RAJARATNAM in violation
of duties of trust and confidence that Goel owed to Intel.
RAJARATNAM, knowing that Goel had disclosed the Intel Inside
Information to him in violation of duties of trust and confidence,
then caused Galleon Tech and Diversified to execute securities
transactions on the basis of this Inside Information, earning a
total profit (or avoiding losses) of approximately $3 million from
the scheme. Goel provided the Intel Inside Information to
RAJARATNAM because of his friendship with RAJARATNAM. Goel
benefitted from his friendship with RAJARATNAM in various ways,
some of which were financial. For example, in or about 2005 and
2006, RAJARATNAM gave Goel money to help Goel with personal
financial matters, and, from in or about October 2005 to in or
about 2009, RAJARATNAM executed securities transactions on behalf
of Goel in Goel's personal brokerage account, earning Goel trading
profits. For example, in or about October 2008, RAJARATNAM

executed a profitable trade in PeopleSupport common stock in Goel's personal brokerage account based on Inside Information that RAJARATNAM obtained from his colleague at Galleon who served on PeopleSupport's Board of Directors.

## The Conspiracy

18. From at least in or about 2007 up to and including in or about 2009, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, Rajiv Goel, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

19. It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, Rajiv Goel, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing

13

devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Means and Methods of the Conspiracy

20.   Among the means and methods by which RAJ RAJARATNAM, the defendant, Rajiv Goel, and others known and unknown, would and did carry out the conspiracy were the following:

a.   Goel misappropriated the Intel Inside Information in violation of: (a) the fiduciary and other duties of trust and confidence that Goel owed Intel; (b) the expectations of confidentiality of Intel; and (c) Intel's written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b.   Goel disclosed the Intel Inside Information to RAJARATNAM in breach of Goel's duty of confidentiality to his employer, with the understanding that RAJARATNAM and others would use the Inside Information to purchase and sell securities, and

14

thereby receive substantial illegal profits.

        c.   RAJARATNAM, while in possession of the Intel Inside Information that he knew had been misappropriated by Goel in breach of Goel's duty of confidentiality to Goel's employer, purchased and sold securities based on such information and thereby received substantial illegal profits.

### Overt Acts

      21.  In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, Rajiv Goel, and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

        a.  In or about April 2007, Goel provided RAJARATNAM with Inside Information about Intel's quarterly earnings announcement for the quarter ending in March 2007.

        b.  On or about March 20, 2008, Goel made a call to a cellphone used by RAJARATNAM.

        c.  On or about March 24, 2008, in New York, New York, RAJARATNAM caused Galleon Tech to purchase approximately 125,800 shares of Clearwire common stock.

      (Title 18, United States Code, Section 371.)

15

## COUNT FOUR

(Conspiracy to Commit Securities Fraud)

The Grand Jury further charges:

### Relevant Entities and Individuals

22.   The allegations contained in paragraphs 1 and 2 of this Indictment are repeated and realleged as though fully set forth herein.

23.   At all times relevant to this Indictment, Anil Kumar, a co-conspirator not named as a defendant herein, worked at McKinsey & Company, Inc. ("McKinsey"), a global management consulting firm, as a senior partner and director.   In that capacity, Kumar advised various clients in the technology industry concerning their business strategies, including potential acquisitions and reorganizations.

### The Rajaratnam-Kumar Insider Trading Scheme

24.   From in or about 2003 through in or about October 2009, RAJ RAJARATNAM, the defendant, Anil Kumar, and others known and unknown, participated in a scheme to defraud by disclosing Inside Information and/or executing securities transactions based on Inside Information obtained from clients of McKinsey.   The means by which RAJARATNAM and Kumar effectuated the fraudulent scheme were as follows:   Kumar obtained Inside Information from certain of McKinsey's clients, including, for example, Inside Information relating to AMD, ATI Technologies Inc. ("ATI") and

16

eBay Inc. ("eBay"). Kumar communicated the Inside Information to RAJARATNAM in violation of duties of trust and confidence that Kumar owed to McKinsey and/or its clients. RAJARATNAM then caused Galleon Tech and Diversified to execute securities transactions based on the Inside Information, earning a total profit of at least approximately $24.5 million from the scheme. In exchange for this Inside Information, RAJARATNAM arranged for Galleon to wire money to an offshore account designated by Kumar. That money was subsequently reinvested in certain Galleon funds in the name of Kumar's domestic worker and then subsequently, in the name of an offshore entity designated by Kumar. In addition, in or about January 2007, RAJARATNAM wired approximately $1 million to an offshore account controlled by Kumar.

## The Conspiracy

25. From in or about 2003 through in or about October 2009, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, Anil Kumar, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

26. It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, Anil Kumar, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Means and Methods of the Conspiracy

27. Among the means and methods by which RAJ RAJARATNAM, the defendant, Anil Kumar, and others known and unknown, would and did carry out the conspiracy were the following:

18

a.    Kumar misappropriated the Inside Information in violation of: (a) the fiduciary and other duties of trust and confidence that Kumar owed to McKinsey and/or its clients; (b) the expectations of confidentiality of McKinsey and its clients; and (c) McKinsey's written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b.    Kumar disclosed the Inside Information to RAJARATNAM in breach of Kumar's duty of confidentiality to his employer and/or its clients, with the understanding that RAJARATNAM and others would use the Inside Information to purchase and sell securities, and thereby receive substantial illegal profits.

c.    RAJARATNAM, while in possession of the Inside Information that he knew had been misappropriated by Kumar in breach of Kumar's duty of confidentiality to Kumar's employer and/or its clients, purchased and sold securities based on such information and thereby received substantial illegal profits.

### Overt Acts

28.    In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, Anil Kumar and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    In or about 2006, Kumar spoke to RAJARATNAM by telephone about AMD's planned acquisition of ATI.

19

    b.  On or about August 15, 2008, Kumar spoke with RAJARATNAM on RAJARATNAM's cellphone.

    c.  On or about August 15, 2008, in New York, New York, RAJARATNAM caused Galleon Tech to purchase shares of AMD common stock.

    (Title 18, United States Code, Section 371.)

### COUNT FIVE

    (Conspiracy to Commit Securities Fraud)

    The Grand Jury further charges:

### Relevant Entities and Individuals

    29.  The allegations contained in paragraphs 1 and 2 of this Indictment are repeated and realleged as though fully set forth herein.

    30.  At certain times relevant to this Indictment, Danielle Chiesi, a co-conspirator not named as a defendant herein, worked for a hedge fund called New Castle Partners ("New Castle"), which, in early 2008, was the equity hedge fund group of Bear Stearns Asset Management Inc. ("BSAM"). Following the acquisition of BSAM's parent company by JPMorgan Chase & Co. ("JPMorgan"), New Castle operated as a hedge fund affiliated with JPMorgan. At certain times relevant to this Indictment, New Castle had assets under management of approximately $1 billion.

20

## The Rajaratnam-Chiesi Insider Trading Scheme

31.  From at least in or about July 2008 through in or about October 2008, RAJ RAJARATNAM, the defendant, Danielle Chiesi, and others known and unknown, participated in a scheme to defraud by disclosing Inside Information and/or executing securities transactions based on Inside Information pertaining to publicly traded companies, including, for example, Akamai Technologies, Inc. ("Akamai") and AMD.  The means by which RAJARATNAM and Chiesi effectuated the fraudulent scheme included, for example, the following: Chiesi obtained Inside Information regarding Akamai from an employee of Akamai (the "Akamai Source"), and Chiesi and RAJARATNAM obtained Inside Information regarding AMD from Anil Kumar and/or other sources (the "AMD Sources" and, together with the Akamai Source, the "AMD/Akamai Sources").  The AMD/Akamai Sources disclosed the Inside Information in violation of duties of trust and confidence owed by the AMD/Akamai Sources to their respective employers, their shareholders, and/or their employers' clients.  Chiesi communicated Inside Information regarding Akamai to RAJARATNAM.  In addition, RAJARATNAM and Chiesi provided one another with Inside Information regarding AMD. RAJARATNAM caused Galleon Tech and Diversified to execute securities transactions on the basis of Inside Information obtained from Chiesi, earning a total profit of approximately $3.5 million from the scheme.

21

## The Conspiracy

32.    From at least in or about July 2008 up to and including in or about October 2008, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, Danielle Chiesi, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

33.    It was a part and an object of the conspiracy that RAJ RAJARATNAM, the defendant, Danielle Chiesi, and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

22

(c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Means and Methods of the Conspiracy

34. Among the means and methods by which RAJ RAJARATNAM, the defendant, Danielle Chiesi, and others known and unknown, would and did carry out the conspiracy were the following:

a. The AMD/Akamai Sources misappropriated the Inside Information in violation of: (a) the fiduciary and other duties of trust and confidence that they owed to their respective employers, their shareholders, and/or their employers' clients; (b) the expectations of confidentiality of their respective employers, their shareholders, and/or their employers' clients; and (c) their respective employers' written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b. The Akamai Source disclosed Inside Information regarding Akamai to Chiesi. The AMD Sources disclosed Inside Information regarding AMD to Chiesi or RAJARATNAM. RAJARATNAM and Chiesi provided one another with Inside Information regarding AMD, and Chiesi provided RAJARATNAM with Inside information regarding

23

Akamai, all with knowledge that the Inside Information had been disclosed in violation of the duties of confidentiality owed by the sources of the Inside Information to their respective employers, their shareholders, and/or their employers' clients, and with the understanding that RAJARATNAM, Chiesi and others would use the Inside Information to purchase and sell securities, and thereby receive substantial illegal profits.

  c. RAJARATNAM and Chiesi, while in possession of the Inside Information that they knew had been misappropriated in breach of the duties of confidentiality owed by the AMD/Akamai Sources to their respective employers, their shareholders, and/or their employers' clients, purchased and sold securities based on such information and thereby received substantial illegal profits.

### Overt Acts

  35. In furtherance of the conspiracy and to effect the illegal object thereof, RAJ RAJARATNAM, the defendant, Danielle Chiesi, and their co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

  a. On or about July 24, 2008, Chiesi called RAJARATNAM from New York, New York.

  b. On or about July 25, 2008, in New York, New York, RAJARATNAM caused Galleon Tech to sell short approximately 138,550 shares of Akamai common stock, which traded under the

symbol "AKAM."

   c.  On or about September 30, 2008, RAJARATNAM spoke on the telephone with Chiesi, who was in New York, New York.

   (Title 18, United States Code, Section 371.)

### COUNTS SIX THROUGH TWELVE

(Securities Fraud)

  The Grand Jury further charges:

  36.  The allegations contained in paragraphs 1-3, 6-7, 16-17, 20-21, 30-31, and 34-35 of this Indictment are repeated and realleged as though fully set forth herein.

  37.  On or about the dates set forth below, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated

and would operate as a fraud and deceit upon persons, to wit: (i) RAJARATNAM caused Galleon Tech and/or Diversified to execute the securities transactions listed below in the securities of: (a) Clearwire on the basis of material, nonpublic information he obtained from Rajiv Goel, and (b) Akamai, on the basis of material, nonpublic information he obtained from Danielle Chiesi; and (ii) RAJARATNAM executed the securities transactions listed below in the securities of PeopleSupport, on the basis of material, nonpublic information he obtained from a source at PeopleSupport:

| COUNT | APPROX. DATE | SECURITY | TRANSACTION (AMOUNT APPROXIMATE) |
|-------|--------------|----------|----------------------------------|
| SIX | March 24, 2008 | Clearwire (CLWR) | Galleon Tech purchased 125,800 shares of common stock |
| SEVEN | March 25, 2008 | Clearwire (CLWR) | Galleon Tech purchased 136,000 shares of common stock |
| EIGHT | July 25, 2008 | Akamai (AKAM) | Galleon Tech sold short 138,550 shares of common stock |
| NINE | July 29, 2008 | Akamai (AKAM) | Galleon Tech sold short 173,300 shares of common stock |
| TEN | July 30, 2008 | Akamai (AKAM) | Galleon Tech sold short 86,650 shares of common stock and purchased 1,400 put options |
| ELEVEN | July 28, 2008 | PeopleSupport (PSPT) | Rajaratnam purchased 15,000 shares of common stock |

| TWELVE | October 7, 2008 | PeopleSupport (PSPT) | Rajaratnam purchased 30,000 shares of common stock |
|--------|-----------------|----------------------|---------------------------------------------------|

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2, and Title 18, United States Code, Section 2.)

## COUNT THIRTEEN

(Securities Fraud)

The Grand Jury further charges:

38. The allegations contained in paragraphs 1-3, 6-7, 23-24, and 27-28 of this Indictment are repeated and realleged as though fully set forth herein.

39. From in or about March 2006 to in or about July 2006, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of

27

business which operated and would operate as a fraud and deceit upon persons, to wit: RAJARATNAM caused Galleon Tech and/or Diversified to execute transactions in the securities of ATI on the basis of material, nonpublic information.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section 2.)

## COUNT FOURTEEN

(Securities Fraud)

The Grand Jury further charges:

40. The allegations contained in paragraphs 1-3, 6-7, 16-17, and 20-21 of this Indictment are repeated and realleged as though fully set forth herein.

41. In or about April 2007, in the Southern District of New York and elsewhere, RAJ RAJARATNAM, the defendant, unlawfully, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which

28

they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, RAJARATNAM caused Galleon Tech and/or Diversified to execute transactions in the securities of Intel on the basis of material, nonpublic information.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
240.10b5-2, and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

42.  As a result of committing one or more of the foregoing securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Section 371; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, as alleged in Counts One through Fourteen of this Indictment, RAJ RAJARATNAM, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses, in an amount of at least approximately $45 million.

## Substitute Assets Provision

43.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

     (i)        cannot be located upon the exercise of due diligence;

     (ii)      has been transferred or sold to, or deposited with, a third party;

     (iii)    has been placed beyond the jurisdiction of the court;

     (iv)     has been substantially diminished in value; or

     (v)       has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

       (Title 15, United States Code, Sections 78j(b), 78ff;
Title 18, United States Code, Sections 371 and 981;
Title 21, United States Code, Section 853(p);
Title 28, United States Code, Section 2461;
and Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

30

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### RAJ RAJARATNAM,

Defendant.

### <u>INDICTMENT</u>

**S2 09 Cr. 1184 (RJH)**

(Title 15, United States Code, Sections
78j(b), 78ff; Title 17, Code of Federal
Regulations, Sections 240.10b-5,
240.10b5-2; Title 18, United States Code,
Section 2)

<u>PREET BHARARA</u>
United States Attorney

**A TRUE BILL.**

Foreperson.

1/20/11   FILED INDICTMENT   COTT, USMJ

# EXHIBIT 168

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -x
                         :

UNITED STATES OF AMERICA       :

                         :

        -v-            :

                         :

RAJ RAJARATNAM,         :

                         :

          Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ORDER**

S2 09 Cr. 1184 (RJH)

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/11/11**

## ORDER

    In light of the jury's verdict of guilty on all fourteen counts of the superseding indictment

S2 09 Cr. 1184 (RJH), the Court hereby ORDERS that the defendant Raj Rajaratnam's bail

conditions are modified with the following additional conditions to be applied immediately: (1)

home detention; and (2) electronic monitoring. The defendant Rajaratnam shall report

immediately to Pretrial Services so that Pretrial Services can immediately impose the condition

of electronic monitoring on the defendant.

                        SO ORDERED

                        RICHARD J. HOLWELL
                        U.S. DISTRICT COURT JUDGE

                        5/11/4

# EXHIBIT 169

p

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA      :

     -v.-      :

MICHAEL STEINBERG,      :

          Defendant.      :

- - - - - - - - - - - - - - - x

SEALED
SUPERSEDING
<u>INDICTMENT</u>

S4 12 Cr. 121 (RJS)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 28 2013

## COUNT ONE

(Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Entities and Individuals

1.    At all times relevant to this Indictment, MICHAEL STEINBERG, the defendant, was a portfolio manager at a hedge fund located in New York, New York ("Hedge Fund A"). STEINBERG managed a portfolio that was predominantly invested in technology stocks.

