UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                       :

UNITED STATES OF AMERICA         :

                                       :

         -v.-                 :           S1 12 Cr. 973

                                       :

MATHEW MARTOMA,          :

                                       :

              Defendant.      :

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# GOVERNMENT'S SENTENCING MEMORANDUM

 

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
       of America

ARLO DEVLIN-BROWN
EUGENE INGOGLIA
Assistant United States Attorneys

     - Of Counsel -

# **Table of Contents**

Table of Authorities ........................................................................................................ ii

PRELIMINARY STATEMENT ...................................................................... 1

I.   Offense Conduct ......................................................................................... 1

II.   The Guidelines Calculation ...................................................................... 5

A.   The Calculation Appropriately Includes The Gains and Avoided Losses of SAC Capital, Trading on Martoma's Recommendation ...................................................... 6

B.   The Wyeth Swap Is Wholly Irrelevant To The Calculation Of Gain .................................. 10

C.   Whichever July 30, 2008 Stock Price For Elan and Wyeth Is Chosen as a Reference Point to Determine Gain, The Total Remains In Excess of $200 Million, and the Guidelines Calculation is Not Impacted ............................................................................................. 13

II.   The Section 3553(a) Analysis.................................................................... 15

A.   The Offense Was Serious ......................................................................... 15

B.   Martoma's Role In the Offense Was Central .................................................. 20

C.   A Significant Period of Imprisonment Toward the High End of the Insider Trading Sentences Imposed by Courts in this District Would Not Create an Unwarranted Sentencing Disparity........................................................................................................ 21

D.   The "History And Characteristics Of The Defendant" ........................................ 24

E.   Impact On The Defendant's Family .............................................................. 27

CONCLUSION.............................................................................................. 29

# Table of Authorities

United States v. Fernandez
    443 F.3d 19, 32 (2d Cir. 2006)……………………………………………….. 23

United States v. Florez,
    447 F.3d 145 (2d Cir. 2006)……………………………………………… 23, 24

United States v. Goffer
    721 F.3d at 113, 132 (2d Cir. 2013)……………………………………… 18

United States v. Heffernan
    43 F.3d 1144, 1149 (7th Cir. 1994)……………………………………….. 16

United States v. Sarna
2009 WL 2633153 (S.D.N.Y. 2009)……………………………………………. 26

United States v. Silkowski
    32 F.3d 682, 688 (2d Cir. 1994)…………………………………………… 7, 8

United States v. Skowron
    11 Cr. 699 (S.D.N.Y. 2011)………………….……………………..………… 22

United States v. Wills
    476 F.3d 103, 109-10 (2d Cir. 2007)…………………………………….... 23

## PRELIMINARY STATEMENT

The Government submits this memorandum in connection with the sentencing of the defendant Mathew Martoma (the "defendant") and in response to the defendant's sentencing submission filed on May 27, 2014 ("Def. Mem."). Martoma was the central figure in the most lucrative insider trading scheme ever charged. Over a period of approximately 18 months, the defendant cultivated and corrupted two doctors legally bound to guard confidential information concerning a high-profile drug trial, ultimately obtaining an advance preview of the highly-anticipated public announcement of the results. Martoma caused approximately $750 million worth of Elan and Wyeth securities to be traded based on this illegal inside information, netting profits and avoiding losses of $275 million for SAC Capital and, as a direct result, a $9.3 million bonus for himself. Although the Government does not oppose a sentence below the applicable Guidelines Range of 188 to 235 months, we respectfully request a sentence that nevertheless includes a substantial period of incarceration that is commensurate with the seriousness of the offense conduct and the unprecedented ill-gotten gains that it generated. In this regard, the Government respectfully submits that a significant period of imprisonment toward the high end of the insider trading sentences imposed by courts in this District – and above Probation's recommendation of 96 months – is warranted.

### I.     Offense Conduct

Mathew Martoma's entire success across his four years at SAC Capital was based on illegal insider trading. Days after starting at SAC Capital, in the summer of 2006, Martoma began searching for doctors who would be willing to provide him access to confidential information about a high-profile Alzheimer's disease drug trial (the "Drug Trial") conducted by

Elan Pharmaceuticals Plc. ("Elan")  and Wyeth Corporation ("Wyeth").  Finding two such

doctors – Dr. Joel Ross and Dr. Sidney Gilman – Martoma proceeded to corrupt them through

consulting fees and phony promises of business referrals and friendship, obtaining confidential

information about the safety of the drug.  The ultimate payoff from the relationships Martoma

carefully nurtured for nearly two years came in July 2008, when first Dr. Gilman and then Dr.

Ross discussed with Martoma the negative results of the Drug Trial prior to the public

announcement on July 29, 2008 ("the "Public Announcement"), and when Martoma, acting on

this information, caused the sale of approximately $750 million worth of Elan and Wyeth

securities.

      The evidence at trial established the evolution of the conspiracy following Martoma's

arrival at SAC Capital.  In August, 2006, Martoma sent an e-mail to his contact at an expert

networking firm, the Gerson Lehrman Group ("GLG"), attaching a list of all principal

investigators on the Drug Trial and requesting consultations with each of them.  (GX 262).  That

same month, Martoma began engaging in paid consultations with Dr. Gilman, the chair of the

Safety Monitoring Committee ("SMC") for the Drug Trial.  Martoma ultimately consulted with

Dr. Gilman through GLG forty-two times prior to the Public Announcement (GX 600),

becoming Dr. Gilman's most regular client and, from Dr. Gilman's perspective, a friend.  (Tr.

1236-1238).  Over the course of these consultations, Dr. Gilman learned confidential information

about the safety of the drug during the SMC meetings he chaired.  The SMC was initially

concerned about a potentially dangerous side effect – vasogenic edema – but learned as the Drug

Trial went on that it appeared that the side effect could be managed through a protocol developed

by the SMC.  (Tr. 883-887).  The SMC met five times following Martoma's employment at SAC

and prior to the Public Announcement.   (GX 105, 109, 110, 111, 117).   Martoma arranged GLG

consultations with Dr. Gilman to occur shortly after each and every one of these SMC meetings

and, during these post-SMC consultations (GX 600), Dr. Gilman provided Martoma with

detailed and confidential safety data he had learned from the Drug Trial sponsors.  (Tr. 1275-

1276).

  During the same timeframe, Martoma consulted with Dr. Ross through a second expert

networking firm.  Dr. Ross, like Dr. Gilman, had entered into a confidentiality agreement

concerning the Drug Trial, and was forbidden from disclosing any non-public information about

the trial.  Despite this, Dr. Ross – hoping that Martoma would refer pharmaceutical companies to

a new clinical trial facility he was starting – disclosed to Martoma confidential information about

the Drug Trial.  (Tr. 645).  Dr. Ross told Martoma that one of his patients had developed

vasogenic edema but that the side effect was well-managed, and shared anecdotal information

about how the patients under his care appeared to be doing.  (Tr. 614-615).

  The Public Announcement of the Drug Trial results was scheduled to take place after the

stock market closed on July 29, 2008, at the annual meeting of the International Conference on

Alzheimer's Disease.  In May, 2008 Martoma learned that the Drug Trial principal investigators

would be briefed on the results on the evening of July 28, and Martoma arranged a meeting with

Dr. Ross to take place immediately after the debriefing so that Dr. Ross could share with

Martoma the still-confidential results one trading-day in advance of the Public Announcement.

(Tr. 826; GX 365, 367).  In June, Martoma learned that Dr. Gilman had been selected to deliver

the Public Announcement on behalf of Elan and Wyeth and would be unblinded to the detailed

results several weeks in advance.  (Tr. 1396).  On Sunday, July 13, 2008, Martoma and Dr.

Gilman spoke by phone to discuss the most recent information from the July 11, 2008 SMC, and ended the call with plans to speak again on Thursday, July 17, 2008, after Dr. Gilman returned from San Francisco where he would be unblinded to the results and develop a draft presentation for the Public Announcement.  (GX 710, 752; Tr. 1408-09, 1412).

On July 17, 2008, Martoma left work midday to return home for his scheduled call with Dr. Gilman (arranged outside of GLG's auspices), who had received a confidential draft PowerPoint presentation containing the Drug Trial results only a few hours before the call.  (GX 11, 11A).  During a call lasting one hour and 45 minutes, Dr. Gilman proceeded to walk Martoma through the draft PowerPoint presentation in detail.  (Tr. 1424, GX 1211).  Later that evening, Martoma called Dr. Gilman and told him that, as events would have it, Martoma would be in Ann Arbor that Saturday, and asked to drop by Dr. Gilman's office.  Martoma booked the trip and on Saturday flew to Detroit (GX 1307) and took a taxi to Dr. Gilman's Ann Arbor office, where Martoma reviewed the PowerPoint presentation in person and discussed it with Dr. Gilman.  (Tr. 1440-1456).   An hour and a half later, the taxi driver drove Martoma back to the Detroit airport for his trip home.  (GX 759, 1002A, 1400, 1401, 1402, 1120).

The very next day, Martoma e-mailed the owner of SAC Capital, Steve Cohen, that he needed to speak to him about something "important." (GX 459).  Shortly thereafter, the two men spoke for 20 minutes (GX 1215) and Martoma sent Mr. Cohen an e-mail about the Elan and Wyeth positions.  (GX 460).  The next morning, Martoma began liquidating the entirety of the Elan positions in the portfolio he controlled, and Steve Cohen directed the same for his portfolio. (GX 431, 436).  On the evening of July 28, 2008, Martoma met with Dr. Ross as scheduled.  (Tr. 714).  Dr. Ross shared what he had learned at the confidential debriefing of the principal

4

investigators and was struck that Martoma appeared to have already seen the slides that Dr. Ross had just viewed. (Tr. 714-17, 826). On July 29, 2008, SAC liquidated what remained of its Wyeth position in equity securities and further shorted Elan stock. (GX 1258, 1261). Following the Public Announcement, shares of Elan and Wyeth fell approximately 40 percent and 11 percent respectively, on a day when the S&P 500 index was up. (GX 1262, 1264, 1265).

By causing SAC Capital to liquidate nearly $750 million worth of Elan and Wyeth securities prior to the Public Announcement, Martoma cheated the market to earn profits and avoid losses for SAC Capital in the staggering amount of $275 million. The $9.4 million bonus Martoma was awarded at the end of 2008 was based *entirely* on trades that year in Elan and Wyeth. Indeed, but for Martoma's pre-July 2008 trading in Elan and Wyeth securities, Martoma's portfolio would have performed negatively through each of his four years at SAC Capital. (Cite GXs). Martoma's apparent success at a SAC Capital was thus only a mirage, masking a trading strategy dependent at its core in obtaining and using material non-public information.

## II.    The Guidelines Calculation

As set forth in the PSR, pursuant to U.S.S.G. § 2B1.4(b), the base offense level for insider trading offenses is 8. (PSR ¶ 32). The defense does not dispute the base offense level.

Pursuant to U.S.S.G. § 2B1.4(b)(1), the base offense level is increased by the "gain resulting from the offense" from the table in § 2B1.1(b)(1). The "gain" is "the total increase in value realized through trading in securities by the defendant and *persons acting in concert with the defendant or to whom the defendant provided inside information . . . .*" U.S.S.G. § 2B1.4 cmt (emphasis added).

5

Probation added 28 levels, based on a gain of an amount greater than $200 million. (PSR ¶ 33).  That resulted in a total offense level of 36 (PSR ¶ 40), and, at criminal history category I, a Guidelines range of 188 to 235 months' imprisonment. (PSR ¶ 85).  This is the correct calculation.

### A.    The Calculation Appropriately Includes The Gaines and Avoided Losses of SAC Capital, Trading on Martoma's Recommendation

As to the amount of the "gain" to be included in the Guidelines calculation, Probation relied on the evidence introduced at trial, which showed that the profits earned and avoided losses based on Martoma's trading and recommendations was approximately $275 million.  *See* GX 1268; Tr. 2232-2234, 2383-2391.  Probation appropriately came to that number by including as part of the total gain attributable to the defendant under Section 2B1.4, trading by SAC based on Martoma's recommendation to Cohen that SAC sell Elan and Wyeth, because SAC and Cohen were "persons acting in concert with the defendant or to whom the defendant provided inside information" within the meaning of Section 2B1.4.

It is not necessary for the Court to find that Cohen knew that the information Martoma provided him was obtained in breach of a duty of trust and confidence.  The comment to Section 2B1.4 contains two separate prongs for attributing another individual's trading activity to a defendant.  The first prong – that the trader act "in concert with" the defendant – covers individuals who had some level of awareness of the illegal nature of the information.  If the second prong in Section 2B1.4's comment – a person "to whom the defendant provides inside information" – is to be given any independent meaning, it must apply when the recipient of the inside information was not aware of the illegal nature of the information he or she received, since

knowledge of the illegality of the information would always place the recipient in the "in concert with" category in the comment to Section 2B1.4.

The fact that the Government did not allege that Cohen was a coconspirator at trial is of no moment here. As noted, the Guidelines provision expressly includes trading profits and avoided losses of another trader whether or not the trader was aware of the criminal scheme.[1] Accordingly, SAC's gains and avoided losses based on Martoma's recommendation should be included in the calculation of the profits and avoided losses attributable to Martoma's misconduct – as Probation did.

In *United States v. Steinberg*, the Government and the defense argued this very issue at sentencing – whether or not the applicable Sentencing Guidelines for Steinberg should include SAC's trading in Dell, or should be limited to only Steinberg's own trading. The defense argued that if Cohen could not be proven to be a co-conspirator, then the gains associated with his trades for SAC should not be attributed to Steinberg. The government responded that the only issue necessary to resolve was whether Steinberg's recommendation was a basis for Mr. Cohen's trading. (Steinberg Sent. Tr., attached as Exhibit A, 12-14). At sentencing, Judge Sullivan ruled that there was a sufficient factual basis to find "that the information was conveyed to Mr. Cohen, and was, in fact, the basis for his trading" and that Steinberg was therefore liable Mr. Cohen's trading for Guidelines purposes. (Steinberg Sentencing Tr. 13-14, 21-22). The same analysis applies here.

---

[1]     In addition, the Sentencing Guidelines permit courts to consider as relevant conduct the entire range of a defendant's conduct, "regardless of the number of counts that are alleged or on which a conviction is obtained." U.S.S.G. § 1B1.3, comment. (backg'd). Even "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range." *Id.*; *United States* v.

