UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

MATHEW MARTOMA,

               Defendant.

No. 12-cr-00973 (PGG)
ECF Case

# DEFENDANT MATHEW MARTOMA'S SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF HIS SENTENCING MEMORANDUM

GOODWIN PROCTER LLP

Richard M. Strassberg (RS5141)
John O. Farley (JF4402)
Daniel Roeser (DR2380)

The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

Roberto M. Braceras (RB2470)
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Defendant Mathew Martoma*

August 21, 2014

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT .................................................................................................................... 3

I.      BOTH PROBATION AND THE GOVERNMENT AGREE THAT THE GUIDELINE
RANGE SHOULD NOT APPLY IN THIS CASE. ............................................. 3

II.     A SENTENCE SUBSTANTIALLY BELOW THAT PROPOSED BY PROBATION OR
THE GOVERNMENT IS WARRANTED UNDER 18 U.S.C. § 3553(A) ....................... 4

      A.     The Sentences Proposed By Probation And The Government Would
Create An Unwarranted Sentence Disparity. ........................................... 4

      B.     The Government Cannot Justify The Sentence Disparity That The
Proposed Sentences Would Create. ...................................................... 13

      C.     A Lenient Sentence Is Warranted To Mitigate The Impact On Mr.
Martoma's Family And To Allow Him To Continue To Contribute To The
Community. ....................................................................................... 21

            1.     Mr. Martoma Provides Critical ▮▮▮▮▮▮▮▮▮▮ Support
To His Wife Rosemary. ........................................................ 21

            2.     Mr. Martoma's Imprisonment Will Be Devastating To His Three Young
Children .............................................................................. 24

            3.     Mr. Martoma's Commitment To Others Is Not Negated By
His Career Choices Or Past Mistakes. ................................... 27

      D.     The Sentences Proposed By Probation And The Government Are Far
Greater Than Necessary To Serve The Purposes Of Deterrence. ............. 30

            1.     Specific Deterrence. ............................................................. 31

            2.     General Deterrence. .............................................................. 31

III.    A FINE IS NOT WARRANTED IN THIS CASE. ....................................... 33

CONCLUSION ............................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..............................................................................................19

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).................................................................32

*United States v. Bennett*,
    252 F.3d 559 (2d Cir. 2001)..................................................................................7

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)...........................................................17, 31

*United States v. Goffer*,
    721 F.3d 113 (2d Cir. 2013).................................................................................18

*United States v. Milne*,
    384 F. Supp. 2d 1309 (E.D. Wis. 2005).............................................................17

*United States v. Mueffelman*,
    400 F. Supp. 2d 368 (D. Mass. 2005), *aff'd* 470 F.3d 33 (1st Cir. 2006)..........17, 19

STATUTES

18 U.S.C. § 3553 ....................................................................................... passim

U.S.S.G. § 5K1.1 ......................................................................................2, 7

OTHER AUTHORITIES

United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004).........32

## PRELIMINARY STATEMENT

In the time since Mr. Martoma filed his Sentencing Memorandum with this Court in May, attaching letters from more than 100 people seeking leniency in his sentencing, dozens more have written the Court on his behalf.  All of these supporters, of course, are aware of Mr. Martoma's conviction.  But, notwithstanding his conviction, they write to tell the Court about the often life-altering contributions that Mr. Martoma has made to his community and to his family: they write to urge the Court to impose the *minimum* sentence possible so that Mr. Martoma can continue to make a positive difference to the lives of others and so that he can continue to support his fragile family.  We submit this supplemental memorandum to bring these letters to the Court's attention[1] and to address the Government's position with respect to the length of any period of imprisonment and the amount of any fine.

Notably, both the Probation Department *and* the Government agree with Mr. Martoma that Probation's Guideline Range[2] of 188 to 235 months is *not* an appropriate basis for a sentence in this case and should be disregarded.  (*See* PSR at 26; Government's Sentencing Memorandum, ECF No. 293, June 27, 2014 ("Gov't Sentencing Mem."), at 15, 23-24.)  Instead, Probation has recommended a sentence of eight years (96 months) imprisonment (PSR at 26), while the Government advocates a sentence "moderately higher than the 96 months' recommended by the Probation Department."  (Gov't Sentencing Mem., at 1, 15, 23-24.)  Those proposed sentences, however, would wrongly treat Mr. Martoma as one of the most egregious insider trading defendants ever to be sentenced in this District – a result that is unwarranted by both the nature and circumstances of this case and Mr. Martoma's personal circumstances.

---

[1]   While we summarize aspects of many of these letters below, we respectfully refer the Court to the letters themselves, which are attached in their entirety as Exhibits A-CC.

[2]   Unless otherwise noted, defined terms have the meaning set forth in Mr. Martoma's Sentencing Memorandum, May 27, 2014, ECF No. 287 ("Sentencing Memorandum" or "Def. Sentencing Mem.").

The Government seeks one of the longest sentences ever given to an insider trading defendant in this (or any other) District, arguing for a sentence approaching that received by Raj Rajaratnam.  It bears repeating, however, that **the Government itself has admitted** that Mr. Martoma's charged conduct is nothing like that of Mr. Rajaratnam:

> While the instant case is substantial in terms of the amounts at stake, the specific allegations – relating to trading in two securities in connection with a single event – are far simpler than in the *Rajaratnam* case, which alleged insider trading spanning six years and involving dozens of stocks, dozens of co-conspirators, and a total of seven conspiracies as charged in the indictment.[3]

Indeed, the Government seeks a sentence far longer than the sentences of two to three years imprisonment received by other recent insider trading defendants, even though Mr. Martoma's charged conduct is less culpable – according to most measures **used by the Government** in recent cases – than the conduct of other recent insider trading defendants.  The Government's proposed sentence also is far longer than the sentences received by many other recent insider trading defendants who pleaded guilty to insider trading offenses (without receiving credit for cooperation pursuant to U.S.S.G. § 5K1.1) even though the unlawful trading at issue in this case is no greater in many important respects than the unlawful trading in nearly all of these other recent insider trading cases.  In short, the sentences proposed by Probation and the Government would create precisely the sort of unwarranted sentence disparity that 18 U.S.C. § 3553 forbids and should be rejected in favor of a sentence that more accurately reflects the conduct in this case.

The devastating impact of a prolonged sentence on Mr. Martoma's family also strongly supports leniency under Section 3553.  Although imprisonment imposes a hardship on any family, the consequences of a lengthy sentence for Mr. Martoma's fragile family would be

---

[3]   (Gov't's Opp. to Def. Mathew Martoma's Mot. for a Bill of Particulars, ECF No. 26, at 7 n.2 (emphasis and internal quotation marks omitted).)

particularly severe in this case.  Mr. Martoma's   While the Martomas have a supportive family, there

is no one who can replace Mr. Martoma in caring for Rosemary and the children.  The reality is

that Mr. Martoma is the glue that holds his family together; there is no one able to fill his shoes,

and his wife and children will likely crumble without him.  In the words of Rosemary's cousin:

> If Mathew is sent away, the children will suffer drastically.  Even for the basic
> needs and the day-to-day survival of the children, Mathew is indispensable.  As of
> now Mathew is, in addition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Ex. A, Letter from J. Tharakan.)

## ARGUMENT

### I.    BOTH PROBATION AND THE GOVERNMENT AGREE THAT THE GUIDELINE RANGE SHOULD NOT APPLY IN THIS CASE.

Like Mr. Martoma, Probation and the Government both argue for a sentence that is

outside of the Guideline Range.  Probation has concluded "that *a sentence of more than 15*

*years seems excessive*," explaining: "We do believe the defendant's history of charitable

activities is noteworthy, and, additionally, we believe that a range of 188 to 235 months of

imprisonment (although we contend it is accurate) is higher than necessary to address the

seriousness of the defendant's conduct."  (PSR at 26 (emphasis added).)  Even the Government

"*does not oppose a sentence below the applicable Guidelines Range* of 188 to 235 months."

(Gov't Sentencing Mem., at 1 (emphasis added).)  In short, Probation and the Government agree

with Mr. Martoma that the Guideline Range is not a basis for determining an appropriate

sentence in this case.  (*See* Def. Sentencing Mem., at 22-26, 39 & nn.20 & 21.)  This Court

should instead look to the statutory factors outlined in 18 U.S.C. § 3553(a) – as courts in this

District have done in most recent insider trading cases.  *See infra* Part II.

## II.    A SENTENCE SUBSTANTIALLY BELOW THAT PROPOSED BY PROBATION OR THE GOVERNMENT IS WARRANTED UNDER 18 U.S.C. § 3553(a).

As this Court has recognized, in fashioning an appropriate sentence, sentencing courts

have a "duty to impose a sentence that is sufficient ***but not greater than necessary*** to accomplish

the purposes of sentencing as explained in Section 3553."  (Def. Sentencing Mem., Ex. 134,

Sentencing Tr. 24:21-24, *United States v. Koulouroudis*, No. 09 Cr. 440 (PGG), (S.D.N.Y.

Apr. 9, 2010) (emphasis added).)  The sentences proposed by Probation and the Government

would be far greater than necessary to accomplish the purposes of sentencing in this case and

would be inconsistent with the Section 3553(a) sentencing factors.

