# EXHIBIT DD

Case 1:12-cr-00973-PGG   Document 301-30   Filed 08/21/14   Page 1 of 16

Case 1:11-cr-00664-GBP Document 4-3 Filed 08/05/11 Page 2 of 16
Case 1:11-cv-09705-RPP Document 1 Filed 06/21/12 Page 2 of 15

JUDGE PATTERSON

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA
                                    :   INFORMATION
    - v. -
                                    :   11 Cr.
DREW CLAYTON PETERSON,
                                        **11 CRIM 664**
         Defendant.
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### COUNT ONE

(Conspiracy To Commit Securities Fraud)

The United States Attorney charges:

Relevant Persons and Entities

1.  At all times relevant to this Information, Mariner Energy, Inc. ("Mariner") was a company based in Houston, Texas. Mariner was engaged in, among other things, the business of oil and gas exploration and production. Mariner's common stock was traded on the New York Stock Exchange under the ticker symbol "ME."

2.  At all times relevant to this Information, Apache Corporation ("Apache") was a company based in Houston, Texas. Apache was engaged in, among other things, the business of oil and gas exploration and production. Apache's common stock was

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 0 5 2011

traded on the New York Stock Exchange under the ticker symbol "APA."

3. Beginning in or about March 2006, and at all times relevant to this Information, a co-conspirator not named as a defendant herein ("CC-1"), was a member of Mariner's board of directors. As a member of Mariner's board of directors, CC-1 participated in and/or was kept apprised of the negotiation of potential mergers and acquisitions between Mariner and other companies, including other publicly traded companies. In addition, at all times relevant to this Information, CC-1 was the chairman of the audit committee for the Mariner board of directors. CC-1 is a resident of Denver, Colorado.

4. DREW CLAYTON PETERSON, the defendant, is CC-1's son. At all times relevant to this Information, PETERSON worked as an investment advisor. PETERSON is a resident of Denver, Colorado.

## The Insider Trading Scheme

5. On or about March 25, 2010, representatives of Apache began confidential discussions with representatives of Mariner to acquire Mariner. On or about March 26, 2010, representatives of Apache and Mariner entered into a

-2-

confidentiality agreement for the purpose of facilitating those discussions.

6. On or about Wednesday, April 7, 2010, Apache sent Mariner a term sheet proposing to acquire Mariner for cash and Apache stock totaling $25 per share of Mariner. At the time, Mariner's stock was trading at approximately $17 per share. Apache's term sheet stated that it would expire on April 14, 2010.

7. Mariner's board of directors convened a telephonic special meeting on or about April 7, 2010 to discuss Apache's proposal. CC-1 participated in that meeting.

8. On or about Thursday, April 8, 2010, CC-1 telephoned his son, DREW CLAYTON PETERSON, the defendant. In breach of CC-1's fiduciary and other duties of trust and confidence owed to Mariner and its shareholders, CC-1 told PETERSON that CC-1 had participated recently in a number of Mariner board meetings and instructed PETERSON to purchase Mariner stock on behalf of CC-1's daughter, PETERSON's sister. When PETERSON asked why, CC-1 said that he would not comment, but that he would come visit PETERSON that day at the office where PETERSON worked as an investment advisor. After hanging up with CC-1, PETERSON - without his sister's knowledge - using

-3-

the confidential, material, non-public information obtained from CC-1, purchased 2,000 shares of Mariner stock on his sister's behalf, using an account of hers over which he had discretionary authority.

9. Later that day, CC-1 visited the firm where DREW CLAYTON PETERSON, the defendant, worked as an investment advisor. CC-1 met with PETERSON and asked PETERSON how much Mariner stock PETERSON had purchased for PETERSON's sister, CC-1's daughter. PETERSON told CC-1 that he had purchased 2,000 shares. CC-1 directed PETERSON to buy more.

10. After CC-1 left, DREW CLAYTON PETERSON, the defendant, continuing to use the confidential, material, non-public information obtained from CC-1, purchased an additional 2,000 shares of Mariner stock on his sister's behalf, again without her knowledge. PETERSON also purchased 500 shares of Mariner stock in the name of an investment club in which he participated with several friends.

