# EXHIBIT XX

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

UNITED STATES OF AMERICA                    :

   - v -                                              :            10 Cr. 56 (RJS)

ZVI GOFFER *et al.*,                              :

             Defendants.            :

-------------------------------------------------------X


# MEMORANDUM OF LAW IN OPPOSITION TO
# DEFENDANTS' JOINT DISCOVERY MOTION


PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
        of America

ANDREW L. FISH
REED M. BRODSKY
Assistant United States Attorneys

     - Of Counsel -

# TABLE OF CONTENTS

Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    The Indictment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   The Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.  David Slaine's Cooperation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.  Intercepted Wire Communications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     C.  Additional Evidence Produced In Discovery. . . . . . . . . . . . . . . . . . . . . . . . 5

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    The Motion For A Bill Of Particulars Should Be Denied. . . . . . . . . . . . . . . . . . 6

     A.  Insider Trading. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.  Bill of Particulars. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     C.  Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          1. Ropes & Gray Tips. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          2. Shankar Tips. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          3. Other Tips. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          4. Request For Specific Trades During Conspiracy. . . . . . . . . . . . . . . . . . 11

II.   Defendants' Request For Additional Discovery Should Be Denied. . . . . . . . . . . 12

     A.  Documents Relating To Minimization. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     B.  Documents Relating To Surveillance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     C.  Documents Relating To Analyses Of Trading Data. . . . . . . . . . . . . . . . . . . 15

     D.  *Giglio* Material Relating To David Slaine. . . . . . . . . . . . . . . . . . . . . . . . . . 15

     E.  *Giglio* Material Relating To Roomy Khan. . . . . . . . . . . . . . . . . . . . . . . . . 16

     F.   Recordings By Cooperating Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     G.  Intercepted Wire Communications Over Rajaratnam's Telephone. . . . . . . 18

III.  The U.S. Attorney's Office Should Not Be Required To Produce SEC Materials 20

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

The Government submits this memorandum in opposition to the defendants' joint discovery motion. As explained below, contrary to the defendants' representations, the Government has provided ample notice of the nature of the charges against the defendants. Accordingly, the defendants' request for a bill of particulars should be denied. Moreover, for the reasons explained below, this Court should deny the defendants' motion for additional discovery.[1]

## Background

### I.    The Indictment

In their memorandum of law, the defendants incorrectly characterize the charges in the Indictment. (Br. 3-4). Both the conspiracy charged in Count One and the conspiracy charged in Count Two, as well as the substantive insider trading charges in Counts Three through Ten, relate to schemes to trade in securities based on material, nonpublic information misappropriated from Ropes & Gray LLP ("Ropes & Gray"), including information regarding the acquisitions of 3Com Corporation ("3Com") and Axcan Pharma, Inc. ("Axcan"). (*See* Indictment ¶¶ 12, 13, 29, 31, 38).

As alleged in the Indictment, two Ropes & Gray attorneys — Brien Santarlas and defendant Arthur Cutillo — misappropriated material, nonpublic information from their law firm regarding, among other things, certain clients' merger and acquisition activities. Count One charges an insider trading conspiracy among Cutillo, Santarlas, defendant Zvi Goffer, and defendant Jason Goldfarb. The Indictment alleges that Zvi Goffer and Goldfarb paid tens of thousand of dollars in cash to Cutillo and Santarlas for the Ropes & Gray inside information, and Zvi Goffer used that information to execute and cause others to execute profitable securities transactions. (*See* Indictment ¶ 18). Santarlas has pleaded guilty to conspiracy and securities fraud charges in connection with this

---

[1]    Throughout their motion, the defendants make unsupported assertions regarding the validity of the wiretap applications. Unless otherwise ordered by the Court, the Government will respond to these assertions in opposition to any motion to suppress the wiretaps.

scheme in the case captioned *United States* v. *Brien Santarlas*, 09 Cr. 1170 (PKC).

Count Two charges an insider trading conspiracy among defendants Zvi Goffer, Goldfarb, Craig Drimal, Emanuel Goffer, Michael Kimelman, and David Plate, as well as Gautham Shankar. (*See* Indictment ¶ 33). The conspiracy alleged in Count Two involved trading both on the Ropes & Gray inside information acquired from Santarlas and Cutillo, as well as trading on information obtained from Shankar regarding the acquisitions of Kronos, Inc. ("Kronos"), and Hilton Hotels Corp. ("Hilton"). (*See* Indictment ¶¶ 30-32).[2] Shankar has pleaded guilty to conspiracy and securities fraud charges in connection with this scheme in the case captioned *United States* v. *Gautham Shankar*, 09 Cr. 996 (VM). The Indictment does not allege that Santarlas and Cutillo's illegal agreement with Zvi Goffer and Goldfarb included dissemination of the Ropes & Gray inside information to others. Accordingly, Santarlas and Cutillo are not alleged to be part of the conspiracy charged in Count Two.

## II.     The Investigation

### A.     David Slaine's Cooperation

David Slaine worked at a hedge fund called Chelsey Capital between in or about February 2002 and in or about December 2002. In 2002, a Chelsey analyst named Erik Franklin brought to Chelsey material, nonpublic information regarding upcoming upgrades and downgrades in UBS analysts' securities recommendations. Slaine used this inside information to execute profitable securities transactions. In December 2009, Slaine pleaded guilty to conspiracy and securities fraud charges in connection with this 2002 insider trading scheme in the case captioned *United States* v.

