```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/4/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MATHEW MARTOMA,

Defendant.

**MEMORANDUM**
**OPINION & ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On February 6, 2014 – after a month-long trial – a jury convicted Defendant Mathew Martoma of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and of two substantive counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. The Superseding Indictment charges that between summer 2006 and July 29, 2008, Martoma caused his employer, the hedge fund S.A.C. Capital Advisors, LLC ("SAC Capital"), to trade on the basis of material non-public information. (Superseding Indictment (Dkt. No. 61) ¶¶ 1, 8, 14) The evidence at trial showed that Martoma obtained material, non-public information from two doctors – Sidney Gilman and Joel Ross – about the Phase II clinical trial of bapineuzumab, a drug it was thought might be useful in treating Alzheimer's disease. Elan Corporation, plc ("Elan") and Wyeth owned rights to the drug and were responsible for the clinical trial. The charges against Martoma relate to trading in the securities of these companies.

Martoma has moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 or, alternatively, for a new trial under Federal Rule of Criminal Procedure 33. (Dkt. No. 270) For the reasons stated below, Martoma's motions will be denied.

## I.    THE EVIDENCE AT TRIAL

The evidence at trial overwhelmingly demonstrated Martoma's guilt on all three counts in the Superseding Indictment.

During the summer 2006 to July 29, 2008 time period cited in the Superseding Indictment, Martoma served as a portfolio manager at SAC Capital.  (Trial Transcript ("Tr.") 112-17, 434-35)  Both of Martoma's alleged co-conspirators – Dr. Sidney Gilman and Dr. Joel Ross – testified that during this period they disclosed material, non-public information concerning the Phase II clinical trial of bapineuzumab to Martoma.  Dr. Gilman and Dr. Ross's improper disclosures to Martoma included the clinical trial's final results on efficacy, which were not publicly disclosed until the International Conference on Alzheimer's Disease (the "ICAD conference") on July 29, 2008.  Pursuant to confidentiality agreements, both doctors had been given access to confidential information about the study because of their roles in the clinical trial.  Dr. Gilman was the chair of the study's Safety Monitoring Committee (the "SMC"), while Dr. Ross was one of the study's principal clinical investigators.  (Tr. 568, 1168)

The evidence showed that, over a two-year period, Martoma cultivated relationships with Dr. Gilman and Dr. Ross through expert networking agencies.  (Tr. 557, 588, 1231-32)  Dr. Gilman was paid approximately $1000 an hour to speak with Martoma about treatments for Alzheimer's disease through the Gerson Lehrman Group ("GLG").  (Tr. 1228, 1543)  He had at least 43 consulting sessions with Martoma, most of which took place by telephone.  (GX 601)  The evidence showed that Dr. Gilman regularly shared the confidential safety data disclosed at the SMC meetings with Martoma, generally on the day of the meeting or the following day.  (Trial Tr. 1272-76; GX 209; GX 210; GX 211; GX 212; GX 213; GX 601)  Throughout this period, Martoma and SAC Capital amassed large positions in Elan and Wyeth

securities.[1]  (Tr. 124-25, 130, 472-83, 2267; GX 431; GX 436; GX 565-C; GX 1256; GX 1260)
The Government's theory at trial was that Dr. Gilman's improper disclosure of the safety data
permitted Martoma and SAC Capital to build and maintain these positions, secure in the
knowledge that no serious adverse reaction would derail the study (as had happened with a
precursor drug to bapineuzumab).  (Tr. 2941-43, 2950-60, 3134-35)

> At the conclusion of the 18-month bapineuzumab Phase II clinical trial, Elan
asked Dr. Gilman to present the final results at ICAD, in Chicago, on July 29, 2008.  (Tr. 1396)
Dr. Gilman was not unblinded to this data until July 15 and 16, 2008.  (Tr. 1413)  Analysis of the
final results showed that the drug had not met the study's efficacy endpoints – i.e., the study's
results did not indicate that bapineuzumab was efficacious for the treatment of Alzheimer's
disease.  (Tr. 692, 703, 1420-23)  The data also showed no dose effect (i.e., administering more
of the drug did not yield better results for patients), suggesting a lack of efficacy.  Finally, the
mental condition of the placebo group in the non-gene carrier cohort[2] had – for reasons that are
not clear – deteriorated much more quickly than the placebo group in the carrier cohort,
suggesting some type of flaw in the study or in the data. (Tr. 1420-24)

> Elan provided the data to Dr. Gilman in the form of a draft PowerPoint
presentation for the ICAD conference.  Dr. Gilman testified that on July 17, 2008, he went
through the data in the PowerPoint slides with Martoma by telephone.  (Tr. 1424, 1439)  The
Government introduced telephone records showing that Dr. Gilman and Martoma had a one-hour
and forty-five minute call that evening.  (GX 1211)

---

[1]  Martoma managed his own portfolio at SAC Capital – the "GEHC" portfolio – and purchased
Elan and Wyeth stock for that portfolio.  (Tr. 118-19, 124-25, 130)
[2]  Individuals who carry a particular gene – the ApoE4 gene – have a greater chance of
contracting Alzheimer's disease.  (Tr. 1417)

The evidence further showed that that same day – July 17, 2008 – Martoma bought a round-trip ticket on Delta Air Lines for travel between JFK airport in New York and Detroit, Michigan, on Saturday, July 19, 2008. (Tr. 1950, 1952; GX 1307; GX 1308) The testimony of Dr. Gilman and a Detroit cab driver, University of Michigan access card logs, and cell phone tower records show that on Saturday, July 19, 2008, Martoma flew to Detroit, and took a cab from the Detroit airport to the University of Michigan's campus in Ann Arbor. (Tr. 1453-56, 1968-69; GX 1210; GX 1307; GX 1400; GX 1401; GX 1402) There, he met with Dr. Gilman, at lunchtime, in Dr. Gilman's office. (Trial Tr. 1453-56) During this meeting, Dr. Gilman showed Martoma the PowerPoint slides containing the efficacy results, and discussed the data with him in detail. Given that Martoma had studied potential treatments for Alzhemier's disease for more than two years, and had had countless consultations with medical experts, including Dr. Gilman, Dr. Ross, and others (Tr. 177, 588, 591, 601-16, 613, 626, 1235, 1390, GX 601, DX 791, DX 800), a reasonable jury could have concluded that Martoma had – by that time – a highly sophisticated understanding of the science behind bapineuzumab and was well-equipped to understand the practical significance of the clinical trial results. A reasonable jury could likewise have concluded that Martoma recognized that, in light of the bapineuzumab study's final results, it was highly unlikely that the drug would receive U.S. Food & Drug Administration ("FDA") approval at any point in the foreseeable future.

