USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/ 8 / 2.01'4_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MATHEW MARTOMA,

Defendant.

**MEMORANDUM
OPINION & ORDER**

12 Cr. 973 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On February 6, 2014 – after a month-long trial – a jury convicted Defendant Mathew Martoma of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and of two substantive counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5 and 240.10b5-2, and 18 U.S.C. § 2. The Superseding Indictment charges that between summer 2006 and July 29, 2008, Martoma caused his employer, the hedge fund S.A.C. Capital Advisors, LLC ("SAC Capital"), to trade on the basis of material non-public information. (Superseding Indictment (Dkt. No. 61) ¶¶ 1, 8, 14) The evidence at trial showed that Martoma obtained material, non-public information from two doctors – Sidney Gilman and Joel Ross – about the Phase II clinical trial of bapineuzumab, a drug it was thought might be useful in treating Alzheimer's disease. Elan Corporation, plc ("Elan") and Wyeth owned rights to the drug and were responsible for the clinical trial. The charges against Martoma relate to trading in the securities of these companies.

Sentencing is scheduled for September 8, 2014. This opinion addresses Martoma's objections to the calculation of gain under U.S.S.G. §§ 2B1.4 and 2B1.1(b) as set forth in the U.S. Probation Office's June 3, 2014 Pre-Sentence Report ("PSR").

## BACKGROUND

Between 2006 and 2009, Martoma was employed as a portfolio manager at SAC

Capital in Stamford, Connecticut.  (Trial Transcript ("Tr.") 112-13, 117, 2106)  Martoma

analyzed and researched companies in the healthcare industry, with a focus on pharmaceutical

firms.  (Tr. 113-14, 2035-36)

As a portfolio manager at SAC Capital in 2008, Martoma was responsible for

investing approximately $500 million.  (Tr. 114-15, 427)  The account that Martoma managed

was known as the "GEHC" portfolio.  (Tr. 118-19, 138, 436)  In addition to directing trades in

the GEHC portfolio, Martoma made investment recommendations to Steven A. Cohen, the

founder and head of SAC Capital, for trading in Cohen's own portfolio – the "COHE" portfolio.

(Tr. 116, 133-36, 171, 427-29, 434-38, 471, 2053, 2555-57)  Cohen managed and traded one of

the largest portfolios at SAC Capital.  (Tr. 116, 428)

The evidence at trial showed that – during his tenure at SAC Capital – Martoma

spent approximately two years cultivating relationships with two experts and practitioners in the

field of Alzheimer's disease:  Dr. Sidney Gilman and Dr. Joel Ross.  (Tr. 588, 591, 613, 622-23,

626, 633-34, 1241-43, 1390)  Pursuant to confidentiality agreements with Elan, both doctors had

been given access to confidential information about the Phase II clinical trial of bapineuzumab.

(Tr. 285-90, 293, 298-99, 631-32, 1189-90, 1274-76, 1380-81, 1390; GX 6; GX 20)  Dr. Gilman

served as the chair of the study's Safety Monitoring Committee ("SMC"), and Dr. Ross was one

of the study's principal clinical investigators.  (Tr. 566, 1175)

Through expert networking agencies, Martoma arranged numerous consultations

with both doctors.  (Tr. 557, 1240)  Dr. Gilman alone had 43 sessions with Martoma, generally

by telephone.  (Tr. 1231-32; GX 601)  The evidence showed that Dr. Gilman shared with

2

Martoma confidential safety data concerning the bapineuzumab clinical trial.  This data was disclosed to Dr. Gilman during SMC meetings, and Dr. Gilman generally shared this information with Martoma the day of the meeting or the next day.  (Tr. 1272-76; GX 209; GX 210; GX 211; GX 212; GX 213; GX 601)

During the period that Martoma was obtaining confidential information from Dr. Gilman and Dr. Ross, SAC Capital amassed enormous positions in Elan and Wyeth securities. (Tr. 124-25, 130, 472-83, 2267; GX 431; GX 436; GX 565-C; GX 1256; GX 1260)  Indeed, in the first half of 2008, the largest position in Martoma's GEHC portfolio was in these securities. (Tr. 130, 2077)  Other portfolios at SAC Capital – including Cohen's COHE account – took large positions in Elan and Wyeth securities based on Martoma's recommendation.  (Tr. 133-36, 467-76, 485-87, 2555-57; GX 305; GX 554-A; GX 554-B; GX 554-C; GX 555; GX 556; GX 565-C)  The Government's theory at trial was that the doctors' improper disclosures permitted Martoma and SAC Capital to build and maintain these positions, secure in the knowledge that no serious adverse reactions would bring the study to a premature end.  (Tr. 2941-43, 2950-60, 3134-35)

In mid-2008, Elan asked Dr. Gilman to present the final results of the 18-month Phase II bapineuzumab trial at the International Conference on Alzheimer's Disease (the "ICAD conference"), in Chicago, on July 29, 2008.  (Trial Tr. 1396)  Dr. Gilman was unblinded to these data on July 15 and 16, 2008.  (Tr. 1413)  Analysis of the final results showed that the drug had not met the study's efficacy endpoints – i.e., the study's results did not indicate that bapineuzumab was efficacious for the treatment of Alzheimer's disease.  (Tr. 692, 703, 1420-23) The data also showed no dose effect (i.e., administering more of the drug did not yield better results for patients), further suggesting a lack of efficacy.  Finally, the mental condition of the

3

placebo group in the non-gene carrier cohort[1] had – for reasons that are not clear – deteriorated much more quickly than the placebo group in the carrier cohort, suggesting a flaw in the study or in the data. (Tr. 1420-24)

Elan provided the data to Dr. Gilman in the form of a draft PowerPoint presentation for the ICAD conference.  Dr. Gilman testified that on July 17, 2008, he went through the data in the PowerPoint slides with Martoma by telephone.  (Tr. 1424, 1439)  The Government introduced telephone records showing that Dr. Gilman and Martoma had a one-hour and forty-five minute call that evening.  (GX 1211)

The evidence further showed that that same day – July 17, 2008 – Martoma bought a round-trip ticket on Delta Air Lines for travel between JFK airport in New York and Detroit, Michigan, on Saturday, July 19, 2008.  (Tr. 1950, 1952; GX 1307; GX 1308)  The testimony of Dr. Gilman and a Detroit cab driver, University of Michigan access card logs, and cell phone tower records show that on Saturday, July 19, 2008, Martoma flew to Detroit and took a cab from the Detroit airport to the University of Michigan's campus in Ann Arbor.  (Tr. 1453-56, 1968-69; GX 1210; GX 1307; GX 1400; GX 1401; GX 1402)  There, he met with Dr. Gilman, at lunchtime, in Dr. Gilman's office.  (Trial Tr. 1453-56)  During this meeting, Dr. Gilman showed Martoma the PowerPoint slides containing the efficacy results, and discussed the data with him in detail.

