UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    -against-<br><br>MATHEW MARTOMA,<br><br>                                    Defendant. | No. 12-cr-00973 (PGG)<br>ECF Case |

**ROSEMARY A. MARTOMA'S SUR-REPLY MEMORANDUM OF LAW
IN FURTHER OPPOSITION TO THE GOVERNMENT'S MOTION
TO DISMISS HER THIRD-PARTY PETITION**

GOODWIN PROCTER LLP

Richard M. Strassberg (RS5141)
Daniel Roeser (DR2380)
The New York Times Building
620 Eighth Avenue
New York, New York 10018
(212) 813-8800

Roberto M. Braceras (RB2470)
53 State Street
Boston, Massachusetts 02109
(617) 570-1000

*Attorneys for Rosemary A. Martoma*

March 23, 2015

Rosemary A. Martoma respectfully submits this sur-reply memorandum of law to address the Yagoda Declaration filed with the Government's Reply and in further opposition to the Government's motion to dismiss the Petition.[1]

## PRELIMINARY STATEMENT

The Government's Reply and accompanying Yagoda Declaration merely confirm that the Government's motion to dismiss should be denied.  The Yagoda Declaration changes the conclusions of the Coleman Declaration, and those conflicting *Government* declarations raise fact issues that in and of themselves defeat the Government's motion to dismiss – particularly where the numbers in the Yagoda Declaration themselves do not add up.  Moreover, the Government's Reply has no answer to the binding Second Circuit precedent of *Pacheco v. Serendensky*, 393 F.3d 348 (2d Cir. 2004), under which the Government may not use this Court's Preliminary Order forfeiting the interests of the *Defendant* in the Specific Properties to forfeit the interests of *Mrs. Martoma*, an innocent third party.  Mrs. Martoma is entitled to her day in court to protect her own interests in the Specific Properties.  For the reasons below and in the Opposition, this Court should deny the Government's motion to dismiss the Petition.

## ARGUMENT

### I.  THE YAGODA DECLARATION CONFIRMS THAT THE GOVERNMENT'S MOTION TO DISMISS SHOULD BE DENIED.

With its Reply, the Government submits the Yagoda Declaration, which purports to "revisit[] each step of the tracing analysis" in the Coleman Declaration, "providing greater detail and clarity along the way."  (Gov't Reply at 11-12.)  Although the Government claims that "[t]he

---

[1] All capitalized terms have the same meanings as in Mrs. Martoma's Opposition unless otherwise stated.  The "Opposition" or "Opp." is Rosemary A. Martoma's Memorandum of Law in Opposition to the Government's Motion to Dismiss Her Third-party Petition (Dkt. #339), filed on February 27, 2015.  The "Government Reply" or "Gov't Reply" is the Government's Reply Memorandum of Law in Response to Third-party Petitioner Rosemary A. Martoma's Opposition to the Government's Motion to Dismiss (Dkt. #340), filed on March 13, 2015.  The "Yagoda Declaration" is the Declaration of Steven Yagoda in Support of the Government's Motion to Dismiss the Petition of Rosemary Martoma (Dkt. #340-1), filed on March 13, 2015.

Yagoda Declaration reaches the same conclusion as does the Coleman Declaration" (*id.* at 12), even a cursory comparison shows that the Government's conflicting declarations raise fact issues that this Court should not resolve on a motion to dismiss.

Mrs. Martoma's Opposition demonstrates that the Coleman Declaration is unreliable. Specifically, the Coleman Declaration states that the entirety of the 2008 Bonus, amounting to $6,505,181.50, was paid into the USAA -2552 Account. (Coleman Decl. ¶ 6.) The Coleman Declaration inaccurately concludes, however, that (1) approximately $6,486,243.27 transferred from the USAA -2552 Account to the Amex Account can be traced to the 2008 Bonus (*id.* ¶¶ 12-13); (2) $196,000 paid from the USAA -2552 Account for a down payment on the Florida Home can be traced to the 2008 Bonus (*id.* ¶¶ 15, 18); (3) approximately $101,000 transferred from the USAA -2552 Account to the ING -4626 Account can be traced to the 2008 Bonus (*id.* ¶¶ 25-27); and (4) approximately $1,000,000 transferred from the USAA -2552 Account to the Vanguard Account can be traced to the 2008 Bonus (*id.* ¶¶ 21-23). The Coleman Declaration does not explain how approximately $7.8 million in transfers from the USAA -2552 Account can be traced to a 2008 Bonus of only $6.5 million paid into the USAA -2552 Account. (Opp. at 14-15.)