2.    At all times relevant to this Indictment, Jon Horvath ("Horvath"), a coconspirator not named as a defendant herein, was an analyst at Hedge Fund A who worked for MICHAEL STEINBERG, the defendant.

3.    At all times relevant to this Indictment, Jesse Tortora ("Tortora"), a coconspirator not named as a defendant herein, was employed as an analyst at a hedge fund located in Stamford, Connecticut ("Hedge Fund B").

4.   At all times relevant to this Indictment, Danny Kuo ("Kuo"), a coconspirator not named as a defendant herein, was employed as an analyst at a wealth management company headquartered in South Pasadena, California ("Investment Firm C").

5.   At all times relevant to this Indictment, Dell, Inc. ("Dell"), a public company whose stock was traded on the Nasdaq Stock Market, produced personal computers and provided technology services around the world.  Further, at all times relevant to this Indictment, Dell's policies prohibited the unauthorized disclosure of Dell's confidential information.

6.   At all times relevant to this Indictment, NVIDIA Corporation ("NVIDIA"), a public company whose stock was traded on the Nasdaq Stock Market, produced, among other things, graphics processors.  Further, at all times relevant to this Indictment, NVIDIA's policies prohibited the unauthorized disclosure of NVIDIA's confidential information.

### The Insider Trading Scheme

7.   From in or about late 2007 through in or about 2009, MICHAEL STEINBERG, the defendant, obtained material, nonpublic information ("Inside Information") from his analyst, Horvath.  Horvath, in turn, obtained the Inside Information directly and indirectly from employees of certain publicly traded technology companies ("Technology Companies"), including

2

information relating to the Technology Companies' earnings, revenues, gross margins, and other confidential and material financial information of the Technology Companies. Specifically, Horvath obtained Inside Information from his own sources at companies, as well as from analysts who worked at different hedge funds and investment firms in New York, New York and elsewhere (the "Analyst Coconspirators"), who, in turn, obtained the Inside Information directly or indirectly from employees of the Technology Companies. STEINBERG executed and caused to be executed securities transactions in certain of the Technology Companies based in whole or in part on the Inside Information Horvath provided to him, earning substantial sums in unlawful profits for the benefit of Hedge Fund A.

8. The Inside Information received by MICHAEL STEINBERG, the defendant, was obtained in violation of: (i) fiduciary and other duties of trust and confidence owed by the employees of the Technology Companies to their employers; (ii) expectations of confidentiality held by the Technology Companies; (iii) written policies of the Technology Companies regarding the use and safekeeping of confidential business information; and (iv) agreements between the Technology Companies and their employees to maintain information in confidence.

## The Dell Inside Information

9.     From in or about 2008 through in or about 2009, in advance of Dell's quarterly earnings announcements, Tortora provided Inside Information regarding Dell's financial performance (the "Dell Inside Information") to Horvath and to the portfolio manager for whom Tortora worked, among others.  Tortora obtained the Dell Inside Information from Sandeep Goyal, a/k/a "Sandy Goyal" ("Goyal").  At all times relevant to this Indictment, Goyal worked as an associate analyst for a global asset management firm based in New York, New York.  Goyal, in turn, obtained the Dell Inside Information from an employee at Dell (the "Dell Insider").

10.     At certain times relevant to this Indictment, the Dell Insider worked in Dell's investor relations department, and had access to confidential financial information concerning Dell's quarterly earnings announcements before it was publicly announced.  The disclosure by the Dell Insider of the Dell Inside Information in advance of Dell's public earnings announcements violated Dell's policies and the Dell Insider's fiduciary and other duties of trust and confidence owed to Dell.

August 28, 2008 Earnings Announcement

11.     Dell announced its earnings for the quarter ended August 1, 2008 shortly after the close of the market on or about August 28, 2008 (the "August 28 Earnings Announcement").  On

4

multiple occasions in advance of the August 28, 2008 Earnings Announcement, the Dell Insider provided to Goyal, who, in turn, provided to Tortora, Inside Information concerning Dell's financial results for the quarter ended August 1, 2008. That Inside Information reflected, among other things, that Dell's gross margins would be materially lower than market expectations. As such, the Inside Information was negative news concerning the upcoming August 28 Earnings Announcement.

      12.   Tortora then provided this negative Inside Information to Horvath, among others, and Horvath, in turn, provided the Inside Information to MICHAEL STEINBERG, the defendant. STEINBERG executed or caused to be executed transactions in securities of Dell based in whole or in part on the Dell Inside Information.

      13.   Specifically, on or about August 18, 2008, after receiving the Dell Inside Information, MICHAEL STEINBERG, the defendant, executed or caused to be executed short sales of Dell stock. The following events, among others, led to the August 18, 2008 short sales:

      a.   On or about Friday, August 15, 2008, Tortora obtained the Dell Inside Information from Goyal, who had, in turn, obtained the information from the Dell Insider in the evening on or about August 14, 2008.

b.     On or about Monday, August 18, 2008, at approximately 12:20 p.m., Tortora and Horvath spoke by telephone for approximately 10 minutes.

c.     On or about Monday, August 18, 2008, at approximately 12:34 p.m. - a few minutes after Horvath completed his telephone call with Tortora – Horvath had a telephone conversation with STEINBERG that lasted approximately 2 minutes.

d.     At approximately 12:37 p.m. on or about August 18, 2008, the portfolio at Hedge Fund A over which STEINBERG had sole trading discretion ("STEINBERG's Portfolio") started to sell short shares of Dell.

e.     At approximately 12:38 p.m. on August 18, 2008, Horvath wrote in an email to STEINBERG: "Pls keep the DELL stuff especially on the down low . . . . just mentioning that because JT [Jesse Tortora] asked me specifically to be extra sensitive with the info."

f.     By the end of the trading day on or about August 18, 2008, STEINBERG's Portfolio had acquired a net short position of 167,368 shares of Dell stock.

14.     Similarly, on or about August 28, 2008, MICHAEL STEINBERG, the defendant, executed or caused to be executed short sales of Dell stock based in whole or in part on the Dell Inside Information.  The following events, among others, led to the August 28, 2008 short sales:

6

a.   On or about August 26, 2008, at approximately
1:09 p.m., Horvath sent an email to STEINBERG and another
portfolio manager at Hedge Fund A stating, in relevant part,
that, based on a "2nd hand read from someone at the company,"
Horvath learned that Dell would report a "GMs [gross margins]
miss by 50-80 bps due to poor mix, opex [operating expenses] in-
line and a little revenue upside netting out to an EPS [earnings
per share] miss."  Horvath further stated in the email: "Please
keep to yourself as obviously not well known."

b.   On or about August 26, 2008, at approximately
1:12 p.m., STEINBERG responded to Horvath's email, stating, in
relevant part: "Yes normally we would never divulge data like
this, so please be discreet."

c.   On or about August 27, 2008, at approximately
1:11 p.m., STEINBERG sent an email to Horvath with the subject
line "Dell action," stating, in relevant part: "Have u double
checked [with] JT [Jesse Tortora] this week?"  At approximately
1:15 p.m. the same day, Horvath responded: "Yes he [Tortora]
checked in couple days ago, same read no change."

d.   On or about August 28, 2008, at approximately
3:56 p.m., STEINBERG executed or caused to be executed an
additional short sale of approximately 30,000 shares of Dell.

15.   Between on or about August 19, 2008 and on or
about August 28, 2008, MICHAEL STEINBERG, the defendant, also

7

executed or caused to be executed securities transactions in Dell
option contracts based in whole or in part on the Dell Inside
Information.

16.  The August 28 Earnings Announcement included gross
margin numbers for Dell that were materially below market
expectations.  As a result, at the close of the trading day
following the August 28 Earnings Announcement, Dell's stock price
dropped by more than 13%, from approximately $25.21 at the close
on August 28, 2008 to $21.73 at the close on August 29, 2008.

17.  Between on or about August 29, 2008 and September
2, 2008, MICHAEL STEINBERG, the defendant, covered or caused to
be covered his portfolio's entire short position in Dell shares
and closed out or caused to be closed out the portfolio's
position in Dell option contracts, earning an illegal profit for
Hedge Fund A of approximately $1 million.

### The NVIDIA Inside Information

18.  In or about 2009, Kuo obtained Inside Information
regarding NVIDIA's financial results (the "NVIDIA Inside
Information") in advance of NVIDIA's quarterly earnings
announcements.  Kuo obtained the NVIDIA Inside Information from a
friend, Hyung Lim ("Lim"), who, in turn, obtained the NVIDIA
Inside Information from an employee at NVIDIA (the "NVIDIA
Insider").

19. At certain times relevant to this Indictment, the NVIDIA Insider worked in NVIDIA's finance department, and had access to confidential financial information concerning NVIDIA's quarterly earnings announcements before the information was publicly announced. The disclosure by the NVIDIA Insider of the NVIDIA Inside Information in advance of NVIDIA's public earnings announcements violated NVIDIA's policies and the NVIDIA Insider's fiduciary and other duties of trust and confidence owed to NVIDIA.

20. Kuo passed the NVIDIA Inside Information to the portfolio manager at Investment Firm C for whom he worked, and to Tortora and Horvath, among others.

May 7, 2009 Earnings Announcement

21. NVIDIA announced its earnings for the quarter ended April 26, 2009 shortly after the close of the market on or about May 7, 2009 (the "May 7 Earnings Announcement"). In advance of the May 7 Earnings Announcement, the NVIDIA Insider provided to Lim, who, in turn, provided to Kuo, Inside Information concerning NVIDIA's financial results for the quarter ended April 26, 2009. That Inside Information reflected, among other things, that NVIDIA's gross margins would be lower than market expectations. As such, the Inside Information was negative news concerning the upcoming May 7 Earnings Announcement.

9

22.   Kuo provided this NVIDIA Inside Information to Horvath, among others, who then provided it to MICHAEL STEINBERG, the defendant.   STEINBERG executed or caused to be executed transactions in securities of NVIDIA in advance of the May 7 Earnings Announcement based in whole or in part on the NVIDIA Inside Information.

23.   Specifically, on or about April 27, 2009 and May 4, 2009, Horvath received emails from Kuo that contained Inside Information concerning the May 7 Earnings Announcement.   Horvath provided this Inside Information to MICHAEL STEINBERG, the defendant.   Subsequently, on or about May 5, 2009 and May 7, 2009, STEINBERG executed or caused to be executed securities transactions that were the economic equivalent of a short sale of 160,000 shares and 100,000 shares, respectively, of NVIDIA stock, based in whole or in part on the NVIDIA Inside Information.

24.   The May 7 Earnings Announcement included gross margin numbers for NVIDIA that were materially below market expectations.   As a result, at the close of the trading day following the May 7 Earnings Announcement, NVIDIA's stock price dropped by more than 13%, from approximately $10.73 at the close on May 7, 2009 to $9.25 at the close on May 8, 2009.

25.   Shortly after the May 7 Earnings Announcement, MICHAEL STEINBERG, the defendant, liquidated or caused to be

10

liquidated his portfolio's entire position in NVIDIA securities, earning an illegal profit for Hedge Fund A of over $400,000.

### The Conspiracy

26. From in or about late 2007 through in or about 2009, in the Southern District of New York and elsewhere, MICHAEL STEINBERG, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

### Object of the Conspiracy

### Securities Fraud

27. It was a part and an object of the conspiracy that MICHAEL STEINBERG, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in

11

order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Means and Methods of the Conspiracy

28.   Among the means and methods by which MICHAEL STEINBERG, the defendant, and others known and unknown, would and did carry out the conspiracy were the following:

a.   STEINBERG received Inside Information from Horvath which Horvath obtained directly and indirectly from employees of public companies who disclosed such information in violation of fiduciary and other duties of trust and confidence that they owed to their employers.

b.   Horvath obtained the Inside Information either from his own sources at the Technology Companies or indirectly through one or more of the Analyst Coconspirators.

c.   STEINBERG executed and caused others to execute securities transactions for the benefit of Hedge Fund A in various Technology Companies based in whole or in part on the Inside Information provided by Horvath, knowing that the Inside Information had been disclosed by public company employees in

violation of duties of trust and confidence owed to their employers.

## Overt Acts

29. In furtherance of the conspiracy, and to effect the illegal object thereof, MICHAEL STEINBERG, the defendant, and his coconspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about August 5, 2008, Tortora sent an email to Horvath that contained certain of the Dell Inside Information.

b. On or about August 18, 2008, Tortora had a telephone conversation with Horvath.

c. On or about August 18, 2008, Horvath had a telephone conversation with STEINBERG, who was in New York, New York at the time.

d. On or about August 26, 2008, Horvath sent an email to STEINBERG and another portfolio manager at Hedge Fund A that contained certain of the Dell Inside Information.

e. On or about May 4, 2009, Kuo sent an email to Horvath and others that contained certain of the NVIDIA Inside Information.

(Title 18, United States Code, Section 371.)

13

## COUNTS TWO THROUGH FIVE

(Securities Fraud)

The Grand Jury further charges:

30.    The allegations contained in paragraphs 1 through 25 and 28 through 29 are repeated and realleged as though fully set forth herein.

31.    On or about the dates set forth below, in the Southern District of New York and elsewhere, MICHAEL STEINBERG, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, STEINBERG executed or caused others to execute the securities transactions listed below based in whole or in part on Inside Information provided to him by Horvath:

14

| COUNT | DATE | SECURITY | TRANSACTION |
|-------|------|----------|-------------|
| TWO | August 18, 2008 | Dell, Inc. | short sale of at least 167,368 shares of common stock |
| THREE | August 28, 2008 | Dell, Inc. | short sale of 30,000 shares of common stock |
| FOUR | May 5, 2009 | NVIDIA Corporation | a swap transaction equivalent to a short sale of 160,000 shares of common stock |
| FIVE | May 7, 2009 | NVIDIA Corporation | a swap transaction equivalent to a short sale of 100,000 shares of common stock |

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5
and 240.10b5-2; and Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

32.  As a result of committing one or more of the foregoing conspiracy and securities fraud offenses alleged in Counts One through Five of this Indictment, MICHAEL STEINBERG, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the securities fraud offenses.

## Substitute Assets Provision

33.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

15

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981; Title 28, United States Code, Section 2461; Title 18, United States Code, Sections 371 and 2; Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

16

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### MICHAEL STEINBERG,

Defendant.

### SUPERSEDING
### INDICTMENT

### S4 12 Cr. 121 (RJS)

(18 U.S.C. §§ 2, 371; Title 15, United
States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations,
Section 240.10b-5)

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

5/28/13   Fld Superseding Indictment, Arrest warrant issued

P H man, USMJ

# EXHIBIT 170

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                :

       - v. -                :        S4 12 Cr. 121 (RJS)

MICHAEL STEINBERG,                :        **<u>Final Bill of Particulars</u>**

           Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


      The Government hereby supplements the particulars set forth in the Superseding

Indictment in the above-captioned case with additional particulars set forth below concerning: (a)

the identity of known coconspirators; (b) the identity of certain stocks with respect to which one

or more of the defendant and/or coconspirators provided, obtained, or received material,

nonpublic information, or attempted to do so; (c) the nature of the confidential information

obtained or passed by one or more of the defendant and/or coconspirators; (d) the sources of that

information, if known; (e) the nature of the benefit received by the tippers of the information;

(f) the approximate periods of time during which one or more of the defendant and/or

coconspirators obtained or attempted to obtain the information; and (g) certain trading activity

that was in furtherance of the conspiracy charged in Count One of the Superseding Indictment.

      The information set forth below is based on the current state of the evidence and the

Government's review and analysis of the evidence to date.  Certain answers are based, in part, on

inferences drawn from documents and other evidence in the case.  As the Government continues

to review and analyze the evidence, the Government reserves the right to draw other reasonable

1

inferences from the evidence.

Additionally, the Government anticipates that further particularity as to the Government's charges will be apparent from the Government's exhibits, which will be provided to the defendant on October 15, 2013, as well as materials that will be provided to the defendant pursuant to 18 U.S.C. § 3500.