7

The defense trots out its oft-repeated refrain that there were "myriad reasons to sell… that had nothing to do with the alleged inside information" (Def Mem. at 30.).  But while there was evidence at trial that there might have been reasons at various points in 2007 and 2008 that other people might have considered reasons to sell Elan or Wyeth, the jury determined, based on compelling  evidence, that Martoma made *his* decision to sell on the basis of the inside information he received from Dr. Gilman.  It was undisputed that, throughout 2007 and much of 2008 Martoma recommended to Cohen that he purchase Elan and Wyeth shares for SAC Capital, which he did, "tagging" Martoma so that he would receive financial compensation for the recommendation. It was only after reviewing the draft PowerPoint from Dr. Gilman, and quickly and urgently communicating with Steve Cohen over the weekend after Martoma's trip to Michigan to meet with Dr. Gilman, that SAC Capital started to unwind its entire massive position in a secret fashion, and then go short, ahead of the public announcement.   And of course SAC Capital chose to compensate Martoma for the sale recommendation.  There is therefore ample basis for the Court to conclude that Mr. Cohen's decision to sell Elan and Wyeth occurred after Martoma's recommendation and because of Martoma's recommendation, regardless of whether or not Cohen knew that Martoma's recommendation was based on material non-public information.[2]

---

*Silkowski*, 32 F.3d 682, 688 (2d Cir. 1994) (relevant conduct includes conduct not charged in the indictment.)

[2]        For the same reasons the Court chose not to allow the admission at trial of select portions of Cohen's self-serving deposition testimony before the Securities and Exchange Commission, the Court should not give any weight to Cohen's denial (as portrayed at Def. Br. at 30) in that proceeding that he received inside information from Martoma, or that he relied on advice from Wayne Holman, whom the defense did not choose to call as a witness at trial.  In any event, for the reasons, discussed in the Government's opposition to the defendant's motion to admit Cohen's deposition testimony, that testimony even if fully credited, does not as the

8

The other cases referenced by the defendant are either inapposite or in fact support the Government's analysis.  Here, unlike those cases (such as defendants Emanuel Goffer and Michael Kimelman) involving defendants for whom the magnitude of trading was not foreseeable, the evidence at trial plainly showed that Martoma specifically recommended the Elan and Wyeth positions that were amassed in various SAC accounts (as well as in Martoma's own GEHC account).  Indeed, Martoma was compensated on that basis, and, as SAC's Chief Financial Officer testified, it would be "inconceivable" for a portfolio manager to be compensated for positions traded by the hedge fund unless he had recommended those trades.  (Trial Tr. 526-27).  And the evidence overwhelmingly showed that, after learning the bad news about the results of the drug trial from Dr. Gilman, Martoma contacted Steve Cohen on Sunday, spoke with him by telephone, and at Cohen's direction SAC began liquidating their position the very next morning.  Moreover, Martoma himself, in an email he sent after the fact, claimed credit for the successful Elan trades, while making an argument about how much money he had made the firm through his recommendations.  (GX 550).   In an attachment to that email, Martoma estimated he made the firm some $212.6 million dollars; and took credit for performance in multiple firm accounts such as the GEHC account, the GGEN account, the COHE account and other accounts, in which the Elan short sales took place.  (GX 551).

As a result, Martoma is differently situated from those defendants in the Goffer case.  In the Goffer cases, Zvi Goffer received merger tips from insiders.  Zvi Goffer then tipped, among others, Emanuel Goffer and Kimelman.  Neither Emanuel Goffer nor Kimelman tipped any other individuals.  Zvi Goffer was held responsible not only for his own trades, but for the trades of his

---

defense claims establish that Martoma played no role in Mr. Cohen's decisions to sell Elan and Wyeth.

downstream tippees, including Emanuel Goffer and Kimelman.  Those defendants, however, were held responsible for their own respective trades alone.  While they were members of the same conspiracy, they were not part of the same firm, or responsible for each other's trades in the way that Martoma contributed to SAC's decisions to trade in Elan and Wyeth here, at the same fund.  Martoma specifically recommended the trades to SAC's owner, Cohen, and was compensated by Cohen for those recommendations, thus making him more analogous to Zvi Goffer, who was held accountable for all of the trades of the downstream tippees when he was sentenced to a term of imprisonment of 10 years.

In addition, the defense curiously cites *United States v. Gupta* in support of its argument that Martoma should only be held responsible for his own trading.  (Def. Mem. at 30-31.)  But Gupta was held responsible for profits earned from trades made "directly and immediately as the result of tips from Gupta" of inside information.  (Def. Mem 30-31, Def. Ex. 131, attaching and citing *Gupta* sentencing transcript.)  This limiting principle is of no help to Martoma; there can hardly be more dramatic examples of directness and immediacy as those employed by SAC to divest itself of its Elan and Wyeth positions, commencing early in the morning Monday after Martoma's communication with Cohen on Sunday (following Martoma's Saturday mad-dash flight to Detroit to meet with Dr. Gilman about the inside information).

For all the foregoing reasons, SAC's profits and avoided losses are appropriately included in the Guidelines calculation for Martoma.

### B.      The Wyeth Swap Is Wholly Irrelevant To The Calculation Of Gain

The defense submission introduces a red herring to the calculation of profits and avoided loss, by including in that calculation the changes in value of the Firm's Wyeth swap, which was

*not traded at all* in the weeks leading up to the announcement.  Given the complete lack of

trading, it is perhaps not surprising that there is no allegation that SAC traded the Wyeth swap

based on inside information.  It is absolutely nonsensical to include this untraded position in an

analysis of the profits gained and losses avoided due to insider trading, as the defense suggests.

There can be no insider-trading based gain or avoided loss, where there was no trading.

The folly of this effort is perhaps best illustrated by considering what the appropriate

calculations of gain and avoided loss might have looked like, had SAC actually unwound its

Wyeth swap, after hearing Martoma's inside-information based recommendation.[3]   Had that

happened, then it would be appropriate to consider additional gains or avoided losses, and the

ultimate number would have been much higher than $275 million.  Martoma's argument thus

boils down to the illogical proposition that because SAC could have, but did not, make illegal

gains in an amount exceeding $275 million, that the Guidelines gain should therefore be reduced

below the $275 million gain that SAC Capital actually achieved.

Even if the defendant's logically nonsensical and legally unsupported claim that SAC

should receive credit for not engaging in insider trading in the Wyeth swap was adopted, the

defendant's argument still fails as a matter of math.  What the defense approach does is look at

the theoretical decrease in value of the Wyeth swap position between the market opening on July

21, 2008 and July 30, 2008 (using the highest trading price in Wyeth stock that day).  *See* Def

Ex. 115 at 5.  The stock price fell in that period by approximately $6.30 per share, using the

defense-suggested prices, from $47.10 to $40.80 (Def. Ex. 115 at 3, n. 3, and at 5, n.6).   The

---

[3]   As the evidence at trial showed, unwinding this position would have been difficult to
do on the sly, as it required contacting the counterparties and negotiating an early termination,
shortly before a widely anticipated public announcement that was expected to impact the price of
Wyeth.   There was no dark-pool equivalent method available for unwinding the swap position.

value of the Wyeth swap, which SAC Capital held on July 21, 2008 and continued to hold on July 30, 2008, after the public announcement of the Drug Trial results, decreased by approximately $75.6 million, as measured by the defense calculation.  (Def. Ex. 115 at 6).  This, obviously, was not a realized loss *because there was no sale* – the firm still held the Wyeth swap position on July 30, 2008.  Indeed, when SAC unwound the swap in August, 2008 it did so at a higher price than when the swap was entered into, earning a profit.  (Tr. 2483-84).

The defense methodology then takes that $75.6 million unrealized paper decrease in value, and *subtracts* it from the total gains and avoided losses due to insider trading.  (Def. Ex. 115 at 6).  It is only this perverse subtraction that enables the defense to argue that the total profits and avoided losses associated with Martoma's insider trading scheme[4] are "less than $200 million".  *See* Def. Mem. at 35, Def. Ex. 115 at 6 (losses and avoided profits for SAC total $207.5 million in the defense calculation, without the $75.6 million adjustment.).

In sum, the defense proposes that the total gains and avoided losses due to SAC's trading on Martoma's insider information driven recommendation and his own trading, be discounted by an unrealized paper loss in a security in which there was no trading during the relevant period and about which there was no allegation that there was insider trading.  The defense does not offer any support for taking this approach, because there is none, as the approach is patently absurd on its face.  The Court should not consider the Wyeth swap – or any other trades that SAC did not execute during the relevant time period – in its calculations of the overall gain and avoided losses associated with Martoma's insider trading scheme.

---

[4] The defense separately argues, among other things, that the Court should only consider profits and avoided losses incurred in the defendant's GEHC account, for Guidelines purposes. For the reasons set forth in the previous section, this argument should be rejected.

12

### C.   Whichever July 30, 2008 Stock Price For Elan and Wyeth Is Chosen as a Reference Point to Determine Gain, The Total Remains In Excess of $200 Million, and the Guidelines Calculation is Not Impacted

The defense objects to Probation's use of the closing price on July 30, 2008, as its reference point for determining the profits and avoided losses associated with Martoma's insider trading scheme.  (Def. Mem. at 35-36.)   Instead, the defense argues that the appropriate reference price should be the highest price at which the stocks traded on the day after the announcement, explicitly because it results in the smallest "gain", and because such a "conservative" approach was employed by Judge Sullivan in determining an appropriate forfeiture amount in *United States v. Contorinis* (Def. Ex. 115, Def. Mem. at 31-33, 35.)

As an initial matter, as noted above, whether one uses the stock price favored by the defense, or the stock price used by Probation (and by the Government at trial), the total gain and avoided losses associated with Martoma's insider trading scheme exceeds $200 million ($275 million as calculated by the Government at trial; $207.5 million using the defense price, if one does not incorporate a special Wyeth Swap adjustment).   Under Section 2B1.1, there is a 28 level increase where the total exceeds $200 million but is less than $400 million.  U.S.S.G. § 2B1.1(b)(1)(O).  Therefore, the Guidelines calculation remains the same, whichever reference price is employed, because, as discussed in the preceding section, there is no basis in law or logic for factoring non-trading in the Wyeth swap into the equation.

The Court need only make a reasonable estimate of loss.  U.S.S.G. § 2B1.1, Application Note 3(C).  The Government's method, using the closing price at the end of the first trading day after the public announcement, is a reasonable method.  The Government's approach does not employ the lowest price at which the stocks traded that day – Elan traded lower (at $19.30)

before closing at $19.63, and Wyeth traded as low as $38.30 before closing at $39.74**.**
Moreover, the evidence at trial showed that the sheer size of SAC's position in Elan and Wyeth –
much larger than any position considered in any other insider trading case – would have made
liquidating the entire position at once virtually impossible.  It is likely that the firm would not
have been able to sell the millions of shares – that it sold over the course of week – at a single
moment in the course of a single trading day after an announcement of bad news.  Sales of that
many shares certainly would have driven the stock price down.  As the SAC witnesses testified,
one reason for the secrecy surrounding their unwinding of the positions, and the use of dark
pools and other non-transparent methods, was to avoid downward pressure on prices that would
have been occasioned by more visible sales in such volumes.  (Tr. 2311).

On these facts, while there is uncertainty as to the exact price at which SAC could have
sold (or the collective average price at which it would have sold the entire position), it is virtually
certain that the collective average price at which it would have sold the entire position would not
have been the *highest* price of the day, the price which the defense seeks to employ, as effort to
sell a massive Elan position at that price would have pushed the price downwards.  In this
context, the closing price at the end of the day, which was up from the day's low price for each
stock, is a fair estimate on which the Court may reasonably rely.   The closing price represents
the price of these securities *after* a significant volume had been sold through the day's trading,
and thus serves as a useful proxy for the price of Elan and Wyeth had SAC Capital sought to
sells its large positions over time on that day.[5]

----

[5] Additionally, the defense suggestion that the calculation must be adjusted by an
unspecified amount to reflect the volatility of the market in 2008 (Def. Mem. at 33), is undercut
by the fact that the dramatic declines in the stock price of Elan and Wyeth immediately after

For all of these reasons, the Probation's Department's calculation of a gain of over $200 million is accurate, and the corresponding Guidelines Range of 188 to 235 months' imprisonment is accurate.

## II.      The Section 3553(a) Analysis

In determining a reasonable sentence, the sentencing Court must consider, along with the Guidelines Range, each of the factors set forth in 18 U.S.C. § 3553(a).  These factors include, among others, (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (3) the need for afford adequate deterrence to criminal conduct; and (4) the need to avoid unwarranted sentence disparity.  *See* 18 U.S.C. § 3553(a).

As set forth below, the 3553(a) factors support a sentence moderately higher than the 96 months' recommended by the Probation Department.  Insider trading is a serious offense generally, and Martoma committed the most lucrative insider trading offense ever charged, by a significant margin, through an 18-month long cultivation of doctors with access to confidential information.   Particularly given the magnitude of the crime, a significant sentence is needed to promote respect for the law, provide just punishment, and deter others.

---

Elan's public announcement of the drug trial results on July 29, 2008 occurred on a day (July 30, 2008) on which the S&P Index *rose*.   Whatever volatility that existed in the market in 2008 was not generally moving the market down on July 30, 2008; and there was no specific showing at trial that the drop in Elan and Wyeth stocks was unusually precipitous for reasons other than as a reaction to the bad news announced by Elan.  *See, e.g.,* Tr. 1511-12 (Rene Shen, testifying that the news about the results was shocking, worse than expected, and "as bad as it could have been.")

### A.      The Offense Was Serious

There can be no dispute that insider trading is a serious crime.  A fundamental purpose of the securities laws is to outlaw deceptive practices in the securities markets.  Insider trading undermines the public's confidence in the capital markets and deters ordinary investors from investing in those markets to the extent they are seen as rigged in favor of well-connected Wall Street professionals.[6]  Not only does insider trading harm the integrity of the markets but it also harms public companies whose business secrets are purloined for personal gain.  Moreover, because insider trading schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

If the crime of insider trading is a serious one, Martoma stands before the Court as one of the very worst offenders.  By one important measure, the amount of illegal profits, Martoma's crimes are without parallel.  As set forth in the preceding section section, Martoma sold or

---

[6]      *See* Insider Trading and Securities Fraud Enforcement Act of 1988, H.R. Rep. No. 100-910, at 7-8 (1988), *reprinted in* 1988 U.S.C.C.A.N. 6043,6044, (stating that "[i]nsider trading damages the legitimacy of the capital market and diminishes the public's faith .... [T]he small investor will be--and has been--reluctant to invest in the market if he feels it is rigged against him"); H.R. Rep. No. 98-355, at 5 (1983) (emphasizing that "[t]he abuse of informational advantages that other investors cannot hope to overcome through their own efforts is unfair and inconsistent with the investing public's legitimate expectation of honest and fair securities markets where all participants play by the same rules"); Arthur Levitt, *A Question of Integrity: Promoting Investor Confidence By Fighting Insider Trading,* in vital Speeches of the Day, Vol. LXIV, 354, 355 (Apr. 1, 1998) ("The American people see it, bluntly, as a form of cheating.").

caused to be sold approximately $750 million worth of Elan and Wyeth exposure in the seven

trading days leading up to the public announcement of the Drug Trial results.  The result was

profits and avoided losses of $275 million to SAC Capital.  Martoma himself received a bonus of

over $9 million.