### A.    The Sentences Proposed By Probation And The Government Would Create An Unwarranted Sentence Disparity.

The sentences proposed by Probation and the Government would place Mr. Martoma

among the most egregious insider trading defendants to have come before courts in this District,

when, in fact, his charged conduct is less culpable than that of insider trading defendants who

received between two and three years imprisonment.

***First***, Probation and the Government propose ***one of the longest sentences ever*** given to

an insider trading defendant in this (or any other) District.  Indeed, the Government makes clear

that it seeks a sentence in the same range as Raj Rajaratnam's (11 years) and Zvi Goffer's (10

years).  Mr. Martoma's charged conduct, however, pales by comparison:

- Raj Rajaratnam was convicted of multiple conspiracies and substantive counts of insider trading.  His illegal conduct spanned more than a decade, involving trades based on information concerning more than 19 public companies from at least 20 corrupt insiders and traders across at least five separate conspiracies.[4]  Indeed,

---

[4]    (Def. Sentencing Mem., Ex. 136, *Rajaratnam* Sentencing Tr. 23:1-13; *id.*, Ex. 148, *Rajaratnam* Gov't Sentencing Mem., at 4-5, 13-14.)

there was evidence that Mr. Rajaratnam had been committing insider trading since the late 1990s.[5]  As the Government itself summarized Mr. Rajaratnam's conduct: "Raj Rajaratnam's criminal conduct was brazen, arrogant, harmful, and pervasive. He corrupted old friends.  He corrupted subordinates.  He corrupted entire markets. . . .  Rajaratnam repeatedly leveraged the power of money and his position as the head of a 7-billion dollar hedge fund to induce friends, employees, and associates to participate in his criminal activities."[6]  Mr. Rajaratnam also went to great lengths to conceal his extensive criminal activity.  He created false e-mails and instant message trails in Galleon's files and instructed others to do the same; instructed co-conspirators to trade in a manner suggesting that they did not have inside information; instructed co-conspirators to remain "radio silent"; paid co-conspirators through offshore accounts; used straw men to make payments "indirectly" to tippers; executed trades in other people's brokerage accounts; used prepaid cellphones to avoid detection; and repeatedly lied to the SEC.[7]

- Zvi Goffer was convicted of conspiring with eight other co-conspirators in a scheme that the Government described as "brazen, sophisticated and extensive."[8]  As the Government argued at sentencing, Mr. Goffer "set up an entire infrastructure for insider trading activity."[9]  He sought out corruptible lawyers who would disclose confidential information from their law firm in exchange for cash bribes, collected cash from co-conspirators to help fund the bribe payments, and personally delivered $97,500 in cash bribes.[10]  Mr. Goffer also took extensive steps to conceal his criminal activity and "to create deniability as a defense for future use," including by using an intermediary to communicate with tippers, creating a false paper trail to hide the true motivations behind stock purchases, and distributing prepaid cellular telephones to his co-conspirators in an effort to evade detection by law enforcement.[11]

Notably, *the Government itself has admitted* that Mr. Martoma's charged conduct does

not even begin to approach the charged conduct of Mr. Rajaratnam.  *See supra* at 2.  Yet, despite

the stark differences in conduct and culpability between Mr. Martoma and both Mr. Rajaratnam

---

[5]   (Def. Sentencing Mem., Ex. 148, *Rajaratnam* Gov't Sentencing Mem., at 19; *id.*, Ex. 136, *Rajaratnam* Sentencing Tr. 20:19-21:1.)  Given the evidence that Mr. Rajaratnam engaged in extensive, uncharged insider trading dating back to the late 1990s, the Government's assertion that "based on the amount of illegal profits received . . . Martoma's conduct would rank more serious tha[n] Rajaratnam's by a factor of four" is plainly false.  (*See* Gov't Sentencing Mem., at 22.)

[6]   (Def. Sentencing Mem., Ex. 148, *Rajaratnam* Gov't Sentencing Mem., at 2.)

[7]   (*Id.* at 2, 12-13, 25-26.)

[8]   (Def. Sentencing Mem., Ex. 143, *Zvi Goffer* Gov't Sentencing Mem., at 1, 6-7; *id.*, Ex. 159, *Goffer* Verdict Form at 1; *id.*, Ex. 158, *Goffer* Indictment ¶¶ 18, 28-29.)

[9]   (Def. Sentencing Mem., Ex. 130, *Zvi Goffer* Sentencing Tr. 29:19-20.)

[10]   (*Id.*, Ex. 143, *Zvi Goffer* Gov't Sentencing Mem., at 1-2, 9.)

[11]   (*Id.* at  9; Def. Sentencing Mem., Ex. 130, *Zvi Goffer* Sentencing Tr. 37:8-24.)

and Mr. Goffer, the Government seeks a largely equivalent sentence – which would create precisely the sort of unwarranted sentence disparity that is prohibited under Section 3553(a).

*Second*, the sentences proposed by Probation and the Government are *far longer* than the sentences received by the other recent insider trading defendants who have gone to trial and been convicted in this District, even though, by most measures used by the Government, his charged conduct was less serious than the conduct of these defendants:

| Case | Prison Sentence |
|------|-----------------|
| *United States v. Doug Whitman,* No. 12 Cr. 125 | 2 years incarceration; 1 year supervised release |
| *United States v. Rajat Gupta,* No. 11 Cr. 907 | 2 years incarceration; 1 year supervised release |
| *United States v. James Fleishman,* No. 11 Cr. 32 | 2.5 years incarceration; 2 years supervised release |
| *United States v. Michael Kimelman,* No. 10 Cr. 56-6 | 2.5 years incarceration; 3 years supervised release |
| *United States v. Emanuel Goffer,* No. 10 Cr. 56-5 | 3 years incarceration; 3 years supervised release |
| *United States v. Michael Steinberg,* No. 12 Cr. 121-4 | 3.5 years incarceration; 3 years supervised release |
| *United States v. Winifred Jiau,* No. 11 Cr. 161 | 4 years incarceration; 2 years supervised release |
| *United States v. Todd Newman,* No. 12 Cr. 121-1 | 4.5 years incarceration; 1 year supervised release |
| *United States v. Joseph Contorinis,* No. 09 Cr. 1083 | 6 years incarceration; 2 years supervised release |
| *United States v. Anthony Chiasson,* No. 12 Cr. 121-2 | 6.5 years incarceration; 1 year supervised release |

*Third*, the sentences proposed by Probation and the Government are *far longer* than the sentences received by many other recent insider trading defendants who pleaded guilty to insider

trading offenses (without receiving credit for cooperation pursuant to U.S.S.G. § 5K1.1).[12]  Since

2009, eighteen such defendants have been sentenced.  Fifteen received sentences of three years

or less:

| **Case** | **Prison Sentence** |
|---|---|
| *United States v. Drew Peterson*, No. 11 Cr. 664 | 3 years probation |
| *United States v. H. Clayton Peterson*, No. 11 Cr. 665 | 3 months home confinement; 2 years probation |
| *United States v. Richard Hansen*, No. 10 Cr. 875 | 3 months incarceration; 2 years supervised release |
| *United States v. Robert Moffat*, No. 10 Cr. 270 | 6 months incarceration; 2 years supervised release |
| *United States v. Drew Brownstein*, No. 11 Cr. 904 | 1 year and a day of incarceration; 3 years supervised release |
| *United States v. Ali Hariri*, No. 10 Cr. 173 | 1.5 years incarceration; 2 years supervised release |
| *United States v. Igor Poteroba*, No. 10 Cr. 649 | 1.83 years incarceration; 3 years supervised release |
| *United States v. Alexei Koval*, No. 10 Cr. 443 | 2.17 years incarceration; 2 years supervised release |
| *United States v. Mark Kurland*, No. 10 Cr. 69 | 2.25 years incarceration; 2 years supervised release |
| *United States v. Yonni Sebbag*, No. 10 Cr. 753 | 2.25 years incarceration; 2 years supervised release |
| *United States v. Danielle Chiesi*, No. 09 Cr. 1184 | 2.5 years incarceration; 2 years supervised release |
| *United States v. Arthur Cutillo*, No. 10 Cr. 56 | 2.5 years incarceration; 2 years supervised release |
| *United States v. Frank Hixon, Jr.*, No. 14 Cr. 227 | 2.5 years incarceration; 3 years supervised release |
| *United States v. Donald Longueuil*, No. 11 Cr. 161 | 2.5 years incarceration; 2 years supervised release |
| *United States v. Jason Goldfarb*, No. 10 Cr. 56 | 3 years incarceration; 3 years supervised release |

---

[12]   While these insider trading defendants pleaded guilty, Mr. Martoma should not receive a longer sentence simply
because he exercised his constitutional right to a trial.  *E.g.*, *United States v. Bennett*, 252 F.3d 559, 562 n.5 (2d
Cir. 2001) (recognizing that the Second Circuit prohibits a court from increasing a defendant's sentence as a
penalty for exercising his constitutional right to stand trial); *see also* Def. Sentencing Mem., at 42 n.24.

As the Government's own charging documents and sentencing memoranda in these cases make clear, the unlawful trading at issue in Mr. Martoma's case is no greater in many important respects than the unlawful trading in nearly **all** of these other recent insider trading cases where the defendants received sentences of three years or less.  Specifically:

- Drew Peterson pleaded guilty to participating in an insider trading conspiracy where he twice purchased securities based on material inside information provided by his father, who served on the board of directors of a company involved in acquisition discussions.[13]  Mr. Peterson also passed along the inside information to a co-conspirator, who then caused his hedge fund to purchase stock and options based on the inside information.[14]  Mr. Peterson was sentenced to three years probation.