11. That evening, DREW CLAYTON PETERSON, the defendant, went to a gym with a co-conspirator not named as a defendant herein ("CC-2"). CC-2 was a close friend of PETERSON's, and was the CEO of a hedge fund located in Denver, Colorado (the "Hedge Fund"). PETERSON told CC-2 that he should

-4-

think about buying Mariner stock because PETERSON's father, CC-1 - whom CC-2 knew to be a Mariner board member - had been attending a number of board meetings and it appeared to PETERSON that a significant event was about to happen involving Mariner. PETERSON suggested to CC-2 that Mariner was about to be acquired. PETERSON and CC-2 then speculated together about who the potential acquirer might be.

12. On or about Friday, April 9, 2010, Mariner's board of directors, including CC-1, conducted a telephonic meeting to continue its discussion of Apache's merger offer.

13. On or about Saturday, April 10, 2010, DREW CLAYTON PETERSON, the defendant, visited CC-2 at CC-2's home. PETERSON and CC-2 renewed their discussion of Mariner, with PETERSON repeating to CC-2 that PETERSON's father, CC-1, had been participating in a number of board meetings and that it appeared that Mariner was about to be acquired. During the conversation, CC-2 told PETERSON that he would be attending a multi-day oil and gas industry conference in New York, New York starting that Monday.

14. On or about Monday, April 12, 2010, DREW CLAYTON PETERSON, the defendant, continuing to use the confidential, material, non-public information obtained from CC-1, purchased

1,000 shares of Mariner stock for himself, 200 shares of Mariner stock for his retirement fund, and another 1,000 shares of Mariner stock for his investment club. PETERSON also purchased several thousand shares of Mariner stock on behalf of various friends, clients, and family members.

15. That same day, CC-2 - while in Manhattan for the oil and gas industry conference - caused his Hedge Fund to purchase approximately 200,000 shares of Mariner and approximately 1,500 call options for Mariner stock. A single such call option entitled the holder to purchase 100 shares of Mariner stock.

16. Also that same day, CC-1 participated in a telephonic board of directors meeting in which Mariner's board authorized Mariner's management to continue negotiating with Apache. Later that evening, CC-1 telephoned DREW CLAYTON PETERSON, the defendant, who was driving with a friend to a Denver Nuggets basketball game. CC-1 told PETERSON, in breach of his fiduciary and other duties of trust and confidence owed to Mariner and its shareholders, that Mariner would be acquired by another company within the week. At the time of this conversation, as CC-1 well knew, Mariner had not yet publicly announced this acquisition. Upon hanging up with CC-1, PETERSON

-6-

immediately told his friend – who had heard PETERSON's side of the telephone conversation between PETERSON and CC-1 – that the friend should buy Mariner stock.

17. Moments after hanging up with CC-1 and advising his friend to buy Mariner stock, DREW CLAYTON PETERSON, the defendant, while still at the Pepsi Center in Denver, telephoned CC-2 and left a short, coded voicemail message informing CC-2 that he had confirmed that Mariner was being acquired.

18. Early in the morning on or about Tuesday, April 13, 2010, CC-2 – who was still in Manhattan at the oil and gas industry conference – telephoned DREW CLAYTON PETERSON, the defendant, and the two spoke for several minutes. Immediately thereafter, CC-2 began causing his Hedge Fund to make additional purchases of call options on Mariner stock. Specifically, on April 13, 2010, CC-2 caused his Hedge Fund to purchase approximately 2,500 call options on Mariner stock. CC-2 also purchased approximately 25,000 shares of Mariner stock and 200 call options on Mariner stock on behalf of two individuals who had previously given CC-2 discretionary authority over their accounts. Later that afternoon, PETERSON and CC-2 spoke again for several minutes by telephone and discussed, among other

-7-

things, the information obtained from CC-1 that Mariner was about to be acquired.

19. On or about Wednesday, April 14, 2010, DREW CLAYTON PETERSON, the defendant, and CC-2 – who was still in Manhattan at the oil and gas industry conference – spoke again for several minutes by telephone in the morning. That day, CC-2 caused his Hedge Fund to purchase approximately 1,000 additional call options on Mariner stock. CC-2 also personally purchased approximately 200 call options on Mariner stock.

20. Before the opening of trading on the New York Stock Exchange on or about Thursday, April 15, 2010, Apache and Mariner issued a press release that announced that Apache would acquire Mariner for approximately $26 per share (the "Acquisition Announcement"). The price of Mariner stock rose dramatically that day, opening at approximately $18 per share and closing at approximately $26 per share.