---

[2]     Any suggestion by the defendants that Count Two does not relate to the Ropes & Gray inside information (*see* Br. 3-4) would plainly contradict the Indictment.

*David Slaine*, 09 Cr. 1222 (RJH).

In or about July 2007, Slaine (who is identified in the Complaint as CS-1) began to cooperate with the Government. (Complaint ¶ 7(j) (attached as Exhibit A)). Slaine told the Government, among other things, that in or about July 2006, Drimal had asked Slaine to purchase stock in ATI Technologies, Inc. ("ATI"), for Drimal. Shortly thereafter, the proposed acquisition of ATI by Advanced Micro Devices ("AMD") was publicly announced. (*See* Def. Exh. F at 3).

At the direction of the Federal Bureau of Investigation ("FBI"), Slaine had a series of conversations with Drimal, most of which were consensually recorded. During these conversations, Drimal provided Slaine with, among other things, Ropes & Gray inside information regarding the 3Com acquisition. For example, on September 4, 2007, Drimal told Slaine that 3Com was an acquisition target. (Complaint ¶ 11). On September 17, 2007, Drimal said that he just met with his source (Zvi Goffer), that Drimal's source provided details about private equity firms' bid for 3Com, and that Drimal's source was getting the information from lawyers. (Complaint ¶ 13). On September 18, 2007, Drimal said that his source (Zvi Goffer) paid cash to the lawyer providing the 3Com information. (Complaint ¶ 14). Drimal said he did not know why the lawyer was risking his career and possibly "jail" by providing such information. (*Id.*). Then, on September 20, 2007 — eight days before the 3Com acquisition was publicly announced — Drimal told Slaine (accurately) that 3Com would be acquired by Bain Capital. (Complaint ¶ 15). During this conversation, Drimal said that the law firm was "Ropeson." (*Id.*).

Drimal also told Slaine additional details regarding the charged conspiracies. For example, on December 27, 2007, Drimal told Slaine (1) that Zvi Goffer had different sources in different places, (2) that one of Zvi Goffer's sources was Shankar, who provided information regarding the

acquisitions of Hilton and Kronos, (3) that the source for the 3Com acquisition was a law firm that was working on the transaction, and (4) that, in some circumstances, Zvi Goffer used prepaid cellular telephones to communicate with his sources. (Complaint ¶ 18).

Slaine continued to communicate with members of the conspiracy in 2008. For example, on August 4, 2008, Slaine met with Drimal, Zvi Goffer, Emanuel Goffer and Michael Kimelman. (Complaint ¶ 35).[3] During this meeting, Slaine pressed the conspirators to identify their source of information. Zvi Goffer said that Slaine did not need to know and did not want to know the source. Zvi Goffer added that, if someone from the Government ever asks where Slaine got the information, Slaine would be better off being able to say, "I don't know," and that was "better for everybody." (*Id.*). Kimelman then joked about the information coming from a guy fixing a pothole. (*Id.*).

### B.    Intercepted Wire Communications

Based on information from Slaine, including consensually recorded conversations, as well as analyses of telephone records and other materials, the Government obtained authorization to intercept wire communications over several telephones, including telephones used by defendants Drimal, Zvi Goffer, and Goldfarb. Far from "proving to be a dead end" (Br. 1), the intercepted wire communications provided important evidence of the charged conspiracies.

For example, the intercepted wire communications include conversations about the Ropes & Gray inside information relating to the Axcan acquisition, information which Zvi Goffer received from Cutillo, Santarlas, and Goldfarb. (*See* Complaint ¶¶ 20-22). The intercepted wire communications also include discussions about cash payments for the Axcan tip. These payments were delivered from Drimal to Zvi Goffer, and then from Zvi Goffer to Goldfarb. (*See* Complaint ¶¶ 23-25).

---

[3]     The Complaint incorrectly lists the date of this meeting as August 4, 2009.

The intercepted wire communications also confirmed that the conspirators used prepaid cellular telephones to communicate. (*See*, *e.g.*, Complaint ¶¶ 31(c), 31(d), 34(d), 36(c)). In addition, in intercepted wire communications, Zvi Goffer and Goldfarb referred to the source of information as "Art" or "Artie" (referring to the defendant Cutillo). (*See* Complaint ¶¶ 31(c), 31(d)).

Further, far from showing that Zvi Goffer had "no edge at all" (Br. 1), the intercepted communications establish the materiality and value of the inside information that Zvi Goffer obtained from Cutillo, Santarlas, and Goldfarb. For example, Zvi Goffer told Goldfarb that Zvi Goffer's profit and loss statement for 2008 was great "partly thanks to you" (*i.e.*, thanks to the Ropes & Gray inside information that Goldfarb had relayed to Zvi Goffer). (Complaint ¶ 31(b)). Similarly, Zvi Goffer told Goldfarb to tell "our friends" (*i.e.*, Cutillo and Santarlas) "to follow that 3Com one very closely because there is money to be made either way" (*i.e.*, if the 3Com transaction closed or if it did not). (Complaint ¶ 31(c)). The intercepted wire communications also confirmed that Zvi Goffer paid Cutillo and Santarlas for the inside information — Goldfarb told Zvi Goffer that the pair of attorneys had spent their cash payments and were "ready to replenish." (*Id.*).