After his lunchtime meeting with Dr. Gilman, Martoma flew back to JFK airport that same afternoon. (Tr. 1952-53; GX 1307) The next morning, Sunday, July 20, 2008, he sent an email to the principal of SAC Capital, Steven A. Cohen, asking whether the two could speak by telephone that morning. (GX 459) In the subject line of the email Martoma wrote, "It's important." Telephone records introduced at trial show that the two men had a 20-minute

conversation on Sunday, July 20, 2008.  (GX 1215)  The next day, Monday, July 21, 2008, SAC

Capital began selling the approximately $700 million in Elan and Wyeth securities that it was

then holding.[3]  (Tr. 151-52, 520-22, 2266-67, 2272-75, 2279-80, 2282-93, 2490; GX 431; GX

432; GX 436; GX 554-C; GX 1256; GX 1260)  SAC also entered into significant short

transactions involving Elan and Wyeth securities.  (Tr. 2385, 2387)

       The evidence at trial showed that the sale of Elan and Wyeth securities was kept

secret at SAC Capital.  Martoma did not tell the research analyst (Kathryn Lyndon) and

execution trader (Tim Jandovitz) who worked for him that the positions were being sold.  Indeed,

their computer monitors showed that Martoma's portfolio – the "GEHC" portfolio – was still

holding these securities long after they had been sold.  (Tr. 150-54, 2068-69, 2075-77)  Only

Martoma, Cohen, and Cohen's head trader – Phillip Villhauer – knew that these huge positions

were being sold.  (Tr. 2279-80)  Longtime employees of SAC, including Chandler Bockledge –

Cohen's "right-hand man" – testified that SAC had never sold positions in such a secret fashion

before.  (Tr. 2537, 2562-63, 2566)

       On July 28, 2008, during an evening dinner for Dr. Joel Ross and others who had

served as principal investigators for the bapineuzumab Phase II clinical trial, Elan disclosed the

study's efficacy results.  The evidence showed that Martoma had arranged to meet with Dr. Ross

immediately after the presentation, in the lobby of the hotel where the presentation was to take

place.  (Tr. 714; GX 375)  Dr. Ross told Martoma that bapineuzumab had not shown efficacy in

treating Alzheimer's disease, and the two men discussed some of the data that had just been

---

[3] During the week of July 21, 2008, Martoma also liquidated the Elan and Wyeth positions in
the "GEHC" portfolio, the portfolio he managed for SAC Capital.  (Tr. 2384-88; GX 431; GX
436; GX 1266)

disclosed at the principal investigators' dinner. Dr. Ross testified, however, that Martoma appeared to already know all the details of the data; Dr. Ross commented that it was almost as if Martoma had been "in the room" when the data were disclosed. (Tr. 715-17)

The next day – July 29, 2008 – Dr. Gilman presented the bapineuzumab efficacy results to the attendees of the ICAD conference. (Tr. 2381, 2395-96) Elan's stock price began dropping even before Dr. Gilman had completed his fifteen minute presentation. (Tr. 2381, 2396; GX 1263) Ultimately, the stock dropped 42% over that day. (Tr. 2379) Wyeth stock suffered a decline of about 12% that day. (Tr. 2383)

After July 29, 2008, when Martoma's research assistant (Lyndon) and execution trader (Jandovitz) discovered that SAC's holdings in Elan and Wyeth stock had been liquidated – including the shares held in Martoma's "GEHC" portfolio – they asked Martoma what had led him to sell. Martoma said merely that he had reviewed his notes and decided that he was no longer comfortable holding the stock. (Tr. 151-54, 2076-77)

As a result of the trades in Elan and Wyeth securities during the week leading up to the ICAD conference, SAC Capital made profits from the short sales and avoided losses totaling $275 million. (Tr. 2391; GX 1268)

## II.    MOTION FOR A JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29

### A.    Legal Standard

Under Fed. R. Crim. P. 29, a trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

To prove Martoma guilty of the substantive securities fraud counts at trial, the Government was required to demonstrate, by proof beyond a reasonable doubt, that Martoma (1) in connection with the purchase or sale of the security specified in each count, had employed a

device, scheme or artifice to defraud, or engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser or seller of the specified security; (2) acted willfully, knowingly, and with the intent to defraud; and (3) knowingly used, or caused to be used, any means or instrument of transportation or communication in interstate commerce or the mails, or any facility of any national securities exchange, in furtherance of the fraudulent conduct. (Tr. 3181)  To prove Martoma guilty of the charged conspiracy, the Government was required to demonstrate, by proof beyond a reasonable doubt, that (1) between the summer of 2006 and July 29, 2008, an agreement or understanding between two or more people existed to commit securities fraud; (2) Martoma intentionally and knowingly joined and participated in that conspiracy during the applicable time period; and (3) during the life of the conspiracy, one of the conspirators knowingly committed at least one overt act in furtherance of the conspiracy in the Southern District of New York.  (Tr. 3201-02)

       "In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government," and "[a]ll permissible inferences must be drawn in the government's favor." United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).  "[U]pon a motion for judgment of acquittal, 'the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'"  Id. (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984) (internal quotations omitted)).  "The court should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Mariani, 725 F.2d at 865.  This is because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing

court." United States v. McDermott, 245 F.3d 133, 137 (2d Cir. 2001). "The Second Circuit has observed that '[t]hese strict rules are necessary to avoid judicial usurpation of the jury function.'" United States v. DiPietro, No. S502 Cr. 1237 (SWK), 2005 WL 1863817, at *1 (S.D.N.Y. Aug. 5, 2005) (quoting Mariani, 725 F.2d at 865) (alterations in DiPietro). Given this standard, "[a] defendant bears a 'very heavy burden' in challenging a conviction based on insufficient evidence." United States v. Goldstein, No. S2 01 Cr. 880 (WHP), 2003 WL 1961577, at *1 (S.D.N.Y. Apr. 28, 2003) (quoting United States v. Brewer, 36 F.3d 266, 268 (2d Cir. 1994)).