Given that Martoma had studied potential treatments for Alzheimer's disease for more than two years, and had had countless consultations with medical experts, including Dr. Gilman, Dr. Ross, and others (Tr. 177, 588, 591, 601-16, 613, 626, 1235, 1390; GX 601; DX

---

[1]  Individuals who carry a particular gene – the ApoE4 gene – have a greater chance of contracting Alzheimer's disease.  (Tr. 1417)

791; DX 800), a reasonable jury could have concluded that Martoma had – by that time – a highly sophisticated understanding of the science behind bapineuzumab and was well-equipped to understand the practical significance of the clinical trial results.  A reasonable jury could likewise have concluded that Martoma recognized that, in light of the bapineuzumab study's final results, it was highly unlikely that the drug would receive U.S. Food & Drug Administration ("FDA") approval at any point in the foreseeable future.

 After his lunchtime meeting with Dr. Gilman, Martoma flew back to JFK airport that same afternoon.  (Tr. 1952-53; GX 1307)  The next morning, Sunday, July 20, 2008, he sent an email to the principal of SAC Capital, Steven A. Cohen, asking whether the two could speak by telephone that morning.  (GX 459)  In the subject line of the email Martoma wrote, "It's important."  Telephone records introduced at trial show that the two men had a 20-minute conversation on Sunday, July 20, 2008.  (GX 1215)  The next day, Monday, July 21, 2008, SAC Capital began selling the approximately $700 million in Elan and Wyeth securities that it was then holding.[2]  (Tr. 151-52, 520-22, 2266-67, 2272-75, 2279-80, 2282-93, 2490; GX 431; GX 432; GX 436; GX 554-C; GX 1256; GX 1260)  SAC also entered into significant short transactions involving Elan and Wyeth securities.  (Tr. 2385, 2387)

 The evidence at trial showed that the sale of Elan and Wyeth securities was kept secret at SAC Capital.  Martoma did not tell the research analyst (Kathryn Lyndon) and execution trader (Tim Jandovitz) who worked for him that the positions were being sold.  Indeed, their computer monitors showed that Martoma's portfolio – the GEHC portfolio – was still holding these securities long after they had been sold.  (Tr. 150-54, 2068-69, 2075-77)  Only

---

[2] During the week of July 21, 2008, Martoma also liquidated the Elan and Wyeth positions in the "GEHC" portfolio, the portfolio he managed for SAC Capital.  (Tr. 2384-88; GX 431; GX 436; GX 1266)

Martoma, Cohen, and Cohen's head trader – Phillip Villhauer – knew that these huge positions were being sold.  (Tr. 2279-80)  Longtime employees of SAC, including Chandler Bockledge – Cohen's "right-hand man" – testified that SAC had never sold positions in such a secret fashion before.  (Tr. 2537, 2562-63, 2566)

On July 29, 2008, Dr. Gilman presented the efficacy results from the Phase II bapineuzumab study to the attendees of the ICAD conference.  (Tr. 2381, 2395-96)  Dr. Gilman's presentation began at about 5:15 p.m. Eastern Standard Time.  (Tr. 2381, 2395-96)  Elan's stock price began sliding even before Dr. Gilman had completed his fifteen minute presentation.  (Tr. 2381, 2396; GX 1263)  By the close of trading on July 30, 2008, Elan's stock had suffered a 42% decline.  (Tr. 2379)  Wyeth stock dropped about 12% that day.  (Tr. 2383)

At trial, FBI Special Agent James Barnacle testified regarding the amount of profits and avoided losses associated with SAC Capital's trading in Elan and Wyeth securities during the week preceding the disclosure of the Phase II final results at the ICAD conference.  (Tr. 2337-38)  Agent Barnacle concluded that SAC's total profits and avoided losses from these trades amounted to approximately $275 million.  (Tr. 2391; GX 1268)  Defendant has not disputed this calculation.

The evidence also showed that Martoma received a $9,380,435 bonus from SAC Capital for 2008.  (GX 555; GX 556)  Several former employees of SAC Capital testified that portfolio managers at the firm received bonuses when Cohen was able to make profitable trades based on their recommendations.  (Tr. 116, 429)  Moreover, SAC Capital records introduced at trial show that Martoma's bonus was attributed to trading in Elan and Wyeth securities that took place prior to the public disclosure of the Phase II bapineuzumab study's final results at the ICAD conference.  (Tr. 468-94, 2274-75; GX 555; GX 556)

## THE PROBATION OFFICE'S SENTENCING GUIDELINES CALCULATIONS

The Probation Office determined that Martoma has a base offense level of 8 under U.S.S.G. § 2B1.4(a), which applies to insider trading.  (PSR ¶ 32)  The Probation Office then increased Martoma's offense level based on the amount of gain resulting from his offense.  See U.S.S.G. § 2B1.4(b)(1).  The PSR calculates the gain resulting from Martoma's offense at $285.4 million.  (PSR ¶ 33)  This figure includes SAC Capital's total profits and avoided losses resulting from Martoma's insider trading – which total approximately $276 million[3] – and the $9.4 million bonus that Martoma received from SAC Capital for 2008.  (Id. ¶ 33 & n.5)

Under the Sentencing Guidelines, an illicit gain amounting to more than $200 million but less than $400 million results in a 28-level enhancement.  U.S.S.G. § 2B1.1(b)(1)(O). Accordingly, the Probation Office imposed a 28-level increase here, resulting in a total offense level of 36.  (PSR ¶¶ 33, 40)  Because Martoma has no criminal record, he falls within Criminal History Category I.  (PSR ¶ 43)  Offense level 36 at Criminal History Category I yields a Guidelines range of 188 to 235 months' imprisonment.  See U.S.S.G. Sentencing Table, Ch. 5, Pt. A.  The Probation Office determined that this is the Guidelines range applicable to Martoma's offense.  (PSR ¶ 85)

The Government agrees with this Guidelines analysis.  (Govt. Br. (Dkt. No. 293) at 6)

Martoma objects to the Probation Office's analysis, arguing that (1) this Court should not consider the applicable Guidelines provisions, because they exaggerate Martoma's

---

[3] According to the Government, the profits SAC Capital realized and the losses it avoided based on Martoma's insider trading amount to $275 million.  (Govt. Br. (Dkt. No. 293) at 6)  The Government does not address the discrepancy between this amount and the $276 million figure cited in the PSR.  (See id.)

culpability; (2) the amount of gain under the Guidelines should reflect only Martoma's personal

gain or – at most – the profits in the GEHC account that Martoma managed; and (3) the

Probation Office's calculation of profit and avoided losses overstates the actual amount of gain.