In addition, Mrs. Martoma's Opposition details how the Coleman Declaration shows that the Specific Properties were acquired with commingled funds (or, in the case of the Vanguard Account, entirely untainted funds) and are not traceable to the conduct of which the Defendant was convicted. Specifically: (1) at least $800,000 in untainted funds was transferred from the USAA -2552 Account to the Amex Account, (2) at least $177,062 of the down payment for the Florida Home was made with untainted funds from the USAA -2552 Account and a portion of the remainder of the purchase price might have been paid with untainted funds from the Amex

Account; (3) the approximately $1 million transferred from the USAA -2552 Account to the Vanguard Account was untainted funds; and (4) the approximately $101,000 transferred from the USAA -2552 Account to the ING -4626 Account was untainted funds and some or all of the remaining amount subject to forfeiture in the ING -4626 Account might have been untainted funds from the Amex Account.  (Opp. at 21-23.)

To address "the questions raised by Mrs. Martoma" (Gov't Reply at 11), the Government submits the Yagoda Declaration, which arbitrarily changes the conclusions of the Coleman Declaration.  Specifically:

- Like the Coleman Declaration, the Yagoda Declaration states that the $6,505,181.50 from the 2008 Bonus was paid into the USAA -2552 Account. (*Compare* Coleman Decl. ¶ 6 *with* Yagoda Decl. ¶ 6.)

- Like the Coleman Declaration, the Yagoda Declaration states that on or about December 16, 2010, approximately $7,300,000 was transferred from the USAA -2552 Account to the Amex Account.  (*Compare* Coleman Decl. ¶ 12 *with* Yagoda Decl. ¶ 11.)

- But, where the Coleman Declaration states that approximately $6,486,243.27 of the $7,300,000 transferred from the USAA -2552 Account to the Amex Account is traceable to the 2008 Bonus (Coleman Decl. ¶ 12), the Yagoda Declaration states that only $5,156,529.27 is traceable to the 2008 Bonus (Yagoda Decl. ¶ 11).

In short, the Yagoda Declaration rewrites the conclusions of the Coleman Declaration – without any explanation or justification – reducing by ***more than $1.3 million*** the amount transferred from the USAA -2552 Account to the Amex Account that is traceable to the 2008 Bonus.  The impetus for this change is clear: to resolve the discrepancies identified by Mrs. Martoma between the amounts paid to and from the USAA -2552 Account that can be traced to the 2008 Bonus and to claim that the down payment for the Florida Home, the entire Vanguard Account, and the amount subject to forfeiture in the ING -4626 Account consist entirely of tainted funds.  But the Government cannot correct the errors in the Coleman Declaration and salvage its tracing analysis

simply by having Mr. Yagoda play with the numbers without any basis in fact.

Moreover, as a matter of law, the Yagoda Declaration provides no support for the Government's motion because "it is improper for a court to consider declarations and affidavits on a motion to dismiss." *Novie v. Village of Montebello*, No. 7:10-cv-09436, 2012 WL 3542222, at *9 (S.D.N.Y. Aug. 16, 2012). That is all the more true when the declaration is submitted for the first time with a reply brief. *See, e.g., United States v. Hughes*, No. 14-CV-0719, 2015 WL 729735, at *2 (N.D.N.Y. Feb. 19, 2015) ("A party may not submit new materials in a reply to meet its initial burden."); *State Farm Mut. Auto. Ins. Co. v. Cohan*, No. 09-CV-2990, 2010 WL 890975, at *4 (E.D.N.Y. Mar. 8, 2010) ("The Court does not credit Dr. Cohan's second affidavit, as Defendants improperly submitted it with their reply papers.").