Known Coconspirators

| | |
|---|---|
| *Analyst Coconspirators*: | Jesse Tortora, Spyridon Adondakis, a/k/a "Sam Adondakis," Danny Kuo, Jon Horvath, Fayad Abassi, Ron Dennis. |
| *Portfolio Manager Coconspirators*: | Michael Steinberg, Todd Newman, Anthony Chiasson, Victor Dosti. |
| *Other Coconspirators*: | Sandeep Goyal, Michael Alessi, Greg Brenner, David Ganek, Lacey Higgins, Mark Lipacis. |

Stocks With Respect to Which the Defendant and/or Coconspirators
Obtained or Attempted to Obtain Inside Information

Dell, Inc. ("Dell"), NVIDIA Corporation ("Nvidia"), Sun Microsystems ("Sun"), Advanced Micro Devices ("AMD"), Taiwan Semiconductor Manufacturing Company ("TSMC"), Altera Corporation ("Altera"), Intel Corporation ("Intel"), Texas Instruments, Western Digital Corporation ("Western Digital"), Volterra Semiconductor Corporation ("Volterra"), PMC Sierra Inc. ("PMCS"), Ingram Micro, Inc. ("Ingram Micro"), Seagate Technology PLC ("Seagate"), and Hewlett-Packard .

2

<u>The Nature of the Confidential Information Passed or Obtained</u>

The nature of the confidential information passed or obtained includes the following:

| **Company** | **Information** |
|---|---|
| Dell | • Earnings information, including revenue, gross and operating margin, and operating expense information (from Rob Ray).<br><br>• Actual and forecast unit sales numbers for desktop and/or notebook computers, and pricing and market share information relating to hard drives from Dell's suppliers, including Western Digital and Seagate Technology PLC (from Dan DeVore).<br><br>• Financial information pertaining to Dell's commercial business (from Ruchir Purwar). |
| Nvidia | Earnings information, including revenue and gross margin information. |
| Sun | Earnings information, including sales information. |
| AMD | Actual and forecast unit sales numbers and average sales prices for different product lines; total revenue and gross margin information. |
| TSMC | Actual and forecast bookings information for wafers, by customer, for substantially all of TSMC's North America business. |
| Altera | Earnings information, including revenues. |
| Intel | Actual and forecast unit sales numbers for various Intel products, including microprocessors for notebooks, desktops, and servers; information pertaining to Intel's average selling prices for certain products; and information relating to Intel's fab utilization rates. |
| Texas Instruments | Earnings information, including actual and forecast sales numbers. |
| Western Digital | Actual unit shipment/sales numbers for Western Digital products. |
| Volterra | Earnings information, including revenues. |
| PMCS | Earnings information (from Ron Dennis); revenue information for PMCS's enterprise business (from unknown source). |
| Ingram Micro | Earnings information pertaining to Ingram Micro's European business. |

3

| Seagate | Earnings information, including Earnings Per Share and gross margin numbers. |
|---------|---------|

The Source of the Information, If Known

| Company | Source |
|---------|--------|
| Dell | Rob Ray, Daniel DeVore, Ruchir Purwar |
| Nvidia | Chris Choi |
| Sun | Davide Pacchini |
| AMD | Mark Anthony Longoria |
| TSMC/SMIC (wafer information) | Manosha Karunatilaka, Sam Wang |
| Altera | Hyung Lim |
| Intel | ████████████████ |
| Texas Instruments | Tyson King |
| Western Digital | Edward Strong |
| Ingram Micro | ████████████ |

Ron Dennis passed information pertaining to Volterra and PMCS to Tortora. Horvath received earnings information for Seagate from ████████████████████████

With respect to Intel, as the Government has previously indicated, the Intel information provided by ████████████ was provided to Higgins and then passed to Tortora and Adondakis through Higgins and/or Lipacis. As is apparent from emails provided in discovery in this case, and as will be further supported by the Government's exhibits and Section 3500 materials that will be provided to defendant, Tortora and Adondakis also received confidential financial information regarding Intel from a number of other sources.

4

Nature of the Benefit Received By the Tipper

| Individual | Benefit |
|---|---|
| Rob Ray | Goyal provided Ray career advice and actual assistance – as well as promises of future assistance – with opportunities to work in the securities industry; Ray also provided the information to maintain a personal friendship. |
| Davide Pacchini | To maintain a personal friendship; assistance with possible employment opportunities. |
| Chris Choi | Choi provided the information to maintain a personal friendship with Lim; Lim told Choi that he was seeking the Inside Information for purposes of trading in his own account. |
| John Lee and Jeff Greenfield | Lee and Greenfield provided information to maintain a personal friendship with Higgins; Higgins also provided career advice and assistance to Lee. |
| Ruchir Purwar | Purwar provided the information to maintain a personal friendship with Goyal. |
| █████ | To maintain a personal friendship with Horvath. |

Manosha Karunatilaka, Daniel DeVore, Mark Anthony Longoria, Sam Wang, Tyson King, and Edward Strong were consultants for PGR.  PGR payment records that have been provided in discovery set forth the payments PGR made to these individuals for their consultations with investment firm employees, including Tortora and Adondakis.[1]

Approximate Periods of Time During Which Information Was Passed or Obtained

As relevant to the conspiracy charged in the Superseding Indictment, the approximate periods of time during which the information described above was passed or obtained, are as

_____

[1] ████████████████████████████████████████████████████████

follows:

Rob Ray provided confidential information pertaining to Dell from in or about late 2007 through in or about August 2009.

Ruchir Purwar provided confidential information pertaining to Dell's commercial business from in or about late 2007 through in or about 2009.

Hyung Lim provided confidential information pertaining to Altera from in or about late 2007 through in or about the first half of 2008.

Chris Choi provided confidential information pertaining to Nvidia from in or about late 2008 through in or about 2010.

Ron Dennis provided confidential information pertaining to Volterra and PMCS from in or about 2008 through in or about 2009.

████████████ provided confidential information pertaining to Intel to Higgins for a period of approximately 6 to 8 months in or about 2006 to 2007. ████████ provided confidential information pertaining to Intel to Higgins from in or about the second half of 2007 through in or about 2009.

While Horvath worked at Sigma Capital Management, LLC, ████████████████ provided confidential information pertaining to Ingram Micro to Horvath from in or about 2006 through in or about 2009.

Davide Pacchini provided confidential information pertaining to Sun Microsystems from in or about the second half of 2007 through in or about the first half of 2008.

████████████ provided confidential information pertaining to Seagate to Horvath from in or about 2007 through in or about 2010.

6

In addition, to the extent the information was provided by the various PGR consultants identified above, the approximate time periods during which information was passed can be ascertained from the billing records provided by PGR that have been produced in discovery, and the emails sent by Tortora, Adondakis and others memorializing the conversations with those consultants.

<u>Trading Activity in Furtherance of the Conspiracy</u>

a.   *Dell*:

<u>Sigma Capital</u>:

- Between on or about May 13, 2008 and on or about May 29, 2008, Sigma Capital executed securities transactions in Dell call option contracts based in whole or in part on Inside Information.

- Between on or about August 18, 2008 and on or about August 28, 2008, Sigma Capital executed securities transactions in Dell stock based in whole or in part on Inside Information.

- Between August 19, 2008 and August 27, 2008, Sigma Capital executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Sigma Capital executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's February 26, 2009 earnings announcement, Sigma Capital executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, Sigma Capital executed transactions in Dell securities based in whole or in part on Inside Information.

Diamondback:

- On or about February 28, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- From at least on or about May 16, 2008 to on or about May 29, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about July 3, 2008 and on or about August 28, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about August 15, 2008 and on or about August 26, 2008, Diamondback executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Diamondback executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, Diamondback executed transactions in Dell securities based in whole or in part on Inside Information.

Level Global:

- From at least on or about May 13, 2008 to on or about May 28, 2008, Level Global executed transactions in Dell stock based in whole or in part on Inside Information.

- On or about May 12, 2008, Level Global executed transactions in Dell call option contracts based in whole or in part on Inside Information.

- Between on or about July 8, 2008 and on or about August 28, 2008, Level Global executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about August 11, 2008 and on or about August 26, 2008, Level Global executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Level Global executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, Level Global executed transactions in Dell securities based in whole or in part on Inside Information.

Whittier Trust Company:

- Between on or about July 8, 2008 and on or about August 28, 2008, Whittier Trust Company executed securities transactions in Dell stock based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Whittier Trust Company executed transactions in Dell securities based in whole or in part on Inside Information.

b.  *Nvidia*:

Sigma Capital:

- Between on or about May 5, 2009 and May 7, 2009, Sigma Capital executed transactions in Nvidia securities based in whole or in part on Inside Information.

- In advance of NVIDIA's August 6, 2009 earnings announcement, Sigma Capital executed transactions in NVIDIA securities based in whole or in part on Inside Information.

Diamondback:

- Between on or about April 27, 2009 and on or about May 7, 2009, Diamondback executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

Level Global:

- Between on or about April 27, 2009 and on or about May 7, 2009, Level Global executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

9

Whittier Trust Company:

- Between on or about April 15, 2009 and on or about May 7, 2009, Whittier Trust Company executed securities transactions in Nvidia stock based in whole or in part on Inside Information.


c.  *Other Stocks*

Sigma Capital, Diamondback, and/or Level Global executed transactions in one or more of the securities identified herein in addition to Dell and Nvidia during the period in which they received confidential information from the sources set forth above.  The Government presently intends to limit proof of specific securities transactions in these other stocks, if any, to trading by Sigma Capital in Sun Microsystems in advance of one or more of the following quarterly announcements:  November 5, 2007 and/or May 1, 2008.


Dated: New York, New York
     September 18, 2013

                PREET BHARARA
                United States Attorney

     By:   _____
                Antonia M. Apps
                Harry A. Chernoff
                Assistant United States Attorneys
                (212) 637-2198/2481

# EXHIBIT 171

p

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
UNITED STATES OF AMERICA                      :
                                              :
              - v. -                          :        S2 12 Cr. 121 (RJS)
                                              :
TODD NEWMAN,                                  :        **Bill of Particulars**
ANTHONY CHIASSON, and                         :
JON HORVATH,                                  :
                                              :
                     Defendants.              :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Pursuant to the Court's Order filed June 29, 2012, the Government supplements the

particulars set forth in the Superseding Indictment with additional particulars set forth below

concerning: (a) the identity of known coconspirators; (b) the identity of certain stocks with

respect to which one or more of the defendants and/or coconspirators provided, obtained, or

received material, nonpublic information, or attempted to do so; (c) the nature of the confidential

information obtained or passed by one or more of the defendants and/or coconspirators; (d) the

sources of that information, if known; (e) the nature of the benefit received by the tippers of the

information; (f) the approximate periods of time during which one or more of the defendants

and/or coconspirators obtained or attempted to obtain the information; and (g) certain trading

activity that was in furtherance of the conspiracy charged in Count One of the Superseding

Indictment.

      The information set forth below is based on the current state of the evidence and the

Government's review and analysis of the evidence to date.  Certain answers are based, in part, on

1

inferences that we have drawn from documents and other evidence in the case. As the Government continues to review and analyze the evidence, the Government reserves the right to draw other reasonable inferences from the evidence.

Additionally, the Government anticipates that further particularity as to the Government's charges will be apparent from the Government's exhibits, which will be provided to the defendants on September 21, 2012, in accordance with the Court's June 29, 2012 Order, as well as materials that will be provided to the defendants in advance of trial pursuant to 18 U.S.C. § 3500.

Finally, in accordance with the Court's May 15, 2012 Order, the names of uncharged third parties have been redacted from the publicly filed version of this Bill of Particulars.

<u>Known Coconspirators</u>

*Analyst Coconspirators*:    Jesse Tortora, Spyridon Adondakis, a/k/a "Sam Adondakis," Danny Kuo, Jon Horvath, ███████████████████.

*Portfolio Manager Coconspirators*:  Todd Newman, Anthony Chiasson, ████████████, ████████████████.

*Other Coconspirators*:    Sandeep Goyal, ██████████████████████ ████████████████.

Stocks With Respect to Which the Defendants and/or Coconspirators <u>Obtained or Attempted to Obtain Inside Information</u>

Dell, Inc. ("Dell"), NVIDIA Corporation ("Nvidia"), Sun Microsystems ("Sun"), Advanced Micro Devices ("AMD"), Taiwan Semiconductor Manufacturing Company ("TSMC"), Altera Corporation ("Altera"), Intel Corporation ("Intel"), Texas Instruments,

2

Western Digital Corporation ("Western Digital"), Volterra Semiconductor Corporation ("Volterra"), PMC Sierra Inc. ("PMCS"), Ingram Micro, Inc. ("Ingram Micro"), and TE Connectivity Ltd.

<u>The Nature of the Confidential Information Passed or Obtained</u>

The nature of the confidential information passed or obtained includes the following:

| **Company** | **Information** |
|---|---|
| Dell | <ul><li>Earnings information, including revenue and gross margin information (from ▮▮▮▮▮▮).</li><li>Actual and forecast unit sales numbers for desktop and/or notebook computers, and pricing and market share information relating to hard drives from Dell's suppliers, including Western Digital and Seagate Technology PLC (from Dan DeVore).</li><li>Financial information pertaining to Dell's commercial business (from ▮▮▮▮▮▮).</li></ul> |
| Nvidia | Earnings information, including revenue and gross margin information. |
| Sun | Earnings information, including actual and forecast sales information. |
| AMD | Actual and forecast unit sales numbers and average sales prices for different product lines; total revenue and gross margin information. |
| TSMC | Actual and forecast bookings information for wafers, by customer, for substantially all of TSMC's North America business. |
| Altera | Earnings information, including revenues. |
| Intel | Actual and forecast unit sales numbers for various Intel products, including microprocessors for notebooks, desktops, and servers; information pertaining to Intel's average selling prices for certain products; and information relating to Intel's fab utilization rates. |
| Texas Instruments | Earnings information, including actual and forecast sales numbers. |
| Western Digital | Actual unit shipment/sales numbers for Western Digital products. |
| Volterra | Earnings information, including revenues. |

3

| PMCS | Earnings information (from ████████); revenue information for PMCS's enterprise business (from unknown source). |
|---|---|
| Ingram Micro | Earnings information pertaining to Ingram Micro's European business. |

The Source of the Information, If Known

| **Company** | **Source** |
|---|---|
| Dell | ████████, Daniel DeVore, ████████ ████ |
| Nvidia | ████████ |
| Sun | ████████████ |
| AMD | Mark Anthony Longoria |
| TSMC/SMIC (wafer information) | Manosha Karunatilaka, Sam Wang |
| Altera | ████████ |
| Intel | ████████████ |
| Texas Instruments | ████████ |
| Western Digital | ████████████ |

████████ passed information pertaining to Volterra and PMCS to Tortora.

With respect to Intel, as the Government has previously indicated, the Intel information provided by ████████ and ████ was provided to ████████ and then passed to Tortora and Adondakis through ████████ and/or ████████. As is apparent from emails provided in discovery in this case, and as will be further supported by the Government's exhibits and Section 3500 materials that will be provided to defendants, Tortora and Adondakis also received confidential financial information regarding Intel from a number of other sources.

4

Nature of the Benefit Received By the Tipper

| Individual | Benefit |
|---|---|
| ▮▮▮▮ | Goyal provided ▮▮▮ career advice and actual assistance – as well as promises of future assistance – with opportunities to work in the securities industry; ▮▮ also provided the information to maintain a personal friendship. |
| ▮▮▮▮ | To maintain a personal friendship; assistance with possible employment opportunities. |
| ▮▮▮▮ | ▮▮▮ provided the information to maintain a personal friendship with ▮, ▮▮ told ▮▮▮ that he was seeking the Inside Information for purposes of trading in his own account. |
| ▮▮▮▮ | ▮▮ and ▮▮▮▮ provided information to maintain a personal friendship; ▮▮ and ▮▮▮▮ were also taken out to lunch by ▮▮, who paid for the lunches; ▮▮▮▮ also provided career advice and assistance to ▮▮. |
| ▮▮▮▮ | ▮▮▮ provided the information to maintain a personal friendship with Goyal. |

Manosha Karunatilaka, Daniel DeVore, Mark Anthony Longoria, ▮▮▮▮, ▮▮▮▮, and ▮▮▮▮ were consultants for PGR. PGR Payment records that have been provided in discovery set forth the payments PGR made to these individuals for their consultations with investment firm employees, including Tortora and Adondakis.