The lucrative nature of the scheme, reflected in the Guidelines calculations, is an

important measure of the seriousness of the offense and the need for a significant sentence in

several ways. While Martoma argues that the Guidelines Range "should be disregarded by the

Court" and "should not even form the starting point for the Court's analysis" (Def. Mem. at 2),

the fact is that massive illegal trades and correspondingly outsized profits provide a very

important measure of the seriousness of the offense.

First, the magnitude of the scheme impacts the need for a term of incarceration sufficient

to promote deterrence.  Indeed, the defendant's argument that the fraud loss table has no

relationship to the need for deterrence (Def. Mem, at 25) flies in the face of the economic

analysis central to operation of hedge funds: risk and reward.  Financial industry professionals

routinely engage in risk/reward calculations in making trading decisions, and a sentence for

illegal trading should convey that when a trader is tempted to cheat because of exceptionally

high rewards (measured in dollars), the downside risk (measured in years of prison if caught)

will correspondingly increase.[7]  If the penalty is not sufficiently steep, a trader may determine

that an opportunity to make illegal profits in the hundreds of millions may be worth the relatively

---

[7] Indeed, in a 2013 survey of 250 financial industry professionals involved in securities trading, a full 23% of respondents stated that they "likely would engage in insider trading to make $10 million if they could get away with it." *See* Jason M. Breslow, *Survey: One in Four on Wall Street Open to Insider Trading*, PBS Frontline, available at http://www.pbs.org/wgbh/pages/frontline/business-economy-financial-crisis/untouchables/survey-one-in-four-on-wall-street-open-to-insider-trading/.

low risk of getting caught and serving a short sentence of imprisonment.  The calculation changes when a potential insider trader considers a penalty that approximates a decade imprisonment.  *See also Goffer,* 721 F.3d at 132 ("The district court's assertion that insider trading requires high sentences to alter th[e] calculus" that insider trading is "a game worth playing" given the potential for large profits "is a Congressionally-approved example of giving meaning to the 18 U.S.C. § 3553(a) factors").

Second, the amount of money a defendant steals through fraud speaks in a meaningful way to the wrongfulness of conduct.  A defendant who perpetrates a multi-hundred million fraud scheme has simply committed a greater transgression than someone who perpetrates a fraud scheme involving a few thousand dollars, just as a shoplifter who steals diamonds bears more culpability than a shoplifter stealing a candy bar.  Indeed, insider trading of the sort Martoma engaged in – the calculated cultivation of corrupt relationships with insiders, for the purpose of gaining inside information and then trading on it – is driven by the desire for financial success through trading.  The amount of the sought-after gain is the whole point of the illicit activity.  In Martoma's case, the amount of the profit and avoided loss was directly tied to his personal compensation at the firm in the form of a bonus – the more he made for the firm, the more he got paid.

It may be that in other cases, where a defendant is ignorant of the magnitude of the trading, that the loss table is an imprecise measure of culpability.  But that is hardly the case here.  Martoma knew exactly the nature and size of the positions he amassed for his own account and for SAC.  Martoma knew the magnitude of what he and the hedge fund stood to gain by dumping and shorting the position after he acquired the inside information from Dr. Gilman.

Indeed, he trumpeted it to SAC's leadership when negotiating his compensation.  *See* GX 550, 551.

Third, the magnitude of the securities fraud scheme relates to the impact the crime had on trust in the markets that is essential to their functioning.  *See Goffer,* 721 F.3d at 132 (insider trading gain of approximately $11 million "had major deleterious effects on the market").  It is an incredible fact that, during the week leading up to the public announcement, SAC Capital was responsible for more than 20% of all trading in Elan ADRs.  *Complaint*, para. 35, 12 Mag  2985. Accordingly, nearly a quarter of the stock market investors buying Elan shares in the week leading up to the announcement were buying from a hedge fund that, acting on inside information, knew that the price of Elan securities was far too high given the non-public news about the Drug Trial results.  The fact that a major hedge fund, representing such a large percentage of the securities transactions in the stock, was acting on the basis of secret, market-moving information that other investors did not have is a more significant breach of market integrity than a scheme in which a fortuitous individual investor holding only a few hundred shares of a stock received a tip based on illegal inside information.  Indeed, a number of investors who lost money buying Elan and holding it through the announcement have written to the Court to express this sense of unfairness, a sense of unfairness no doubt driven in part by the magnitude of SAC Capital's gains.

Martoma seeks to downplay the seriousness of the offense by arguing that the criminal activity was limited to a few weeks, but this is simply incorrect.  Count One of the Superseding Indictment charged an insider trading conspiracy from 2006 to July 2008, and the evidence at trial demonstrated that while the ultimate "payoff" to the scheme was Dr. Gilman's willingness,

19

after over 18 months' of cultivation, to give Martoma far more sensitive confidential information about the Drug Trial than he had previously obtained, the criminal conduct leading up those two weeks in July 2008 was long-running. The fact that the most crucial, profitable trading on this information occurred over two weeks says little about the culpability of Martoma, who had for years been pushing Dr. Gilman and Dr. Ross to tell him whatever confidential information they were learning.

### B.       Martoma's Role In the Offense Was Central

Martoma's role in the offense was central.  Martoma was not a passive recipient of inside information; he urged those with duties to Elan and Wyeth to share with him information that breached these duties.  Most notably, Martoma made last-minute plans for a solo round-trip Saturday visit to Dr. Gilman (on the pretext of visiting a bereaved relative) so he could see for himself a confidential PowerPoint presentation of the Drug Trial results that Dr. Gilman was set to deliver.  Martoma's constant and direct involvement in encouraging doctors who owed duties of confidentiality to Elan and Wyeth to breach those duties is a more direct role, with great moral culpability, than is the case when a tippee is uninvolved with the core breach and merely benefits from it.  Nor was Martoma a mere conduit for inside information being transmitted to others; Martoma traded on the inside information in his own portfolio and urged the owner of SAC Capital directly to trade in other firm portfolios (for which Martoma's contract provided a sharing of the profits).  In short, Martoma was at the heart of the scheme, culpable for causing both the illegal breach of confidentiality and for trades designed to profit on the same.  But for Martoma's role there would have been no breach of duty, no insider trading, and no ill-gotten gains of $275 million.

20

**C.     A Significant Period of Imprisonment Toward the High End of the Insider Trading Sentences Imposed by Courts in this District Would Not Create an Unwarranted Sentencing Disparity**

Martoma also argues that the criminal conduct at issue was not more serious than conduct of twelve other defendants sentenced following insider trading trials in this district in recent years when measured on a number of metrics, and that a sentence above several years' imprisonment would result in unwarranted disparities.  To this end, Martoma discusses in detail a number of data points – the number of securities traded in, number of co-conspirators, number of tippers, number of tippees, etc. – and argues that Martoma compares more to defendants who received lower sentences, such as Gupta.

As an initial matter, Martoma's methodology is self-serving, focusing on certain metrics benefitting Martoma even though the relevance of these metrics is not always apparent or explained in the defense submission.  For example, the defense submission contains a detailed analysis of the number of co-conspirators in Martoma's case compared with the number of co-conspirators involved in other recent cases, pointing out that Martoma had relatively few co-conspirators in comparison to certain other defendants.  *See* Def. Mem. at 47-49.  However, one could just as easily argue that culpability is generally *greater* where a defendant was at the center of a massive securities fraud scheme – indeed, the driver of that scheme – in comparison to cases in which a defendant is simply one of number of friends exchanging and trading on illegal tips obtained indirectly.  Likewise, it is not clear why a defendant who obtains high-quality inside information directly from one or two inside sources is less culpable, as the defense would seem to have it, than a defendant who gets less significant inside information from a greater number of lower-quality or indirect inside sources.  *See* Def. Mem. at 49-50 (comparing the number of

tippers providing Martoma with inside information in comparison to other defendants).

The greatest flaw in Martoma's methodology, however, are not the metrics chosen by the defense but the metrics simply omitted. Most obviously, defendant's 14-page analysis (Def. Mem. at 40 to 54) omits any comparison between Martoma and the other defendants based on the amount of illegal profits received, a measure on which Martoma's conduct would rank more serious that Rajaratnam's by a factor of four. Martoma also fails to include the role of the defendant in terms of causing the breach and trading on the information in his analysis. Martoma is one of the relatively rare defendants who both directly caused the breach of duty from the public company insider (Gilman, in his role as presenter of the Drug Trial data) *and* controlled a portfolio through which to trade based on the inside information.[8] By contrast, the majority of the defendants cited by Martoma were either people who caused a breach but did not trade on the information (e.g., Jiao, Fleishman and Gupta) or who received inside information through a chain of tippees and did not personally encourage the original insider to breach his duty (e.g., Steinberg, Newman, Chiasson, and Whitman). Likewise, if one were to consider the role of the defendant at the particular fund, the size of the portfolio controlled, or the size of the position traded based on inside information, Martoma would rank unfavorably to all defendants with the possible exception of Rajaratnam. Finally, if one were to compare the significance of the breach of duty by assessing the market-moving power of the information improperly disclosed, Martoma's theft of a confidential PowerPoint presentation that sent a security falling

---

[8]     Indeed, a somewhat analogous defendant in terms of role is Joseph Skowron, who was sentenced to 60 months' imprisonment after accepting responsibility through a guilty plea to obtaining confidential medical data from a doctor and trading on it, with a gain (approximately $30 million) only a fraction of the size of the gain here. *See United States v. Skowron*, 11 Cr.

40 percent substantially exceeds the trading impact on the securities at issue in other cases cited by the defendant.

Ultimately, while it is of course instructive to review sentences imposed in other insider trading cases, by different judges, on other defendants, one cannot compare the offense conduct in different cases by any precise mathematical formula tied to the number of tippers, number of securities or the like.  Nor does defendant's analysis take into consideration other Section 3553(a) factors beyond offense conduct that may have impacted the sentences in the cited cases.  As the Second Circuit has repeatedly observed, sentencing disparities are not "unwarranted" where defendants are not "similarly situated."  *United States* v. *Wills*, 476 F.3d at 109-10; *United States* v. *Fernandez*, 443 F.3d at 32.  Moreover, as the Second Circuit has explained, even where a sentencing judge acknowledges the existence of a disparity, such acknowledgment does not necessarily require the judge to "adjust a sentence downward from the advisory guidelines range in order for that sentence to be reasonable."  *United States* v. *Florez*, 447 F.3d 145, 157-58 (2006) (citation and internal quotation marks omitted).  That is, "if sentencing disparities . . . are properly considered, the weight to be given such disparities, like the weight to be given any '3553(a) factor,' is a matter firmly committed to the discretion of the sentencing judge and is beyond our [appellate] review, as long as the sentence ultimately imposed is reasonable in light of all the circumstances presented."  *Id.* at 158 (quoting *Fernandez*, 443 F.3d at 32).

Accordingly, nothing about the need to avoid unwarranted sentencing disparities would preclude a sentence of significant period of imprisonment toward the high end of the insider

---

699 (S.D.N.Y. 2011).

trading sentences imposed by courts in this District and higher than the 96 months' proposed by the Probation Department.

### D.  The "History And Characteristics Of The Defendant"

The defendant also argues at length that the history and characteristics of the defendant warrant leniency.  Martoma's history and characteristics, however, are not unambiguously mitigating.

Much of the defendant's submission is focused on calling the Court's attention to "acts of humanity and compassion by Mr. Martoma, for which he neither sought nor received any public recognition."  (Def. Mem. at 5).  To this end, the defense submission provides the Court with "[m]ore than 100 letters" which "speak in one voice" in describing Martoma.  (Def. Mem. at 1).[9] There is no doubt, of course, that the defendant has engaged in kind-hearted and fundamentally good acts over the course of his life.  Letters submitted by friends and family of the defendant reflect that Martoma engaged in volunteer work during various stages of his academic career, contributed unspecified amounts to the church his family attends and school where his children are educated, and generally helped friends in times of need.

But other claims about Martoma's good works are simply exaggerated.  Martoma has not, as the defense memorandum puts it, "dedicated himself to a lifetime of giving."  (Def. Mem. at 12).  Martoma's post-graduate working life has been limited to highly-paid work for hedge

---

[9]      The defense submission includes letters from family members who supported Martoma in connection with the Harvard Law School administrative proceedings, including by testifying – though not entirely consistently – in support of  Martoma's defense that he had entrusted his family to assemble and submit his clerkship applications and that they inadvertently placed a forged transcript in the package rather than the accurate transcript that Martoma had allegedly intended to submit.

funds.  The bulk of Martoma's earnings from his hedge fund career – the entirety of his $9

million bonus from SAC Capital – were the proceeds of securities fraud.  The defendant's claim

that Martoma "donated or set aside upwards of $1 million for at least 30 charitable

organizations" (Def. Mem. at 70) is artful in its ambiguity.  The defense appears to the referring

to the fact that, in 2010, when Martoma received a $2.1 million distribution from his 2008 bonus,

he transferred approximately $1 million to a newly created charitable foundation, thus benefiting

from an immediate tax deduction.  However, bank records and the foundation's filing reflect *de

minimis* spending by the foundation on anything prior to the defendant's arrest (records

following that time period are incomplete).  While the defense submission asserts at one point

that "[b]eneficiaries of the foundation have thus far included 30 non-profit organizations," it

provides no support, such as foundation records, to reflect whether any monies have actually

been transferred to any organizations and whether any decision to commit financial resources to

these charities came before or after the initiation of the criminal case.[10]

More fundamentally, though, there is a profound illogic to the defendant's argument,

which asserts that the Court should take the "true measure of the man" from various "acts of

humanity and compassion" described in letters from family and friends (Def. Mem. at 5)  but

ignore entirely an episode that speaks volumes about character: Martoma's willingness to forge a

law school transcript, interview with federal judges for a clerkship on the basis of this forged

transcript, lie to Harvard Law School officials when confronted with the forgery, fabricate e-mail

---

[10]      Likewise, the defendant's citation to a defense letter in which Dr. Haddad claims
that the Martoma foundation "has donated to over 25 different worthy causes" although the
"specific donations are too many to list" (Def. Ex. 28 at 3) provides little support for the
defendant's arguments about charitable giving, and the basis for Dr. Haddad's beliefs about the
foundation's actual donations is unclear.

evidence in an attempt to exonerate himself, and deploy family members to support a false

defense.  Section 3553(a)'s directive that the sentencing court should consider the "history and

characteristics of the defendant" must not be truncated to reach only positive history and

flattering characteristics.   The defense's claim that this prior misconduct should not be

considered because it is not "even remotely similar to the charged conduct" (Def. Mem. at 71)

also rings hollow, particularly from the perspective of sentencing rather than as a matter of trial

evidence.[11]  Indeed, the parallels are in important ways uncanny.  At both Harvard Law School

and SAC Capital Martoma found himself in a privileged position with an opportunity to achieve

success honestly, and, in both cases, Martoma cheated in an attempt to elevate himself higher

still.  Martoma's prior bad acts at Harvard also demonstrate Martoma's willingness and capacity

to commit fraud in a variety of contexts.