- H. Clayton Peterson (Drew Peterson's father) pleaded guilty to participating in an insider trading conspiracy where he provided his son with inside information about a pending corporate acquisition.[15]  Mr. Peterson was a director and chairman of the audit committee of one of the companies involved in the pending acquisition and tipped his son "[i]n breach of [his] fiduciary and other duties of trust and confidence."[16]  Moreover, on multiple occasions, Mr. Peterson specifically instructed his son to purchase additional securities based on this inside information.[17]  Mr. Peterson was sentenced to three months of home confinement and two years probation.

- Richard Hansen pleaded guilty to participating in an insider trading conspiracy in which he traded based on material, nonpublic information about two different corporate acquisitions.[18]  Mr. Hansen engaged in two trades involving two companies based on this inside information.[19]  Mr. Hansen also wired money to a co-conspirator, which the co-conspirator then used to purchase call options based on the inside information.[20]  Mr. Hansen was sentenced to three months imprisonment.

---

[13]  (Ex. DD, *Drew Peterson* Information, at ¶¶ 1-10.)

[14]  (*Id.* at ¶¶ 11-19.)

[15]  (Ex. EE, *H. Clayton Peterson* Information, at ¶¶ 1-14.)

[16]  (*Id.* at ¶¶ 3, 8.)

[17]  (*Id.* at ¶ 8-9.)

[18]  (Ex. FF, *Hansen* Information, at ¶¶ 5-7.)

[19]  (*Id.* at ¶ 27.)

[20]  (*Id.* at ¶ 17.)

- Robert Moffat was a senior executive at IBM and board member of Lenovo.  He pleaded guilty to participating in an insider trading scheme in which he provided Danielle Chiesi with inside information about *three companies*, "knowing that the information was helpful to her in executing securities trades."[21]  The Government argued that Mr. Moffat "put IBM's business, IBM's reputation, Lenovo's business, and Lenovo's reputation at risk" and "*repeatedly* engaged in his fraudulent schemes with Chiesi, knowing full well that she was going to execute securities trades for a hedge fund."[22]  Mr. Moffat was sentenced to six months imprisonment.

- Drew Brownstein was a hedge fund founder and president who pleaded guilty to participating in an insider trading conspiracy in which he "traded heavily and aggressively" on inside information that he received from Drew Peterson about a pending corporate acquisition.[23]  The Government argued that Mr. Brownstein "was well aware that Drew Peterson had obtained the information based on a breach of duty by his father, H. Clayton Peterson."[24]  Mr. Brownstein was sentenced to one year and one day imprisonment.

- Ali Hariri served as Vice President of Atheros Communications, Inc. and pleaded guilty to participating in an insider trading conspiracy where he provided a co-conspirator with inside information regarding Atheros's quarterly earnings.[25]  Mr. Hariri provided this inside information to his co-conspirator "with the understanding that [the co-conspirator] would trade in securities on the basis of that information," and "in exchange for, among other things, [the co-conspirator]'s advice on buying and selling the securities of other publicly traded companies."[26]  Mr. Hariri was sentenced to 18 months imprisonment.

- Igor Poteroba pleaded guilty to participating in an insider trading conspiracy spanning nearly five years, during which he provided co-conspirator Alexei Koval with inside information on *six* different corporate acquisitions.[27]  The Government emphasized that "Poteroba was not a one-time tipper; rather he provided *repeated tips* over the course *of several confidential transactions spanning a number of years*."[28]  Mr. Koval and another co-conspirator "executed *dozens* of securities transactions, including trades in offshore accounts," based on the inside information from Mr. Poteroba.[29]  Mr. Poteroba accepted at least

---

[21]   (Ex. GG, *Moffat* Gov't Sentencing Mem., at 1-2.)

[22]   (*Id*. at 5 (emphasis added).)

[23]   (Ex. HH, *Brownstein* Gov't Sentencing Mem., at 2.)

[24]   *Id.*

[25]   (Ex. II, *Hariri* Information, at ¶¶ 1, 10.)

[26]   (*Id*. at ¶¶ 6, 9.)

[27]   (Ex. JJ, *Poteroba* Gov't Sentencing Mem., at 1-2.)

[28]   (*Id*. at 9 (emphasis added).)

[29]   (*Id*. at 3.)

$55,000 in payments from Mr. Koval during the course of the conspiracy, and "hundreds of thousands of dollars in profits from the scheme [were] moved to accounts in Russia."[30]  Mr. Poteroba received a sentence of 22 months imprisonment.

- Alexei Koval pleaded guilty to participating in an insider trading conspiracy spanning nearly five years, during which he obtained and traded on inside information involving *six* different corporate acquisitions.[31]  According to the Government, "Koval was not a one-time tippee" but rather "received and traded on *repeated tips* over the course of *several confidential transactions spanning a number of years*," paying his inside source at least $55,000 over the course of the conspiracy.[32]  Moreover, Mr. Koval "was not a mere tippee; he also tipped another person . . . on multiple transactions through the course of the conspiracy, further exacerbating his crime."[33]  Mr. Koval was sentenced to 26 months imprisonment.

- Mark Kurland pleaded guilty to participating in an insider trading scheme with Danielle Chiesi, his co-worker and co-conspirator.[34]  According to the Government, that scheme was "more egregious than most" because it "was not a one-off transaction or event" but rather involved "criminal conduct that spanned *several months*," "insider trading in the securities of *three* different public companies," "the participation of at least two different inside sources," and the "purchase and sale of tens of millions of dollars' wo[r]th of stock."[35]  Mr. Kurland received a sentence of 27 months imprisonment.

- Yonni Sebbag pleaded guilty to participating in an insider trading conspiracy in which he obtained inside information from his girlfriend, an employee of Walt Disney Company, and then "offered to sell the Inside Information to outside investors for the purpose of trading in advance of the official public announcement of Disney's earnings."[36]  Mr. Sebbag sent FBI agents posing as hedge fund traders a confidential document containing "a collection of talking points" that Disney executives intended to use during a quarterly earnings call.[37]  Mr. Sebbag also notified the undercover FBI agents of Disney's earnings per

---

[30]  (*Id.* at 4. )

[31]  (Ex. KK, *Koval* Gov't Sentencing Mem., at 1-2.)

[32]  (*Id.* at 4, 7 (emphasis added).)

[33]  (*Id.* at 7.)

[34]  (Ex. LL, *Kurland* Gov't Sentencing Mem., at 1-3.)

[35]  (*Id.* at 13-14 (emphasis added). )

[36]  (Ex. MM, *Sebbag* Gov't Sentencing Mem., at 1-2.)

[37]  (*Id.* at 2.)

share in advance of the call and accepted payment of $15,000 in cash from the agents.[38]  Mr. Sebbag was sentenced to 27 months imprisonment.

• Danielle Chiesi pleaded guilty to participating with Raj Rajaratnam and several other co-conspirators in multiple insider trading schemes "involv[ing] some of the most powerful and connected members of the business and financial industries."[39] According to the Government, Ms. Chiesi obtained and traded on inside information about *three companies* and shared that information with *several* other portfolio managers "as a bargaining chip to obtain additional tips and information."[40]  Ms. Chiesi "*routinely* provided inside information she obtained to [her supervisor], and encouraged [her supervisor] to take significant positions based on the inside information."[41]  Government wiretaps intercepted conversations where Ms. Chiesi "discussed with Rajaratnam how to show a pattern of trading – buying stock on the basis of inside information and then selling a bit to create a smoke screen around that insider trading" and "describ[ed] to others the array of techniques she employed to avoid getting caught."[42]  Ms. Chiesi was sentenced to 30 months imprisonment.

• Arthur Cutillo pleaded guilty to participating in an insider trading conspiracy over at least six months involving two companies and two trades.[43]  According to the Government, Mr. Cutillo was one of the Ropes & Gray attorneys who funneled inside information to Jason Goldfarb in return for $32,500 in cash bribes.[44] "Cutillo's crimes were extensive" and "involved *repeated misconduct over a period of many months*" in violation of his "special responsibility to protect client confidences and to uphold and respect the law."[45]  Mr. Cutillo recruited another Ropes & Gray attorney into the scheme, and "used multiple methods to avoid detection, such as sneaking around Ropes & Gray and its computer system to find material nonpublic information that would be useful for a trader and using prepaid cellular telephones to communicate with his partners in crime."[46]  Mr. Cutillo was sentenced to 30 months imprisonment.

• Frank Hixon, Jr. pleaded guilty to "engag[ing] in *repeated insider trading from 2011 to early 2013*" involving "illegal trading in the securities of Hixon's own

---

[38]   *Id.*

[39]   (Ex. NN, *Chiesi* Gov't Sentencing Mem., at 2.)

[40]   (*Id.* at 1-8.)

[41]   (*Id.* at 4.)

[42]   (*Id.* at 10.)

[43]   (Def. Sentencing Mem., Ex. 158, *Goffer* Indictment ¶¶ 13-19.)