21. During the trading day on or about April 15, 2010, following the Acquisition Announcement, CC-2 caused his Hedge Fund, his own account, and the aforementioned accounts of two other individuals over which he had discretionary authority, to sell all of their Mariner shares and all of their options on

-8-

Mariner shares, realizing illegal profits of approximately $5 million.

22. Within the days immediately following the Acquisition Announcement, DREW CLAYTON PETERSON, the defendant, and the various other individuals (besides CC-2) whom PETERSON had induced to purchase Mariner stock, or on whose behalf PETERSON had purchased Mariner stock, sold their Mariner shares, realizing approximately $150,000 in illegal profits.

23. On or about April 15, 2010, DREW CLAYTON PETERSON, the defendant, spoke by telephone with CC-2 as CC-2 arrived back in Denver. PETERSON mentioned that morning's Acquisition announcement and asked CC-2 whether CC-2 had purchased any Mariner stock. CC-2 falsely told PETERSON that he had not.

<u>Statutory Allegations</u>

24. From at least on or about April 8, 2010 through at least on or about April 15, 2010, in the Southern District of New York and elsewhere, DREW CLAYTON PETERSON, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code,

Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

25.  It was a part and an object of the conspiracy that DREW CLAYTON PETERSON, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon any person, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

Means and Methods of the Conspiracy

26. Among the means and methods by which DREW CLAYTON PETERSON, the defendant, CC-1, CC-2, and their co-conspirators would and did carry out the conspiracy were the following:

    a. CC-1, in his role as a member of Mariner's board of directors, obtained material, non-public information from Mariner about Apache's potential acquisition of Mariner.

    b. CC-1, in breach of his fiduciary and other duties of trust and confidence owed to Mariner and its shareholders, provided PETERSON with this material, non-public information and directed PETERSON to make purchases of Mariner stock.

    c. Consistent with the preceding paragraph, PETERSON used the material, non-public information obtained from CC-1 to execute profitable securities trades on behalf of himself and others.

    d. PETERSON also provided the material, non-public information obtained from CC-1 to CC-2 for the purpose of permitting CC-2 to use it to execute profitable securities trades.

    e. Consistent with the preceding paragraph, CC-2 used the material, non-public information obtained from

-11-

PETERSON to execute profitable securities trades on behalf of himself, the Hedge Fund, and others.

### Overt Acts

27. In furtherance of the conspiracy and to effect the illegal object thereof, DREW CLAYTON PETERSON, the defendant, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

    a. On or about April 8, 2010, DREW CLAYTON PETERSON, the defendant, purchased approximately 4,000 shares of Mariner stock on behalf of his sister.

    b. On or about April 12, 2010, DREW CLAYTON PETERSON, the defendant, purchased several thousand shares of Mariner stock for himself, his investment club, and various friends, clients, and family members.

    c. On or about April 12, 2010, DREW CLAYTON PETERSON, the defendant, telephoned and left a voicemail message for CC-2, who was in Manhattan.

    d. On or about April 13, 2010, DREW CLAYTON PETERSON, the defendant, spoke by telephone with CC-2, who was in Manhattan.

    e.    On or about April 13, 2010, DREW CLAYTON PETERSON, the defendant, again spoke by telephone with CC-2, who was in Manhattan.

    f.    On or about April 14, 2010, DREW CLAYTON PETERSON, the defendant, spoke by telephone with CC-2, who was in Manhattan.

(Title 18, United States Code, Section 371.)

### COUNT TWO

(Securities Fraud)

The United States Attorney further charges:

28. The allegations contained in paragraphs 1 through 23, 26, and 27 are repeated and realleged as though fully set forth herein.

29. From at least on or about April 8, 2010 through at least on or about April 15, 2010, in the Southern District of New York and elsewhere, DREW CLAYTON PETERSON, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section

-13-

240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon other persons and entities in connection with the purchase and sale of Mariner stock.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

## FORFEITURE ALLEGATION

30. As a result of committing the offenses alleged in Counts One and Two of this Information, DREW CLAYTON PETERSON, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of either of the offenses.

## SUBSTITUTE ASSET PROVISION

31. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

-14-

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

 (Title 18, United States Code, Section 981, Title 28, United States Code, Section 2461.)

            _Preet Bharara_ (MB)
            PREET BHARARA
            United States Attorney