### C.    Additional Evidence Produced In Discovery

In addition to the evidence from Slaine and from intercepted wire communications, the Government obtained and produced trading records, telephone records, and other consensually recorded conversations. The Government produced, among other things, a consensually recorded conversation between Santarlas and Cutillo on November 4, 2009. During this conversation, Cutillo said, among other things, that he had spent all the cash Zvi Goffer (whom he did not mention by name) had paid him. During the conversation, Cutillo also told Santarlas to destroy the prepaid cellular telephone Santarlas used to communicate with Goldfarb, stating as follows:

> Just take a walk outside and break it into pieces, and throw one piece
> in one garbage can and another one two blocks down the road. That's
> what I did.

During the conversation, Cutillo reported that, following Raj Rajaratnam's arrest, Goldfarb had

spoken with Zvi Goffer (whom Cutillo did not mention by name). Zvi Goffer had told Goldfarb that

he was not worried, because, among other things, "they are only looking at higher ups." During the

conversation, Cutillo asked whether Santarlas was wearing a "wire."

**Argument**

**I.     The Motion For A Bill Of Particulars Should Be Denied**

**A.     Insider Trading**

Insider trading based on material, nonpublic information that has been misappropriated in

violation of a duty of trust or confidence constitutes securities fraud within the meaning of Section

10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5. *United States* v.

*O'Hagan*, 521 U.S. 642, 653 (1997) (holding that attorney who purchased Pillsbury Co. securities

based on information that client was preparing a tender offer for Pillsbury could be guilty of

securities fraud under a misappropriation theory); *United States* v. *Falcone*, 257 F.3d 226, 234 (2d

Cir. 2001) (holding that defendant was guilty of insider trading because defendant participated in

scheme to execute securities transactions based on misappropriated pre-release copies of a *Business

Week* column "that has a known effect on the prices of securities of the companies it discusses").

Information is material if there is a substantial likelihood that a reasonable investor would

consider it important in making an investment decision. *United States* v. *Bilzerian*, 926 F.2d 1285,

1298 (2d Cir. 1991). Information is nonpublic if it is more reliable or specific than public rumors.

*United States* v. *Cusimano*, 123 F.3d 83, 89 (2d Cir. 1997).

6

Even in cases where the financial press has published articles about the possible acquisition of a public company, an insider's information regarding the status of acquisition negotiations can still be material and nonpublic. *See*, *e.g.*, *SEC* v. *Mayhew*, 121 F.3d 44, 50-51 (2d Cir. 1997) (holding that district court did not clearly err in finding that tip from corporate insider, which was more reliable or specific than articles in the financial press, was material and nonpublic) (cited in *Cusimano*); *United States* v. *Mylett*, 97 F.3d 663, 666-67 (2d Cir. 1996) (holding that information from insider corroborating press reports of a possible corporate acquisition could be material and nonpublic); *United States* v. *O'Hagan,* 139 F.3d 641, 648 (8th Cir. 1998) ("[C]ontemporaneous media reports speculating that Pillsbury would be taken over by Grand Met do not render the information O'Hagan learned immaterial or nonpublic [*sic*]. Financial analysts testified that these media reports were 'not taken seriously' and were dismissed because 'newspapers are always having articles of rumors.'").

A person uses material, nonpublic information in connection with a stock sale or purchase if that information is a factor in his decision to purchase or sell the stock. *See*, *e.g.*, *United States* v. *Teicher*, 987 F.2d 112, 121 (2d Cir. 1993) ("It strains reason to argue that an arbitrageur, who traded while possessing information he knew to be fraudulently obtained, knew to be material, knew to be nonpublic, — and who did not act in good faith in doing so — did not also trade on the basis of that information.").

### B.     Bill Of Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure permits the Court to direct the Government to file a bill of particulars. A bill of particulars is not a general investigatory tool for the defense. *See United States* v. *Salazar*, 485 F.2d 1272, 1277-78 (2d Cir. 1973). Nor is it a device to

compel disclosure of the Government's evidence or its legal theory prior to trial. *United States* v. *Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974). Rather, its sole purpose is to furnish facts necessary to apprise a defendant of the charges against him with sufficient precision to (i) enable him to prepare his defense, (ii) avoid unfair surprise at trial, and (iii) preclude a second prosecution for the same offense. *See Wong Tai* v. *United States*, 273 U.S. 77, 80-82 (1927); *United States* v. *Torres*, 901 F.2d 205, 234 (2d Cir. 1991); *United States* v. *Salazar*, 485 F.2d at 1278. Indeed, "a bill of particulars should be required only where the charges of an indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States* v. *Torres*, 901 F.2d at 234; *accord United States* v. *Chen* 378 F.3d 151, 163 (2d Cir. 2004). Furthermore, "a bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." *United States* v. *Walsh*, 194 F.3d 37, 47 (2d Cir. 1999).

Contrary to the defendants' suggestion (Br. 12), a bill of particulars cannot be used as a vehicle to obtain a pretrial ruling on the sufficiency of the evidence. *See*, *e.g.*, *United States* v. *Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998) (holding that unless the Government provides a full proffer of its trial evidence, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment").

### C. Discussion

The Government has provided sufficient particulars for defendants to prepare a defense.

#### 1. Ropes & Gray Tips

The Government identified four specific pieces of material, nonpublic information that Santarlas and Cutillo misappropriated from Ropes & Gray and provided to Goldfarb and Zvi Goffer: (1) 3Com was going to be acquired, (2) Axcan was going to be acquired, (3) PF Chang's China

8

Bistro, Inc. ("PF Chang's"), was going to be acquired, and (4) the acquisition of Clear Channel Communications, Inc. ("Clear Channel"), was progressing toward closing. (*See* Def. Exh. F).[4]

The Government provided notice of the times at which Cutillo and Santarlas conveyed information regarding these transactions. (*See* Def. Exh. F). Additional evidence concerning Cutillo and Santarlas's updates to Goldfarb are contained in the discovery materials. For example, as described in the Complaint, on September 20, 2007, Drimal reported to Slaine that 3Com would be bought out by Bain Capital, that his friend was not wavering, and that the law firm was "Ropeson." (Complaint ¶ 15). Information about Cutillo and Santarlas's methods for acquiring the Ropes & Gray inside information constitutes evidentiary detail and is not the proper subject for a bill of particulars.