**B.     Insufficiency Arguments as to Substantive Securities Fraud Counts**

Martoma argues that the evidence was insufficient to convict him of the substantive securities fraud counts because the Government did not establish that he received material, non-public information concerning:  (1) a side effect of bapineuzumab known as vasogenic edema; (2) enrollment of participants in the clinical trial; (3) dropout rates for study participants; (4) the lack of a dose response to the drug; (5) the rate of decline in mental condition of a particular subset of study participants (those who were receiving placebo and who were carriers of the ApoE4 gene); and (6) the Phase II results to be presented at the ICAD conference. (Def. Br. (Dkt. No. 271) at 5-14; see also Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 3-10)  Martoma further argues that the Government did not show that he received material, non-public information from Dr. Ross.  (Def. Br. (Dkt. No. 271) at 14-15)

The Government was not required, of course, to show that all of the information Martoma obtained from Dr. Gilman and Dr. Ross was material, non-public information, or that Martoma obtained and traded on material, non-public information from both Dr. Gilman and Dr. Ross.  It is sufficient to support Martoma's securities fraud convictions that the evidence shows beyond a reasonable doubt that he traded on some material, non-public information he obtained

from at least one of the doctors.  (See Tr. 3185-86 ("[I]n order to find that the Government has

established the first element of the crime of insider trading . . . the Government must prove the

following beyond a reasonable doubt . . . that Dr. Gilman or Dr. Ross breached th[eir] duty of

trust and confidence by disclosing material, non-public information about the bapineuzumab

Phase II clinical trial to Martoma") (emphasis added)))

           Here, a reasonable jury could have found – at the very least – that the final

efficacy data Martoma obtained from Dr. Gilman prior to the ICAD conference was material,

non-public information that Martoma considered when deciding to sell the Elan and Wyeth

positions he was responsible for at SAC Capital, and in advising Cohen to do the same.

Martoma's argument that Elan's June 17, 2008 press release about the bapineuzumab study is

not materially different from the data disclosed at the ICAD conference (see Def. Br. (Dkt. No.

271) at 13-14) was not persuasive to the jury and is not persuasive to this Court.  Even assuming

that Dr. Thomas Wisniewski – an expert in Alzheimer's disease who testified for the defense at

trial – had the knowledge necessary to "read between the lines" of the June 2008 Elan press

release, there is overwhelming evidence that the investor community – from the June press

release – had a more positive impression of the results of the bapineuzumab clinical study than

appeared warranted after the data was disclosed at the late July ICAD conference.  The investor

community reacted with extreme disappointment to the data disclosed at the ICAD conference,

and that reaction was as swift as it was pronounced:  Elan's stock price fell 42% in one day.  The

reaction of the investor community is reflected in a contemporaneous report prepared by a stock

analyst who had followed the bapineuzumab clinical trial and who was a defense witness at trial:

"[the] [d]ata is a disaster."  (GX 1353)

Whatever reaction medical experts may have had to the efficacy data disclosed at the ICAD conference, the reaction of the investor community was that bapineuzumab was not headed for FDA approval anytime soon, if ever.  The evidence the Government offered at trial on this point is sufficient to support a conclusion that a "reasonable investor" would have found the efficacy data disclosed at the ICAD conference "material" – i.e., "significant in deciding whether to buy, sell, or hold securities, and at what price to buy or sell securities."  (Tr. 3189)

Emphasizing that the Government did not introduce at trial any email from Dr. Gilman to Martoma containing the ICAD presentation slides, Martoma argues that the Government offered only speculation as to whether he received the final efficacy data from Dr. Gilman prior to the ICAD conference.  (Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 8-10)  This argument provides no basis to disturb the jury's verdict, however.  Whether or not Dr. Gilman emailed the draft ICAD PowerPoint presentation slides to Martoma, there was abundant evidence that Martoma received the final efficacy data from Dr. Gilman.  This evidence included Dr. Gilman's testimony that he discussed the data with Martoma by telephone on July 17, 2008, and discussed the results with him again in a July 19, 2008 meeting that took place in Dr. Gilman's University office in Ann Arbor, Michigan.  Dr. Gilman's testimony on this point was corroborated by a wealth of independent evidence including (1) telephone records showing a one-hour and forty-five minute telephone call between Dr. Gilman and Martoma on July 17, 2008; (2) testimony and airline records showing that on July 17, 2008 – the same day Martoma spoke with Dr. Gilman – Martoma purchased a round-trip ticket from JFK airport to Detroit for travel on July 19; (3) cell phone tower records showing that Martoma traveled from New York to Michigan and back on July 19; (4) records concerning a Detroit cab driver's cellphone, which reflected calls to Dr. Gilman's office number and cell phone number on July 19; (5) access card

records at the University of Michigan; (6) email and telephone records reflecting a conversation between Martoma and Cohen about something that Martoma described as "important" on the morning of July 20; and (7) Martoma and SAC Capital's secret sale of Elan and Wyeth securities, which began on the morning of July 21.  No plausible innocent explanation for this sequence of events was offered at trial.[4]  In sum, the jury heard ample evidence from which it could have reasonably concluded that Martoma obtained – a week before the ICAD conference – the final results of the bapineuzumab Phase II study.