(Def. Br. (Dkt. No. 287) at 22-37)

## DISCUSSION

### I.   APPLICABLE LAW

"Although the [Sentencing] Guidelines are no longer mandatory, the sentencing

court must nonetheless consider the applicable Guidelines sentence and relevant policy

statements before sentencing." United States v. Brady, 417 F.3d 326, 332 (2d Cir. 2005).  In

determining the applicable Guidelines sentence, "district courts[ ] . . . determine sentencing

factors by a preponderance of the evidence." United States v. Vaughn, 430 F.3d 518, 525 (2d

Cir. 2005).

U.S.S.G. § 2B1.4 of the Guidelines governs the calculation of a defendant's

offense level for insider trading. See U.S.S.G. § 2B1.4.  "The Sentencing Guidelines require that

the base offense level for insider trading be adjusted upward, using the loss table in [§ 2B1.1],

according to the 'gain resulting from the offense.'" United States v. Cusimano, 123 F.3d 83, 90

(2d Cir. 1997).  Section 2B1.4 provides that "[i]f the gain resulting from the offense exceeded

$5,000, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction,

and Fraud) corresponding to that amount." U.S.S.G. § 2B1.4(b)(1).  In determining the amount

of gain, "[t]he court need only make a reasonable estimate. . . . The sentencing judge is in a

unique position to assess the evidence and estimate the [gain] based upon that evidence."

U.S.S.G. § 2B1.1 cmt. n.3(C); see United States v. Rajaratnam, No. 09 CR. 1184 (RJH), 2012

WL 362031, at *21 (S.D.N.Y. Jan. 31, 2012) (in insider trading case, determining applicable

Guidelines range based on "reasonable estimate of the total gains").

 Although the text of the Guidelines does not further elaborate on how courts

should calculate gain, courts in this Circuit have looked to the commentary to Section 2B1.4 for

guidance.  See, e.g., United States v. Royer, 549 F.3d 886, 904 (2d Cir. 2008) (applying

commentary's definition of gain); Cusimano, 123 F.3d at 90 (citing the commentary to U.S.S.G.

§ 2F1.2, the identical predecessor to U.S.S.G. § 2B1.4); United States v. Gupta, 904 F. Supp. 2d

349, 352 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014) (applying the commentary's

definition of gain); Rajaratnam, 2012 WL 362031, at *1 (same).

 The commentary to Section 2B1.4 states that

> [i]nsider trading is treated essentially as a sophisticated fraud.  Because the
> victims [of insider trading] and their losses are difficult if not impossible to
> identify, the gain, i.e., the total increase in value realized through trading in
> securities by the defendant and persons acting in concert with the defendant or to
> whom the defendant provide[d] inside information, is employed instead of the
> victims' losses.

U.S.S.G. § 2B1.4 cmt. Background.  "[T]he comment limits the calculation to gains made or

losses avoided in trades that were based, in whole or in part, on the inside information."  Gupta,

904 F. Supp. 2d at 352.

## II. THIS COURT IS REQUIRED TO CONSIDER THE SENTENCING GUIDELINES

 Martoma argues that "Probation's Guideline[s] Range should be

disregarded [and] . . . should not even form the starting point for the Court's analysis of a fair

and just sentence in this matter."  (Def. Br. (Dkt. No. 287) at 2)  According to Martoma, this

Court "should not credit the proposed Guideline[s] Range in any way," because the Guidelines'

emphasis on gain resulting from the offense leads to "advisory sentence ranges that are unreasonably high and that fail accurately to reflect culpability." (Id. at 22, 26)

> To the extent Martoma urges this Court not to consider the Guidelines in determining an appropriate sentence, that position must be rejected. "In arriving at a sentencing decision, the District Court must consider the now-advisory Guidelines, for they are the 'starting point and the initial benchmark,' and are not to be treated as only a 'body of casual advice.'" United States v. Bonilla, 618 F.3d 102, 109-10 (2d Cir. 2010) (quoting Gall v. United States, 552 U.S. 38, 49 (2007); United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005)) (internal citations omitted) (emphasis added); see also Gupta, 904 F. Supp. 2d at 352 (although defendant's gain – which was calculated "almost exclusively on the basis of how much money his accomplice gained by trading on the information" -- was "[a]t best[ ] . . . a very rough surrogate for the harm to [the institution that owned the information]," "[t]he Court [was] nonetheless mandated to calculate the defendant's Guidelines range, see 18 U.S.C. § 3553(a)(4)(A), even if . . . the non-guideline sentence that [the court] intend[ed] to impose would not vary one whit if the Guidelines calculation was that proposed by the Government, that proposed by the defendant, or anywhere in between"). Accordingly, although the Guidelines are merely advisory, this Court must consider the sentencing range recommended in the Guidelines for Martoma's offenses.