Instead, the Yagoda Declaration confirms that the Government's motion to dismiss should be denied. Courts routinely deny motions to dismiss (*e.g.*, motions to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction) where there are factual disputes arising from conflicting affidavits and declarations (albeit usually submitted by opposing parties rather than the same party). *See, e.g.*, *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala,* 989 F.2d 572, 580 (2d Cir. 1993) ("If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."); *Cauthorne v. Mutual Life Ins. Co. of N.Y.*, No. 96-CV-0232, 1997 WL 154019, at *3 (S.D.N.Y. Apr. 1, 1997) (holding that "it would be improper to grant [a defendant]'s motion to dismiss at this stage of the case" in light of "the affidavits' conflicting accounts" and that "it would be improper for the Court to make any dispositive ruling on this issue before Plaintiff has had the opportunity to conduct discovery");

*Jezarian v. Csapo*, No. 72-CV-1671, 1973 WL 371, at *2 (S.D.N.Y. Feb. 22, 1973) ("The conflicting affidavits submitted by the parties on the issue of whether defendant Sibley had access to inside information raises material issues of fact which cannot be decided on this motion to dismiss."); *see also Vitrano v. State Farm Ins. Co.*, No. 08-CV-00103, 2008 WL 2696156 (S.D.N.Y. July 8, 2008) (converting a motion to dismiss into a motion for summary judgment and denying the motion because "the conflicting allegations create an issue of fact").

This Court should do the same here – especially where ***the Government's numbers still do not add up***. According to the Yagoda Declaration:

- As of December 16, 2010, $6,486,243.27 in the USAA -2552 Account was traceable to the 2008 Bonus, which was then traced to the Specific Properties. (*Id.* ¶ 10.) On or about that day, approximately $5,156,529.27 traceable to the 2008 Bonus was transferred to the Amex Account, leaving in the USAA -2552 Account "$1,196,000 [that] is traceable to the Bonus Payments ($6,486,243.27 minus $5,156,529.27 equals $1,196,000)." (*Id.* ¶ 11.) ***That is wrong: $6,486,243.27 minus $5,156,529.27 equals $1,329,714, not $1,196,000.***

- On or about December 21, 2010, approximately $196,000 traceable to the 2008 Bonus was paid from the USAA -2552 Account for a down payment on the Florida Home, leaving "$1,714,208.65 in crime proceeds remaining in the USAA -2552 Account after the down payment was made." (*Id.* ¶ 13.) ***That is wrong: Assuming that the Yagoda Declaration reflects "[t]he tracing of the remaining $1,196,000 in criminal proceeds out of the USAA -2552 Accounts" as the Declaration states (id. ¶ 11), the amount remaining in the USAA -2552 Account after making the down payment would have been $1,000,000 ($1,196,000 – $196,000).***

- On or about January 5 and 10, 2011, $101,000 traceable to the 2008 Bonus was transferred from the USAA -2552 Account to the ING -4626 Account. (*Id.* ¶¶ 22-23.) ***That is wrong: only $65,102.23 ($1,000,000 – $934,897.77) traceable to the 2008 Bonus remained in the USAA -2552 Account at that time because $934,897.77 traceable to the 2008 Bonus had already been transferred from the USAA -2552 Account to the Vanguard Account. (Id. ¶¶ 18-19.)***

In sum, the Yagoda Declaration provides no basis for the Government's motion to dismiss as a matter of law because it is improper for this Court to consider the Yagoda Declaration (especially since the Yagoda Declaration was submitted for the first time with the Government's

5

Reply). Rather, the Yagoda Declaration merely confirms that the Government's motion to dismiss should be denied because the Yagoda Declaration's arbitrary revisions to the Government's tracing analysis create fact disputes with the Coleman Declaration, as well as a series of errors within the Yagoda Declaration itself.