Approximate Periods of Time During Which Information Was Passed or Obtained

As relevant to the conspiracy charged in the Superseding Indictment, the approximate periods of time during which the information described above was passed or obtained, are as follows:

▮▮▮▮ provided confidential information pertaining to Dell from in or about late 2007 through in or about August 2009.

▮▮▮▮ provided confidential information pertaining to Dell's commercial

5

business from in or about late 2007 through in or about 2009.

███████████ provided confidential information pertaining to Altera from in or about late 207 through in or about the first half of 2008.

███████████ provided confidential information pertaining to Nvidia from in or about late 2008 through in or about 2009.

███████████ provided confidential information pertaining to Volterra and PMCS from in or about 2008 through in or about 2009.

████████████ provided confidential information regarding Intel to ████████ for a period of approximately 6 to 8 months in or about 2006 to 2007. ████████ provided confidential information regarding Intel to ████████ from in or about the second half of 2007 through in or about 2009.

Horvath provided confidential information regarding Ingram Micro from in or about 2008 through in or about 2009.

In addition, to the extent the information was provided by the various PGR consultants identified above, the approximate time periods during which information was passed can be ascertained from the billing records provided by PGR that have been produced in discovery, and the emails sent by Tortora, Adondakis and others memorializing the conversations with those consultants.

Trading Activity In Furtherance of the Conspiracy

a.   *Dell*:

Diamondback:

- On or about February 28, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- From at least on or about May 16, 2008 to on or about May 29, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about July 3, 2008 and on or about August 28, 2008, Diamondback executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about August 15, 2008 and on or about August 26, 2008, Diamondback executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, Diamondback executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, Diamondback executed transactions in Dell securities based in whole or in part on Inside Information.

██████████:

- From at least on or about May 13, 2008 to on or about May 28, 2008, ████████████ executed transactions in Dell stock based in whole or in part on Inside Information.

- On or about May 12, 2008, ████████████ executed transactions in Dell call option contracts based in whole or in part on Inside Information.

- Between on or about July 8, 2008 and on or about August 28, 2008, ██████ █████ executed transactions in Dell stock based in whole or in part on Inside Information.

- Between on or about August 11, 2008 and on or about August 26, 2008, ███████████ executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, ██████ executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, ██████ executed transactions in Dell securities based in whole or in part on Inside Information.

████████████:

- Between on or about May 13, 2008 and on or about May 29, 2008, ██████ executed securities transactions in Dell call option contracts based in whole or in part on Inside Information.

- Between on or about August 18, 2008 and on or about August 28, 2008, ████████████ executed securities transactions in Dell stock based in whole or in part on Inside Information.

- Between August 19, 2008 and August 27, 2008, ████████████ executed transactions in Dell put option contracts based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, ██████ executed transactions in Dell securities based in whole or in part on Inside Information.

- In advance of Dell's August 27, 2009 earnings announcement, ██████ executed transactions in Dell securities based in whole or in part on Inside Information.

██████████████████:

- Between on or about July 8, 2008 and on or about August 28, 2008, ███████████████ executed securities transactions in Dell stock based in whole or in part on Inside Information.

- In advance of Dell's November 20, 2008 earnings announcement, ████████████ executed transactions in Dell securities based in whole or in part on Inside Information.

8

b.  *Nvidia*:

<u>Diamondback:</u>

- Between on or about April 27, 2009 and on or about May 7, 2009, Diamondback executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

▮▮▮▮▮▮▮:

- Between on or about April 27, 2009 and on or about May 7, 2009, ▮▮▮▮ ▮▮▮▮▮ executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

▮▮▮▮▮▮▮▮▮▮:

- Between on or about April 15, 2009 and on or about May 7, 2009, ▮▮▮▮▮▮▮▮▮ executed securities transactions in Nvidia stock based in whole or in part on Inside Information.

▮▮▮▮▮▮▮:

- Between on or about May 5, 2009 and May 7, 2009, ▮▮▮▮▮▮▮ executed transactions in Nvidia securities based in whole or in part on Inside Information.

9

c.     *Other Stocks*

Diamondback, ▓▓▓▓▓, and/or ▓▓▓▓▓▓ executed transactions in one or more of the securities identified herein in addition to Dell and Nvidia during the period in which they received confidential information from the sources set forth above.  The Government presently intends to limit proof of specific securities transactions, if any, to trading in the following stocks: Sun, Intel, Texas Instruments, and TSMC.


Dated: New York, New York
          August 29, 2012

Respectfully submitted,

PREET BHARARA
United States Attorney

By:  _Antonia Apps_

Antonia M. Apps
Richard C. Tarlowe
John T. Zach
Assistant United States Attorneys
(212) 637-2198/2330/2410

# EXHIBIT 172

BEFORE THE SECURITIES AND EXCHANGE COMMISSION

```
                            )
In the Matter of:           )
                            )
Elan Corporation, plc       )   File No. NY-8152
                            )
                            )
```

WITNESS:        STEVEN COHEN

PAGES:          1-253

PLACE:          Room 425
                Securities and Exchange Commission
                3 World Financial Center
                New York, New York

Date:           May 3, 2012


            The above-entitled matter come on for

investigation at 10:10 a.m.

Steven Cohen                                                    May 3, 2012

## Page 1

BEFORE THE SECURITIES AND EXCHANGE COMMISSION
                                        )
In the Matter of:                       )
                                        )
Elan Corporation, plc      )     File No. NY-8152
                                        )
                                        )

WITNESS:     STEVEN COHEN

PAGES:       1-253

PLACE:       Room 425
             Securities and Exchange Commission
             3 World Financial Center
             New York, New York
Date:        May 3, 2012

             The above-entitled matter come on for
investigation at 10:10 a.m.

## Page 2

1   On behalf of the Securities and Exchange Commission:
2
3     CHARLES D. RIELY, ESQ.
      AMELIA A. COTTRELL, Assistant Director
4     SANJAY WADHWA, Associate Regional Director
      NEIL HENDELMAN, Staff Accountant
5     Securities and Exchange Commission
      Division of Enforcement
6     Northeast Regional Office
      4th Floor, Suite 400
7     3 World Financial Center
      New York, New York 10281
8
9
10  On behalf of the Witness and S.A.C. Capital Advisors, L.P.:
11
12    MARTIN B. KLOTZ, ESQ.
      JEANNA COMPOSTI, ESQ.
13    Willkie Farr & Gallagher, Llp
      787 Seventh Avenue
14    New York, New York 10019
15    -and-
16    DANIEL J. KRAMER, ESQ.
      Paul, Weiss, Rifkind, Wharton & Garrison, Llp
17    1285 Avenue of the Americas
      New York, New York 10019
18
19
20
21
22
23
24
25

## Page 3

1              PROCEEDINGS
2         MR. RIELY:  We are on the record May 3, 2012,
3   at 10:10 a.m., New York regional office of the SEC.
4   Whereupon,
5              STEVEN COHEN,
6   having been first duly sworn/affirmed, was examined and
7   testified as follows:
8   EXAMINATION BY
9   MR. RIELY:
10       Q     Will you please state and spell your full
11  name for the record?
12       A     Steven A. Cohen.
13       Q     My name is Charles Riely.  With me are my
14  colleagues, Sanjay Wadhwa, Amelia Cottrell, Neil
15  Hendelman.  We are members of the Division of Enforcement
16  of the United States Securities and Exchange Commission
17  and are officers of the Commission for purposes of this
18  proceeding.
19            This is an investigation by the Securities
20  and Exchange Commission entitled Elan Corporation, plc,
21  File Number NY-8152, to determine whether there have been
22  violations of certain provisions of the federal securities
23  laws.  However, the facts developed in this investigation
24  might constitute violations of other federal or state
25  civil or criminal laws.

## Page 4

1              Prior to the opening of the record you were
2   provided with a copy of the formal order of investigation
3   in this matter.  It will be available for your examination
4   during the course of this proceeding.  Okay?
5        A     Okay.
6        Q     Have you had an opportunity to review the
7   formal order?
8        A     Yes, I have.
9        Q     Prior to the opening of the record you were
10  also provided with a copy of the Commission's Supplemental
11  Information Form 1662.  A copy of that notice has been
12  previously marked as Exhibit Number 1.
13            Have you had the opportunity to read Exhibit
14  number 1?
15       A     Yes, I have.
16       Q     Do you have any questions concerning
17  Exhibit 1?
18       A     No, I don't.
19       Q     Mr. Cohen, do you understand that you are
20  under oath?
21       A     Yes, I do.
22       Q     Do you understand that you are swearing that
23  your answers to my questions are true and correct?
24       A     Yes, I do.
25       Q     If at any time you do not understand a

1 (Pages 1 to 4)

## Page 161

1        You see that?
2    A    Yes, I do.
3    Q    Do you remember getting that message from
4  Mr. Martoma?
5    A    I believe so.
6    Q    And did you subsequently speak to
7  Mr. Martoma?
8    A    Yes, I did.
9    Q    On the Sunday that you received this e-mail
10 how many conversations did you have with Mr. Martoma?
11   A    I don't remember.
12   Q    Was it one or more than one?
13   A    Could have been more than one. It could have
14 been more than one but I don't remember.
15   Q    Did you speak to Mr. Martoma on the morning
16 of Sunday, July 20, 2008?
17   A    I believe so.
18   Q    How long did the conversation last?
19   A    I don't remember.
20   Q    In the first conversation who participated in
21 the conversation?
22   A    It was just me and Mat.
23   Q    Mr. Martoma was the one who initiated the
24 idea to have a conversation?
25   A    I believe so.

## Page 162

1    Q    What did Mr. Martoma say when you first got
2  on the phone with him?
3    A    He called me and he said — I remember him
4  saying that he was getting uncomfortable with the Elan
5  position.
6    Q    Did he explain why?
7    A    I must have asked him how come or — because
8  he repeated back to me, "I am just getting uncomfortable
9  with the Elan position."
10   Q    Did he provide any reasons as to why he was
11 uncomfortable in the Elan position?
12   A    He might have. I just don't remember.
13       MS. COTTRELL: What else do you recall about
14 that conversation?
15       THE WITNESS: I don't recall really anything
16 else.
17       MS. COTTRELL: The only thing that you recall
18 is Mr. Martoma saying, "I am getting uncomfortable with
19 the Elan position," you said, "What do you mean?" him
20 repeating that, and that's it?
21       THE WITNESS: That is what I remember, yes.
22   Q    After Mr. Martoma said that he was
23 uncomfortable with the Elan position, what else happened
24 in the discussion?
25   A    I don't remember.

## Page 163

1    Q    Did you take any notes of the conversation?
2    A    I did not.
3    Q    Do you know if anybody else — do you know if
4  Mr. Martoma took notes of the conversation?
5    A    I don't know.
6    Q    After this first conversation with
7  Mr. Martoma, what did you do next concerning your
8  investment in Elan and Wyeth?
9    A    Well, it was a Sunday so I really didn't do
10 anything.
11       MS. COTTRELL: You said you got together —
12 you said "we tried to have a conference call" or something
13 together. You recall that?
14       THE WITNESS: Yes, I do. At some point on
15 Sunday — and I don't remember exactly what time or when,
16 I wanted — I wanted Mat Martoma and Wayne Holman to talk.
17   Q    And why did you want them to talk?
18   A    Because they were the experts in Elan and
19 Wyeth and I wanted to hear them discuss it.
20   Q    Prior to the time that Mr. Martoma reached
21 out to you and communicated that he was uncomfortable in
22 the position in Elan, before that had Mr. Holman's views
23 on Elan or Wyeth changed?
24   A    Not that I know of.
25   Q    You mentioned that you tried to have a

## Page 164

1  conference call with Mr. Martoma and Mr. Holman. Did you
2  ultimately have a conference call with them on July 20th?
3    A    I don't believe so.
4    Q    Did you speak to Mr. Holman on July 20th?
5    A    I might have.
6        MS. COTTRELL: Do you recall speaking to
7  Mr. Holman on July 20th?
8        THE WITNESS: It's possible. I just don't
9  remember.
10       MS. COTTRELL: You don't recall one way or
11 the other whether you spoke to Mr. Holman on July 20th?
12       THE WITNESS: I am not sure.
13       MS. COTTRELL: When you say you are not sure,
14 do you have a general recollection one way or the other?
15       THE WITNESS: It's possible. I know I tried
16 to get a conference call together. I don't think it
17 happened on Sunday.
18   Q    Did it happen in the subsequent day?
19   A    It happened on Monday.
20   Q    What time was the conference call on Monday?
21   A    I don't remember.
22   Q    Do you remember whether it was before the
23 market opened?
24   A    I don't remember.
25   Q    Do you remember whether it was after the

Page 165

1  market opened?
2      A    It could have been.
3           MS. COTTRELL:  You didn't get a conference
4  call together on the Sunday.  Did you speak to Mr. Holman
5  on the Sunday?
6           THE WITNESS:  I might have.  I don't remember
7  connecting or somehow we missed each other.  I just don't
8  remember.
9           MS. COTTRELL:  Did you communicate to
10 Mr. Holman why you wanted to speak with him on that
11 Sunday?
12          THE WITNESS:  What was the question?
13          MS. COTTRELL:  Did you communicate to
14 Mr. Holman why you wanted to speak to him on that Sunday?
15          THE WITNESS:  I don't remember.
16          MS. COTTRELL:  Did you communicate to
17 Mr. Holman, before you actually had the conference call
18 with Martoma and Holman, why you wanted to get Holman on
19 the phone?
20          THE WITNESS:  I might have.
21          MS. COTTRELL:  Do you recall one way or the
22 other?
23          THE WITNESS:  I could have.
24          MS. COTTRELL:  So you don't recall one way or
25 the other?