     The defense struggles to present the defendant's expulsion from Harvard Law School as

an embarrassing act that led to self-reflection and learning by Martoma.  But that is simply not

the history.  After the Administrative Board's decision to expel Martoma, the defendant

committed significant further acts of related fraud.  First, he formed a computer forensics

---

[11]      The defense cites only *United States v. Sarna*, 2009 WL 2633153 (S.D.N.Y.
2009) for the proposition that evidence of bad character at sentencing must relate to the offense
of conviction (Def Mem. at 71, n. 108).  *Sarna* does not remotely support this claim.  In *Sarna*,
the district court issued an order denying a defendant's request for early termination of
supervised release and remarked in a footnote that "the Court deems immaterial the uncharged
pre-conviction conducted alleged by the Government" in a letter that was not filed publicly.  For
one thing, it is not surprising that a court, in considering an application for early termination of
supervised release – the merits of which are measured based on the defendant's behavior *while
on supervised release* – would place little weight on pre-conviction conduct of any sort.
Moreover, the Court in *Sarna* simply rejected a particular, unspecified allegation of bad conduct
as immaterial in that case and said absolutely nothing to support the defendant's wishful position
that prior bad conduct must be similar to the offense conduct to be considered a factor at
sentencing under § 3553(a).

company that issued a bogus report to provide an innocent but false explanation to the e-mail evidence that Martoma had fabricated.  Second, Martoma submitted a fraudulent application to Stanford Business School which falsely described his academic record.  Incredibly, even today Martoma fails to accept responsibility for that conduct, instead blaming the direct consequence of his false application – Stanford Business School's recent decision to withdraw Martoma's degree – not on Martoma's own actions but on "the media coverage of his Harvard dismissal during the trial" (Def. Mem. at 71) that enabled Martoma to keep this lie from Stanford no longer.

The defendant's use of a forged transcript in an application for a federal judicial clerkship reflects as poorly on individual deterrence as it does on character.  Despite a profound fall from grace brought on by Martoma's reckless cheating, the defendant, upon rising again to become a portfolio manager at one of the country's then-most prominent hedge funds, decided to engage in the most lucrative insider trading ever proven, or even charged.   Cheating of this magnitude, by a defendant who was undeterred following the costly prior consequences of such conduct, and who has failed in any way to accept responsibility for his actions, warrants a significant sentence.

### E.    Impact On The Defendant's Family

The defendant also argues at length that the negative impact Martoma's incarceration will have on his family warrants a reduced sentence.  As the Court is aware, the unfortunate reality is that many convicted defendants cause hardship to their families by committing crimes that result in imprisonment and the forfeiture of ill-gotten gains.  Unlike many defendants, however, Martoma is fortunate to have a devoted spouse who has the potential, as a prior medical doctor and real estate investor, to earn a meaningful income and support the couple's children

27

financially and emotionally.  The Martomas also benefit from a strong family support network as evidenced by the numerous letters attached to the defendant's submission.

The defendant's family circumstances argument rests heavily on a letter from Dr. Rosemary Martoma (Def. Ex. 1)[12] which asserts that she suffers from physical and mental maladies that will make it more difficult than usual to raise her children without her husband's presence.  Among other things, the defense argued that "Rosemary's ███████ limits her ability to care for her family."  (Def. Mem. at 61).  However, it is not unusual for the spouse of an incarcerated person to face added ████████████████ health challenges upon separation from a loved one.  Indeed, in some cases the Court is provided with independent evidence (such as medical or psychiatric reports) documenting serious health challenges and, in some cases, treatment for these issues prior to the initiation of the criminal case.  The facts and circumstances described in the defense submission do not support a finding that the adverse family impact will be far greater than in other cases.

---

[12]     The Government also wishes to correct certain factual misstatements in Ms. Martoma's letter relating to interactions with law enforcement in this case.  *See* Def. Mem. Ex. 1 at 3.  The Martoma's children were never "questioned at [the Martomas'] front door by the FBI," unless this is a reference to asking if Martoma was home when Martoma was initially approached for questioning many months prior to the arrest.  Martoma's home was not "raided" upon the execution of the arrest warrant and no "battering ram" was used or displayed.  Similarly, Martoma was not "carried away" by law enforcement.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a significant period of imprisonment toward the high end of the insider trading sentences imposed by courts in this District – and above Probation's recommendation of 96 months – is warranted.

Dated:   New York, New York
         June 27, 2014

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By:  _____/s/_____
     Arlo Devlin-Brown
     Eugene Ingoglia
     Assistant United States Attorneys
     (212) 637-2506/1113

# Exhibit A

E5GVSTES                          Sentence

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              12 CR 121 (RJS)

5    MICHAEL STEINBERG,

6                Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        May 16, 2014
9                                       11:30 a.m.

10

     Before:
11
                        HON. RICHARD J. SULLIVAN,
12
                                            District Judge
13

14                            APPEARANCES

15

     PREET BHARARA,
16        United States Attorney for the
          Southern District of New York
17   ANTONIA APPS
     HARRY A. CHERNOFF
18        Assistant United States Attorney

19   KRAMER LEVIN NAFTALIS & FRANKEL LLP
          Attorneys for Defendant
20   BARRY H. BERKE
     MEGAN RYAN
21   STEVEN SHANE SPARLING

22   ALSO PRESENT:  KAITLIN PAULSON, Paralegal
                    JAMES HINKLE, FBI
23

24

25

1          (Case called)

2          THE COURT:  We have a lot of people in the courtroom

3    today, many friends and relatives.  Many of you wrote letters

4    to the Court, and I thank you for that.

5          This is a public courtroom, so everybody is welcome

6    here; but I'm sure your presence means a great deal to

7    Mr. Steinberg, so I thank you for taking the time to be here.

8    Our system is an open one, so we do proceedings like this

9    publicly and on the record in the open.  I think that's the

10   strength of the system, so thanks for being here.

11         I will do everything I can to make sure I explain

12   what's happening, because I think it's important that everybody

13   understands what's taking place.  A lot of people will be

14   affected by the sentence imposed today, not just Mr. Steinberg;

15   so it's important that we do this carefully and deliberately,

16   and so we'll do that.

17         Let me just remind everybody why we're here.

18         Mr. Steinberg was found guilty on December 18th of

19   last year, after a monthlong trial.  The jury returned a guilty

20   verdict on all five counts of the indictment.  Yesterday I

21   ruled on the defense Rule 29 motion; I issued a separate order

22   and opinion on that.  I explained my reasoning, so we don't

23   need to get into that today, but I just wanted to make the

24   record clear.

25         Today we're here for sentencing.  It's an important

1    day for Mr. Steinberg and his family; it's an important day for

2    our system of justice, as well, because every case matters, and

3    every case is an opportunity, I think, for us to live up to our

4    values and to make sure that every case is an opportunity for

5    us to act wisely and justly.  So that's certainly what I'm

6    endeavoring to do, and so we will take this one step at a time.

7         What I want to do first is go over with the parties

8    what I've received in connection with sentencing, which is a

9    fairly voluminous pile.  And they, of course, will let me know

10   if I'm missing anything.

11        So I have received, first of all, the presentence

12   report prepared by the probation department.  The presentence

13   report is dated May 9th; it is 27 pages long, single-spaced.

14        I have also reviewed the sentencing submission made by

15   Mr. Berke and his colleagues on behalf of Mr. Steinberg.  It is

16   a 64-page, double-spaced submission.  It is characteristically

17   thorough and thoughtful.  It also includes a number of

18   exhibits, the vast majority of which are letters from people

19   close to Mr. Steinberg who know him best, who wrote letters

20   attesting to his character, and provided me with a much fuller

21   sense of the man, and that's very helpful.  So I thank those

22   who took the time to write.  There are 68, I think, in total,

23   some of them quite lengthy, so it's really hundreds of pages,

24   and I've read them all and certainly have thought about them a

25   great deal.

1          In addition to the letters, Mr. Berke also attached

2     several articles relating to the trial and the charges in the

3     trial.  And I've reviewed those, as well.

4          I've also reviewed the government's sentencing

5     submission, which is no less thorough.  It's 37 pages,

6     double-spaced.  The government has also included exhibits

7     attached to its submission, a two-volume set, mostly consisting

8     of trial exhibits that were introduced at the trial and that

9     are referenced in the submission.  And I've reviewed those, as

10    well.

11         I then have reviewed the May 14th reply letter, I

12    guess I'll call it, of Mr. Berke and his colleagues.  It is a

13    nine-page single-spaced letter; it has one attachment.  It

14    mostly responds to some of the arguments that were put forth in

15    the government's submission.  So I've read that, as well.

16         I presided over the trial, so I'm certainly familiar

17    with the facts as they were introduced at the trial.  I have

18    refreshed myself on some of it and some of the exhibits just so

19    that I was sharp and familiar with what had taken place in the

20    courtroom during the trial.  But that's principally what I have

21    in connection with sentencing.

22         Have I overlooked anything, Mr. Berke?

23         MR. BERKE:  You have not, your Honor.  Thank you.

24         THE COURT:  Okay.  Ms. Apps?

25         MS. APPS:  Nothing, your Honor.

1          THE COURT:  All right.  Well, let's start then with

2     the presentence report.  And for those who maybe missed it the

3     first time, the presentence report is a report prepared by the

4     probation department.  And it's quite a lengthy report.  It

5     sets forth a lot of factual detail about Mr. Steinberg, about

6     the crimes that he was convicted of, and it's a very helpful

7     acumen, helping the judge get a sense of the case and what

8     might be an appropriate sentence.  It also makes a sentencing

9     recommendation, among other things.

10          So I have reviewed that.  I want to make sure,

11     Mr. Berke, you've seen a copy of it and reviewed it with your

12     client?

13          MR. BERKE:  We have, your Honor.

14          THE COURT:  Do you have any objections to it?

15          MR. BERKE:  No, your Honor.  The elements are already

16     considered in the report that we raised with probation

17     directly.

18          THE COURT:  Okay.  That's what I thought.

19          Ms. Apps, you've reviewed the report?

20          MS. APPS:  Yes, your Honor.

21          THE COURT:  And do you have an objection with respect

22     to the sentencing guidelines calculation on gain?

23          MS. APPS:  Correct.  We have no objection to the

24     factual statements in the report, but we do object to the

25     probation department's determination that it excluded trading

1    activity by Mr. Cohen, which we believe should be included as

2    is reflected in the body of the probation department's report;

3    although notwithstanding I informed probation after I received

4    the first report that we did continue our objection as to their

5    exclusion of that trading conduct.   Towards the end of the

6    report it indicates the government has no objections.   I think

7    there may have been some confusion by the probation department

8    as to our position.   But as has been made clear in the

9    government's papers, we maintain that objection.

10              THE COURT:   Okay.   All right.

11              Well, we'll go to the guidelines, I guess, first.

12              I want to just explain to everybody here and

13   Mr. Steinberg, most importantly, the different factors that I'm

14   required to consider.   Congress has told judges they have to

15   consider certain things.   And, frankly, even if I weren't

16   required to, these are the kinds of things I would consider.

17              But these factors include, first of all, your own

18   personal history, the facts and circumstances of your life.

19   You're an individual, and a unique one, unlike anybody I've

20   ever sentenced or ever met.   And so it's important that the

21   sentence be tailored to you as a person.

22              Now, I have to also consider the facts and

23   circumstances of the crimes for which you were convicted.   They

24   are serious crimes, obviously.   But it's not just the name of

25   the crimes, it's the details.   So I have to look carefully at

1    what the facts were, how long did this go on for, what were the

2    details, who did what, because I have to make sure that the

3    sentence imposed reflects the seriousness of the crime, and

4    that it also promotes respect for the law, which is another

5    important value, and ultimately that it provides a just

6    punishment for the crime.

7          Another objective that I'm required to consider is the

8    need to deter or discourage crimes like this from being

9    committed in the future.  And there's two types of deterrence:

10   There's specific, which means hopefully the sentence imposed on

11   the defendant will send a message to the defendant that they

12   can't commit crimes like this in the future; and then there's

13   general deterrence, which is the hope that by imposing a

14   sentence on one person, the message will seep through to a

15   larger population, and people will absorb it and take the

16   message that this is conduct that can't be engaged in because

17   the consequences are too severe.  And the hope, of course, is

18   that the message is received and absorbed and in the future

19   there is less crime, fewer instances of this kind of activity.

20         Now, it's hard to predict with any kind of certainty

21   what future effects will come from a sentencing.  It's

22   certainly hard to quantify.  But Congress has said -- and I

23   think most of us recognize there's something to that -- there's

24   some intuitive relationship between a sentence and future

25   conduct.  And courts are told to take that seriously and to try

1    to make that a factor in imposing a sentence.

2          Other factors include the needs of a particular

3    defendant while in custody.  So some people have medical needs

4    or mental health needs; many have substance abuse treatment

5    needs.  And courts have to be sensitive to that and make sure

6    the time in which a person is incarcerated is not wasted time

7    so that they can deal with issues that might be holding them

8    back or derailing them in life, so that once someone finishes

9    serving their sentence, they can be productive and live a happy

10   and a healthy life.  That's something judges should consider.

11         Another factor that judges have to consider is

12   something that's referred to as the need to avoid unwarranted

13   sentencing disparities, which is kind of a lawyerly statement.

14   But the point is that there has to be some kind of rough

15   justice, rough fairness in the sentences imposed across cases.

16   It would be wrong if people who engaged in similar conduct

17   under similar circumstances got wildly different sentences just

18   by virtue of who the judge was or who the prosecutors were or

19   who the defense lawyers were.

20         It's important that judges take a step back to make

21   sure that there's rough equality in the sentences imposed,

22   recognizing, of course, that no two defendants are exactly

23   alike, and no two cases are exactly alike, but that people

24   would lose respect for the law if the sentences were just high

25   and low and random and apparently arbitrary.  So those are

1    things that judges have to consider.