[44]   (*Id.*, Ex. 143, *Zvi Goffer* Gov't Sentencing Mem., at 1-2 (noting that Mr. Goffer paid Mr. Goldfarb $97,500, to be split among Mr. Goldfarb, Mr. Cutillo, and Brien Santarlas).)

[45]   (Ex. OO, *Cutillo* Gov't Sentencing Mem., at 3-4 (emphasis added).)

[46]   *Id.*

employer, the securities of a longtime client, and the securities of a prospective client."[47]  According to the Government, Mr. Hixon's offenses constituted a "flagrant abuse of [ ] trust" because of "the web of direct fiduciary duties he breached in committing them – duties to his employer, and to his own clients."[48]  Mr. Hixon committed "serial obstruction – lies to FINRA, lies to [his employer], coaching another to lie, and lies to the FBI."[49]  Mr. Hixon was sentenced to 30 months imprisonment.

- Donald Longueuil pleaded guilty to "participat[ing] in a large insider trading scheme that spanned *numerous hedge funds* and a *number of securities*," occurring "[f]rom at least in or about 2006, through in or about 2010."[50]  According to the Government, Mr. Longueuil's scheme was "highly sophisticated." [51]  Mr. Longueuil and two co-conspirators "attempted to obtain detailed financial earnings and other material information" about at least *six* different public companies.[52]  Mr. Longueuil and his co-conspirators "often split the costs associated with hiring and utilizing certain inside sources and research consultants who obtained and provided Inside Information to them" on which they then traded.[53]  Mr. Longueuil also "destroyed evidence of his own involvement in insider trading, in an effort to obstruct the FBI's investigation."[54]  Mr. Longueuil was sentenced to 30 months imprisonment.

- Jason Goldfarb pleaded guilty to "play[ing] a critical role" in a scheme "in which two Ropes & Gray attorneys misappropriated material, nonpublic information from their law firm in exchange for cash bribes."[55]  Mr. Goldfarb also accepted $32,500 in cash bribes from Zvi Goffer.[56]  According to the Government, Mr. Goldfarb "kept the scheme running by constantly prodding [the attorneys] to obtain new inside information."[57]  "Goldfarb's crimes did not relate to a one-time event," because, "between approximately July 2007 and approximately June 2008, Goldfarb *repeatedly* pressed [the attorneys] for inside information,

---

[47]  (Ex. PP, *Hixon* Gov't Sentencing Mem., at 1-2, 12 (emphasis added).)

[48]  (*Id.* at 1, 19.)

[49]  *Id.*

[50]  (Ex. QQ, *Longueuil* Gov't Sentencing Mem., at 1.)

[51]  (*Id.* at 1-2.)

[52]  *Id.*

[53]  (*Id.* at 3.)

[54]  (*Id.* at 2.)

[55]  (Ex. RR, *Goldfarb* Gov't Sentencing Mem., at 3-5.)

[56]  (*Id.* at 3-4 (noting that "Goldfarb's role was so important that Goffer paid Goldfarb the same amount in cash bribes as he paid to the two Ropes & Gray attorneys"); Def. Sentencing Mem., Ex. 142, *Zvi Goffer* Gov't Sentencing Mem., at 1-2 (noting that Mr. Goffer paid Mr. Goldfarb $97,500, to be split among Mr. Goldfarb and the two Ropes & Gray attorneys).)

[57]  (Ex. RR, *Goldfarb* Gov't Sentencing Mem., at 3.)

*repeatedly* received inside information from them, and *repeatedly* disseminated the inside information to Zvi Goffer."[58]  Mr. Goldfarb was sentenced to 36 months imprisonment.

As these cases make clear, Mr. Martoma's charged conduct is no more culpable than the conduct of many other insider trading defendants who received sentences of no more than three years imprisonment.

### B.   The Government Cannot Justify The Sentence Disparity That The Proposed Sentences Would Create.

The Government's efforts to justify the draconian sentence that it proposes fall short.

*First*, the Government argues that "Martoma's methodology is self-serving, focusing on certain metrics benefitting Martoma even though the relevance of these metrics is not always apparent or explained in the defense submission."  (Gov't Sentencing Mem., at 21.)  Not so.  The Government ignores the fact that Mr. Martoma has focused on the *same* metrics that courts in this District and *the Government itself* have repeatedly cited as relevant to the defendants' culpability in other recent insider trading cases.  (Def. Sentencing Mem., at 42-54.)  For example, the Government criticizes Mr. Martoma for treating the number of co-conspirators as a measure of culpability.  (Gov't Sentencing Mem., at 21-22.)  Yet the Government has used exactly this metric in multiple recent insider trading cases.[59]  Such factors "benefit" Mr. Martoma *not* because of any selective bias, but because Mr. Martoma is, in fact, less culpable than other recent insider trading defendants.

*Second*, the Government argues that "Martoma seeks to downplay the seriousness of the offense by arguing that the criminal activity was limited to a few weeks" when the Government

---

[58]   (*Id*. at 4 (emphasis added).)

[59]   (*See* Def. Sentencing Mem., Ex. 150, *Steinberg* Gov't Sentencing Mem., at 36 ("Steinberg benefited from a much more wide-ranging conspiracy in which multiple analysts pursued multiple sources"); *id*., Ex. 135, *Newman* Sentencing Tr. 48:14-16 ( "the size or the number of the coconspirators in the scheme . . . makes it different from others").)

"charged an insider trading conspiracy from 2006 to July 2008." (Gov't Sentencing Mem.,

at 19.) That, too, is wrong.[60] The Government does not and cannot dispute:

- Although the Government alleged that Mr. Martoma received inside information from Dr. Sidney Gilman during consultations from mid-2006 through July 2008, it expressly and repeatedly disclaimed that Mr. Martoma ever traded on any of that information prior to July 21, 2008. (Def. Sentencing Mem., at 40.)

- Mr. Martoma was convicted of insider trading over the course of at most *two weeks* based on *one* piece of information from *one* tipper about *one* event. (*Id.*)

- As the Government itself has explained: "This is a one defendant case, involving trades in two securities, both relating to the outcome of a single event: the public announcement of the Drug Trial results on July 29, 2008." (*Id.* quoting Gov't's Opp. to Def. Mathew Martoma's Mot. for a Bill of Particulars, ECF No. 26, at 7).)

Moreover, the Government did not prove that Mr. Martoma received *any* material, nonpublic

information from either Dr. Gilman or Dr. Joel Ross prior to July 2008.[61] (*See* Def. Mathew

Martoma's Mem. of Law in Supp. of His Renewed Mot. for J. of Acquittal or, Alternatively, for

a New Trial, ECF No. 271, at 5-15.)

Further, even accepting the Government's charges of a two-year conspiracy, many other

recent insider trading defendants convicted of similar conspiracies received sentences of two to

three-and-a-half years:

- Doug Whitman was convicted of insider trading and participating in two separate conspiracies to obtain information on three companies from at least seven tippers

---

[60]   The Government baldly asserts that "Mathew Martoma's entire success across his four years at SAC Capital was based on illegal insider trading." (Gov't Sentencing Mem., at 1.) Yet the Government has never even alleged that Mr. Martoma engaged in any "illegal insider trading" other than with respect to Elan and Wyeth over the last two weeks of July 2008. The Government also claims that, "but for Martoma's pre-July 2008 trading in Elan and Wyeth securities, Martoma's portfolio would have performed negatively through each of his four years at SAC Capital." (*Id.* at 5.) That, too, is not supported by the record. Even absent trading in Elan and Wyeth, Mr. Martoma's portfolio was profitable in 2006 (GX 565-A), and no evidence was presented at trial regarding Mr. Martoma's performance in 2009 and 2010. There is, in short, no basis for the Government's rhetoric that "Martoma's apparent success at a SAC Capital was thus only a mirage, masking a trading strategy dependent at its core in obtaining and using material non-public information." (Gov't Sentencing Mem., at 5.)

[61]   Tellingly, the Government continues to argue that, prior to July 2008, Dr. Gilman and Dr. Ross shared "confidential" information – but not material, nonpublic information. (*See* Gov't Sentencing Mem., at 1-3, 15, 20.)

14

over the course of more than ***three years***, conduct that the Government described as "brazen, harmful, and pervasive."[62]  The Court also found that Mr. Whitman "repeatedly perjured himself" at trial.[63]  He received a two-year sentence.

- Rajat Gupta was charged with ***repeatedly*** providing or conspiring to provide Raj Rajaratnam with inside information about at least ***three*** different companies.[64] Mr. Gupta was convicted of securities fraud for two tips in particular but, according to the Government, "[t]he evidence at trial also established tips by Gupta on several other occasions."[65]  The Government argued that Mr. Gupta's conduct "carrie[d] an added layer of harm because of Gupta's status as a member of the Board of Directors" of Goldman Sachs.[66]  The Court similarly found that Mr. Gupta's tipping was a "huge abuse of trust to Goldman Sachs," "disgusting in its implications," and "the functional equivalent of stabbing Goldman in the back."[67]  He received a two year sentence.

- James Fleishman was convicted of conspiring with insiders from at least four different companies to provide hedge fund clients with inside information.[68]  The Government explained that "[t]he scope of the criminal activity jointly undertaken by Fleishman and others was to funnel confidential business information, including Inside Information" and described the activity as a "corrupt business that knowingly trafficked in Inside Information."[69]  He received a two-and-one-half year sentence.