The defendants are free to attempt to defend against the substantive insider trading charges by asserting that the 3Com and Axcan acquisitions were public at the time they executed their trades. However, the Government will prove at trial that this was not the case. Notably, the *Wall Street Journal* article cited by the defendants reports that "3Com and its bankers at Goldman Sachs Group don't appear to be rushing to do a deal." (Def. Exh. G). Moreover, the Second Circuit has held that information from an insider that corroborates press accounts can be material and nonpublic. *United States* v. *Mylett*, 97 F.3d at 666-67; *see also SEC* v. *Mayhew*, 121 F.3d at 50-51. In this case, at trial the Government will prove that the Ropes & Gray inside information regarding the 3Com and Axcan acquisitions was material and nonpublic through, among other things, evidence of the following: (1) that Zvi Goffer paid approximately $75,000 to Goldfarb, Cutillo and Santarlas after the 3Com acquisition was announced, (2) that Zvi Goffer paid approximately $22,500 to Goldfarb, Cutillo and

---

[4]    This case is distinguishable from *United States* v. *Contorinis*, because in *Contorinis* the insider provided various pieces of positive and negative information during the course of a single transaction. As explained above, this case is very different.

Santarlas after the Axcan acquisition was announced, (3) that Zvi Goffer distributed prepaid cellular telephones to Goldfarb, Cutillo, Santarlas, and others to transmit inside information, (4) that Zvi Goffer said the Ropes & Gray inside information was valuable (*see*, *e.g.*, Complaint ¶ 31(b)), and (5) that conspirators earned millions of dollars by trading on the 3Com and Axcan information.

Contrary to the defendants' assertion, PF Chang's and Clear Channel are not "uncharged stocks." The transmittal of Ropes & Gray inside information regarding these companies constitutes part of the charged conspiracies. (*See* Indictment ¶ 13). Because this inside information relates only to the conspiracy counts (and not the substantive counts), the Government need not show that this information actually was material. *See, e.g., United States* v. *Svboda*, 347 F.3d 471, 476 (2d Cir. 2003). "'[T]he illegality of [a conspiracy] does not depend upon the achievement of its goal' and it therefore 'does not matter that the ends of the conspiracy were from the beginning unattainable.'" *United States* v. *Shellef*, 507 F.3d 82, 105 (2d Cir. 2007) (quoting authority omitted); *see also United States* v. *Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994).

### 2. Shankar Tips

The Government provided notice of the two tips from Shankar — the material, nonpublic information was that Kronos and Hilton would be acquired. As the defendants note, the Government will identify the source of the Kronos information subject to a protective order, as approved by the Court. (*See* Def. Exh. I). Because the Kronos and Hilton tips are relevant only to the conspiracy charged in Count Two, and not to any substantive count, the Government need not prove that this information was, in fact, misappropriated in violation of a duty. Rather, the Government can offer these trades as evidence of the illegal agreement to trade on inside information.

### 3. Other Tips

The Government's notice regarding the ATI tip (which originated with Anil Kumar) was sufficient. (*See* Def. Exh. F. at 4). Further, as the Government advised the defendants, it does not know the sources of the tips listed on page 4 of the Government's April 27, 2010 letter in subparagraphs (2), (3), and (4). (*See id.*). The Government listed those tips, because there will likely be trial evidence (including consensually recorded conversations) in which those tips are discussed.

### 4. Request For Specific Trades During Conspiracy

In connection with the conspiracy counts, the Government should not be required to identify which trades the defendants executed based on inside information. The Government has identified the inside information and the times at which it was conveyed. The Government has produced relevant trading records. As the Second Circuit observed, "material information cannot lay idle in the human brain." *United States* v. *Teicher*, 987 F.2d at 120. "The individual with such information may decide to trade upon that information, to alter a previously decided-upon transaction, to continue with a previously planned transaction even though publicly available information would now suggest otherwise, or simply to do nothing." *Id.* Accordingly, trades in a security about which the defendants received inside information are based, at least in part, on the inside information.

In sum, the defendants have received ample notice of the charges against them, and their motion for a bill of particulars should be denied. *See also United States* v. *Ballesteros Gutierrez*, 181 F. Supp. 2d 350, 356 (S.D.N.Y. 2002) (defendant withdrew bill of particulars motion when satisfied with the Government's statement that the tipper "disclosed material, nonpublic information about . . . business plans to defendant between [June 17, 1999] . . . [and] on or about June 21, 1999.").

11

## II. Defendants' Requests For Additional Discovery Should Be Denied

For the reasons described below, the requests for additional discovery should be denied.

### A. Documents Relating To Minimization

The Court should deny the defendants' motion for the documents listed in the bullet points at pages 16-17 of their brief, both because such materials (to the extent they have not already been produced) are not necessary to file any suppression motions and because the defendants failed to comply with this Court's schedule and Local Criminal Rule 16.1.