Martoma also argues that the Government did not show that he used material, non-public information in connection with a sale or purchase of securities.  (Def. Br. (Dkt. No. 271) at 15-19)  As set forth in the jury charge, to satisfy this element the Government was required to show, by proof beyond a reasonable doubt, that the "information [at issue was] a factor, however small, in his decision to purchase or sell the stock, or cause the purchase or sale of stock."  (Tr. 3192)  Martoma now repeats his jury argument that, for a variety of reasons – including the general state of the stock market and the economy in July 2008; the appreciation of Elan stock between 2006 and 2008; and analyst recommendations in June and July 2008 – "every input and factor made [the sale of Elan and Wyeth securities] the only reasonable decision."  (Def. Br. (Dkt. No. 271) at 15-16 (emphasis in original); see also Tr. 3002, 3024, 3072, 3098-107)  It is a question of fact – and therefore a jury question – what motivated Martoma's actions, however.  Moreover, the Government was not required to prove at trial that the material, non-public information Martoma had obtained was the only factor that affected his

---

[4]  The only contrary evidence as to the purpose of Martoma's trip to Ann Arbor came in through Dr. Gilman, who testified that Martoma had told him that he was in the area in order to pay respects to an uncle who had died several months earlier.  (Tr. 1440)  The jury heard no evidence corroborating that claim.

decision – just that it was "a factor, however small." (Tr. 3192)  Finally, to prevail against a

Rule 29 motion, "the government need not negate every theory of innocence."  United States v.

Autuori, 212 F.3d 105, 114 (2d Cir. 2000).

   In any event, Martoma offered no persuasive argument at trial, and offers no

persuasive argument now, against the overwhelming circumstantial evidence demonstrating that

it was the information that Dr. Gilman provided to Martoma that led to the decision to sell and

short the Elan and Wyeth securities.  The sequence of events described above – Dr. Gilman's

telephone disclosure to Martoma on July 17; Martoma's purchase of a plane ticket to Detroit on

July 17; the one-day roundtrip to Detroit on July 19 to meet with Dr. Gilman at his University

office; the email to Cohen the next day requesting a telephone conference to discuss something

"important"; the call with Cohen later that day; and the secret sale of Elan and Wyeth securities

beginning on Monday, July 21, the next business day – points to only one reasonable conclusion:

that the material, non-public information Martoma had just received from Dr. Gilman – the final

efficacy results of the bapineuzumab Phase II clinical trial – contributed to his decision to sell his

positions in Elan and Wyeth, and to advise Cohen to do the same in the firm's accounts.

   Martoma's argument that he did not "use" the inside information – because it was

ultimately Cohen's decision to liquidate the Elan and Wyeth positions in SAC Capital's firm

accounts (see Def. Reply Br. (Dkt. No. 283) at 9) – is unpersuasive for the same reason.  The

sequence of events described above – including the proximity between the Martoma/Cohen

telephone call on July 20, 2008, and the sale of the Elan and Wyeth positions in Martoma's

portfolio and the firm's accounts on July 21, 2008, the next business day – support the

conclusion that Martoma "cause[d] the purchase or sale of stock" based on the material, non-

public information he had recently obtained from Dr. Gilman.

In his reply brief, Martoma argues – for the first time – that the Government has not demonstrated that his charged conduct was "in connection with" the purchase or sale of Elan or Wyeth securities, because there are "no victims" of his crime. (Id. at 10)  This argument ignores the purpose of this Nation's insider trading laws.

As the Supreme Court explained in Chadbourne & Parke LLP v. Troice, 134 S. Ct. 1058, 1067 (2014) – the case that Martoma misconstrues in making this argument – "victims [in securities fraud cases include] 'members of the investing public' harmed by the defendant's 'gain[ing of an] advantageous market position' through insider trading." Id. (quoting United States v. O'Hagan, 521 U.S. 642, 656 (1997)).  "The basic purpose of the 1934 and 1933 regulatory statutes is 'to insure honest securities markets and thereby promote investor confidence.'" Id. at 1067 (quoting O'Hagan, 521 U.S. at 658).  While Martoma and SAC Capital were able to make profits and avoid losses totaling $275 million because of the inside information Martoma had wrongfully obtained, countless other investors who were not privy to this information were forced to bear the full brunt of the steep declines in Elan and Wyeth stock prices, once the final efficacy data from the bapineuzumab clinical study was made publicly available.  The assertion that there are no victims of Martoma's crimes is as astounding as it is meritless.

Also meritless is Martoma's argument that (1) Dr. Gilman and Dr. Ross did not receive any personal benefit as a result of breaching the duties of confidentiality they owed to Elan and Wyeth; and (2) that he was not aware of any personal benefit Dr. Gilman and Dr. Ross received as a result of breaching their duties of confidentiality.[5]  (Def. Br. (Dkt. No. 271) at 20-

---

[5]  The jury was charged that – in order to find Martoma guilty – it had to conclude, inter alia, "that Dr. Gilman or Dr. Ross personally benefited in some way, directly or indirectly, from the disclosure of the allegedly inside information to Mr. Martoma," and "that Mr. Martoma knew that

23; Def. Aug. 14, 2014 Ltr. (Dkt. No. 299) at 11-15)  The evidence at trial demonstrated that

both doctors received substantial consulting fees every time they spoke or met with Martoma.

(Tr. 613, 1543)  Even assuming that SAC Capital paid a flat fee to GLG for consulting services

(see Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 12), it is undisputed that both doctors received

consulting fees on a session-by-session basis.  The more consulting sessions Martoma arranged

with the doctors, the more consulting fees they received.