## III.   GAIN INCLUDES TRADING BY COHEN AND SAC CAPITAL

> Martoma argues that the PSR significantly overstates the applicable gain under U.S.S.G. § 2B1.4, because "SAC's profits . . . should not be used to determine [his] Guideline[s] range." (Def. Br. (Dkt. No. 287) at 28) Martoma contends that "gain" – for Guidelines purposes – should be limited to his personal profits. (Id. at 27-28) Martoma calculates that amount to be $6.3 million, based on the $9,380,435 bonus he received from SAC Capital for 2008, less $3.1

million that he paid in taxes on the bonus.[4]  (Id. at 27)  Alternatively, Martoma argues that "gain" under the Guidelines should include only the profits and avoided losses associated with trades in the GEHC portfolio that he managed, which he claims total "at most" $49.4 million.  (Id. at 28)

Contending that only his personal profits should be included in the gain calculation, Martoma argues that "[d]etermining the Guideline[s] range based . . . on the full amount of profits realized by all of SAC, as Probation suggests, would substantially overstate the seriousness of [his] conduct."  (Id. at 27)  Martoma has cited no case that stands for this proposition, however.  Instead, in the cases he cites, courts granted a variance or a departure from a Guidelines range that reflected the full amount of illicit profit.  See Gupta, 904 F. Supp. 2d at 353, 355 (calculating Guidelines gain amount based on profits others realized from trading on inside information supplied by the defendant, but granting a variance from the applicable Guidelines range); United States v. Oakford Corp., No. 98 Cr. 144 (JSR), 1999 WL 1201725, at *1-2 (S.D.N.Y. Dec. 13, 1999) (calculating Guidelines gain based on full amount of profits realized by the conspirators, but granting a 13-level downward departure).  Whether or not this Court later determines that a variance or departure from the Guidelines range is warranted, the Guidelines "gain" amount must be accurately calculated using the criteria set forth in the Guidelines.

As noted above, the commentary to Section § 2B1.4 states that "gain" includes "the total increase in value realized through trading in securities by the defendant and persons

---

[4]  According to defense counsel, "[a] portion of Mr. Martoma's 2008 bonus was paid in 2009 (approximately $30,000) and another portion was deferred until a later time (approximately $1.9 million).  Since the vast majority of Mr. Martoma's bonus was paid in 2008, [defense counsel] ha[s] estimated the total amount of taxes paid on that bonus by applying the effective tax rate that Mr. Martoma paid on his 2008 income (33 percent) to the total amount of his 2008 bonus ($9.4 million)."  (Def. Br. (Dkt. No. 287) at 27 n.11)

<u>acting in concert with the defendant</u> or <u>to whom the defendant provide[d] inside</u>

<u>information</u>. . . ." U.S.S.G. § 2B1.4 cmt. Background (emphasis added). Courts in this district

have concluded that "[i]t makes far more sense to interpret th[is] phrase . . . as referring to the

increase in value realized by the defendant or others' trading <u>vel</u> <u>non</u> rather than the value

realized by the defendant himself from that trading." <u>Rajaratnam</u>, 2012 WL 362031, at *15.

"Th[is] interpretation . . . include[s] gains from trading by 'persons . . . to whom the defendant

provided inside information' and thereby hold[s] tippers responsible for gains by their tippees."

<u>Id.</u> (third alteration in original). "[T]he commentary is indifferent to [who] . . . took home th[e]

increase in value. Rather, the relevant number is the size of the increase. . . ." <u>Id.</u>

   Consistent with this interpretation, courts in this Circuit have repeatedly held that

a defendant's gain – for Guidelines purposes – is not limited to his personal profit; gains realized

by others as a result of the defendant's trading, or gains from trading based on inside information

that the defendant supplied, are included in the gain calculation. See <u>Royer</u>, 549 F.3d at 904

("given the fact that the insider trading scheme was clearly a joint endeavor among [defendant]

and the AP site subscribers, it was appropriate to take into account the subscribers' trades" in

calculating gain under U.S.S.G. § 2B1.4); <u>Cusimano</u>, 123 F.3d at 91 ("[t]he district court's

determination that the trading profits of Corrigan and Thomas Flanagan should be attributed to

appellant [for purposes of the Guidelines gain calculation] was not clearly erroneous," where the

district court "[found] it likely that [appellant] provided information to Corrigan and his brother

[Thomas Flanagan] or acted in concert with them"); <u>United States v. Chiasson</u>, No. 12 Cr. 121

(RJS) (May 13, 2013) (Sentencing Tr. 9, 15) (including in gain calculation profits of unindicted

co-conspirator who traded on defendant's tips); <u>Gupta</u>, 904 F. Supp. 2d at 352-53 (defendant

tipper's "gain" under the Guidelines equals the amount of profit realized and losses avoided by

funds that traded on the basis of defendant's tips); Rajaratnam, 2012 WL 362031, at *13-15

(rejecting Rajaratnam's argument that Guidelines gain should only reflect his personal profit, and

holding defendant accountable for "the increase in the price of [the subject] company's shares

from the time that [he] purchased them to the time that the public learned the inside

information," regardless whether defendant, his hedge fund, or its investors "took home that

increase in value"); United States v. Contorinis, No. 09 Cr. 1083 (RJS) (Dec. 17, 2010)

(Sentencing Tr. 19-20) ("[C]learly [gain under Section 2B1.4] need not be gain that was

ultimately obtained or accessible or usable by Mr. Contorinis.  It was just gain derived from the

offense.  [That] [t]he lion's share went to the funds that Mr. Contorinis managed and that they

had an interest [in] is sufficient.").[5]

   Here, the gain resulting from Martoma's trading on material, non-public

information about the Phase II bapineuzumab trial went well beyond the bonus that he received

for 2008.  Given that Martoma directed trading in the GEHC portfolio at SAC Capital, and given

that his portfolio realized profit and avoided losses as a result of Martoma's trading on the basis

of inside information (see Tr. 113-15, 118-19, 124-25, 130, 138, 151-53, 2076-77, 2385-87; GX

431; GX 1266), the sum of these profits and avoided losses must be included in the Guidelines

calculation.

   As to accounts at SAC Capital other than his GEHC portfolio, Martoma

acknowledges that "trading in . . . other SAC accounts [could be included] for purposes of the

---

[5]  The approach is the same in other circuits.  See, e.g., United States v. Kluger, 722 F.3d 549,
561 (3d Cir. 2013) ("We agree with Rajaratnam and hold that the plain language of the
background commentary to § 2B1.4 clearly indicates that Kluger can be held responsible for the
full extent of Bauer's gains.  Bauer is explicitly an individual 'to whom the defendant provided
inside information.'  U.S.S.G. § 2B1.4 cmt. background.  Therefore, Bauer's gains should be
attributed to Kluger in their entirety, and the District Court needed to go no further in its
calculations of the gain attributable to Kluger under § 2B1.4.").