II. **THE PRELIMINARY ORDER DOES NOT FORFEIT MRS. MARTOMA'S INTERESTS IN THE SPECIFIC PROPERTIES.**

    A. **By Its Own Terms, the Preliminary Order Does Not Forfeit Mrs. Martoma's Interests in the Specific Properties.**

The Government may not use the Preliminary Order to forfeit **Mrs. Martoma's** interests in the Specific Properties. (Opp. at 7-9.) In *Pacheco*, 393 F.3d 348, the Second Circuit held that "a criminal defendant can only be made to forfeit what was his in the first place," *id.* at 349, and consequently that "the government only acquired [the defendant]'s interest" in forfeited property, *id.* at 356. *Pacheco* is dispositive, and the Government's motion to dismiss should be denied.

The Government's only response is a half-hearted attempt to distinguish *Pacheco* in a footnote. (Gov't Reply at 3 n.3.) Specifically, the Government argues that, "[i]n *Pacheco*, it was undisputed that the non-spouse petitioner was a bona fide purchaser for value who had obtained her asserted interest in the premises after the conduct giving rise to the forfeiture because she had acquired her ownership interest in an arm's length transaction at a foreclosure sale" while, "by contrast and as demonstrated, Mrs. Martoma was not a bona fide purchaser for value in an arm's-length transaction with her husband." (*Id.*)

The Government badly misconstrues *Pacheco*. It was not undisputed that the petitioner was a bona fide purchaser for value. Rather, the Government argued that "Pacheco [*i.e.*, the petitioner] was **not** a bona fide purchaser of the Premises because she was on notice of the government's interest." 393 F.3d at 351 (emphasis added). And it was not undisputed that the petitioner had acquired an ownership interest in the forfeited property in an arm's length

6

transaction at a foreclosure sale.  The Government argued that "the foreclosure sale from which Pacheco's title originated was *invalid*." Id. (emphasis added).  Indeed, the Second Circuit *rejected* the Government's arguments and held that the petitioner was a bona fide purchaser for value precisely because the criminal defendant "could only have forfeited his interest in the Premises," and, "[i]f [the defendant] forfeited only his interest, then the foreclosure sale was valid with respect to [his wife]'s interest." Id. at 355.

As in *Pacheco*, this Court should conclude that the Government cannot forfeit Mrs. Martoma's interest in the Specific Properties through her husband, the Defendant.  By its own terms, this Court's Preliminary Order limits forfeiture to the Defendant's interests only.  Thus, the Court should deny the Government's motion to dismiss the Petition.

### B. The Preliminary Order Does Not Forfeit Mrs. Martoma's Interests in the Specific Properties Because They Were Never Possessed by the Defendant.

In *United States v. Contorinis*, 692 F.3d 136 (2d Cir. 2012), the Second Circuit expressly held that "a defendant may be ordered to forfeit all monies received *by him* as a result of the fraud" but not "proceeds [that] go directly to *an innocent third party* and are never possessed by the defendant." Id. at 147 (emphasis added; internal quotation marks omitted).  Since Mrs. Martoma adequately alleges that her interests in the 2008 Bonus and Specific Properties went directly to her and were never possessed by the Defendant, this Court should not order the forfeiture of any portion of Mrs. Martoma's interests and should instead deny the Government's motion to dismiss.  (Opp. at 9-13.)

To avoid the consequences of *Contorinis*, the Government asserts that the 2008 Bonus "was undoubtedly in the defendant's possession and under his control" and that "Mrs. Martoma alleges no facts to the contrary." (Gov't Reply at 3.)  That is demonstrably false.  Mrs. Martoma adequately alleges that the 2008 Bonus was in her possession and under her control.