Page 166

1           THE WITNESS:  I just don't, no.
2           (Plaintiff's Exhibit 31, E-mail chain, SAC
3           ELAN 178801, was marked for identification as
4           of this date.)
5      Q    I am handing the witness Exhibit 31.  A copy
6  has also been provided to his counsel.  For the record,
7  Exhibit 31 is a document Bates stamped SAC ELAN 178801 an
8  e-mail chain between Mr. Martoma and Mr. Cohen dated
9  July 20, 2008.
10          Directing your attention to the first e-mail
11 in the chain, e-mail from Mr. Martoma at 10:30 in the
12 morning with the Elan and Wyeth positions in the two
13 accounts, GEHC and GGEN?
14          Do you see that, Mr. Cohen?
15     A    Yes, I do.
16     Q    What does the GEHC refer to?
17     A    That is Mat Martoma's account.
18     Q    What does GGEN refer to?
19     A    That was the Intrinsic firm account.
20     Q    You received this e-mail at 10:30 in the
21 morning.  Was this before or after you spoke to
22 Mr. Martoma?
23     A    While I don't remember, probably after.
24     Q    Why do you say that?
25     A    He is sending me the positions in the firm --

Page 167

1  in the -- that he owns and in the GGEN account, so he's
2  sending me those positions.
3      Q    Did you have an understanding as to why he
4  was sending you these positions on Sunday, July 20th?
5      A    I don't remember.
6           MS. COTTRELL:  That conversation you had with
7  Mr. Martoma when he said he was getting uncomfortable with
8  the Elan position, do you recall asking him for a summary
9  of what his and the firm's holdings were in Elan and
10 Wyeth?
11          THE WITNESS:  I don't remember.
12          MS. COTTRELL:  Is that something that would
13 surprise you, if you had asked him for that information?
14          THE WITNESS:  I mean I could have.  I just
15 don't remember.
16          MS. COTTRELL:  Is the information contained
17 on Exhibit 31 consistent with your understanding of what
18 your holdings were in Elan and Wyeth on July 20, 2008?
19          THE WITNESS:  I don't remember.
20          MR. KLOTZ:  Object to the form.
21     Q    Mr. Cohen, I am showing you a document
22 previously marked as Exhibit 10.  A copy is also being
23 provided to your counsel.  For the record, it is Bates
24 stamped SAC 3349444.
25          Calling your attention to the last clause of

Page 168

1  your e-mail at the top of the chain on July 20, 2008 at
2  1:24 p.m., you say, "We need to talk on ELN, WYE."
3      A    Yes, I see that.
4      Q    Do you recall sending this e-mail to
5  Mr. Holman on July 20, 2008?
6      A    I don't recall.
7      Q    Why did you need to speak to Mr. Holman on
8  the afternoon of July 20, 2008?
9      A    Probably -- I don't know for certain, but
10 after Mat Martoma called me it was probably to speak to
11 Wayne and try to set up that call.
12          MS. COTTRELL:  Where is the ferry line that
13 Mr. Holman refers to in that Saturday e-mail?
14          THE WITNESS:  Well, I am not sure but it
15 appears like we were going to Shelter Island the previous
16 night.
17          MS. COTTRELL:  Do you recall going to Shelter
18 Island with Mr. Holman the night before?
19          THE WITNESS:  Yes.  Yes, I do.
20          MS. COTTRELL:  Did you have any conversations
21 with Mr. Holman that Saturday night concerning Elan and
22 Wyeth?
23          THE WITNESS:  I don't remember.
24          MS. COTTRELL:  Do you remember having any
25 conversations with him about any securities that evening?

42 (Pages 165 to 168)

Page 169

1        THE WITNESS: I don't remember.
2        MS. COTTRELL: So, no, you don't have any
3   memory about discussions concerning securities?
4        THE WITNESS: That's correct.
5        (Plaintiff's Exhibit 32, E-mail, SAC 3339488,
6        was marked for identification as of this
7        date.)
8   Q     Mr. Cohen, handing you Exhibit 32, a copy
9   being provided to your counsel, 32 is a document stamped
10  SAC 3349488 from Mr. Cohen to Mr. Martoma, July 20, 2008,
11  at 7:58 p.m. It says, "What is your phone number? I want
12  to patch you in."
13       Do you remember sending this e-mail?
14  A    I do not.
15  Q     When you say "want to patch you in," what are
16  you referring to?
17  A    Sounds like I am patching him into a call
18  with somebody else.
19  Q     And do you recall having a call with somebody
20  else that you wanted to patch Mr. Martoma into on the
21  evening of July 20, 2008?
22  A    I recall wanting to patch him into a call
23  with Wayne Holman. I don't think that call ever happened
24  on Sunday.
25  Q     Do you recall speaking to Mr. Holman on the

Page 170

1   evening of July 20, 2008?
2   A    I don't remember.
3        MS. COTTRELL: Did you have a call with
4   Mr. Martoma and anyone else other than Mr. Holman?
5        THE WITNESS: I don't believe so.
6        MR. KLOTZ: On July 20th, we are talking
7   about?
8        MS. COTTRELL: On July 20th.
9        (Plaintiff Exhibit 33, E-mail, SAC ELAN
10       734105, was marked for identification.)
11  Q     I am handing the witness a copy of
12  Exhibit 33. A copy is also being provided to his counsel.
13       For the record Exhibit 33 is a document Bates
14  stamped SAC ELAN 734105, from Mr. Cohen to Mr. Phillip
15  Villhauer, V-I-L-L-H-A-U-E-R.
16       Mr. Cohen, do you know who Phillip Villhauer
17  is?
18  A    Yes. He is my head trader.
19  Q     The e-mail on July 20, 2008 at 8:12 from you
20  to him says, "How much ELN does ISO own?" You see that?
21  A    Yes.
22  Q     What does ISO refer to?
23  A    That is the quantitative program that we have
24  in SAC.
25  Q     Do you have visibility to what is in the ISO

Page 171

1   account?
2   A    I can get it if I want to.
3   Q     Can you view it from home?
4   A    I probably could. I just don't know how to
5   get it.
6   Q     Do you have visibility -- in 2008 did you
7   have visibility to the positions of your other accounts
8   from home?
9   A    Probably.
10  Q     Do you remember -- Mr. Martoma earlier had
11  sent you an e-mail with the positions in the CR Intrinsic
12  firm account and his account. Do you recall looking at
13  what SAC's accounts were in other accounts from home on
14  the day of July 20, 2008?
15  A    I don't remember.
16  Q     Other than what we've discussed so far, do
17  you remember having a conversation with anybody else
18  concerning Elan or Wyeth on Sunday, July 20th?
19  A    I don't remember.
20       (Plaintiff's Exhibit 34, Verizon Wireless
21       bill, SAC COHEN 3763 through 3768, was marked
22       for identification as of this date.)
23  Q     Mr. Cohen, I am handing you what has been
24  marked Exhibit 34. I am also handing a copy to your
25  counsel. For the record, Exhibit 34 is a document Bates

Page 172

1   stamped SAC COHEN 3763 through 3768.
2        This is a Verizon Wireless bill for Steve
3   Cohen, (203)912-2982. Do you see that?
4   A    Yes.
5   Q     Is that your cell phone number?
6   A    Yes, it is.
7   Q     If I can have you turn to page 3765? There
8   is -- if you go to the first few calls on 7/20 there is a
9   (203) 979-7824. Do you recognize whose telephone number
10  that is?
11  A    No, I don't.
12  Q     If I represent to you that that is
13  Mr. Martoma's cell phone, will you accept that
14  representation?
15  A    Sure.
16       Is that okay to accept?
17       MR. KLOTZ: Sure.
18  Q     That number appears in your contacts as a
19  cell phone record for Mr. Martoma. Okay?
20       There is one call, a one-minute call followed
21  by a 20-minute call at 9:43 in the morning.
22       Do you recall -- does this refresh your
23  recollection about how long your call with Mr. Martoma
24  was?
25       MR. KLOTZ: Object to the form.

Steven Cohen                                                    May 3, 2012

| Page 173 | Page 175 |
|---|---|

Page 173

1    A    It appears to be one minute if I am looking
2  at it correctly.
3    Q    I am referring to the next call.
4    A    20-minute call?
5    Q    Yes.
6         MR. KRAMER:  Are you making a representation
7  about that call?
8    Q    We know from other records that that call is
9  also from Mr. Martoma.
10        MR. KLOTZ:  That doesn't appear from this
11 document but you are saying you know from other documents
12 that is from Martoma?
13        MR. RIELY:  Yes.
14   Q    Was your call with Mr. Martoma on the morning
15 of July 20th approximately 20 minutes?
16   A    It could have been.
17   Q    Do you remember it being longer than that?
18   A    I don't remember.
19   Q    Do you remember it being shorter than that?
20   A    I don't remember.
21   Q    In the call, other than Mr. Martoma
22 expressing that he was getting uncomfortable with the Elan
23 investment, do you recall anything else?
24   A    I don't.
25   Q    Was there any discussion of Wyeth during the

Page 174

1  call?
2    A    There might have been.
3    Q    What do you recall about that?
4    A    I am just -- it's possible.  I don't recall.
5         MS. COTTRELL:  At this time you had a lot
6  of -- you had a lot of money invested in Elan.  Correct?
7         THE WITNESS:  Yes.
8         MS. COTTRELL:  So when Mr. Martoma, who I
9  think you had described as one of your experts, said that
10 he was getting uncomfortable, you don't recall saying to
11 him, "Why?"
12        THE WITNESS:  I believe I did.
13        MS. COTTRELL:  And you don't recall any
14 substantive response that he had given you?
15        THE WITNESS:  Well, he told me again that he
16 was uncomfortable.
17        MS. COTTRELL:  And anything more substantive
18 than that?
19        THE WITNESS:  He might have.  I just don't
20 remember.
21   Q    Do you recall challenging him?
22   A    Well, I asked him again and that's what he
23 said.  And then I just don't remember the rest of the
24 conversation.
25   Q    You referenced a conversation with

Page 175

1  Mr. Martoma and Mr. Holman on July 21, 2008.
2    A    That's correct.
3    Q    When in the day was that?
4    A    I don't remember.
5         (Plaintiff's Exhibit 35, E-mail, SAC ELAN
6         0581168, was marked for identification as of
7         this date.)
8         MR. RIELY:  I am handing the witness
9  Exhibit 35 and a copy is being provided to his counsel.
10 For the record Exhibit 35 is a document Bates stamped SAC
11 ELAN 0581168, an e-mail from Mr. Martoma to Mr. Cohen,
12 July 21, 8:21 a.m.
13   Q    Do you see that, Mr. Cohen?
14   A    Yes, I do.
15   Q    The e-mail says, "Do you have a moment to
16 speak when you get in?"
17   A    I see that.
18   Q    Do you recall speaking with Mr. Martoma on
19 the morning of July 21, 2008?
20   A    No, I don't.
21   Q    Do you recall receiving this e-mail?
22   A    I don't recall -- I don't remember.
23   Q    You referenced -- at some point you had a
24 conversation with Mr. Holman and Mr. Martoma on July 21st.
25 Correct?

Page 176

1    A    Actually, I don't remember it happening that
2  way.
3    Q    What do you remember?
4    A    I don't remember being on that call.  I
5  remember asking Wayne to speak to Mat.
6    Q    When do you remember asking Mr. Holman to
7  speak to Mr. Martoma?
8    A    It would have been the 20th or the 21st.
9    Q    Do you know if they subsequently spoke?
10   A    I believe they did.
11   Q    How do you know about that?
12   A    Because Wayne reported back to me on the
13 conversation.
14   Q    What did Mr. Martoma report back to you --
15 what did Mr. Holman report back to you about his
16 conversation with Mr. -- let me rephrase the question.
17        After you asked Mr. Holman to speak to
18 Mr. Martoma on July 20th, do you understand that
19 Mr. Holman spoke to Mr. Martoma?
20   A    What date did you say?
21   Q    July 20th.
22   A    I believe it happened on the 21st.
23   Q    Did you have an understanding that
24 Mr. Martoma and Mr. Holman spoke on the 21st?
25   A    Yes, I do.

44  (Pages 173 to 176)

Steven Cohen                                                    May 3, 2012

---

Page 177

1    Q    Did Mr. Holman subsequently tell you about
2  that conversation?
3    A    Yes, he did.
4    Q    What did he say?
5    A    He said he spoke to Martoma, that he had
6  specific -- Martoma had reasons why he didn't want to be
7  in Elan anymore. They were, you know, reasons that were
8  normal, typical reasons. I am sort of summarizing because
9  I don't remember exactly what Wayne said to me.
10        Then he said, "Listen, in the end, this data
11 is 50/50. You know, this data is unknowable. It's a
12 50/50 bet."
13   Q    Who said that?
14   A    Wayne Holman.
15   Q    When did you have that conversation with
16 Mr. Holman?
17   A    On the 21st.
18   Q    When on the 21st?
19   A    After he spoke to Martoma. I don't know
20 when.
21   Q    Did you make any decisions concerning your
22 investments in Elan and Wyeth on or about July 21, 2008?
23   A    I believe at some point afterwards I started
24 selling Elan.
25   Q    Why did you start selling Elan?

---

Page 178

1    A    Well, a couple reasons. One, my two experts
2  sounded very different than the way I -- the way they
3  sounded previous. Mat sounded -- said he was very -- he
4  was uncomfortable. Then when talking to Wayne, he
5  described the Bap 2 data as a coin flip, which I was a
6  little surprised at.
7    Q    And you had conversations with Mr. Holman
8  concerning the Bap data prior to July 21, 2008?
9    A    Probably, sure.
10   Q    You said that you were surprised with
11 Mr. Holman's characterization of the Bap data being a coin
12 flip on July 21st?
13   A    That's right.
14   Q    Is that because it was inconsistent with his
15 previous recommendations to you concerning Wyeth and Elan?
16   A    I don't remember exactly what he said to me
17 on the Bap data other than that generally positive. So I
18 was surprised when he said it was 50/50 and that it was a
19 risk/reward bet. That's not what I signed up for.
20   Q    It sounds like you recall having a
21 conversation with Mr. Martoma on July 21, 2008 where he
22 said the news about the Bap data was 50/50 and that the
23 investment in Elan and Wyeth was a risk/reward bet?
24        MR. KRAMER: You said Mr. Martoma. I think
25 you mean Mr. Holman.

---

Page 179

1    Q    It sounds like, from your testimony -- is it
2  correct or not correct that you had a conversation with
3  Mr. Holman where Mr. Holman told you on July 21st that the
4  Bapineuzumab data was a coin flip and that it was a
5  risk/reward call?
6    A    That was what I took out of it. And to
7  repeat -- and then he said, "In the end, the data is
8  unknowable."
9        MS. COTTRELL: Was that a different statement
10 than Mr. Holman had made to you in the past?
11       THE WITNESS: Well, he never said that in
12 that way, so -- but, you know, that's the way Wayne talks,
13 so it's not -- it's not surprising.
14       MS. COTTRELL: Is that different from your
15 understanding of the data?
16       THE WITNESS: I didn't have an understanding
17 of the data. I just felt, based on the work that they
18 did, that at least in Wayne's case it would be better than
19 a 50/50 bet.
20       MS. COTTRELL: You had said that Mr. Holman
21 reported back that Mr. Martoma's reasons why he didn't
22 want to be in Elan were kind of normal, typical reasons.
23 What were you referring to?
24       THE WITNESS: I don't remember. I can
25 surmise what some of them could be. I mean --

---

Page 180

1        MR. KLOTZ: Do you want him to do that?
2        MS. COTTRELL: Do you have any recollection
3  of what those reasons were that Mr. Holman told you?
4        THE WITNESS: I don't remember.
5        MS. COTTRELL: Why didn't you participate in
6  the phone call between Martoma and Holman?
7        THE WITNESS: I don't remember.
8    Q    Prior to July 21, 2008 had Mr. Holman ever
9  previously referred to the Bap data as a coin flip?
10   A    I don't believe so.
11   Q    And when you referred before, when
12 referencing your conversation with Martoma, that it's not
13 what you signed up for, what did you mean by that?
14       MR. KRAMER: You said Martoma, I think you
15 mean Holman. Can you reask the question so it is clear?
16 I just want to be sure the transcript is clear.
17   Q    You referenced before, in relation to your
18 conversation with Mr. Holman, that this was not what you
19 signed up for. What did you mean by that?
20   A    I didn't want a 50/50 bet. I mean,
21 it's coin flip. You know, it's not what -- I would have
22 hoped the probability was better than 50/50.
23   Q    I am just trying to understand what you meant
24 when you said "not what you signed up for." What are you
25 referring to when you say "signed up for"?