2         There's another factor that judges have to consider --

3    I'm sure you've discussed this with Mr. Berke; we've alluded to

4    it a little bit already -- which is the United States

5    Sentencing Guidelines.  And certainly I know Mr. Berke and the

6    lawyers here understand and are familiar with the guidelines.

7    Mr. Steinberg is probably more familiar with it now by virtue

8    of talking to his lawyers.  And some of you may be less

9    familiar with that.

10        The sentencing guidelines are a big book; it's about

11   five or 600 pages long, and it's put out by a commission.  It's

12   a commission of judges and lawyers and experts in the field.

13   And their task is to come up with a manual that can provide

14   guidance to judges like me, who are tasked with imposing

15   sentences on human beings, who have been found guilty of

16   committing crimes.

17        And the way it works is that this book is divided up

18   into chapters.  And there is a separate chapter or subchapter

19   for every crime or type of crime.  And so in a case like this,

20   one involving a fraud, particularly insider trading, the judge

21   is directed to go to the chapter relating to insider trading.

22   And the judge is asked to make certain findings of fact.  And

23   based on those findings, the judge is then to assign points.

24   It's sort of mathematical.  And the judge adds points and

25   sometimes subtracts points, and comes up ultimately with a

1    number; and that number is referred to as the offense Level.

2           The judge then goes to a different chapter in the book

3    that relates to criminal history.  And it is simply and

4    intuitively, generally speaking, people who have committed

5    crimes before, who have gone to jail before, are going to be

6    treated more harshly than people who have had no convictions or

7    no prior involvement at all in the criminal justice system.

8    And so the judge is directed to go to that chapter, make

9    findings if there are any convictions; if so, what the

10   sentences were, how long ago the crimes were committed.  And on

11   the basis of those findings, the judge then determines which of

12   six criminal history category applies.  Category I is the

13   lowest, least serious; Category VI is the highest and the most

14   serious.

15          And on the basis then of those two findings, the

16   offense level on the one hand, and the criminal history

17   category on the other, the judge goes to the back of this book

18   where there's a grid, it's a two-dimensional grid that is

19   pretty basic, and the judge is directed to go down this column,

20   which is the offense level, and across these columns, which is

21   the Criminal History Category.  And where the categories land,

22   that's the spot in the guidelines that the judge is to find as

23   the range, according to the commission, that would be

24   appropriate in the case.

25          Now, the judge is not required to follow this book;

1    they are advisory, they are not mandatory.  There is a

2    recognition that this book, although helpful, is just a book;

3    it can't anticipate every fact and every circumstance.  It's

4    what Mr. Berke quoted back to me as a blunt instrument, and I

5    think that's fair.  But it's useful.  And the goals of this

6    manual are, in large part, the goals that I already talked

7    about.  It's to achieve some of those objectives at sentencing.

8          So we are going to talk about each of these.  We'll

9    spend a few minutes now talking about the guidelines and how

10   they apply.

11         After that, I'll give Mr. Berke an opportunity to

12   address any of the factors that I just mentioned; his

13   submission covered many of them, but I'll certainly give him

14   time to address and elaborate upon some of them.

15         I'll give Ms. Apps the same opportunity.

16         I'll maybe let them respond a little bit to each other

17   to make sure nobody feels they haven't had a chance to say

18   their piece.

19         And then, after that, Mr. Steinberg, I'll give you an

20   opportunity to speak.  You have a right to speak before I

21   impose sentence.  But you're not required to.  But you'd

22   certainly be welcome to.  So I'll leave that up to you.  And if

23   you choose not to, that's fine; it wouldn't be held against

24   you.  But if you would like to speak, I'll give you a minute,

25   okay, or more than a minute; I'll give you as much time as

1    you'd like.

2              Any questions so far?

3              No.

4              Well, if you do have questions, whisper in Mr. Berke's

5    ear, and he'll let me know, because all of this should be

6    understandable and accessible.  And, as I said, this is an

7    important day for you, so we are not going to rush it.  We're

8    going to take it very slow and careful, all right?

9              Great.

10             All right.  So let's start with the sentencing

11   guidelines.

12             The presentence report, on page, I think it's 8, sets

13   out the view of the probation office.  And there's no dispute

14   that the base offense level, given the crime involved, is 8.

15   And that's pursuant to Section 2B1.4 of the guidelines.  And if

16   this sounds technical, that's because it is; basically, it's

17   sort of accounting.

18             There is a dispute as to what enhancement there should

19   be for the amount of gain.  According to the sentencing

20   guidelines, there's a base offense level of 8, but then you get

21   more points, depending on how much you gained from an insider

22   trading offense.  And the more money you gained, the higher the

23   enhancement is going to be.

24             So Mr. Berke is of the view -- and the probation

25   department agrees -- that the enhancement should be 16 levels,

1  because the amount of gain was limited to the roughly $1.8

2  million that Mr. Steinberg's portfolio received as a result of

3  trades in Dell and in Nvidia stock, which were the subject of

4  the indictment and the counts that the jury returned guilty

5  verdicts on.

6          The government argues that it should be two points

7  higher, it should be level 18, because in addition to the gains

8  in the portfolio, the gains that were achieved by Mr. Cohen,

9  who traded on the basis of information provided by

10  Mr. Steinberg in certain Dell trades, should be attributed as

11  gain.  And this really turns on the language of the sentencing

12  guidelines.

13          There's a commentary in the guidelines, it's Section

14  2B1.4, that says "gain" is defined as the "total increase in

15  value realized through trading and securities by the defendant

16  and persons acting in concert with the defendant or to whom the

17  defendant provided inside information."

18          So I think we're really just talking about the last

19  part of that sentence, to whom the defendant provided inside

20  information.  And the parties take very different views.

21          Mr. Berke is of the view that if Mr. Cohen can't be

22  proven to have been a co-conspirator, in essence, who knowingly

23  engaged in insider trading, and would meet all the elements for

24  insider trading, then the gains associated with his trades

25  shouldn't be attributed to Mr. Steinberg.

1        The government is of the view that all that is
2  required is information be provided, not that all the elements
3  of insider trading be proven.
4        And the standard, we should be clear, is not proof
5  beyond a reasonable doubt here.  At trial it was.  Here, the
6  standard is what's known as a preponderance of the evidence.
7  And that simply means the greater weight of the evidence.  If
8  you have the scales of justice, and you took all the evidence
9  and put it on there, if the evidence tipped in favor of a
10  finding that the gain of Mr. Cohen's trades should be
11  attributed, then it would be.  I don't have to find beyond a
12  reasonable doubt.  But I think this is, in many ways, more a
13  legal argument than a factual one.
14        So I've reviewed the parties' papers on this.  I think
15  I understand the arguments, but I'm happy to hear from you if
16  you'd like to elaborate.  If you want to rest on your papers,
17  that's fine, too, Mr. Berke.
18        MR. BERKE:  Your Honor, thank you.
19        We won't repeat --
20        THE COURT:  It may be useful to use the lecturn.
21  Let's try to do that, because I am worried people are having --
22  I assume you all can hear me okay, because I've got a
23  microphone within an inch of my mouth.  It's harder for lawyers
24  who are standing, especially if they are really tall, like
25  Mr. Berke, to get close to the mike.

1          All right, Mr. Berke.  Go ahead.

2          MR. BERKE:  Thank you, Judge.

3          Your Honor, I did want to respond to the question of

4     the facts, because I do believe that even if you take the

5     government's construction that "provided inside information"

6     simply means provided inside information, and doesn't require

7     any guilty knowledge or any knowledge at all by the recipient,

8     I think it is clear that the guidelines very specifically say

9     "provided inside information."

10         And that language, I think, means something, your

11    Honor.  I would submit they didn't say make a recommendation

12    based on inside information, they didn't say other

13    constructions that they could have said, the commission could

14    have said.  Instead, they said provided inside information.  It

15    has to be Mr. Steinberg who provided that inside information.

16         And what the government relies on factually is simply

17    an email that reflects a call that Mr. Steinberg had with Mr.

18    Cohen, as your Honor knows.  And then the call, the only

19    evidence that the government offers is Mr. Steinberg said, I

20    spoke to Mr. Cohen, and he would like Mr. Plotkin and

21    Mr. Horvath to compare notes.  And then Mr. Steinberg offers --

22    appears on opposite sides of this one.  And that's what the

23    government is relying on.

24         So, your Honor, I would submit that even under the

25    government's construction -- and I would submit this is an

1    unusual position for the government, as we look through the

2    cases, whether it's Ganek, Mr. Ganek and the Chiasson case,

3    whose trading was included, was alleged to be a co-conspirator,

4    in virtually all of these cases the government seeks to include

5    additional trading, they are alleging that someone is a

6    co-conspirator.  This is obviously very different

7    circumstances; there's not a whole lot of law on the

8    construction of this commentary, at least a lot of law that we

9    can find, where the government is saying assuming -- in this

10   case Mr. Cohen is a complete innocent -- that there's a basis

11   to nevertheless include his trading.

12           And as we set forth in our papers, your Honor, as we

13   were trying to understand the government's position, initially

14   the government informed us that they agreed with our number of

15   1.8 million and change.  We conveyed to the probation

16   department we had an agreement on that.  And then they

17   obviously told us in probation they took a different view and

18   wanted to include both Cohen and select, the select account

19   which your Honor has read about.  And now they agree that the

20   select account should not be there.

21           From our perspective, your Honor, whether it's a legal

22   matter or it's a matter of fact, the government has not

23   established or shown at all that Mr. Steinberg provided inside

24   information, as the commentary would require.  And as your

25   Honor certainly knows, the rule of lenity applies to the

1   guidelines, as well as statutes.  And to the extent there's any

2   ambiguity to what that means, I would submit that "inside

3   information" has a definite meaning.  And simply what the

4   government offers, that one call that Mr. Steinberg spoke about

5   Dell to Mr. Cohen, and then, as a result, had Mr. Plotkin and

6   Mr. Horvath compare notes, that that is insufficient in order

7   to increase Mr. Steinberg's sentencing guidelines by really a

8   year, if the government's construction is adopted, as your

9   Honor knows.

10          So, your Honor, we respectfully submit that probation

11  has it right, that we have it right; and that in this instance,

12  based on these facts, regardless of how one construes that

13  provision, the Cohen trading losses avoided should not be

14  included.

15          THE COURT:  Thank you, Mr. Berke.

16          MR. BERKE:  Thank you, Judge.

17          THE COURT:  Ms. Apps, did you want to respond to that?

18          MS. APPS:  Just briefly, your Honor.

19          With respect to the facts in this case, I think the

20  government relies not just on the communication between

21  Mr. Steinberg and Mr. Cohen as reflected in the email in

22  Government Exhibit 634 on the morning of August 26, it's a

23  series of events which we rely on which demonstrate, in our

24  view, that the Cohen trading resulted from inside information

25  that Mr. Steinberg provided him.

1          It starts with a chain of events where the day before

2     Mr. Steinberg learns that Mr. Cohen is long in Dell, and then

3     discusses with Horvath weighing the risk reward of

4     communicating their view to Mr. Cohen.  And then when

5     Mr. Steinberg then reports to Mr. Horvath and Mr. Plotkin that

6     he had talked to Mr. Cohen and they should compare notes, it is

7     not, we submit, a point at which Mr. Steinberg would simply

8     step out of the picture and let others take over.  Of course,

9     having worked for many years at SAC Capital, and working for

10    ultimately Steve Cohen, the head of the firm, the purpose was

11    to ensure that Mr. Cohen receives the view that Mr. Steinberg

12    held, which was, in turn, based on inside information.

13          And finally, after the earnings announcement on August

14    28, 2008, Mr. Cohen sent an email to Mr. Steinberg and

15    Mr. Horvath.  It was actually sent to the distribution list

16    Steinberg Group.  And he said, "Nice job on Dell," reflecting

17    that Mr. Cohen's trading in his own account was indeed based on

18    the information which was inside information provided by

19    Mr. Steinberg and his analyst, Mr. Horvath.  So those are

20    really the facts that we rely on, your Honor.

21          Mr. Berke pointed out that in the probation

22    department's report we had initially included the select

23    account trades.  In an abundance of caution and to be

24    conservative, we withdrew our request to include the select

25    account trades.  I will note it makes no difference to the

1    guidelines range if your Honor includes the trading in Mr.

2    Cohen's portfolio, which was approximately 1.8 million in

3    losses.   The loss amount under the guidelines is 3.5 million,

4    which is between the range set forth in the guidelines of 2.5

5    and seven million.   To include the select account trading,

6    which would only be an additional 1.7 million in losses, does

7    not put Mr. Steinberg's trading -- excuse me, does not put the

8    total loss amount in a different bracket.

9              THE COURT:   All right.   Thank you.

10             MR. BERKE:   Your Honor, may I briefly respond?

11             THE COURT:   You always get the last word, Berke.

12             MR. BERKE:   No, your Honor, you do, as you know.

13             THE COURT:   I guess that's true.

14             That's fine.   I'm not looking to shut anybody out.

15             MR. BERKE:   Thank you, Judge.

16             And I think, as I understood the government's position

17   from their papers, is they were looking to this latter exchange

18   as corroboration, and not the basis.   And I assume that based

19   on how the papers were written, because, again, the commentary

20   said "Mr. Steinberg must provide."

21             And I believe that the information that ultimately --

22   even if you credit the government's version for purposes of

23   sentencing, that the information that ultimately got to Mr.

24   Cohen, according to their version, went through two different

25   layers, and independent layers, Plotkin and Vaccarino, and then

1   to Cohen.  And again, your Honor, the commentary doesn't say if

2   someone trades based on inside information, they receive; it

3   doesn't have any other number of constructions.  It could have.

4   It says "Mr. Steinberg provided."  And I would submit in the

5   rule of lenity, "provided" means Mr. Steinberg provides.

6        Beyond that, your Honor, I think the government is

7   truly relying on speculation in support of their argument,

8   because they rely on Mr. Plotkin as supposedly the conduit who

9   provided the inside information.  We know from the evidence

10  presented or at least discussed at trial -- I think ultimately

11  it wasn't presented -- that Mr. Plotkin, in the August 2008

12  Dell trade, was long 1.8 million shares, worth approximately

13  $40 million; that he went the exact opposite direction and did

14  not rely on all of the information provided.  So when Mr. Cohen

15  says, "Good job," he's just as well rewarding the side that was

16  right as opposed to the side that was wrong, which was

17  Mr. Plotkin.  And he was wrong in a big way and cost the firm a

18  lot of money.

19       But all this, your Honor, we are speculating what's

20  going on here.  And I would submit the question is does the

21  evidence show that Mr. Steinberg provided inside information to

22  Mr. Cohen.  And I would submit that at most the government can

23  say he provided was a statement about Dell that didn't lead Mr.