- Michael Kimelman was convicted of insider trading and conspiring to obtain inside information from three tippers about at least three separate corporate acquisitions allegedly with six co-conspirators[70] in a ***two-year scheme*** that the Court found to be "a more serious conspiracy than most insider trading cases that get brought in this court house."[71]  He received a two-and-one-half year sentence.

---

[62]   (*See* Def. Sentencing Mem., Ex. 151, *Whitman* Gov't Sentencing Mem., at 1-7, 22.)

[63]   (*See id.*, Ex. 138, *Whitman* Sentencing Tr. 5:10-6:17.)

[64]   (*Id.*, Ex. 157, Indictment ¶ 12, *United States v. Gupta*, No. 11 Cr. 907 (JSR), ECF No. 25, Jan. 31, 2012.)

[65]   (*Id.*, Ex. 144, *Gupta* Gov't Sentencing Mem., at 2 n.1.)

[66]   (*Id.* at 5.)

[67]   (Def. Sentencing Mem., Ex. 131, *Gupta* Sentencing Tr. 32:8-10, 33:17-23, 52:15-16.)

[68]   (*Id.*, Ex. 141, *Fleishman* Gov't Sentencing Mem., at 2-10.)

[69]   (*Id.* at 15, 20.)

[70]   (*See* Ex. XX, Mem., in Opp. to Defs.' Joint Disc. Mot., at 2, *United States v. Goffer et al.*, No. 10 Cr. 56 (RJS), ECF No. 75, June 11, 2010; Def. Sentencing Mem., Ex. 146, *Kimelman* Gov't Sentencing Memo, at 1; *id.*, Ex. 158, *Goffer* Indictment, at ¶¶ 29-30, 33.)

[71]   (*See* Def. Sentencing Mem., Ex. 133, *Kimelman* Sentencing Tr. 25:2-15; *id.*, Ex. 158, *Goffer* Indictment, at ¶ 33.)

- Emanuel Goffer was convicted of insider trading and conspiring to obtain inside information from three tippers about at least five separate corporate acquisitions,[72] as part of a ***two-year scheme*** that the Court described as "pretty elaborate" and "a pretty calculated and pretty long-term scheme"[73] and that involved "brib[ing] lawyers to obtain valuable inside information regarding corporate mergers and acquisitions."[74]  He received a three-year sentence.

- Michael Steinberg was convicted of insider trading and conspiring to obtain inside information in what the Government described as "a criminal club that exchanged inside information about technology stocks over a nearly-***two year period***," which allegedly involved fifteen co-conspirators, including 13 different tippers, inside information concerning at least four companies and several uncharged instances of insider trading.[75]  Mr. Steinberg himself allegedly received inside information from his analyst about Dell, Inc. "for seven or eight quarters in a row."[76]  The Government explained that, compared to other recent defendants, "Steinberg benefited from a much more wide-ranging conspiracy in which multiple analysts pursued multiple sources."[77]  He received a three-and-one-half year sentence.

Mr. Martoma is less culpable than these insider trading defendants, and his sentence should reflect as much.[78]

***Third***, the Government argues that Mr. Martoma's methodology is flawed because it "omits any comparison between Martoma and the other defendants based on the amount of illegal profits received."  (Gov't Sentencing Mem., at 22.)  Not so.  As Mr. Martoma explained at length in his initial Sentencing Memorandum, the amount of purported "gain" is a particularly poor determinant of an appropriate sentence in insider trading cases in general and in this case in

---

[72] (*See* Def. Sentencing Mem., Ex. 142, *Emanuel Goffer* Gov't Sentencing Mem., at 1-3.)

[73] (*See id*., Ex. 158, *Goffer* Indictment, at ¶ 33; *id*., Ex. 129, *Emanuel Goffer* Sentencing Tr. 23:12-22.)

[74] (*See id*., Ex. 142, *Emanuel Goffer* Gov't Sentencing Mem., at 1.)

[75] (*See id*., Ex. 150, *Steinberg* Gov't Sentencing Mem., at 7, 15-17, 22; *id*., Ex. 169, *Steinberg* Indictment, at ¶ 31; *id*., Ex. 170, *Steinberg* Bill of Particulars, at 2, 4.)

[76] (*See id*., Ex. 150, *Steinberg* Gov't Sentencing Mem., at 5-6.)

[77] (*Id*. at 36.)

[78] In several of these cases, the Government argued that the defendants also engaged in uncharged insider trading during the time period of the conspiracy.  (*See, e.g.*, Def. Sentencing Mem., Ex. 146, *Kimelman* Gov't Sentencing Mem., at 1 (stating that Mr. Kimelman made additional trades based on inside information besides the charged conduct); *id*., Ex. 150, *Steinberg* Gov't Sentencing Mem., at 1, 3-4, 7, 15-17, 22 (stating that Mr. Steinberg executed several trades based on inside information other than the charged trades).)  The Government has made no such allegation about Mr. Martoma.  *See supra* at 5.

particular.  (Def. Sentencing Mem., at 22-26, 43.)  Indeed, the Government does not (and cannot) dispute that courts in this District have repeatedly found that any purported "gain" by the defendant "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."  *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).[79] Further, although the Government now asserts that "the amount of money a defendant steals through fraud speaks in a meaningful way to the wrongfulness of conduct" (Gov't. Sentencing Mem., at 18), it has apparently forgotten its own words in this case: "[T]he amount of money involved in the scheme says ***nothing*** about its ***complexity***."  (Gov't's Opp. to Def. Mathew Martoma's Mot. for a Bill of Particulars, ECF No. 26, at 6-7 (emphasis in original).)

***Fourth***, the Government argues that "Martoma also fails to include the role of the defendant in terms of causing the breach and trading on the information in his analysis" and that "Martoma is one of the relatively rare defendants who both directly caused the breach of duty from the public company insider (Gilman, in his role as presenter of the Drug Trial data) and controlled a portfolio through which to trade based on the inside information."  (Gov't Sentencing Mem., at 22 (emphasis omitted).)  That is simply false.  In his initial Sentencing Memorandum, Mr. Martoma analyzed both (1) the defendant's role as a tipper or tippee and (2) the scope of unlawful trading, which includes the defendant's role in causing any breach and trading on inside information.  (Def. Sentencing Mem., at 43-47, 49-50.)  Moreover, Mr. Martoma's charged conduct is not "rare."  Even if Mr. Martoma is "culpable for causing both the illegal breach of confidentiality and for trades designed to profit on the same" (Gov't Sentencing Mem., at 20), other recent insider trading defendants such as Emanuel Goffer and Todd Newman

---

[79]  *Accord United States v. Mueffelman*, 400 F. Supp. 2d 368, 373 (D. Mass. 2005) (reiterating that, in many cases, loss amount "'is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence'" (quoting *Emmenegger*, 329 F. Supp. 2d at 427)), *aff'd* 470 F.3d 33 (1st Cir. 2006); *United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D. Wis. 2005) ("With their almost singular focus on loss amount, the guidelines sometimes are insufficiently sensitive to personal culpability.").

were convicted of conduct that went further than Mr. Martoma's charged conduct – *i.e.*, inducing

the insider's breach by paying for inside information (which even the Government does not

accuse Mr. Martoma of doing) and then trading on that inside information in their portfolio.

Those defendants received far more lenient sentences than the sentences proposed by Probation

or the Government here.[80]

*Fifth*, the Government argues that, "if one were to consider the role of the defendant at

the particular fund, the size of the portfolio controlled, or the size of the position traded based on

inside information, Martoma would rank unfavorably to all defendants with the possible

exception of Rajaratnam."  (Gov't Sentencing Mem., at 22.)  That is incorrect.  Other defendants

had even more prominent roles at their funds:  Doug Whitman was the President of Whitman

Capital, LLC and principal portfolio manager of Whitman Partners, LLC;[81] Anthony Chiasson

was the co-founder of Level Global Investors;[82] Emanuel Goffer and Michael Kimelman were

co-founders of Incremental Capital;[83] Joseph Contorinis was a portfolio manager of the Paragon

Fund, sharing control of the fund with one other manager;[84] Todd Newman was a portfolio

manager at Diamondback Capital;[85] and Michael Steinberg was a portfolio manager for the

---

[80] The Government compares Mr. Martoma to Joseph Skowron, who pleaded guilty to obtaining confidential medical data from a doctor and trading on it.  (Gov't Sentencing Mem., at 22 n.8.)  Unlike Mr. Martoma, however, Mr. Skowron made "hand-to-hand cash payments" in return for inside information, conspired to obstruct an SEC investigation, and lied to the SEC under oath.  (Ex. SS, *Skowron* Gov't Sentencing Mem., at 3, 7-8.)  Despite this egregious conduct (none of which Mr. Martoma is even accused of committing), Mr. Skowron received a sentence of five years imprisonment – well below the sentence that the Government seeks in this case.

[81] (*See* Def. Sentencing Mem., Ex. 151, *Whitman* Gov't Sentencing Mem., at 2.)

[82] (*See id*., Ex. 139, *Chiasson* Gov't Sentencing Mem., at 1.)

[83] *See United States v. Goffer*, 721 F.3d 113, 118 (2d Cir. 2013) ("In late 2007, Kimelman, [Zvi] Goffer, and Goffer's brother Emanuel established a new trading firm, Incremental Capital.").