This Court directed the defendants to confer with the Government regarding any discovery disputes on or before April 21, 2008, and then file any discovery motions by May 19, 2008. (*See* Transcript dated April 7, 2010, at 28). Contrary to this Court's instructions and Local Criminal Rule 16.1, the defendants never consulted with the Government regarding these discovery requests. Rather, Drimal's counsel sent an e-mail containing these requests at 6:43 p.m. two days before the defendants filed their motion. (*See* Def. Exh. K). No defense counsel followed up prior to filing the discovery motion. Because the defendants did not confer with the Government regarding these requests before filing a motion, the defendants' motion should be denied.

In any event, to the extent the materials sought by the defendants have not already been produced, they are not necessary to file any suppression motions. The Government has already produced, among other things, the following: (1) written minimization instructions for the wiretaps (including the signatures of individuals who monitored the wiretaps); (2) line sheets reflecting, among other things, typewritten summaries of intercepted communications and the first initial and last name of monitoring personnel; (3) the wiretap applications and orders relating to, among other things, minimization procedures; and (4) the wiretap recordings. These materials provide the

12

defendants with the information necessary to evaluate whether the agents complied with the statutory minimization requirements and orders of authorization. *See* 18 U.S.C. § 2518(5); *Scott* v. *United States*, 436 U.S. 128 (1978); *United States* v. *Capra*, 501 F.2d 267, 275-76 (2d Cir. 1974).

The defendants' request for "the names of all FBI special agents, FBI employees, and FBI translators who had access to the contents of the wiretaps, their position within the FBI, the authority for their access to the wiretapped conversations within the scope of Title III, and the orders of authorization" is in the form of an interrogatory that falls outside the scope of Rule 16. Moreover, the request appears to seek irrelevant information. To the extent that the defendants are fishing for a basis to claim that non-investigative/non-law enforcement officers improperly participated in intercepting wire communications, the defendants overlook the statutory language. The statute expressly states that "[a]n interception under this chapter may be conducted in whole or in part by Government personnel, or by an individual operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception." 18 U.S.C. § 2518(5). At the very least, the defendants should explain how this request would be relevant to a motion to suppress. The Government is not aware of any documents showing that unauthorized individuals monitored the interceptions.

To the extent there are other documents reflecting the receipt of or efforts to comply with minimization protocols (beyond the minimization instructions already produced), such documents appear to fall within Title 18, United States Code, Section 3500 ("Section 3500"), and defendants are not entitled to such material at this stage. Likewise, the request for "all reports, memoranda and notes made by investigating agents about the monitoring of the phone numbers at issue in the various wiretap orders" appears to seek 3500 material. Moreover, the defendants have failed to explain how

13

this request is relevant to any motion to suppress the wiretap recordings.

The defendants do not cite any case that supports their requests for additional materials beyond what has already been produced in discovery. Instead, they cite *United States* v. *Simels*, 08 Cr. 640 (JG), 2009 WL 1924746 (E.D.N.Y. July 2, 2009), and *United States* v. *Giordano*, 416 U.S. 505 (1974). (Br. 17). To the extent that they rely on *Simels* for their requests, that reliance is misplaced. In that case, the defendant moved to suppress wiretaps based on allegedly improper minimization procedures in the order of authorization. Judge Gleeson held that a special procedure authorizing the Government to record potentially privileged conversations without listening to them and then limit further dissemination violated the wiretap statute. *Simels*, 2009 WL 1924746 at *9. Here, the defendants have the orders of authorizations and do not need additional materials to analyze whether the procedures complied with the statute. *Giordano* also does not support their request for additional documents. In *Giordano*, the Supreme Court determined that wiretap applications must be authorized by a statutorily designated official and failure to do so warrants suppression. Here, the defendants have the Government's wiretap applications and, therefore, will be able to verify that the applications were authorized by a statutorily designated official.

### B.   Documents Relating To Surveillance

The defendants' request for additional documents relating to "surveillance of the defendants" should be denied. The defendants seek "all reports, memoranda and notes made by investigating agents about their surveillance of the defendants in this case" and "all instant messages, text messages, and email messages, made by the agents conducting electronic or physical surveillance of the defendants in this case, to the extent that they refer to the defendants or surveillance operations." (Br. 17). Conspicuously absent is any explanation of how such documents would assist

the defendants in connection with a motion to suppress the wiretap recordings. To the extent that they seek documents from the Government that are inconsistent with the statements made regarding surveillance in the wiretap applications, the Government is not aware of any such documents. Moreover, this request appears to ask for Section 3500 material to which the defendants are not entitled at this stage of the criminal case.

### C. Documents Relating To Analyses Of Trading Data

The defendants' request for "analyses of trading data reference[d] in successive wiretap applications and progress reports" (Br. 17) should be denied because the defendants have not explained how such documents would be relevant to any suppression motion. In addition, the defendants fail to identify the specific "analyses" in any of the wiretap applications which they apparently seek to obtain.

### D. *Giglio* Material Relating To David Slaine

The defendants' request for all *Giglio* material relating to Slaine should be denied. (Br. 18). This Court need not decide whether *Giglio* applies to pretrial suppression motions. Assuming it applies, the Government disclosed the material impeachment relating to Slaine in its wire applications. In particular, the wiretap applications stated, in substance, that Slaine had participated in an insider trading scheme in 2002 and was cooperating with the Government in hopes of providing substantial assistance, entering into a cooperation agreement, and receiving a reduced sentence for his crimes. (*See* Def. Exh. B ¶ 15, Def. Exh. M). All of the wire applications were submitted before Slaine pleaded guilty. Further information about Slaine's criminal conviction, including the charging instrument and transcript of his guilty plea, is publicly available. *See United States* v. *David Slaine*, 09 Cr. 1222 (RJH). Slaine does not have any other criminal convictions. It

15

is not clear what additional "details of Slaine's criminal conduct" the defendants wish to obtain. (Br. 18). Additional "details" do not appear to be material to any motion to suppress.