Martoma was also aware that the doctors were paid for each consulting session

with him, in part because he was required to obtain prior approval from GLG for each consulting

session with Dr. Gilman or Dr. Ross, which was a prerequisite for the doctors to be paid for

those sessions.  (Tr. 1031, 1540, 1545; GX 200; GX 202; GX 234; GX 852)  GLG also asked

Martoma to confirm the amount of time that Gilman represented he had spent on consultations

with Martoma.  (See, e.g., DX 729)  Martoma was also aware of SAC's agreement with GLG

and related pricing, because the cost of consulting services provided by GLG experts was

charged to the portfolio that Martoma managed.  (Tr. 2106)  In short, Martoma was aware that,

in providing consulting services to him on 43 occasions, Dr. Gilman was not acting out of the

goodness of his heart.

In addition to the financial benefits Dr. Gilman and Dr. Ross realized as a result

of their breach of the duties they owed Elan and Wyeth, both men testified to non-pecuniary

benefits they received as a result of their misconduct.  Dr. Gilman testified that – as a result of

his numerous sessions with Martoma – the two men had developed a real friendship.  (Tr. 1237-

---

the information he obtained had been disclosed in breach of a duty owed by Dr. Gilman or Dr.
Ross to Elan or Wyeth and in exchange for a personal benefit to Dr. Gilman or Dr. Ross."  (Tr.
3186)

40, 1488; GX 235)  Dr. Ross testified that he had obtained pharmaceutical industry business contacts from Martoma that he hoped would be useful in helping him attract Phase I clinical study work to a new clinical research center with which Ross had become affiliated.  (Tr. 555-56, 626-27, 630, 684; GX 375)

From this evidence, a reasonable jury could have concluded that Dr. Gilman and Dr. Ross received both pecuniary and non-pecuniary benefits as a result of breaching the duties of confidentiality they owed to Elan and Wyeth, and that Martoma was aware of the personal benefits the doctors received in exchange for breaching the duties of confidentiality they owed to Elan and Wyeth.

Finally – with respect to the substantive securities fraud counts – Martoma argues that the Government did not introduce sufficient evidence to demonstrate that he had the requisite criminal intent.  More specifically, Martoma argues that the Government did not prove that he knew that (1) Dr. Gilman and Dr. Ross had breached duties they owed to Elan and Wyeth in disclosing information to him about the Phase II bapineuzumab trial; or (2) he was receiving material, non-public information from the two doctors in violation of the duties they owed to Elan and Wyeth.  (Def. Br. (Dkt. No. 271) at 21-23)  The evidence at trial showed, however, that Martoma frequently communicated with doctors regarding clinical trials and knew – both from his training at SAC Capital and his agreements with GLG – that Dr. Gilman and Dr. Ross were not permitted to disclose confidential, non-public information about the Phase II bapineuzumab trial, including the not yet publicly released final results of the trial.  (Tr. 127-29, 1071-81; GX 585; GX 587; GX 588; GX 589; GX 590; DX 729; DX 800)  In sum, the evidence was sufficient to demonstrate that Martoma knew that he had received material, non-public information from the two doctors in violation of the duties they owed to Elan and Wyeth.

### C.   Defendant's Insufficiency Arguments as to the Conspiracy Count

As to the conspiracy charge, Martoma argues that the Government did not introduce sufficient evidence to prove that (1) he possessed the requisite criminal intent to commit this crime, or (2) there was an agreement between Martoma and Dr. Gilman or Dr. Ross to commit securities fraud.  (Def. Br. (Dkt. No. 271) at 23-25)  Martoma's argument regarding criminal intent is addressed above, and fails for the same reasons here.

With respect to the existence of an agreement between Martoma and Dr. Gilman or Dr. Ross to commit insider trading, Martoma argues that no reasonable jury could have found such an agreement, because neither doctor ever discussed the sale of Elan or Wyeth stock with him.  As stated in the jury charge, however,

> [i]t is enough if two or more people, in some way or manner, impliedly or tacitly, come to an understanding to violate the law.  Express language or specific words are not required to indicate assent or agreement to the conspiracy. . . . What the Government must prove is that there was a mutual understanding, either spoken or unspoken, between two or more people to cooperate with each other to violate the law and to accomplish an unlawful act.

(Tr. 3203)  Accordingly, it was not necessary for the Government to prove that Martoma and the doctors had expressly entered into an agreement to trade Elan and Wyeth securities based on inside information.  The evidence showed that the doctors knew that (1) Martoma traded securities for a living; (2) the reason he was speaking with them was to obtain information that would be useful in making investment decisions; and (3) they were providing him with material, non-public information about the Phase II bapineuzumab clinical trial in breach of the duties they owed to Elan and Wyeth.  A reasonable jury could conclude from this evidence that Martoma

and Dr. Gilman or Dr. Ross had entered into an agreement to commit securities fraud through insider trading.[6]

*      *      *      *

Because the Government offered sufficient evidence as to each element of the charges against Martoma, his motion for a judgment of acquittal under Fed. R. Crim. P. 29 will be denied.

## III.   MOTION FOR A NEW TRIAL UNDER FED. R. CRIM. P. 33

Martoma argues, in the alternative, that this Court should order a new trial under Fed. R. Crim. P. 33 because (1) the jury was "tainted" by evidence unrelated to the charged offenses – namely, Dr. Ross's testimony and evidence that Dr. Gilman provided Martoma with confidential information disclosed at SMC meetings; (2) the Government's case depended on Dr. Gilman's testimony, which was unreliable and inconsistent; (3) the jury was "presumptively biased" by the unsealing of motions in limine relating to Martoma's expulsion from Harvard Law School; and (4) Martoma was prejudiced by certain press releases issued by the U.S. Attorney's Office and the FBI at the time of his arrest. (Def. Br. (Dkt. No. 271) at 25-37)

Under Fed. R. Crim. P. 33, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33.