Guidelines 'gain' calculation[ if] the Government . . . established that Mr. Cohen either (1) acted 'in concert' with . . . Martoma or (2) received inside information from . . . Martoma." (Def. Br. (Dkt. No. 287) at 29 (citing U.S.S.G. § 2B1.4 cmt. Background))  Martoma argues that such trading should be excluded here, however, because (1) the Government did not prove that Cohen or others at SAC Capital were acting in concert with Martoma; (2) no one else at SAC Capital was named as a co-conspirator; and (3) the Government did not prove that Martoma provided inside information to Cohen or others at SAC Capital because there "were myriad reasons [for Cohen and others at SAC Capital] to sell Elan and Wyeth securities in July 2008 that had nothing to do with the alleged inside information," and "Cohen testified under oath during an SEC deposition that Mr. Martoma did not provide him with any inside information." (Id. at 29-31)

Martoma's arguments are not persuasive.  While the Government has not argued that Cohen is a co-conspirator of Martoma (see Govt. Br. (Dkt. No. 293) at 7), Martoma concedes that the Government need only show "for purposes of the Guidelines 'gain' calculation . . . that Mr. Cohen . . . received inside information from Mr. Martoma." (See Def. Br. (Dkt. No. 287) at 29)  There is a more than sufficient basis here for this Court to find – by a preponderance of the evidence – that Martoma provided inside information to Cohen, and that this information was the basis for Cohen and SAC Capital's subsequent trades in Elan and Wyeth securities.[6]  Despite the array of theories posited by the defense as to why Cohen and SAC Capital may have liquidated their huge positions in Elan and Wyeth stock in the week before the ICAD conference, the defense has never offered an explanation for the sequence of

---

[6] As this Court has stated, Martoma's "repeated assertions that Cohen's testimony [before the Securities and Exchange Commission] is completely exculpatory of him are not accurate. . . . [M]uch in Cohen's deposition is inculpatory of Martoma." (See Jan. 7, 2014 Order (Dkt. No. 190) at 3-5 n.1 (emphasis in original))  Moreover, for the reasons set forth in this Court's January 7, 2014 order, this Court does not credit Cohen's SEC testimony. (See id. at 11)

events between July 17, 2008 and July 29, 2008, including (1) the phone call between Dr.
Gilman and Martoma on July 17, 2008, in which Dr. Gilman went through the PowerPoint slides
containing the bapineuzumab efficacy results with Martoma; (2) Martoma's purchase that same
day of a round-trip Delta Air Lines ticket for a flight from New York to Detroit; (3) Martoma's
flight to Detroit on Saturday, July 19, 2008; (4) Martoma's meeting with Dr. Gilman at the
University of Michigan on July 19, at which the study's final results were discussed in detail; (5)
Martoma's return flight to New York later that afternoon; (6) Martoma's email to Cohen on
Sunday, July 20, 2008 – the next day – asking whether the two could speak by telephone that
morning about something "important"; (7) Martoma's 20-minute telephone call with Cohen on
Sunday, July 20, 2008, which was followed by an e-mail in which Martoma summarized the
firm's positions in Elan and Wyeth stock; and (8) SAC Capital's secret sale of its positions in
Elan and Wyeth, which began on July 21, 2008, the next business day.

      Given this sequence of events, it is much more likely than not that Cohen did, in
fact, receive material, non-public information from Martoma on July 20, 2008, and that Cohen
and SAC Capital's trades in Elan and Wyeth securities in the following days were based on this
information. See United States v. Steinberg, No. 12 Cr. 121 (RJS) (S.D.N.Y. May 16, 2004)
(Sentencing Tr. 21-22) (making no finding that Cohen was a co-conspirator but nonetheless
including Cohen's gain in the Guidelines "gain" calculation; "the inferences to be drawn from
the evidence that was introduced, the chronology of communications, the chronology of the
trades, . . . support[s] an inference that the information was conveyed to Mr. Cohen, and was, in
fact, the basis of his trading"). Accordingly, in calculating "gain" for purposes of the Guidelines,
this Court will include profits and avoided losses associated with Cohen and SAC's trades in

Elan and Wyeth stock, in addition to profits and avoided losses resulting from Martoma's trades

in the GEHC portfolio at SAC Capital and the bonus that Martoma received for 2008.[7]

## IV.     GAIN FROM MARTOMA'S INSIDER TRADING EXCEEDS $200 MILLION

Martoma argues that – even if this Court holds him liable for all of SAC's trading

in Elan and Wyeth stock – the amount of gain is still less than $200 million.  (Def. Br. (Dkt. No.

287) at 35)  According to Martoma, the amount of SAC's gain from trading in Elan and Wyeth

stock is "at most $131.9 million."  (Id. at 37 (emphasis omitted))  Martoma argues that the PSR's

calculation of "gain" is overstated because:

(1)     it does not account for SAC Capital's long position in Wyeth through an
        equity swap, which lost $75.6 million[8] between July 21, 2008 and July 30,
        2008;

(2)     it does not account for extrinsic market factors that affected the price of
        Elan and Wyeth securities in July 2008;

(3)     it includes SAC Capital's sales of Wyeth securities, which – according  to
        Cohen's deposition before the Securities and Exchange Commission –
        were based on information provided by another individual (Wayne
        Holman), not Martoma; and

(4)     it erroneously uses the closing price of Elan and Wyeth securities on July
        30, 2008, to measure market reaction after the ICAD presentation, instead
        of applying a "conservative approach" – i.e., using the highest price of
        those securities that day – which would result in gain of only $131.9
        million.

(See Def. Br. (Dkt. No. 287) at 35)  Each of these arguments is meritless.

---

[7]  Martoma suggests that "profits from short sales of Wyeth securities in [the] GEHC [portfolio]
resulted from internal transfers by Mr. Cohen and [therefore] should not be attributed to
Martoma."  (Def. Br. (Dkt. No. 287) at 35 n.17)  Having concluded that Cohen traded in Wyeth
securities on the basis of inside information supplied by Martoma, and that Cohen's trading on
this information must be included in Martoma's "gain," these short sales will be included as
well.
[8]  Martoma calculated this loss using the difference between the opening price of Wyeth stock on
July 21, 2008, and the highest price of Wyeth stock on July 30, 2008.  (Def. Br. (Dkt. No. 287) at
36 n.18)

### A.    "Gain" Under the Guidelines Will Not Be Offset
###        By SAC's Losses from the Wyeth Swap

Martoma argues that any gain from his insider trading should be offset by approximately $75.6 million in losses that SAC Capital incurred in connection with equity swap positions that it held in Wyeth stock (collectively, the "Wyeth swap") between July 21, 2008, and July 30, 2008. (Def. Br. (Dkt. No. 287) at 35) This argument has no basis in law or fact.