7

Specifically, Mrs. Martoma adequately alleges (and the Government does not dispute) that she held a tenancy by the entirety interest in the 2008 Bonus – *i.e.*, an inseverable interest in the entirety of the 2008 Bonus that gave her possession of the Bonus, control over its disposition, and protection from its seizure by the state or creditors.  (Opp. at 10-11.)  In addition, Mrs. Martoma adequately alleges that the Specific Properties were in her possession and under her control.  Specifically, Mrs. Martoma adequately alleges (and the Government does not dispute) that her tenancy by the entirety interest in the 2008 Bonus was the subject of a constructive trust, which was in force when any portion of the Bonus was subsequently transferred to any accounts that were not held solely or jointly in her name (*e.g.*, the Amex Account).  (Opp. at 11-12.)

In short, Mrs. Martoma adequately alleges that she ***always*** had possession and control over her interests in the 2008 Bonus and Specific Properties.  Therefore, the Preliminary Order, which only addressed the Defendant's interests, does not supply any basis to find that Mrs. Martoma's interests have been forfeited.  *Contorinis*, 692 F.3d at 147 ("[W]e are not aware of, and the government has not cited, any decision standing for the proposition that a defendant may be required to forfeit funds never acquired by him or someone working in concert with him.").

### C. The Government's Motion to Dismiss the Petition and Forfeit Mrs. Martoma's Interests in the Specific Properties Raises Serious Constitutional Concerns.

The Government argues that, although "Mrs. Martoma may not relitigate this Court's finding in the underlying criminal case that the Specific Properties are subject to forfeiture because they are traceable to defendant's crime,"[2] that "in no way infringes upon her due process

---

[2] The Government relies on *DSI Assoc. LLC v. United States,* 496 F.3d 175 (2d Cir. 2007), for this point.  (Gov't Reply at 7 & n.6)  In *DSI*, however, the Second Circuit held that the petitioner could not challenge the validity of the forfeiture order because it concededly lacked standing to recover an alleged interest in the forfeited property as a general creditor and instead sought to re-litigate the defendant's interests.  *DSI*, 496 F.3d at 184-

8

rights because this ancillary proceeding provides her with an opportunity to be heard at a meaningful time and meaningful manner to prove that she has a superior legal interest in property that will otherwise be forfeited." (Gov't Reply at 7-8 (internal quotation marks omitted).) The Government's *ipse dixit* does not address, much less resolve, Mrs. Martoma's due process concerns.

*First*, Mrs. Martoma does not seek to "re-litigate" matters already decided by this Court but rather to assert and litigate **her own** interests in the Specific Properties at the first available opportunity. The Government's position is ironic since it – not Mrs. Martoma – attempts to re-litigate its own tracing analysis in its Reply through the Yagoda Declaration.

*Second*, the Second Circuit has recognized that, where "a criminal's activity may result in the forfeiture of an innocent third party's interest in property," it "may thus constitute an unconstitutional taking of a third party's interest or a deprivation of that party's property without due process, in violation of the Fifth Amendment." *Pacheco*, 393 F.3d at 354. Indeed, " [i]f this court were to deem forfeited the entire estate despite a valid claim of partial ownership by a third party, it would punish the third party, against whom no jury has returned a verdict of guilt, and may therefore raise constitutional questions of a whole different order." *Id.* (alterations and internal quotation marks omitted). As the Second Circuit makes clear, it is not enough to hope – as the Government does – that "[d]ue process is satisfied because if the property really belongs to the third party, she will prevail and recover her property whether there were defects in the criminal trial or the forfeiture process or not." (Gov't Reply at 8 (alterations and internal quotation marks omitted).)[3]

---

85. In contrast, Mrs. Martoma can challenge the Preliminary Order, the Coleman Declaration, and the Yagoda Declaration, because she has standing to recover her interests in the Specific Properties (as the Government does not dispute) and seeks to litigate her own interests for the first time.

[3] The Government asserts that the Fourth Circuit's decision in *United States v. Reckmeyer*, 836 F.2d 200, 206

Mrs. Martoma's due process rights would be infringed if she were now barred from challenging the Preliminary Order, the Coleman Declaration, and the Yagoda Declaration as they apply to her own interests in the Specific Properties. Not only was she previously barred by statute from intervening in the Defendant's criminal action, 21 U.S.C. § 853(k), but the Government offers those documents as a basis for this Court to dismiss Mrs. Martoma's ancillary proceeding and thwart her only opportunity for a hearing. The Government's motion to dismiss the Petition should be denied.