---

45 (Pages 177 to 180)

Steven Cohen                                                    May 3, 2012

Page 181

1    A    You know, I invested money in Elan and Wyeth,
2  significant sums, and it didn't seem like I was making a
3  bet that was a 50/50 bet. I was surprised by that.
4        MS. COTTRELL: Did Mr. Holman talk to you
5  about your investment in Wyeth as opposed to Elan?
6        THE WITNESS: He might have at some point. I
7  don't – when are we talking about?
8        MS. COTTRELL: On July 21st.
9        THE WITNESS: On July 21st, I don't remember.
10 I believe we were talking about the conversation with
11 Martoma and then he made those comments.
12       MS. COTTRELL: What was Mr. Holman's view on
13 July 21st concerning Wyeth?
14       THE WITNESS: I think he was still positive
15 from a risk/reward perspective.
16       MS. COTTRELL: And do you think that because
17 he told you that?
18       THE WITNESS: It was a 50/50 bet. Wayne
19 tends to be a cautious guy and so he thinks in those
20 terms.
21       MS. COTTRELL: So on July 21st was Mr. Holman
22 still recommending that you hold Wyeth securities?
23       THE WITNESS: I don't remember speaking to
24 him specifically about that.
25    Q    On July 21, 2008, did you make any decisions

Page 182

1  as to your investment in Elan?
2    A    I believe at some point after that
3  conversation --
4    Q    Which conversation?
5    A    -- with Wayne Holman, I decided to sell the
6  Elan position.
7    Q    When you say "sell the Elan position," what
8  are you referring to?
9    A    Selling the -- whatever Elan that I owned.
10 And I believe Mat Martoma wanted to sell his Elan.
11   Q    You said you believe that Mr. Martoma wanted
12 to sell his Elan?
13   A    Yes.
14   Q    He sent you an e-mail on the Sunday where he
15 referred to the position that GEHC account in Elan was?
16   A    That's right.
17   Q    What portion of that position did Mr. Martoma
18 want to sell?
19   A    I don't remember.
20   Q    Was it all of it?
21   A    I believe he wanted to get out at some point.
22   Q    Get out of all of Elan?
23   A    I don't remember him saying that exactly but
24 that was the intent.
25   Q    The intent was to get out of Elan. Was there

Page 183

1  a date before which there was a plan to get out of Elan?
2    A    He wanted it sold during the week.
3    Q    During the week of July 21st?
4    A    That's right.
5    Q    So in advance of the July 29, 2008
6  announcement about the phase 2 trial results?
7    A    He wanted to be out of the position before
8  the data came out.
9    Q    Other than Mr. Martoma telling you that he
10 was uncomfortable with the Elan position, did he give you
11 any other reasons why he wanted to be out of Elan before
12 the July 29, 2008 announcement concerning the phase 2
13 results?
14   A    He might have. I mean, I do remember him
15 telling me that he came to my side.
16   Q    What do you mean by that?
17   A    I think it was a reference to the Kelly
18 Martin meeting. And I was somewhat skeptical. And he
19 made a comment at some point there saying, you know, "I
20 have come over to your side."
21       MS. COTTRELL: After the Kelly Martin meeting
22 you didn't sell your Elan position. Is that correct?
23       THE WITNESS: That's correct.
24       MR. KLOTZ: Object to the form retroactively.
25       MS. COTTRELL: You know there is no

Page 184

1  objections to form in testimony anyway, so --
2        MR. KRAMER: We can't help it.
3    Q    How did Mr. Martoma go about selling his
4  position in Elan from the accounts that he controlled?
5    A    I don't know if he did. I think what we did
6  was instruct Phil Villhauer to liquidate all the stock
7  that was owned by -- in the firm account, in my account
8  and in Mat Martoma's account and let him handle it.
9    Q    When was that instruction given to
10 Mr. Villhauer?
11   A    It was probably given after that phone call
12 with Wayne.
13   Q    On July 21st?
14   A    Probably.
15   Q    What were the instructions that were given to
16 Mr. Villhauer?
17   A    To sell the entire position in those three
18 accounts.
19   Q    Which three accounts?
20   A    GGEN, Cohen and GEHC.
21   Q    And GGEN is the CR Intrinsic account?
22   A    Actually, there might have been other stock.
23 I mentioned ISO. There might have been other places.
24 Generally the position that we owned in Elan.
25   Q    How about Wyeth? Were there any instructions

46 (Pages 181 to 184)

Steven Cohen                                                    May 3, 2012

Page 185

1    given to Mr. Villhauer concerning Wyeth?
2        A    I don't believe so at that point.
3        Q    Is Mr. Villhauer Mr. Martoma's trader?
4        A    No. He is the firm trader. He is in charge
5    of the trading desk.
6        Q    Why was the trades for Mr. Martoma's account
7    placed through Mr. Villhauer?
8        A    Because we wanted it executed all -- so he
9    could allocate and -- so he could handle it so we weren't
10   competing with each other in trying to get out of his
11   name.
12       MR. KLOTZ: I don't want to interrupt you in
13   the middle of key events but at some point I think it
14   would be time for a break. We have been going for well
15   over an hour.
16       Q    On July 21, 2008 did you make any decisions
17   concerning your investment in Wyeth?
18       A    What was the date?
19       Q    July 21st.
20       A    I don't remember.
21       Q    At some point prior to July 29, 2008, did you
22   make a decision concerning your investment in Wyeth?
23       A    Yes.
24       Q    When was that?
25       A    At some point during that week.

Page 186

1        Q    What prompted you to make a decision
2    concerning your investment in Wyeth the week of July 21st?
3        A    I spoke to Wayne at some point and he was
4    telling me he was selling his Wyeth.
5        Q    You referenced before a conversation on the
6    21st. Was that the same conversation in which he said he
7    was selling Wyeth?
8        A    I don't believe so.
9        Q    In the conversation where Mr. Holman
10   referenced that he was selling Wyeth, what do you recall
11   about that conversation?
12       A    I don't recall much other than he was telling
13   me he is selling his -- he is selling some Wyeth.
14       MS. COTTRELL: Did he say why?
15       THE WITNESS: I don't remember. I know he
16   was nervous about the world, the macro picture, but he
17   didn't give me any specifics.
18       MS. COTTRELL: Did he say anything else to
19   you in that conversation?
20       THE WITNESS: I don't remember.
21       MS. COTTRELL: Did he recommend that you sell
22   Wyeth?
23       THE WITNESS: I don't believe so.
24       MS. COTTRELL: Did Mr. Holman ever recommend
25   that you sell your Wyeth position?

Page 187

1        THE WITNESS: I don't believe so, but he
2    might have.
3        MS. COTTRELL: Do you have a recollection of
4    him telling you?
5        THE WITNESS: I know he told me that he was
6    selling Wyeth, so I am not sure if he told me to sell it
7    or I took it on my own volition based on that he was
8    selling it.
9        MS. COTTRELL: Aside from kind of the macro
10   concerns, did Mr. Holman say anything else about why he
11   was selling Wyeth?
12       THE WITNESS: I don't believe so.
13       MS. COTTRELL: Since Mr. Holman had macro
14   concerns, his macro concerns might not have been your
15   macro concerns. Isn't that correct?
16       THE WITNESS: I can't speak for what his
17   macro concerns were.
18       MS. COTTRELL: So did he give you any reason
19   relating to the investment in Wyeth why he was selling
20   Wyeth as opposed to kind of macro concerns about the
21   economy in general?
22       THE WITNESS: He -- I don't remember him
23   telling me specifically why he was selling Wyeth.
24       MS. COTTRELL: When we were both talking
25   about macro concerns, can you say what you meant by macro

Page 188

1    concerns?
2        THE WITNESS: Yeah. It was 2008. The
3    markets were under pressure. The stocks had outperformed
4    a lot and the markets were under pressure.
5        MS. COTTRELL: So Mr. Holman didn't tell you
6    anything specific about his views on Wyeth as to why he
7    sold Wyeth?
8        THE WITNESS: I know we spoke. I just don't
9    remember the specifics.
10       MS. COTTRELL: you don't remember him saying
11   anything specifically concerning Wyeth?
12       THE WITNESS: I don't remember that, no.
13       MR. RIELY: Off the record at 4:08.
14       (Recess.)
15       MR. RIELY: Back on the record at 4:20.
16       Q    Mr. Cohen, while we were off the record we
17   had no conversations about the substance of this
18   investigation. Correct?
19       A    That's correct.
20       Q    You referenced before that Mr. Martoma wanted
21   to get out of his position in Elan. Is that correct?
22       A    That's correct.
23       Q    When did he first express that view to you?
24       A    I don't remember. It was definitely after
25   the first conversation we had that Sunday.

47 (Pages 185 to 188)

# EXHIBIT 173

# BUSINESS INSIDER

# Here's Preet Bharara's Amazing 79-0 Insider Trading Conviction Score Card



**JULIA LA ROCHE**
FEB. 6, 2014, 4:30 PM

U.S. Attorney Preet Bharara has a perfect track record in insider trading convictions since the government's massive crackdown began in the fall of 2009.

Today, Bharara, also known as "The Sheriff Of Wall Street", convicted former SAC Capital portfolio manager Mathew Martoma in what the DOJ says is the "most lucrative" insider trading scheme of all time.



*REUTERS/ Lucas Jackson*

So far, he's 79-0 for convictions.  Of those convicted, 58 have been sentenced, while others are waiting.  What's more is there's still a handful of cases still pending.

Here's a rundown of all the folks he's convicted to date:

## INSIDER TRADING DEFENDANTS SINCE AUGUST 2009

### CASES CHARGED SINCE AUGUST 2009

|   | DEFENDANT | CHARGED | STATUS |
|---|---|---|---|
| 1 | Lee, Richard C.B. | 10/13/2009 | Pled 10/13/2009 |
| 2 | Chiesi, Danielle | 10/15/2009 | Sentenced 7/20/2011 to 30 months in prison |
| 3 | Goel, Rajiv | 10/15/2009 | Sentenced 9/24/2012 to 2 years of probation |
| 4 | Kumar, Anil | 10/15/2009 | Sentenced 7/19/2012 to 2 years of probation |
| 5 | Kurland, Mark | 10/15/2009 | Sentenced 5/21/2010 to 27 months in prison |
| 6 | Moffat, Robert | 10/15/2009 | Sentenced 9/13/2010 to 6 months in prison |
| 7 | Rajaratnam, Raj | 10/15/2009 | Sentenced 10/13/2011 to 132 months in prison |
| 8 | Far, Ali | 10/19/2009 | Sentenced 2/11/2013 to 1 year of probation |
| 9 | Khan, Roomy | 10/19/2009 | Sentenced 1/31/2013 to 1 year in prison |
| 10 | Fortuna, Steve | 10/20/2009 | Sentenced 2/13/2013 to 2 years of probation, including 6 months on home confinement and 120 hours of community service |
| 11 | Shankar, Gautham | 10/20/2009 | Sentenced 4/18/2012 to 3 years of probation, including 6 months' home confinement |
| 12 | Grmovsek, Stanko | 10/27/2009 | Sentenced 1/21/2010 to time served |
| 13 | Tudor, Franz | 10/29/2009 | Sentenced 6/4/2012 to 3 years of probation |
| 14 | Cutillo, Arthur | 11/4/2009 | Sentenced 6/30/2011 to 30 months in prison |
| 15 | Drimal, Craig | 11/4/2009 | Sentenced 8/31/2011 to 66 months in prison |
| 16 | Goffer, Emanuel | 11/4/2009 | Sentenced 10/7/2011 to 36 months in prison |
| 17 | Goffer, Zvi | 11/4/2009 | Sentenced 9/21/2011 to 120 months in prison |
| 18 | Goldfarb, Jason | 11/4/2009 | Sentenced 8/19/2011 to 36 months in prison |
| 19 | Hariri, Ali | 11/4/2009 | Sentenced 11/8/2010 to 18 months in prison |
| 20 | Kimelman, Michael | 11/4/2009 | Sentenced 10/12/2011 to 30 months in prison |
| 21 | Plate, David | 11/4/2009 | Sentenced 11/2/2011 to 3 years of probation, including 6 months home confinement |
| 22 | Shah, Deep | 11/4/2009 | At Large/Pending |
| 23 | Santarlas, Brien | 12/10/2009 | Sentenced 11/30/2011 to 6 months in prison |
| 24 | Slaine, David | 12/18/2009 | Sentenced 1/20/2012 to 3 years of probation |
| 25 | Hardin, Thomas | 12/21/2009 | Pled 12/21/2009 |
| 26 | Koval, Alexei | 3/22/2010 | Sentenced 5/24/2011 to 26 months in prison |
| 27 | Poteroba, Igor | 3/22/2010 | Sentenced 3/21/2011 to 22 months in prison |
| 28 | Hoxie, Bonnie | 5/25/2010 | Sentenced 2/22/2011 to 4 months home confinement |
| 29 | Sebbag, Yonni | 5/25/2010 | Sentenced 1/28/2011 to 27 months in prison |
| 30 | Hansen, Richard | 9/27/2010 | Sentenced 5/13/2011 to 3 months in prison |
| 31 | Benhamou, Yves | 11/1/2010 | Sentenced 12/21/2011 to 3 years supervised release |
| 32 | Chu, Don | 11/23/2010 | Sentenced 9/7/2011 to 2 years of probation |
| 33 | DeVore, Daniel | 12/10/2010 | Sentenced 12/5/2013 to time served and 2 years of supervised release |
| 34 | Scolaro, Anthony | 12/10/2010 | Sentenced 8/2/2012 to 3 years of probation |
| 35 | Motey, Karl | 12/14/2010 | Sentenced 2/4/2013 to time served |
| 36 | Fleishman, James | 12/16/2010 | Sentenced 12/21/2011 to 30 months in prison |
| 37 | Karunatilaka, Manosha | 12/16/2010 | Sentenced 9/15/2011 to 18 months in prison |

Updated: 2/6/2014

*U.S. Attorney NY's office*

## INSIDER TRADING DEFENDANTS SINCE AUGUST 2009

| | | | |
|---|---|---|---|
| 38 | Longoria, Mark Anthony | 12/16/2010 | Sentenced 7/1/2013 to time served |
| 39 | Shimoon, Walter | 12/16/2010 | Sentenced 7/1/2013 to time served |
| 40 | Pflaum, Jason | 12/17/2010 | Sentenced 1/31/2013 to time served |
| 41 | Jiau, Winifred | 12/28/2010 | Sentenced 9/21/2011 to 48 months in prison |
| 42 | Nguyen, Bob | 1/11/2011 | Sentenced 10/2013 to 2 years of probation |
| 43 | Cardillo, Michael | 1/26/2011 | Sentenced 10/25/2012 to three years of probation |
| 44 | Smith, Adam | 1/26/2011 | Sentenced 6/26/2012 to 2 years of probation |
| 45 | Freeman, Noah | 2/7/2011 | Pled 2/7/2011 |
| 46 | Barai, Samir | 2/8/2011 | Pled 5/27/2011 |
| 47 | Longueuil, Donald | 2/8/2011 | Sentenced 7/29/2011 to 30 months in prison |
| 48 | Skowron, Joseph | 4/13/2011 | Sentenced 11/18/11 to 5 years in prison |
| 49 | Nguyen, Son Ngoc | 5/27/2011 | Sentenced 4/12/2012 to 1 year of probation |
| 50 | Peterson, H. Clayton | 8/5/2011 | Sentenced 10/11/2011 to 24 months probation with first 3 months on home confinement |
| 51 | Peterson, Drew | 8/5/2011 | Sentenced 4/11/2012 to 3 years of probation |
| 52 | Ng, Stanley | 8/10/2011 | Sentenced 5/9/2012 to 2 years of probabtion with 400 hours of community service |
| 53 | Allen, Scott | 9/15/2011 | Pled 3/19/12 |
| 54 | Bennett, John | 9/15/2011 | Pled 11/28/2011 |
| 55 | Brownstein, Drew K. | 10/21/2011 | Sentenced 1/11/12 to 1 year and 1 day in prison |
| 56 | Gupta, Rajat | 10/26/2011 | Sentenced 10/24/2012 to 2 years in prison |
| 57 | Newman, Todd | 1/18/2012 | Sentenced 5/2/2013 to 54 months in prison |
| 58 | Chiasson, Anthony | 1/18/2012 | Sentenced 5/13/2013 to 78 months in prison |
| 59 | Horvath, Jon | 1/18/2012 | Pled 9/28/2012 |
| 60 | Kuo, Danny | 1/18/2012 | Pled 4/13/2012 |
| 61 | Tortora, Jesse | 5/18/2011 | Pled 5/18/2011 |
| 62 | Adondakis, Spyridon ("Sam") | 4/25/2011 | Pled 4/25/2011 |
| 63 | Goyal, Sandeep ("Sandy") | 11/3/2011 | Pled 11/3/2011 |
| 64 | Whitman, Doug | 2/10/2012 | Sentenced 1/24/2013 to 2 years in prison |
| 65 | Kinnucan, John | 2/17/2012 | Sentenced 1/15/2013 to 51 months in prison |
| 66 | Barnetson, Donald | 2/17/2012 | Sentenced 6/25/2013 to 1 year of probation |
| 67 | Kwok, Robert | 5/21/2012 | Sentenced 10/17/2012 to 2 years probation |
| 68 | Shah, Reema | 5/21/2012 | Pled 5/21/2012 |
| 69 | Ebrahim, Alnoor | 6/18/2012 | Sentenced 10/25/2012 to one year and one day in prison |
| 70 | Nguyen, Tai | 6/26/2012 | Sentenced 3/14/2013 to one year and one day in prison |
| 71 | Wang, Wesley | 7/13/2012 | Sentenced 1/9/2013 to two years of probation |
| 72 | Lim, Hyung | 9/4/2012 | Pled 9/4/2012 |
| 73 | Martoma, Mathew | 11/20/2012 | Convicted at trial 2/6/2014 |
| 74 | Conradt, Thomas C. | 11/29/2012 | Pled 4/3/2013 |
| 75 | Weishaus, David J. | 11/29/2012 | Pled 12/19/2013 |
| 76 | Martin, Trent | 12/26/2012 | Pled 9/12/2013 |
| 77 | Rajaratnam, Rengan | 3/21/2013 | Pending |
| 78 | Riley, David | 3/26/2013 | Pending |
| 79 | Teeple, Matthew | 3/26/2013 | Pending |