24  Cohen to change his position, didn't lead Mr. Cohen to take a

25  short position so he could make money on the information; it

1    simply caused Mr. Cohen to say compare notes.

2            Now, ultimately, in terms of the later facts that the

3    government is apparently relying on, I would note we don't know

4    what happened with Mr. Cohen and Mr. Vaccarino and the like.

5    We have the SEC testimony of Mr. Vaccarino, which the

6    government submitted, we referenced some that is included in

7    the submission.   We have a submission that the SAC submitted to

8    the SEC in which Mr. Cohen represents to the SEC in those

9    papers that the reason he reduced his position is because when

10   he -- in this case, following Mr. Plotkin, he saw a reduction

11   and, therefore, cleaned out his position.   Whether that's right

12   or not, we don't know.   But what we do know, your Honor, is

13   that the government has speculation.

14           But even on the basis of those facts, we would submit

15   that would not satisfy, applying the rule of lenity, the

16   requirement that Mr. Steinberg himself provided inside

17   information, not a recommendation, inside information to Mr.

18   Cohen.   And we would ask, your Honor, here, based on those

19   facts, that you not include the additional amounts and the

20   recommendation of the probation department.

21           Thank you, Judge.

22           THE COURT:   Okay.   Thank you, Mr. Berke.

23           All right.   I'm prepared to rule.

24           I guess I don't think that it boils down to

25   speculation ultimately.   It seems to me that the inferences to

1    be drawn from the evidence that was introduced, the chronology
2    of communications, the chronology of the trades, does support
3    an inference that the information was conveyed to Mr. Cohen,
4    and was, in fact, the basis of his trading.
5              So because the standard here is by a preponderance of
6    the evidence, I think that standard has been met, and I am
7    going to include the two-level enhancement.  I'm not sure at
8    the end of the day it's going to really make much difference
9    ultimately to my sentence, but the first process here is to do
10   the guidelines and to just call balls and strikes as I see
11   them.  And so this one strikes me as one that has been
12   demonstrated by a preponderance based on the fair inferences
13   from the evidence that was introduced.
14             So with that then, there's an 18-level increase, which
15   yields a total offense level of 26.  Mr. Steinberg has no prior
16   convictions or any involvement of any kind with the criminal
17   justice system, so he is, of course, in Criminal History
18   Category I.  That results then in a guidelines range of 63 to
19   78 months, which is about five and-a-third to six and-a-half
20   years.
21             When you get familiar with the guidelines, you learn
22   to divide by 12 pretty well.  But that's basically five
23   and-a-third to six and-a-half years, which is sort of a very
24   odd number, but that's the view of the commission that prepares
25   this report based on their grid as to what would be the

1    appropriate sentence in light of the findings I've just made.

2              That's the guidelines.

3              As I said, the guidelines are not mandatory.  And I

4    think there's a recognition that no guidelines could ever

5    replace the care and balancing of a human judge in deciding an

6    appropriate sentence.  So we'll talk now about the other

7    factors that are every bit as important as the guidelines.  And

8    so, Mr. Berke, I'm happy to hear from you.

9              Can I ask you again to go to the lecturn.

10             MR. BERKE:  Yes, of course, your Honor.

11             THE COURT:  Thanks.

12             MR. BERKE:  Thank you, your Honor.

13             Your Honor, as you know, I have represented

14   Mr. Steinberg now for a number of years.  And I've gotten to

15   know Mr. Steinberg and his family at this point quite well.

16   And on the unhappy day when I began turning towards thinking

17   about the sentencing and these proceedings, I felt fairly

18   confident that we would have a lot to say when discussing the

19   history and characteristics of Mr. Steinberg in asking you to

20   consider them, in addition to the offense conduct for which he

21   was convicted.

22             And I have to confess, your Honor, after that, I began

23   hearing from people who I may have met once or twice in court,

24   or not at all, and began hearing about stories and anecdotes

25   and more that Mr. Steinberg had done.  I began hearing about

1    his deeds, his words, his support, his genuine acts of kindness

2    that he gave to family, to friends, to strangers, and, in some

3    respects, in a very organized way, and charitable and

4    altruistic pursuits that he really has done all his adult life.

5         And I have to say, your Honor, that as much as I

6    expected I'd have a lot to say, those expectations were

7    surpassed by all that I learned about Mr. Steinberg that I

8    didn't know, given how he has lived his life and how that may

9    impact the factors beyond the offense conduct and the 3553(a)

10   factors your Honor will, of course, consider.  And I understand

11   your Honor, and I know you've read the 65-plus letters very

12   carefully, and I appreciate that.  And I just wanted to, if I

13   may, talk about some aspects of that for your Honor.

14        Of course, I know your Honor has read letters from Liz

15   Steinberg, his wife, as well as many friends, who talked about

16   the relationship between Mr. Steinberg and Liz and their

17   children.  And without question, I would submit that they

18   reflect very positively on Mr. Steinberg's character and

19   characteristics, they've obviously been very blessed with a lot

20   of good things.  But they've also, in their lives, had

21   challenges.  And you read in great detail -- and I won't go

22   into those details -- how Mr. Steinberg responded and addressed

23   those challenges they faced between health issues and issues

24   with their children, and challenges that they continue to face;

25   and that Mr. Steinberg is obviously a very key person that

1   their children, his son, relies on substantially, and you

2   certainly read about how he meets those challenges.  And I

3   submit that those are relevant in considering his history and

4   characteristics and some of the other factors, although

5   obviously there are a lot of other factors, as well.

6        I know your Honor read the submissions by

7   Mr. Steinberg's parents, Maurice and Sandy Steinberg.  And, of

8   course, they are his parents; they have a lot of good things to

9   say.  But I would submit even beyond just the good things, they

10   tell stories and describe things about Mr. Steinberg that also

11   show the support he's given them, his friends, and other family

12   members, and also the respect he's afforded them.  I was struck

13   by the fact that to this day he speaks to his parents almost on

14   a daily basis, which reflects how he honors them and how he

15   carries himself with respect to his family.

16        His brother Daniel, of course, recounts, again, from a

17   family perspective, how Michael has given him advice and helped

18   him become a better person, and then did more tangible things

19   where he was fortunately in a position to pay off his medical

20   school loans, and which he did that, which obviously he was

21   able to do that in part because of the success he has had in

22   his job.  But also I think it reflects other things he did

23   beyond simply that financial contribution.

24        And, your Honor, I want to talk about beyond simply

25   the family.  There's a lot submitted about the immediate

1    family, the distant family, and all of the things that

2    Mr. Steinberg has done and meant to him, which I do think does,

3    I would submit, reflect on his character, which is, again, an

4    undefined term, but I think obviously his characteristics are

5    one of the things that I know your Honor will consider.

6         Beyond that though, I think Mr. Steinberg really is

7    exceptional in terms of how he has lived his life in terms of

8    an altruistic way, in terms of his giving in charitable

9    pursuits.  And I'll give the most obvious example, where

10   Mr. Steinberg, starting when he was relatively young, 30, with

11   others, had the idea of organizing the young professionals to

12   see if they could maximize their skill set and get more

13   involved in philanthropy and charitable causes by filling a gap

14   where they saw smaller charities that were not able to get big

15   institutions to give money, and try to not only identify the

16   ones that could benefit the most from that, but do it in a

17   hands-on way, I think they call it venture philanthropy

18   hands-on giving.  Mr. Steinberg committed himself all in.  I

19   think you certainly have the letter from Ms. Herman, the

20   director of Natan, but also from many people who were able to

21   talk about it either because they were involved in Natan or

22   recipients of those grants.  And I think you get a feel for the

23   amount of time Mr. Steinberg actually contributed both in

24   reviewing the grants, understanding what would be the best use

25   of the money, but also involved with the organizations

1    themselves.

2          And as your Honor no doubt read, I think there are

3    over 80 small charities that they helped, including some that

4    stood out to me:  Innovation Africa, where they help to bring

5    Israeli technology to Africa, and over five years helped to

6    bring, I believe the numbers were, electricity, food, and

7    medical care to over 450,000 people.  There are obviously a lot

8    of other examples given where I think Mr. Steinberg gave of

9    himself and was able to truly make a difference in the world in

10   a way that if it should ever matter, I would submit today may

11   be the day it matters.

12          Beyond that, I also think your Honor no doubt read how

13   Mr. Steinberg 's involvement with Natan helped him to encourage

14   not just his peers to get involved, but then as they got older,

15   focused on younger professionals who may not be giving, may not

16   be involved in such organizations, and to get them involved,

17   and he did that, in addition to the children of his friends who

18   as they began to have families.

19          And I would submit, your Honor, those sorts of acts

20   really do stand out about who Mr. Steinberg is.  And in

21   balancing the offense conduct that your Honor is also required

22   to consider, I hope your Honor will find that that does support

23   a substantially lower sentence.

24          Beyond sort of the more higher profile acts of Mr.

25   Steinberg, I also was struck by the smaller acts.  One in

1    particular I mentioned is I thought it stood out that when

2    Hurricane Sandy struck, and obviously affected so many people

3    in our city, that Mr. Steinberg and his wife, Liz, that they

4    opened their home to people who worked in their building who

5    were affected by it.  They cooked meals for them, offered them

6    a place to rest, shower, and the like.  And I thought that that

7    also reflected their private acts of charity.  And as your

8    Honor knows, there's many more examples that are given in the

9    letters and in his life, but I think that also reflects on his

10   character.

11           The third piece I wanted to mention about the letters,

12   your Honor, were really the anecdotes and stories that came

13   from so many friends and acquaintances who talked about how Mr.

14   Steinberg responded when they were in a time of need, of

15   crisis, looking for help.  Mr. Steinberg didn't only respond

16   with words, but as the old saying goes, actions speak louder

17   than words, he actually acted; he actually did something.

18           And, your Honor, I was struck and wanted to highlight

19   the many examples where Mr. Steinberg was confronted with

20   people in need, friends, but also situations where people

21   didn't know him so well, and strangers who had reached out to

22   Mr. Steinberg or he had reached out to them because he noticed

23   they had some need.

24           His friend who was diagnosed with a terrible illness,

25   Mr. Steinberg believed that he wasn't getting the proper

1    treatment, and did research himself, and then became involved

2    with him and his family and doctors to get him the proper

3    research.  He credits Mr. Steinberg with actually saving his

4    life.

5           The other friends with other illnesses, Mr. Steinberg

6    responded again not just with words, but with deeds.  And there

7    was story, after story, after story that had an impression on

8    me.  And I was concerned I wouldn't have the words to sort of

9    express it, but I know your Honor read them all yourself, and

10   would ask that your Honor consider it.

11          And I recognize that it's difficult in considering all

12   these factors, but I would submit, your Honor, that the long

13   list of examples and evidence of how Mr. Steinberg has

14   conducted his life outside of what your Honor is required to

15   consider, based on the conviction here, does stand out.  And I

16   would ask your Honor to consider providing a sentence

17   substantially below the guideline ranges based on those

18   factors.

19          In considering how to quantify that and what that

20   number may mean, I know your Honor has certainly given this a

21   lot of thought.

22          I did want to focus on something that we talked about

23   in our submission; and obviously our submissions are lengthy in

24   discussing issues of culpability and relative culpability.  But

25   addressing the factor your Honor highlighted, the need to avoid

1    unwanted disparities, which, of course, the Supreme Court has

2    also said in *Gall*, also involves making sure the sentences of

3    defendants who are dissimilar or not similar.  And to that, I

4    wanted to address in particular what I think is the most direct

5    and easy comparison.

6           The co-conspirator in this case, Mr. Newman, as your

7    Honor knows, he had a guideline range that is actually the same

8    as your Honor has now found for Mr. Steinberg.  Your Honor

9    sentenced him to nine months below the low-end of the

10   guideline, 54 months.  And we would submit, your Honor, that

11   Mr. Steinberg's culpability, based on obviously the jury

12   verdict and the government's allegations in this case, are

13   substantially below that of Mr. Newman.

14          I think the most obvious example is what certainly the

15   government spoke about in great length at his sentencing, and

16   that is his role in paying the $175,000 to Mr. Boyle that the

17   government alleged directly led to the breach by Mr. Ray and

18   were covert payments.  I think there are a lot of other

19   distinctions that we draw out in our papers that I don't need

20   to discuss here.

21          I would submit, your Honor, that based on the

22   allegations and accepting obviously the verdict, that Mr.

23   Steinberg is substantially less culpable than Mr. Newman.  And

24   we would ask that your Honor consider that in imposing a

25   sentence sufficient, but not greater than necessary, to meet

1     the requirements of the guidelines.

2           And the other example we would give and reference in

3     our papers, but would highlight today, is Mr. Whitman, who, as

4     your Honor knows, was sentenced to 24 months.  I would just say

5     that Mr. Whitman was also someone -- he actually ran his own

6     hedge fund.  We think he was involved or alleged to be involved

7     in two separate conspiracies.  He was alleged to have directly

8     provided the benefits in exchange for the inside information.

9     And we would submit that based on the evidence publicly

10    available, it would appear that he would have greater

11    culpability than Mr. Steinberg based on the allegations in this

12    case.  And we would ask your Honor to consider that sentence,

13    as well, recognizing that's a different conspiracy and a

14    different set of facts.

15          And based on all this, your Honor, obviously we've

16    submitted a lot more in our papers, if your Honor has any

17    questions about any of the positions we've made or any of the

18    submissions, we are available to discuss them.

19          Other than that, we would just ask your Honor

20    obviously, based on all of the factors, to impose a sentence

21    substantially below the advisory guideline range.

22          THE COURT:  All right.  Thank you, Mr. Berke.

23          MR. BERKE:  Thank you, Judge.

24          THE COURT:  Ms. Apps, I'm happy to hear from you.

25          MS. APPS:  Thank you, your Honor.

1          As your Honor is aware, insider trading is a serious

2    crime.  And Michael Steinberg knowingly received and traded on

3    material nonpublic information about Dell and Nvidia for

4    multiple quarters in 2008 and 2009.  He knew that his analyst

5    obtained that inside information through a network of corrupt

6    analysts at other hedge funds, and he pressed his analysts to

7    get updates on that inside information.  He made nearly two

8    million in profits in his own portfolio, and passed the inside

9    information to his boss, Steve Cohen.

10          As the jury found, based on your Honor's instructions,

11   the evidence at trial overwhelmingly established that Mr.

12   Steinberg knew of the fraudulent nature of the insider trading

13   scheme he joined, and he acted with the intent that it succeed.

14   He knowingly violated the law, and knew what he was doing was

15   wrong.

16          If I may briefly address Mr. Berke's arguments on

17   unwarranted sentencing disparities.