[84] (*See* Ex. TT, *Contorinis* Gov't Response to Def.'s Sentencing Mem., at 1, 3.)

[85] (*See* Def. Sentencing Mem., Ex. 147, *Newman* Gov't Sentencing Mem., at 1-2.)

Sigma Capital Management division of SAC and one of SAC's longest-serving employees.[86]

Other defendants also controlled portfolios as large or larger than Mr. Martoma's.  For instance,

Anthony Chiasson had trading authority of nearly *$4 billion* in assets;[87] Joseph Contorinis was

co-manager of a hedge fund with approximately $400 million in assets under management;[88]

Michael Steinberg controlled a portfolio with as much as $196 million in assets under

management;[89] Doug Whitman owned a hedge fund with $100 million under management;[90] and

Todd Newman controlled a portfolio with $100 million in assets.[91]  All received sentences well

below what Probation and the Government propose in this case.  Regardless, "the size of the

position traded based on inside information" is simply another reference to the amount of

purported "gain," which is an inappropriate basis for a sentence in this case.  *See supra* at 16-17.

   *Sixth*, the Government argues that, "if one were to compare the significance of the breach

of duty by assessing the market-moving power of the information improperly disclosed," the

trading impact in this case "exceeds the trading impact on the securities at issue in other cases

cited by the defendant."  (Gov't Sentencing Mem., at 22-23.)  Yet the "market-moving power of

the information improperly disclosed" – which the Government measures using a *post hoc*

analysis of the change in Elan's share price – depends on the "fortuities" of the market,

*Mueffelman*, 400 F. Supp. 2d at 373, including "changed economic circumstances, changed

investor expectations, new industry-specific or firm-specific facts, conditions, or other events."

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342-43 (2005).  More fundamentally, the

---

[86]   (*See id*., Ex. 150, *Steinberg* Gov't Sentencing Mem., at 2.)

[87]   (*See* Ex. UU, *Chiasson* Supplemental Sentencing Mem., at 4.)

[88]   (*See* Def. Sentencing Mem., Ex. 140, *Contorinis* Gov't Sentencing Mem., at 8.)

[89]   (*See id*., Ex. 150, *Steinberg* Gov't Sentencing Mem., at 2.)

[90]   (*See id*., Ex. 147, *Newman* Gov't Sentencing Mem., at 17.)

[91]   (*See* Ex. UU, *Chiasson* Supplemental Sentencing Mem., at 4.)

Government's attempt to assess culpability based on "trading impact" assumes that other investors in Elan and Wyeth were harmed by Mr. Martoma's charged conduct.  The Government now argues that "the magnitude of the securities fraud scheme relates to the impact the crime had on trust in the markets."  (Gov't Sentencing Mem., at 19.)  **The Government itself**, however, has already rejected this argument.  As the United States Attorney himself recently told Judge Swain in the case against SAC Capital:

> [T]here is no evidence that individuals in the putative class would not have engaged in the transactions claimed to have resulted in losses in the absence of trading by the SAC Defendants . . . [They are not injured] merely because [they were] denied the opportunity to make the same illegal profits obtained by the defendant . . . [Accordingly,] investors who trade without the benefit of inside information are not properly understood as the direct and proximate victims of those that do.[92]

For the same reasons, we respectfully submit that the letters that this Court has received from investors stating that they were harmed by Mr. Martoma because they lost money in Elan and/or Wyeth securities (*see* Gov't Sentencing Mem., at 19) are not instructive in determining an appropriate sentence.  Those contemporaneous traders are not victims of the charged conduct; they do not claim that they were induced to trade by Mr. Martoma, and their asserted losses were not caused by Mr. Martoma, but rather by market forces.

*     *     *

In sum, the sentences proposed by Probation and the Government are disconnected from other recent insider trading cases, where the defendants had far greater culpability than in this case.  Mr. Martoma should receive a sentence substantially below what Probation and the Government propose in order to avoid a sentence disparity that is unfair and contrary to the letter and spirit of Section 3553(a).

---

[92]   (*See* Ex. VV, Letter dated November 8, 2013, from P. Bharara to Hon. L. Swain at 1-2, *United States v. S.A.C. Capital Advisors, L.P.*, No. 13-cr-541 (S.D.N.Y.), ECF No. 17.)

### C.      A Lenient Sentence Is Warranted To Mitigate The Impact On Mr. Martoma's Family And To Allow Him To Continue To Contribute To The Community.

The Government does not dispute that a long sentence would be devastating to Mr. Martoma's children and to his wife, ███████████████████████████████████ ████████████████████████████████████████ (*See* Def. Sentencing Mem., at 6-12, 55-64.)  Nor does the Government dispute that Mr. Martoma's community would be better off with him as an active contributor.  (*See id.* at 12-20, 64-71.)  The Government, however, tries to minimize the impact of a long sentence, arguing that the adverse family impact will not be far greater than in other cases.  (Gov't Sentencing Mem., at 28.)  The Government also suggests that Mr. Martoma's good works are exaggerated.  (*Id.* at 24).  Those who know Mr. Martoma best show that the Government is wrong.

#### 1.      Mr. Martoma Provides Critical ████████████████ Support To His Wife Rosemary.

The Government dramatically understates the nature of Rosemary's ████████████ ███████ by asserting that "it is not unusual for the spouse of an incarcerated person to face added . . . health challenges upon separation from a loved one."  (Gov't Sentencing Mem., at 28.)

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████████ David Kurian acutely

understands █████████████████████ and speaks to Mr. Martoma's critical role in

Rosemary's ███████████████ well-being:



 (Ex. B, Letter of D. Kurian.)  Dr. Fernando Recio, ████████████████████████

████████████████████████████████ on Mr. Martoma, who is "the

'rock' of his family":

> At the time of my office encounter with Rosemary and Matthew [*sic*] ███████
> ██████████████████████ Her husband Matthew was there by her side for
> support every step of the way.  In fact, I have never seen Rosemary without
> Matthew by her side.  This is something which I, as a clinician, look for when
> determining ███████████████████████████████████████

(Ex. C, Letter from Dr. F. Recio.)

████████████████████████████████████

████████████████████████████████████

██████████████.  Family friend Tia Disick writes:

> Every couple's personal dynamic is different.  We all, to a certain extent, depend
> on our spouses for support – be it emotional, financial, or otherwise.  But in this
> particular case, ████████████████████████████████████
> ██████████████████████████████████████████
> ████████████████████████████

(Ex. D, Letter from T. Disick; *see also* Ex. E, Letter from Dr. N. Singh.)

In addition to the ███████████ with which she deals on a daily basis, Rosemary

████████████████████████████████████████████████████████████

██████████████████████████████ Dr. Brian Bernick, ███████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

        ████████████████████████████████████████████
        ████████████████████████████████████

Throughout my years in medicine including sharing the happiest of times with
couples when I delivered their babies, I have never witnessed two people more in
love and ████████████████████ In fact, I have never seen the two of them
apart or without their children.
        ████████████████████████████████████████████
        ████████████████████████████

(Ex. F, Letter from Dr. B. Bernick.)  Joseph Tharakan, Rosemary's cousin, also writes of the

critical role that Mr. Martoma plays in his family's lives ████████████████████

███████

Since moving to Florida in 2010, Mathew has become the primary caregiver of
the family.  He buys the groceries, cooks the meals, takes the kids to school,
organizes the family activities and cares for them the whole time. ██████████
        ████████████████████████████████████████████

If Mathew is sent away, the children will suffer drastically.  Even for the basic
needs and the day-to-day survival of the children, Mathew is indispensable. ████
        ████████████████████████████████████████████
        ████████████████████████████████████████████

(Ex. A, Letter from J. Tharakan.)  Maria Devassy, Rosemary's cousin, continues:

In Mathew and Rosemary's case, raising three children has already been difficult
because of ████████████████████████ In fact Mathew has been the one who is
in charge of the kids in most respects, █████████████████
        ██████████████████████ Taking Mathew away from the family would result in a

horrible calamity for the children ████████████████████████████
████████████. In addition, I know Rosemary is ███████████████
███████████████████

(Ex. G, Letter from M. Devassy; *see also* Ex. H, Letter from N. Ramnarine; Ex. I, Letter

from S. Nadukudiyil; Ex. J, Letter from Dr. J. John; Ex. K, Letter from P.Y. Pappachan.)

The Government's attempt to brush aside these concerns reflects a profound

misunderstanding of – and/or lack of compassion for – their significance.  Rosemary and those

who know her are not simply apprehensive of ████████████████ that *may perhaps* arise

if Mathew is removed from her life (Gov't Sentencing Mem., at 28), but rather speak of ████

████████████████████████████████████████████████ (*See*

Def. Sentencing Mem., Ex. 1, Letter from Dr. R. Martoma.)  Mr. Martoma's presence is vital to

this fragile family, especially in light of ████████████████

### 2. Mr. Martoma's Imprisonment Will Be Devastating To His Three Young Children.

Mr. Martoma's family and friends confirm that separating the Martoma children from

their father for an extended period of time will devastate them.  (Def. Sentencing Mem., at 6-12,

56-59, 61-64.)  Mr. Kurian, Rosemary's father, is keenly aware of Mr. Martoma's role in caring

for his young children and writes:

> In our own experience, Mathew has been a very loving and dedicated father and
> husband.  He spends no time outside the home on his own, and has been
> fastidious in taking more than his share of the work in running a family.  He
> automatically takes on taking the children to school and to various activities.
> Their feeding, bathing, monitoring of homework, their learning about the world
> and history are all things he is intimately involved in.