In their motion, the defendants state that the Government "has refused to turn over details (including proffer notes and interview reports) of other alleged securities violations Slaine has engaged, referring counsel to FINRA's website." (Br. 18). The defendants' motion does not provide the context for the Government's response. In a May 12, 2010 e-mail message (attached as Exhibit B), Zvi Goffer's counsel asked for further information about Slaine's "regulatory issues." In response, the Government stated, among other things, that the NASD action against Slaine did not constitute discoverable information, but nevertheless directed counsel to publicly available information about this regulatory matter. That information describes how, in 2000, the NASD's National Adjudicatory Council fined Slaine (and others) $2,500. (*See* Def. Exh. M). To the extent that the defendants wish to make any motions based on this fine, they are free to do so.

Significantly, it should be noted that most of Slaine's meetings with conspirators were recorded. With respect to the content of these recorded conversations, the Government did not simply rely on Slaine's account of what was said. As a result, in connection with descriptions of these conversations in the wiretap applications, Slaine's credibility does not appear to be at issue.

### E. *Giglio* Material Relating To Roomy Khan

The defendants' request for all *Giglio* material relating to Roomy Khan should be denied. (Br. 19). The wiretap applications relating to the Drimal, Zvi Goffer, Goldfarb, Shankar, and Hardin telephones did not rely on any of Khan's statements. Accordingly, Khan's *Giglio* material is not relevant to any motion to suppress the wiretaps.

The defendants argue that Khan's *Giglio* material "is relevant to a *Franks* motion attacking

16

the fruits of the Shankar and Hardin wiretaps." (Br. 19). For several reasons, the defendants'
argument is meritless. First, Khan was not even mentioned as a cooperating source in the Shankar
wiretap applications. As a result, the defendants have no basis to argue that information to impeach
Khan would be relevant to suppressing the Shankar wiretaps. Second, in the Hardin wiretap
application, the Government did not rely on any statements from Khan to establish probable cause.
(*See* Def. Exh. O ¶ 41). Instead, Khan was referenced in the "alternative investigative means" section
of the agent's affidavit. (*Id.*). Any impeachment information about Khan would not have been
relevant to the probable cause finding. Accordingly, Khan's *Giglio* information is not relevant to a
motion to suppress the Hardin wiretap.

The defendants do not, and cannot, explain how Khan's statements about being the source
of tips on Hilton and Kronos (Br. 19) have anything to do with the Government's applications for
the Shankar and Hardin wiretaps. None of these applications relied on statements from Khan to
establish probable cause. The Government will, of course, produce impeachment material for all its
witnesses in advance of trial. However, the defendants cannot obtain early disclosure of
impeachment material that has no bearing on any motion to suppress.

### F. Recordings By Cooperating Witnesses

The defendants' motion for production of other recordings by cooperating witnesses under
the supervision and at the direction of the FBI that have nothing to do with this criminal case (Br.
22) should be denied. The Government produced all relevant recordings pursuant to Rule 16. The
Government is also aware of its *Brady* and *Giglio* obligations, and the Government has complied
with them and is under a continuing obligation to comply with them.

The defendants do not argue that these other recordings are material to any motion to

suppress the wiretaps. Instead, the defendants request production of these other recordings because the testimony of these cooperating witnesses "will be the centerpiece of the government's case" and "other efforts made by these cooperating witnesses to curry favor with the same agents and prosecutors involved in this case would be information that is 'material to the preparation of the defense.'" (Br. 22). In short, the defendants speculate that these other recordings — which have nothing to do with this criminal case — might help them attack the cooperating witnesses at trial for trying to "curry favor" with the Government by recording additional conversations at the direction of the FBI. Under the defendants' reasoning, any time a cooperating witness testifies at trial, the Government would be obliged to produce in discovery every recording of the cooperating witness in every investigation in which the cooperating witness participated.

To the extent that the defendants are seeking *Giglio* or Section 3500 material regarding potential trial witnesses, the request is premature. *See*, *e.g.*, *United States* v. *Noble*, 07 Cr. 284 (RJS), 2008 WL 1990707, at *9 (S.D.N.Y. May 7, 2008) ("the government 'need not provide *Brady* and *Giglio* materials immediately' but merely 'in time for [their] effective use.'"). If such recordings contain impeachment material relating to a trial witness or relate to the subject matter of the testimony of a witness, the Government will produce them at an appropriate time before trial.

### G. Intercepted Wire Communications Over Rajaratnam's Telephone

The defendants' motion for production of the intercepted wire communications over Raj Rajaratnam's telephone (Br. 23-24) should be denied. The Government produced to the defendants seven intercepted wire communications over the Rajaratnam telephone: four conversations between Zvi Goffer and Rajaratnam (conversations which were also intercepted over the Zvi Goffer telephone) and three additional conversations intercepted over Rajaratnam's telephone relating to

18

Clear Channel and PF Chang's. The Government also advised defense counsel that it does not intend to offer into evidence in this criminal case any conversations intercepted over Rajaratnam's telephone unless such conversations were also intercepted over Zvi Goffer's telephone. The Government is not aware of any additional conversations intercepted over Rajaratnam's phone that would be material to the defense or any additional conversations that relate to Clear Channel or PF Chang's. As a result, the defendants' motion for production of all intercepted wire communications over Rajaratnam's telephone is nothing more than a fishing expedition.