> The rule by its terms gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." . . . Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." An example of exceptional circumstances is

---

[6] Contrary to Martoma's argument, Dr. Gilman's statement – in a September 28, 2008 email – that he hoped that Martoma "ha[d] not been too terribly set back by the great turmoil in the markets plus the disappointing drop in Elan stock" (Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 15-16), sheds no light on whether the two had agreed to violate the securities laws between 2006 and July 29, 2008, as charged in the superseding indictment.

where testimony is "patently incredible or defies physical realities," although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.

The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict.  The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation.  "There must be a real concern that an innocent person may have been convicted."  Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority "sparingly" and in "the most extraordinary circumstances."

United States v. Ferguson, 246 F.3d 129, 133-34 (2d Cir. 2001) (quoting United States v.

Sanchez, 969 F.2d 1409, 1413-14 (2d Cir. 1992)) (internal citations omitted).

A.     **Evidence Allegedly "Unrelated" to Charged Conduct**

Martoma argues that he is entitled to a new trial because the Government

introduced certain evidence "unrelated to the charged offenses," which "tainted the jury." (Def.

Br. (Dkt. No. 271) at 26-30; see also Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 26-28)  Martoma

cites Dr. Ross's testimony, and Dr. Gilman's testimony about his disclosures to Martoma after

SMC meetings, as evidence "unrelated to the charged offenses." (Id.)  The crux of Martoma's

argument is that the Government ultimately did not rely on this evidence to prove its case, and

that introduction of this proof confused the jury and prejudiced Martoma.  This argument is not

persuasive.

As to Dr. Gilman's disclosures to Martoma regarding the SMC meetings, this

proof was not "unrelated" to the charged conduct.  It is well-established in this Circuit that

evidence of uncharged acts "may be admitted to inform the jury of the background of the

conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury

how the illegal relationship between participants in the crime developed." United States v. Pitre,

960 F.2d 1112, 1119 (2d Cir. 1992); see also United States v. Pipola, 83 F.3d 556, 566 (2d Cir.

18

1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case."); United States v. Rosa, 11 F.3d 315, 334 (2d Cir. 1993) ("[I]t is within the court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.").

Here, the SMC evidence demonstrated an ongoing conspiratorial relationship between Martoma and Dr. Gilman, in which Dr. Gilman disclosed confidential information concerning the Phase II bapineuzumab clinical trial to Martoma with knowledge that Martoma would use this information in making investment decisions. The evidence showed that over the course of two years Dr. Gilman repeatedly and consistently shared information with Martoma about the Phase II trial following SMC meetings. (Tr. 1275-76; GX 209; GX 210; GX 211; GX 212; GX 213) Indeed, Dr. Gilman even rescheduled consultations with Martoma on multiple occasions so that they would take place after rescheduled SMC meetings. (GX 209, 212, 213) It was through this relationship that Dr. Gilman and Martoma formed their conspiracy to trade on inside information, and it was this relationship that ultimately made it possible for Martoma to learn the final efficacy results of the Phase II trial – and to trade on this information – before the results were publicly announced. In sum, the Government's introduction of the SMC evidence was proper because it constituted background to the charged conspiracy and showed the development of the illegal relationship between Dr. Gilman and Martoma.

Moreover, and contrary to Martoma's arguments (see Aug. 14, 2014 Ltr. (Dkt. No. 299) at 27), in presenting this evidence the Government did not confuse the jury by conflating "confidential" information with "material, non-public information." The Government

made clear to the jury that it did not contend that the SMC information was the basis for

Martoma's trading in July 2008.  (See Tr. 3134-35)  The Court also instructed the jury that

> confidential information is not necessarily the same as material, non-public
> information.  Information may be confidential that is neither material nor non-public.
> Evidence that Dr. Gilman and Dr. Ross violated confidentiality agreements does not
> alone establish that they disclosed material, non-public information.  The
> Government must prove beyond a reasonable doubt that Dr. Gilman and Dr. Ross
> disclosed material, non-public information – not simply confidential information.

(Tr. 3190-91)  Under these circumstances, there is no basis to conclude that the jury believed that

merely confidential information could support a conviction.

As to Dr. Ross's testimony, the Government told the jury in its opening that the

information Dr. Ross provided to Martoma "was confidential . . . [and] was useful to Mathew

Martoma, but it certainly wasn't the end-all and be-all."  (Tr. 40)  Dr. Ross's testimony was far

from irrelevant, however.  At the very least, Martoma's contemporaneous efforts to obtain

confidential information from Dr. Ross about the same Phase II bapinuezumab study shed light

on Martoma's intent in his dealings with Dr. Gilman.

To the extent that Martoma argues that the Government improperly focused on

Cohen and SAC Capital's trading in Elan and Wyeth securities at trial (see Aug. 14, 2014 Def.

Ltr. (Dkt. No. 299) at 27-28), this argument is likewise without merit.  As discussed above, the

evidence at trial was sufficient for a reasonable jury to find that Martoma had relayed material,

non-public information about the final efficacy results of the Phase II trial to Cohen, and that

Cohen and Martoma then orchestrated secret trades in those securities on the basis of that

information during the week leading up to the ICAD conference.  Cohen and SAC Capital also

compensated Martoma on the basis of these trades.  Under these circumstances, the evidence

concerning Cohen and SAC Capital's trades in Elan and Wyeth stock was properly admitted to

demonstrate Martoma's motivation for engaging in insider trading, his fraudulent scheme, and his criminal intent.