The "gain" that is the subject of Section 2B1.4(b) is that which "result[s] from the offense" – that is, insider trading. See U.S.S.G. § 2B1.4(b). Accordingly, Guidelines "gain" under Section 2B1.4(b) is that which results from trading. See id. cmt. Background (defining gain as "the total increase in value realized through trading in securities . . .") (emphasis added); see also Gupta, 904 F. Supp. 2d at 352 ("[T]he comment limits the calculation to gains made or losses avoided in trades. . . .") (emphasis added). Here, a defense witness – SAC Capital's general counsel – testified that there was no trading in connection with the Wyeth swap between July 21, 2008 and July 29, 2008. (See Tr. 2483; see also Tr. 2376, 2388-89; GX 1260) Accordingly, any losses that occurred during that period in connection with the Wyeth swap are not attributable to insider trading and are irrelevant to the Guidelines "gain" calculation. Stated another way, the fact that SAC Capital lost money on the Wyeth swap at the same time that it made a profit or avoided losses as a result of trading in Wyeth securities on the basis of inside information has no implications for calculating Guidelines "gain."[9]

---

[9] Even where trading on inside information results in losses, those losses cannot generally be used to offset gains realized from insider trading based on the same source. In United States v. Goffer, 721 F.3d 113, 130 (2d Cir. 2013), the Court of Appeals rejected a defendant's argument that "the district court committed procedural error by failing 'to deduct losses resulting from trades that emanated from the same' insider sources as provided the tips that gave him $11 million in profits." Id. The Second Circuit "[found] no precedent indicating that additional illegal trades made on material nonpublic information that result in losses should mitigate the sentences of insider traders." Id. (citing U.S.S.G. § 2B1.1 n.3).

B.    **Extrinsic Market Factors Are Irrelevant to the**
      **Gain Calculation for Insider Trading**

Martoma also argues that the Government's calculation of gain is overstated "because it fails to account for extrinsic factors unrelated to the charged insider trading." (Def. Br. (Dkt. No. 287) at 33, 36)  More specifically, Martoma contends that the amount of gain should be reduced in light of market volatility in 2008.  (Id. at 33-34)  Martoma does not suggest what reduction should apply or propose any method for calculating this reduction.  (See id.)

In any event, courts in this District have held that extrinsic market factors are irrelevant when calculating Guidelines "gain" in insider trading cases.  See Rajaratnam, 2012 WL 362031, at *7-8.  In Rajaratnam, the defendant argued that "the phrase 'gain resulting from the offense' requires 'separating the gains attributable to the prohibited conduct (i.e., trading stock on the basis of material, nonpublic information) from gains attributable to factors unrelated to that conduct, such as gains caused by exogenous market movements or events unrelated to the material, nonpublic information.'"  Id. at *2.  In rejecting Rajaratnam's argument, the district court observed that

> where a defendant has traded on the basis of inside information, the defendant has not engaged in any "lawful trading." Rather, the defendant has committed an "offense." The fact that the defendant later earns profits that he would have earned if he had, in fact, traded lawfully does not change the fact that he has traded unlawfully.  And having made the decision to do so, it makes no more sense to insulate the insider trading defendant from the risk that he will earn more than he expects than to insulate the bank robber who robs a bank from the risk that the vault is full. . . .
>
> . . . .
>
> [A] punishment that subjects one who commits that offense to the very market fluctuations his criminality enabled him to avoid seems like justice par excellence.

See Rajaratnam, 2012 WL 362031, at *7-8.

The court reasoned that "since the defendant commits the 'offense' [of insider trading] when he trades, it makes perfect sense that the Guidelines calculate the 'gain resulting from the offense' as 'the total increase in value realized through trading in securities by the defendant.'" Id. at *8. "Since the plain meaning of 'increase in value' is the difference between the purchase and sale price, the government's method [which does not exclude market factors] best accords with the plain language of the Guidelines." Id.

The Rajaratnam court also noted that – in determining "gain" for Guidelines purposes – insider trading cases are distinguishable from fraudulent misrepresentation cases, see id. at *6, such as those cited by Martoma here.[10] (Def. Br. (Dkt. No. 287) at 33-34 & n.16) Whereas the offense level enhancement in fraudulent misrepresentation cases is generally based on "the amount of loss caused by the wrongful conduct" under U.S.S.G. 2B1.1, see, e.g., United States v. Rutkoske, 506 F.3d 170, 178 (2d Cir. 2007), the Guidelines provide that enhancements to the offense level for insider trading are based on a different metric – gain from insider trading, pursuant to U.S.S.G. § 2B1.4. Gain realized from insider trading, "instead of the victims' losses," is the proper metric, because "the victims [of insider trading] and their losses are difficult if not impossible to identify." U.S.S.G. § 2B1.4 cmt. Background; see also Contorinis,

---

[10] All but one of the cases cited by Martoma are fraudulent misrepresentation cases. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 339-40, 342-43 (2005) (examining proper measure of plaintiff's loss in civil fraud-on-the-market case); Rutkoske, 506 F.3d at 178-79 (calculating victims' losses in market manipulation case under Section 2B1.1); United States v. Zolp, 479 F.3d 715, 717 & n.1, 718-21 (9th Cir. 2007) (calculating victims' loss from defendant's "pump and dump" scheme, which involved "touting of a company's stock . . . through false and misleading statements to the marketplace") (internal quotations omitted); United States v. Olis, 429 F.3d 540, 541-42, 545-46 (5th Cir. 2005) (calculating loss under Section 2B1.1 where officer of corporation was part of a scheme to conceal secret agreements from the Securities and Exchange Commission in order to obtain desired accounting treatment for a transaction on behalf of the corporation, and the corporation's stock price was adversely affected when this was revealed); United States v. Mueffelman, 400 F. Supp. 2d 368, 370, 373, 377 (D. Mass. 2005), aff'd, 470 F.3d 33 (1st Cir. 2006) (calculating victims' loss in wire fraud and mail fraud case).