## III. THE PETITION ADEQUATELY ALLEGES THAT MRS. MARTOMA'S INTERESTS IN HER PORTION OF THE SPECIFIC PROPERTIES ARE SUPERIOR TO THE GOVERNMENT'S AND DEFENDANT'S INTERESTS UNDER 21 U.S.C. § 853(N)(6)(A).

### A. Mrs. Martoma's Interests in Her Portion of the Specific Properties Are Superior to the Government's Interests Because the Specific Properties Are Substitute Assets Acquired with Commingled Funds.

Although the Government does not dispute that the Specific Properties were acquired with commingled funds, the Government nevertheless argues that the Specific Properties do not constitute substitute assets under *United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986). (Gov't Reply at 11.) The Government is wrong.

*First*, the Government accuses Mrs. Martoma of not "providing any authority for the proposition" that the *Banco Cafetero* accounting principles do not apply to criminal forfeiture. (Gov't Reply at 10.) That is simply false. Mrs. Martoma cites *United States v. All Funds Presently on Deposit or Attempted to be Deposited in Any Accounts Maintained at American Express Bank*, 832 F. Supp. 542, 556-57 (E.D.N.Y. 1993), which explains that the *Banco*

---

(4th Cir. 1987) – *i.e.*, that "[s]erious due process questions would be raised, however, if third parties asserting an interest in forfeited assets were barred from challenging the validity of the forfeiture" – is "an outlier" to the extent that it disagrees with an advisory committee note to Federal Rule of Criminal Procedure 32.2. (Gov't Reply at 7-8 n.6.) The constitutional due process protections at issue here, however, are no "outlier," and they certainly trump any advisory committee note.

*Cafetero* tracing analysis "appear[s] to have been designed by courts to deal with the problem posed by fungible property" in civil forfeiture actions. (Opp. at 20 n.8.) And Mrs. Martoma cites *United States v. Salvagno*, No. 5:02-cr-00051, 2006 WL 2546477, at *10 (N.D.N.Y. Aug. 28, 2006), which did ***not*** apply the *Banco Cafetero* accounting principles to criminal forfeiture. (Opp. at 19-21 & n.9.)

*Second*, the Government argues that "courts including the Second Circuit have routinely applied the *Banco Cafetero* accounting principles in criminal cases." But the Government cites no Second Circuit case applying *Banco Cafetero* accounting principles to criminal forfeiture.[4] And, contrary to the Government's claims, the holding of *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996) – *i.e.*, that "when tainted and untainted funds are co[m]mingled it is impossible to separate out the tainted funds" (Gov't Reply at 11) – has been applied to criminal forfeiture proceedings in this Circuit. In *Salvagno*, the court held: "[O]nce a defendant has commingled [tainted] funds with untainted funds – whether in a bank account or in a tattered suitcase – such that they 'cannot be divided without difficulty,' 21 U.S.C. § 853(p)(5),[5] the government must satisfy its forfeiture judgment through the substitute asset provision." 2006 WL 2546477, at *10 (quoting *Voigt*, 89 F.3d at 1088).[6]

---

[4] The Government cites *United States v. Coriaty*, 300 F.3d 244, 251-253 (2d Cir. 2002), but that case applied *Banco Cafetero* accounting principles to a "restitution penalty on a criminal defendant" – not to criminal forfeiture – as the Government admits. (Gov't Reply at 10.)

[5] 21 U.S.C. § 853(p)(5) was renumbered as § 853(p)(1)(E) on October 26, 2001.