Updated: 2/6/2014

*U.S. Attorney NY's office*

## INSIDER TRADING DEFENDANTS SINCE AUGUST 2009

| | | | |
|---|---|---|---|
| 80 | Johnson, John | 3/18/2013 | Pled 3/18/2013 |
| 81 | Steinberg, Michael | 3/29/2013 | Convicted at trial 12/18/2013 |
| 82 | Lee, Richard | 7/23/2013 | Pled 7/23/2013 |
| 83 | S.A.C. Capital Advisors, L.P. | 7/25/2013 | Pending |
| 84 | S.A.C. Capital Advisors, LLC | 7/25/2013 | Pending |
| 85 | CR Intrinsic Investors, LLC | 7/25/2013 | Pending |
| 86 | Sigma Capital Management, LLC | 7/25/2013 | Pending |
| 87 | Aggarwal, Sandeep | 7/30/2013 | Pled 11/8/2013 |
| 88 | Prado, Waldyr | 1/27/2014 | Pending |
| 89 | Cornelsen, Igor | 1/27/2014 | Pending |

**TOTAL CHARGED:** 89
**TOTAL CONVICTED:** 79
**TOTAL SENTENCED:** 58

Updated: 2/6/2014

*U.S. Attorney NY's office*

* Copyright © 2014 Business Insider, Inc. All rights reserved.

http://www.businessinsider.com/bharara-insider-trading-convictions-2014-2

Case 1:12-cr-00973-PGG   Document 287-17   Filed 05/28/14   Page 98 of 113

# EXHIBIT 174

By continuing to use this site you consent to the use of cookies on your device as described in our **cookie policy** unless you have disabled them. You can change your **cookie settings** at any time but parts of our site will not function correctly without them.



ft.com/frontpage   UK      All times are London time

# FINANCIAL TIMES

| Home | World | Companies | Markets | Global Economy | Lex | Comment | Management | Life & Arts |
|------|-------|-----------|---------|----------------|-----|---------|------------|-------------|
| Video | Interactive | Blogs | News feed | Alphaville | beyondbrics | Portfolio | Special Reports | In depth | Today's Newspaper | Tools |

July 18, 2008 3:00 am

# Blowing in the wind

By Krishna Guha

F or Janet Yellen, president of the Federal Reserve Bank of San Francisco, the forces that began threatening the US economy nearly a year ago are "a bit like the opening of *Macbeth* , with the three ghastly witches brewing up trouble amid thunder and lightning". She adds: "Only here, the three troublemakers are the housing market, the financial markets and commodity prices."

Almost a year on, those three troublemakers are still very much at work. Financial markets remain in turmoil and the fate of the US economy once more hangs in the balance. **Growth this quarter is shaping up to be quite strong** . But the risk of a relapse **into very weak growth or even** recession has increased. The core dynamic of the credit squeeze - financial weakness and economic weakness feeding off each other - has intensified **recently** , reinforced by the shock from oil.

Yet the danger of high inflation becoming embedded in the US economy has also escalated, with rapid energy price increases pushing headline consumer price rises to 5 per cent year-on-year and driving up at least some measures of future inflation expectations.

The latest big intervention by the US authorities - the rescue plan for Fannie Mae and Freddie Mac - has secured the troubled mortgage giants' access to funds and with it a continued flow of finance for the beleaguered housing sector. **Bear StearnsBut it provoked little immediate reaction in the wider financial markets.** Indeed, financial shares fell further in the days following the Fannie and Freddie rescue, before **rebounding** strongly in midweek, in a **sharp** reminder that neither stocks nor the US economy offer a one-way bet.

Economists and investors alike are left wondering where we are in the credit crisis: whether, to borrow from baseball, the US is in the eighth inning or the fourth inning of a nine-inning game. For a while it looked as though the Bear rescue marked the turning point of the credit crisis. Now it is clear that while it marked a turning point in the crisis, it did not mark *the* turning point. There is little reason to think that the Fannie and Freddie intervention will mark the ultimate turning point either.

Fannie's and Freddie's debt was always seen as implicitly backed by the government. Their rescue closes off one avenue to financial and economic disaster. But it does not greatly im-prove the situation of other financial groups. As terrifying as the possibility of a Fannie or Freddie default might be, it was only one factor in the contest of forces weighing on financial markets and the economy.

On the one hand, after a shaky start to the year, the US economy has proved remarkably resilient through the spring and early summer. Gross domestic product might have contracted in some individual months, but across the first half as a whole it expanded at a stronger than expected pace. The US has continued to benefit from global growth, with exports providing an essential support for economic activity. But consumer spending has also held up much better than many - including the Federal Reserve Board - had expected.

At their last meeting in June, Fed officials revised up their "central tendency" forecasts for growth this year to reflect the first-half performance. They now expect growth this year (on a fourth-quarter-to-fourth-quarter basis) to come in at 1-1.6 per cent, compared with their April expectation for 2008 of just 0.3-1.2 per cent.

On the other hand, the economy is in increasing danger of deteriorating again later this year. The forces at work are the same three "witches" that threatened the US from the outset of the crisis. **While there have been occasional glimpses of hope on all three fronts, overall, these negative forces intensified over the past two months.** As a result, a growing number of economists are predicting a "W-shaped" downturn, with some forecasting outright contraction around the turn of the year.

Depending on how economists ultimately classify the period of weakness at the start of this year, the year-end could mark the moment when the US finally falls into recession - or tips back into it. "I think there is a better than 50-50 chance that we see a double-dip recession,"

says Richard Berner, chief US economist at Morgan Stanley. He says the consumer is being buffeted and the headwinds have only grown worse of late.

At the core of the threat to growth is the resumption of the basic dynamic of the credit crisis: a negative-feedback loop from a damaged financial sector to the real economy and back again. This is aggravated by the decline in house and stock prices that reduces the collateral available to support loans.

From its high in the middle of May, the S&P 500 financials index fell 37 per cent to its low on Tuesday before bouncing back in the past 48 hours to trade yesterday at nearly 15 per cent below the low reached in March at the time of the Bear crisis.

Amazingly enough, banks still did not know the ultimate extent of their losses on complex new credit securities. Now, they are taking a second wave of losses caused by rising delinquencies on a wide range of loans that have been put under stress by economic weakness. There is nothing unusual about these losses - they are part of an old-fashioned credit cycle. The problem is that the banks are entering this phase with their capital already impaired by the previous wave of markdowns. At the same time, financial groups are desperately trying to reduce their leverage, in response to increased volatility and to a market demand for solid counterparties.

"Who is driving deleveraging? In short, all of us," says Jan Loeys, strategist at JPMorgan Chase. "We as institutions: as banks, hedge funds and broker-dealers." But "it is very hard for the overall system to deleverage", he says.

Many analysts are concerned that there will be a rash of bank failures. But even if there were not, banks unable or unwilling to raise expensive equity could further cut back on lending, intensifying the credit squeeze in the economy. "In many cases banks are deleveraging or shrinking or are reluctant to raise the extra capital needed to take advantage of business opportunities," Ben Bernanke, the Fed chairman, told Congress this week.

The difficulties in the financial sector are closely linked to uncertainty over the economic outlook - and, above all, the outlook for housing. House prices have a powerful effect on consumer spending through their impact on wealth and on access to credit. They also affect financial institutions through their influence on mortgage defaults and the value of mortgage-backed securities. According to the S&P Case-Shiller 10-cities index, house prices are down 19 per cent from their peak and, based on futures trading, are expected to fall 30 per cent in all before bottoming out. This measure, which captures only the main metropolitan areas, is seen as exaggerating the likely nationwide price decline. But as Fed policymakers observed in the minutes of their June policy meeting, the outlook for housing remains "bleak".

While some affordability measures have improved, prices remain high relative to rents. Inventories of unsold homes are at elevated levels and the downward momentum in house prices shows no sign of abating.

T here is a danger that house prices could undershoot fair value on the way down, just as they overshot it on the way up. More than 500,000 mortgages began the foreclosure process in the first quarter and in some localities there is evidence of "foreclosure spirals", in which falling prices push up foreclosures, in turn driving prices still lower.

"The asset price deflation in housing makes it very difficult to stabilise the financial system's balance sheets; it also accentuates the headwinds facing the real economy," says Mohamed El-Erian, co-chief executive at Pimco, the bond fund manager.

Overlaid on the credit squeeze is the additional shock from oil, which may prove to be the decisive factor that tips the economy into recession. Most analysis focuses on the effect of oil on inflation. But the jump in petrol prices also imposes a big tax on US consumers. Since the start of the year, moreover, rapid increases in food and energy prices have essentially eaten up nominal wage growth, leaving no growth in real labour incomes to support consumption.

With the pressure from the credit squeeze, housing, oil and a softening jobs market, the wonder is that the US economy has been as resilient as it has to date. First-quarter growth was revised upward to 1 per cent. For the second quarter, growth could come in at 2 to 2.5 per cent - not far below the country's long-term trend.

A large chunk of the first half's strength will have come from net exports. But consumer spending has continued to grow, in part the result of $110bn (£55bn, €69bn) in tax rebates sent out from May onwards. These rebates appear to have had a strong immediate impact on spending, boosting consumption growth by perhaps 2 percentage points. But the stimulus is temporary and will fade in the second half of this year.

There may be another reason why spending is holding up for now, yet may fade as the second half unfolds. The time lag between the credit crisis in the financial sector and the peak of the credit squeeze in the real economy may simply be longer than initially anticipated.

At the onset of the credit crisis last August, banks had already committed large unused lines of credit to companies and to individuals (in the shape of home equity lines of credit, credit cards with generous lines of credit and the like). Since the start of this year, lenders have been cutting back on new credit lines and trying to pare back old ones. But cancelling existing lines is not easy and many borrowers have been able to draw on preauthorised credit.

Moreover, coming into the crisis, companies were generating lots of cash. This self-generated cash provided a buffer against reduced credit. But it is gradually being eroded by a weak economy. Lawrence Summers, a Harvard professor and former Treasury secretary, says the peak impact of the credit squeeze on the real economy is probably still to come. "I would be surprised if it had peaked already," he says.

Yet at the same time, the US faces a very serious inflation risk. The 5 per cent inflation reached in June is unlikely to be the peak. In essence, it is externally generated, driven up by record prices for globally traded oil and food. But the longer it persists, the greater the risk that it could become embedded in domestic prices. Some measures of inflation expectations are flashing an alert. Core inflation (excluding food and energy) crept higher last month.

There is clearly some chance that the economy, after turning out to be stronger than most economists expected in the first half, could sustain this momentum in the second six months of the year. Persistent growth could, moreover, also indicate that the US is less vulnerable to financial market dislocations than generally thought. If that is the case, growth could quickly return to normal levels or higher, fuelled by very low real interest rates and an expected stabilisation in home construction, particularly if financial strains ease again.

That could swiftly reduce the currently modest amount of economic slack - unemployment is still only 5.5 per cent - and greatly aggravate the risk that high inflation becomes embedded in domestic wage and price setting behaviour.

Even if growth does not turn out to be stronger than expected, there is still some risk that inflation expectations could take off despite a weak economy. In effect, workers might accept little or no increase in expected real wages but demand full compensation for higher prices - as they did in the 1970s.

If the Fed miscalculates, the US could have a serious inflation problem on its hands. But if it responds to inflation risk appropriately, the result will be to amplify the growth risk. At a minimum, unless the price of oil suddenly subsides or the economy enters a crater, the most the Fed will be able to do is to put off the day when it has to start raising rates again.

Moreover, if inflation expectations worsen further, the US central bank would have to abandon its balancing act and raise rates, in spite of the consequences for growth. This raises the question of what, if anything, the authorities could still do to reduce the growth risks without compounding the inflation risks.

While policymakers have been able to moderate the impact of the financial crisis and close off particular routes to economic Armageddon, they have not been able to break the underlying dynamic. With monetary policy at full stretch - given the threat from inflation - the bulk of any future policy response will have to come from the fiscal authority: the US government.

Hank Paulson, the Treasury secretary, has taken the view that the government should if necessary intervene to ensure the stability of the system as a whole but let individual institutions, companies and households work through their problems. The Bush administration argues that markets will naturally stabilise if they are left alone, as prices fall to levels that attract new buyers.

It could be right. The bounce-back in financial stocks this week demonstrates that at a certain price investors are willing to take on risks. At some stage house prices will reach an equilibrium point at which buyers return to match supply; then - if not before - the credit crisis will be over. Moreover, the task of balancing growth and inflation risks could become less difficult if the oil price subsides. **The decline in crude prices this week raises the tantalising possibility that oil could be easing its grip on the economy.**

But Mr El-Erian of Pimco says there may be "multiple unstable equilibria" for house prices, the financial sector and the economy. In other words, there could be a "good equilibrium" - higher house prices, recovering banks, a stronger economy - and a "bad equilibrium" - lower house prices, troubled banks and a weak economy. Or there could be other intermediate outcomes.

Mr Summers wants a second fiscal stimulus to prop up the economy while the housing market adjusts, reducing the risk that the jobs market could collapse, driving house prices still lower. Others think policymakers should focus on more targeted interventions to reduce the risk that house prices will undershoot fair value.

Martin Feldstein, a professor at Harvard, says: "The key is to take away the incentive for people to default on their mortgage when they have negative equity, because that will drive house prices down further."

Whether the interventionists are right or not, if the feared economic weakness materialises, the next president of the US could take office in very difficult circumstances. Ambitions for foreign policy, tax cuts and domestic reform might have to take second place to figuring out a way to revitalise the economy.

**RELATED TOPICS**   United States of America, Central Banks

Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.

© **THE FINANCIAL TIMES LTD 2014** FT and 'Financial Times' are trademarks of The Financial Times Ltd.

# EXHIBIT 175

By continuing to use this site you consent to the use of cookies on your device as described in our **cookie policy** unless you have disabled them. You can change your **cookie settings** at any time but parts of our site will not function correctly without them.



ft.com/frontpage    UK        All times are London time

# FINANCIAL TIMES

| Home | World | Companies | Markets | Global Economy | Lex | Comment | Management | Life & Arts |
|------|-------|-----------|---------|----------------|-----|---------|------------|-------------|
| Video | Interactive | Blogs | News feed | Alphaville | beyondbrics | Portfolio | Special Reports | In depth | Today's Newspaper | Tools |

July 29, 2008 3:00 am

# IMF gloom over 'fragile' markets and global risk

By Krishna Guha in Washington

Global financial markets are "fragile" and indicators of systemic risk remain "elevated" almost a year into the credit crisis, the International Monetary Fund said yesterday.