18          THE COURT:  Sure.

19          MS. APPS:  I won't focus on cases outside of this

20   particular conspiracy, your Honor, because I know having

21   appeared before your Honor at sentencings before, you are more

22   familiar with the different cases, both with higher sentences

23   and lower sentences, than anyone else I know.  But if I may

24   focus for a few moments on Mr. Newman.

25          As we argued earlier, I think the plain language of

1    the guidelines dictate the result that Mr. Cohen's trading

2    should be included in the loss calculation and as your Honor

3    found.

4              THE COURT:  I've already found that, right.

5              MS. APPS:  Of course.

6              I will note that that puts him in the same guidelines

7    range as Mr. Newman.  And in that regard, I think that the

8    guidelines do not make a distinction between trades in an

9    individual's portfolio account and those in the account of his

10   boss for purposes of considering an individual's culpability.

11             But, of course, your Honor may consider, under Section

12   3553(a), whether or not the situations are comparable.  And in

13   that regard, I will note that Mr. Steinberg made 1.8 million in

14   his portfolio, whereas Mr. Newman made four million in his

15   portfolio.  And the impact of that was partly to the profit

16   that Mr. Newman made on the insider trades that were in his

17   portfolio.  The profit on that $4 million from Mr. Newman was

18   far more direct, of course, than the profit from the trading in

19   Mr. Cohen's account; indeed, in this case it was Mr. Cohen

20   avoided losses and Mr. Steinberg made no profit from the

21   trading in Cohen's account.  And the Court, of course, may

22   consider that for purposes of sentencing the defendant under

23   Section 3553(a).

24             THE COURT:  I think one of the distinctions that

25   Mr. Berke focused on, not today, but certainly in his papers,

1     is that Mr. Newman was arranging for payments to be made to a

2     source.   And I think there's no such allegation with respect to

3     Mr. Steinberg, so does that make Mr. Newman more culpable.

4            MS. APPS:   Your Honor, we have conceded that Mr.

5     Steinberg did not know of the payments that Mr. Newman made to

6     Mr. Goyal.   And there certainly is an argument that in that

7     respect, Mr. Steinberg is less culpable than Newman.   Of

8     course, as we present it in our papers, that does not mean Mr.

9     Steinberg was not fully aware of the illegal nature of this

10    insider trading scheme, and participated and furthered that

11    scheme --

12           THE COURT:   Look, there are many people here who I

13    think still believe that Mr. Steinberg is innocent, and I

14    respect that.   But the jury has spoken on that, so I'm

15    sentencing on the basis of a guilty conviction and a finding

16    that he was a member of the insider trading conspiracy and

17    engaged in insider trading.   So that's a given.

18           MS. APPS:   Of course.

19           THE COURT:   But there are still degrees of culpability

20    within a conspiracy and a cross-conspiracy.   So I think that

21    was at least one of the points Mr. Berke was making, right.

22           MS. APPS:   And I agreed that not having made those

23    direct payments himself, in that respect, Steinberg is less

24    culpable than Mr. Newman.

25           THE COURT:   All right.

```
1          MS. APPS:  Your Honor, I understand we'll get to

2    forfeiture later, but we have a draft order for the Court's

3    consideration.

4          THE COURT:  Why don't we just spend a minute talking

5    about forfeiture, because it always kind of breaks the flow

6    when we take it up later.

7          The government is seeking forfeiture of approximately

8    $365,000, which was the proceeds of the trades in Mr.

9    Steinberg's portfolio.

10         Mr. Berke, I may have missed it, I don't think you

11   addressed that, do you have any objection to that?

12         MR. BERKE:  No, your Honor.  Based on the conviction,

13   we agree that's the proper --

14         THE COURT:  You are not waiving any arguments on

15   appeal, but in terms of the math, basically.  So the

16   forfeiture, 365,142.30, I think, right?

17         MS. APPS:  Yes.

18         THE COURT:  So you can hand that up.  I'll look at it

19   and I'll -- have you seen a copy, Mr. Berke?

20         MR. BERKE:  I have, your Honor.

21         THE COURT:  I think that will be part of any judgment.

22         Nothing else, Ms. Apps?

23         MS. APPS:  I have nothing further at this time, your

24   Honor.

25         THE COURT:  Mr. Berke.
```

1          MR. BERKE:  Nothing further, your Honor.

2          THE COURT:  Mr. Steinberg, as I said, if you wish to

3   speak, you can do that.  If you want to sit, that's fine;

4   frankly, it might be closer to the mike.  If you prefer to

5   stand, that's fine, too.

6          MR. BERKE:  Your Honor, I just want to alert you, as

7   your Honor may not be surprised to hear, we've advised

8   Mr. Steinberg not to make a statement in light of the fact that

9   there will be an appeal.

10         THE COURT:  That's fine.  Not unusual, and certainly

11  nothing that would be held against you.

12         Okay.  That's fine.  Have a seat.

13         MR. BERKE:  Thank you, Judge.

14         THE COURT:  All right.  Let me tell you the sentence I

15  intend to impose and my reasons for it.

16         In our system, judges have to give reasons, and they

17  have to do it publicly, which is, I think, a good thing.  I

18  think it's a strength in our system, because that way a

19  defendant and his family and the public generally don't have to

20  guess what the judge was thinking.  They can know and

21  understand.  And even if they disagree, they can hopefully

22  respect or have at least some respect for the judgment that

23  came down.

24         Sentencing is the hardest job of any judge; every

25  judge I know says that.  And it's true.  It's an awesome

1    responsibility to impose a sentence on another human being.

2    It's a humbling experience.  And it's a lonely part of the job,

3    candidly, because Mr. Steinberg and his family and friends are

4    united in their concern and their worry and in their hope.

5    Others, I think, likewise have perspectives that are limited.

6    I'm the only one who has to balance all these different

7    factors, and that's something that I generally can't share; it

8    has to be done by me based on my judgment.  And there are times

9    when that's a very daunting thing, it's a daunting task.  But

10   it is something that is the most important thing I do, and I

11   think most judges feel that also.

12          So I'm going to explain to you sort of how I get to

13   where I'm going, Mr. Steinberg.  And I think it's important to

14   walk through the process, even though the punchline gets sort

15   of saved to the end, and it seems as though I'm trying to build

16   suspense.  It's not that, it's just that I want to give you a

17   sense of my reasoning.

18          I was struck by a letter, the letter from your wife,

19   Elizabeth, a really beautiful and moving letter; very

20   heartfelt.  But in it, she expressed some concern about whether

21   her words could do justice to what she wanted to convey.  And I

22   think, frankly, her worries were unfounded, because I thought

23   it was really a beautiful and eloquent letter, and gave a real

24   sense of you as a man that, frankly, any husband would be proud

25   to have from his wife.

     1          But I understand her sentiment and her concerns,

     2     because I share the concerns in that I worry that my words

     3     today are not going to be sufficient to convey what I've

     4     considered and what I have thought about and what I have

     5     weighed.  And so I guess that's the nature of human

     6     communication; there are limits to it.  It doesn't always carry

     7     the freight we want it to, but it's the best we have.  And so

     8     with that in mind, I'll proceed.

     9          I read all the letters.  They were very moving

    10     letters.  They were very thoughtful letters.  It's rare that I

    11     get that many, and that many letters of such a quality.  People

    12     spent a lot of time thinking about what they were going to

    13     write.  It didn't have the feel of a letter-writing campaign;

    14     it seemed like people really sat down and took the time to

    15     express themselves on a subject that they felt very strongly

    16     about.

    17          I'm not going to comment on all or most of them.

    18     There are a couple that stood out, and I just think it's worth

    19     reading portions of them, because for one reason or another

    20     they struck me.

    21          One of them was from Mark and Randy Berman, who may

    22     even be here, I don't know, but they wrote:  "We hope you will

    23     invest the time to get a full understanding of who Michael

    24     Steinberg is as a person, father, and member of the community.

    25     We only wish you knew him personally."

And I thought, Well, that really does sum up what the hope I would think of a person writing a letter would be as to what the Court would do with that letter.  And I can assure you, I certainly have invested the time, not just to read the letters -- I'll tell you, that took a long time; these are some very long letters and very detailed letters.  They are not just a paragraph, He's a good guy, and sort of moves on.  So I definitely invested that time.

But I think the harder part, the more time-consuming part is, frankly, investing the time to try to understand and appreciate the point of view of the letter writer, and to have empathy and understanding, put myself in their shoes, but also then to put myself in your shoes, Mr. Steinberg; because for understandable reasons, you haven't spoken here today, and you and I have never really directly spoken, I don't think, though I feel as though I know you in some ways, because we spent a month together in a courtroom, but there are limits to our communication.  So these letters, in a sense, speak for you based on what you've meant to other people.  And so I thank them for it.  It's been very valuable.

There is a letter from your father which I thought had a comment that I thought was worth repeating.  It said: "Michael cannot be defined by what you saw in court."  And I think that's true.  I know that going in.  I know that a trial is not about providing a full picture of an entire person; it's

1  much more limited than that.  The trial didn't define
2  Mr. Steinberg; it couldn't have.  There's so much more to this
3  rich and really, really nuanced and complicated person.
4      One of the things that Dr. Steinberg said was:
5  "Missing was the person known by his many friends and
6  colleagues as an honorable, moral, and decent man."  And I
7  think perhaps that is true in a sense that really wasn't what
8  the trial was about.  The trial was much more limited; it was
9  about whether the crimes charged were committed, whether the
10  evidence -- and, frankly, it's more limited than that, whether
11  the evidence demonstrated it beyond a reasonable doubt.  That's
12  all the jury was asked to do; that's all they really could do.
13  They don't have the capacity to make a judgment about this man
14  as a person or to offer a referendum on the quality of his life
15  or who he is.  They weren't exposed to most of who he is.  They
16  really were limited to the facts of the allegations and the
17  proof that was presented at trial.
18      But sentencing is a little different.  I have to go
19  deeper than what the jury was focused on, because sentencing is
20  a different task.  So I certainly have endeavored to be careful
21  about this.
22      Mr. Steinberg's mother wrote a beautiful letter, as
23  well.  And she described Michael as her precious son Michael.
24  I suppose every mother says that about their son in some ways,
25  but I do think that this is a special and a precious person.  I

1   think that most defendants I sentence are special and precious

2   in ways that defy what they have been charged with.  But I

3   think it's particularly true in this case.

4        I think Mr. Steinberg has lived a life that has, by

5   and large, been not just good, it's been very good.  He's been

6   kind, he's been generous, he's been thoughtful.  He's the kind

7   of person that I would think any father or mother would be

8   proud to have for a son.  That comes across in the letters

9   again and again.

10       Again, I don't want to read them and become

11  repetitive, but Danielle Harris, who's a public defender in San

12  Francisco, I think, wrote:  "The world is a better place

13  because of Michael Steinberg."

14       Lara Markenson said the same thing.

15       A lot of people used similar views and expressions to

16  convey the sense of this person.

17       Ernie Dahlman credited Mr. Steinberg with literally

18  saving his life.  And that's a dramatic story and one that you

19  don't read everyday.

20       But equally moving in some ways to me was a letter

21  from Samantha and Eric Schmell -- I may be mispronouncing

22  names -- who just talked about Mr. Steinberg being kind to the

23  new kid on the first day of school.  That's a small thing, I

24  suppose, and it was a long time ago, but it gives a sense of

25  character.  And I think character is very important.  It's

1    important in many ways more than just individual acts of

2    charity or individual acts of generosity.  I think most of the

3    letters really speak about character, and it wasn't lost on me.

4         Barry Scherman wrote:  "I have found Michael to be a

5    person of noble character, someone to admire and emulate.  I

6    have the utmost respect and admiration for Michael Steinberg."

7         Heather Heller said a similar thing, very eloquently:

8    "Michael Steinberg is a dedicated and loving father and

9    husband, a wonderful and caring friend, and a generous,

10   thoughtful, and philanthropic member of our community."

11        I believe that to be true.  And I believe it to be

12   important.  So those things are not lost on me, and they are

13   certainly weighed in the balance, and they count for a lot.

14        I will say that I was particularly pleased and, in

15   some ways, touched with a letter from Andrew Heller,

16   Ms. Heller's husband.  He also spoke to the character of

17   Mr. Steinberg very eloquently and thoughtfully.

18        But he said something else that sort of touched me.

19   He said:  "I can only imagine that sentencing someone is a

20   tremendously difficult decision, and I appreciate that you have

21   many considerations to balance.  I hope that my letter will

22   give you some additional information and perspective on the

23   many good things Michael has done in his life so far, and the

24   type of generous, thoughtful, and caring person I and many

25   others know him to be."

1          Candidly, I was grateful for that bit of empathy from

2    Mr. Heller, who tried to put himself in my shoes for a moment,

3    because he's right, I have difficult decisions to make, but I

4    also have many considerations to balance; and I guess that's my

5    segue to some of the other considerations to balance.

6          If it were only this, if it were only what is the

7    character of this man, then this would be easy, because I think

8    this is a basically good man and a person who is loved and

9    respected by many or most who know him in a way that is

10   unusual.  I wouldn't say it's unheard of; most of the people

11   who come before me are good in a meaningful sense.  I'm not

12   naive, but I do think that most of the people that I sentence

13   are people who are loved and missed and mourned when they are

14   separated from their loved ones, and who are capable of great

15   generosity and kindness.

16         But I do think that your life to this point takes you

17   into a different category, and I think that has to be

18   respected.  But it has to be balanced, too.  It has to be

19   balanced against these other factors.  And the letter writers,

20   other than perhaps Mr. Heller, who focused on for a moment, at

21   least acknowledged what I have to do, or not focused on that,

22   and that's not a criticism, because they are focused on you,

23   and they are focused on what is most immediate to them.

24         But I do have to consider the crime here.  And as I

25   said, there are some who sincerely believe that you did not

1    commit this crime; that the jury's verdict was erroneous.   And

2    I respect that.   But that's why we have trials.   And I think

3    the jury's verdict was justified on the evidence.   I issued a

4    ruling on that.   But I sentence now with the understanding, the

5    assumption, that Mr. Steinberg is guilty of the crime that he

6    was charged with, crimes that he was charged with.

7         They are serious crimes.   No one died as a result of

8    these crimes; there are more serious crimes.   But they are not

9    trivial crimes; they are crimes that go to the heart of what it

10   is to live in an honest society, and to live in a market system

11   where we have rules.

12        And one of the real objectives of sentencing is to

13   promote respect for the law.   And we have had these laws for a

14   long time.   And I think the understanding by everyone involved

15   was that there are certain things you cannot do; there are

16   certain types of information that can't be the basis for

17   trades.   And I think the evidence demonstrated that this was

18   something that was honoring the breach, notwithstanding

19   compliance manuals, notwithstanding training, notwithstanding

20   full knowledge of the consequences of engaging in insider

21   trading.