(Ex. B, Letter from D. Kurian.)  Ms. Disick, whose children are close friends with the

Martomas' children, likewise states:

> As I've gotten to know the family, it has become clear to me that Mathew is, quite
> literally, the glue that holds the family together.  Unfortunately, ████████████

24

███████████████████████ so Mathew is the one I see at school most often. He is regularly the only father in attendance in a roomful of mothers, and far from minding that fact, he thrives on it. He's always happy to lend a hand and help, and the joy that being there with his children brings to him is evident to everyone in the room. And perhaps more importantly, the delight on the children's faces when they see their dad walk in is extraordinary. Of course, all children love their parents and are happy to see them, but I promise you, this is different. He is clearly their rock and their security. We've run into him outside of school taking the children to the park, to their activities and lessons, and spending quality time with them after school hours. At school performances, he's in the front row. This isn't a father who is doing these things because he has to. This is a man whose love for and devotion to his children is clearly, singularly important.

(Ex. D, Letter from T. Disick; *see also* Ex. E, Letter from Dr. N. Singh; Ex. L, Letter from A. Abraham; Ex. M, Letter from I. John; Ex. N, Letter from E. Malhotra.)

The support and guidance that Mr. Martoma provides to his children has become even more critical in the wake of this case. Not only do the children now ████████████████ ████ in light of the jury's verdict when their father is away (*see* Def. Sentencing Mem., at 11), but the effect of the Government's invasion into the Martomas' lives has been equally scarring. The Government does not dispute that before Mr. Martoma was arrested, FBI agents questioned the Martoma children about their father's whereabouts while Mr. and Mrs. Martoma were not at home. (*See* Gov't Sentencing Mem., at 28 n.12.) The Government's attempt to downplay the FBI's questioning misses the point: the fear that the children felt was real. And that fear was only compounded when numerous armed FBI agents needlessly arrested Mr. Martoma at dawn in front of his family. (He obviously was willing to self-report.) While the Government may take issue with Rosemary's description of this frightening and significant event (*id.*), it misleadingly omits the fact that Mr. Martoma was arrested by a number of armed agents with his children looking on. Omana Kurian, Rosemary's mother who was present at the time of the arrest, writes of the impact on the Martoma children:

> On 20th November in the early morning officers arrested Mathew in front of the entire family including his terrified little children.  Ever since, the family including the children has lived in fear, anxiety and insecurity.  Even now when somebody knocks on the door, we see fear on their faces, as they ask us whether they should run and hide.

(*See* Def. Sentencing Mem., Ex. 58, Letter of O. Kurian; *see also* Ex. B, Letter of D. Kurian.)

These events have left a searing mark on the Martomas' young children, as a result of which they now rely even more on Mr. Martoma's calming and stabilizing influence.  As Aneeta John, Rosemary's cousin, explains:  "To his children he is as necessary as one of the founding stones of the building that is their life."  (Ex. O, Letter from A. John.)  The Martoma family is all too aware of the importance of a father in the lives of children and the trauma that prolonged separation can cause, having witnessed the suffering and eventual suicide of Rosemary's uncle. (Def. Sentencing Mem., at 58-59; *see also* Ex. B, Letter of D. Kurian.)  Without Mr. Martoma, this fragile family will break.

The Government asserts that "[t]he Martomas also benefit from a strong family support network as evidenced by the numerous letters attached to the defendant's submission."  (Gov't Sentencing Mem., at 28.)  Although the Martomas have a supportive family, there is no one who can replace Mr. Martoma in caring for Rosemary and the children.  Mr. Martoma's and Rosemary's parents are elderly and neither physically, emotionally, nor financially able to support Rosemary and the Martomas' three young children; and most of the Martomas' extended family lives across the country or halfway around the world.  (*See* Ex. B, Letter from D. Kurian; Def. Sentencing Mem., Ex. 94, Letter from L. Thomas.)  The Government also claims that, "[u]nlike many defendants, . . . Martoma is fortunate to have a devoted spouse who has the potential, as a prior medical doctor and real estate investor, to earn a meaningful income and support the couple's children financially and emotionally."  (Gov't Sentencing Mem., at 27-28.) While the Government assumes that it will be relatively easy for Rosemary to provide for her

family as a single parent, it is not that simple.  Rosemary has never practiced medicine, and her

residency ended nine years ago.  Moreover, given Rosemary's ████████ and the strain of

having to care for three children under such challenging circumstances, it would be extremely

difficult for her to pursue a career in the medical profession at this stage of her life.  In addition,

Rosemary's real estate business is tied directly to investments that the Government has seized.  If

those assets are forfeited, Rosemary will not be able to continue as a real estate investor.

In short, as the letters submitted to this Court shout loud and clear, Mr. Martoma's

presence in the lives of his wife and young children is irreplaceable and an extended absence will

devastate his family.  As Ms. Disick writes:

> How does one find words that truly capture the love, the devotion, and the caring
> that one witnesses between spouses, or between children and their parents?  It's
> not easy.  But in an ideal world, every family dynamic would be like that of the
> Martomas – a husband who is solicitous and concerned about his wife's well-
> being; a child who crawls into his father's lap rather than sitting with friends
> while watching a school magic show; siblings with a clear and evident bond of
> friendship; parents who never miss a play, performance, or class event.  The
> world would be a happier, kinder place if every family exhibited the qualities I
> have witnessed in knowing the Martomas.

(Ex. D, Letter from T. Disick.)

### 3.  Mr. Martoma's Commitment To Others Is Not Negated By His Career Choices Or Past Mistakes.

Many supporters attest to Mr. Martoma's compassion and generosity toward friends,

family, relative strangers, and the community at large.  For example, Ms. Devassy writes of Mr.

Martoma's care and concern for her during times of need:

> They have been part and parcel of our lives' ups and downs and I have seen them
> help out in whatever way they can, with words of advice, or supporting the family
> during times of need.  When I ████████████████ a couple of years ago,
> Rosemary and Mathew were among the first to call, with medical advice and
> support that we needed.

(Ex. G, Letter from M. Devassy.)  Dr. Natasha Singh, a friend of the Martomas, continues:

> We recently lost a friend of ours to colon cancer and it was Mathew and
> Rosemary who stood by her grieving family.  They both sat beside her in hospice
> allaying her fears and lifted up the devastated husband and young children she left
> behind.  It was so moving to see how much love they poured out to that poor
> family.

(Ex. E, Letter from Dr. N. Singh.)

Mathew Mathai, a relative of Mr. Martoma's mother, also writes of Mr. Martoma's

genuine concern for those around him:

> I am related to Mathew Martoma through his mother, Lizzy Thomas and have
> known the family from my upbringing days in India.  While growing up and
> during one of his visits to India, I've had the opportunity to witness Mathew
> Martoma's selflessness & generosity.

(Ex. P, Letter from M. Mathai; *see also* Ex. A, Letter from J. Tharakan; Ex. C, Letter from Dr. F.

Recio; Ex. I, Letter from S. Nadukudiyil.)  In the words of Jeffrey Joseph, Rosemary's cousin:

"Mathew is a genuinely good person; loving, compassionate and giving through and through."

(Ex. Q, Letter from J. Joseph.)

The Government tries to minimize Mr. Martoma's good works, asserting that he has not

dedicated himself to a lifetime of giving because his "post-graduate working life has been limited

to highly-paid work for hedge funds" and "[t]he bulk of Martoma's earnings from his hedge fund

career – the entirety of his $9 million bonus from SAC Capital – were the proceeds of securities

fraud."  (Gov't Sentencing Mem., at 24-25.)  The Government's argument is a *non sequitur* and

does nothing to diminish the kindness that Mr. Martoma has shown to others, as recounted by the

more than 100 people who have written to this Court on his behalf.  Phillip Kannookadan,

Rosemary's cousin, writes:

> I do wish, Your Honor, to take this opportunity to request your kind attention to
> the fact that Mathew is a precious person who has, throughout the time I have
> known him so closely, been so connected and so intimately concerned with the
> problems and needs of the society.  He has never been an idle talker; he has been
> a man who has put his actions well before his words through acts of compassion
> and giving, and through a confirmed parsimonious lifestyle.

28

(Ex. R, Letter from P. Kannookadan.)

The Government also impugns the Martomas' donation of approximately $1 million to a charitable foundation in 2010, questioning "whether any monies have actually been transferred to any organizations and whether any decision to commit financial resources to these charities came before or after the initiation of the criminal case" and implying that the donation was given for "an immediate tax deduction."   (Gov't Sentencing Mem., at 24-25.)  The Government's criticisms are baseless:

- Tax records show that the Martomas donated money from this foundation to dozens of non-profit organizations in 2011.[93]  The amount of those distributions has been limited to date for several reasons.  The purpose of the Martomas' foundation (like similar foundations) is to make contributions over a period of many years, and the Martomas' foundation was never intended to distribute its donations immediately in one lump sum (as the Government would seem to believe).  Moreover, Mr. Martoma was the subject of a criminal investigation, and potential criminal and civil cases, not long after the foundation was established.  Those pending cases – which ultimately resulted in the Government seizing a large portion of the foundation's funds[94] – interfered with the Martomas' ability to distribute charitable donations.