In seeking the wiretap recordings over Rajaratnam's telephone, the defendants argue that (a) these recordings must be relevant because the Government produced the Drimal, Goffer, and Goldfarb wires to Rajaratnam, and (b) the Rajaratnam wire "undoubtedly captures" Rajaratnam discussing Clear Channel and PF Chang's with others. Both of these arguments miss the mark. The Government produced the Drimal, Goffer, and Goldfarb wires to Rajaratnam because, among other reasons, Goffer was passing along tips to Rajaratnam and the wiretaps included evidence of activities at Rajaratnam's firm. In contrast, based on the Government's review of the evidence, there were only seven intercepted conversations over the Rajaratnam wire that would even potentially be relevant to the charges against the defendants in this criminal case. The Government produced those conversations. Almost all intercepted conversations over the Rajaratnam wire were not related to the charges against Zvi Goffer and the other defendants in this case. The defendants' argument that there must be additional wire communications intercepted over the Rajaratnam wire relating to Clear Channel and PF Chang's is purely speculative and not a valid basis to compel production of thousands of additional wiretap recordings that have nothing to do with this criminal case.

## III. The U.S. Attorney's Office Should Not Be Required To Produce SEC Materials

The Court should deny the defendants' motion to require the U.S. Attorney's Office ("USAO") to produce materials in the possession, custody, and control of the SEC. The USAO is part of the Department of Justice, while the SEC is an independent agency and "cannot in any proper sense be characterized as an arm or an eye of the executive." *See Humphrey's Executor* v. *United States*, 295 U.S. 602, 628 (1935) (discussing Federal Trade Commission). Further, although the USAO and the SEC cooperated with one another, their investigations were separate and independent. Accordingly, under well settled precedent in the Second Circuit, the USAO cannot be required to produce materials in the SEC's possession, custody, and control.

"An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (quoting authority omitted). "Nonetheless, knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *Id*. at 255 (quoting authority omitted). *See also United States* v. *Locasio*, 6 F.3d 924, 949 (2d Cir. 1993) (rejecting imputation of knowledge of FBI reports by agents who were not involved in the investigation or trial); *United States* v. *Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting imputation of knowledge of a Florida prosecutor to an AUSA in New York).

Recently, in connection with the prosecution of Adelphia's former executives, the Second Circuit affirmed Judge Sand's decision not to require the USAO to produce documents in the SEC's custody because "the United States Attorney's Office was not in possession of notes from the SEC interviews with [Adelphia's former securities lawyer] or other witnesses, and did not have an obligation to disclose what they did not possess." *United States* v. *Rigas*, 583 F.3d 108, 126 (2d Cir. 2009). Judge Sand explained that the USAO was not obligated to produce documents that were not within its possession, custody, or control and that "there was no joint investigation with the SEC." *United States* v. *Rigas*, 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008), *aff'd*, 583 F.3d 108 (2d Cir. 2009). *See also SEC* v. *Stanard*, 06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007) (holding that USAO and SEC did not conduct a "joint" investigation); *United States* v. *Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (holding that USAO and NYSE did not conduct a joint investigation); *Ferreira* v. *United States*, 350 F. Supp. 2d 550, 556-57 (S.D.N.Y. 2004) (holding that cooperation between USAO and NYPD was "not sufficient to make the USAO and the state prosecutor members of the same 'prosecutorial team'"); *United States* v. *Upton*, 856 F. Supp. 727, 750 (E.D.N.Y. 1994) (holding that USAO and FAA did not conduct a "joint investigation" even though the FAA provided two inspectors to assist the criminal investigation); *United States* v. *Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying Rule 16 discovery request for grand jury minutes at the Bronx District Attorney's Office where there was no joint investigation with the USAO and USAO had no control over the material).

*Stanard* and *Finnerty* are instructive. In *Stanard*, under comparable circumstances, Judge Lynch denied the very same motion that the defendants are making in this case. The defendants in that case moved to compel the SEC to produce documents in the possession of the USAO. *Id.* at *2-

21

3. Just as in this case, the defendants argued that the USAO and the SEC conducted a joint investigation because they worked together, and the SEC was able to access and review FBI interview memoranda at the USAO. Judge Lynch rejected the argument. Judge Lynch found that "[t]he SEC is an independent agency from the USAO" and that "[t]he facts of this case make clear that the investigations, while they may have overlapped, were not conducted jointly, and that the SEC has neither possession, custody, nor control of the FBI's notes." *Id*. at *3. Judge Chin reached a similar conclusion in *Finnerty*. There, the defendants argued that the USAO should be required to produce documents in the possession of the NYSE because the USAO had access to them. 411 F. Supp. 2d at 432. Judge Chin was not persuaded that "the Government's current investigation and prosecution have been undertaken jointly with the NYSE." *Id*. at 433. Judge Chin held that "[t]he mere fact that the Government may have requested and received documents from the NYSE in the course of its investigation does not convert the investigation into a joint one." *Id*.

The USAO and the SEC are different governmental offices that have separate and independent missions. The SEC is an independent federal regulatory agency charged with the civil administration and enforcement of, among other statutes, the Securities Exchange Act of 1934 and regulations promulgated thereunder. The SEC is composed of five commissioners appointed by the President with the advice and consent of the Senate. 15 U.S.C. § 78d(a). The SEC has rulemaking, investigative, and adjudicatory powers. *See*, *e.g.*, *United States* v. *O'Hagan*, 521 U.S. 642, 673-74 (1997) (SEC did not exceed its rulemaking authority in proscribing insider trading rules); *American Power & Light Co.* v. *SEC*, 329 U.S. 90, 105 (1946) (upholding delegation of authority to SEC to prevent unfair or inequitable distribution of voting power among security holders).