### B.   Dr. Gilman's Testimony

Martoma next argues that he is entitled to a new trial because Dr. Gilman's testimony should be rejected in its entirety.  (Def. Br. (Dkt. No. 271) at 30-36)  Martoma contends that Dr. Gilman's testimony should be ignored because (1) it contained certain inaccuracies and inconsistencies; (2) Dr. Gilman testified under a non-prosecution agreement; (3) Dr. Gilman reviewed documents before his testimony; and (4) Dr. Gilman's demeanor on cross-examination was different than his demeanor on direct examination.  (Id.; see also Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 2-3, 17-20)

"In deciding [a Rule 33] motion, the Court may weigh the evidence and the credibility of witnesses, but cannot 'wholly usurp' the role of the jury."  United States v. Lloyd, 947 F. Supp. 2d 259, 265 (E.D.N.Y. 2013) (quoting Autuori, 212 F.3d at 120).  "'It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment,'" Autuori, 212 F.3d at 120 (quoting Sanchez, 969 F.2d at 1414), such as "[w]here testimony is patently incredible or defies physical realities." Sanchez, 969 F.2d at 1414.  Even if a "trial judge[ ] reject[s ] all or part of the testimony of a witness or witnesses[, that] does not automatically entitle a defendant to a new trial." Id.  Instead, "[t]he test is whether 'it would be a manifest injustice to let the guilty verdict stand.'"  Id. (quoting United States v. Reed, 875 F.2d 107, 114 (7th Cir. 1989)).

Here, all of the issues raised by Martoma relate to Dr. Gilman's credibility as a witness, and defense counsel explored all of these matters at length on cross-examination.  For example, the jury was well-aware that Dr. Gilman was testifying under a non-prosecution

agreement; that fact was raised in opening statements and addressed repeatedly throughout the trial. Defense counsel cross-examined Dr. Gilman extensively about his cooperation with the Government, including the circumstances under which he obtained a non-prosecution agreement. Moreover, the jury was instructed that because Dr. Gilman was a cooperating witness, his testimony "must be scrutinized with special care and caution." (See Tr. 3167-68)

As is often the case with witnesses testifying about events that took place five or more years before trial, Dr. Gilman sometimes had a failure of recollection, and at times his testimony was confused and inconsistent with earlier statements. His testimony on the key points – his involvement in the Phase II bapineuzumab study, the complex science associated with bapineuzumab, the significance of the study data, his relationship with Martoma, and the confidential information he provided to Martoma – was clear, however.[7] Moreover, as discussed

---

[7] As evidence of the alleged unreliability of Dr. Gilman's testimony, Martoma repeatedly cites the following colloquy during Dr. Gilman's re-direct examination:

Q. Dr. Gilman, sitting here today, are you at all confused about whether you provided Martoma with information about the ICAD presentation in advance?

A. No, sir. I'm not confused.

Q. Did you decide to end your career for something you had never done?

A. No, I didn't say that I would end my career that way. It was an unfortunate result of internal conflicts within my unconscious brain that did it.

(Tr. 1943; see Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 3, 19) Because neither side explored what Dr. Gilman meant in referring to "internal conflicts within [his] unconscious brain," it is not clear what Dr. Gilman intended to communicate in making this remark about the end of his long and distinguished career at the University of Michigan. In any event, this isolated statement is not sufficient to cast doubt on hours of testimony in which Dr. Gilman explained the nature of the information he disclosed to Martoma and the circumstances under which that disclosure was made.

above, Dr. Gilman's account was supported by strong circumstantial evidence.[8]

Martoma's other complaints about Dr. Gilman's testimony are likewise unpersuasive. It is not unusual for a witness to review documents prior to testifying, particularly where – as here – the events at issue occurred five or more years before trial. It is also not uncommon for a witness's demeanor to change somewhat during cross-examination, particularly where – as here – the cross-examination is hostile and adversarial.

In sum, Dr. Gilman's testimony was not "patently incredible," nor did it "def[y] physical realities." Sanchez, 969 F.2d 1414. To the contrary, Dr. Gilman's account was – as to the key issues – supported by strong circumstantial evidence. There is no basis for rejecting Dr. Gilman's testimony, nor does it provide any basis for granting Martoma's motion for a new trial.

### C.   Unsealing of Motions Referencing Martoma's Expulsion from Harvard Law School and Government Press Releases

Martoma argues that the jury was "presumptively biased" by the unsealing of motions in limine that had been filed by the Government and Martoma regarding his expulsion from Harvard Law School. (Def. Br. (Dkt. No. 271) at 36-37) Martoma further contends that he was prejudiced by pre-trial publicity. (Id.; Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 20-25)

Prior to trial, the Government moved in limine to introduce evidence concerning Martoma's expulsion from Harvard Law School. The Government represented that this evidence indicated that Martoma

---

[8]  For example, although Dr. Gilman testified that he did not recall the critical July 19, 2008 meeting with Martoma in Ann Arbor, Michigan, until very late in his cooperation with the Government, the fact that that meeting took place was confirmed by a great deal of circumstantial evidence, including, inter alia, the same-day roundtrip plane tickets Martoma booked after his telephone call with Dr. Gilman about the final efficacy results; telephone records; University of Michigan access card records; the cell phone records of the cab driver who drove Martoma to the meeting with Dr. Gilman; and cell phone tower records.

(1) used computer software to generate a forged law school transcript, and then submitted the falsified transcript to Federal judges in connection with his application for a clerkship;

(2) was then interviewed by several judges, on the basis of the falsified law school transcript;

(3) during disciplinary proceedings at Harvard Law School, altered the date of an e-mail he submitted as mitigating evidence; and

(4) during the disciplinary proceedings, submitted a computer forensic report concerning the date on which the email had been sent, without disclosing to the disciplinary committee that he had formed the company that had prepared the forensic report.