No. 09 Cr. 1083 (RJS) (Dec. 17, 2010) (Sentencing Tr. 10-11) ("I am not focused on loss at all. I

am focused on the gain resulting from the offense and that is the inquiry under 2B1.4. It directs

you to the table, the numerical table that is a loss table under 2B1.1, but that is just to figure out

the dollars. But those dollars reflect the gain resulting from the offense, not loss to the

victims.").

   As the Rajaratnam court observed, "there is an important difference between

fraudulent misrepresentation and insider trading cases: the inside trader does not cause the price

of a company's stock to move. . . . [O]ne who trades in a company's stock does not affect its

price the way that the company's announcements (or omissions from those announcements) do."

Rajaratnam, 2012 WL 362031, at *6. More specifically,

> when a stock declines after a company announces the truth, the decline results
> from the defendant's offense, namely, fraud. That offense involves making a
> statement that inflates the price of stock above what its price would be if the
> market knew the truth. Hence the decline in the stock price attributable to the
> revelation of the truth measures the difference to investors between a world where
> the defendant lied and a world where the defendant told the truth.
>
> Insider trading is different. When an insider trades on the basis of material, non-
> public information, the insider usually does not cause any price inflation or
> deflation. . . . Similarly, when a stock declines after a company announces worse
> than expected earnings or rises when a company announces better than expected
> earnings, the decline or rise itself does not result from the defendant's insider
> trading. . . .
>
> Where the rise or decline in the price of a stock in response to a public
> announcement does not result from any action of the defendant giving rise to the
> offense, it is hard to say that a defendant's gain from the rise or decline is a "gain
> resulting from the offense" of insider trading. Indeed, the change in stock price
> following the public announcement of information that an insider traded on in
> advance does not measure the difference between a world in which the defendant
> acted lawfully and a world in which the defendant acted unlawfully. An insider
> and a lawful investor who purchase stock at the same time will earn the same
> profit. The difference between them is not how each has affected the stock but
> what each knows about the company issuing it. Measuring the change in stock
> price might measure the value of what an insider knows, but that is not how the
> Guidelines measure the "gain." The commentary refers to the "value realized

through trading in securities[,]" not the value of the information used to do the trading. And the plain language of the "value realized through trading in securities" is the increase in the price of stock from the time that the defendant purchased it to the time he sold it.

Id.

In sum, in fraudulent misrepresentation cases, it makes sense to isolate the effect of the defendant's conduct on the market from other market forces, because the defendant's "offense" directly relates to the effect that his misrepresentations had on the market. See id. In insider trading cases, however, the focus is not on the effect of the defendant's trading on the market, but instead on the fact that the defendant has engaged in unlawful trading and benefited from it. Since the insider trading defendant stood to – and, presumably, hoped to – benefit from market forces, it is not unjust to refuse to exclude the effect of those same market forces in calculating the gain from his offense. Id. at *7 ("To be sure, there is a sense . . . [that this] result subjects an insider trading defendant to market mysteries that are far more elusive than whether the bank vault will have any money. But that is hardly objectionable as a measure of the punishment for an offense that enables a defendant to avoid (or least minimize) those very same risks."); id. at *13 ("It hardly seems unjust to include those benefits in the calculation of his gain from an offense whose core is benefitting from an informational advantage."). The same rationale applies to avoided losses. Id. ("[J]ust as . . . there is nothing unjust about subjecting one who purchases stock on the basis of inside information to the risk that the market will make his trade more profitable than he expects, there is nothing unjust about subjecting one who sells stock on the basis of inside information to the risk that his trade will save him more than he expects. For, like the defendant who purchases stock, a defendant who sells stock on the basis of inside information has an illegal advantage that allows him to minimize the risk of his sale.").

Accordingly, Martoma's gain will not be reduced based on external market factors in 2008.[11]

### C.   The Court Does Not Credit Cohen's Deposition Testimony

Martoma also argues that the Court should exclude Cohen and SAC Capital's trading in Wyeth securities from the gain calculation, because Cohen testified at a deposition before the Securities and Exchange Commission that the Wyeth trades were based on

---

[11] United States v. Nacchio, 573 F.3d 1062, 1074-75 (10th Cir. 2009) – the only insider trading case Martoma cites in support of his argument regarding external market factors (see Def. Br. (Dkt. No. 287) at 34 n.16) – is not binding on or persuasive to this Court. In Nacchio, the Tenth Circuit held that an insider trading defendant's "increased prison sentence should be linked to the gain actually resulting from the offense, not to gain attributable to legitimate price appreciation and the underlying inherent value of the [relevant securities]. . . . [A] stock's inherent value . . . should not be a component of the gain amount." Nacchio, 573 F.3d at 1075. In reaching this conclusion, however, the Nacchio court relied on fraudulent misrepresentation cases which – as discussed above – do not provide the proper measure for determining Guidelines "gain" in insider trading cases. See id. at 1074-77; cf. Rajaratnam, 2012 WL 362031, at *6-7. Moreover, as the Rajaratnam court noted, the rationale underlying the Nacchio court's gain calculation analysis is inconsistent with Second Circuit insider trading law, because it "rests on the false premise that insider trading has legal and illegal parts for purposes of th[e] term ['offense']":

> The Nacchio court distinguished between trading vel non – "standing alone, a lawful act" and "trading on the basis of inside information." Nacchio, 573 F.3d at 1072 (emphasis in original). That position – that the "gain" "should be limited . . . to the gain that resulted from trading with insider knowledge," id. at 1072 – assumes that a single trade can be divided into "trading with insider knowledge" and trading on the basis of public information.
>
> The Second Circuit, however, appears to have rejected that proposition. "Unlike a loaded weapon which may stand ready but unused, material information cannot lay idle in the human brain." United States v. Teicher, 987 F.2d 112, 120 (2d Cir. 1993). Hence "[i]t does not follow[] that when one such piece of information is revealed to be material, in and of itself, and the trader knows it to be material, the trader might somehow consider the information irrelevant to the whole." Id. at 121. Indeed, the Second Circuit has stated that "[i]t strains reason to argue that an arbitrageur, who traded while possessing information he knew to be fraudulently obtained, knew to be material, knew to be nonpublic – and who did not act in good faith in so doing – did not also trade on the basis of that information." Id.

Rajaratnam, 2012 WL 362031, at *7; see also id. at *4-6.

recommendations from Wayne Holman, and were not based on inside information provided by

Martoma. (Def. Br. (Dkt. No. 287) at 36-37)

   For the reasons set forth in this Court's January 7, 2014 Order (Dkt. No. 190),

Cohen's deposition testimony on this point is neither persuasive nor credible. As the Court

explained in that order,

> much in Cohen's testimony is inculpatory of Martoma and consistent with the
> Government's theory in this case. According to Cohen, Martoma played a
> significant role in his decision to buy Elan and Wyeth stock, and it was
> Martoma's discomfort with the Elan position on July 20, 2008 that was the
> impetus for selling the position. While Cohen testified that he was also
> influenced by Holman's view that the outcome of the bapineuzumab trial was
> "50/50," it is a fair inference that Holman's views about Elan and Wyeth changed
> after speaking with Martoma on July 21. [(Govt. Br. (Dkt. No. 140), Ex. A
> ("Cohen Dep. Tr.") at 163)] While [Martoma] asserts that Cohen testified that
> Martoma had "nothing to do with" Cohen's decision to sell the Wyeth position
> (Def. Br. (Dkt. No. 107) at 1), Cohen actually said no such thing. Instead, he
> testified that he did not recall whether, in his July 20 call with Martoma, the two
> discussed both Elan and Wyeth. (Cohen Dep. Tr. at 173-74, 189) . . . .
>
> With respect to Martoma's involvement in the decision to short Elan and Wyeth
> securities, and the manner in which Elan and Wyeth securities were sold, Cohen's
> testimony likewise does not demonstrate that Martoma played no role in these
> matters. When asked at his deposition how Martoma had gone about selling his
> position in Elan – in the SAC accounts Martoma controlled – Cohen testified: "I
> think what we did was instruct Phil Villhauer to liquidate all the stock that was
> owned by – in the firm account, in my account, and in Mat Martoma's account
> and let him handle it." (Id. at 184) (emphasis added) With respect to shorting
> Elan stock, Cohen was asked whether he discussed his shorting strategy with
> Martoma. Cohen testified: "I could have. . . . I don't remember." (Id. at 204)

(Jan. 7, 2014 Order (Dkt. No. 190) at 3-5 n.1 (emphasis in original))

   Finally, even if Cohen's testimony was exculpatory of Martoma, "when Cohen's

deposition was taken, SAC Capital – his company – was under investigation by the SEC for

insider trading. Accordingly, Cohen had a strong motive to offer an exculpatory version of

events at SAC." (Id. at 11) Cohen's SEC deposition does not alter this Court's conclusion that

Cohen and SAC Capital's trades in Wyeth securities in late July 2008 were based on inside information that Martoma had supplied.

> ### D.    The Gain from Martoma's Insider Trading Exceeds $200 Million Even if the Highest Price of Elan and Wyeth Stock on July 30, 2008 is Applied

Martoma also argues that the Government's calculation of gain is incorrect because the Government used the <u>closing</u> prices of Elan and Wyeth stock on July 30, 2008 – the day after the final results from the Phase II bapineuzumab clinical study were announced – to calculate profits and avoided losses. (Def. Br. (Dkt. No. 287) at 31-33, 36) Martoma argues that use of the closing market prices at the end of the next trading day is arbitrary and unreasonable. (<u>Id.</u> 31-32) Martoma contends that "because it is impossible to pinpoint the precise moment when the alleged inside information was incorporated into Elan's and Wyeth's security prices, this Court should [instead] adopt the most conservative calculation of 'gain,'" by using the "Elan and Wyeth prices on July 30, 2008, that result in the smallest profits and losses avoided. . . ." (<u>Id.</u> at 32-33)

It is not necessary for this Court to choose between the competing methods proffered by the parties, however, because the amount of gain exceeds $200 million under either approach. In support of his gain calculations, Martoma has submitted a report from John F. Gould, an economic and financial consultant. (Def. Br. (Dkt. No. 287), Ex. 115 ("May 27, 2014 Gould Report")) In his report, Gould "calculate[d] losses avoided and profits for S.A.C. [Capital] as a result of the firm's trading in Elan and Wyeth securities" from July 21, 2008, through July 30, 2008 "[b]ased on the methodology that [defense] [c]ounsel asked [him] to follow." (<u>Id.</u> ¶¶ 3, 5) This methodology uses the highest intraday trading prices for Elan and Wyeth securities on July 30, 2008. (<u>See id.</u> ¶ 8 & n.3, ¶ 12)

Gould concludes that SAC Capital's profits and avoided losses total $131.9 million. (Id. at ¶ 21) Gould's calculation is premised, however, on a deduction of $75.6 million for losses incurred as a result of the Wyeth swap. (See id. at ¶ 19 & tbl. 2) As discussed above, there is no basis for deducting losses associated with the Wyeth swap in calculating Martoma's gain. Without the $75.6 million deduction, SAC Capital's total gain under Gould's calculations amounts to $207.50 million.[12] Accordingly, even if the highest price for Elan and Wyeth stock on July 30, 2008 is used to calculate gain, the gain resulting from Martoma's insider trading exceeds $200 million.

## CONCLUSION

The amount of illicit "gain" attributable to Martoma for purposes of the Sentencing Guidelines is more than $200 million but less than $400 million. Accordingly, a 28-level enhancement under U.S.S.G. §§ 2B1.4 and 2B1.1(b)(1)(O) is appropriate. The Probation Office's Presentence Report properly concludes that the applicable range under the Sentencing Guidelines is 188 to 235 months' imprisonment. See U.S.S.G. Sentencing Table, Ch. 5, Pt. A; (PSR ¶ 85).

Dated: New York, New York
       September 5, 2014

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge

---

[12] Gould's calculation also does not take into account the bonus that Martoma received for 2008. (See May 27, 2014 Gould Report, tbl. 2) There is no dispute that Martoma's 2008 bonus should be included in the gain calculation, however. (See Def. Br. (Dkt. No. 287) at 27 ("The 'gain' in this case should be determined based upon the amount that Mr. Martoma personally profited. . . . Mr. Martoma's only personal gain from the charged insider trading was a $9.4 million bonus that he received in 2008.") (emphasis omitted))