[6] The Government cites two decisions from this Circuit that apply *Banco Cafetero* accounting principles to criminal forfeiture, *United States v. Cosme*, No. 13 CR. 43 HB, 2014 WL 1584026 (S.D.N.Y. Apr. 21, 2014), and *United States v. Corey*, No. 04CR349, 2006 WL 1281824 (D. Conn. May 9, 2006). (Gov't Reply at 10.) At most, the Government has identified a split in this Circuit on the treatment of commingled funds. Mrs. Martoma respectfully submits that this Court should follow the reasoning of *Salvagno*, which is compelling on the facts of this case: "Much like the circumstances in *Voigt,* numerous intervening deposits and withdrawals into the AAR operating account prior and subsequent to the deposit of the tainted funds make it virtually impossible to say that any one contribution into the company's pension fund is traceable to property involved in the RICO conspiracy. . . . By enacting § 1963(m) [*i.e.*, the substantively identical substitute assets provision under RICO], Congress precisely intended to insulate the courts from serving as either an actuary or

11

***Third***, the Government argues that "any 'difficulty' Mrs. Martoma experienced in tracing her husband's crime proceeds to the Specific Properties is attributable to his movement of those proceeds through numerous accounts, in a series of unnecessary transfers, in an attempt to layer the proceeds." (Gov't Reply at 11.) That is a red herring. There is no factual basis for the Government's assertion that the Defendant "layered" any proceeds through "a series of unnecessary transfers," much less the Government's attempt to hold the Defendant's conduct against Mrs. Martoma. In any event, the reason that funds were commingled is legally irrelevant; the fact that funds were commingled alone is enough to satisfy 21 U.S.C. § 853(p). *See, e.g., Salvagno*, 2006 WL 2546477, at *10.

### B. Mrs. Martoma's Constructive Trust Interests in Her Portion of the Specific Properties Are Superior to the Government's and Defendant's Interests.

"The Government does not dispute that a constructive trust may impose a legal interest, but maintains that there are no facts in this case that could support the imposition of a constructive trust in 2005." (Gov't Reply at 4.) The Government's arguments – which simply ignore Mrs. Martoma's allegations – should be rejected.

***First***, the Government argues for the first time in its Reply that "Mrs. Martoma's claim fails because she does not adequately plead all of the elements that are required to give rise to a constructive trust under Florida law." (*Id.* at 4-5.) Since the Government did not make this argument in its opening Memorandum, the argument has been waived. *See, e.g., Coach, Inc. v. O'Brien,* No. 10-CV-6071, 2011 WL 3462317, at *5 n.9 (S.D.N.Y. July 27, 2011) ("It is well-settled that arguments advanced for the first time in a reply brief should not be considered."). Moreover, the Government is wrong. As the Opposition details, Mrs. Martoma adequately

---

accountant or to labor with a calculator in hand on these types of matters." *Salvagno*, 2006 WL 2546477, at *12-13.

12

alleges all of the elements of a constructive trust under Florida law in her Petition. (Opp. at 11-12.)

*Second*, the Government argues that "there is absolutely no evidence that property was transferred in 2005, because the defendant didn't commit the fraud and receive his bonus until years later." (Gov't Reply at 5.) The Government continues to misconstrue the nature of Mrs. Martoma's constructive trust interests in the Specific Properties. Mrs. Martoma adequately alleges that, in 2005, she agreed to give up her career to care for the household and children based on the promise that she would have equal, joint ownership of all family income and assets – including all property derived from the Defendant's work outside of the household. (Petition ¶¶ 4, 26.) That created a constructive trust over all of the Defendant's present and future income and the family's present and future property, to which Mrs. Martoma traces her interests in the Specific Properties. (Opp. at 25-26.) It does not matter when the 2008 Bonus was paid; Mrs. Martoma's constructive interests arose in 2005.[7]

*Third*, the Government argues both that the Defendant was not unjustly enriched "because [his] interests in the assets traceable to the 2008 bonus have already been forfeited to the Government" and that the Defendant would be unjustly enriched by a constructive trust because he is still married to Mrs. Martoma. (Gov't Reply at 5 (emphasis omitted).) That makes no sense. Mrs. Martoma adequately alleges constructive trust interests in the Specific Properties that are hers and hers alone. If the Defendant forfeited Mrs. Martoma's interests in the Specific Properties – as the Government argues throughout its opening Memorandum and Reply – then he

---

[7] The Government seeks to distinguish the many Florida cases recognizing a constructive trust in future proceeds in a wide range of circumstances (*see* Opp. at 25-26) on the bases that (1) "divorce law does not govern a spouse's claimed interest in forfeited property" and (2) they are "not analogous to the constructive trust Mrs. Martoma is asking this court to impose." (Gov't Reply at 4-5.) The Government misses the point. These cases all show that, under Florida law, Mrs. Martoma can and does have constructive trust interests in the Specific Properties that arose before the 2008 Bonus was paid.

13

necessarily appropriated those interests first and consequently was unjustly enriched. Imposing a constructive trust would protect Mrs. Martoma's interests, not unjustly enrich the Defendant.

*Fourth*, the Government argues that "imposing a constructive trust in favor of Mrs. Martoma's interest . . . would also mean that any individual who gave up his or her income-producing job in reliance on the income of his or her spouse could allege a constructive trust establishing an ownership right in the spouse's eventual crime proceeds." (Gov't Reply at 5.) In reality, to dismiss Mrs. Martoma's Petition on the pleadings would mean that a wife who gives up her career in reliance on the promise of equal, joint ownership of all family income and assets could have her house and property – *i.e.*, the very means to support her children – taken by the Government without so much as a hearing. Mrs. Martoma deserves her own day in court.

### IV. THE PETITION ADEQUATELY ALLEGES THAT MRS. MARTOMA IS A BONA FIDE PURCHASER FOR VALUE OF HER INTERESTS IN THE SPECIFIC PROPERTIES UNDER 21 U.S.C. § 853(N)(6)(B).

The Government argues only that "Mrs. Martoma does not qualify as a bona fide purchaser for value" because "[t]here is no evidence that the purported exchange of Mrs. Martoma's household work for an interest in her husband's bonus payments was an arm's-length transaction." (Gov't Reply at 6.) Yet the Government does not dispute that there is no authority holding that Florida law requires that a party engage in an arm's-length transaction in order to be considered a bona fide purchaser for value. (Opp. at 29.) Instead, the Government argues that it is "irrelevant" if "Florida law does not require a bona fide purchaser to have acquired her property interest by way of an arm's length transaction." (Gov't Reply at 6.)

The Government simply disregards both its own prior briefing and binding Second Circuit precedent. In its opening Memorandum, the Government conceded that "the question of whether a petitioner fits within the definition of a bona fide purchaser for value is determined by state law." (Gov't Mem. at 13 (citation omitted).) Indeed, that is the law in the Second Circuit:

14

"[W]hether a petitioner is a bona fide purchaser is a question appropriately determined by reference to state law." *Pacheco*, 393 F.3d at 353 (cited by Gov't Mem. at 13). The Government may not impose an additional requirement on Mrs. Martoma that does not exist under Florida law. Mrs. Martoma may seek to recover her interests in the Specific Properties through her Petition as a bona fide purchaser for value, where the "value" she offered was sacrificing her career, and dedicating her time and labor to the care of her family and household over the course of several years.

## CONCLUSION

For the foregoing reasons and those in the Opposition, this Court should deny the Government's motion to dismiss Mrs. Martoma's Petition.

Dated:  New York, New York  
        March 23, 2015

Respectfully submitted,

GOODWIN PROCTER LLP

By: /s/ Richard M. Strassberg  
Richard M. Strassberg (RS5141)  
 (rstrassberg@goodwinprocter.com)  
Daniel Roeser (DR2380)  
 (droeser@goodwinprocter.com)  
The New York Times Building  
620 Eighth Avenue  
New York, New York 10018  
Telephone: (212) 813-8800  
Facsimile: (212) 355-3333

Roberto M. Braceras (RB2470)  
 (rbraceras@goodwinprocter.com)  
53 State Street  
Boston, Massachusetts 02109  
Telephone: (617) 570-1000  
Facsimile: (617) 523-1231

*Attorneys for Rosemary A. Martoma*