The fund warned credit growth in the US could fall further as a result of continuing financial system stress and warned that emerging markets would be tested as global financing conditions tightened and policymakers tackled rising inflation.

The IMF noted that house prices had softened in a number of European economies including the UK, raising the possibility of further problems in those markets.

The assessment came in the July update to the global financial stability re-port, led by Jaime Caruana, former Bank of Spain governor.

Mr Caruana warned the year-long financial crisis was starting to squeeze lending, "leading to a negative feedback loop between the financial system and the broader economy" as reduced household spending slowed the real economy and prompted further lending cuts in deteriorating credit conditions.

If US house price declines began to level off, that "would remove a key component of the feedback loop", he said. However, he warned "a bottom for the housing market is not yet visible".

The IMF said while likely losses on US subprime mortgages had "largely been acknowledged" in writedowns, financial institutions faced a second wave of losses on other loans. Credit quality "across many loan classes has begun to deteriorate with declining house prices and slowing economic growth".

With mounting inflationary pressure, the fund said, "policy trade-offs between inflation, growth and financial stability are . . . increasingly important".

The IMF reaffirmed its earlier, contentious estimate that total losses in this cycle could total $945bn (€600bn, £474bn) - a number that combines mark-to-market losses on subprime-related securities and estimates of likely losses on loans.

Relative to April, when the fund published its last stability report, it said "systemic strains in funding markets continue" and the "low level of risk appetite remains unchanged". Interbank lending rates "remain elevated", while "long-term funding costs have risen" for financial institutions.

The IMF said financial institutions globally had written off about $400bn since the crisis began last August and that while they had raised substantial amounts of capital, the losses had "exceeded capital raised". Banks also faced problems maintaining their earnings, weakening stock prices and making it more difficult to raise capital.

The fund said policy interventions - mostly by the US Treasury and the Federal Reserve - had so far succeeded in containing systemic risk. But it said the authorities in the US in particular had had to intervene further to preserve financial stability.

It, in effect, endorsed the need for the US to shore up Fannie Mae and Freddie Mac in the short term - saying their failure would have systemic consequences - but said "the policy challenge now is to find a clear and permanent solution" for the troubled governmentsponsored mortgage groups.

**RELATED TOPICS**    United States of America, United Kingdom, Central Banks, International Monetary Fund

Case 1:12-cr-00973-PGG   Document 287-17   Filed 05/28/14   Page 106 of 113

**Printed from:** http://www.ft.com/cms/s/0/8526a81a-5d05-11dd-8d38-000077b07658.html

Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others.

© **THE FINANCIAL TIMES LTD 2014** FT and 'Financial Times' are trademarks of The Financial Times Ltd.

# EXHIBIT 176

**U.S. v. Raj Rajaratnam, et al.; U.S. v. Dainielle Chiesi, et al.**
**Hedge Fund Insider Trading Takedown**

**Prepared Remarks for U.S. Attorney Preet Bharara**

**October 16, 2009**

Good afternoon.  My name is Preet Bharara, and I am the United States Attorney for the Southern District of New York.

Today, we take decisive action against fraud on Wall Street.  We have unsealed two complaints charging six defendants with allegedly making more than $20 million in profits through insider trading.

Three of the defendants manage large hedge funds on Wall Street with literally billions of dollars under management – and virtually all of the alleged insider trading took place in those hedge funds.  Those defendants are:

(1) Raj Rajaratnam, portofolio manager for the Galleon Technology Funds;

(2) Danielle Chiesi, an employee at NewCastle Partners (formerly the equity hedge fund group at Bear Stearns); and

(3) Mark Kurland, a top executive at NewCastle.

The other three defendants were high-level corporate insiders – at Intel, at IBM, and at McKinsey and Company – who gained (and then gave away) sensitive and confidential information about Fortune 500 companies.  This information allegedly included advance information about earnings, planned joint ventures, and still-secret corporate acquisitions.  Those three defendants are:

(1) Rajiv Goel, a Director at Intel Capital;

(2) Robert Moffat, a Senior Vice President at IBM; and

(3) Anil Kumar, a Director at McKinsey and Company.

On stock after stock – in companies like Hilton and Google and Advanced Micro Devices – these defendants allegedly conspired with each other to cheat the market and enrich themselves by trading on inside information to turn profits of more than $20 million.

I am joined today by our two law enforcement partners in this case:  Joe Demarest, the Assistant Director-in-Charge of the New York Division of the FBI, and Robert Khuzami, the Director of Enforcement for the United States Securities and Exchange Commission.  I am also joined by

Ray Lohier, the Chief of this Office's Securities and Commodities Fraud Task Force, and the AUSAs handling the prosecutions – Josh Klein, Jon Streeter, and Andrew Michaelson.

Now, I want to emphasize that this is not a garden-variety insider trading case. It is unprecedented for at least two reasons. First, with alleged profits of more than $20 million, this case represents the largest hedge fund insider trading case ever charged, criminally.

Second, we believe this case represents the first time that court-authorized wiretaps have been used to target significant insider trading on Wall Street. All the defendants charged today were ultimately caught committing their alleged crimes over phones that we were listening to.

This aggressive use of wiretaps is important: it shows that we are targeting white collar insider trading rings with the same powerful investigative tools that have worked so successfully against the mob and drug cartels.

As I said, the defendants charged today worked across the securities industry – from hedge funds to Fortune 500 companies to an international consulting company. They used their access to inside information to gain an unfair trading advantage.

Chart 1
[Selected Hedge Fund Insider Trading]

This chart here highlights some of the hedge fund insider trading we've outlined in the complaints.

As alleged in the complaints, in some cases, inside information was traded for money.

In other cases, valuable inside information was traded for other valuable inside information. The defendants, in a sense, operated in a cozy world of you scratch my back and I'll scratch yours.

Let me close by saying this:

Greed, sometimes, is not good. This case should be a wake up call for Wall Street.

It should be a wake up call for every hedge fund manager and every Wall Street trader and every corporate executive who is even thinking about engaging in insider trading.

As the defendants in this case have now learned the hard way, they may have been privy to a lot of confidential corporate information, but there was one secret they did not know: we were listening.

Today, tomorrow, next week, the week after, privileged Wall Street insiders who are considering breaking the law will have to ask themselves one important question: Is law enforcement listening?

# EXHIBIT 177

UNITED STATES DEPARTMENT *of* JUSTICE

THE UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT *of* NEW YORK

SEARCH THE SITE

Search        **SEARCH**

HOME | ABOUT | MEET THE U.S. ATTORNEY | DIVISIONS | NEWS | PROGRAMS | EMPLOYMENT | CONTACT US

Home » News

PRESS RELEASES

Follow @SDNYNews        🖨 Printer Friendly

UNITED STATES ATTORNEYS' OFFICES
**HOMEPAGE**

UNITED STATES ATTORNEYS' OFFICES
**BRIEFING ROOM**

Community Outreach

**Giving Back to the Community**
through a variety of venues &
initatives.

LEARN MORE

**VWA**
VICTIM
WITNESS
ASSISTANCE

**Making sure that victims of
federal crimes are treated with
compassion, fairness and respect.**

LEARN MORE

OFICINAS DE LOS FISCALES DE
LOS ESTADOS UNIDOS
EN ESPAÑOL

STAY CONNECTED

Twitter

## SAC Capital Portfolio Manager Mathew Martoma Found Guilty In Manhattan Federal Court Of Insider Trading Charges

**FOR IMMEDIATE RELEASE**                                      Thursday, February 6, 2014

*Most Lucrative Insider Trading Scheme Ever Charged Earned S.A.C. Capital $275 Million
In Illegal Profits And Avoided Losses*

Preet Bharara, the United States Attorney for the Southern District of New York, announced that
MATHEW MARTOMA, a former portfolio manager of CR Intrinsic Investors, LLC, a division of S.A.C.
Capital, was found guilty today in Manhattan federal court in connection with his participation in the most
lucrative insider trading scheme ever charged, involving approximately $275 million in illegal profits and
avoided losses. MARTOMA was convicted after a four-week jury trial presided over by U.S. District Judge
Paul G. Gardephe.

Manhattan U.S. Attorney Preet Bharara said: "As the jury unanimously found, Mathew Martoma cultivated
and purchased the confidence of doctors with secret knowledge of an experimental Alzheimer's drug, and
used it to engage in illegal insider trading. Martoma bought the answer sheet before the exam – more than
once – netting a quarter billion dollars in profits and losses avoided for SAC, as well as a $9 million bonus
for him. In the short run, cheating may have been profitable for Martoma, but in the end, it made him a
convicted felon, and likely will result in the forfeiture of his illegal windfall and the loss of his liberty.
Mathew Martoma becomes the 79th person convicted of insider trading after trial or by guilty plea in this
District in the last four years."

According to the allegations in the Superseding Indictment filed in Manhattan federal court, other court
documents, and the evidence presented at trial:

During the period of the insider trading scheme, MARTOMA was an S.A.C. Capital portfolio manager
responsible for investment decisions in public companies in the health care sector, including
pharmaceutical companies Elan and Wyeth, that were involved in the development of experimental drugs
to combat Alzheimer's Disease. At the time, scientists and investors alike were awaiting the results of a
clinical trial being conducted by Elan and Wyeth for a drug called bapineuzumab, which offered a novel
but untested approach to the treatment of Alzheimer's Disease (the "Drug Trial").

In order to obtain material nonpublic information (the "Inside Information") about the Drug Trial,
MARTOMA, shortly after starting his employment at S.A.C. Capital in the summer of 2006, began using
expert networking firms to try to speak to doctors involved in the Drug Trial with access to confidential
information. Through these efforts, MARTOMA arranged dozens of paid consultations with one of the
Drug Trial's principal investigators, Dr. Joel Ross, and the chairman of the Drug Trial's Safety Monitoring
Committee ("SMC"), Dr. Sidney Gilman. Through an exploitation of MARTOMA's personal and financial
relationships with these doctors, MARTOMA was able to obtain Inside Information about the Drug Trial.

The Inside Information that MARTOMA initially received from Dr. Ross included anecdotal reports
concerning patients under Dr. Ross's care. The Inside Information MARTOMA initially received from Dr.
Gilman included generally positive safety data about which Dr. Gilman was aware through his
chairmanship of the SMC. In fact, MARTOMA arranged a paid consultation shortly after each and every
SMC meeting, in part to ensure that he would be among the first to learn if any substantial safety issues
were emerging from the Drug Trial that could lead to the cancellation of the Drug Trial and decreases in
the price of Elan and Wyeth stock. Based in part on the positive safety information, MARTOMA purchased

and held shares of Elan and Wyeth, and further recommended that the owner of S.A.C. Capital (the "S.A.C. Capital Owner") purchase and hold Elan and Wyeth securities, which the S.A.C Capital Owner did. By the spring of 2008, S.A.C. Capital held approximately $700 million worth of Elan and Wyeth equity securities.

Elan and Wyeth planned to release the full results of the Drug Trial to the investing public at the International Conference on Alzheimer Disease (the "ICAD Presentation") on July 29, 2008. Dr. Gilman was selected to present the results on behalf companies and was "unblinded" to the full safety and efficacy results of the drug trial on July 15, 2008. Until that time, Dr. Gilman had only been privy to the safety results of the Drug Trial. On July 17, 2008, Dr. Gilman received a draft PowerPoint presentation that had been created for the ICAD meeting and that was marked "Confidential, Do Not Distribute." The draft PowerPoint presentation showed that the Drug Trial results were negative, particularly in comparison with market expectations. The results raised serious questions about how well the drug worked and, in fact, whether it worked at all.

Later on July 17, 2008, MARTOMA called Dr. Gilman from his home and spoke to Dr. Gilman in detail about the draft PowerPoint presentation during a phone call that lasted one hour and forty-five minutes. Then, on Saturday, July 19, 20008, MARTOMA flew roundtrip from New York City to Detroit, Michigan, to meet Dr. Gilman in his University of Michigan office and review the draft PowerPoint presentation further.

The next day, Sunday, July 20, 2008, MARTOMA sent the owner of S.A.C. Capital (the "S.A.C. Capital Owner") an email in which he wrote that "...It's important [that we speak,]" which they did, for approximately 20 minutes. The S.A.C. Capital Owner then directed S.A.C Capital to sell Elan and Wyeth securities prior to the ICAD Presentation. Over the next seven days, S.A.C. Capital liquidated its entire equity position in Elan and almost all of its equity position in Wyeth – a total of 17.7 million shares worth approximately $700 million. S.A.C. Capital also shorted Elan and Wyeth by approximately 7.75 million shares. This trading represented over 20% of the reported U.S. trading volume in Elan and 11% of the volume in Wyeth.

MARTOMA also received information about the ICAD presentation from Dr. Joel Ross. In particular, on the evening of July 28, 2008, after Dr. Ross had been un-blinded to the Drug Trial results at a dinner for Principal Investigators, Dr. Ross met with MARTOMA in a hotel lobby to discuss the negative results. To Dr. Ross's surprise, MARTOMA already seemed to have seen the Drug Trial results.

The day after the ICAD presentation, Elan stock closed approximately 42% lower, and Wyeth shares fell approximately 11%. Through this trading activity S.A.C. Capital earned profits and avoided losses of approximately $275 million.

*          *          *

MARTOMA, 39, was convicted of one count of conspiracy to commit securities fraud and two counts of securities fraud. He faces a maximum penalty of five years in prison for the conspiracy charge and 20 years in prison on each of the two securities fraud charges. With respect to the conspiracy charges, he faces a maximum fine of $250,000, or twice the gross gain or loss derived from the crimes, and for the securities fraud charges, he faces a maximum fine of $5 million, or twice the gross gain or loss derived from the crime on each charge.

Mr. Bharara praised the efforts of the FBI and also thanked the SEC for its assistance in the investigation. He added that the investigation is continuing.

This case was brought in coordination with President Barack Obama's Financial Fraud Enforcement Task Force, on which Mr. Bharara serves as a Co-Chair of the Securities and Commodities Fraud Working Group. The task force was established to wage an aggressive, coordinated and proactive effort to investigate and prosecute financial crimes. With more than 20 federal agencies, 94 U.S. attorneys' offices and state and local partners, it's the broadest coalition of law enforcement, investigatory and regulatory agencies ever assembled to combat fraud. Since its formation, the task force has made great strides in facilitating increased investigation and prosecution of financial crimes; enhancing coordination and cooperation among federal, state and local authorities; addressing discrimination in the lending and financial markets and conducting outreach to the public, victims, financial institutions and other organizations. Over the past three fiscal years, the Justice Department has filed nearly 10,000 financial fraud cases against nearly 15,000 defendants including more than 2,900 mortgage fraud defendants. For more information on the task force, please visit www.stopfraud.gov.

This case is being handled by the Office's Securities and Commodities Fraud Task Force. Assistant U.S. Attorneys Arlo Devlin-Brown, Eugene Ingoglia, Megan Gaffney, and Andrea Griswold are in charge of the prosecution.

14-040

 0

U.S. v. Mathew Martoma S1 Indictment.pdf

National
Terrorism
Advisory
System

Return to Top

**SOUTHERN DISTRICT** *of* **NEW YORK**
One St. Andrews Plaza - New York, NY 10007

**JUSTICE.GOV/USAO**

| HOME | ABOUT | PRESS RELEASES | MEET THE US ATTORNEY | DIVISIONS | PROGRAMS | EMPLOYMENT | CONTACT US |
|------|-------|----------------|----------------------|-----------|----------|------------|------------|
|      | The District | Conferences | U.S. Attorney | Civil Division | Victim Witness | AUSAs | Telephone |
|      | Office History | Speeches | Senior | Criminal | Services | Support Staff | Mail |
|      |       |                | Leadership | Division |          | Intern Program | Webmaster |
|      |       |                |                      |           |          |            | Report A Crime |

Site Map
Accessibility
FOIA
Privacy Policy
Legal Policies & Disclaimers

Justice.gov
USA.gov