22        There was insider trading here in this conspiracy, not

23   once or twice, this was consistent over a period of time,

24   quarter to quarter to quarter, in multiple stocks, involving

25   multiple trades.   They didn't all make money, but in some ways

1   that was just sort of an accident of market expectations.   But

2   certainly the jury found -- and I think the evidence

3   supports -- that there was a lot of trading going on.   It

4   wasn't an isolated thing.   And that's something obviously that

5   I have to consider.   And it's something that has to be

6   balanced.

7        There are a lot of people who criticize these

8   guidelines.   And I think it's fair to criticize these

9   guidelines.   They are not perfect.   But to say they are not

10  perfect is not to say they sort of go out the window.   I think

11  their endeavor is to avoid disparity, to equalize across cases,

12  and to provide guidance based on measures of culpability.

13       The amount of gain is, in some ways, a clumsy way to

14  measure culpability, but it's not an illogical one.   There

15  might be other more subtle things that could also be

16  considered, but, for most people on the planet, $1.8 million of

17  gain is a lifetime of accumulated wealth.   It might be several

18  generations of accumulated wealth.   Even a hedge fund, it's no

19  big deal, but it's a lot of money to most people.   And the

20  illegal procurement of those gains is something that has to be

21  punished and has to be called out.

22       And so there are other factors I think are not in this

23  guideline.   The real criticism of the sentencing guidelines for

24  insider trading is that it really focuses just on basically a

25  base offense level and a gain amount.   That's all there is.

1    And I think that is the fair criticism.  There are other things
2    that matter.  But I think those other things in some ways are
3    present here:
4          The number of trades.  The guidelines make no
5    distinction between someone who does one big trade on the
6    spur-of-the-moment, exercising a momentary lapse in judgment,
7    from someone who does systematic trades over a period of months
8    and years.  In this case, we have the latter.
9          The sophistication of the parties involved.  Someone
10   who sort of was young and not really familiar with the
11   standards or understood how the rules were constructed and how
12   they were played might be less culpable.  But I think in this
13   case Mr. Steinberg was very sophisticated, was in a leadership
14   position, was someone who others looked to and respected.  And
15   so I think that counts against him in sort of weighing the
16   culpability of this offense.  Those are things I take into
17   consideration, and they are things that can't be ignored.
18         Promoting respect for the law, as I said before,
19   matters.  And I think that's one of the chief harms of his
20   crimes; it undermines people's respect for the law; it also, I
21   think, undermines people's confidence in markets and confidence
22   in systems that are essential to the prosperity of this
23   country.  This is a country where I think we should be proud of
24   our free market system, and proud that we have access to wealth
25   and access to investment to enable good ideas to be developed

1    so that we have a more prosperous society.  I think that's a

2    good thing.  We are all proud of that.  But things that

3    undermine people's confidence in that system are at least

4    potentially very harmful.

5            I guess that leads to the next point:  Deterrence.  As

6    I said, there's specific deterrence and general deterrence.

7            Specific deterrence, I have to say, I don't think is

8    really a factor here.  I don't think Mr. Steinberg is ever

9    going to commit another crime, so I'm not worried about that.

10           General deterrence is perhaps a different story.  I do

11   think others will follow this case and cases like it and

12   perhaps derive lessons from it.  That's important.  That's not

13   true of every case.  I have to say the vast majority of cases

14   where I sentence defendants, it's an empty courtroom; there

15   might be one or two people, and no prospects for anybody else

16   really learning much about the sentence.

17           This is a case and cases like it I think word gets out

18   and people can learn from it.  The lessons that are taught can

19   be constructive ones.  They can also be, I think,

20   misunderstood, as well.  But I do think that that's a relevant

21   concern; it's not the driving concern, but it is a relevant

22   concern and not an insignificant one.

23           And then with respect to sentencing disparity, look,

24   it's hard sometimes to compare individuals, even in the same

25   conspiracy, because each person is unique.  I think a

1    distinction can be made between Mr. Newman and Mr. Steinberg, I
2    think, in terms of culpability.  I think Mr. Newman was more
3    all in, was more of a driving force; the payments he made were
4    reminders of the corrupt nature of this thing, whereas Mr.
5    Steinberg's was a more passive involvement.  I've seen no
6    evidence to suggest that this was rampant, at least with
7    respect to Mr. Steinberg's portfolio.  Dell and Nvidia were the
8    trades; they were not isolated; this happened quarter after
9    quarter, not insignificant amounts of money, but certainly
10   distinguishable from other cases that I've presided over where
11   there was a much more aggressive seeking of inside information,
12   basically putting bounties on sources, bounties on lawyers
13   willing to breach their duties.  I don't think this is that
14   kind of a case, and it distinguishes Mr. Steinberg's
15   culpability from some of the others that I've sentenced and
16   have been sentenced in other cases.
17           Balancing all that is a hard thing.  There's no magic
18   in the guidelines.  It may surprise you to know that I sentence
19   below the guidelines at twice the national average, I just
20   looked it up.  And I don't feel bad about that.  I usually, in
21   cases like this, have sentenced at the low end, very low end of
22   the range, or below the range, because I think there are other
23   factors that are often not recognized in the guidelines, as
24   I've mentioned.
25           In this case, I do intend to go below the guidelines,

and it's largely because of your character and the person I
think you are.  And it's not that you just sort of could throw
money at things and buy yourself chips to throw on the good
behavior column; it's not simply that you have no prior
convictions, because, of course, you don't.  I do think that
the life you've led, the testimonials of people who know you
best, says something about you that strikes me distinguishes
you from most of the people I've sentenced.  And you have to
get credit for that.  I think that a system that didn't
consider that would be rigid and unjust.  So I do consider
those things.

    But I also balance it against the other factors I
talked about, including the fact that, look, I think the fact
is that you didn't need to commit these crimes.  You were
comfortable.  Not just comfortable, my goodness, in the history
of mankind, there's very few who had all the blessings and
material things that you had; but to throw the immaterial ones
on top, family who loved you, and responsibilities to people
who were depending on you, lots of reasons not to engage in
this conduct.  No need to engage in this to save a failing
business or to stave off bankruptcy or anything like that.
There were no financial pressures that drove to the commission
of this crime.  And I think that's something that I also meant
to mention before.

    But, on balance, look, I think I agree with the

1    letters I've received, I agree with most of what Mr. Berke

2    said, I also agree with most of what Ms. Apps said; it's just,

3    on balance, I think this is conduct that has to be punished,

4    has to be punished in a serious way, but not in a way that's

5    cruel or vindictive.

6           So with all that, I'll get to the punchline.   I'm

7    sorry I dragged this out.

8           It's my intention to impose a sentence of 42 months,

9    which is three and-a-half years, not insignificant, but below

10   the guidelines certainly, but I think reflective of the things

11   I talked about.   I think a sentence greater than that would be

12   unnecessary to meet the objectives that I've talked about, and

13   I think a sentence less than this would perhaps undermine some

14   of those same objectives.

15          So 42 months, to be followed by a term of supervised

16   release of three years, with terms and conditions that are set

17   forth in the presentence report.   Probation had asked for one

18   year of supervised release.   And if you're doing well, I'm

19   happy to cut it short; I do that sometimes.   But for now I'm

20   going to say three years, which is what I typically do.

21          I am going to impose a fine.   I think a fine of $2

22   million is appropriate.   It's often the case I don't impose

23   fines because people just don't have the money to pay a fine,

24   but I think you have the ability to pay a fine.   And I think it

25   would be appropriate that you do so.

1      I am also going to order forfeiture, as I said, in the

2  amount of $365,142.30, if I remember correctly.   And I'll issue

3  a separate order for that.

4      And then there's a special assessment of $500 that has

5  to be imposed; that's mandatory $100 for each count of

6  conviction.

7      So that's the sentence I intend to impose.

8      Mr. Berke, is there any legal impediment to my

9  imposing that sentence?

10     MR. BERKE:  Nothing that we haven't already raised,

11 your Honor.

12     THE COURT:  Okay.

13     Ms. Apps, is there any legal impediment to my imposing

14 this sentence?

15     MS. APPS:  No, your Honor.

16     THE COURT:  Mr. Steinberg, let me ask you to stand.

17     Mr. Steinberg, having presided over your trial and

18 accepted the guilty verdict from the jury on the five counts of

19 the indictment, I now sentence you as follows:

20     I sentence you to a term of incarceration of 42 months

21 to run concurrently on each of the counts.   I also impose a

22 term of supervised release of three years; it will include the

23 following standard and mandatory special conditions.   There are

24 standard conditions 13 that apply in every case.   I'm imposing

25 those.

1          The mandatory conditions are that you shall not commit

2     another federal, state, or local crime; you shall not possess a

3     controlled substance of any kind; you shall not possess a

4     firearm or destructive device of any kind.

5          I'm not too worried about most of these, candidly.

6          You will also cooperate in the collection of DNA as

7     directed by your probation officer.

8          There are the following special conditions that I'm

9     going to impose:  First, that you shall provide the probation

10    office with any requested financial information; second, you

11    shall not incur new credit charges or open additional lines of

12    credit without the approval of the probation officer.  That's

13    just to make sure that you're not doing anything that's going

14    to put you at financial risk.  I'm not too worried about that

15    either.

16         I'm going to order that you report to the nearest

17    probation office within 24 hours of your release from custody;

18    so when you get home, celebrate, there will be a lot of people

19    happy to see you.  But the next day I want you to go to

20    probation.  You'll be supervised in this district, so it will

21    probably be across the street by then, I'm not sure exactly,

22    but I think it will be 500 Pearl Street.

23         As I said, I'm going to impose a fine of $2 million,

24    as well as a special assessment of $500, which is due

25    immediately.  And then forfeiture in the amount of $365,142.30.

1        Okay.  So have a seat.  That's the sentence.

2        I should tell you -- I think you know already -- you

3   have a right to appeal the sentence.  And so if you wish to

4   appeal, you need to file a notice of appeal within two weeks.

5   Mr. Berke will help you with that, I'm sure.

6        All right.  Mr. Berke, any recommendations you'd like

7   me to make to the Bureau of Prisons?

8        MR. BERKE:  Thank you, your Honor.

9        We would ask that you recommend that the sentence be

10  served at the satellite camp at Otisville close to Mr.

11  Steinberg's family.

12       THE COURT:  I will make that recommendation.  I'm not

13  sure if anybody could hear you, but the request is that I make

14  a recommendation to the Bureau of Prisons that he be designated

15  to the Otisville facility, which is in -- it's not Westchester,

16  I guess it's -- it might be Orange or Dutchess, I'm not sure.

17  In any event, it's pretty close, so close enough to visit.

18       I can only make recommendations; I can't order it.

19  But I certainly will make the recommendation in the strongest

20  possible terms, okay?

21       MR. BERKE:  Thank you, your Honor.

22       The other request we have, your Honor, is that your

23  Honor grant bail pending appeal.  The government has consented

24  to that.

25       THE COURT:  Look, I had denied a similar request to

1    Mr. Chiasson and Mr. Newman.  And I denied it on the basis that
2    I didn't think the standard had been met; seemed to me that the
3    law was pretty clear, and so I denied it.

4           The Circuit reversed it, and I since, I think,
5    indicated that this is a closer call than I thought.  And I
6    respect that.  They are the Circuit; they get to make the final
7    calls on this.

8           So in light of those changed circumstances, certainly
9    I will grant the request, okay?

10          MR. BERKE:  Thank you, your Honor.

11          THE COURT:  I'll probably know what's going on.  It
12   may be that I might want to revisit this, depending on how the
13   appeal in the *Newman* and *Chiasson* case goes.  So if that comes
14   down in the interim, I'd ask the parties to submit a joint
15   letter indicating how that ruling would affect bail pending
16   appeal, if at all.  I'll probably learn about it at the same
17   time you do, but we'll both keep our eyes out, okay?

18          MR. BERKE:  Thank you, your Honor.

19          THE COURT:  Anything else we should cover today?

20          MS. APPS:  No, your Honor.

21          There are no open counts.

22          THE COURT:  No other open counts.

23          Okay.  Mr. Berke, anything else from your perspective?

24          MR. BERKE:  No, your Honor.

25          The only thing I would say is to alert your Honor with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
 1   regard to the financial component of the sentence.  We've had
 2   some conversations with the government, and we'll speak to them
 3   about hopefully reaching an agreement, as happened in the
 4   Chiasson case, in light of where we are with the sentencing.
 5              THE COURT:  Okay.  The appeal.
 6              MR. BERKE:  The appeal, rather, yes.
 7              Thank you, Judge.
 8              THE COURT:  All right.  Mr. Steinberg, that may be a
 9   sentence of more than what you'd hoped for, maybe it's better,
10   I don't know.  As I said, I have to call them as I see them,
11   and I try to do that.
12              I meant what I said.  I think you're a decent man, a
13   good man, a very good man.  I read those letters.  I just kept
14   thinking, Boy, would people say such good and kind things about
15   me so consistently.  I don't know that they would.  So you have
16   much to be proud of.
17              And I do think, as your father said, this doesn't
18   define you.  The jury has spoken; and punishment follows from a
19   verdict like that.  But you're a young man, and this will pass.
20   You've got a family, incredible family and support network
21   behind you.  You're very blessed in having that.
22              Obviously I think you will do everything you can to
23   make sure that you're there for your kids and there for your
24   family, even when you're separated from them, because that's a
25   challenge, but it's one that I think you can manage.
```

1          And so my wish for you is a long and healthy and happy

2     life; that you'll continue to do all the good things you were

3     doing before, mindful of the harmfulness of this crime.  And I

4     think you have learned productive lessons from it, which no

5     doubt you seem like that kind of person.

6          You and I have never really spoken, but I hope, even

7     if you disagree with me, at least respect how I went about it,

8     because I guess that's all I can ask for.

9          I feel the same way towards the rest of you here

10    today.  This is a sad day for everybody.

11         There may be newspaper stories and things tomorrow and

12    the days after that will treat this like a morality play of

13    some kind, and turn you and to some extent me into cartoon

14    characters.  But there's much more to it than this.  It's much

15    more complicated.  And the process, I think, is capable of

16    reflecting all of that.  So don't doubt that there's much more

17    to this, much more to you, and much more to this process than

18    might be reported in the headlines.  So good luck.

19         Let me thank the lawyers, who I thought did an

20    exemplary job throughout this case through the trial and

21    through sentencing.  It's a pleasure to have such really

22    capable lawyers who are thoughtful and respectful to each other

23    and to the Court.  So thanks for that.

24         All right.  Good luck to everybody.  Have a nice day.

25                          *     *     *