- The Government's skepticism is belied by the fact that the Martomas started their charitable foundation in 2010, *before* Mr. Martoma was ever approached by the FBI.

- The Government's suggestion that the Martomas donated to their foundation for "an immediate tax deduction" makes no sense economically.  The $1 million set aside for the foundation far exceeded any tax benefit that Mr. Martoma received.  That Mr. Martoma received a tax deduction (as is the case for many charitable donations) does not diminish the significance of setting aside those funds to help others.

In short, the Martomas donated $1 million to a charitable foundation *before* they were aware of the criminal investigation, the Martomas relinquished any claim to those funds in doing

---

[93]   (Ex. WW, Foundation 2011 990-PF at 11-16.)

[94]   (*See* Superseding Indictment, ECF No. 61, Aug. 22, 2013 (seeking forfeiture of "up to $934,897.77 in funds or other assets in account number 88047594915 at Vanguard, held in the name of Mathew and Rosemary Martoma Foundation"); Post-Indictment Consensual Protective Order Pursuant to 18 U.S.C. 981, 28 U.S.C. 2461, and 21 U.S.C. 853, ECF No. 70, Sept. 24, 2013 (ordering (*inter alia*) that neither Mr. Martoma nor anyone acting on his behalf take any action to depreciate, damage, or diminish the value of the foundation assets).)

so, and the Martomas had every intention of using that money for the purpose of making donations to charitable and non-profit organizations.

In addition, the Government pays lip service to Mr. Martoma's many contributions to those in need and instead urges this Court to punish Mr. Martoma for his past mistakes at Harvard Law School.  (Gov't Sentencing Mem., at 25-27.)  As Mr. Martoma explained in his initial Sentencing Memorandum, he has already been punished repeatedly for his mistakes at Harvard Law School: when he was dismissed, when his dismissal was publicized in connection with his trial, when his dismissal affected his defense strategy, and when he lost his Stanford degree.  (Def. Sentencing Mem., at 5-6, 71.)  Further, contrary to the Government's assertions (Gov't Sentencing Mem., at 25-26), those mistakes are not connected to the charged conduct at issue here, as this Court has expressly found: "[T]here is no direct connection between the Law School Evidence and the insider trading charges the Defendant faces" (Order, ECF No. 196, at 13).  We respectfully submit that Mr. Martoma's past mistakes at Harvard Law School should not have any impact on his sentence.

*        *        *

For all of these reasons, this Court should recognize the unique role that Mr. Martoma plays in supporting his wife and family, credit Mr. Martoma's good works over the years, and impose a sentence that minimizes the impact on his family and allows him to remain an active contributor to his community.

### D.    The Sentences Proposed By Probation And The Government Are Far Greater Than Necessary To Serve The Purposes Of Deterrence.

The Government does not address, much less rebut, the many reasons set forth in Mr. Martoma's initial Sentencing Memorandum as to why any sentence would be sufficient to serve the purposes of both specific and general deterrence.  (*See* Def. Sentencing Mem., at 72-

76.)  Indeed, the Government's arguments provide no support for the extreme sentence that it proposes.

### 1.    **Specific Deterrence.**

The Government does not dispute that:  (1) Mr. Martoma has lost his career and livelihood, faces steep financial penalties, and has seen his reputation ruined, which courts have repeatedly found to eliminate any need for specific deterrence; (2) Mr. Martoma has already been severely punished by the mere fact of his very public trial and ultimate conviction; and (3) the charged conduct in this case stopped years before Mr. Martoma left SAC despite the fact that he had many more opportunities to engage in insider trading.  (*See* Def. Sentencing Mem., at 72-74.)  Instead, the Government argues that a "significant sentence" is warranted because Mr. Martoma was "undeterred" by the consequences of his past mistakes at Harvard Law School.  (Gov't Sentencing Mem., at 27.)  Again, those mistakes occurred fifteen years ago; Mr. Martoma was punished at the time when he was dismissed; and he was punished all over again throughout his trial when his dismissal was scrutinized in the media and affected his defense strategy in court.  (*See* Def. Sentencing Mem., at 71.)  Moreover, Mr. Martoma's "career is over, and his potential to commit this particular type of crime has been eliminated."  *Emmenegger*, 329 F. Supp. 2d at 428.  No additional sentence is necessary to deter Mr. Martoma from committing any crime.

### 2.    **General Deterrence.**

The Government argues that, "because insider trading schemes are both highly lucrative and difficult to detect, significant punishment is necessary to deter others from similar conduct." (Gov't Sentencing Mem., at 16.)  The Government posits that "a sentence for illegal trading should convey that when a trader is tempted to cheat because of exceptionally high rewards (measured in dollars), the downside risk (measured in years of prison if caught) will

correspondingly increase." (*Id.* at 17.)[95]  The Government's argument, however, "flies in the face" of decisions by this Court and other courts in this District (*see* Def. Sentencing Mem., at 74-76):

- This Court recently noted that a long sentence is not necessary to achieve sufficient general deterrence in an insider trading case because "imposing ***any sentence of imprisonment*** in this type of case has a great effect in and of itself." (*See* Def. Sentencing Mem., Ex. 134, *Koulouroudis* Sentencing Tr. 28:6-7 (emphasis added).)

- There is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)).

- The Sentencing Commission itself has acknowledged that the Guidelines were written in part to "ensure a ***short but definite*** period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence."  United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (emphasis added; internal quotation marks omitted).

- Courts in this Circuit have repeatedly held that sentences well below the Guideline Range – a range expressly based on profit – serve the purpose of general deterrence in insider trading cases.  (*See* Def. Sentencing Mem., at 75.)

The track record of the United States Attorney's Office in aggressively and ***successfully*** prosecuting nearly 80 individuals for insider trading over the past several years compounds the significant general deterrence achieved by this case.  (*Id.* at 75-76.)  A long sentence simply is not necessary to achieve the goal of deterring criminal conduct generally.

---

[95]  The Government also argues: "If the penalty is not sufficiently steep, a trader may determine that an opportunity to make illegal profits in the hundreds of millions may be worth the relatively low risk of getting caught and serving a short sentence of imprisonment."  (Gov't Sentencing Mem., at 17-18.)  That is a red herring. Mr. Martoma did not "make illegal profits in the hundreds of millions."  Even according to the Government, his personal profits were a very small fraction of the $275 million "gain" that the Government attributes to SAC. (Def. Sentencing Mem., at 28.)

**III.    A FINE IS NOT WARRANTED IN THIS CASE.**

Mr. Martoma should not be subject to a fine as part of any sentence imposed by the Court.  Probation recommends a fine of $20,000.  (PSR at 28.)  The Government requests a fine of an unspecified amount in what it describes as the Guideline Range of $20,000 to $570.8 million because insider trading "is a serious offense" and "a fine would . . . impose an additional, punitive sanction."  (Letter dated August 11, 2014, from USAO to Judge Gardephe at 1-2.)  The Government, however, does not even attempt to address the many factors set forth in Mr. Martoma's initial Sentencing Memorandum that weigh heavily against the imposition of a fine (*see* Def. Sentencing Mem., at 77-80):

- Mr. Martoma already faces significant financial penalties as a result of the charged conduct in the form of forfeiture and substantial exposure in the parallel SEC and private securities class actions currently pending against him.

- Mr. Martoma has no ability to pay any fine, because, as the Government concedes, the forfeiture judgment will exceed his net worth by approximately $2 million (Letter dated August 11, 2014, from USAO to Judge Gardephe at 2) and he has no ability to earn substantial income – not only during any period of incarceration, but also in the foreseeable future.

- A fine will impose an unnecessarily onerous burden on Mr. Martoma's wife and children, who depend on Mr. Martoma as their only source of financial support and likely will be wiped out when all of the related litigation has been resolved.

- A fine would create an unwarranted sentence disparity between Mr. Martoma and many other recent insider trading defendants, who were not fined.

For all of these reasons, a fine is not warranted in this case.

## CONCLUSION

For the foregoing reasons and those in his initial Sentencing Memorandum, Mr. Martoma respectfully requests that this Court impose a lenient sentence consistent with 18 U.S.C. § 3553(a) and that the Court grant the other relief requested herein.


Dated: August 21, 2014                    Respectfully submitted,
       New York, NY

                                          GOODWIN PROCTER LLP

                                          By: */s/ Richard M. Strassberg*_____
                                              Richard M. Strassberg (RS5141)
                                                (rstrassberg@goodwinprocter.com)
                                              John O. Farley (JF4402)
                                                (jfarley@goodwinprocter.com)
                                              Daniel Roeser (DR2380)
                                                (droeser@goodwinprocter.com)

                                              The New York Times Building
                                              620 Eighth Avenue
                                              New York, New York 10018
                                              Telephone:  (212) 813-8800


                                              Roberto M. Braceras (RB2470)
                                                (rbraceras@goodwinprocter.com)
                                              53 State Street
                                              Boston, Massachusetts 02109
                                              Telephone:  (617) 570-1000

                                              *Attorneys for Defendant Mathew Martoma*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on August 21, 2014, I caused a true and correct copy of the foregoing to be served by electronic mail and hand delivery on all counsel of record.


_/s/ Richard M. Strassberg_____
Richard M. Strassberg (RS5141)