In this case, the USAO and the SEC conducted parallel, but separate and independent

22

investigations. There was not a single "joint" investigation. This is apparent for numerous reasons. First, the USAO has not reviewed or seen the documents sought by the defendants. The USAO does not have possession, custody, or control over these documents. The USAO has produced all relevant documents pursuant to Rule 16 that it has received from the SEC. Second, the SEC did not act on behalf or under the control of the USAO. The USAO and SEC did not work as part of the same "prosecutorial" team. Indeed, the USAO and the SEC had different purposes during their investigations and separately evaluated different evidence to make independent investigatory and charging decisions. During the course of the parallel investigations, the USAO could not and did not direct the SEC to do anything, and the SEC could not and did not direct the USAO to do anything.

Third, although the USAO and the SEC shared certain information, sharing information does not convert independent investigations into a joint one. *United States* v. *Finnerty*, 411 F. Supp. 2d at 432. Indeed, the USAO obtained substantial evidence in the course of its investigation that it did not share with the SEC. For example, the USAO did not share any grand jury material with the SEC. *See* Fed. R. Crim. P. 6(e). The USAO also did not share wiretap recordings with the SEC during the course of its investigation.[5] Indeed, in connection with the SEC's civil suit against Galleon and other individuals (including defendants Zvi Goffer and David Plate), the SEC has sought to obtain the wiretap recordings from the civil defendants.[6]

The defendants' argument that there was a "joint" investigation between the USAO and the

---

[5]     Following the arrest of the defendants, the USAO inadvertently sent an SEC attorney wiretap recordings that were disclosed in the Complaint. Upon learning of this inadvertent disclosure, the USAO retrieved the recordings from the SEC.

[6]     In the SEC's civil case, Judge Rakoff ruled over objections that the defendants had to produce the wiretap recordings to the SEC subject to a protective order. That order is currently stayed pending appeal.

SEC is unfounded. Their argument that it was "joint" because the "SEC had access to government cooperators and recorded telephone calls" disregards that the USAO did not permit the SEC to access other evidence, including grand jury material and wiretap recordings. Indeed, Judge Lynch rejected the very same argument in *Stanard*. The defendants also point to press releases issued by the USAO and the SEC thanking each other for assistance and cooperation. That is not evidence of a joint investigation. For a variety of reasons, the USAO often thanks other governmental organizations and agencies, both foreign and domestic, as well as private companies, for assistance in its investigations. Indeed, in connection with the prosecution of Adelphia executives, the USAO issued a press release using similar language thanking the SEC for its assistance. Nevertheless, Judge Sand concluded that the USAO and SEC did not conduct a joint investigation.

In arguing that the USAO must produce documents in the SEC's possession, the defendants rely on four cases which are inapposite. (*See* Br. 25). *SEC* v. *Saad*, 229 F.R.D. 90 (S.D.N.Y. 2005), does not stand for the proposition, as the defendants seem to claim, that "when SEC and USAO conducted parallel investigations, materials in the possession of the SEC may 'well be *Brady* material that the government might well be required to turn over . . . .'" (Br. 25). In that case, Judge Rakoff denied the USAO's request as intervener in the SEC's civil action to delay production of notes, which were in both the USAO and SEC's possession, to the civil defendants. In rejecting the USAO's arguments for delaying production, Judge Rakoff remarked that the notes in the USAO's possession might well be *Brady* that it would be required to turn over sooner than anticipated in the parallel criminal case. 229 F.R.D. at 92. In *United States* v. *Wood*, 57 F.3d 733 (9th Cir. 1995), in the context of charging individuals with defrauding the FDA (which, unlike the SEC, is not an independent agency), the Government did not contest that it was obligated to produce documents in

24

the FDA's custody. *Id.* at 736. In *United States* v. *Jennings*, 960 F.2d 1488 (9th Cir. 1992), in reversing two district court orders requiring AUSAs to personally review files of federal law enforcement witnesses, the Government did not contest that it was obligated to produce any *Brady* material in those files. 960 F.2d at 1489. Finally, in *United States* v. *Hankins*, 872 F. Supp. 170, 173 (D.N.J. 1995), the district court found that the criminal division of the USAO was responsible for making sure that documents in its civil division were produced when both divisions brought actions against the defendant stemming from the same underlying activity. In short, *Saad*, *Wood*, *Jennings*, and *Hankins* did not address the issue of whether the USAO should produce documents in the possession of an independent federal regulatory agency.

The defendants' alternative argument that the USAO must produce materials in the SEC's possession even if there were not a joint investigation conflicts with the law in the Second Circuit. *See Rigas*, 583 F.3d at 126; *Avellino*, 136 F.3d at 255; *Stanard*, 2007 WL 1834709; *Finnerty*, 411 F. Supp. 2d at 433.

## Conclusion

For the foregoing reasons, the defendants' discovery motion should be denied.

Dated: New York, New York
      June 11, 2010

                               Respectfully submitted,

                               PREET BHARARA
                               United States Attorney

By:       _____/s/_____
              Andrew L. Fish
              Reed M. Brodsky
              Assistant United States Attorneys
              Tel. (212) 637-2548/2492