(Govt. Motion in Limine (Dkt. No. 200) at 1, 3-5)  The Government argued that Martoma's sophisticated computer skills might become relevant at trial, given the absence – on Martoma's laptop – of any email from Dr. Gilman attaching the draft PowerPoint presentation for the ICAD conference.  (Id. at 1-2)  In his own motion in limine (Dkt. Nos. 197, 198), Martoma moved to preclude any mention of his expulsion from law school.  Martoma also argued that the motions in limine and supporting documents should be sealed, because the law school expulsion was a "source of great embarrassment to Martoma" and "would risk tainting prospective jurors and biasing them against [him]."  (Dec. 6, 2013 Def. Ltr. (Dkt. No. 195) at 1)

On December 28, 2013, this Court denied Martoma's request to seal the motions in limine and the supporting documents, finding that he had not overcome the strong presumption of public access that applied to these materials.  (Dkt. No. 196)  The Court stayed its order, however, to permit Martoma to seek appellate review.  (Id.)

Martoma filed an appeal, and on January 8, 2014, the Second Circuit dismissed Martoma's appeal for want of jurisdiction, finding that the exercise of appellate jurisdiction under the collateral order doctrine would not be appropriate.  United States v. Martoma, No. 13-4807, 2014 WL 68119, at *1-2 (2d Cir. Jan. 8, 2014) (summary order).  The Second Circuit also

24

ruled that, to the extent the appeal could be treated as a petition for a writ of <u>mandamus</u>, the court saw "no adequate basis in fact or in law for concluding that the district court exceeded the bounds of its power or clearly abused its discretion in denying Martoma's motion to seal." <u>Id.</u> at *2. Accordingly, to the extent that the appeal could be construed as a petition for a writ of <u>mandamus</u>, the petition was denied. (<u>Id.</u>)

That same day, Martoma asked this Court to again stay its decision while he sought <u>en banc</u> review. This Court denied that request, finding that it was highly unlikely that a petition for <u>en banc</u> rehearing would be granted. (Dkt. No. 191) Martoma did not seek further appellate review, and accordingly the motions <u>in limine</u> were unsealed on January 9, 2014. (Dkt. No. 192)

Jury selection began on January 7, 2014. At the outset of the jury selection process, repeatedly throughout that process, and repeatedly once a jury was selected, this Court instructed the jurors not to read, look at, or listen to anything about the case outside of the courtroom. (<u>Voir Dire</u> Tr. 6-7, 338-39, 371; Trial Tr. 20, 222, 337, 550, 656, 764, 862, 974-75, 1084, 1202, 1286-87, 1443, 1618, 1705, 1795, 1908, 1982, 2128, 2224, 2345, 2451, 2572, 2668, 2759, 2858) On January 10, 2014, the morning after the motions <u>in limine</u> were unsealed, the Court polled the jury – which by that time had been empanelled – to determine whether any juror had read, seen, or heard anything about the case before arriving at court. (Tr. 22) The jurors responded that they had not.

At trial, no evidence concerning Martoma's expulsion from Harvard Law School was introduced.

Martoma now contends that he is entitled to a new trial based on the unsealing of the motions <u>in limine</u>, arguing that the jury was "presumptively biased" against him. Martoma

offers no factual or legal support for this argument, however.  There is no evidence that any juror was ever exposed to these materials.  Moreover, the two cases Martoma cites in support of this argument – Estes v. State of Texas, 381 U.S. 532 (1965) and Bruton v. United States, 391 U.S. 123 (1968) – are not on point.  Estes concerns the use of cameras in the courtroom.  In that case,

> [i]nitial [pretrial] hearings were carried live by both radio and television, and news photography was permitted throughout. . . . [A]t least 12 cameramen were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings.  Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table.

Estes, 381 U.S. at 536.  When a "jury was empaneled at the trial[,] four of the jurors selected had seen and heard all or part of the broadcasts of the earlier proceedings."  Id. at 538.  No such circumstances are present here.  Bruton, or course, concerns the question of whether the conviction of a defendant at a joint trial should be set aside where the jury heard a co-defendant's confession that inculpated the first defendant.  Bruton, 391 U.S. at 123-24.  Neither Estes nor Bruton suggests that this Court should assume that the jurors in this case disregarded the Court's instructions, misrepresented what they had seen, heard, or read, or were somehow biased against Martoma based on materials that they were never exposed to.

Martoma also argues that he was unfairly prejudiced by press releases issued by the U.S. Attorney's Office and the FBI on November 20, 2012, after his arrest.  (Aug. 14, 2014 Def. Ltr. (Dkt. No. 299) at 20-25)  Martoma asserts that these press releases disclosed that he had been terminated by SAC Capital, and contained factual inaccuracies and "statements that were beyond inflammatory."  (Id. at 23-24)  Martoma further claims that potential defense witnesses were thereby intimidated from testifying, and that the fairness of potential jurors was compromised.  (Id. at 24-25)  Martoma provides no factual support for any of these arguments, however.  He does not cite a single witness who refused to testify or to cooperate with the

defense, asserting only in general terms that "the Government's intimidation of potential defense witnesses rendered testimony from other investors and members of the financial industry largely unavailable." (Id. at 25)  Martoma likewise does not explain how statements made in two press releases issued fourteen months before trial unfairly prejudiced him.  Venire members were asked – in both a written questionnaire and in oral voir dire – whether they had read, seen, or heard anything about Martoma, Steven A. Cohen, or SAC Capital.  (Voir Dire Tr. 5, 99)  The vast majority of venire members responded in the negative.  Those panel members who indicated any familiarity with Martoma, Cohen, SAC Capital, or the subject matter of the charges were carefully questioned and, where appropriate, excused.

Neither the unsealing of the motions in limine concerning Martoma's expulsion from Harvard Law School nor the press releases issued by the U.S. Attorney's Office and the FBI provide any basis for granting Martoma a new trial.

## CONCLUSION

For the reasons stated above, Martoma's motion for a judgment of acquittal or, alternatively, for a new trial, is denied.  Sentencing will proceed as scheduled on September 8, 2014, at 3:00 p.m.

Dated: New York, New York
       September 4, 2014

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge